# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                )
                                                )
**DONALD THOMAS SCHOLZ,**                       )
                                                )
      **Plaintiff and**            )
      **Counterclaim Defendant,**   )
                                                )
   **v.**                                    )    **Civ. Action No. 13-cv-10951**
                                                )
                                                )
**BARRY GOUDREAU,**                             )
                                                )
      **Defendant and**            )
      **Counterclaim Plaintiff.**   )
                                                )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                    **September 21, 2015**

## I.    Introduction

Plaintiff Donald Thomas Scholz ("Scholz") has filed this lawsuit against Defendant Barry Goudreau ("Goudreau") alleging federal trademark infringement in violation of 15 U.S.C. § 1114(1) (Count I); unfair competition in violation of 15 U.S.C. § 1125(a) (Counts II and III); trademark dilution in violation of 15 U.S.C. § 1125(c) and Mass. Gen. L. c. 110H (Counts IV and VIII); contributory trademark infringement and vicarious trademark infringement in violation of 15 U.S.C. § 1114(1) (Counts V and VI); trademark infringement under Massachusetts common law (Count VII); unfair competition in violation of Massachusetts common law (Count IX); violation of Mass. Gen. L. c. 93A ("Chapter 93A") (Count X); violation of the Truth in Music Statute, Mass. Gen. L. c. 93, §§ 12 and 43B (Count XI); breach of contract (Count XII); and breach of

the implied covenant of good faith and fair dealing (Count XIII).  First Amended Comp., D. 43 ("FAC").  Goudreau asserts five counterclaims:  declaratory judgment (Count I); breach of contract (Count II); breach of the implied covenant of good faith and fair dealing (Count III); violation of Chapter 93A (Count IV); and abuse of process (Count V).  D. 45.  Goudreau has moved for summary judgment on Scholz's claims, D. 83, and Scholz has moved for summary judgment on Goudreau's counterclaims, D. 88.  For the reasons stated below, the Court ALLOWS in part and DENIES in part Goudreau's motion and ALLOWS in part and DENIES in part Scholz's motion.

## II.     Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law."  Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).  The movant bears the burden of demonstrating the absence of a genuine issue of material fact.  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986).  If the movant meets its burden, the non-moving party may not rest on the allegations or denials in her pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor."  Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010).  "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'"  Id. (quoting Anderson, 477 U.S. at 249) (alteration in original).  The Court "view[s] the record in the

light most favorable to the nonmovant, drawing reasonable inferences in his favor."

Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III.     Factual Background

Scholz and Goudreau were both members of the rock band BOSTON.  D. 92 (Goudreau's statement of undisputed material facts) ¶ 1; D. 99 (Scholz's response to Goudreau's statement of undisputed material facts) ¶ 1; D. 101 (Scholz's counterstatement of additional material facts) ¶¶ 2-3.  Goudreau, a guitar player, performed on BOSTON's first two albums and performed with the band from approximately 1976 until 1979.  D. 92 ¶¶ 2, 4; D. 99 ¶¶ 2, 4.  Goudreau left the band in 1981, filing a lawsuit against Scholz and other band members in 1982 regarding the rights and obligations of the parties.  D. 92 ¶ 8; D. 99 ¶ 8.  In May 1983, the parties to the suit executed a settlement agreement (the "Settlement Agreement").  D. 92 ¶ 9; D. 99 ¶ 9.  Pursuant to the Settlement Agreement, Goudreau continued to receive a one-fifth royalty for the songs on the first two BOSTON albums.  D. 92 ¶ 10; D. 99 ¶ 10.  Regarding Goudreau's use of the BOSTON name, the Settlement Agreement stated:

> 1.       By the execution hereof, the parties acknowledge that Goudreau is no longer, and he has ceased to be, a partner in Boston, and as such shall have no interest, right nor title to the name "BOSTON," nor to any recording royalties, performing rights royalties, performance income, copyright interests or payments, or financial interest therein, except as provided herein.
>
> . . .
>
> 2D.    The Name "BOSTON":  The parties hereto expressly agree that Goudreau may use the term "Formerly of Boston" for and in conjunction with any biographical usage with respect to future performances, but, except to this extent, Goudreau shall have no other interest, right or title to the name "BOSTON."  Without limiting the foregoing, Goudreau may not use the name "BOSTON" for or in conjunction with any advertisement or promotion.

D. 43-3 at 3, 8-9.

Goudreau's music career continued following his departure from BOSTON.  He has been a member of, or performed with, various musical groups at a number of venues. Scholz's FAC focuses on the advertisements and promotions associated with five particular groups or performances involving Goudreau:  performances at the Cannery Casino Hotel, promoted by Paul Curcio ("Curcio"); "The Best of Boston" performances, promoted by Maximus Entertainment and its Chief Executive Officer, Robert Devine ("Devine"); a musical revue called World Class Rockers ("WCR"); the James Montgomery Blues Band ("JMBB"); and Ernie and the Automatics ("EATA").  D. 43 ¶¶ 30-32, 34, 36, 38, 40; D. 92 ¶ 25. The crux of Scholz's claims is that Goudreau violated the Settlement Agreement and infringed on Scholz's BOSTON trademarks by using or allowing the use of descriptive terms that deviate from "formerly of Boston," as specified by the Settlement Agreement, in connection with these performances and musical groups. D. 43 ¶¶ 15-17, 51, 57, 63, 70, 77, 82, 90, 96, 102.

Scholz has sued or threatened to sue Goudreau prior to this action.  Scholz pursued similar claims in a 2009 complaint that was later dismissed.  D. 96 (Goudreau's statement of additional undisputed material facts in opposition to Scholz's motion for summary judgment) ¶¶ 77-80; D. 104 (Scholz's response to Goudreau's statement of additional undisputed material facts) ¶¶ 77-80.  Scholz again sued in 2010, asserting the same claims as in the 2009 action, but the complaint was never served.  D. 96 ¶¶ 81-83; D. 104 ¶¶ 81-83.  Scholz threatened to pursue the same causes of action in 2011, providing Goudreau's counsel with a draft complaint that ultimately was never filed.  D. 96 ¶¶ 84-85; D. 104 ¶¶ 84-85.  Goudreau's counterclaims are primarily premised on Scholz's litigiousness and his additional efforts to thwart Goudreau's ability to promote

himself.  See, e.g., D. 45 ¶ 46 (alleging that "[t]here are literally dozens of threatening letters . . . in which Scholz uses his purported trademark rights in BOSTON to interfere with Goudreau's efforts to perform for venues and promoters").

## IV.    Procedural History

Scholz instituted the present action on April 17, 2013.  D. 1.  Goudreau answered and asserted five counterclaims against Scholz.  D. 7.  Scholz's motion to dismiss the counterclaims, D. 10, was denied on December 26, 2013.  D. 22.  On January 17, 2014, Scholz moved for leave to amend his complaint, D. 30, which the Court allowed on May 19, 2014, D. 41.  Scholz filed the FAC, the operative complaint, on May 21, 2014, asserting the thirteen claims now before the Court.  D. 43.  Goudreau answered the FAC and asserted five counterclaims against Scholz.  D. 45. Goudreau has now moved for summary judgment.  D. 83.  Simultaneously, Scholz moved for summary judgment on Goudreau's counterclaims.  D. 88.  The Court heard the parties on the pending motions and took these matters under advisement.  D. 109.

## V.    Goudreau's Motion for Summary Judgment

### A.    Direct Trademark Infringement

#### 1.    Goudreau's performances and recordings

The Lanham Act, 15 U.S.C. § 1114(1), prohibits infringement of registered trademarks, providing:

> Any person who shall, without the consent of the registrant—(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or to cause mistake, or to deceive; . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

Federal trademark infringement under the Lanham Act and under Massachusetts common law require that a plaintiff prove that "(1) the plaintiff owns and uses the disputed marks; (2) the defendant used similar or identical marks without permission; and (3) unauthorized use likely confused consumers, harming the plaintiff." Lyons v. Gillette, 882 F. Supp. 2d 217, 226 (D. Mass. 2012) (citing Venture Tape Corp. v. McGills Glass Warehouse, 540 F.3d 56, 60 (1st Cir. 2008)). The dispute here centers on the second prong. Goudreau asserts that the infringing uses of the BOSTON mark about which Scholz complains were, in every instance, the result of actions of third parties, not of Goudreau. D. 91 at 8. The Court agrees that Scholz has failed to proffer evidence that Goudreau was responsible for any of the allegedly infringing advertisements and promotions that are the subject of the FAC. Without evidence that Goudreau himself directly participated in the infringing activity, Scholz's claims for direct infringement fail. See Lyons, 882 F. Supp. 2d at 226.

Scholz's trademark infringement allegations center on advertisements for and Goudreau's involvement in five bands or sets of performances: (1) "The Best of Boston" series, promoted by Maximus Entertainment and Devine; (2) the shows with Francis Migliaccio ("Fran Cosmo") at the Cannery Casino Hotel organized by Curcio; (3) the JMBB; (4) WCR; and (5) EATA led by Ernie Boch, Jr. ("Boch"). D. 91 at 3-5.

### a. "The Best of Boston" series

Scholz points to an advertisement for The Best of Boston series stating that the show featured "original founding Boston member Barry Goudreau." D. 102 at 3. The wording of the advertisement deviates from the "formerly of Boston" language permitted by the Settlement Agreement. Goudreau replies that he did not perform in any shows

promoted as "The Best of Boston" because he concluded that the proposed promotional materials were "asking for trouble" due to the use of the "The Best of Boston" moniker. D. 105 at 5; D. 92 ¶¶ 28-30. Goudreau further demanded that he be omitted from any advertisements already created. Id. Scholz does not direct the Court to any evidence that Goudreau played any role in the naming or promotion of the series or that Goudreau performed. See D. 101 ¶ 60; D. 102 at 7. The Court thus concludes that Goudreau cannot be liable for direct infringement with respect to The Best of Boston series.

b.  *Cannery Casino Hotel*

Scholz next alleges that the shows at the Cannery Casino Hotel were marketed by Curcio with materials that referred to Goudreau as BOSTON's former "lead" guitarist and an "original" BOSTON member. D. 99 ¶¶ 21-22, 24. Scholz points to promotional materials circulated by Curcio to potential concert purchasers and venues. D. 99-36 at 13-14. He also cites a billboard-type of advertisement stating that Cosmo and Goudreau were "Playing the Hits of BOSTON." D. 99 ¶ 20; D. 99-19. Scholz does not, however, offer evidence that Goudreau was directly responsible for these promotions and advertisements. D. 102 at 6. Without such proof, Goudreau is not liable for direct trademark infringement.

c.  *JMBB*

According to Scholz, Goudreau performed in a concert with the JMBB where he was advertised as the "lead guitarist rock legend from the band BOSTON." D. 101 ¶¶ 60, 84. While acknowledging the advertisement, Goudreau urges that the advertisement submitted by Scholz omits the complete advertisement including a fuller description of Goudreau as "former band member from The Band BOSTON." D. 87-29; D. 87-30. The

7

complete advertisement appears to be a website printout containing both the permitted descriptions containing the words "former" and "formerly" as well as the prohibited description "lead guitarist rock legend from the band BOSTON."   Id.   While the promotion thus infringes on Scholz's mark, once again Scholz provides no evidence that Goudreau was the party responsible for the promotion.  D. 101 ¶¶ 60, 84.  Without such evidence, Goudreau cannot be liable for direct trademark infringement.

### d. WCR

Scholz's complaint alleges that WCR "promoted Goudreau's work as a 'trademark' of the BOSTON sound on a variety of 'smash singles . . . and other chart-toppers.'"  FAC ¶ 38.  Whatever that promotion may be, it does not appear to be part of the record before the Court.  Instead, Goudreau points to a 2008 advertisement about which Scholz previously complained as infringing on his marks. The WCR advertisement used the BOSTON mark, stating that WCR was "an all-star performance by former members of rock & roll's greatest bands!  Lynyrd Skynyrd, Toto, Steppenwolf, Journey, Santana, and now . . . BOSTON!"  D. 92 ¶ 49.  Goudreau, however, established that he provided permission to WCR to use his name and likeness specifying that Goudreau could be promoted only as "formerly of Boston" or "former member of BOSTON," a fact not disputed by Scholz.  D. 92 ¶ 47; D. 101 ¶ 77.  In addition, WCR provided a "Production/Technical Rider" to venues that specified that Goudreau had to be promoted as a "former member of BOSTON."  D. 92 ¶ 48.  Within five days of receiving a cease and desist letter from Scholz's attorney, WCR or its advertising agency changed the advertisement, which change was acknowledged by Scholz.  Id. ¶ 51.

Scholz provides no evidence that Goudreau was responsible for the disputed advertisement, which was amended only five days after WCR was informed of Scholz's grievances.  Scholz also provides no evidence of the likelihood of confusion based on the use of his mark in the WCR advertisement.[1]  Scholz claims that there were additional instances of WCR's infringement of his marks, including the misrepresentation of "biographical facts on the WCR website concerning Goudreau's former affiliation with BOSTON," D. 99 ¶ 49, but Scholz does not indicate the presence of any record evidence detailing these examples or assigning responsibility for them to Goudreau.  Based on these facts, Goudreau is not liable for infringement with respect to the WCR allegations.

### e.  EATA

Finally, turning to EATA, Scholz maintains that Goudreau was complicit in his promotion as an "original" BOSTON member.  D. 102 at 3, 5-6.  In response, Goudreau contends that he was explicit in his instructions to Boch that he could be promoted only as formerly of BOSTON.  D. 91 at 5.  Several excerpts from Boch's deposition bear out this contention.  See, e.g., D. 99-3 at 9 (stating that Goudreau "always said, 'You've got to put 'former' member'") & at 8 (answering no to question "did [Goudreau] tell you to promote him with the band as [an] 'original member' of BOSTON?").  Despite Goudreau's instructions, he was promoted in advertisements, on EATA's website and on a CD label as an "original" BOSTON member.  D. 99 ¶ 14.  Boch testified, however, that he was responsible for representing Goudreau as an original member, even after

---

[1] Scholz offers an expert report concluding that consumers were confused by certain advertisements that promoted Goudreau's performances.  D. 99-34.  The advertisement at issue with respect to WCR, however, was not one of the two exemplar advertisements used in the study.  Id. at 36, 38.

Goudreau told him to limit promotions to the phrase "former member."  D. 99-3 at 6-7; D. 99 ¶ 14 (Scholz's acknowledgment that Boch referred to Goudreau as an original member even after Goudreau instructed him to say "formerly of BOSTON").

Scholz appears to rely primarily on Goudreau's own counterclaim to show that Goudreau instructed EATA that he be promoted as an "original member of BOSTON." See, e.g., D. 99 ¶¶ 13, 76; D. 102 at 7.  The pleading states that "Goudreau . . . made sure that all venues, managers and other [stet] involved referred to Goudreau as a former member of the band BOSTON in any biographical and other materials associated with Goudreau's performance, using the truthful and accurate descriptive designations of formerly of BOSTON or as an original member of BOSTON."  D. 45 Counterclaim ¶ 53. Despite Goudreau's allegation, however, neither party directs the Court to any evidence that Goudreau actually did direct Boch or anyone else affiliated with EATA to bill him as an original BOSTON member.  D. 101 ¶¶ 64-65.  For these reasons, Goudreau is not liable for direct infringement with respect to the EATA allegations.

### 2.    Goudreau's website

Scholz contends that Goudreau's use of meta-tags such as "BOSTON," "band BOSTON" and "Tom Scholz" on Goudreau's website conclusively demonstrates trademark infringement.  D. 102 at 15.  While use of a mark is evidence of intent to use a mark, "the only relevant intent is intent to confuse."  Jenzabar, Inc. v. Long Bow Grp., Inc., 82 Mass. App. Ct. 648, 661 (2012) (quoting Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 117 (2d Cir. 2009)).  Trademark infringement requires a likelihood of confusion, which means "more than the theoretical possibility of confusion."  International Ass'n of Machinists & Aerospace Workers, AFL-CIO v.

Winship Green Nursing Ctr., 103 F.3d 196, 200 (1st Cir. 1996).   "[T]he allegedly infringing conduct must create a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care."   Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 12 (1st Cir. 2008) (internal quotation marks omitted).

There is no evidence that the content of Goudreau's website is likely to confuse the reasonably prudent purchaser.   The undisputed evidence offered by Goudreau indicates that the website identifies itself as the website of "former BOSTON guitarist" and  "[t]he OFFICIAL website for former BOSTON guitarist, Barry Goudreau!"  D. 91 at 11-12; D. 92 ¶ 95; D. 99 ¶ 95.  The URL address of the website is Goudreau's name.  D. 92 ¶ 94; D. 99 at 11.  Scholz insists that the intent regarding the use of the meta-tags is to drive traffic to Goudreau's website, D. 102 at 15, relying on Venture Tape, 540 F.3d at 61.  In that case, however, the Court concluded that a likelihood of confusion could be inferred from the defendant's admitted purpose of luring his competitor's customers to his site.  Id. at 61-62.  Even if Goudreau's website diverts consumers who search for Scholz or the band Boston to his own website, "[m]ere diversion, without any hint of confusion, is not enough."  Hearts on Fire Co., LLC v. Blue Nile, Inc., 603 F. Supp. 2d 274, 285, 286 (D. Mass. 2009) (noting that even if a consumer chooses a competitor's product after finding that product via a search using a trademarked name, the consumer has been diverted, but not confused).  Venture Tape relied heavily on the defendant's intent to trade on his competitor's reputation and it is silent as to any consumer confusion resulting from the use of the defendant's website.  Venture Tape, 540 F.3d at 61.  In contrast, here, the record does not indicate that a consumer is likely to be confused and

that Goudreau makes his former relationship with BOSTON clear.  D. 99-34 (assessing advertisements for consumer confusion, but not Goudreau's website).

In summary, Goudreau is entitled to summary judgment on the claims for direct infringement (Counts I and VII) with respect to The Best of Boston series, the Cannery Casino Hotel advertisements, JMBB, WCR and EATA.  Summary judgment is also allowed on the direct infringement claims based on the use of meta-tags on Goudreau's website (Counts I and VII).

### B.     Contributory Infringement and Vicarious Infringement

Scholz asserts two claims premised on Goudreau's secondary liability for trademark infringement.  In Count V, Scholz alleges contributory infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1)(a), and in Count VI Scholz alleges vicarious infringement pursuant to the same section.

#### 1.     Contributory infringement

To prove contributory infringement, a plaintiff must show that the defendant "(1) 'intentionally induced' the primary infringer to infringe, or (2) continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied." Perfect 10, Inc. v. Visa Int'l Serv. Ass'n, 494 F.3d 788, 807 (9th Cir. 2007) (quoting Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 855 (1982)).  "When the alleged direct infringer supplies a service rather than a product, under the second prong of this test, the court must consider the extent of control exercised by the defendant over the third party's means of infringement." Id. (internal quotation marks omitted).  "For liability to attach, there must be direct control and monitoring of

the instrumentality used by a third party to infringe the plaintiff's mark." Id. (internal quotation marks and alterations omitted).

Scholz's argument that Goudreau induced a primary infringer to infringe is not supported by the record before the Court. Scholz maintains that Goudreau instructed promoters and venues regarding the use of the BOSTON mark in such a manner that infringement was inevitable. D. 102 at 19. The evidence cited to support this assertion, however, does not demonstrate that Goudreau induced infringement. Specifically, Scholz cites several advertisements with allegedly infringing descriptions of Goudreau, such as "lead guitarist rock legend from the band Boston," but Scholz does not point to evidence that Goudreau instructed those responsible for the promotions to use that description. D. 101 ¶ 60. Scholz also asserts that Goudreau permitted an infringing advertisement for the JMBB, but he does not cite any record evidence supporting that assertion. Id. In addition, the cited promotional piece is not part of the record. D. 106 ¶ 60. Similarly, Scholz points to an advertisement for EATA improperly describing the band as "[j]ust another band out of Boston," but the evidence shows that the advertisement was a third-party advertisement not approved by Boch or EATA. D. 101 ¶ 60; D. 87-9 (Boch's deposition transcript) at 11-12. Scholz also does not point to any evidence that Goudreau induced anyone to produce, or provided instructions regarding, the advertisement. D. 101 ¶ 60. Finally, Scholz claims EATA promoted other concerts billing Goudreau as an "original" BOSTON member, D. 101 ¶ 60, D. 99-30, but the record evidence does not show that EATA was responsible for the advertisements or that Goudreau induced any party to create them. D. 87-9 at 15 (Boch testimony that "I think these weren't generated

by us" and that Boch had not seen allegedly infringing advertisements).  Scholz's claim,

therefore, does not satisfy the intentional inducement test for contributory infringement.

However, regarding the supply of an infringing product to the infringer test for

contributory infringement, the Court concludes that a dispute of material fact precludes

summary judgment.  Because the alleged direct infringers provided a service (Goudreau's

musical performance) rather than a product, the Court must examine the extent of

Goudreau's control over the means of infringement.  There must be evidence of

Goudreau's "direct control and monitoring" of the infringing advertisements and

promotions.  Perfect 10, 494 F.3d at 807.

Scholz argues that Goudreau is liable because he continued to perform at concerts

promoted by infringing advertisements.  D. 102 at 19.  The evidence, however, does not

show that Goudreau continued to perform at shows that he knew were promoted in an

infringing manner.  For example, Scholz cites the Legends of Rock Cruise 2 where

Goudreau was promoted as an original BOSTON Member.  D. 101 ¶ 60.  While

Goudreau admits that he performed on the cruise, he testified that he instructed the

promoters to bill him only as formerly of BOSTON, consistent with the Settlement

Agreement.  D. 106 ¶ 60.  Scholz does not point to any contrary evidence showing that

Goudreau had direct control and monitoring of the advertisement.

Another example concerns the Cannery Casino Hotel shows.  The record evidence

appears to show that infringing advertisements promoted the shows, D. 99-36, 99-19, and

that Goudreau performed at the Cannery Casino Hotel, D. 99-1 at 42.  The record further

includes material improperly promoting Goudreau with Curcio's name as the contact

person, although the record does not make clear that these materials were in fact provided

to the Cannery Casino Hotel.  D. 99-15 at 6-11.  But, again, the crucial missing element is some proof that Goudreau exercised direct control and monitoring over the infringing promotions.  In contrast, Goudreau testified that he objected to the manner in which the shows were promoted, so he severed ties with Curcio and did not continue to perform.  D. 87-2 at 15-16.  Scholz does not offer evidence refuting this testimony.  D. 101 ¶ 60.

Goudreau's affiliation with EATA, however, presents an issue of material fact sufficient to avert summary judgment with respect to the issue of direct monitoring and control.  Goudreau acknowledges that he was a member of EATA.  D. 92 ¶ 73.  He indicates that he instructed Boch and Tom Baggott ("Baggott"), whose responsibilities included "management of EATA's bookings . . . and oversight of EATA's promotion," regarding acceptable descriptions of Goudreau's BOSTON affiliation.  Id. ¶ 74. Goudreau insists he was not involved in securing performances or promoting EATA and that he informed both Boch and Baggott that he must be promoted only as "formerly of BOSTON."  Id. ¶¶ 75-76.  Boch and Baggott confirm that Goudreau did not tell them he could be described as an "original" member of the BOSTON.  Id. ¶ 77.  Goudreau, however, did not immediately notify Boch and Baggott that the Settlement Agreement prohibited any description of Goudreau other than "formerly of BOSTON."  D. 101 ¶¶ 72-74; D. 99-3 at 5-6; D. 106 ¶¶ 72-74.

Unlike the other performances and affiliations complained of by Scholz, the record as it pertains to EATA implies that there is at least a dispute of material fact as to whether Goudreau had the requisite ability to directly control and monitor EATA's promotions. Boch admitted that he promoted Goudreau as an "original" member of Boston.  D. 99-3 at 6-8, 65.  It may be reasonably inferred from the evidence that

Goudreau did not attempt to prevent Boch from promoting him as an "original" member for some period of time. D. 99-3 at 6 (Boch testifying that Goudreau instructed him to say "former member" only when EATA started to "advertise more heavily"). Yet, when Goudreau did weigh in, the evidence shows that he was diligent in instructing Boch and EATA regarding the appropriate description. Id. at 10 (Boch describing Goudreau as "methodical"), 8 (Boch testifying that Goudreau did not tell him he could describe Goudreau as an "original" member). Boch further testified that he acceded to Goudreau's requests. Id. at 6.

Evaluating the evidence in the light most favorable to Scholz, the non-moving party, Goudreau's instructions to Boch and Boch's responsiveness to Goudreau's requests lend credence to the contention that Goudreau had direct control and monitoring of EATA's promotions. Whether Goudreau exercised sufficient ability to direct and control the promotions, and thus to establish contributory infringement, is the subject of a factual dispute that must be resolved by a jury. See Robinson v. Delicious Vinyl Records Inc., No. CV 13-4111-CAS (PLAx), 2013 WL 3983014, at * 6 (C.D. Cal. Aug. 1, 2013) (reasoning that plaintiffs were likely to prevail on contributory infringement claim where defendants "tour[ed] for the better part of a year knowing that a significant number of venues and third-party promoters were infringing" on mark because defendants admitted "direct control and monitoring" of third-party promoters, as demonstrated by third-parties' compliance with instructions to remove infringing advertisements); but see Scholz v. Migliaccio, No. C13-1229 JLR, 2013 WL 4482077, at * 3-4 (W.D. Wash. Aug. 20, 2013) (disagreeing with reasoning in Robinson and stating

that defendant's efforts to avoid infringement could not be used to show that defendants could do more to avoid infringement).

Aside from Goudreau's performances, Scholz points to one additional instance he asserts demonstrates that Goudreau is liable for contributory infringement. An email to Goudreau requested that he "[c]hoose a photo" and asked, "Do you want a small Boston logo?" D. 99-16 at 2. Goudreau responded, "The color shot with the Boston logo would be great." Id. There is no evidence, however, that the photo of Goudreau with the Boston logo was used in an infringing manner, *i.e.*, in connection with the sale of goods or services or in a way likely to cause confusion. 15 U.S.C. § 1114(1). Without infringement by a third party, there can be no contributory infringement. CrossFit, Inc. v. Mustapha, No. 13-11498-FDS, 2014 WL 3499589, at *2 (D. Mass. July 10, 2014) (stating that "there can be no contributory infringement absent actual infringement").

To summarize, Scholz's contributory infringement claim, Count V, may proceed only with respect to Goudreau's involvement with EATA on the issue of direct control and monitoring of EATA's advertisements and promotions.

### 2. *Vicarious liability for trademark infringement*

"Vicarious liability for trademark infringement requires 'a finding that the defendant and the infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product.'" Perfect 10, 494 F.3d at 807 (quoting Hard Rock Café Licensing Corp. v. Concession Servs., Inc., 955 F.2d 1143, 1150 (7th Cir. 1992)). Because there is no evidence of an actual partnership between Goudreau and an infringer, of authority to bind Goudreau, or of joint ownership of the infringing promotions, Scholz's case turns on

17

apparent authority of the alleged infringers to act for Goudreau.  Apparent authority, in turn, "results from conduct by the principal which causes a third person reasonably to believe that a particular person . . . has authority to enter into negotiations or make representations as his agent."  Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 16 (1997) (quoting Hudson v. Massachusetts Prop. Ins. Underwriting Ass'n, 386 Mass. 450, 457 (1982) (alteration in original)).  Goudreau disputes that he had the requisite relationship with any third-party infringer, noting that he had not had a manager or agent since the 1990s.  D. 91 at 17-18.

Scholz relies upon Goudreau's alleged relationship with Maximus Entertainment, with which Devine was affiliated, and with Curcio.  D. 92 ¶¶ 27-34, 41-42.  But Scholz fails to point to any conduct by Goudreau that resulted in a third party reasonably believing that Devine or Curcio was acting on Goudreau's behalf.  Scholz contends that Goudreau did not withdraw from shows promoted in an infringing manner, D. 102 at 17, but the evidence shows that Goudreau did exactly that with respect to the shows at the Cannery Casino.  The record is not clear as to how many performances included him, but Goudreau withdrew due to Curcio's promotions.  See D. 92 ¶ 23 (stating that Goudreau informed Curcio and that he "would not perform any more shows with Curcio").  Moreover, nothing in the record shows that Goudreau acted in a manner that reasonably indicated to a third-party that Curcio was his agent.

As for Goudreau's relationship with Devine, the record shows that Goudreau never performed in The Best of Boston series marketed by Devine.  D. 92 ¶¶ 28-30.  Scholz argues that Maximus Entertainment nonetheless continued to circulate infringing promotions in the course of marketing The Best of Boston concerts and that Devine was

Goudreau's agent.  D. 99 ¶¶ 30-31.  Scholz acknowledges that Goudreau did not have a written agreement with Devine, but asserts that Devine solicited concert buyers on Goudreau's behalf.  Id. ¶ 33.  Scholz, however, does not point to any evidence to support his contention that Devine acted with Goudreau's apparent authority.  Scholz indicates that at least two venues promoted a Best of Boston concert with the understanding that the concert included Goudreau, id. ¶ 34, but nothing in the record points to any conduct by Goudreau that led the venue representatives or anyone else reasonably to believe that Devine acted with Goudreau's authority.

Although nothing in Goudreau's relationships with Curcio and Devine suggests vicarious liability, Goudreau's membership in the EATA band raises factual issues that prevent summary judgment in his favor.  Goudreau acknowledges he was a member of EATA, D. 92 ¶ 73, and he performed with EATA in as many as 60 shows per year at the height of their popularity.  D. 106 ¶ 63.  From this conduct, a third party could reasonably infer that representatives of EATA, including Boch and Baggott, acted on Goudreau's behalf.  Linkage, 425 Mass. at 16.  Goudreau's association with EATA implied that the band was empowered to act on his behalf in its promotion of its performances and recordings.  To the extent that it is shown that Boch and Baggott agreed to or perpetrated infringing promotions for EATA, it reasonably could be inferred that they acted with Goudreau's authority, making Goudreau vicariously liable for breaches of the BOSTON mark committed by EATA.  Accordingly, summary judgment for Goudreau is denied on Scholz's claim for vicarious trademark infringement as to EATA (Count VI).

### C.     Trademark Dilution and the Huckabee Event

At a political event for then-presidential candidate Mike Huckabee ("Huckabee"), Goudreau was filmed answering a query regarding where he was from and why he was in attendance with the response, "Barry Goudreau from Boston.  I like Mike."  D. 92 ¶ 71; D. 99 ¶ 71.  The parties disagree as to whether this statement is sufficient to support Scholz's claim for trademark dilution by tarnishment.  D. 91 at 9-10; D. 102 at 15.

Federal trademark dilution requires a showing that the defendant's actions likely caused the "dilution by blurring or dilution by tarnishment of the famous mark."  15 U.S.C. § 1125(c).  A plaintiff need not demonstrate the likelihood of confusion.  Id.  As the statute implies, there are two types of dilution:  dilution by blurring and dilution by tarnishment.  Bose Corp. v. Ejaz, No. 11-10629-DJC, 2012 WL 4052861 at * 10 (D. Mass. Sept. 13, 2012) (citing Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, 507 F.3d 252, 264 (4th Cir. 2007)).  Dilution by tarnishment, at issue here, occurs when there is an "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark."  15 U.S.C. § 1125(c)(2)(C). The Massachusetts statute prohibiting dilution is less strict, requiring a plaintiff to prove "(1) that its mark is distinctive, and (2) that the defendant's use of a similar mark has created a likelihood of dilution."  Santander Consumer USA Inc. v. Walsh, 762 F. Supp. 2d 217, 231-32 (D. Mass. 2010) (quoting Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc., 718 F.2d 1201, 1209 (1st Cir. 1983)).

Assuming Goudreau's statement constituted the use of the BOSTON mark, the Court concludes that it is neither direct infringement nor dilution by tarnishment because the statement did not use the mark in commerce.  See 15 U.S.C. § 1125 (c)(3)(C) (stating that "noncommercial use of a mark" "shall not be actionable as . . . dilution by

tarnishment under this subsection"). The use of marks in a political context is not commercial and thus is exempt from the statutory prohibition against dilution. MasterCard Int'l, Inc. v. Nader 2000 Primary Comm., Inc., No. 00 Civ.6068(GBD), 2004 WL 434404, at *1, 9 (S.D.N.Y. Mar. 8, 2004) (concluding Nader's use of plaintiff's "priceless" tagline was not commercial but "political in nature" and thus not covered by the anti-dilution statute). Scholz attempts to distinguish the MasterCard case by arguing that Nader used the mark in parody while Goudreau sought to "falsely associate[e] himself with a famous mark to give a false endorsement of a decisive [stet] political figure." D. 102 at 15 n.4. The Court disagrees with this distinction. As Mastercard points out, the legislative history of the Lanham Act indicates that Congress did not intend for the statute to inhibit political speech. 2004 WL 434404, at * 7. "Political advertising and promotion is political speech, and therefore not encompassed by the term 'commercial.'" Id. at * 8 (quoting 134 Cong. Rec. H. 1297) (Apr. 13, 1989) (statement of Rep. Kastenmeier). Accordingly, Scholz's claims for dilution by tarnishment (Counts IV and VIII) fail.

### D.  Unfair Competition

Scholz asserts three counts for unfair competition. Two arise under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1) (Counts II and III) and one is predicated on Massachusetts common law (Count IX). Section 43(a) of the Lanham Act provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (A)        is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association

> of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B)  in a commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).  Proof of a violation of Section 43(a) of the Lanham requires a five-part showing:  (1) a false or misleading description or representation of fact by the defendant in a commercial advertisement about his or another's product; (2) "materiality, such that the misrepresentation is likely to influence the purchasing decision"; (3) "the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience"; (4) "the defendant placed the false or misleading statement in interstate commerce"; and (5) the plaintiff was injured.  Euro-Pro Operating LLC v. TTI Floor Care N. Am., No. 12-10568-DJC, 2012 WL 2865793, at * 3 (D. Mass. July 11, 2012) (citing Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 310-11 (1st Cir. 2002)); Datacomm Interface v. Computerworld, Inc., 396 Mass. 760, 769 (1986) (stating that "the gravamen of an unfair competition claim is the likelihood of consumer confusion as to the source of the goods or services").

Goudreau argues that Scholz lacks standing under Lexmark Int'l, Inc. v. Static Control Components, Inc., __ U.S. __, 134 S. Ct. 1377 (2014).  In Lexmark, the Court held that "a direct application of the zone-of-interests test and the proximate-cause requirement supplies the relevant limits on who may sue" for unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  Id. at 1391.  The issue here is the

proximate cause element.   "[A] plaintiff can only have standing under section 1125(a) if [his] 'injuries are proximately caused by violations of the statute.'"   <u>Ahmed v. Hosting.com</u>, 28 F. Supp. 3d 82, 91 (D. Mass. 2014) (quoting <u>Lexmark</u>, 134 S. Ct. at 1390).   In addition, a plaintiff "cannot obtain relief without *evidence* of injury proximately caused by [the defendant's] alleged misrepresentations."  <u>Lexmark</u>, 134 S. Ct. at 1395 (emphasis in original).   "To invoke the Lanham Act's action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations."  <u>Id.</u>

Goudreau contends that Scholz has proffered no evidence that he suffered any injury to a commercial interest in sales or business reputation.  D. 91 at 13-14.  Scholz responds that he "will be able to prove at trial that Goudreau's exploitation of the BOSTON marks has proximately caused harm to Scholz and BOSTON's reputation."  D. 102 at 20.  The problem is that, at the summary judgment stage, Scholz needs to point to actual evidence of reputational injury.  <u>Anderson</u>, 477 U.S. at 256 (stating that a non-moving party may not rest on the allegations or denials in its pleadings); <u>Borges</u>, 605 F.3d at 5 (requiring plaintiff to come forward with specific admissible facts showing there is genuine issue for trial).   Without evidence in the record demonstrating reputational injury, Scholz's claims for unfair competition (Counts II, III and IX) may proceed no further. <u>Lundgren v. AmeriStar Credit Solutions, Inc.</u>, 40 F. Supp. 3d 543, 550 (W.D. Pa. 2014) (allowing summary judgment where Lanham Act plaintiff failed to support his allegations of reputational harm with record evidence and noting that "[a]t this stage of the proceedings, Plaintiff must present evidence to support his allegations").

E.      **Breach of Contract**

A claim for breach of contract obligates the plaintiff to show the existence of a valid and binding contract, the defendant breached the contract's terms and the plaintiff's damages.  Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995).  Scholz asserts two categories of breaches of the Settlement Agreement.  First, as discussed with reference to direct trademark infringement, Scholz contends that Goudreau used descriptive language other than "formerly of BOSTON," the wording referenced in the Settlement Agreement.  D. 102 at 9.  Second, Scholz argues that Goudreau has improperly referenced BOSTON in advertisements and promotions when the Settlement Agreement limits his usage of "formerly of BOSTON" to "biographical usage with respect to future performances."  Id. at 10.

The Court may dispose of the second of these arguments.  The contract at issue states that Goudreau "may use the term 'formerly of Boston' for and in conjunction with any biographical usage with respect to future performances . . . ."  D. 43-3 at 8-9.  The provision goes on to state, "*Without limiting the foregoing*, Goudreau may not use the name "BOSTON" for or in conjunction with any advertisement or promotion."  Id. (emphasis added).  The phrase "without limiting the foregoing" means that the second sentence is subject to the rights granted in the first sentence.  Goudreau may say he is "formerly of BOSTON" in biographical descriptions made with respect to future performances, but he may not otherwise use the BOSTON mark in advertisements and promotions.  The second sentence may not vitiate the rights bestowed by the first or the first would be meaningless.  Lexington Ins. Co. v. All Regions Chem. Labs, Inc., 419

24

Mass. 712, 713 (1995) (instructing that "[a] contract should be construed in such a way that no word or phrase is made meaningless by interpreting another word or phrase").

The Court discussed the first category of breach – Goudreau's alleged deviation from the term "formerly of BOSTON" – with respect to direct trademark infringement. Scholz must point to competent evidence that Goudreau (and not third parties) violated the Settlement Agreement. Scholz has failed to make such a showing, and, therefore, Goudreau is entitled to summary judgment on Count XII.

### F.     Truth in Music Statute

In Count XI, Scholz alleges that Goudreau violated the Massachusetts Truth in Music Statute, Mass. Gen. L. c. 93, §§ 12 & 43B, through his "false and misleading advertisements regarding his 'original' or 'founding' affiliation with BOSTON." D. 102 at 20. The statute provides for injunctive relief against "[a] person who engages in unfair methods of competition or unfair or deceptive acts or practices as defined in this section . . . ." Id. § 43B. "Unfair methods of competition" and "unfair or deceptive acts or practices" include "advertising a live musical performance or production in the commonwealth through the use of a false, deceptive or misleading affiliation, connection or association between the performing group and the recording group." Id. "Performing group" is defined as "a vocal or instrumental group seeking to use the name of another group that has previously released a commercial sound recording under that name." Id.

As it states, the statute is applicable only to performances in Massachusetts, which means that only EATA and the JMBB are implicated. D. 92 ¶¶ 55-57, 73. Neither group, however, sought to perform under the BOSTON name and thus neither is a "performing group" under the statute. Scholz nonetheless insists that "nothing in the

statute requires that the 'performing group' use the BOSTON trademark as the name of the performing group." D. 102 at 20. That assertion is belied by the statute itself which defines performing group as "a . . . group seeking to use the name of another group." Mass. Gen. L. c. 93, § 43B. The Court allows summary judgment on Count XI alleging violation of the Truth in Music statute.

### G.        Covenant of Good Faith and Fair Dealing

Massachusetts law implies an obligation of good faith and fair dealing in every contract. Warner Ins. Co. v. Commissioner of Ins., 406 Mass. 354, 362 n.9 (1990). "[T]he purpose of the implied covenant is to 'ensure that neither party interferes with the ability of the other to enjoy the fruits of the contract' and that 'when performing the obligations of the contract, the parties remain faithful to the intended and agreed expectations of the contract.'" FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d 93, 100 (1st Cir. 2009) (quoting Chokel v. Genzyme Corp., 449 Mass. 272, 276 (2007) (internal quotation marks omitted)). To make out a claim for a breach of the covenant, Scholz must demonstrate that Goudreau "acted with . . . dishonest purpose or conscious wrongdoing necessary for a finding of bad faith or unfair dealing." Schultz v. Rhode Island Hosp. Trust Nat'l Bank, N.A., 94 F.3d 721, 730 (1st Cir. 1996).

Scholz's claim for breach of the implied covenant of good faith and fair dealing is premised on his other allegations. D. 43 ¶ 125-27. Because Scholz's claims for contributory trademark infringement and vicarious liability survive summary judgment as to EATA, his claim for breach of the covenant of good faith and fair dealing based upon the same facts also may proceed. Goudreau's ability to directly control and monitor third-parties' infringing activity, the basis of the contributory infringement claim, and his

actions giving rise to a reasonable belief that others acted with his apparent authority, on which the vicarious liability theory turns, both support a claim for a breach of the implied covenant of good faith and fair dealing as to EATA.  Summary judgment on Count XIII is denied.

### H.      Chapter 93A

Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. L. c. 93A, § 2(a).  A plaintiff asserting a Chapter 93A claim must show that the alleged conduct "(1) falls within the penumbra or some common-law, statutory, or other established concept of unfairness; (2) is immoral, unethical, oppressive, or unscrupulous; and (3) causes substantial injury to consumers or other business persons."  FAMM Steel, 571 F.3d at 107 (internal quotation marks and alterations omitted).

The FAC alleges that Goudreau violated Chapter 93A through "Goudreau's infringing use of the BOSTON Marks and JUST ANOTHER BAND Marks."  D. 43 ¶ 109.  The focus of the allegations on Goudreau's own use of the marks implies that the claim rests on the contention that Goudreau engaged in direct trademark infringement; the allegation does not mention Goudreau being complicit in or acquiescing to third-parties' infringing activity.  But Scholz now argues that Goudreau "engaged in a pattern of conduct to confuse, mislead, and/or encourage concert promoters and venues to misuse the BOSTON trademark in promotions."  D. 102 at 22.  In addition, Scholz contends that his claim for contributory trademark infringement supports his Chapter 93A claim.  Id.

As pleaded, Scholz's claim for violation of Chapter 93A fails.  As the Court discussed above, there is no evidence supporting a claim that Goudreau directly infringed

upon Scholz's marks.  The evidence shows that Goudreau did not create the allegedly infringing promotions and advertisements himself.  Even if the Court credits Scholz's argument that Goudreau "engaged in a pattern of conduct" intended to mislead promoters and venues, the Court has already concluded that Scholz has not demonstrated Goudreau's control of the promoters and venues' actions.  Scholz makes much of the fact that Goudreau consummates his business transactions with a handshake rather than a written agreement, e.g., D. 99 ¶ 13, but does not explain why such a practice violates Chapter 93A.   Moreover, Scholz relies on Goudreau's counterclaim alleging that Goudreau allows himself to be described as an "original member of BOSTON."  Id. ¶ 14; D. 45 Counterclaim ¶ 53.  But, as the Court stated above, Scholz must point to competent evidence that that in fact occurred; he has not done so.   Finally, the FAC does not indicate that the Chapter 93A claim is premised on the contributory infringement claim, instead focusing on Goudreau's use of the marks, not a third-party's infringing activities. D. 43 ¶ 109.   In this pleading, Scholz does not allege that his Chapter 93A claim to activity that allegedly contributed to infringement and thus Goudreau's summary judgment motion is allowed as to Count X.

## VI.  Scholz's Motion for Summary Judgment on Goudreau's Counterclaims

### A.  Declaratory Judgment

Goudreau seeks a declaration that he and others may describe him as "former member of BOSTON" and as "former original member of BOSTON" without violating the Settlement Agreement.  D. 45 Counterclaim ¶ 60.  Goudreau argues that the contract language is ambiguous and that he should be able to use a broader array of terms than the language specified in the Settlement Agreement -- "formerly of Boston."  D. 95 at 14-15.

Whether a contract is ambiguous constitutes a question of law for the court.  LPP Mortg. Ltd. v. Sugarman, 565 F.3d 28, 31 (1st Cir. 2009).  If a contract term is deemed ambiguous, then the Court may consult extrinsic evidence to deduce the term's meaning. Bank v. International Bus. Machs. Corp., 145 F.3d 420, 424 (1st Cir. 1998).  Ambiguity exists only "where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and the obligations undertaken."   Coll, 50 F.3d at 1122 (internal quotation marks and alterations omitted).

The relevant provision of the Settlement Agreement states that "Goudreau may use the term 'Formerly of Boston' for and in conjunction with any biographical usage with respect to future performances, but, except to this extent, Goudreau shall have no other interest, right or title to the name 'BOSTON.'"  D. 43-3 at 8-9.  The Court does not discern any facial inconsistency in this provision.  The Settlement Agreement is clear that Goudreau may say he is "formerly of Boston."  Nothing in the language suggests a right to deviate from this language.  In contrast, Scholz entered into an agreement with another former BOSTON member permitting him to use the description "formerly of Boston or similar designation."  D. 89 at 9 n.1; D. 90 ¶ 39 n.2.  This latter phraseology allows for a broader array of descriptions than that in Goudreau's Settlement Agreement.

Similarly, the Court concludes that the contract language does not support a reasonable difference of opinion regarding the meaning of the limitation and Goudreau's obligations under the Settlement Agreement.  Goudreau does not explain how reasonable minds might differ in interpreting the restrictions to which he agreed, arguing instead that ambiguity is demonstrated by Scholz's counsel's statement at the hearing on the motion

to dismiss that Goudreau may say is a "former member of Boston."  D. 95 at 14; see Murphy Door Bed Co. v. Interior Sleep Sys., Inc., 874 F.2d 95, 102 (2nd Cir. 1989) (explaining injunction to prevent trademark infringement was proper where defendant had contracted to refrain from using Murphy name).   Whatever counsel's characterization, this does not make the contract ambiguous as a matter of law.

However, even if the Settlement Agreement were ambiguous, Goudreau points to little extrinsic evidence supporting an alternative reading.  General Convention of New Jersey in the U.S. of Am., Inc. v. MacKenzie, 449 Mass. 832, 835-36 (2007) (noting that a court may consider extrinsic evidence if contract language is ambiguous). Extrinsic evidence "includes proof of negotiations between the parties, their post-contract conduct, and general trade practice."  National Tax Inst., Inc. v. Topnotch Stowe Resort & Spa, 388 F.3d 15, 19-20 (1st Cir. 2004).  Goudreau points to a 2007 email from Scholz to another former BOSTON member stating that Scholz had no issue with Goudreau describing himself as "having performed with BOSTON."  D. 92 ¶ 12.  This one email, however, hardly encapsulates the post-contract conduct of the parties.  No other extrinsic evidence bolsters a broader reading of the Settlement Agreement Goudreau advocates. Accordingly, the Court holds that the Settlement Agreement is unambiguous and allows Scholz's motion for summary judgment as to Count I for declaratory judgment.

**B.    Breach of Contract**

Goudreau asserts that Scholz breached the Settlement Agreement by interfering with Goudreau's right to describe himself as a former member of the band BOSTON or as an original member of the band BOSTON and by threatening promoters and venues who wish to hire Goudreau.  D. 45 Counterclaim ¶ 65.  Scholz argues that Goudreau has

not identified any specific provision of the Settlement Agreement breached by Scholz and that Scholz complied with all obligations under the contract.[2] D. 89 at 22.

In reply, Goudreau shifts his claim to assert that Scholz breached the provision of the Settlement Agreement permitting Goudreau to refer himself as "formerly of BOSTON." D. 95 at 17. He further argues that Scholz has breached the Settlement Agreement by pursuing or threatening legal action against Goudreau related to promotions or advertisements that conformed to the parameters of the Settlement Agreement. Id. at 17-18.

To maintain an action for breach of contract, Goudreau must demonstrate "(1) that the parties reached a valid and binding agreement . . . (2) that [Scholz] breached the terms of [that agreement] . . . and [3] that [Goudreau] suffered damages from the breach." Coll, 50 F.3d at 1122. The Court concluded above that Goudreau has not directly infringed Scholz's trademarks but that Scholz may proceed with his claims for contributory and vicarious infringement relating to EATA. If a jury finds that Goudreau never contributed to or permitted trademark infringement, then it also may be reasonably concluded that Scholz failed to honor his own contractual obligations by endeavoring to deny Goudreau the right to promote himself in conformance with the Settlement Agreement.

Scholz also argues that Goudreau cannot demonstrate that he suffered damages. See D. 89 at 18. "However, '[u]nder Massachusetts law, a person who is injured by a

---

[2] Scholz attempts to recast Goudreau's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of Chapter 93A and abuse of process as a claim for intentional interference with contractual relations. D. 89 at 17-18. Goudreau, however, does not assert that claim, D. 45, and the Court is not persuaded that Goudreau's claims should be analyzed under that rubric.

breach of contract has a right to judgment even if the breach caused no harm.'" <u>Neponset</u>

<u>Landing Corp. v. Northwestern Mut. Life Ins. Co.</u>, 902 F. Supp. 2d 149, 165 (D. Mass.

2012) (quoting <u>Flynn v. AK Peters, Ltd.</u>, 377 F.3d 13, 23 (1st Cir. 2004)).   Goudreau

would be entitled to nominal damages if he could not prove actual damages at trial.

<u>Flynn</u>, 377 F.3d at 23.   The Court denies summary judgment to Scholz on Goudreau's

counterclaim for breach of contract (Count II).

### C.   Breach of the Implied Covenant of Good Faith and Fair Dealing and Chapter 93A

"[T]he purpose of the implied covenant [of good faith and fair dealing] is to

ensure that neither party interferes with the ability of the other to enjoy the fruits of the

contract." <u>Lass v. Bank of Am., N.A.</u>, 695 F.3d 129, 137-38 (1st Cir. 2012) (quoting

<u>FAMM Steel</u>, 571 F.3d at 100).   The covenant is breached "when one party violates the

reasonable expectations of the other." <u>Eigerman v. Putnam Invs., Inc.</u>, 450 Mass. 281,

287-88 (2007).   Because the Court concludes that Goudreau's claim for breach of

contract may proceed, premised on Scholz's alleged efforts to hinder Goudreau's

contractual rights, it also concludes that the claim for breach of the implied covenant may

go forward.   Goudreau's Chapter 93A claim is similarly derivative of his breach of

contract claim.   <u>See</u> D. 45 Counterclaim ¶ 77 (alleging Scholz interfered with Goudreau's

ability to secure performance opportunities and promote himself); D. 89 at 23 (stating

Scholz's argument that Goudreau's Chapter 93A claim is supported by the same "core

allegations" as the other counts).   Accordingly, Scholz's motion for summary judgment is

denied as to Goudreau's claims for breach of the implied covenant of good faith and fair

dealing (Count III) and violation of Chapter 93A (Count IV).

### D.     Abuse of Process

"To prevail on an abuse of process claim 'it must appear that the process was used to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed.'"   Datacomm, 396 Mass. at 775 (quoting Beecy v. Pucciarelli, 387 Mass. 589, 595 (1982)); see Broadway Mgmt. Servs. Ltd. v. Cullinet Software, Inc., 652 F. Supp. 1501, 1503 (D. Mass. 1987) (noting that "[t]he essence of the tort of abuse of process is use of process . . . [to] extort some collateral advantage not properly involved in the proceeding").   An abuse of process claim requires a showing "'that 'process' was used, for an ulterior or illegitimate purpose, resulting in damage.'"   Psy-Ed Corp. v. Klein, 459 Mass. 697, 713 (2011) (quoting Millenium Equity Holdings, LLC v. Mahlowitz, 456 Mass. 627, 636 (2010)).

A proper claim for abuse of process seeks to address a "perversion of process to achieve an extraneous end."   Cohen v. Hurley, 20 Mass. App. Ct. 439, 442 (1985). "'[T]here is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions.'"   Id. (quoting Prosser & Keeton, Torts § 121, at 898 (1984)).   Process is abusive when it is coercive, as when it is used "'to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club.'"   Id. (quoting Prosser & Keeton, Torts § 121, at 898). The alleged collateral benefits of the process must be "clearly outside the interests properly pursued in the proceeding."   Broadway Mgmt., 652 F. Supp. at 1503.   Claims for abuse of process are "not to be favored and ought not to be encouraged."   Cohen, 20 Mass. App. Ct. at 443 (internal quotation marks omitted).

On the present record, the Court cannot conclude that Scholz used process to obtain an improper end.   The first ulterior motive alleged by Goudreau is Scholz's goal of obtaining all royalty rights to and copyrights in BOSTON's first two albums.  D. 95 at 5-8.  Rescission of the Settlement Agreement that conferred the copyright and royalty payments on Goudreau, however, is a stated purpose in Scholz's complaint.  D. 43 at 27 ¶ C; see IPL Sys., Inc. v. EMC Corp., No. 952816E, 1993 WL 818577, at *  2 (Mass. Super. Nov. 30, 1993) (concluding that motive not ulterior where it was a stated purpose). Scholz cannot be said to have used process with the "intent to gain some other end indirectly" when one of his stated purposes is to sever Goudreau's rights to copyright and royalty revenue.  Psy-Ed, 459 Mass. at 714 n.35.  Goudreau does not explain how this purpose is not properly part of the proceeding or not "a legitimate purpose of the particular process employed," Quaranto v. Silverman, 345 Mass. 423, 426 (1963) (internal quotation marks omitted), given that Scholz brought claims related to the contract between the parties, the Settlement Agreement.  Although rescission is a remedy typically awarded "only upon a showing of fraud, accident, mistake or some type of grossly inequitable conduct which renders the contract void *ab initio*," P.L.A.Y., Inc. v. NIKE, Inc., 1 F. Supp. 2d 60, 65 (D. Mass. 1998), and it is questionable as to whether those elements have been pled and proved, Goudreau has not challenged Scholz's efforts to obtain rescission as a remedy.  Accordingly, the abuse of process claim premised on Scholz's efforts to rescind the Settlement Agreement fails.

The second ulterior motive argued by Goudreau is Scholz's efforts to obtain discovery related to a defamation lawsuit brought by Scholz against the Boston Herald. D. 95 at 8-10.  "[T]raditionally, discovery activities have not provided grounds for abuse

of process actions in Massachusetts." <u>Alphas Co. v. Kilduff</u>, 72 Mass. App. Ct. 104, 115 (2008). Abuse of process claims "aimed at curtailing discovery activities . . . would be inconsistent with the spirit of Mass. R. Civ. P. 26(b)(1) . . . which affords broad latitude in the discovery of relevant information and is not limited to the issues raised in the pleadings or to the merits of the case." <u>Id.</u> at 115-16. Fed. R. Civ. P. 26 similarly affords parties significant leeway in their discovery of pertinent facts. Fed. R. Civ. P. 26 (permitting the discovery of "any nonprivileged matter that is relevant to a party's claim or defense"). For all of these reasons, summary judgment is warranted on Goudreau's abuse of process claim (Count V).

## VII.   Conclusion

For the foregoing reasons, the Court ALLOWS in part and DENIES in part Goudreau's motion for summary judgment, D. 83. The Court ALLOWS summary judgment to Goudreau with respect to all Counts except Count V for contributory trademark infringement and Count VI for vicarious trademark infringement as to EATA.

The Court ALLOWS in part and DENIES in part Scholz's motion for summary judgment on the counterclaims, D. 88. The Court ALLOWS summary judgment to Scholz as to Count I for declaratory judgment and Count V for abuse of process. The Court DENIES summary judgment on the remaining counterclaims as to breach of contract, breach of the implied warranty of good faith and fair dealing and violation of Chapter 93A.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge