```
                 IN THE UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF MASSACHUSETTS



     * * * * * * * * * * * *    13CV10951-DJC
     DONALD THOMAS SCHOLZ     *
                              *
     VS.                      *    OCTOBER 28, 2016
                              *    8:45 A.M.
     BARRY GOUDREAU           *
                              *
     * * * * * * * * * * * *    BOSTON, MA



              BEFORE THE HONORABLE DENISE J. CASPER

                       DISTRICT JUDGE

                       (Jury Trial)
```

**VOLUME V**

**APPEARANCES**:

```
     FOR THE PLAINTIFF:     LAWRENCE G. GREEN, ESQ.
                            SUSAN E. STENGER, ESQ.
                            Burns & Levinson LLP
                            125 Summer Street
                            Boston, MA 02110


     FOR THE DEFENDANT:     JEFFREY S. BAKER, ESQ.
                            Baker & Associates
                            2 West Hill Place
                            Suite 100
                            Boston, MA 02114

                            DANIEL P. TARLOW, ESQ.
                            Copani Tarlo & Cranney
                            265 Broadway
                            Methuen, MA  01844
```

1    **<u>APPEARANCES</u>** (Cont'd):

2    FOR THE DEFENDANT:        DAVID M. GIVEN, ESQ.
                              Phillips, Erlewine, Given &
3                             Carlin, LLP
                              39 Mesa Street
4                             Suite 201 - The Presidio
                              San Franscisco, CA  94129
5

6    Court Reporter:          Debra D. Lajoie, RPR-FCRR-CRI-RMR
                              One Courthouse Way
7                             Boston, MA  02210

8
                   Proceeding reported and produced
9                    by computer-aided stenography

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          <u>I N D E X</u>

2

3       <u>PLAINTIFF WITNESS</u>                                    <u>PAGE</u>

4       <u>Barry Goudreau</u>
        Continued Recross Examination by Mr. Tarlow      14
5
        <u>Donald Thomas Scholz</u>
6       Direct Examination by Mr. Green                  17
        Cross-examination by Mr. Baker                  103
7       Redirect Examination by Mr. Green               162
        Recross Examination by Mr. Baker                180
8
        <u>William Scally</u>
9       Direct Examination by Mr. Green                 182

10

11

12                        <u>E X H I B I T S</u>

13

        <u>NUMBER</u>                        <u>FOR ID</u>      <u>IN FULL</u>
14
        63                                               117
15      64                                               119

16

17

18

19

20

21

22

23

24

25

1    28 OCTOBER 2016 -- 8:45 A.M.

2         (The jury is not present for the following)

3         THE COURT:  Good morning, Counsel.

4         Counsel, before I ask you if there's anything we

5    need to take up, I did receive additional proposed

6    instructions from the Plaintiff.  I also received what

7    I take to be the Plaintiff's designation of deposition

8    excerpts.  Is that going to come up today or we think

9    Monday?

10        MR. GREEN:  I believe it may well, Your Honor.

11   It really depends on how long opposing counsel will be

12   cross-examining Mr. Scholz.

13        THE COURT:  Okay.

14        MR. BAKER:  Our intention is do Mr. Scholz,

15   Mr. Scally, and then we'll be reading that in,

16   Your Honor.

17        THE COURT:  Okay.  And are there

18   cross-designations, Mr. Tarlow?

19        MR. TARLOW:  Your Honor, we just saw that come

20   over on ECF this morning.  We haven't even actually

21   looked at the pleading, we were walking over here, so

22   I'm not sure what the designations are.  We will be --

23   we believe we'll be designating some small portions of

24   the transcript as well, and we can probably get that

25   done today, but I'd like an opportunity maybe during

```
 1      the break to see what portions --

 2              THE COURT:  Okay.

 3              MR. TARLOW:  -- they want to designate and --

 4              THE COURT:  I'll ask you again --

 5              MR. TARLOW:  Thank you.

 6              THE COURT:  -- at the end of the break, and

 7      we'll see where we are.

 8              Counsel, any matters that we need to take up

 9      now?  My memory is we're on the -- Mr. Tarlow, we were

10      at the recross of Mr. Goudreau.

11              MR. TARLOW:  I anticipate there will be just one

12      matter that will come up on the cross of Mr. Scholz.

13      If the Court remembers, there is a verified statement

14      by Mr. Scholz in the *Herald* case, and we've prepared --

15      on cross, we want to use that because the statement is,

16      "Their comments have usually been an attempt to turn

17      public opinion against Scholz in favor of Brad Delp and

18      the three former original band members, Barry Goudreau,

19      Fran Sheehan and Sib Hashian."

20              Actually, I meant to redact it after the period.

21      It does say Mickey Delp after that, but I have a

22      redacted version, which I would redact to take out

23      Mickey Delp and further -- that's something we intend

24      to do.

25              THE COURT:  Okay.  And this is in -- okay.  This
```

1    is in regards to previous identification of your client

2    as an original member?

3         MR. TARLOW:  And what we do is we would not --

4    we would just mention it in a former action or a former

5    lawsuit, we wouldn't reference the *Herald* complaint,

6    and we would offer the redacted version with the signed

7    verification after it, Your Honor.

8         THE COURT:  Okay.

9         Counsel?

10        MR. GREEN:  I'm going to withhold comment on it,

11   Your Honor, other than to ask, why would it come up in

12   Mr. Goudreau's --

13        MR. TARLOW:  Mr. Sholz's.

14        MR. GREEN:  Oh, Mr. Sholz's.

15        THE COURT:  I think he said --

16        MR. GREEN:  I misheard, then.  Okay.

17        THE COURT:  Yeah, you did.  He was planning

18   ahead.

19        MR. GREEN:  All right.  I appreciate the notice.

20   I would like to -- I think we'll respond when the time

21   comes, Your Honor.  I want to confer with Ms. Stenger

22   and my client on that.

23        THE COURT:  Okay.

24        MR. GREEN:  But we'll be prepared to respond.

25        I do have one matter, Your Honor.

1          THE COURT:  Okay, Mr. Green.

2          MR. BAKER:  I want to put the Court on notice,

3     and I want to put Defendant's counsel on notice that we

4     will be moving to amend our complaint, Your Honor,

5     under the provisions of Rule 15(b)(2) to add -- or

6     really add back in this case the contract claim.

7          You ruled, Your Honor, in your summary judgment

8     motion, and I'm citing to Page 25, that the contract

9     claim would be dismissed because Mr. Scholz failed to

10    point to competent evidence that Mr. Goudreau and not

11    third parties violated the settlement agreement.

12         We will be moving to amend to conform to the

13    evidence because we believe that the evidence of the

14    last couple of days is overwhelming that Mr. Boch was

15    Mr. Goudreau's agent, expressly authorized to act on

16    his behalf in connection with any ads and promotions

17    for Ernie and the Automatics.

18         It was reinforced when Mr. Goudreau entered into

19    the 2009 agreement when he gave to Mr. Boch all of his

20    rights to his name in his biography.  We will be

21    prepared to file a motion with a supporting brief over

22    the weekend, Your Honor, but I am putting everybody on

23    notice now.

24         I know that Counsel has said that they intend to

25    recall Mr. Goudreau as part of their case, and we will

1    be asking for formal argument on this Monday, but I do

2    want to let them know to be prepared for that,

3    Your Honor.

4            THE COURT:  And Counsel, what page are you

5    referring to?

6            MR. BAKER:  I'm referring to Page 25 of your

7    summary judgment ruling, Your Honor, the September 21,

8    2015, ruling.

9            THE COURT:  Yeah, I have that here.

10            MR. GREEN:  And in particular, at the --

11            THE COURT:  Oh, at the top, 25?

12            MR. GREEN:  Yes.  And specifically there, you've

13    talked about, in the three lines from the bottom of

14    that section, "must point to competent evidence that

15    Goudreau and not third parties."

16            And our position, Your Honor, is that Mr. Boch

17    is not any third party; he was an authorized agent

18    here, and we're not talking about third parties beyond

19    his control.  Indeed, they had full authority here.

20            THE COURT:  Okay.  Counsel?

21            MR. BAKER:  Judge, if I understand Mr. Green

22    correctly, he's going to file a motion and brief it, so

23    my view is that's probably the better time to present

24    full argument.

25            But I do want to point out to the Court, you

1    ruled on this in summary judgment, and second -- one.

2    And secondly -- point two, rather, unless I

3    haven't been in the same courtroom, all Mr. Goudreau

4    said and all Mr. Boch said was they couldn't present

5    him as an original member of the band BOSTON.  So

6    whatever contract he's talking about is not what was

7    presented in the course of this proceeding.

8    I guess the best thing to do is to wait to see

9    what their papers say and then to respond completely at

10   that time.  But that's what our thinking is.

11   Anything else?

12   And it was also part of the summary judgment,

13   Your Honor, the agreement that Mr. Green is referring

14   to.

15   THE COURT:  Well, Counsel, I'll -- Mr. Green,

16   I'll wait to hear your arguments.  I'm not sure -- I

17   understand you're putting both the Court and defense

18   Counsel on notice, given that they haven't started

19   their case yet.

20   I'm not sure that I will agree with your motion,

21   but I'll certainly hear you out.

22   MR. GREEN:  Thank you, Your Honor.  I do note

23   here that 15(b)(2) talks about amending during the

24   course of trial and even after trial, so I'm trying to

25   give the maximum notice possible.  This really only

1    arose, Your Honor, in light of the testimony of the

2    last two days.  But otherwise, I appreciate your

3    consideration, and we'll have more to say on that

4    Monday, and we'll have the written brief over the

5    weekend.

6         THE COURT:  Okay.  And Counsel, I guess I was

7    going to again check in with you towards the end of the

8    day because, just looking forward, it may be that we

9    need to have our charge conference on Monday at the end

10   of the day, but I need to hear from Counsel on the

11   issue of directed verdict, as Mr. Given had previously

12   reserved, in anticipating their motion at the end of

13   the Plaintiff's case, and I suppose I'd also hear you

14   on this matter.

15        MR. BAKER:  Could I ask the Court a question,

16   please?  Just so we clearly understand the expectations

17   of the Court and timing issues, Your Honor, when

18   Plaintiff closes -- or rests, if that should occur

19   today --

20        THE COURT:  Yes.

21        MR. BAKER:  -- we have the intention to go

22   forward with the motion.  It's not fully fleshed out.

23   Obviously, we're still waiting to hear what Mr. Green's

24   evidence will be today.  And I want to make sure that

25   we understood you correctly that we would reserve our

1    right and then present it over the weekend?

2         THE COURT:  Right.

3         MR. BAKER:  Okay.  Now, Judge, with respect to

4    the charge conference, could I just ask you a quick

5    question on that, please?

6         THE COURT:  Sure.

7         MR. BAKER:  Okay.  My understanding of the way

8    things are done in this particular Courthouse is

9    typically the Judges send the instructions over, like,

10   Sunday night, it always seems to be Monday that we have

11   the charge conference.

12        THE COURT:  Right.

13        MR. BAKER:  You're going to work Sunday night.

14        Sunday night, the charge -- the jury

15   instructions come and then proposed form of the

16   verdict, and then we have the charge conference the

17   following day after the jury's been dismissed for the

18   day?

19        THE COURT:  That is not necessarily --

20        MR. BAKER:  Or no.

21        THE COURT:  -- the practice in this Court.

22        MR. BAKER:  Okay.

23        THE COURT:  So Counsel, I want to see where we

24   are at the end of the day.  It is my -- I will tell you

25   this:  It is my practice to give you a draft of what I

1    am intending to do, which will reflect that I've

2    reviewed the proposals on either side and I've

3    reviewed -- I know that there were competing verdict

4    form proposals as well, so that you're -- at the charge

5    conference, you're responding to what I'm proposing,

6    either to object to it, to ask to amend it and so

7    forth.

8         I cannot promise you the timing on when you will

9    get that, Mr. Baker, but it will be in advance of when

10   we speak.

11        MR. BAKER:  One last question on the charge

12   conference.  I want to make sure my understanding is

13   clear.

14        THE COURT:  Sure.

15        MR. BAKER:  That is the time to lodge objections

16   that would be preserved for appeal; is that correct?

17        THE COURT:  Right.

18        MR. BAKER:  Okay.  Because some Judges do it

19   differently.

20        THE COURT:  Well, I will -- well, let me say

21   this:  Counsel, I think you need to make the objections

22   when you think you need to for preservation reasons.

23   My experience is that Counsel does them both during the

24   charge conference but also when I get to -- and we'll

25   talk about this in the charge conference -- when I get

1    to the second to last page of the charge, when I'm

2    giving it to the jury, I have a sidebar, and usually at

3    the sidebar, Counsel recites what they're wanting to

4    reserve.

5         MR. BAKER:  Okay.  And lastly, Judge, do we make

6    a record at the charging conference?

7         THE COURT:  In terms of --

8         MR. BAKER:  Is there a stenographer?

9         THE COURT:  Everything --

10        MR. BAKER:  Okay.

11        THE COURT:  Everything you say to me is always

12    on the record.

13        MR. BAKER:  Thank you.

14        THE COURT:  Okay.  Counsel, anything else?

15        MR. GREEN:  Nothing from the Plaintiff,

16    Your Honor.

17        THE COURT:  Okay.  So why don't we see if we

18    have jurors, and we can get started.

19        (Pause)

20        (The jury is present for the following)

21        THE COURT:  Good morning, Jurors.  We'll get

22    started again.

23        Mr. Goudreau, good morning.

24        THE WITNESS:  Good morning.

25        THE COURT:  I just remind you, you remain under

1    oath.

2              THE WITNESS:  Yes.

3              THE COURT:  Mr. Tarlow.

4              MR. TARLOW:  Thank you, Your Honor.

5              THE COURT:  We're on recross?

6              MR. TARLOW:  Yes, Your Honor.

7          **CONTINUED RECROSS EXAMINATION BY MR. TARLOW**

8    **Q.**   Mr. Goudreau, I'm going to ask you some very brief

9    questions this morning.

10   **A.**   Sure.

11   **Q.**   Do you recall Mr. Green asking you some questions

12   yesterday regarding your activities related to the

13   video that we saw, the Ernie and the Automatics music

14   video?

15   **A.**   Yes.

16   **Q.**   All right.  And drawing your attention to the very

17   end of the video, there was some home footage; you

18   recall seeing that?

19   **A.**   I do.

20   **Q.**   Did you recognize that home footage?

21   **A.**   Yes.  Sib Hashian, the drummer, had one of those

22   little Super 8 cameras, and he filmed that.

23   **Q.**   And did you provide any of that footage to anyone

24   who produced that video?

25   **A.**   No.

1    Q.    Okay.  Now, you also recall Mr. Green had asked
2    you if you were a sane adult a couple of times when you
3    were -- when he was asking you about certain matters?
4    A.    Yes.
5    Q.    Okay.  And you recall that he asked you if you --
6    what you did with respect to the video; correct?
7    A.    Yes.
8    Q.    Now, when you were a sane adult and you -- your
9    activities related to the video, what did you do with
10   relation to the video?
11   A.    I showed up and played guitar.
12   Q.    And you recall that he asked you about some
13   in-store appearances; correct?
14   A.    Yes.
15   Q.    And that's related to some Ernie and the
16   Automatics promotions; correct?
17   A.    Right.
18   Q.    And when you were a sane adult and you showed up
19   to those in-store appearances, what did you do, sir?
20   A.    I showed up and played guitar.
21   Q.    And he also asked you about some television
22   appearances that you did with Ernie and the Automatics;
23   correct?
24   A.    Right.
25   Q.    And what did you do with respect to those

1    television appearances?

2    A.    I showed up and played guitar.

3    Q.    Do you recall Mr. Green referring, when he was

4    directing attention to Ernie and the Automatics, he

5    said, "Well, Ernie and the Automatics, you know, the

6    band that was out of Boston;" do you recall him saying

7    that?

8    A.    Yes.

9    Q.    When he said those words, did you believe he was

10   referring to Boston, the City, or BOSTON, the band?

11         MR. GREEN:    Objection.

12         THE COURT:    Overruled.

13   A.    Could you repeat that again?

14   Q.    Yes.    When Mr. Green had referred to Ernie and the

15   Automatics and he said that -- you know, that band that

16   was out of Boston, did you believe he was referring to

17   Boston, the City, or BOSTON, the band?

18   A.    The City.

19   Q.    All right.    You recall some questions Mr. Green

20   asked you about the document you had testified earlier

21   that Mr. Messina, your former attorney, had filed on

22   your behalf, which he's saying is evidence that you had

23   directed people to refer to you as an original member

24   sometime between 2011 and 2012; do you recall that?

25   A.    I do.

1    **Q.**   All right.  That pleading, did you ever sign that

2    pleading?

3    **A.**   No.

4    **Q.**   Did you ever see it before your lawyer filed it?

5    **A.**   No.

6    **Q.**   Was that in fact a truthful statement that your

7    lawyer filed with the Court?

8    **A.**   No.  No.

9          MR. TARLOW:  Thank you.  No further questions,

10   Your Honor.

11         THE COURT:  Sir, you're excused.  You can step

12   down.  Thank you.

13         Mr. Green.

14         MR. GREEN:  Your Honor, Plaintiff calls

15   Donald Thomas Scholz as the next witness.

16         THE COURT:  He may be called.

17         (The Witness Was Sworn)

18         THE COURT:  Good morning, sir.  Good morning.

19         MR. GREEN:  May I proceed, Your Honor?

20         THE COURT:  You may.

21         MR. GREEN:  Thank you.

22            **DIRECT EXAMINATION BY MR. GREEN**

23   **Q.**   State your full name for the record, please.

24   **A.**   Donald Thomas Scholz.

25   **Q.**   And do you go by Tom, Mr. Scholz?

1    **A.**    That's correct.

2    **Q.**    And you've just sat into the chair a certain way.

3    Do you have any physical issues that require that?

4    **A.**    Yeah, chairs are my worst enemy.  I have a bad

5    back.

6    **Q.**    Where do you live, Mr. Scholz?

7    **A.**    Weston, Massachusetts.

8    **Q.**    And with whom do you live there?

9    **A.**    My wife, Kim.

10    **Q.**    What do you do for a living, sir?

11    **A.**    I'm an engineer, musician, producer engineer

12    and --

13    **Q.**    Do you write songs?

14    **A.**    -- occasional inventor.

15    **Q.**    And do you write any songs?

16    **A.**    I do write songs.

17        THE COURT:  And sir, can you just move the

18    microphone a little bit closer?

19        THE WITNESS:  Sure.  I'm sorry.

20        THE COURT:  Yeah, just -- I'm having a little

21    hard time hearing you.

22    **Q.**    When did you first start studying music, sir?

23    **A.**    Well, I took piano lessons when I was seven for

24    two years, but I had listened to it when I -- starting

25    at age four.

1    **Q.**    Where did you attend college?

2    **A.**    MIT.

3    **Q.**    Did you graduate from MIT?

4    **A.**    I did.

5    **Q.**    And with what degree?

6    **A.**    A BS and MS in mechanical engineering.

7    **Q.**    Now, after graduation, did you find steady

8    employment?

9    **A.**    I did.

10    **Q.**    And where was that?

11    **A.**    Polaroid Corporation.

12    **Q.**    And what did you do at Polaroid?

13    **A.**    I was a design engineer.

14    **Q.**    And what did that mean, sir?

15    **A.**    I worked on an instant movie system, designing the

16    projectors and cameras and then the sound system for

17    the instant movie system, which was a form of an

18    analogue magnetic recording.

19    **Q.**    And what years were you at Polaroid?

20    **A.**    I started at Polaroid in 1970, and I left there

21    finally at the beginning of 1977.

22    **Q.**    Did you receive any special recognitions while you

23    were at Polaroid?

24    **A.**    Well, I was promoted to Senior Engineer.  I had

25    some patents.

1    **Q.**    And as of the time you left Polaroid, how many

2    patents did you hold?

3    **A.**    Maybe 15 or 20.

4    **Q.**    What was the subject matter of the patents, just

5    generally?  I don't need you to go --

6    **A.**    It was in the same fields that I was working in,

7    magnetic recording for instant developing of film.

8    **Q.**    Now, Mr. Scholz, calling your attention to the

9    time period from when you were a student until April,

10    1974, what was your first music-related activity?

11    **A.**    I began playing in bands for fun at MIT.

12    **Q.**    And when was that?

13    **A.**    I think the first one was in 19 -- late 1967 or

14    early '68.

15    **Q.**    And how many different bands did you play in?

16    **A.**    Well, at least three that actually did shows.

17    **Q.**    Were you involved in any demo tape activity during

18    that time period?

19    **A.**    I started doing my -- I made my first demo tape in

20    the winter of 1970, which was actually after I left

21    Polaroid -- after I left MIT.  Excuse me.

22    **Q.**    And did you send out any demo tapes?

23    **A.**    While I was at MIT, no.

24    **Q.**    At some point after you left MIT, did you start

25    sending out demo tapes?

1    **A.**    I did.

2    **Q.**    And over what timeframe was that, sir?

3    **A.**    From the beginning of 1971 through January of

4    1976.

5    **Q.**    So this is while you were working full time at

6    Polaroid?

7    **A.**    That's correct.

8    **Q.**    You were also doing music; correct?

9    **A.**    That's correct.

10    **Q.**    And how many demo tapes did you send out during

11    that time period?

12    **A.**    Well over a hundred.

13    **Q.**    Were there costs incurred in connection with those

14    demo tapes?

15    **A.**    Yes, actually.  Yes.  Initially, I started

16    recording in commercial studios, which was ungodly

17    expensive back in the early '70s, and then incidental

18    costs of buying the tape and mailing, and of course I

19    had to purchase some equipment.

20          Later on in that period, I cobbled together a

21    home-built four-track recorder and a really crude

22    system in my basement, so I had to buy a fair amount of

23    equipment associated with that also.

24    **Q.**    And that was at your expense?

25    **A.**    Of course.

1    **Q.**    Now, did you write any original music that ended

2    up on those demo tapes?

3    **A.**    Yes.  All the -- everything I recorded to send out

4    was music I had written.

5    **Q.**    Now, during the same timeframe, did Mr. Goudreau

6    contribute to any of those demo tapes?

7    **A.**    He played guitar on some of them.

8    **Q.**    And did you ever go to New York to shop the demo

9    tapes?

10    **A.**    Yes, twice.

11    **Q.**    Did anyone go with you?

12    **A.**    On the second trip in late summer of 1973, Barry

13    asked if he could come with me, and then -- he wanted

14    to drive, and it was a little red Triumph Spitfire I

15    think it was called, and it was not built for someone

16    6'5.5", so it was a long trip.

17    **Q.**    You were traveling from Boston at that point in

18    time?

19    **A.**    That's correct.

20    **Q.**    What, if any, success did you have with those demo

21    tapes?

22    **A.**    None.

23    **Q.**    None at all?  Over a hundred tapes?

24    **A.**    None.  Not even a nibble.

25    **Q.**    Get through the front door anywhere?

1    **A.**    The -- on that trip to New York, there was one

2    person -- I had made three appointments.  One of them

3    didn't know there was an appointment when I got there.

4    Another one didn't let me out of the little tiny

5    vestibule at the front of the thing and listened for

6    two minutes and then came back and handed it to me.

7         But there was one that actually listened to the

8    tape.  There were I think three songs on the tape.

9    **Q.**    But did they ultimately reject it?

10   **A.**    Yes.

11   **Q.**    Now, during this time period that you were working

12   at Polaroid, did you perform in any bands?

13   **A.**    Yes, I did.  And at MIT also.

14   **Q.**    I'm sorry?

15   **A.**    And at MIT also.

16   **Q.**    Okay.  And what bands did you perform in?

17   **A.**    Quite a few.  All right.  My debut was with the

18   Wambat Express, then I played with the Burton House

19   Bombers, there was a third band while I was in school

20   that actually did a fair amount of work, it was a

21   Framingham band, and I don't remember the name of it.

22        Then I joined Freehold, which was a band

23   that hadn't been named yet, but it was a band that

24   Kevin Claherty was running at his -- out of his frat.

25   He was an MIT student also.

1              I formed a band, Middle Earth; I formed a band,

2    Mother's Milk; and then subsequently, I formed a band,

3    BOSTON.

4    **Q.**    All right.  Let's go to Middle Earth.  That was

5    when, sir?

6    **A.**    1972 I believe was when we -- I first put that

7    name on a tape.

8    **Q.**    And did that band come out with any demos?

9    **A.**    Well, you have to understand, there was two --

10   there's two very distinct categories of work here.  One

11   is --

12              MR. BAKER:  Judge, move to strike.  The question

13   was:  Did it wind up on a demo?

14   **Q.**    I think my question was, did that band come out

15   with any demo tapes?

16   **A.**    I'm trying to explain it, that -- I know that the

17   historical vision of making recordings is a band goes

18   into the studio and somebody runs a tape deck and the

19   band plays and it's recorded.

20              That was not how I've made demos ever.  So there

21   were two distinct categories.  There was recording

22   activities for demos, and there was playing, performing

23   activities.  What I did do --

24              MR. BAKER:  Note my objection, Your Honor .

25              THE COURT:  Noted, Counsel.  Overruled.

1    **A.**    There -- the -- with --

2         THE COURT:  Well, sir, wait for the next

3    question.  I think there's another question coming.

4    **Q.**    All right.  Let me ask this -- I want to move

5    along -- how many times did Middle Earth ever perform,

6    sir?

7    **A.**    I believe twice.

8    **Q.**    Twice?  That was it?

9    **A.**    Yes.

10   **Q.**    Okay.  The next band was Mother's Milk?

11   **A.**    That is the next band I tried to come up with.

12   **Q.**    And when was that formed?

13   **A.**    1973.

14   **Q.**    And who named it Mother's Milk?

15   **A.**    I'm afraid I have to take the blame for that.

16   **Q.**    Now, who was in that band?

17   **A.**    Barry Goudreau, myself, Jim Masdea, Frank Framone

18   and Brad Delp originally, and then Brad Delp left, and

19   we had a singer named Rabbit.

20   **Q.**    Were there any demos sent out for Mother's Milk?

21   **A.**    Again, the demos were totally separate from the

22   band.  I did send out a demo under the name Mother's

23   Milk.

24   **Q.**    Okay.  And was that demo accepted?

25   **A.**    No.

1    **Q.**    How many times did Mother's Milk perform?

2    **A.**    Four or five.

3    **Q.**    And whatever became of Mother's Milk?

4    **A.**    I disbanded it in 1974.

5    **Q.**    When in 1974?

6    **A.**    Early spring.  I believe it was April.

7    **Q.**    Now, why did you disband Mother's Milk?

8    **A.**    Well, first of all, I had been knocking my head

9    against the wall and spending an incredible amount of

10   money and a lot of time doing demo tapes and trying to

11   play out and get people to listen to my music, and it

12   had been an absolute total failure, not only failure

13   commercially; the tapes that I got, even though quite

14   expensive, I never captured what I was -- what I was

15   hearing in my mind I was not getting on tape.

16          And in 1974, I realized I had all of the pieces

17   together.  I had learned about the physics of sound and

18   music and how the human ear interpreted it; I had come

19   up with some new pieces of musical equipment, some new

20   techniques for recording and producing sound; I had

21   learned about song-writing; I had gotten my playing

22   skills together for guitar, base, organ and piano; and

23   I had learned about arranging; I had learned about

24   producing, actual recording; and I also had a lot of

25   ideas for some new pieces of music that I thought were

1    worth pursuing.

2          See, this is getting late.  I had been working

3    for years at Polaroid, I had spent an awful lot of the

4    money that I had made, so I made a decision in the

5    spring of 1974 that I was going to do one last project,

6    I had six songs in mind, and the -- I had to -- I

7    couldn't do it like I had done before.  I wasn't

8    getting it on tape.  The band -- idea of trying to play

9    the music out with a band got nobody's attention.  I

10   stopped playing in all bands.

11         I needed two additional things in addition to

12   the skills and so forth that I had developed over those

13   years.  I had to get rid of the studio time clock

14   because I needed complete freedom to experiment.  I was

15   willing to work for hours and days on one little piece

16   of a song, and then if it wasn't there, I was willing

17   to erase it and start over again, but I could not do

18   that with a studio time clock running.

19         And the other thing was I really had to get away

20   from anyone else associated with the music, and that

21   included Barry.  You know, Barry Goudreau is an

22   excellent guitar player, but I wasn't capturing what I

23   wanted to get on the tape.  It didn't have the feeling,

24   it didn't have quite the right style, and mostly it

25   just wasn't expressing what I was hearing in my mind.

1    So I realized I was going to have to play those parts
2    with my own two hands, and I felt that -- I felt
3    confident in my skills at that point to be able to play
4    them.
5    **Q.**    Now, did you inform Mr. Goudreau that you were
6    disbanding Mother's Milk?
7    **A.**    Absolutely, and that I wasn't going to play out at
8    all.
9    **Q.**    Now, Mr. Goudreau, you heard him testify yesterday
10   that he was in your basement to work on recordings and
11   that, from time to time, he made reference to a poor
12   song demo tape.  Did you hear all of that?
13   **A.**    Yes, I did.
14   **Q.**    All right.  Do you -- was that testimony accurate?
15   **A.**    No.
16   **Q.**    Why was it inaccurate, sir?
17   **A.**    In 1973, I built a crude four-track system in my
18   basement, trying to -- I had some ideas about how to
19   put songs together that was going to be too
20   time-consuming to do in a studio, and I began
21   attempting to record songs with no one else except the
22   drummer.
23         There was -- I did that with three different
24   songs.  One was called "Shattered Images," one was
25   called "Shaken," and the very last one I did was called

1    "Don't Be Afraid," which I did actually at the -- in
2    the early spring of 1974.
3         On one of those songs, the first one, "Shattered
4    Images," Barry did come to my basement, and he played a
5    single guitar part in that song.  That was the only
6    time he was in there doing any recording up until 1976.
7    Q.  Thank you.  Now, do you recall that Mr. Goudreau
8    also testified that the song "San Francisco Day" was,
9    in essence, re-recorded as "Hitch a Ride?"
10   A.  It was re-written and re-arranged, and I renamed
11   it "Hitch a Ride."
12   Q.  And do you recall that Mr. Goudreau stated that
13   the song "90 Days" became "More Than a Feeling"?  Was
14   that accurate?
15   A.  No.
16   Q.  Can you explain to the jury?
17   A.  Well, a song is not a living organism, it doesn't
18   grow into something else, it doesn't metamorphosize
19   from, you know, a cocoon to a butterfly, so to speak.
20   Some person has to come up with a new piece of work.
21        Now, not to take away the romance of music here,
22   but just like books, for instance, are made up of
23   sentences and paragraphs and chapters, music is made up
24   of elements, it's made up of licks or riffs, it's made
25   up of chord progressions, it's made up of melodies and

1    lyrics.

2          And there are -- those elements get put together

3    in various ways, and just like a writer who writes a

4    great paragraph and hates the rest of the chapter will

5    throw away the chapter, but he's going to save the

6    great paragraph.  And "90 Days" had a lick in it that

7    ran under just the verse.  That lick was used in the

8    song "More Than a Feeling," but that was the only piece

9    of it that I used in "More Than a Feeling."

10   **Q.**   And similarly, did you hear --

11   **A.**   I'm sorry.  "More Than a Feeling" was really a

12   completely new song.

13   **Q.**   All right.  I'm going to get back to "More Than a

14   Feeling" in a little bit.  I just want to ask you about

15   one other song that he mentioned.

16          Do you recall that he stated in his testimony

17   that the song "Shaken" became "Smokin'"?

18   **A.**   Well, in the same way, a new song was written that

19   used some of the parts from "Shaken."

20   **Q.**   Now, you disband -- you testified that you

21   disbanded Mother's Milk in the spring of -- April, '74.

22          Can you tell me what, if anything, you did in

23   connection with the development of your musical career

24   between spring of '74 until the Ahern CBS contract was

25   signed in February, 1976?

**A.**   Yes, sure.  Well, like I had mentioned before,
that's the point at which I thought I had all the
pieces in place to be able to completely record and
write and so forth a demo that would represent what I
thought I could do.

I had already spent an enormous amount of money.
My wife and I both worked.  I decided to take a very
big roll of the dice, with her approval, reluctantly,
I'm sure, to empty the bank account.  We still had
about $8,000 left, which was enough for a down payment
on a small house.

I emptied the bank account.  I went looking for
money that I could borrow anywhere.  I bought a
12-track tape-recorder that was used and a little bit
obsolete but that I could modify into what I needed.  I
bought other equipment, and I built in the basement of
my apartment house a spartan but fully capable
production studio that could make production-quality
recordings.

I had already experimented with my little set-up
that I had with four-tracks and had come up with this
idea for a new style and basically a new sound.  The --
it required an enormous amount of time.  It was
extremely labor-intensive.  The sort of rough theory
behind it, to save time here, was that all of the

1     instruments that appeared were double- and

2     triple-tracked, so I would -- and there were other --

3     certainly lots of other bands at that time period that

4     would what they call double-track or rhythm-part, play

5     the rhythm part and you run the tape back and you play

6     it again, and it was on both speakers, and then you

7     split it up into stereo.

8          But what I did was I did that with a twist, and

9     I used -- I de-tuned the guitars intentionally on the

10    second pass.  They had to be in a very narrow range of

11    being off-tune from the first one.  I did the same

12    thing with the lead guitars, and I did not know of

13    anyone else that did that, very difficult, very

14    time-consuming after you've done the first part.

15         The second part has to be done, it can't be in

16    the same pitch, it can't be at exactly the same time,

17    and yet it has to be close enough to sound like it's

18    not a mistake.  I added harmony guitar parts to almost

19    all the leads, and these ran through the songs in and

20    out of the vocals.  Basically the idea was to create an

21    orchestra of guitars and then -- which I did.

22         At the end of that -- I had a drummer friend of

23    mine lay down a drum track, and just so you understand

24    how this is actually done, I would then sit by myself,

25    run a tape deck and so forth, and I had a foot switch

1    with a coat hanger on it so I could punch in and out,

2    and I would play the parts.

3         Now, of course it wasn't just playing the parts;

4    I had to play the part, and then I would listen to it

5    and go back and make changes in the chords, then I

6    would play -- add a base track and realized that I had

7    the wrong chord formation that didn't work well with

8    the baseline, I would have to go back and replay the

9    guitar part.

10        Since it was doubled, I would have to go back

11   and replay two different parts.  Then I would add a

12   lead guitar part or a single one, and I would hear

13   something else that could be done, and I would have to

14   back up and replay the base part and all the other

15   guitar parts behind it.  It was sort of three steps

16   forward and two steps back.

17   **Q.**   Let me ask you this, Mr. Scholz, just so we can

18   get this in context:  The studio was at your apartment.

19   You were living where?

20   **A.**   It was in the basement of my apartment house in

21   Watertown.

22   **Q.**   In Watertown?

23   **A.**   My wife at the time referred to it as my dungeon,

24   and it was.

25   **Q.**   So we're talking about the spring of '74 until

1    early '76 during this timeframe; correct?

2    A.    That's correct.

3    Q.    Were you working at Polaroid during that time?

4    A.    Yes, I was.

5    Q.    Were you working full time?

6    A.    Yes, I was.

7    Q.    When were you doing all of this in terms of the

8    music?

9    A.    I got -- typically I would get -- I would work

10   when I got home, I would get four or five hours of

11   sleep, and then I would get up and I would -- I went to

12   Polaroid.  Sometimes I would work all night and stumble

13   onto the T and go in to Polaroid.  I had to keep a full

14   time job.  I was way in debt at this point.

15   Q.    Now --

16   A.    I was almost 30.  I had been working all these

17   years, and I had --

18        MR. BAKER:  Judge, move to strike.  It's way

19   beyond.

20   A.    -- I had risked --

21        THE COURT:  Sir, you have to wait till the next

22   question.

23        Sustained as to that part, but you can ask the

24   next question.

25   Q.    All right.  Just for the record, you were almost

1    30 at that point in time?

2    A.    That's correct.

3    Q.    Okay.  Now, who, if anybody, was assisting you as

4    part of all of this?

5    A.    No one.

6    Q.    When you mentioned the various instruments, as of

7    that same timeframe -- and these questions all refer to

8    the spring of '74 to early 1976 timeframe -- what

9    instruments were you proficient at?

10   A.    Guitar, base, organ and piano.

11   Q.    And --

12   A.    The organ and piano are actually quite different.

13   I know they're both keyboards but completely different

14   playing style.

15   Q.    And was there one more type of guitar that you

16   played?

17   A.    Yes, of course.  The electric guitar, a Cruz stick

18   and then 12-strings.

19   Q.    And were you proficient at all three forms of

20   guitar?

21   A.    I was.

22   Q.    Now, at some point in time, did Brad Delp play any

23   role in connection with those demo tapes?

24   A.    An enormous role.  He came in after all of the

25   rest of the instruments were in place on the recording,

1    and then he began adding in all the harmonies and so

2    forth in the same way that I had done the other

3    recording, also double-tracked all the vocals, all the

4    harmonies were double-tracked and sometimes

5    triple-tracked.  He did -- he would do exactly as I

6    did.  Of course he had the luxury of somebody running

7    the tape deck and doing the engineering, but --

8    Q.    All right.  And the drummer was who, sir?

9    A.    Tim Masdea.

10   Q.    So that was the one instrument you didn't play?

11   A.    Not well enough.

12   Q.    Okay.  So apart from the drums, every instrument,

13   every instrumental sound on those demo tapes came from

14   whom, sir?

15   A.    Me.

16   Q.    And was all of that put in place before Mr. Delp

17   came in to do the singing?

18   A.    It was.

19   Q.    Did you have any code name for this project?

20   A.    Yes.  It was Julian Foxglove.

21   Q.    What did that mean?

22   A.    Well, it was just a silly name that a friend of

23   mine had told once he thought would be a funny name for

24   a -- for an act or a stage name.  And a foxglove is a

25   flower which I happen to like, so --

1    Q.    Okay.  I didn't see a lot of laughter break out in

2    the room, so --

3    A.    It wasn't that funny.

4    Q.    -- I'm not sure it was all that funny, but let me

5    move on.

6            During this same time period, again, April --

7    the spring of '74 until early 1976, how many, if any,

8    demo tapes did you send out?

9    A.    From '74 to '76?

10    Q.    Yes, correct.

11    A.    I sent out, in '75, in the summer, about a year

12    after I started, I sent out a four-song -- four of the

13    songs that were completed out of the six, I sent out

14    about two dozen copies.

15    Q.    All right.  And there have been various questions

16    about the jacket of BOSTON's first album.  I don't know

17    if that's before you, but I'm sure you're familiar with

18    it.

19    A.    Sure.

20    Q.    Where does it say that the album was recorded?

21    A.    Foxglove Studios.

22    Q.    Foxglove Studios where?

23    A.    In Watertown, Mass.

24    Q.    And was that the studio we've been talking about?

25    A.    That's correct.

1    **Q.**    Now, can you describe a little more about the

2    process of sending out the demo tapes and how that

3    worked?

4    **A.**    Yeah.  Well, it is -- it does sound simple when

5    you say that you sent out the tapes, but in order to do

6    that, in this case -- well, first I had to run off 24

7    clean copies of this.  That had to be done in real

8    time.  I had to listen to each one as it was happening

9    to make sure that there was no drop-outs or anything

10   else.  I didn't have two quarter-inch tape machines

11   that I could make those copies on.  I had to find

12   somebody else who had a machine.

13        I brought one of mine there, wired it, and then

14   sat there for the -- the tape was approximately

15   18 minutes long.  By the time you leadered it and

16   checked the tones to make sure it was recording

17   properly, it took roughly half an hour per tape to make

18   the tape, so I did that 24 times.

19        And then of course somebody has to label the

20   boxes, which I did, there had to be a cover letter,

21   they had to -- I had to have a photograph, get all the

22   mailers, and one of the most time-consuming things was

23   simply getting the addresses.  And this wasn't -- I

24   mean, there was no Google and no internet, so I had a

25   few from my earlier attempts at sending tapes out, but

1    they did change from year to year.

2           So I went to the library, I called people, and I

3    got a list of -- out of phone books and so forth of

4    about two dozen music business concerns that I thought

5    might be interested in making a record of these demo

6    tapes.

7    Q.   Did Mr. Goudreau play a role in any part of that

8    process?

9    A.   No.

10   Q.   Now, after you disbanded Mother's Milk in April,

11   1974, when did you next see Mr. Goudreau?

12   A.   Summer of 1975.

13   Q.   And in what context was that?

14   A.   Well, he had heard that I had gotten some strong

15   positive responses on the tape and that I was

16   negotiating a management and production with this

17   fellow Paul Ahern and his partner Charlie McKenzie, and

18   he asked if he could come and hear the tape.  And I

19   said, "Sure."

20          And so he drove over to my house, I played him

21   the four songs that were on that demo that I sent out.

22   He was very complimentary.  He said that it sounded

23   amazing.  And when he was -- as he was leaving, I

24   remember it was a very nice summer day, and he was down

25   on the sidewalk, and I was sitting on a retaining wall

1    in front of my house.  He stopped as he was getting in

2    his car, and he said, "If you find that you need a

3    second guitar player, I would love a chance at that

4    position."

5            And I said, "Well, I'll certainly keep you in

6    mind."

7    Q.    All right.  So he was then asking to be considered

8    for a job?

9    A.    He was.

10   Q.    Did he at any point at that meeting say, "Wait a

11   second, Tom.  This is all our Mother's Milk stuff.

12   What's going on here?"

13   A.    No.  It was clearly not Mother's Milk.

14   Q.    Now, what was he doing at that point in time?

15   A.    I understood he was working in his father's

16   body -- auto body shop.

17   Q.    When you sent the demo tapes out, did you do it

18   under cover letters?

19   A.    Yes.

20   Q.    Who were the cover letters from?

21   A.    Me.

22   Q.    Were they from Mother's Milk?

23   A.    No.

24   Q.    Anything related to Mr. Goudreau?

25   A.    No.

1    **Q.**    Now --

2    **A.**    I was very glad to have ended Mother's Milk and

3    not have to live with that name any longer.

4            MR. GREEN:  Could we turn to trial Exhibit 1,

5    and if I could ask that, that be projected, Your Honor?

6            THE COURT:  It may.

7    **Q.**    And Mr. Scholz, you understand -- you haven't been

8    up there yet.  You understand you can look on the

9    screen?  If you have any difficulty, let us know

10   because we have hard copies.

11   **A.**    It's not up yet; correct?

12           THE COURT:  No, it's not up yet.

13           Okay.  Exhibit 1, Counsel.

14   **Q.**    And referring to Exhibit 1, sir, can you explain

15   the typed comment at the top of the page, "Exhibit A to

16   the agreement between Paul Ahern and CBS Records dated

17   as of December 15, 1976"?

18   **A.**    I'm sorry.  This was a -- this was an agreement

19   that my manager and production company was making with

20   CBS.  I'm not exactly sure what the Exhibit A is, but

21   it was a re-arrangement of the recording agreement with

22   CBS that happened in December, 1976.

23   **Q.**    All right.  Now, when was the original recording

24   agreement?  I'll call your attention to the next line,

25   which says, "Agreement made this 1st day of February,

1   1976."

2   A.   Yeah, I know that date.

3   Q.   All right.  And let's just go -- let me ask you.

4   It's between Ahern Associates -- is that care of

5   Brian Rohan?  Let me as you this --

6   A.   Yes, care of Brian Rohan.

7   Q.   As of that point in time, February 1, 1976, who

8   was Ahern Associates?

9   A.   They were -- they had a management company, a

10   production company and a song-writing company.  A lot

11   of it was on paper, but Ahern and McKenzie were

12   qualified record-promotion people with experience in

13   that area.

14   Q.   And were you working with them in any way prior to

15   that time?

16   A.   In -- yes, from the summer of 1975, after I got

17   some attention from some major labels, Charlie McKenzie

18   actually caught wind of it walking through some other

19   record company's area, heard the tape and got their

20   phone number, he contacted me and put me in touch with

21   he and Paul Ahern, and we were negotiating a management

22   and production company deal with them, and of course

23   Brad was involved too.

24   Q.   All right.  Was Mr. Goudreau involved --

25   A.   No --

1    **Q.**    -- in connection with the hiring of Mr. Ahern?

2    **A.**    -- of course not.

3    **Q.**    Was Mother's Milk involved in connection with the

4    hiring of Mr. Ahern?

5    **A.**    Thankfully, no.

6    **Q.**    Now, so this contract entered into as of

7    February 1, 1976, was between Ahern Associates -- was

8    that on behalf of you and Mr. Delp?

9    **A.**    Yes.

10    **Q.**    And then the other party to that was CBS Records,

11    a division of CBS, Inc.; do you see that?

12    **A.**    I know that it was without reading it.

13    **Q.**    Okay.  And who -- as of February 1, 1976, what was

14    CBS Records?

15    **A.**    A huge record company, if not the largest, then

16    the second largest.  They had the Epic label, the

17    Columbia label and probably a few smaller ones.

18    **Q.**    Now, had you authorized Ahern Associates to

19    proceed on your behalf?

20    **A.**    I had.

21    **Q.**    And by the way, when you authorized them to

22    proceed, did you understand that you could be bound by

23    what they did?

24    **A.**    I did.

25    **Q.**    Now, let's -- this contract refers to -- let's

1    turn to the last page of this.  Who are the signatories

2    to this contract?

3    **A.**    Brad and myself.

4    **Q.**    You don't see Mr. Goudreau's signature here?

5    **A.**    No, of course not.

6    **Q.**    Does Mother's Milk appear anywhere here?

7    **A.**    No.

8    **Q.**    Now, had you entered into any other contracts in

9    this connection at this point in time?

10   **A.**    Other than with --

11   **Q.**    Management, recording, song-writing, any of that?

12   **A.**    Management, production and song-writing with Ahern

13   and McKenzie's companies.

14   **Q.**    And, again, who entered into it from your

15   standpoint?

16   **A.**    Brad Delp and myself.

17   **Q.**    Was Mr. Goudreau party to that?

18   **A.**    No.

19   **Q.**    Mother's Milk?

20   **A.**    No.

21   **Q.**    Now, could you -- looking at the statement that

22   appears just above your signatures on that page, it

23   begins, "In order to induce CBS Records to enter into

24   the foregoing agreement with Ahern Associates, each of

25   the undersigned hereby assents to the execution of such

1    agreement and agrees to be bound by the terms and

2    conditions thereof."  And it goes on.

3         What did you understand the import of that to

4    be?

5    A.   I mean, I knew that this was a -- what they

6    called a -- well, I know now it's called an inducement

7    letter because we were under contract to Ahern and

8    McKenzie.  Epic wanted make sure that they had

9    Brad Delp and myself.  They wanted to make sure that

10   there wasn't going to be some switch and it would be

11   some other artists when the album came out.

12   Q.   All right.  In other words, when Ahern -- Ahern

13   was the party to the contract with CBS.  CBS wanted to

14   confirm who the artists would be?

15   A.   That's correct.

16   Q.   And the artists are Donald T. Scholz and

17   Brad E. Delp; correct?

18   A.   We were the artists.

19   Q.   Could you turn to Exhibit 2, please.

20        Do you recognize that document?

21   A.   Of course.

22   Q.   And do you see that the -- this is an exhibit to

23   the February 1, '76, agreement?  Is that the agreement

24   we just looked at?

25   A.   I believe so.

1    **Q.**    And it says, "The following individuals comprise

2    the group BOSTON:  Donald T. Scholz, Bradley E. Delp;"

3    do you see that?

4    **A.**    Sure.

5    **Q.**    And that was as of February 1, 1976?

6    **A.**    That's correct.

7    **Q.**    Was that accurate?

8    **A.**    Yes.

9    **Q.**    Why does Mr. Goudreau's name not appear?

10    **A.**    He wasn't involved in any way in the demos that

11    got the deal.

12    **Q.**    And if we could scroll down, we have a signature

13    from Ahern Associates there?

14    **A.**    Yes.

15    **Q.**    Now, let's now turn to Exhibit 6 -- oh, by the

16    way, I meant to ask, on Exhibit 2, it referred to the

17    name BOSTON; do you see that?

18    **A.**    The one that was just up, yes.

19    **Q.**    Yes.  You understood at that point in time that

20    you comprised the group BOSTON with Mr. Delp?

21          MR. BAKER:  Objection, Judge.  Leading questions

22    throughout.

23    **A.**    The name of the --

24          THE COURT:  Well, Counsel, no commentary.  As

25    to --

1    MR. GREEN:  I'll rephrase it, Your Honor.

2    THE COURT:  Yeah.  As to that question,

3    sustained.

4    Q.  This refers to the group BOSTON.  What did that

5    mean, sir?

6    A.  It meant that it was the group that was Brad Delp

7    and I.  The name was not -- definitely not cast in

8    stone.

9    Q.  Now, let's now turn to Exhibit 6.  Do you

10   recognize that document, sir?

11   A.  I've seen it before, yes.

12   Q.  All right.  Now, this document, Exhibit 6, was

13   dated as of when, sir?

14   A.  December of 1976.

15   Q.  Now, let's trace what happened -- just so we can

16   see who the signatories are in this, could we scroll

17   down to the last page?

18       We now see that there are various assents to

19   this contract; correct?

20   A.  Right.

21   Q.  And do you see the name in particular of

22   Mr. Goudreau there?

23   A.  Of course.

24   Q.  All right.  So could you trace for the jury what

25   happens between the original contract in February and

1    Exhibit 6 in December as to how Mr. Goudreau and other

2    names end up on this?

3    **A.**    These are the members of the performing group.

4    Once the record had been completed, the next job was to

5    put a band together that could actually try to present

6    this material, which I actually thought was going to

7    require six people.

8            However, at this point, we had done -- we had

9    successfully done shows, and we -- live shows with this

10    five set of individuals, and especially in arenas.  And

11    although it wasn't -- it wasn't up to the standards of

12    the recording certainly, but they went well.  And at

13    this point, I basically had decided that these guys

14    were going to work for us for being our live

15    presentation.

16    **Q.**    So when Mr. Goudreau had asked you in 1975 if he

17    could be considered to be part of the group, did you

18    ultimately decide, yes, he could?

19    **A.**    Yes, of the -- I mean, my intention at the time

20    was as part of the performing group.

21    **Q.**    Now, let me now --

22            MR. GREEN:  We can take that down.

23    **Q.**    Let me now refer to the debut album of BOSTON.

24            After you and Mr. Delp signed the record deal

25    with CBS, how did you go about recording the first

1    album?

2    **A.**   It was just like I had done the demo, with the

3    exception of one song, which was done completely

4    differently on the other side of the country.

5         I'm not sure how much detail you want, but

6    basically I laid down a drum track, one with

7    Jim Mansdea, all the rest were Sib Hashian, and then I

8    began the very agonizing process of layering on all the

9    other instruments.  Like I said, it was very

10    time-consuming.

11         For that part of it, once this deal had been

12    signed, I had to take a leave of absence.  I basically

13    worked 14-hour days every day, and all I did was this

14    job of trying to record this record.  The -- it takes a

15    long time to create what basically turns into an

16    orchestra of guitars for a lot of different technical

17    reasons that are not things that other performers or

18    artists encounter because of the unusual way I was

19    doing it, the requirement for really precise tuning and

20    difference in tuning between the instruments and

21    between each track and this thing of going forward

22    three steps and back two.

23         So I did it exactly the same way I did the demo.

24    The songs that appeared in the demos were virtually

25    identical with a minor change in one of the tunes.

1    Barry Goudreau came down and played a lead part and a

2    rhythm part on "Long Time."  This was something Brad

3    and I talked about.  Originally --

4              MR. BAKER:  Objection, Judge.  This is a

5    narrative answer.

6              THE COURT:  Well, Counsel, overruled.  What has

7    been said can stand, but Counsel, a follow-up question.

8    Q.   When you've said it was virtually identical, was

9    that the demo tape?

10   A.   Correct.

11   Q.   All right.  Had Mr. Goudreau contributed in any

12   way to the demo tape?

13   A.   No, and the album had to be done exactly the same

14   way.

15   Q.   Okay.  So you were doing the various instruments,

16   as you described in the demo tape?

17   A.   That's correct, and the engineering and the --

18   Q.   What about the drums?

19   A.   The drums is the only instrument I didn't play.

20   Q.   And how many songs were there on the album?

21   A.   There are eight cuts.

22   Q.   And how many songs did Mr. Goudreau contribute to,

23   if any?

24   A.   He played on one of mine, and he played Brad's

25   song.

1    **Q.**    So his instrument appears on those two tracks?

2    **A.**    It does.

3    **Q.**    Any other contributions that he made?

4    **A.**    Not that I know of.

5    **Q.**    Now, take us from there.  How does -- the tracks

6    were all put together.  Can you describe briefly for

7    the jury how it becomes an album?

8    **A.**    Well -- all right.  The basic process is you -- is

9    first the multi-track where I put the instruments on

10   one at a time by over-dubbing until it's built up.

11   Then Brad would add the vocal parts one at a time, also

12   quite time-consuming because people didn't typically

13   double- and triple-track lead vocals or harmony vocals.

14          Then this was taken to -- excuse me --

15   Los Angeles at West Lake Audio.  I didn't have good

16   enough facilities in my little basement set-up to do a

17   first-rate job of mixing, so the mixing was done in

18   Los Angeles, and a lot of the vocal over-dubs that Brad

19   put on were also done in Los Angeles with my oversight.

20          And then -- I'm sorry.  And then it was mixed at

21   West Lake Audio, which is another kind of

22   time-consuming -- it was a time-consuming process for

23   this one because there were 24 tracks of material, and

24   most of the time, there was something on all of those

25   tracks.  They all had to be balanced.

1    Q.    Now, at some point in time, did CBS take any

2    position about recording this in a professional studio?

3    A.    Sure.

4    Q.    And what was that about?

5    A.    They had said that it could not be recorded in my

6    basement.

7    Q.    All right.  And how many songs were recorded at

8    the west coast studio?

9    A.    One.

10   Q.    And what was that song?

11   A.    "Let Me Take You Home."

12   Q.    And who wrote that song?

13   A.    Brad Delp.

14   Q.    Now, when was the album released?

15   A.    August of 1976, I believe the 25th.

16   Q.    And how was the album received, sir?

17   A.    It was unbelievable.

18   Q.    Did it set any records in the music business?

19   A.    Yeah, it became the best-selling debut album in

20   history for actually quite a few years.  It got passed

21   up at one point by another group, and then it over-took

22   them, and then it got passed up by somebody else, and

23   then it over-took them.

24        I don't believe it's still the best-selling

25   album in debut -- debut album in history, but it hung

1    on to it for a long, long time.

2    **Q.**    And at the time, it was?

3    **A.**    It was.

4    **Q.**    Now, how did it sell?  How many copies?

5    **A.**    At this point, over 17 million.

6    **Q.**    As of today?

7    **A.**    That is -- to my best knowledge, it's still under

8    18 million.

9    **Q.**    Now, what -- did you believe that -- how would you

10    describe the sound of BOSTON?

11    **A.**    It was completely unique.  It was totally

12    different.

13    **Q.**    And what made it unique, sir?

14    **A.**    That's a -- all right.  There are a lot of things

15    that made it unique.  I guess I would break them into

16    three categories:  The sound of it; the style of the

17    music; and the story behind the making of the record.

18    **Q.**    All right.  Well, let's take each of those three,

19    and I want to really move this along here.  Could you

20    take two minutes to talk about what made the sound

21    unique?

22    **A.**    All right.  I'll try to just hit the biggest

23    things there.  I had invented a lot of stuff and come

24    up with some odd ways to record things, some techniques

25    in the studio that I was told later were quite

1    different from the way everyone else did it.

2         There was a -- the distorted over-drive electric

3    guitar sound was very unique, and I don't want to get

4    too technical or waste time, but for those who might be

5    familiar, the guitar was not plugged into an amplifier;

6    it went into equalizers and then a special limiting

7    device and then a pre-distortion device that was an old

8    set of transisterized device I had, that was plugged

9    into the amp.

10         The amplifier was not plugged into the speakers.

11    The amplifier drove a purely resistive load, which got

12    a different distortion sound out of a common, ordinary

13    guitar and amplifier.  I took a little piece of that

14    sound off of that resistive load and plugged that into

15    the speakers, so I eliminated most of the speaker

16    distortion, got a different sound from the amp.  It had

17    a very unique distorted guitar sound.

18         The fact that the rhythm guitars were always

19    double-tracked and they were always double-tracked

20    slightly out of tune created this eerie sort of I call

21    it a hollow sound, but it surrounded you.  And those

22    two things were the most prominent things about the

23    general sound that made it unique.

24         It also had double- and triple-tracked harmony

25    guitars, harmony vocals.  That was very unusual.  And

1    that orchestra of those things and the choir of vocals

2    basically created this sort of rock and roll symphony.

3    I mean, it was -- it was -- the comment by "Rolling

4    Stone" that it was a cathedral of sound was actually

5    exactly what I was after.

6          There were many other technical differences of

7    the way things that were recorded that weren't done in

8    a normal studio.

9    **Q.**   All right.  Let me ask you this:  Did you use your

10   training in science and engineering --

11   **A.**   Oh, of course.  I -- my background in physics and

12   electronics enabled me to build all these devices.

13   There was a device that I called a hyperspace pedal

14   that could make a guitar create a sound like a mother

15   ship descending over your house or an F-16 making a low

16   pass with after-burners on or something as delicate as

17   a butterfly floating past your ear.  I could actually

18   make a guitar appear to play itself with this thing,

19   and that was used throughout the record.

20   **Q.**   Now, you just -- you described three things at the

21   beginning as to what made it unique.  You've described

22   the sound.  What about the style, or was that part of

23   what you just described?

24   **A.**   The style was very -- I think was very unique.  It

25   was the combination of classical music, hard rock and

1    pop melody.  The -- and the harmonies, the way they

2    were voiced, there weren't parallel harmony parts, they

3    didn't make the changes on the chord changes often,

4    they -- and the style of the harmony guitars that run

5    throughout the songs was very heavily influenced by the

6    classical masters that I had listened to when I was a

7    little kid.

8    Q.    Just out of curiosity, who's your favorite

9    classical composer?

10   A.    Rachmaninoff.

11   Q.    You like Rossini?

12   A.    Well, I actually was a little more -- I liked

13   Chaykovsky, Rachmaninoff, Beethoven, in -- kind of in

14   that order.

15   Q.    I must be a musical dunce.  Rossini's my favorate.

16         I'll move on.

17   A.    I'm sure he's very good.

18   Q.    What was unique about BOSTON's story?

19   A.    The two things are that, well, first of all, in

20   terms of the connection between MIT and the science and

21   technology and the sound of these albums, and they were

22   completely interlinked, that was picked up on by Epic

23   Records.  They ran ads about -- that are -- the music

24   being better because of science, and it gave me sort of

25   a stepping stone to talk about education and pursuing

1    education when I got a chance to spout off in the
2    media.
3    Q.   Now --
4    A.   And it was -- one other thing.  I'm sorry to
5    interrupt.  But the fact that this was recorded in a
6    basement, I mean, even Epic Records didn't realize it
7    had been recorded in a basement until somebody told
8    them after the record was delivered, was unheard of.
9    People had recorded in their basement before.  Nobody
10   made multi-platinum records in their basement, and
11   actually Epic picked up on that too.  They ran ads,
12   radio ads, where they had somebody being my wife
13   calling downstairs saying, "Is it ready yet"?
14           MR. BAKER:  Objection, Judge.
15           MR. GREEN:  All right.  We'll move on.
16           THE COURT:  Well, sustained as to the last part.
17   But Mr. Green, next question.
18           MR. GREEN:  I'll move on.
19   Q.   Now, apart from guitar, did you play other
20   instruments on the debut album?
21   A.   Of course.
22   Q.   What instruments?
23   A.   All of the instruments except drums.  It would
24   encompass the acoustic and 12-string guitars, the base
25   guitar, organ, clarinet and -- that's it.  I'm sorry.

1    **Q.**    And who wrote the songs on the debut album?

2    **A.**    I wrote most of them.  Brad wrote one song and

3    wrote lyrics to one of my songs.

4    **Q.**    Who produced the debut album?

5    **A.**    I did, with help from John Boylan.

6    **Q.**    And who is John Boylan?

7    **A.**    John Boylan was a real record producer that worked

8    for -- well, he was freelance and then was hired by

9    Epic Records after that album.

10    **Q.**    Who engineered the debut album?

11    **A.**    I engineered most of it.  There was a second

12    engineer present during a mix downstage.

13    **Q.**    Now, what contributions did Mr. Delp make to the

14    first album?

15    **A.**    Incredible contributions.  His voice was the choir

16    of voices, amazing, amazing singing, amazing range and

17    amazing work ethic.  He was like me, he would -- he

18    would go after the same part for hours and try

19    different things and re-sing it until it was just the

20    right amount off-pitch from the previous take and just

21    the right amount of on-pitch.  I mean, his voice was

22    certainly one of the stand-out recognizable features of

23    the album.

24    **Q.**    Were there multiple vocal tracks on the album?

25    **A.**    Yes.

1    Q.    And did Mr. Delp sing them all?

2    A.    He did.  I punched in a few very minor things here

3    and there that nobody knows about or has to know about.

4    I am definitely not a lead singer.

5    Q.    Okay.  What contributions, if any, did Mr. Hashian

6    make to the first album?

7    A.    Sib Hashian was the session drummer for seven of

8    the eight cuts on the album.

9    Q.    And what about Mr. Sheehan?

10   A.    He played base on a song "Foreplay" -- or excuse

11   me the intro of "Foreplay," and he played base on

12   Brad's song, "Let Me Take You Home Tonight."

13   Q.    Now, 17 million in sales.  Were there royalties as

14   a result of the sales of the album?

15   A.    Yes.

16   Q.    And how were the royalties divided up?

17   A.    Evenly, 20 percent apiece for the five performing

18   members of the band.

19   Q.    And those were yourself, Mr. Delp, Mr. Goudreau,

20   Mr. Hashian and Mr. Sheehan?

21   A.    That's correct.

22   Q.    What involvement, if any, did you have in the

23   album cover that's been displayed to the jurors?

24   A.    It was my concept.  It was definitely not my

25   artwork.  Epic had proposed a head of Boston lettuce, a

1    pot of baked beans or a slice of Boston cream pie.

2    That was their proposal for the cover, so --

3    Q.    And how did you come up with the concept that ends

4    up appearing on the album?

5    A.    Because the music is -- it's an escape, and I

6    wanted it to be an escape, and it's also -- there were

7    sounds that had never been heard before on that album,

8    and I wanted something that was out of this world, and

9    I said, "Let's get somebody to paint a guitar that's in

10    outer space like a spaceship."

11    Q.    I now want to turn to the second album.  What was

12    the name of that album?

13    A.    "Don't Look Back."

14    Q.    And when did that come out, sir?

15    A.    In 1978, late August or early September of 1978.

16    Q.    So this is approximately two years and a month or

17    two after the first album?

18    A.    That's correct.

19    Q.    And what was happening with the band BOSTON during

20    that time period, just briefly, in the interim?

21    A.    The other performing members?  Nothing.  We did a

22    short headline tour in 1977, starting in the winter.  I

23    believe it was only about two months.  And then I had

24    to -- I had to move out of the basement apartment house

25    in Watertown.  There was a very nasty flood.

1              And I had to build a new studio, so I had to --
2    I had gotten a house that was suitable, empty basement.
3    I had to build a studio, wire it, debug it and get it
4    operational, write a whole new set of songs for an
5    album.  I did have one, and Brad had one, and then I
6    had to do all this recording work, the same as I had
7    done on the original six-song demo and the original
8    album.
9    Q.   Now, let me ask you this:  Where did you move to?
10   A.   Wayland.
11   Q.   Okay.  And you built a new studio in your Wayland
12   basement?
13   A.   That's correct.
14   Q.   Now, how many tracks end up appearing on the
15   second album, "Don't Look Back"?
16   A.   Also eight cuts.
17   Q.   And what, if any, contribution did Mr. Goudreau
18   play to that -- make to that album?
19   A.   He played on three songs.
20   Q.   Three of the eight?
21   A.   Yes.  They're cameo parts.
22   Q.   Now, did you hear Mr. Goudreau testify that he
23   played on the song, "The Journey"?
24   A.   That's correct.
25   Q.   Did he?

1    **A.**    Not on the album version.  He played the acoustic

2    guitar to play that track in the studio.  It was a

3    background part, but I couldn't use it as it was

4    played.  I re-played it with an electric guitar, but I

5    gave him credit on the album because I didn't want

6    to -- I didn't want to cause any bad feelings.

7    **Q.**    Okay.  Other than Mr. Goudreau's playing guitar on

8    those three songs of the eight, who else was playing

9    guitar?

10    **A.**    Just me.

11    **Q.**    You did all of the guitar?

12    **A.**    All of it.

13    **Q.**    Did that include -- were there different guitars

14    involved?

15    **A.**    There was an enormous number of guitar tracks

16    involved.  Typically, at any one time, there were six

17    to 12 guitars playing as you listen to a BOSTON track

18    and more so on "Don't Look Back" even than the first

19    album.

20    **Q.**    Did you play any other instruments on the second

21    album?

22    **A.**    Sure.  Organ, piano and base.

23    **Q.**    Who wrote the songs on the second album?

24    **A.**    Brad Delp and myself.  I wrote most of them.

25    **Q.**    Who produced the second album?

1    A.    I did.

2    Q.    And who engineered?

3    A.    I did.

4    Q.    And was the second album successful?

5    A.    Yes.

6    Q.    And how successful was that?

7    A.    I believe it sold over seven million.

8    Q.    Now, what contributions did Mr. Delp make to the

9    second album?

10    A.    As before, he sang amazing vocals throughout the

11    album.

12    Q.    And did each of the songs have multiple vocal

13    tracks?

14    A.    Multiple.  It was the same thing as I had to do

15    with the guitar.  Of course I would set him up,

16    being -- as engineer and producer, but he would just

17    sing part after part on a harmony, we would double- and

18    triple-track it, he would move up to the next harmony

19    part, we would go through those, then we would go back

20    and change them all when we discovered it didn't work

21    out as well with the lead line he was going to put on

22    afterwards.

23    Q.    What contributions, if any, did Mr. Hashian make

24    to the second album?

25    A.    A lot.  He played -- he was the session drummer on

1    all but one song.  One song was an instrumental without

2    drums.

3    Q.    So he did all the drumming?

4    A.    That's correct.

5    Q.    And how about Mr. Sheehan?

6    A.    Well, there was one note from Fran Sheehan on

7    "Don't Look Back."

8    Q.    He contributed one note to this album?

9    A.    Well, yeah.  I was trying to put him on the album

10   some place, and it wasn't working out.  I tried "Don't

11   Look Back" because I thought it was the most

12   straightforward part.  I couldn't use it.  I saved one

13   one or two notes in one of the verses.

14   Q.    Are you saying, in the entire album, he played one

15   note?

16   A.    It might have been two.

17   Q.    Did he hit those notes properly?

18   A.    Yes, he did.

19   Q.    What about Mr. Goudreau?  What did he contribute

20   to the second album?

21   A.    He played a very nice cameo guitar part at the

22   beginning and end of "Don't Look Back."  He played a

23   short instrumental that was also very good in the

24   middle of Brad's song, "Used to Bad News."

25         He didn't, as I said, actually perform the part

1    on "The Journey," but he did do some little cameo parts

2    in "Don't Be Afraid," which he had mentioned yesterday.

3    Q.    So that makes it three --

4          THE COURT:  Mr. Green, I may be the only person

5    in the room that doesn't understand the distinction

6    between a cameo --

7          THE WITNESS:  Okay.  A short appearance that's

8    sort of added to the general background that's already

9    there.

10         MR. GREEN:  Thank you, Your Honor.

11         THE COURT:  Thanks.

12   Q.    Now, were there artist royalties on the second

13   album?

14   A.    Yes, of course.

15   Q.    And how were those royalties divided?

16   A.    Five ways.

17   Q.    The same five people we talked about?

18   A.    That's correct.

19   Q.    Now, was there any touring after the second album?

20   A.    Yes.  There was actually touring before the second

21   album came out.

22   Q.    And can you describe, is touring income done

23   differently from artist royalties?

24   A.    The touring profits were also divided five ways.

25   Q.    Okay.  So the touring income is separate and apart

1    from the royalty income?

2    **A.**    Yes.

3    **Q.**    Based upon the net profits of the tour?

4    **A.**    That's correct.

5    **Q.**    Did you have any involvement in the actual putting

6    on of BOSTON concerts on tour?

7    **A.**    Of course.

8    **Q.**    What did you do in that regard?

9    **A.**    Well, first, I had to come up with some new

10    equipment.  This was a five-piece band.  I sort of

11    thought it should be six.  I had to come up with some

12    new equipment that would make it possible to still

13    achieve the sound of this -- of an orchestra of guitars

14    with just five people and also the same thing for the

15    vocals of course.  There was just Brad.  There were a

16    lot of other voices on the record.  So I did that,

17    designed it, built a lot of it.  I designed the sets.

18    I built some of the props myself.

19         I had to come up with the sequence that the

20    songs would be played in, I had to come up with the --

21    write the segways that would go between those songs.

22    There were extended versions, I had to write those.  I

23    had to coach the other players on how to play the parts

24    .  I had to coach the other players of course on the

25    performance of the actual songs that I had recorded on

1    the album to make sure that we were capturing the

2    essence of the individual guitars and so forth on the

3    album.

4    Q.    Okay.  And from when to when did you tour

5    following the second album?

6    A.    And if I could just add, I also had to deal with

7    all the, you know, the management and promotional

8    issues and so forth that went on, on a day-to-day

9    basis.

10    Q.    And from when to when did you tour following the

11    second album?

12    A.    The tour actually began prior to the album coming

13    out in I think it was August.  And -- which was --

14    didn't end up being a good thing.  There was a -- I

15    forced a break after I think the first four weeks and

16    re-scheduled some dates to sort of re-group.  The shows

17    were going very badly, they weren't selling.  The

18    album, second album, hadn't come out, the band didn't

19    sound right.

20         And once I got those things sorted out, the tour

21    went -- the performances went much better.  And in

22    1978, things started going pretty well by the fall of

23    '78.

24    Q.    And when did the tours end at some point after the

25    second album?

1    **A.**    It went all the way through '78 and '79 into the

2    spring.  There were some isolated dates in the spring

3    of '79.

4    **Q.**    Now, were there any issues that faced you

5    professionally at that point in time?

6    **A.**    Yeah, there was those issues every day, so if you

7    could narrow it down a little.

8    **Q.**    Did all of this have any repercussions for your

9    studio?

10    **A.**    Of course the -- while we were on tour, it had

11    nothing to do with studio.  However, there were issues

12    in the studio that I had slapped together in a hurry to

13    make that second album, and I was going to have -- I

14    knew I was going to have to make a major renovation of

15    the equipment to get what I was trying to get out of

16    that studio.  There were some problems with it, the

17    recording of the second album, because of limitations

18    in the studio.

19    **Q.**    Now, at some point in time following the end of

20    the second tour -- and this would have been in the

21    spring of '79? --

22    **A.**    Yes.

23    **Q.**    -- did you call a meeting with the band to discuss

24    solo projects?

25    **A.**    Yes.  If I can just add just for the sake of

1    clarification on the schedule, there were some isolated

2    dates in the spring and maybe early summer.  There was

3    a tour to Europe that I had nothing to do with in the

4    planning, but I went and I played.

5    **Q.**    And when was that?

6    **A.**    And that was in the fall of '79.

7          So this activity ended by late fall of 1979.

8    **Q.**    Well, at some point in time, did the group get

9    together to talk about solo projects?

10   **A.**    Yes.

11   **Q.**    When was that, sir?

12   **A.**    The end of 1979, it might have actually been the

13   very beginning of '80, I called everybody together.

14   **Q.**    What did Mr. Goudreau say, if anything, at that

15   meeting?

16   **A.**    He didn't actually say anything about doing a -- I

17   told everybody, "This would be a good time to do a solo

18   project."  I said I had two issues.  I had to -- I was

19   going to have to re-build the studio.  It wasn't going

20   to be easy.  And I had some issues with Paul Ahern, and

21   the song-writing agreement was very unfair, and I was

22   trying to resolve that.

23   **Q.**    You had your own contractual issues with

24   Mr. Ahern?

25   **A.**    That's correct.

1    **Q.**   Was that a contract that Mr. Goudreau was party
2    to?
3    **A.**   No.
4    **Q.**   Was that the song-writing contract?
5    **A.**   Yes.
6    **Q.**   Mr. Goudreau was never a party to that contract?
7    **A.**   No.
8    **Q.**   Now, were you, in essence, saying you needed a
9    time-out then?
10   **A.**   Well, I needed time to do these things, and it
11   was going to -- it meant that there would be nothing
12   for the other four performers to do at that time.
13   **Q.**   All right.  So did you make a suggestion, then,
14   that people could do solo projects?
15   **A.**   I did.
16   **Q.**   Did Mr. Goudreau accept your offer at that point
17   in time?
18   **A.**   Well, it wasn't an offer.  I just said, "This
19   would be a good time to do a solo project," and he did
20   later come to me with some tapes that he had worked on
21   with Brad and said that he was thinking of doing a solo
22   project.
23   **Q.**   What happened next in that regard?
24   **A.**   He played the tapes for me, and he said, "I wanted
25   to see if you'd be interested in this for the BOSTON

1    album."  There was one song that had a chorus that I

2    really liked, and I said I would -- "I'd like to use

3    this on the album.  I'd like to rewrite the verse

4    portion, but I really like this chorus."

5            And his response was, "That would be great.  How

6    long do you think it's going to take to do the next

7    album?"

8            And I said, "Well" -- I mean, I thought it would

9    take about two years from that point in time.  This was

10   early in 1980.  He said he was not willing to wait that

11   long and he would rather do it as a solo project.  And

12   I said, "That's fine."

13           I did ask him, because he had Brad singing on

14   it, if he planned on using any of the other people from

15   BOSTON, and he said, "No."  And I said -- I did offer

16   to produce the record for him.  I said, "If you want,

17   I'll produce it."

18   **Q.**   Did you produce the record?

19   **A.**   I didn't even know it was being recorded.

20   **Q.**   All right.  What did you next find out about that

21   solo album?

22   **A.**   That three out of the five members of my band were

23   in LA, and three people who had inside knowledge about

24   how I made recordings were in LA working on this what

25   he called a solo project.

1    **Q.**   Did you have any reaction to all of that?

2    **A.**   Well, I was a little hurt.  I mean, I was actually

3    the only one who was excluded, and I wasn't told that

4    it was -- I wasn't told that it was going to happen or

5    in fact that it actually was happening when I

6    discovered it.

7         I only discovered it because I had called up Sib

8    to do some work on the -- get some drum tracks down,

9    trying to shake out the problems in the studio, and he

10   said he wasn't available, he was actually leaving the

11   next morning for LA.

12   **Q.**   At some point in time, did you hear about

13   advertising for that solo album?

14   **A.**   I did.

15   **Q.**   And we do have --

16        MR. GREEN:  We are offering, Your Honor, and

17   this is Exhibit 5-F, if we could have that projected

18   just for the Court, please.

19        THE COURT:  Just to the witness.

20        MR. BAKER:  Your Honor, we're going to object to

21   this exhibit.

22        THE COURT:  Okay.  Let me just see it.  Can we

23   reduce it so I can see it?

24        MR. GREEN:  And Your Honor, it's the language in

25   the top left that we're directing to the Court's

1    attention.

2            THE COURT:  Mr. Baker, can you say in a word?

3    What, relevance?

4            MR. BAKER:  That's it.  It's 40 years old,

5    Your Honor.

6            THE COURT:  I said one word.

7            MR. BAKER:  Oh, I'm sorry.

8            THE COURT:  I got your point.

9            MR. BAKER:  Okay.

10           THE COURT:  Yeah, I'm not going to allow this,

11   but your objection is preserved, Counsel.

12           MR. GREEN:  Thank you, Your Honor.

13           THE COURT:  That was 5-F.

14   Q.   Now, the solo album came out when, sir?

15   A.   Barry Goudreau's solo album?

16   Q.   Yes.

17   A.   In the fall of 1980.

18   Q.   Now, at some point in time, did Mr. Goudreau leave

19   the band BOSTON?

20   A.   He did.

21   Q.   Was he forced out of the band BOSTON?

22   A.   Well, there was a meeting, and there was some

23   airing of grievances.

24   Q.   And when was this, sir?

25   A.   It was in 1981.

1    **Q.**    All right.  Tell us about the meeting.

2    **A.**    Everyone from the band was there.  There was -- I

3    expressed my unhappiness with how the -- with him using

4    three of the five members to record the album.  It had

5    created some really bad rumors that the band had broken

6    up.

7         And he said -- and Barry Goudreau was furious,

8    blaming me for the album failing and saying that I

9    stopped it, which I told him was absolutely untrue and

10   was untrue.  And at one point, he said he wanted to

11   leave the band, and either Sib Hashian or Brad Delp

12   said, "Well" --

13        MR. BAKER:  Objection, Judge.

14        THE COURT:  Well, sustained as to that.

15        But Mr. Green, do you want to ask a follow-up

16   question?

17        MR. GREEN:  I will.

18   **Q.**   Just in terms of your interaction with Mr. Delp,

19   can you describe -- with Mr. Goudreau, rather.

20   Describe further what happened at that meeting without

21   mentioning what other people said.

22   **A.**    Okay.  He wanted to leave, but he wanted to

23   continue to receive one-fifth of the royalties,

24   including on all the songs he had never played on, for

25   the rest of his life basically.  And that's how the

1      meeting ended.

2      **Q.**   Okay.  Did he ultimately leave the band BOSTON

3      following that meeting?

4      **A.**   He did.

5      **Q.**   Did you force him out of the band?

6      **A.**   No.  I actually delayed agreeing to him leaving

7      the band.

8      **Q.**   Why was that, sir?

9      **A.**   Well, there were a few important reasons.  First

10     of all, because of the way the first album had been

11     promoted, they had made it look like there were five

12     people that made the record, which wasn't correct.  But

13     now people thought this guy was going to be part -- an

14     essential part of this album, and if he was leaving,

15     that would be some part of BOSTON sound that wouldn't

16     be there anymore.

17          The -- he was asking for something that I

18     thought was unreasonable, to get paid for the work I

19     did on approximately 13 songs for the rest of his life.

20     The -- and, you know, somewhere behind the jealousy and

21     the bad feelings, this guy used to be my friend.  I put

22     him up in my dining room for six weeks once.

23     **Q.**   All right.  Now, let's turn to Exhibit 8, please.

24          MR. GREEN:  If I could have that published?

25          THE COURT:  You may.

1    **Q.**    Do you recognize this document, sir?

2    **A.**    Yes, I do.

3    **Q.**    Now, this is the settlement agreement that is

4    dated May 9, 1983; correct?

5    **A.**    Correct.

6    **Q.**    Had -- what was going on between this meeting in

7    1981 and 1983?  In other words, was Mr. Goudreau still

8    with the band or not with the band?

9    **A.**    Well, of course he wasn't working with me.  I was

10   in the studio working on that third album.  He had sued

11   the entire band and was demanding basically this sort

12   of -- all right, I'm going to call it extorted money,

13   but he wanted to get paid for these songs, and in his

14   suit, he demanded it.  This was the settlement of that

15   lawsuit.

16   **Q.**    Okay.  Now, let me ask you -- let's turn to the

17   last page here.  Do you see the signatures of the

18   various members of the band there?

19   **A.**    Of course.

20   **Q.**    And do you see Mr. Goudreau's signature on the

21   right side?

22   **A.**    Sure.

23   **Q.**    Now, if we could turn back to the first page here,

24   the first "whereas" clause says, "Mr. Goudreau is and

25   has been an equal partner;" do you see that?

1    **A.**    Yes.

2    **Q.**    What is -- just concentrating on the phrase "is

3    and has been," what is your understanding of that

4    phrase?

5    **A.**    Well, at some point, he became a partner in the

6    band.  I was told that it was 1977 when Paul Ahern's

7    accountant filed tax returns for and a partnership form

8    for the band.

9    **Q.**    Does this say anywhere there that he was an

10   original partner?

11   **A.**    No.

12   **Q.**    Or that he had always been a partner?

13   **A.**    No.

14   **Q.**    Let's next turn -- let's next turn to the clause

15   that appears --

16            MR. GREEN:  Can we scroll down to the clause

17   about BOSTON -- I believe it's on Page 7 -- the name.

18   **Q.**    Clause D on Page 7, if you could take a look at

19   that, and it continues to the top of the next page.

20            MR. GREEN:  If we could perhaps get it together,

21   scroll down so Mr. Scholz can read it.

22   **A.**    Clause D?

23   **Q.**    Yes.  Do you see it?  It starts at the bottom of

24   Page 7, continues to Page 8?

25   **A.**    Yes, I'm familiar with it.

1  **Q.**   Now, did you understand that this said that

2  Mr. Goudreau may use the term in certain contexts

3  "formerly of BOSTON;" do you see that?

4           MR. BAKER:  Objection, Judge.  Same basis.

5           MR. GREEN:  I'm just asking him if he sees that

6  language.

7           THE COURT:  Counsel, you can have that question.

8  Overruled.

9  **A.**   Yes, of course I see it.

10  **Q.**   Okay.  Now, do you see the word "original" there?

11  **A.**   No.

12  **Q.**   Why does the word "original" not appear there,

13  sir?

14  **A.**   He wasn't original.

15  **Q.**   And why do you say that?

16  **A.**   Well, Brad --

17           MR. BAKER:  Your Honor, I object.  And this

18  relates to an evidentiary rule.  I'm not sure if you

19  want me to state it in open court.

20           THE COURT:  I'll hear you at sidebar.

21           (Discussion at sidebar)

22           THE COURT:  Counsel?

23           MR. BAKER:  This is Rule 11.  There's an

24  integration clause, it's the last paragraph of the

25  document.  It precludes all prior contemporaneous

1    statements.

2    THE COURT:  Yeah, but I don't think that's what

3    this was getting at, Counsel, meaning I think it was --

4    it wasn't referring to sort of prior versions or

5    representations or -- it was basically a question that

6    started with the document but was asking for why, as a

7    factual matter, this witness believes your client is

8    not a member --

9    MR. BAKER:  Okay.

10    THE COURT:  -- which we've heard a lot about.

11    MR. BAKER:  That's true.  I understand that.

12    One second, please.

13    THE COURT:  Sure.

14    (Pause)

15    MR. BAKER:  Okay.  I can't afford the sidebar,

16    so I'm going to -- I'm out of time, Judge, so I just

17    note my objection.

18    THE COURT:  It is noted, Counsel.  It's noted.

19    (End of discussion at sidebar)

20  **Q.**    Why did the word "original" not appear in that

21    paragraph, sir?

22  **A.**    Barry Goudreau wasn't an original member.

23  **Q.**    Without repeating testimony, why do you say that?

24  **A.**    He didn't play on the demos that got the Epic

25    deal, he wasn't involved in negotiations with

1    Ahern-McKenzie or sign those deals, he didn't sign the

2    contract.  He was an add-on strictly for the first

3    album.  In fact I actually hadn't anticipated putting

4    him on that album when I suggested he could be part of

5    the performing band.  And Brad and I had performed

6    90 percent of the tracks on that album and written all

7    those songs, and of course I had arranged them.

8    Q.    All right.  Now, let's just go back, if we could

9    turn to Paragraph 2 on Page 2, Paragraph 2(a).

10          As part of the settlement, Mr. Goudreau was

11    receiving a $100,000 buy-out for rights to future

12    recordings?

13    A.    That's correct.

14    Q.    Including the third album that you were working

15    on?

16    A.    That's correct.

17    Q.    Did he contribute anything to the third album

18    whatsoever?

19    A.    No.

20    Q.    You said he played guitars on a few of the songs

21    in the first two albums.  Did he play guitar at all on

22    the third album?

23    A.    No.

24    Q.    Make any contribution?

25    A.    No.

1    **Q.**    But, nevertheless, you were buying him out for

2    $100,000 on the third album; correct?

3    **A.**    That's right.

4    **Q.**    And turning, if you would, to partnership assets,

5    Page 4, Paragraph B, if we could scroll to that, does

6    this make reference to the worth of musical

7    instruments?

8    **A.**    Yes.

9    **Q.**    And Mr. Goudreau is receiving a one-fifth share of

10   that?

11   **A.**    That's correct.

12   **Q.**    And turning now to Page 5, Paragraph C, did this

13   confirm that Mr. Goudreau would --

14           MR. BAKER:  Objection, Judge.  All leading.

15           THE COURT:  Well, sustained as to form.

16   **Q.**    What did you understand the arrangement to be for

17   royalties going forward under this Paragraph?

18   **A.**    He was going to keep getting paid for the songs

19   that he didn't record on.

20   **Q.**    Well, he was going to get paid for whatever

21   royalties on the first and second album?

22   **A.**    That's correct, forever.

23   **Q.**    Turn, if you would, to Page 5, Paragraph D, there

24   is a provision here about reimbursing him for $16,000

25   and change.  What was that about?

1      MR. BAKER:  Objection.

2      THE COURT:  I'm sorry.  Was there --

3      MR. BAKER:  No.  Withdrawn, Judge.  I'm sorry.

4      THE COURT:  Withdrawn?

5      Okay.  You can answer, sir.

6  **A.**   I believe it was for expenses that had been

7  incurred that were band-related expenses.

8  **Q.**   And did he actually get that payment?

9  **A.**   I understand he did.

10  **Q.**   There is, on Page 7, Paragraph E, a reference to a

11  guarantee?  What did this provision provide for?

12  **A.**   It was in the event that the third album didn't

13  make enough money, we were going to make up the

14  difference and --

15  **Q.**   All right.  So you and the four -- and the three

16  others were personally going to go on the line for

17  that?

18      MR. BAKER:  Objection, Judge.

19  **A.**   As I understood it.

20      THE COURT:  Well, sustained as to form.

21  Counsel, you can put another question.

22      MR. GREEN:  I'll rephrase it.

23  **Q.**   He was paid the $100,000, or was he not?

24  **A.**   Early.

25  **Q.**   Okay.  But if the amount were not paid, what did

1    you understand this guarantee provision to mean?

2    **A.**    That the other members would have to pay it.

3    **Q.**    Now, there's a reference on Page 8, Paragraph 3,

4    to CBS Record royalties, deferred royalties?

5    **A.**    Yes.

6    **Q.**    What was that about?

7    **A.**    Some deferred payment plan that had been

8    orchestrated by Ahern's accounting firm for the payment

9    of royalties from CBS to all of the people that were in

10   the band.

11   **Q.**    All right.  Turning to Page 8, Paragraph 4,

12   there's a reference to $72,000 for a pension?

13   **A.**    Yes.

14   **Q.**    And what was that about?

15   **A.**    Well, there was some money in a pension plan, and

16   he got his money out of it or could take his money out

17   of it.

18   **Q.**    All right.  And there is a reference in Page 9,

19   Paragraph 5, to access to books?

20   **A.**    That's correct.

21   **Q.**    And what was that about?

22   **A.**    I assume it gave him access to, or his accountant,

23   to any financial information that might have a bearing

24   on his royalties.

25            MR. GREEN:  We can turn that off.

1    **Q.**   Thank you, Mr. Scholz.  Let me now go on to the

2    next line of questioning.

3         Following this agreement in 1983, did the band

4    tour?

5    **A.**   Yes, eventually, in -- four years later, in 1987.

6    **Q.**   All right.  Can we review the years that the band

7    toured, from --

8    **A.**   Yes.

9    **Q.**   -- 1987 to the present?

10   **A.**   Sure.  '87, which was a huge tour; '95; '97; 2003;

11   2004; 2008; '12; '14; '15; and '16.

12   **Q.**   Now, did Mr. Goudreau participate in any of those

13   tours?

14   **A.**   No.

15   **Q.**   Now, I want to concentrate on the period that

16   Ernie and the Automatics was operating in this case.

17   Do you understand that to be 2007 to 2011?

18   **A.**   Yes, that's right.

19   **Q.**   How many tours did BOSTON do during that period?

20   **A.**   One.

21   **Q.**   And why did it only do one, sir?

22   **A.**   Well, there was a -- I spent a lot of time working

23   on writing and recording music, and we don't tour in

24   those years.

25   **Q.**   Now, when did Mr. Delp pass away?

1    A.    2007.

2    Q.    Did that affect the touring schedule at all?

3    A.    No, actually.  We toured in 2008.

4    Q.    Now --

5    A.    There was a tour --

6          MR. BAKER:  Move to strike, Your Honor.  There's

7    no question.

8          THE WITNESS:  Well, can I --

9          THE COURT:  Well, answer -- you have to just

10   wait for the next question.

11         Mr. Green.

12   Q.    Did you want to supplement your last answer?

13   A.    Yes.  We had -- were planning a tentative tour in

14   2007.  We had actually had a rehearsal in February with

15   Brad for two or three days before his death.  So you

16   asked if it impacted it.  Obviously, that ended any

17   chance that we would be touring in 2007.  It hadn't

18   been booked, but it was a tentative plan.

19   Q.    Now, you've been present in the courtroom

20   throughout?

21   A.    Sure.

22   Q.    Did you hear Mr. Boch talk about playing at

23   Mohegan Sun?

24   A.    Yes.

25   Q.    During any of the tours, 2007, 2011, I guess there

1   was just one, did BOSTON play at Mohegan Sun?

2   **A.**   We played at Mohegan Sun several times, so I

3   believe we did play at Mohegan Sun in 2011, but I'm not

4   sure.

5   **Q.**   Did the fact of the tours have any affect on album

6   sales?

7   **A.**   Yes.   I am told that the royalties go up somewhat

8   when we tour, that the royalties -- that it has a

9   positive effect on album sales.

10          THE COURT:   And Counsel, I wasn't clear which

11   tours we're talking about.

12          MR. GREEN:   Well, I was just asking him in

13   general.

14          THE WITNESS:   Any tour.

15          THE COURT:   Okay.

16   **Q.**   All right.  And --

17   **A.**   Unless we're really playing badly, then they would

18   go down.

19   **Q.**   Did that happen very often?

20   **A.**   No.

21   **Q.**   Did -- so if tours had a positive effect on album

22   sales, how would that affect Mr. Goudreau's cut?

23   **A.**   His royalties would go up.

24   **Q.**   Now, you do recall the Exhibit of -- where

25   Mr. Goudreau was shown his 1099s for artist royalties?

1    **A.**    Yes.

2    **Q.**    And this was as a result of his work on the first

3    and second albums, as memorialized in the 1983

4    agreement?

5    **A.**    Well, it's a result of the 1983 agreement.

6    **Q.**    Now, have the royalties always been divided up

7    one-fifth since that date?

8    **A.**    Yes.

9    **Q.**    And they were divided up one-fifth before that

10    date; correct?

11    **A.**    Yes.

12    **Q.**    And to this day, they've been divided up

13    one-fifth?

14    **A.**    That's correct.

15    **Q.**    Now, Mr. Goudreau has -- we have seen 1099s for

16    Mr. Goudreau's royalties through 2013.

17          Do you understand what his royalties would have

18    been from 2014 to the present?

19    **A.**    Roughly.

20    **Q.**    And would that be the exact same number of

21    royalties you earned?

22    **A.**    Yes.

23    **Q.**    And is that how you know it?

24    **A.**    Yes.

25    **Q.**    What is that rough figure, sir?

1    **A.**    In the neighborhood of 40 to 50,000 a year.

2    **Q.**    Okay.  Do you know what the total is?

3    **A.**    For --

4    **Q.**    For the years 2014, '15 and '16 to date.

5    **A.**    As I understood it, the total for two years was

6    90-some thousand.

7    **Q.**    Okay.

8    **A.**    I may be wrong there.

9    **Q.**    Now, I want to now call your attention to

10   Exhibit 10.

11        What is that document, sir?

12   **A.**    It's a trademark document verifying a trademark.

13   **Q.**    And who owns that trademark?

14   **A.**    I do.

15   **Q.**    Can you describe for the jury what the process was

16   to apply for that trademark?

17   **A.**    Well, of course I had a professional make the

18   actual application, but I simply applied for the

19   trademark for the name BOSTON, and the mark is in caps.

20   **Q.**    Okay.  And when you say the name BOSTON, we live

21   in the City of Boston, is that part of your trademark,

22   sir?

23   **A.**    No.

24   **Q.**    What do you mean -- what did you understand this

25   trademark to mean?

1    **A.**    Of course it referred to BOSTON, the recordings

2    and performances of BOSTON --

3    **Q.**    All right.  And --

4    **A.**    -- and merchandise of BOSTON.

5    **Q.**    And do you own this trademark as of today?

6    **A.**    I do.

7    **Q.**    Has Mr. Goudreau ever had an interest in this

8    trademark?

9    **A.**    No.

10    **Q.**    Has any other member of the band BOSTON had an

11    interest in this trademark?

12    **A.**    No.

13    **Q.**    Why was it that you applied for it, sir, as

14    opposed to the then band BOSTON?

15    **A.**    Because I owned it, and there was nobody else that

16    had any interest, legal or financial interest, in the

17    band BOSTON.

18    **Q.**    And what goods and services, if any, do you

19    understand the trademark to cover?

20    **A.**    Sales of recordings and music, performance and

21    merchandise.

22    **Q.**    Anything in terms of souvenirs or the like?

23    **A.**    Of course, merchandise, yes.

24    **Q.**    Was the trademark registered?

25    **A.**    Yes.

1    Q.    All right.  That's a Federal registration?

2    A.    That's correct.

3    Q.    And referring to Exhibit 10, it says, "Word mark,"

4    and BOSTON is all in caps; do you see that?

5    A.    Yes.

6    Q.    And is that actually the mark?

7    A.    Yes.

8    Q.    Now, let's turn for a moment to -- well, why did

9    you do it all in caps, sir?

10   A.    We've always used all capital letters for the name

11   because it -- the logo has it all in caps, so whenever

12   it's in print form, for instance, on tickets or lists

13   of music or radio station playlists or anything like

14   that, it should always be in caps.

15   Q.    And if we could turn back to, just for a moment,

16   Exhibit, Page 7, Paragraph D, that says the name

17   BOSTON?

18   A.    That's correct.

19   Q.    All right.  What does that refer to there?

20   A.    It refers to the band of course.

21   Q.    Now, and you see below that "formerly of BOSTON"

22   in the third line there?

23   A.    I do.

24        MR. GREEN:  You can take that down.

25        Let me now turn to Exhibit 11, if we could have

1    that published, Your Honor?

2              THE COURT:  You may.

3    **Q.**   You see -- what is shown there, sir?

4    **A.**   It's the trademark logo.

5    **Q.**   Now, is that the same trademark or a different

6    trademark than the other one we just looked at?

7    **A.**   Well, there's a logo trademark, and then there's

8    the printed trademark.

9    **Q.**   All right.  So this is the logo trademark --

10   **A.**   That's correct.

11   **Q.**   -- as opposed to the name trademark?

12   **A.**   That's correct.

13   **Q.**   And are you also the owner of that trademark?

14   **A.**   I am.

15             MR. GREEN:  We can take that down.  Thank you.

16             Let's now turn to trial Exhibit 34, if I could

17   have that published, Your Honor?

18             THE COURT:  You may.

19   **Q.**   Calling your attention to trial Exhibit 34, sir,

20   do you see the round black sticker halfway down the

21   right side?

22   **A.**   I do.

23   **Q.**   Do you have any concerns about that sticker?

24   **A.**   Well, yes.

25   **Q.**   And what are your concerns?

1    **A.**    Well, I didn't bring my reading glasses today, and

2    it's not a very good copy, so just looking at it here,

3    the only thing I see is "Barry Goudreau, Sib Hashian

4    and BOSTON," but I know there's some other language in

5    there.  What my concern would be, that it's all in

6    caps, and it's much more prominent than the rest of the

7    writing.

8    **Q.**    Well, let me ask you this:  I'll read this to you.

9    It says --

10    **A.**    It also says "original members" I see, now that

11    it's enlarged and --

12    **Q.**    All right.  Now that you see that, did that cause

13    you any concern, sir?

14    **A.**    Yes.  It's untrue.

15    **Q.**    Now, do you have any understanding as to whether

16    this CD is still on the market?

17    **A.**    I do.

18    **Q.**    And what is your understanding?

19    **A.**    One was just purchased this week.

20         MR. BAKER:  Judge, move to strike the answer for

21    the basis that we had discussed previously.

22         THE COURT:  Sustained.

23         But if you can lay the foundation, Counsel.

24         MR. GREEN:  All right.

25    **Q.**    Did you make arrangements through Counsel to go on

1       Amazon and purchase this CD --

2    A.    I did.

3    Q.    -- in the past week?

4    A.    I did.

5    Q.    And did you actually look at the CD?

6    A.    I did.

7    Q.    And did it have that sticker?

8    A.    Yes.

9              MR. GREEN:  I'll move on.

10             Could we turn now to trial Exhibit 11, if I

11   could have that -- excuse me.  I covered that,

12   Your Honor.  Excuse me.

13   Q.    At some point in time, sir, did you hear a --

14             THE COURT:  And is someone's phone on?  If they

15   can turn it off.  Thanks.

16             Go ahead.

17   Q.    At some point in time, sir, did you hear any --

18   did you personally hear any advertisements for Ernie

19   and the Automatics?

20   A.    I have.

21   Q.    And what have you heard in that regard?

22   A.    The same sort of language, "original members,

23   Barry Goudreau and Sib Hashian."

24   Q.    And where did you hear that?

25             MR. BAKER:  Judge, I object to that.  We had --

1    well --

2         THE COURT:  Counsel -- well, sustained as to the

3    form of the question, Counsel.

4    **Q.**   At some point in time, did you hear any radio

5    ads --

6         MR. BAKER:  Renew the objection.

7    **Q.**   -- for Ernie and the Automatics?

8         MR. BAKER:  Same objection, Judge.

9         THE COURT:  No.  Overruled for what it's being

10   offered for.

11        MR. BAKER:  We're not clear about that, and

12   there's other matters that were presented previously

13   that are no longer being presented now.  It would be

14   misleading for this testimony to come in.  If you want

15   a sidebar on it, I can explain my position.

16        THE COURT:  No.  Overruled on this, Counsel.

17        MR. BAKER:  I mean, the subject is Ernie and the

18   Automatics, Judge.

19        THE COURT:  No.  Understood.  Understood.

20   Overruled.

21   **Q.**   Were these radio ads that you heard, sir?

22   **A.**   Yes.

23   **Q.**   Did you have any concern about what you heard?

24   **A.**   Yes.

25   **Q.**   What were your concerns?

1    **A.**    I mean, it was untrue.

2    **Q.**    And what about it exactly?  What language did you

3    hear?

4    **A.**    They weren't original members of BOSTON.

5    **Q.**    And when you say "they," who are you referring to?

6    **A.**    Barry Goudreau and Sib Hashian.

7    **Q.**    And what exactly was your concern, sir?

8        THE COURT:  And let me -- Mr. Baker, I think

9    this is your point.  Jurors, remember at the beginning

10   of the trial, I said when there's pieces of evidence

11   that are offered for a particular matter but you can't

12   consider them for other matters, I would tell you there

13   have been a few occasions where I think that's

14   happened.

15       This is one of them.  What's being offered now

16   is for this witness's state of mind about what he

17   heard, not for whether or not they actually said what

18   he's saying they said, it's for his state of mind;

19   okay?

20       Mr. Baker, noted otherwise.

21       MR. GREEN:  Thank you, Your Honor.

22   **Q.**    I'm just asking about your state of mind.  What

23   were you concerned about?

24   **A.**    If people think that original members of the band

25   BOSTON are playing with somebody else and no longer in

1    it, they're likely to think that something about the

2    music that they heard on those records is no longer

3    available to them in a live performance of BOSTON, and

4    it diminishes the value of BOSTON.

5    Q.    Now, at some point in time, did you speak to

6    Mr. Boch?

7    A.    I did.

8    Q.    And what was that conversation about?

9    A.    I had a few conversations with him.  They were

10   mostly superficial about his jet and so forth, but

11   there was one --

12          MR. BAKER:  Judge, I'm going to object.

13   Hearsay.  Mr. Boch was on the witness stand for three

14   days.

15          THE COURT:  And Counsel, again, no speaking

16   objections.

17          Counsel, what is this being offered for, in a

18   word?

19          MR. GREEN:  I'll rephrase this way, Your Honor.

20   Q.    You heard Mr. Boch testify that he had

21   conversations with you; correct?

22   A.    Yes.

23   Q.    You also heard Mr. Bach say that, in those

24   conversations, he never heard you complain about this

25   issue?

1          MR. BAKER:  Objection, Judge.

2          THE COURT:  Well, overruled.

3   **A.**   I did hear that.

4   **Q.**   Was that testimony accurate, sir?

5   **A.**   No.

6   **Q.**   What was inaccurate about it?

7   **A.**   I had a conversation with him about whether Barry

8   Goudreau in particular was an original member or not.

9   **Q.**   All right.  And what did you instruct him in that

10  regard?

11  **A.**   I told him that he wasn't.

12  **Q.**   Now, what have you done -- we've looked at the

13  trademarks.  Are the trademarks important to you, sir?

14  **A.**   Incredibly important.

15  **Q.**   Why are they important to you?

16  **A.**   BOSTON is -- I mean, it's just my -- this is my

17  baby, this is my life's work.  I nearly killed myself

18  and went into debt to get the contract, and I have

19  spent 40 years trying to make the image of this name

20  and the band mean something more than just another rock

21  and roll band playing music.  I was trying to make it

22  mean something that was beneficial to people and a good

23  thing instead of the usual sex, drugs and rock and roll

24  that people associate music with.

25  **Q.**   And could you talk about that a little bit more?

1    When you say activities other than the music, what are
2    you talking about?
3    **A.**    Well, the -- I used BOSTON to promote, first and
4    foremost, education.  I used the connection between the
5    science involved in creating the BOSTON sound as sort
6    of a soapbox to try to get people to think that
7    education was a cool thing, as opposed to a geeky
8    thing, not totally successful at that, but basically
9    get, especially kids, thinking more about
10   self-improvement, doing -- living a clean lifestyle and
11   a good lifestyle, and I tried to promote empathy,
12   generosity, integrity.
13          That name I have tried to make associated with
14   all these things and as well as with an escape, like a
15   safe place for people to go when they're -- excuse
16   me -- when they're dealing with difficult things, and I
17   wanted to make it an inspiration, a motivation to face
18   challenges.
19   **Q.**    All right.  Let me ask you this, sir:  You
20   mentioned 40 years.  Did you have an anniversary tour?
21   **A.**    We did.  Excuse me.
22   **Q.**    And briefly can you tell the jury what the
23   anniversary tour consisted of?  This was 40th
24   anniversary?
25   **A.**    It was our 40th anniversary.  We did -- we were

1    supposed to do 40 dates but it ended up being 50 some.

2    And we returned to Boston at the end of it to play at

3    the venue that was the site of the first headline

4    BOSTON appearance.

5    Q.    All right.  Now, just going back to the -- I

6    was -- my original question to you sir was why the

7    trademarks were important.  I think you've described

8    that.

9         What have you done to protect your trademark?

10   A.    Well, I did the obvious thing, I registered it; I

11   have people that monitor, as best they can, various

12   kinds of media to sort of scan for problems that might

13   come up of people using it improperly, and if they --

14   somebody finds one -- and that could be my publicist or

15   a fan or -- my wife spends a lot of time going through

16   social media looking for anything that might be a

17   problem.

18        If one comes up, if it's a -- seems like a minor

19   thing, I'll have somebody notify them informally, it

20   could be a call, it could be an e-mail, and typically

21   my publicist would do that.  If it seems more serious,

22   I would have a lawyer contact them or send them a

23   letter, litigation the absolute last resort.

24   Q.    Do you have any concerns about customer confusion?

25   A.    Of course.

1    **Q.**   And what are those concerns?

2    **A.**   If the customer's confused about whether he's --

3    whether the BOSTON that he's considering buying a

4    ticket for, for instance, is going to give him the same

5    sounds that he heard on those records that he loves,

6    whichever album it was, if there's anything that

7    creates the impression that, that sound might no longer

8    be there or part of it might be gone, that would create

9    confusion that would diminish the value of BOSTON and

10   hurt our -- and hurt our ability to sell tickets and

11   merchandise and so forth.

12   **Q.**   And tying it back to Ernie and the Automatics, did

13   you have any particular concerns about what they were

14   doing?

15   **A.**   Of course.

16   **Q.**   And what were those concerns?

17   **A.**   Because of their promotion, they kept using

18   these -- saying these were original members, and that

19   gives the impression that these were members that were

20   a key part of that BOSTON sound that might now be

21   missing.

22        And Barry Goudreau was -- he wasn't on most of

23   the songs.  In fact the first two songs that came out

24   of course he wasn't on at all, "More Than a Feeling"

25   and "Peace of Mind," and I didn't want people to have

1   the mistaken impression that, because they were playing

2   with somebody else now, that maybe that sound was gone.

3   **Q.**   Were there any concerns with Ernie and the

4   Automatics, and I'm referring to the years 2007 to

5   2011, that arose from the fact that BOSTON only toured

6   once during that time period?

7   **A.**   Yeah, of course.  We -- I mean, we did I

8   believe 50 to 60 dates in that 2008 tour.  During

9   that time, they were, as Ernie said, they were --

10  played 250 dates.

11        They may have been smaller crowds in many of

12  them, but still, that's a lot of exposure out there of

13  people seeing original members doing something else

14  that I thought diminishes the value of our name when we

15  do plan a tour.

16        Planning a tour is super risky.  You have to put

17  up a ton of money.  You don't ever know exactly what

18  the ticket sales are going to be or which shows are

19  going to be successful.  And of course somebody could

20  get hurt, a lot of things could go wrong.  A BOSTON

21  tour is a huge risk each time we do it.  Having the

22  possibility of a diminished audience is really scary.

23  **Q.**   Now, you heard Mr. Boch talk about the different

24  channels he used to promote his group, Ernie and the

25  Automatics?

1    **A.**    Yes.

2    **Q.**    What channels, if any, has BOSTON been using over

3    the years?

4    **A.**    Well, the same ones.

5    **Q.**    The same ones?

6    **A.**    Yes.

7    **Q.**    Radio?

8    **A.**    Radio, TV, print ads, the internet.

9    **Q.**    Touring itself?

10   **A.**    Touring, of course.

11   **Q.**    Album sales?

12   **A.**    Yes.

13           MR. GREEN:  I have nothing further.  Thank you,

14   Mr. Scholz.

15           THE COURT:  Cross-examination?

16           MR. BAKER:  Should we take a break now, Judge?

17   Would that be all right?

18           THE COURT:  We can take our break now, that's

19   fine.

20           Jurors, we'll take our mid-morning break a

21   little early, but we'll still take 20 minutes; okay?

22   Thank you.

23           Sir, you can step down.  Thank you.

24           Quiet in the courtroom.  The jury's exiting.

25           (The jury is not present for the following)

1          THE COURT:  Counsel, anything before we break?

2          MR. BAKER:  Not from our end, Your Honor.

3          THE COURT:  Counsel, in terms of the deposition

4     designations, a sense of whether -- well --

5          MR. TARLOW:  Ms. Stenger was kind enough to give

6     me her only copy of one of the highlighted portions.  I

7     haven't really had a chance to read it yet.

8          THE COURT:  Okay.  I will look at it.  I'll

9     bring it up at the end of the day, I guess.

10         Okay, thank you.

11         (Recess, 10:50 a.m.)

12         (Resumes, 11:10 a.m.)

13         (The jury is present for the following)

14         THE COURT:  Mr. Baker.

15         MR. BAKER:  May I proceed, Your Honor?

16         THE COURT:  You may.

17         MR. BAKER:  Thank you.

18              <u>**CROSS-EXAMINATION BY MR. BAKER**</u>

19    **Q.**  Mr. Scholz, Monday you were in the courtroom, and

20    your attorney gave an opening statement; do you recall?

21    **A.**  Of course.

22    **Q.**  And he asked rhetorically, "Are we all familiar

23    with the phrase 'genius is one percent inspiration,

24    99 percent hard work,'" and he applied that to you; do

25    you remember?

1    **A.**   I think he said "perspiration," but yes.

2    **Q.**   Beg your pardon.  It was perspiration.

3         But that was in reference to you, fair

4    statement?  It was applied to you?

5    **A.**   I believe I was the one he was speaking of, yes.

6    **Q.**   Sir, now, are you also familiar with the phrase,

7    this expression, sir, "Artistic excellence does not

8    excuse one from complying with the norms of decent

9    behavior"?  Are you familiar with that statement?

10   **A.**   Yes, I am.

11   **Q.**   And that also applies to you, does it not?

12   **A.**   No, I don't believe it does.

13   **Q.**   Now, sir, in the opening statement, your attorney

14   made a couple of observations that the band BOSTON does

15   certain things to promote a healthy lifestyle; correct?

16   **A.**   That's correct.

17   **Q.**   I think he talked about veganism, cruelty to

18   animals and bullying; is that right?

19   **A.**   Among other things, yes.

20   **Q.**   Among others.

21        Now, sir --

22   **A.**   I don't think bullying was mentioned but

23   non-violence.

24   **Q.**   You're certainly against bullying, regardless?

25   **A.**   Of course.

1    **Q.**    When children bully, they hit each other; correct?
2    One instance?
3    **A.**    That would certainly be a form of bullying.
4    **Q.**    And when adults bully, Mr. Scholz, they file
5    painful, hurtful, expensive lawsuits; true?
6    **A.**    Not necessarily.
7    **Q.**    Not a fair statement?
8    **A.**    Not when it's applied to what I'm doing.
9    **Q.**    Okay.  Now, from the period of June, 2009, to
10   2013, you brought four lawsuits against Mr. Goudreau?
11          MR. GREEN:  Objection, Your Honor.  Previous
12   ruling from the Court.
13          THE COURT:  Counsel, overruled as to this
14   question.  Mr. Baker is aware of my ruling.
15          MR. BAKER:  I am, Your Honor.
16   **Q.**    I'll repeat the question.
17          From June, 2009, until 2013, you've brought four
18   separate lawsuits against Mr. Goudreau; correct?  Yes
19   or no, sir.
20   **A.**    I'm not sure.
21          MR. BAKER:  Your Honor, may I approach the
22   witness in the interest of time, just to have him look
23   at the documents?
24          THE COURT:  You may.
25          MR. BAKER:  Thank you, Judge.

1    **A.**    The word "separate" is the problem.

2    **Q.**    Sir, drawing your attention to the first document,

3    is that your name at the top?

4    **A.**    Yes, sir.

5    **Q.**    Is that Mr. Goudreau's name?

6    **A.**    Yes.

7    **Q.**    What's the date of that right there?

8    **A.**    June 26th, '09.

9    **Q.**    And is this Middlesex Superior Court?

10   **A.**    Yes, it is.

11   **Q.**    Do you recognize this document?

12   **A.**    Not from the front page, but I do know that it's

13   essentially this lawsuit filed in Superior Court.

14   **Q.**    This is a lawsuit filed in Superior Court --

15   correct? -- not in Federal District Court; in Superior

16   Court?

17   **A.**    I'm sorry.  I don't understand exactly the

18   differences, but Superior Court, does that mean a State

19   Court, as opposed to a --

20   **Q.**    Correct, sir, State Court.

21   **A.**    Yes.

22   **Q.**    Okay, that's one.  Let's take a look at two.

23   Here's a separate lawsuit, this time filed in Suffolk

24   County; do you see that, sir?

25   **A.**    Yes.

1    Q.    That's your name, is it not?

2    A.    Yes, it is.

3    Q.    And is that Barry Goudreau's name?

4    A.    That's correct.

5    Q.    And what's the date?  Can you read it?  Let me

6    read it for you, sir.  It's December 10th, 2010; you

7    see that, sir?

8    A.    Yes.

9    Q.    Now, sir, let's take a look at this lawsuit.

10         Is that your name at the top, sir?

11   A.    Yes, it is.

12   Q.    And is it Mr. Goudreau on the bottom?

13   A.    Yes, it is.

14   Q.    And this is called "Draft Complaint," is it not?

15   A.    That's correct.

16   Q.    Okay.  Now --

17   A.    But --

18   Q.    -- this is a not a lawsuit that was filed here

19   today?

20   A.    Well, that's why I couldn't answer the question.

21   Q.    Okay.  And then of course there's the lawsuit that

22   we're here for today; right?

23   A.    Which I believe is that lawsuit filed in Federal

24   Court.

25   Q.    Okay.  You would agree with me, sir, it's

1     virtually impossible to police a trademark?

2     A.    Well, you can certainly make an effort at it.

3     Q.    That wasn't the question, sir.  It's impossible to

4     keep a perfect record of your trademark use on the

5     internet?

6     A.    I'm not qualified to answer that, but you can

7     certainly -- you can certainly make an effort.  It

8     would be impossible to catch every use of your mark

9     around the world, yes.

10    Q.    In fact you're constantly reviewing Wikipedia for

11    what you perceive to be errors in the text; fair

12    statement?

13    A.    No.  I have looked at Wikipedia but not constantly

14    doing it.

15    Q.    You have done it --

16    A.    Oh, yes.

17    Q.    -- fair statement?

18    A.    Right.

19    Q.    And you have lawyers that help you; correct?

20    A.    Mostly publicists and fans and my wife.

21    Q.    Okay.  Who's your publicist?

22    A.    Gail Parenteau.

23    Q.    And what is her job?

24    A.    She monitors the use of the name BOSTON, she

25    monitors stories about BOSTON, she helps with -- she

1    helps get publicity for BOSTON.

2    **Q.**    Okay.  Now, sir, you filed two trademarks, did you

3    not, two trademark applications?

4    **A.**    Yeah, there's a logo, and then there's the printed

5    form.

6    **Q.**    The logo and just the word "BOSTON;" correct?

7    **A.**    Correct.

8              MR. BAKER:  Okay.  Your Honor, I'd like to put

9    the logo on the screen.  It's a blow-up of the

10   trademark, and I've got the assent of Mr. Green.

11             THE COURT:  You may.  And we should just mark

12   it as the next -- whatever the next available letter

13   is.  I think we're using double letters perhaps,

14   Ms. Hourihan, weren't we?

15             We can do that later, but we'll mark it as the

16   next one.

17   **Q.**    Now, sir, this is the BOSTON logo; correct?

18             THE COURT:  We'll' make it BB.  Okay.

19             MR. BAKER:  I'm going to publish this to the

20   jury, Your Honor.

21             THE COURT:  You may.

22             MR. BAKER:  Thank you.

23   **Q.**    This is the BOSTON logo, is it not?

24   **A.**    Yes.

25   **Q.**    Stylized writing, gold color and a -- it looks

1    like a spaceship, is that what that's intended to be,

2    the arc shape over the word "Boston"?

3    **A.**    It's a shape that appears on the BOSTON spaceship.

4    **Q.**    Okay.  Now, sir, this image is on T-shirts;

5    correct?

6    **A.**    Often.

7    **Q.**    Souvenirs?

8    **A.**    Yes.

9    **Q.**    Every record BOSTON's ever released?

10    **A.**    Yes.

11    **Q.**    Okay.  On jackets?  Jackets?

12    **A.**    Are you referring to album jackets or --

13    **Q.**    I'm referring to the type of jacket you wore in

14    here, for instance.

15    **A.**    Oh, yes.

16    **Q.**    Okay.  Album jacket?

17    **A.**    Yeah.

18    **Q.**    Key chains?

19    **A.**    Probably.

20    **Q.**    Tickets?

21    **A.**    Well, tickets usually have the printed form.

22    **Q.**    Sometimes it appears on the tickets; correct?

23    **A.**    That I can't say.  I haven't seen it on a ticket.

24    **Q.**    It's on virtually everything BOSTON has put out

25    for the last 40 years?

1    **A.**    No.    There are -- the printed form does appear on
2    tickets, and it appears on lists of recordings of
3    BOSTON, on -- for our BOSTON dates on our website, it
4    often appears in the print form.    So it doesn't -- when
5    you say every, it's not on everything, but it's on a
6    lot of things.
7    **Q.**    If you could tell this Court what number of
8    merchandise items today you believe that image appears
9    on?
10    **A.**    I have no idea.
11    **Q.**    Ten million?
12    **A.**    I have no idea.
13    **Q.**    20 million?    No way of knowing?
14          Okay.    Now, sir, it's your view that the word
15    "Boston" belongs to you; correct?
16    **A.**    That's correct --
17    **Q.**    Okay.
18    **A.**    -- in the capital letters.
19    **Q.**    And if somebody were walking down the street in
20    Faneuil Hall with a T-shirt named "Boston," you would
21    have rights against that person; correct?
22    **A.**    I don't think so.
23    **Q.**    It's virtually impossible, sir, is it not, to
24    claim the word mark "Boston" as exclusively that of the
25    band BOSTON?

1    **A.**    Whenever it's used in reference to anything

2    musical, especially pop music and especially

3    performances or recordings or music merchandise, it

4    absolutely is a trademark of BOSTON.

5    **Q.**    In all of the advertisements that you saw Ernie

6    and the Automatics use, you didn't see one single

7    instance of the logo being used; correct?

8    **A.**    I didn't see the music logo.

9    **Q.**    And you don't have one single person other than

10   yourself and that testimony you gave an hour ago or

11   half hour ago who's going to sit in that witness box

12   and say, I went to an Ernie show thinking it was

13   BOSTON; correct?

14   **A.**    Not that I know of.

15   **Q.**    You're not putting any witness in that witness box

16   who's going to say, I saw the band Ernie and thought it

17   was BOSTON, you have no witness that'll say that;

18   correct?

19   **A.**    Oh, I don't know if I would have a witness who

20   would say it, but there is none planned.

21          MR. BAKER:  Move to strike.

22   **Q.**    I'm talking about who's coming in this trial, sir.

23          THE COURT:  Well, overruled to the extent you're

24   striking it, which was responsive, but you can ask the

25   next question.

1    **Q.**    Okay.  And you don't have, sir, if you'll listen

2    carefully, please, one single person that you intend to

3    put in that witness box who's going to say, I bought

4    the Ernie CD and thought it was BOSTON?

5    **A.**    Only hesitating because I haven't seen the list of

6    witnesses.  I don't believe so.

7    **Q.**    Okay.  And to take it a step further, you don't

8    have an expert, somebody skilled in trademark law,

9    who's going to sit in that witness box and say, I

10    conducted a survey of fans who saw your mark and Ernie

11    and the Automatics and said, I was confused?

12    **A.**    Again, I don't believe so.  I haven't seen the

13    list.

14    **Q.**    Now, this business about the word "original," that

15    really bothers you, does it not?

16    **A.**    Only to the extent that it confuses our fans.

17    **Q.**    Okay.  And in fact the concept of who is and who

18    is not original is exclusively your subjective view;

19    isn't that correct?

20    **A.**    No.

21    **Q.**    Well, in fact you formed the band with Barry --

22    **A.**    No, I didn't.

23    **Q.**    -- isn't that right?

24    **A.**    Absolutely not.

25    **Q.**    Mr. Scholz, do you remember in 1974 or '75 signing

1    a management agreement with a company called Elf

2    Management?

3    **A.**    I do.

4    **Q.**    Yes or no, sir?

5    **A.**    I do.

6    **Q.**    Okay.  And you signed that agreement together with

7    Barry Goudreau; correct?

8    **A.**    And two other people.

9    **Q.**    And then you sued Elf Management because you

10    wanted to get out of the contract; right?

11    **A.**    No.

12    **Q.**    And in the -- no?

13        Do you recall filing a complaint against Elf

14    Management?

15    **A.**    I was told to file a complaint.  I did sign the

16    complaint.

17    **Q.**    And in the course of filing that complaint, just

18    like you have done today, you made a sworn statement in

19    that document; correct?

20    **A.**    I signed it.

21    **Q.**    No, I didn't ask you if you signed it.  I asked

22    you if you made a sworn statement.

23    **A.**    I understood that it was under the penalties of

24    perjury and that it was a sworn statement that I

25    signed.

1    MR. BAKER:  Judge, may I approach the witness,

2  please?

3    THE COURT:  You may.

4    MR. BAKER:  Thank you.

5  **Q.**  Now, sir, I'm going to show you a document.  Can

6  you identify that, please?

7    THE COURT:  And Counsel, just for my benefit,

8  which one is this?

9    MR. BAKER:  It's not an admitted exhibit yet,

10 Your Honor.  I'm going to move it in, in just a moment,

11 please.

12    THE COURT:  Is it marked with a letter?

13    MR. TARLOW:  Yes, Your Honor, I can tell you it

14 is contested Y-2, Your Honor.

15    THE COURT:  Thank you.

16    MR. BAKER:  Okay.

17 **Q.**  Now, sir, it bears your name on the front, does it

18 not?

19 **A.**  That's correct.

20 **Q.**  And also Mr. Goudreau?

21 **A.**  That's correct.

22 **Q.**  And the Defendant is Elf Management against --

23 among other parties; is that right?

24 **A.**  That's correct.

25 **Q.**  And it's called "Complaint"?

1    **A.**    I read it.

2    **Q.**    Okay.  And drawing your attention to the last page

3    of this document, it bears your signature in two

4    places, does it not?

5    **A.**    Yes, it does.

6    **Q.**    And what's the date of the document?

7    **A.**    August 11th, 1977.

8    **Q.**    Okay.  Now, sir, in looking at the paragraph just

9    above your signature, in the first instance, it says,

10   "I have read the foregoing complaint and state of my

11   own personal knowledge under the pains and penalties of

12   perjury that the contents of Paragraphs 1, 2, 5-8,

13   10-39 and 40-46, 54, 56-59 and 61 through 75 are true."

14        Did I read that correctly, sir?

15   **A.**    I'm sure you did.

16   **Q.**    Let's go to Paragraph 41.  I'm going to read this

17   aloud.  "Plaintiff -- Plaintiffs, both of them, in the

18   late fall of 1975 or early winter of 1974, had formed

19   an entirely new and different musical performing group

20   known as BOSTON."

21        Did I read that correctly, sir?

22   **A.**    You did.

23   **Q.**    Okay.  And the Plaintiffs are you and

24   Mr. Goudreau?

25   **A.**    That's correct.

1          MR. BAKER:  Your Honor, I move this in to

2    evidence, please.

3          MR. GREEN:  No objection, Your Honor.

4          THE COURT:  Okay.  It may be moved in.  Counsel,

5    we should talk about the form of it, but it can be the

6    next --

7          MR. BAKER:  Okay.  I don't need it anymore,

8    Your Honor.

9          THE COURT:  Okay.  We'll make it the next

10   number, Ms. Hourihan, 6 -- are we up to 63?

11         THE CLERK:  Yes.

12         THE COURT:  63.

13         (Exhibit No. 63 was admitted in full)

14   **Q.**   Now, sir, in a different legal proceeding, once

15   again, you acknowledged Barry Goudreau was an original

16   member of the band; do you recall?

17   **A.**   There was a --

18   **Q.**   Do you recall, sir?

19   **A.**   No.  It was "original" in quotes, and the quotes

20   were accidentally left off, and I missed it.

21         MR. BAKER:  May I approach the witness,

22   Your Honor?

23         THE COURT:  You may.

24         MR. BAKER:  Mr. Green, you've seen this before.

25         MR. GREEN:  Yes.

1      THE COURT:  Is this the matter we discussed this

2  morning, Mr. Baker?

3      MR. BAKER:  That's correct, Judge.  I understand

4  the ruling.

5  **Q.**  Sir, is that your signature on the second page?

6  **A.**  Yes, it is.

7  **Q.**  And I'm going to read the verification.  "I,

8  Donald Thomas Scholz, have read the foregoing complaint

9  and hereby declare the allegations therein to be true

10  based upon my personal knowledge and upon information

11  and belief which I believe to be true.  Signed under

12  the pains and penalties of perjury this 26th of July,

13  2009."

14      Did I read that correctly, sir?

15  **A.**  I'm sure you did.

16  **Q.**  "Under the pains and penalties," just like the

17  oath you took today; correct?

18  **A.**  That's correct.

19  **Q.**  Okay.  And this document says -- it's been

20  redacted in other places -- "Their comments have

21  usually been an attempt to turn public opinion against

22  Scholz and in favor of Brad Delp and the three former

23  original band members, Barry Goudreau, Fran Sheehan and

24  Sib Hashian."

25      Did I read that correctly?

1    **A.**    You did.

2    **Q.**    And that bears your signature under oath, does it

3    not, sir?

4    **A.**    Yes, it does.

5            MR. BAKER:  Now, Your Honor, I move this in to

6    evidence, please.

7            MR. GREEN:  No objection, Your Honor.

8            THE COURT:  Okay.  It may be admitted 64,

9    Counsel.

10           (Exhibit No. 64 was admitted in full)

11           MR. BAKER:  What's the exhibit number, for the

12   record?

13           THE COURT:  For the original?

14           MR. BAKER:  The original album, Your Honor, may

15   it please the Court.

16           THE COURT:  59.

17           MR. BAKER:  59.

18           Your Honor, may I approach the witness?

19           THE COURT:  You may.

20   **Q.**   Mr. Scholz, I believe you said you didn't have

21   your reading glasses, so I'm going to help you read.

22   We know what this is?

23   **A.**   I don't need glasses for that one, and I can

24   certainly read that.

25   **Q.**   Okay.  Would you read how the band formed?  I want

1    you to start right here where it says -- or would you

2    prefer I read it?

3    **A.**   You're saying read how the band formed, or do you

4    want me to -- do you want me to read what's printed on

5    this?  Because I didn't write it.

6    **Q.**   I want you to read what's on the back of this

7    album, sir, starting with, "As to how" and going right

8    to where it says, "listen to the record," slowly and

9    clearly, please.

10   **A.**   This is what the writer wrote:  "Listen to the

11   record.  As to how the band came together, we let lead

12   singer Bradley Delp tell the story.  Fran knew Barry,

13   and Barry knew Fran, and Fran played with Sib, and Sib

14   had played with Tom, and Barry knew Tom, and Tom knew

15   me, but Fran didn't know that I knew that he knew Barry

16   too, so what happened was 'listen to the record.'

17          "If you still need more information, try this

18   BOSTON -- excuse me -- try this:  BOSTON is

19   masterminded by a guitarist named Tom Scholz, an MIT

20   graduate with Masters Degree in mechanical engineering.

21   Tom was living a split existence at the time his

22   concept for BOSTON began to fall together.  By day, he

23   was a highly touted member of the product design wing

24   of a Massachusetts-based corporation, helping develop

25   all sorts of media, machinery that he's not supposed to

1    talk about.

2        "By night, he was a member of any one of a

3    handful of constantly shifting bands on the north shore

4    club circuit in Boston.  Considering the day gig, when

5    he bought -- considering the day gig when he bought --

6    considering the day gig, when he bought 12-track

7    recording equipment and began experimenting with

8    basement tapes, mastering the machinery at his disposal

9    posed no great problem."

10   Q.    That's fine.  Thank you, sir.

11        And these are the liner notes of the original

12   album right here?

13   A.    That's what they put on there.

14   Q.    Okay.  You saw it before it was released; correct,

15   sir?

16   A.    Just before.

17   Q.    Now, sir, you testified that Barry Goudreau was a

18   20 percent owner of all of the rights to BOSTON from

19   the very beginning; correct?

20   A.    I hope not.

21   Q.    Okay.  In fact that's not true?

22   A.    It isn't true.

23   Q.    Okay.  He's been a 20 percent owner of the rights

24   to the sound recording since the beginning; correct?

25   A.    No.  He was entitled to a 20 percent share of the

1    royalty.  That's a lot different than owner.

2    **Q.**    Okay, thanks for the clarification.  He's entitled

3    to a 20 percent share of the royalties for the sound

4    recording, for making that record; correct?

5    **A.**    That's what Brad and I agreed to.

6    **Q.**    Okay.  And so is Sib Hashian; right?

7    **A.**    That's correct.

8    **Q.**    And so is Fran Cosmo; correct?

9    **A.**    No.  It's Fran Sheehan, but I understand.

10   **Q.**    Fran Sheehan.  I beg your pardon.  Fran Sheehan;

11   correct?

12   **A.**    That's correct.

13   **Q.**    And also the other member.  Who's the other --

14   Barry, Brad, Fran, Sib; right?

15   **A.**    That makes five when you put me in.

16   **Q.**    Okay.  Now, sir, you testified you produced the

17   record, co-produced it with John Boylan?

18   **A.**    That's correct.

19   **Q.**    And separate and distinct from royalties for the

20   record, you got paid a producer fee?

21   **A.**    I did.

22   **Q.**    And separate and distinct from the royalties for

23   the sound recording, you got paid for publishing, did

24   you not?

25   **A.**    Of course.  I was a writer.

1    **Q.**    Okay.  And you got paid for the compositions you

2    wrote; correct?

3    **A.**    Well, it's either one or the other.  It's either

4    publishing or writing.  I got paid for writing.

5    Whether you call it publisher's share or writer's

6    share, I don't know.

7    **Q.**    So when you testified earlier that it was

8    just such a profoundly unfair deal that Barry got

9    20 percent, that was only for the record; right?

10        MR. GREEN:  Objection.  It mischaracterizes.

11        THE COURT:  Well, sustained as to the form of

12    this question.  You can rephrase, though.

13        MR. GREEN:  Thank you, Your Honor.

14    **Q.**    Just to be clear, sir, Barry got the 20 percent of

15    the record only; correct?

16    **A.**    What they call the recording royalties, yes.

17    **Q.**    Okay.  Now, you signed -- and with respect to the

18    second album, that is also true?

19    **A.**    I'm sorry.  They're called artist royalties.

20    **Q.**    Understood, artist royalties.  With respect to

21    the second record that BOSTON released, he got paid

22    20 percent only for artist royalties?

23    **A.**    He got 20 percent of the artist royalties, that is

24    correct.

25    **Q.**    And once again, sir, you got your fees for

1    producing the album?

2    A.    I hope so.

3    Q.    No, not I hope so.  You did?

4    A.    I'm sure I did.  I can't -- when you say I did get

5    it, I didn't look to see if I received the money and

6    actually didn't have anybody paying attention to my

7    income, but I'm sure that eventually I got paid for

8    producing that album.

9    Q.    And in addition to that, sir, you got your extra

10   fees for writing the songs, the compositional fees?

11   A.    They're not extra fees.  I got my compensation for

12   writing the songs, yes.

13   Q.    Okay.  And you're upset today because Barry is

14   entitled to 20 percent artist royalties; correct?

15   A.    No.  I'm upset because he's referring to himself

16   as an original member of a band and in violation of the

17   agreement that entitled him to receive that 20 percent

18   artist royalty.

19   Q.    You made a statement earlier today that Barry

20   played minimally on the first album; correct?

21   A.    Well, I said he played on two songs.

22   Q.    And on the second album, he didn't seem to

23   contribute much; right?

24   A.    Not nearly as much.

25   Q.    And the reality, sir, is that he was a partner in

1    the band, in the partnership called BOSTON, from the

2    very beginning?

3    **A.**    No.

4    **Q.**    He's gotten paid every royalty for the sound

5    recording for the record from the beginning; correct?

6    **A.**    That's correct --

7    **Q.**    And every --

8    **A.**    -- an artist royalty.

9    **Q.**    And every royalty for the second record; correct?

10   **A.**    That's correct.

11   **Q.**    And he got paid 20 percent of all touring income

12   from the very first tour; correct?

13   **A.**    That is correct.

14   **Q.**    How many dates was the first tour, sir?

15   **A.**    Approximately 35.

16   **Q.**    And how many dates was the second tour?

17   **A.**    That was shorter.  It was about two months.  I

18   think there were only 30 days.

19   **Q.**    Let me rephrase the question.  What's the total

20   number of dates that you played with Barry Goudreau

21   when he was touring with BOSTON?

22   **A.**    Probably roughly 60 in '76 and '77.  And in '78

23   and '79, a great deal more, probably in the

24   neighborhood of 150.

25   **Q.**    He pegged it at around 200.  Does that sound

1    reasonable in toto?

2    **A.**    It may be little high, but --

3    **Q.**    And for the entire touring history, he got

4    20 percent; right?

5    **A.**    That is correct.

6    **Q.**    Okay.  Now, sir, when the partnership was formed,

7    it was five partners that came together; correct?

8    **A.**    No.

9    **Q.**    It's not like you doled out the percentages, is

10   it?

11   **A.**    I did.

12   **Q.**    But the partnership existed from the very

13   beginning?

14   **A.**    No.

15   **Q.**    Okay.  And what really bothers you and the real

16   reason why we're here today is because you think you

17   made a stupidly bad deal to acknowledge Mr. Goudreau's

18   20 percent; correct?

19   **A.**    No.

20   **Q.**    Sir, do you remember taking a deposition on

21   February 19th, 2014?

22   **A.**    Sure.

23   **Q.**    Okay.  And at that deposition, just like you did

24   today, you took an oath?

25   **A.**    I understand.

1    Q.    "I swear to tell the truth;" you remember that?

2    A.    Of course.

3    Q.    And you sat in front of a stenographer, and she

4    asked you questions, and you answered them.  I beg your

5    pardon.  The attorneys asked you questions, the

6    stenographer recorded it.

7          You have on your desk --

8          THE COURT:  Was that question?  There wasn't an

9    answer.

10         MR. BAKER:  Yes.

11         THE COURT:  Sir, did you agree with that?

12         THE WITNESS:  Yes.

13         THE COURT:  Okay.

14   Q.    You agree with that, sir?

15   A.    Yes.

16   Q.    You took an oath and you testified.  And your

17   testimony then was different from what you just gave

18   us, was it not, sir?

19   A.    I don't know, unless you want me to read the

20   pages.

21   Q.    Before you, sir, do you see a transcript?

22   A.    Of course.

23   Q.    Okay.  Would you open that, sir, to Page 120.

24         And, sir, if you look at Line 9, I'll read the

25   question, and you read the answer, please.

1        "Question:  And why did the partners in BOSTON
2   each share" --
3   **A.**   I'm sorry.  Where are you on Page 120?
4   **Q.**   I'm reading on Page 120, Line 9, sir.
5   **A.**   Okay.
6   **Q.**   "Question:  And why did the partners in BOSTON
7   each share equally 20 percent of the profits and losses
8   of the partnership?"
9        I'll read your answer.  "Answer:  Because Brad
10  and I were stupidly generous back then.
11       "Question:  So it was stupidly generous on your
12  part and Mr. Delp's part to include Mr. Hashian,
13  Mr. Sheehan and Mr. Goudreau as equal parters?
14       "Answer:  It really was."
15       Do you remember that testimony?
16  **A.**   Of course.
17  **Q.**   Now, sir, you referred to Mr. Goudreau and the
18  others as performers this morning; do you remember?
19  **A.**   At some point, probably.
20  **Q.**   Okay.  You could just as easily have demanded
21  that, if they were going to play on your record, they
22  sign a side man notice; correct?
23  **A.**   That I'm afraid I didn't know anything about at
24  that time.
25  **Q.**   You could have asked them just, Look, I just want

1    to hire you to play on the record, and here's $100, you

2    could have done that; correct?

3    **A.**    I don't know if I could have done it, and I wasn't

4    familiar with how things worked in the music business,

5    especially a business where people would make money.

6    So, no, I actually was not aware of that.

7    **Q.**    But you know it today; correct?

8    **A.**    I assume it today.  I still don't do that today.

9    **Q.**    Sir, based on your 40 years in the music business,

10    you and I can agree, can we not, that when a musician

11    is hired for a day's work, he signs a release and gets

12    a day's pay; correct?

13    **A.**    I wouldn't know.  I don't -- I'm not involved in

14    that sort of commercial activity.  I'm sure what you're

15    describing happens.

16    **Q.**    Now, sir, you've looked at all of these different

17    advertisements that relate to Ernie and the Automatics;

18    correct?

19    **A.**    That's correct.

20    **Q.**    You know about the Hard Rock advertisement?  You

21    know about the existence of the advertisement for the

22    record release party at the Hard Rock Cafe?

23    **A.**    Can you refresh my memory about which -- we've

24    seen a lot of things.  I'm just not sure --

25    **Q.**    Yeah, we'll do just that, sir.  One second,

1    please.

2    **A.**    I wasn't invited to the party, so I don't remember

3    it.

4    **Q.**    Sir, while we're looking for that, you saw the

5    video of Ernie and the Automatics yesterday; correct?

6    **A.**    Yes.

7    **Q.**    And there was some footage -- there's two videos,

8    one that Mr. Boch acknowledged was done by him and the

9    other by a gentleman named Ian Barrett without his

10    permission; do you recall?

11    **A.**    Yes.

12    **Q.**    Okay.  Now, let's just choose the one that he did.

13    At the very end, there was some footage of Sib Hashian,

14    Barry Goudreau and Brad Delp; do you remember?

15    **A.**    Yes.

16    **Q.**    You don't own the rights to those images, do you?

17    **A.**    I don't know.  I doubt it.

18    **Q.**    Okay.  And in fact you didn't take that

19    eight-millimeter footage, did you?

20    **A.**    Personally?  No.

21    **Q.**    Okay.  And you're not claiming that publishing

22    those images is a violation of your BOSTON trademark,

23    are you?

24    **A.**    Well, only insomuch as it would cause confusion

25    about whether they were in BOSTON or not.

1    **Q.**   I'm talking about the images themselves, sir, just

2    the images.

3    **A.**   Like I said, only as to the extent it might cause

4    confusion.

5    **Q.**   Sir, putting the pictures of Brad, Sib and Barry

6    up does not violate your rights to any trademarks, does

7    it?

8    **A.**   If it's combined with the name BOSTON and it's on

9    somebody's else's video, I'm not sure, actually.

10   **Q.**   Okay.  In that video, you did not see the BOSTON

11   logo, did you?

12   **A.**   No.

13            MR. BAKER:  Okay.  Your Honor, I'm going to put

14   on the screen, please, Exhibit 34.

15            THE COURT:  34 --

16            MR. BAKER:  I'm sorry.

17            THE COURT:  -- or 31?

18            MR. BAKER.  I'm sorry.  31, Judge.  Beg your

19   pardon.

20            THE COURT:  You may.

21            MR. BAKER:  Thank you.

22   **Q.**   All right.  You remember this ad, sir?

23   **A.**   Yeah, I know that was one of the exhibits.

24   **Q.**   I can't hear you, sir.

25   **A.**   Sorry.  I know that was one of the exhibits.

1    **Q.**    Okay.  And it's your view, is it not, that, that

2    advertisement infringes on your trademark?

3    **A.**    Yes.

4    **Q.**    And you sued Barry Goudreau for something that's

5    got Ernie and the Automatics plastered all over it but

6    not Ernie; right?

7    **A.**    That's correct.

8    **Q.**    Okay.  And you didn't sue the Hard Rock Cafe.

9    They sponsored the party; right?

10    **A.**    I would assume that they rented the Hard Rock

11    Cafe.

12    **Q.**    But it's got their name right on it, sir.  You

13    didn't sue the Hard Rock?

14    **A.**    No.

15    **Q.**    And there were some advertisements for Bull Run

16    Restaurant; you remember those?

17    **A.**    Sure.

18    **Q.**    You know where the Bull Run Restaurant is, don't

19    you?

20    **A.**    I don't.

21    **Q.**    Okay.  But in that advertisement, it said "Bull

22    Run Restaurant," and it had Ernie and the Automatics on

23    it; do you recall?

24    **A.**    I do remember that.

25    **Q.**    You didn't sue Bull Run now, did you?

1    **A.**    No.

2    **Q.**    And, sir, there were advertisements for a number

3    of other restaurants, but you didn't sue any of them,

4    now, did you?

5    **A.**    No.

6    **Q.**    Okay.  And in addition to that, sir, we saw an

7    advertisement with a gentleman named Kenny Wayne

8    Shepherd; do you remember?

9    **A.**    I remember the name, and I don't especially

10   remember the advertisement.

11   **Q.**    We'll refresh your memory, sir.

12        And this is one such ad that offended you and

13   your trademark; correct, sir?

14        THE COURT:  And this is 20?

15        MR. BAKER:  Exhibit 20, Your Honor.

16        THE COURT:  Okay.

17   **A.**    You know, I don't see the "original members."

18   Only to the extent that it's too former members playing

19   together, it might cause confusion, but --

20   **Q.**    Okay.

21   **A.**    -- it doesn't bother me much.

22   **Q.**    Does this ad infringe or not, sir?  I'm not quite

23   sure I understand your answer.

24        MR. GREEN:  Objection.  Calls for a legal

25   conclusion.

1    THE COURT:  Yeah, sustained as to this question.

2    Q.    Okay.  Sir, this is an exhibit in this trial.  You

3    didn't sue Kenny Wayne Shepherd of course?

4    A.    Of course not.

5    Q.    And you didn't sue the venue Cape Cod Melody Tent?

6    A.    No.

7    Q.    All right.  Now, sir, let's talk about Ernie Boch.

8    You said you had a number of phone conversations with

9    him; do you recall?

10    A.    That's correct.

11    Q.    And in fact you said you told him, "Don't use the

12    word 'original'"?

13    A.    I didn't tell him that.

14    Q.    What did you tell him, sir?

15    A.    I told him that Barry Goudreau was not an original

16    member.

17    Q.    Okay.  And why did you tell him that?

18    A.    Because he suggested that he was.

19    Q.    All right.  And in that conversation, were you

20    aware at that time that there are a number of these

21    advertisements out there with Barry Goudreau's name and

22    referring to BOSTON?

23    A.    Those conversations took place about a year before

24    these advertisements.

25    Q.    I can't hear you, sir.

1    **A.**    These -- the conversations with Ernie Boch, Jr.,

2    took place in the year prior to these advertisements.

3    **Q.**    Prior to which advertisement?

4    **A.**    Well, this is 2007.  I talked to Ernie Boch, Jr.,

5    in 2006.

6    **Q.**    So it's your testimony that Ernie Boch was

7    advertising Mr. Goudreau as an original member as early

8    as 2006?

9    **A.**    No.

10    **Q.**    I gotcha.  I gotcha.  And, sir, at any time --

11    well, strike that.

12         How many times did you talk to Mr. Boch?

13    **A.**    Several.

14    **Q.**    Several.  Approximately how many times?  Ten, 20?

15    **A.**    No.  Maybe four or five, well, in 2006 and a few

16    more in 2007.

17    **Q.**    And at any time when you talked to him, did you

18    ever bring up to him, You're infringing on my

19    trademark?

20    **A.**    I didn't have any reason -- I didn't have any

21    knowledge of any infringing activities at that time.

22    **Q.**    Okay.  But you talked to him in 2006; correct?

23    **A.**    That's correct.

24    **Q.**    Right around there?

25    **A.**    That's correct.

1   **Q.**   And you had his phone number, didn't you?

2   **A.**   Sure.

3   **Q.**   And then shortly thereafter, at some point

4   thereafter, you learned that Ernie and the Automatics

5   was referring to Barry as a former original member of

6   BOSTON; right?

7   **A.**   That's correct.

8   **Q.**   And you never called him and said, I don't like

9   this conduct?

10  **A.**   No, not personally.

11  **Q.**   Okay.  And in fact, sir, we're here today because

12  Mr. Boch, you complain, you state, has infringed your

13  mark; correct?  He's the primary infringer?

14  **A.**   I don't know about that.  I think it's

15  Barry Goudreau.

16  **Q.**   Okay.  But you --

17  **A.**   If I thought it was Mr. Boch, I would have been

18  suing Mr. Boch.

19  **Q.**   But, sir, you're telling me as you sit there right

20  now you are unaware of the fact that Mr. Boch has

21  alleged to have infringed on your marks; is that

22  correct?

23  **A.**   That's not correct.

24  **Q.**   Okay.  So then, I'll say it again, you are here

25  today because Mr. Boch infringed on your marks, and

1    somehow Mr. Goudreau's responsible; correct?

2    **A.**    No.

3    **Q.**    But you never sued Mr. Boch, he's never been sued

4    by you?

5    **A.**    That's correct.

6    **Q.**    Never received one of those lawyer letters that

7    you talked about before?

8    **A.**    Not that I know of.

9    **Q.**    And there's a reason for that, is there not, sir?

10   **A.**    Sure.

11   **Q.**    The reason, sir, it's obvious, Mr. Boch has the

12   financial resources to defend you, and it wouldn't

13   affect him at all; correct?

14   **A.**    No.

15   **Q.**    But instead, you pick --

16   **A.**    No, that's not the reason.

17   **Q.**    But, instead, you go after the secondary party

18   without the primary party in this suit?

19   **A.**    Well, you say instead, but the first premise of

20   your question, I said no, so I can't answer that second

21   question.

22   **Q.**    Instead of suing Mr. Boch, you put Mr. Goudreau in

23   suit; fair statement, sir?

24   **A.**    Yes.

25   **Q.**    Thank you.  Now, sir, Sib Hashian is also

1    identified on a number of these advertisements as

2    "former original member;" correct?

3    **A.**    That's correct.

4    **Q.**    You never sued Sib?

5    **A.**    No.

6    **Q.**    Just Barry?

7    **A.**    That's correct.

8    **Q.**    And the real reason, sir, is you want his

9    royalties, that's what this is all about; correct?

10    **A.**    That's not correct.

11    **Q.**    In fact you testified you're after his royalties;

12    do you remember that?

13    **A.**    Not explicitly, no.

14        MR. TARLOW:  Madam Clerk, could we come off the

15    screen so that I can search a -- thank you.

16    **Q.**    Sir, how many records has BOSTON sold since the

17    beginning?

18    **A.**    Roughly 31 million.

19    **Q.**    31 million.  And in your last tour, sir, what did

20    you gross revenue-wise?

21    **A.**    I'm embarrassed to say I don't know, but it was a

22    very successful tour.

23    **Q.**    I can't hear you, sir.

24    **A.**    I said, I'm embarrassed to say I don't know, but

25    it was a very successful tour.  I would estimate that

1    the gross was approximately $5 million before all

2    commissions and expenses.

3    Q.    Five million, okay.

4          And do you have any idea what the merchandise

5    sales were?

6    A.    Again, I don't.  I would -- I would say an

7    approximate number would be about 25 percent of that.

8    Q.    Okay.  And you're seeking to take Mr. Goudreau's

9    $40,000 payment last year -- correct? -- the royalties?

10   You testified that's what he earned because that's what

11   you earned.  You want that, don't you?

12   A.    I don't want it.

13   Q.    And you want his two years ago royalty payment,

14   which was another 40,000, you said it was about 90 for

15   two years; correct?

16   A.    I did say that.

17   Q.    Now, sir, when you saw that video yesterday, did

18   you see all of the other band images on it, on the

19   travel cases?

20   A.    Yes.  I'm sorry.  I didn't have a good view of the

21   video, but I understand they were on -- they were on

22   there.  They had road cases from different bands.

23   Q.    The road cases.  There was one of RTZ; correct?

24   A.    I believe so.  Again, I couldn't -- I'm afraid I

25   couldn't see it from where I was, but --

1    Q.    And another one said "Orion the Hunter"?

2    A.    I can't argue with you.  I couldn't read it from

3    where I was.

4    Q.    But in none of those frames did you see the BOSTON

5    trademark?

6    A.    Even from my fuzzy viewpoint, I could tell there

7    was no BOSTON logo on any of them.

8    Q.    And you want this jury to believe that, that video

9    infringes on your mark?

10   A.    It does.

11   Q.    Sir, let's talk about your music.  It's different

12   from that of Ernie and the Automatics; would you agree

13   with me?

14   A.    Except when they're playing BOSTON medleys, yes.

15   Q.    Okay.  So let's forget about the BOSTON medleys.

16   Let's just talk about the original songs.  They're

17   basically a three-chord blues band; fair statement?

18   A.    That I don't know.

19   Q.    Well, have you listened to the CD?

20   A.    No.  Only part of it.

21   Q.    So when you say, I haven't listened to it, you

22   can't make a comparison between your music and theirs,

23   except for that one video you saw yesterday?

24   A.    That's correct.

25   Q.    Would you tell the jury, please, what does

1    multi-platinum mean?

2    **A.**   More than -- multiple millions in sales.

3    **Q.**   Once again, sir?  I'm sorry.

4    **A.**   Multiple millions in sales.

5    **Q.**   Okay.  And in fact the band BOSTON is a

6    multi-platinum artist?

7    **A.**   Of course.

8    **Q.**   So when Ernie Boch refers to BOSTON as a

9    multi-platinum-selling artist, that's true?

10   **A.**   Yes.

11   **Q.**   Okay.  Now, sir, once again, you wanted to get

12   Ernie -- Barry Goudreau's royalties in this lawsuit;

13   correct?

14   **A.**   I don't really want his royalties.

15   **Q.**   Okay.  Could you turn to Page 279 of your

16   deposition, sir.

17        THE COURT:  And Counsel, is that what I have

18   here?

19        MR. BAKER:  Do you have his transcript,

20   Your Honor?

21        THE COURT:  It's up on the screen.  I'm just not

22   sure.  Is that the right page?

23        MR. BAKER:  Mr. Tarlow is getting us there.

24   I've got my own copy.

25        MR. TARLOW:  Your Honor, that is Page 279.

1          THE COURT:  Okay.  Thank you.

2    **Q.**   Okay.  Mr. Scholz, I'm looking at Page 279, and

3    starting at Line 5, I'll read the question and the

4    answer.

5          "Question:  What about buying out the remaining

6    royalties that you regret giving to Mr. Goudreau as

7    part of his settlement agreement?"

8          THE COURT:  And Mr. Tarlow, can you move mine

9    back?

10         MR. TARLOW:  I'm sorry, Your Honor.

11         THE COURT:  And can we make it so --

12         MR. BAKER:  Okay.  I'm going to skip over a

13   line, Your Honor.  I'm going to go right to Line 14.

14         THE COURT:  Okay.

15   **Q.**   "Is that a goal of this litigation, to obtain the

16   remaining royalty rights that Mr. Goudreau has --

17         "Well, the original -- now it's a goal.

18         "Question:  Say again.

19         "Answer:  Now it is."

20         Do you see that?

21   **A.**   Yes.

22         Do you know a gentleman named Fran Cosmo, sir?

23   **A.**   Of course.

24   **Q.**   Who is Fran Cosmo?

25   **A.**   Fran Cosmo sang with BOSTON from 19 -- excuse

1    me -- 93 through 2004.

2    **Q.**   How did you meet Mr. Cosmo?

3    **A.**   He was recommended by a former guitar tech of

4    mine.

5    **Q.**   And in fact, before he sang with BOSTON, he sang

6    in one of Barry Goudreau's bands; correct?

7    **A.**   He did.

8    **Q.**   All right.  Now, after Mr. Cosmo left your band,

9    he wanted, once again, to work with Barry Goudreau;

10   correct?

11   **A.**   That's right.

12   **Q.**   In fact it was February of 2017 --

13          THE COURT:  20 -- Counsel, were you correct

14   about the date, February of --

15          MR. BAKER:  February, 2009.  I beg your pardon,

16   Judge.

17          THE COURT:  Okay.

18          MR. BAKER:  I'm sorry, Judge.  One second,

19   please.

20          (Pause)

21   **Q.**   Okay.  Sir, in 2006, December of 2006, did you

22   receive an e-mail from Barry Goudreau informing you

23   that he wanted to work with Fran Cosmo?

24   **A.**   I don't recall that specific -- I did receive a

25   couple of e-mails from Barry Goudreau in 2006.

1    **Q.**   Well, do you recall generally, sir, that Mr. Cosmo

2    and Mr. Goudreau wanted to work again on music, and

3    they sought your permission to do so?

4    **A.**   That's correct.

5    **Q.**   Okay.  And in fact --

6    **A.**   Or Fran Cosmo did.  I'm not sure about Barry.

7    **Q.**   I'm sorry?

8    **A.**   Fran Cosmo did.  I am not sure about -- you asked

9    me about an e-mail from Barry Goudreau requesting that,

10   and I'm not sure about that.

11   **Q.**   Okay.  And in fact, sir, Mr. Goudreau told you

12   that, if you didn't permit Mr. Cosmo to work with

13   Mr. Goudreau, Mr. Cosmo would likely file bankruptcy;

14   do you recall that?

15   **A.**   I remember him making that statement.

16   **Q.**   Okay.  And sometime in February of 2007, a couple

17   of months afterwards, you said, Go ahead and work

18   together, guys, I really don't care; do you recall

19   that?

20   **A.**   I sent them a specific waiver of Fran's condition

21   about not playing with former members for a specific

22   project.  Is that what you're referring to?

23   **Q.**   That's exactly what I'm referring to.

24           You had an agreement with Fran Cosmo, did you

25   not, sir?

1    **A.**    He had requested a waiver to do a certain project,

2    and I granted the waiver --

3    **Q.**    And that project --

4    **A.**    -- so that he wouldn't go bankrupt.

5    **Q.**    And that project was with Barry Goudreau; correct?

6    **A.**    That's correct.

7    **Q.**    And you understood, at or around the time he was

8    asking for your waiver, that he was in dire financial

9    condition; fair statement, sir?

10    **A.**    You know, I knew how much money Fran had made, so

11    I wasn't sure that the representation made by Goudreau

12    was correct.

13    **Q.**    Okay.  But he put you on notice, did he not,

14    Mr. Goudreau, that Mr. Cosmo was in jeopardy of filing

15    bankruptcy if he couldn't get this waiver?

16    **A.**    Barry Goudreau had made a lot of statements that

17    weren't entirely true, so I didn't put an enormous

18    amount of credence in it.

19    **Q.**    Okay.  And do you recall stating in another

20    proceeding under oath that you understood Mr. Cosmo

21    would have to file bankruptcy?

22    **A.**    I may have, yes.

23           MR. BAKER:  Okay.  Your Honor, may I approach

24    the witness?  This is a different proceeding, but I

25    just want to refresh his memory with it.

1      THE COURT:  You may approach.

2  Q.   I'll read it.

3      "Question:  You had heard that Barry Goudreau

4  had offered to pay the Cosmo expenses; correct?

5      "Answer" --

6  A.   Can I -- is it possible for me to read it or to

7  see it while you're reading it?

8  Q.   Absolutely, sir.  That's your testimony.

9  A.   And where are you?

10  Q.   "Question:  You had heard that Barry Goudreau had

11  offered to pay the Cosmo expenses; correct:

12      "Answer:  I had heard that.

13      "Question:  Fran Cosmo had told you in 2006 and

14  in early 2007 that he was going bankrupt; correct?

15      "Answer:  At some point."

16  A.   Right.

17  Q.   Did I read that correctly, sir?

18  A.   Yes, you did.

19  Q.   Okay.  So now, Brad Delp died sometime shortly

20  thereafter; correct?

21  A.   What was the date on that?

22  Q.   Okay.  That's February of 2007.

23  A.   That's correct.

24  Q.   Okay.  And do you recall exactly when Mr. Delp

25  died?

1    **A.**    Yes, March 9th.

2    **Q.**    I beg your pardon?

3    **A.**    March 9th.

4    **Q.**    What year?

5    **A.**    '07, 2007.

6    **Q.**    Okay.  And then, after Mr. Delp died, once again,

7    you had a say in whether Barry and Fran could perform

8    together; correct?

9    **A.**    For a different project.

10   **Q.**    In fact you sent them what's called a cease and

11   desist letter; you recall?

12   **A.**    I don't recall, but I think that's possible.

13   **Q.**    And, sir, with respect to the -- you ever heard of

14   a band called the World Classic Rockers?

15   **A.**    Of course.

16   **Q.**    Okay.  And what are they?

17   **A.**    I'm -- my familiarity with it was that they were

18   advertising BOSTON, the name, with "best of" in front

19   of it, and they had -- were advertising Barry Goudreau

20   and Fran Cosmo and Anthony Cosmo playing together.

21   **Q.**    In fact that's not true, sir.  They were

22   advertising numerous different bands; correct?

23   **A.**    Well, that doesn't mean that what I just said is

24   not true.

25   **Q.**    Okay.  So --

1    **A.**    That's the only thing -- that's my only knowledge

2    of World Class Rockers was the advertisements for

3    BOSTON that had Fran Cosmo and Barry Goudreau.

4    **Q.**    Okay.  Was the World Classic Rockers a band that

5    was performing in the mid to late 2007?

6    **A.**    I wouldn't know anything about that.  A band?

7    **Q.**    Okay.  And in fact, sir, you understood, did you

8    not, that both Barry and Fran Cosmo wanted to perform

9    together in that band?

10   **A.**    I'm sorry.  But as far as I know, the World Class

11   Rockers was not a band; it was a promotion for a series

12   of concerts, if -- I believe, so I have to answer no

13   because I'm -- that's not how I understood it.

14            MR. BAKER:  Can we take a look at trial

15   Exhibit No. 26, please, Your Honor?  It's an admitted

16   exhibit.

17            THE COURT:  Yes, it may be published.

18   **Q.**    And, sir, at that time, April of 2008, Burns &

19   Levinson, just like they are today, were representing

20   you; correct?

21   **A.**    Yes, it is.

22   **Q.**    Sue Stenger sent a letter to World Classic Rockers

23   on your behalf, did they not --

24   **A.**    That's correct.

25   **Q.**    -- did she not?

1    **A.**    That's correct.

2    **Q.**    And this letter essentially said a number of

3    things, including, "Barry Goudreau and Fran Cosmo

4    cannot work together, it's restricted by your

5    contract"?

6    **A.**    That's correct.

7    **Q.**    Okay.  And not only that, but at the very back of

8    it, there was a series of pictures off the website;

9    correct?

10    **A.**    That I'm not sure of.  I'm sorry.  I'd have to see

11    them.

12    **Q.**    And one such page was the list of songs, the World

13    Classic Rockers set list; do you recall that?

14    **A.**    I do remember them publishing a list of songs,

15    most of which neither one of them had played on, yes.

16    **Q.**    Okay.  Just give me one second, sir.

17         Okay, there it is on the screen.  This is called

18    the tentative set list; do you see that?

19    **A.**    A set list?  I'm sorry.  I don't see that.  I see

20    a list of performers --

21    **Q.**    In the upper left-hand corner, sir, does it not

22    say "WCR set list"?

23    **A.**    Oh, tentative set list for the concert.  I

24    understand.

25    **Q.**    And looking in the middle, sir, it says, "Featured

1    artists," does it not?

2    **A.**    Yes.

3    **Q.**    And it lists a number of different musicians;

4    correct?

5    **A.**    That's correct.

6    **Q.**    A guy from Journey, next is Barry Goudreau and

7    Fran Cosmo, and at the top it says, "former member of

8    BOSTON;" you see that?

9    **A.**    Yeah.

10   **Q.**    And it lists a number of other artists,

11   Alex Ligertwood from Santana; do you see that?

12   **A.**    I do see it.

13   **Q.**    Nick St. Nicholas and Michael Monarch, former

14   members of Steppenwolf; you see that?

15   **A.**    I do.

16   **Q.**    Some guy named Frederickson from Toto;

17   Randall Hall, Lynyrd Skynyrd; Michael Monarch from

18   Steppenwolf; Lynrd Skynyrd; and White Snake.  You see

19   all those different bands?

20   **A.**    Most of it, yes.

21   **Q.**    Okay.

22   **A.**    I am just trying to see where you're reading.

23   **Q.**    And in fact, when you were asked under oath

24   previously, you said, I don't care, this band is not

25   going to infringe on my mark, it's not going to cause

1    anybody confusion with all those people; correct?  Do

2    you remember that statement?

3    **A.**    I don't.

4    **Q.**    Okay.  Turn to your deposition, sir, please.

5         MR. BAKER:  Your Honor, if you can look at

6    Page 294.  We'll got it on the screen.

7         MR. TARLOW:  Your Honor, if we could come off

8    publishing.

9         THE COURT:  Yes.

10        MR. TARLOW:  Thank you.

11   **Q.**    So if you read starting at Line 5, sir, there's a

12   description of all these different bands and the songs

13   they play right off of that set list; do you see that?

14   **A.**    I'm sorry.  Could you repeat that question?

15        THE COURT:  And are we on 275 or 294?

16        MR. BAKER:  294, Judge.  I'm going to help the

17   witness, if I may, Your Honor.  May I approach the

18   witness?

19        THE COURT:  You may.

20   **A.**    I have it here.

21   **Q.**    Ready?

22        At Line 13, the question is:  "Do you think that

23   somebody looking at this, a reasonably informed

24   consumer, would believe that this performance by

25   numerous former members of a number of different bands

1    would actually be a concert by BOSTON?"

2          Your answer, "No, not so much.  The fact that

3    they're playing all BOSTON songs instead of songs that

4    they actually released together may be a little

5    misleading, but it says 'former member' at the top of

6    BOSTON is in the same font as the other names."

7          Did I read that accurately, sir?

8    **A.**    I believe so.

9          MR. GREEN:  Can we have -- I'm sorry.  Can we

10   have the witness read his answer?  The whole answer was

11   not read just now.

12         THE COURT:  Right.  Well, Counsel, I think what

13   Mr. Green is referring to, there's -- I see two more

14   lines there, Mr. Baker.

15         MR. BAKER:  Got it.

16   **Q.**    "It might be arguably infringing in some way, but

17   it really wouldn't have gotten my attention."

18         Is that your complete answer, Mr. Scholz?

19   **A.**    No.  It starts at A.

20   **Q.**    For that question, sir.

21   **A.**    No.  It starts at A.  "No, not so much.  The fact

22   that they're playing all BOSTON songs instead of songs

23   that they actually released together may be a little

24   misleading, but it says, 'former member of the' --

25   'former member of' at the top and BOSTON is in the same

1    font as the other names.  It might be arguably

2    infringing in some way, but it really wouldn't have

3    gotten my attention."

4         I was speaking about the former member of BOSTON

5    and the BOSTON name and the font of the BOSTON name.

6    **Q.**   So you really didn't care about this band, the

7    World Classic Rockers, with its 20 other performing

8    musicians, did you?

9    **A.**   That's not what this says, and that statement

10   isn't true.

11   **Q.**   Well, it says, "It really wouldn't have gotten my

12   attention;" correct?

13   **A.**   The font and the size of BOSTON, and this

14   wasn't -- I wouldn't think this would be a concert by

15   BOSTON, but it certainly would have been a performance

16   of songs by BOSTON members.  That's -- this says, "I

17   didn't think it would be an actual concert by BOSTON."

18   I agree with that.

19   **Q.**   Okay.  So just so I'm clear --

20   **A.**   I answered it correctly.

21   **Q.**   Just so we're clear --

22        MR. GREEN:  Excuse me, Your Honor.  For purposes

23   of completion, I ask that the witness be asked to read

24   295, 3-8, because that's the completion of this.

25        THE COURT:  I'm sorry.  295 --

1          MR. GREEN:  3-8.

2          MR. BAKER:  I have no objection, Judge.

3     **A.**   It goes on --

4          THE COURT:  You can read that, yeah.

5     **Q.**   "Incidentally, in addition to my prior answer,

6     neither of these artists had anything to do with any of

7     these songs, with the exception of Barry Goudreau, who

8     participated in a recording of 'Fort Wayne Long Time.'"

9     **A.**   Look, it's not -- you didn't read it correctly.

10    Can I just read it?

11    **Q.**   Please do, sir.

12    **A.**   "Incidentally, in addition to my prior answer,

13    neither of these artists had anything to do with any of

14    those songs, with the exception of Barry Goudreau

15    having participated in a recording of 'Fort Wayne/Long

16    Time.'"  Of course it was supposed to be "Foreplay/Long

17    Time."

18    **Q.**   Now, sir, I showed you the set list of the World

19    Classic Rockers.  We looked at it just a moment ago;

20    you recall?

21    **A.**   Of course.

22    **Q.**   All right.  And it identified band members from

23    Steppenwolf, Journey, Toto, a number of different very

24    well-known bands; correct?

25    **A.**   Yes.

1    **Q.**    And is it your testimony that, if that band

2    performed one or two songs by BOSTON, that would be

3    confusing to the consumer?

4    **A.**    What band?

5    **Q.**    The World Classic Rockers, sir.

6    **A.**    Well, I don't know who the World Classic Rockers

7    are.  I don't -- you're bringing up these names of

8    performers of other bands.  I don't know if they were

9    performing with Cosmo and Goudreau or not.

10         The thing that is confusing is Barry Goudreau

11    and Fran Cosmo, both former members of BOSTON, playing

12    songs that they had nothing to do with the recording

13    of, of BOSTON music.

14    **Q.**    And in fact, sir, you forbade them, based on

15    contractual terms between you and Fran Cosmo, from

16    playing together?

17    **A.**    I definitely asked them not to.

18    **Q.**    Yeah.  And you knew, sir, that if Mr. Goudreau had

19    to drop out, that would hurt him financially?

20    **A.**    Well, I don't know how much he was getting paid,

21    so I don't know if it would actually hurt him.  But it

22    certainly would mean he wouldn't collect the money that

23    he was going to get for that show, yes.

24    **Q.**    And not only would he not collect the money, sir,

25    but that was your intent?  That's what you wanted?

1    **A.**    No, it wasn't what I wanted or the intent.

2    **Q.**    Okay.  But you enforced that provision, you hired

3    your lawyers, you sent him a letter?

4    **A.**    I did enforce that provision.

5    **Q.**    Sir, you know what the Billboard Chart is?

6    **A.**    Yes.

7    **Q.**    Would you tell us what the Billboard Chart is,

8    please?

9    **A.**    All right.  I say I know what it is because I hear

10   it talked about all the time, and I've seen it once or

11   twice.  I'm afraid I am not -- I would not be a

12   knowledgeable person to explain to anyone what the

13   Billboard Chart is.

14   **Q.**    Okay.  It's a chart, is it not, that rates songs

15   in terms of popularity?

16   **A.**    I don't know if it's based on sales or radio air

17   play, but it ranks pop music I think in various

18   categories on some basis that I, frankly, actually

19   don't know.

20   **Q.**    The reality, sir, is you've had many, many hits,

21   to your credit, on the Billboard Chart; fair statement?

22   **A.**    I have had several.

23   **Q.**    Okay.  "Amanda, Don't Look Back, More Than a

24   Feeling;" correct?

25   **A.**    Yes.

1    **Q.**    "We're Ready;" right?

2    **A.**    Yeah.

3    **Q.**    "Can't You Say;" right?

4    **A.**    I don't know about that one.

5    **Q.**    "Long Time"?

6    **A.**    Yeah.

7    **Q.**    "Peace of Mind"?

8    **A.**    Absolutely.

9    **Q.**    "Feeling Satisfied"?

10    **A.**    Yep.

11    **Q.**    Okay.  Have you ever had a single one of your

12    songs on the Blues Billboard?

13    **A.**    No, not that I know of.

14    **Q.**    Fire Flies, you've heard of the restaurant Fire

15    Flies in the course of this proceeding?

16    **A.**    I don't recall it.

17    **Q.**    It's one of the places that Mr. Boch played at --

18    do you recall? -- in the ads?

19    **A.**    I'll take your word for it.  I don't happen to

20    remember that.

21    **Q.**    You never sued them, did you, for trademark

22    infringement?

23    **A.**    Who?

24    **Q.**    You never sued Fire Flies for trademark

25    infringement?

1    **A.**   No.

2    **Q.**   Never sued Boston.com for trademark infringement;

3    correct?

4    **A.**   Boston.com, the newspaper?

5    **Q.**   Boston --

6    **A.**   No.

7    **Q.**   Okay.  And presented yesterday was an article

8    about Ernie -- excuse me -- Ernie and the Automatics

9    and Barry Goudreau and Sib Hashian; do you recall

10   referring to them as original -- former original

11   members?

12   **A.**   Do I recall an article that was printed yesterday?

13   **Q.**   Yeah.

14   **A.**   Of course not.  I haven't seen the newspaper since

15   Monday.

16   **Q.**   An exhibit in this proceeding, sir.  An exhibit in

17   this proceeding, sir.

18   **A.**   Oh, I'm sorry.  I thought it was just written.

19        I'm sure it was.  I'm sorry.  I just don't

20   happen to remember precisely that --

21   **Q.**   Now, you heard Mr. Boch testify yesterday or

22   perhaps the day before --

23        THE COURT:  Yeah, I think it was the day before.

24        MR. BAKER:  I just said that, Judge.

25        THE COURT:  Days are merging together, Counsel,

1    but yes.

2              MR. BAKER:  They all kind of merge into one,

3    yes.

4              THE COURT:  It was earlier this week.

5              MR. BAKER:  Thank you.

6    **Q.**    -- earlier testimony, that he sold 1,000 CDs,

7    approximately?

8    **A.**    Yes, I remember that testimony.

9              MR. GREEN:  Objection.  Mischaracterizes.

10   **Q.**    What's your recollection of what he said, sir?

11             THE COURT:  Well, sustained, so there's a new

12   question.

13             MR. BAKER:  I'll rephrase it, Judge.  I beg your

14   pardon.

15   **Q.**    What's your recollection of what Mr. Boch said he

16   sold?

17   **A.**    Not a lot.

18   **Q.**    A thousand refresh you?

19   **A.**    That sounds reasonable.

20   **Q.**    Okay.  And he also testified that most of the

21   time, they played for free; do you remember that?

22   **A.**    I remember that testimony.

23   **Q.**    Yeah.  Do you have any reason to dispute his

24   accounting that he sold only about a thousand CDs?

25   **A.**    No, I don't.

1    **Q.**    And when he said, "We play mostly for free," do

2    you have any reason to dispute that, sir?

3    **A.**    It seems irrational to play 250 shows for free,

4    so -- I mean, possibly, you know, he was putting in

5    more money than he was getting out of it, but when you

6    go on tour with Deep Purple playing theaters or playing

7    for famous blues artists, I know you always get paid.

8    **Q.**    You don't know whether Mr. Boch actually paid to

9    get on that tour, now, do you, that Deep Purple tour,

10    do you?

11    **A.**    I hope not, but I don't know.

12    **Q.**    Okay.  And, once again, you really don't know

13    whether it's free, ten bucks, 20 bucks or two bucks,

14    how much Ernie and the Automatics charged --

15    **A.**    That's correct.

16    **Q.**    -- for people to come see them?

17    **A.**    That's correct.

18    **Q.**    Okay.  And he testified that he had some minor

19    T-shirt sales; correct?

20    **A.**    I remember that.

21    **Q.**    Okay.  And you can't tell this jury today one

22    single CD, out of the 40 million or whatever the number

23    was, that you lost in a sale to Ernie Boch, can you?

24    **A.**    No.

25    **Q.**    And you can't tell this jury today, in your

1    millions and millions and millions of dollars of

2    concert revenue, one single ticket that didn't go to

3    you but, instead, the transaction went to Ernie Boch,

4    can you?

5    **A.**    No.

6    **Q.**    And you can't tell us one T-shirt with the BOSTON

7    logo that you didn't sell because somebody bought the

8    Ernie Boch logo?

9    **A.**    That's correct.

10   **Q.**    And just so we're clear, you want this jury to

11   believe that Ernie Boch infringed on your mark?

12   **A.**    I did -- I do want them to believe that

13   Barry Goudreau infringed on the mark, not Ernie Boch,

14   Jr.

15   **Q.**    So we're clear, sir, you don't want this jury to

16   believe Ernie Boch infringed, but just Barry Goudreau;

17   correct?

18   **A.**    I don't care whether they believe that

19   Ernie Boch, Jr., infringed or not.  My concern is

20   with Barry Goudreau's infringement.

21   **Q.**    And let me remind you one last time, sir, if I

22   may, "Artistic excellence does not excuse one from

23   complying with the norms of decent behavior."  Do you

24   agree with that, sir?

25   **A.**    Yes.

1      MR. BAKER:  No further questions, Judge.

2      THE COURT:  Thank you.

3      Counsel, redirect?

4      MR. GREEN:  Yes, Your Honor.

5      THE WITNESS:  Your Honor, could I take just two

6  minutes to just run to the men's room and right back?

7  I'll be very quick.

8      THE COURT:  Yes, you may.

9      Jurors, unless you also need a restroom break,

10  we'll just stay in place.  You can feel free to stand

11  and stretch if you'd like to.

12      (Pause)

13      THE COURT:  Okay.  Everyone will resume.

14      Mr. Green.

15      MR. GREEN:  Thank you, Your Honor.

16              <u>**REDIRECT EXAMINATION BY MR. GREEN**</u>

17  **Q.**  Mr. Scholz, you were first shown, at the outset of

18  Attorney Baker's cross-examination, three other

19  complaints; correct?

20  **A.**  That's correct.

21  **Q.**  He said four.  There were three complaints; right?

22  **A.**  That's right..

23  **Q.**  One was a draft?

24  **A.**  That's correct.

25  **Q.**  Did all of those complaints make reference to

1    Ernie and the Automatics?

2    **A.**    They were -- all made reference to the infringing

3    from Barry Goudreau.

4    **Q.**    As to his involvement in Ernie and the Automatics?

5    **A.**    Yes, yes.

6    **Q.**    There were two that were actually filed in State

7    Court?

8    **A.**    That's correct.

9    **Q.**    Do you understand that this is a trademark case?

10   **A.**    Yes.

11   **Q.**    Do you know anything about Federal procedure as to

12   where you file a Federal trademark case?

13   **A.**    I don't.

14   **Q.**    All right.  If I told you that Federal trademark

15   cases have to be filed in Federal Court, do you have

16   any understanding on that?

17          MR. BAKER:  Judge, objection.

18          THE COURT:  Sustained as to that.

19   **Q.**    The previous complaints ended up being filed in

20   this Court; is that correct?

21   **A.**    That's correct.

22   **Q.**    All right.  And this is where you're seeking

23   relief?

24   **A.**    That's right.  The other complaints were the same

25   basic complaint.

1    **Q.**   Right.   Now, do you have the Elf Management

2    complaint put before you there?   I asked Mr. Baker to

3    do that.

4          And could you go to the paragraph that he was

5    talking about?

6    **A.**   Do you remember the page that that's on?

7    **Q.**   I believe it was just above the signature.

8          MR. GREEN:   Could you help us, Mr. Baker, with

9    the page?

10          MR. BAKER:   Sure.   May I approach, Your Honor?

11          THE COURT:   You may.

12          MR. GREEN:   Thank you, Mr. Baker.

13          MR. BAKER:   Sure.

14    **A.**   Just above the signature page?   I'm sorry.   I got

15    to brace myself on the back of this chair.

16          This one?

17          MR. BAKER:   No.   11.

18          MR. GREEN:   Is it Paragraph 77?

19          MR. BAKER:   That's the exhibit.   This is --

20          THE WITNESS:   Thank you.

21    **Q.**   Is it Paragraph 77 you're looking at, sir?

22    **A.**   Yes.

23    **Q.**   Does the word "performing" appear in that

24    paragraph?

25    **A.**   Yes.

1    **Q.**    All right.  What does that refer to?

2    **A.**    It refers to the performing group, as opposed to

3    the recording act.

4    **Q.**    Okay.  Now, when you talked about the history of

5    BOSTON, you started with Mr. Delp; correct?

6    **A.**    That's correct.

7    **Q.**    Were you a performing group?

8    **A.**    No.

9    **Q.**    What were you?

10    **A.**    A recording group.

11    **Q.**    So, to the extent that, that complaint refers to

12    performing, what is that referring to?

13    **A.**    That refers to the performing group that came

14    later.

15    **Q.**    All right.  There's no doubt that Mr. Goudreau was

16    part of the performing group; correct?

17    **A.**    He was part of the performing group.

18    **Q.**    And without repeating your previous testimony, for

19    approximately two years, you were recording; correct?

20    **A.**    That's correct.

21    **Q.**    Thank you.

22        Now, you were also asked a series of questions

23    about, Why didn't you sue Hard Rock, why didn't you sue

24    this venue, why didn't you sue that venue.  I'm not

25    going to go through all of the ads because we've gone

1    through them ad nauseam.  I want to move the case

2    along.

3          Was there any common denominator, sir, to those

4    ads?

5    A.   Yes.

6    Q.   What is the common denominator?

7    A.   Barry Goudreau, original member of BOSTON or a

8    former original member of BOSTON.

9    Q.   Now, you were also asked about why not suing

10   Ernie Boch.  Is Ernie Boch a party to the 1983

11   agreement?

12   A.   No.

13   Q.   When you spoke to Ernie Boch about Barry not being

14   an original member, do you believe he knew better at

15   that point in time?

16   A.   No.  I believe he was misled.

17   Q.   And who misled him?

18   A.   Barry Goudreau.

19   Q.   Now, when you say your issue is not with

20   Ernie Boch, you're not suing Ernie Boch; correct?

21   A.   That's correct.

22   Q.   But you do understand that Mr. Boch was personally

23   involved in all of these ads; correct?

24   A.   I do understand that.

25   Q.   So why is your complaint with respect to

1    Mr. Goudreau, as opposed to Mr. Boch?

2    **A.**    Because I think he was misled.  I know for a fact

3    that he said that he got it -- he used the phrase --

4            MR. BAKER:  Objection, Judge.  Hearsay.

5            THE COURT:  Well, sustained.  Sustained as to

6    this.  Mr. Green, next question.

7    **Q.**    All right.  Well, let's look at Paragraph 53 of

8    Mr. Goudreau's counterclaim, if we may.

9            MR. GREEN:  Can we just have that excerpt,

10   Ms. Stenger?  Or we can put a copy in front of you.

11   I'm not even sure we have that projected.  And while

12   Ms. Stenger's digging that out, I do want to move this

13   along.

14   **Q.**    You were being asked about the video before --

15           MS. STENGER:  Here it is.

16           MR. GREEN:  Okay, we'll cover this now.

17   **Q.**    You see Paragraph 53?

18   **A.**    Yes.

19   **Q.**    And when you said you thought that Mr. Boch was

20   being misled, it says that, the second line, "Goudreau,

21   as he always does, made sure that all venues, managers

22   and others involved referred to Goudreau as a former

23   member of the band BOSTON in any biographical or other

24   materials associated with Goudreau's performance, using

25   the truthful and accurate descriptive designations of

1    formerly of BOSTON or as an original member of BOSTON;"

2    do you see that?

3    **A.**    Yes.

4    **Q.**    And you understand that Mr. Goudreau had his

5    attorneys make that statement?

6    **A.**    Yes.

7    **Q.**    And that he later confirmed that statement under

8    oath in a deposition?

9    **A.**    I heard that.

10    **Q.**    And would that be consistent with your

11    understanding that he misled Mr. Boch?

12        MR. BAKER:  Objection, Judge.

13        THE COURT:  Well, sustained.  Sustained.

14        MR. GREEN:  I'll move on.

15    **Q.**    Now, let me ask you about the reference to the

16    term "stupidly."

17        Are you here, sir -- you do recall that

18    Mr. Baker just showed you a deposition where you say

19    you stupidly agreed to -- what did you mean by that?

20    **A.**    That's the whole thing, the deposition doesn't say

21    it was stupid; it says it was stupidly generous.

22    There's a big difference between a stupid deal and a

23    stupidly generous deal.  I knew it was stupidly

24    generous.

25    **Q.**    All right.  So can you explain what the difference

1     is to the jury?

2     **A.**    It wasn't a stupid deal to give somebody a

3     stupidly generous settlement or a stupidly generous

4     portion of something.  There was a lot of thought that

5     went behind it.  There was a lot of thought that went

6     behind the whole idea of giving these guys who had

7     barely participated in the recording a 20 percent

8     share.

9          And by the way, it was never intended to be a

10    lifetime, but while they were playing in the performing

11    band, we thought, Brad and I, and we were encouraged to

12    do this by Ahern, the manager, that if everybody got an

13    equal share, nobody would feel slighted that they

14    didn't get to really play very much on the albums.

15    This was -- this is Brad and my recording project.

16    Barry Goudreau got added in at the very end of it and,

17    frankly, as an afterthought because we knew he would

18    want to be on the record some place.

19    **Q.**    You entered into that deal with Mr. Goudreau back

20    when he started with you and Mr. Delp in around 1976;

21    correct?

22    **A.**    Yes.

23    **Q.**    And you continued to recognize that?

24         MR. BAKER:  Objection to the form, Judge.

25    **Q.**    You continued to recognize your obligation --

1          THE COURT:  Well, sustained as to the form.

2    Redirect, Counsel.

3          MR. GREEN:  All right.

4    **Q.**   From 1976 until 20 -- until the time that you

5    brought suit as to Ernie and the Automatics, you had

6    always paid him; correct?

7    **A.**   I'm sorry.  From 1976 to --

8    **Q.**   You've paid him through the present date; correct?

9    **A.**   Yes.

10   **Q.**   Had you ever sued him previous to the Ernie and

11   the Automatics --

12   **A.**   No.

13   **Q.**   -- infringements because you had made a

14   stupidly -- stupid deal or a stupidly generous deal?

15   **A.**   No.

16   **Q.**   What was it that resulted in this lawsuit, sir?

17   **A.**   It was the advertising him as an original former

18   member of BOSTON.

19   **Q.**   Now, you're not a lawyer, sir, are you?

20   **A.**   No.

21   **Q.**   Do you understand, as a matter of law, what

22   remedies a Plaintiff is entitled to?

23          MR. BAKER:  Objection, Judge.  This is --

24   **Q.**   I'm just asking, yes or no, do you --

25          THE COURT:  Well, given the scope of

1    cross-examination, I'll allow this question.

2            MR. BAKER:  Okay.

3            THE COURT:  Well, sustained as to the reference

4    to "as a matter of law."

5    Q.    All right.  Do you understand, sir, what you are

6    legally entitled to recover in a trademark infringement

7    case?

8    A.    Yes.

9            MR. BAKER:  Objection, Judge.

10            THE COURT:  Overruled.

11    Q.    And you have retained an expert witness on that

12    subject?

13    A.    That's correct.

14    Q.    That's Mr. Scally who's the next witness here?

15    A.    That's correct.

16    Q.    All right.  And you understand he will be the one

17    testifying as to what damages you're entitled to?

18    A.    That's correct.

19            MR. BAKER:  Judge, I move to strike the answer

20    and the question.  This is an improper question, the

21    way it's phrased.

22            THE COURT:  Well, Counsel -- well, sustained as

23    to the form of that question, Counsel.

24            MR. GREEN:  All right.  I'll move on,

25    Your Honor.

1    **Q.**   Let me ask you this way, sir:  To the extent that

2    you are seeking any remedy concerning Mr. Goudreau's

3    royalties, do you understand that, that is something

4    that you are entitled to?

5    **A.**   I do.

6         MR. BAKER:  Objection, Judge.

7         THE COURT:  Well, sustained as to the phrasing

8    of the question, Counsel.

9         MR. GREEN:  I'll move on, Your Honor.

10   **Q.**   Now, Fran Cosmo, you were asked a series of

11   questions about Fran Cosmo.  Was he under --

12        THE COURT:  And Counsel, I'm just going to

13   interrupt here just with a direction to the jury.

14        Jurors, I think you understand this at this

15   point, but in terms of what the law requires or doesn't

16   require is what I'll instruct you on later.  That was

17   the nature of the back-and-forth that Counsel was

18   engaging in.  Okay.  Thank you.

19        Counsel.

20   **Q.**   Who is Fran Cosmo, sir?

21   **A.**   He was a singer that worked with me from 1993

22   through 2004.

23   **Q.**   Can you keep up your voice because I --

24   **A.**   I am so sorry.  It's been a lifetime problem.

25        He was --

1    Q.    And when you say worked with you, did he work with

2    the band BOSTON?

3    A.    He also worked with the band BOSTON as a

4    performer.

5    Q.    All right.  At some point in time, did he leave

6    the band BOSTON?

7    A.    Yes.

8    Q.    And at some point in time, did he become a party

9    to a restriction as to what he could and could not do?

10   A.    That's correct.

11   Q.    And what was the nature of the restriction, sir?

12   A.    That he was not allowed to play with another

13   former or current member of the band BOSTON for a

14   period of five years following the end of his activity

15   with us.

16   Q.    All right.  And he willingly agreed to that?

17   A.    Yes.

18   Q.    And why did you ask Mr. Cosmo to agree to that?

19   A.    Because my experience in the past had been that,

20   when more than one --

21             MR. BAKER:  Objection, Judge.  Asking him to --

22             THE COURT:  No, no.  Overruled.  And no speaking

23   objections, Mr. Baker.

24             MR. BAKER:  Understood, Your Honor.

25   A.    I had, had experiences before, especially in 20 --

1    excuse me -- in 1980 when Barry did a record with three

2    members of BOSTON.  It was rumored everywhere that

3    BOSTON had broken up because three members were

4    appearing on another record.  That rumor exists till

5    this day.

6         So I've been very careful about requiring people

7    that work with BOSTON, they have a period afterwards

8    where they can't work with other current or former

9    members of the band without a waiver, and I have

10   granted waivers like that.

11        MR. BAKER:  Judge, I move to strike the answer

12   as non-responsive.

13        THE COURT:  Overruled.

14   **Q.**   So that was in his contract, he agreed to it;

15   correct?

16   **A.**   Yes, yes.

17   **Q.**   Now, at some point after that, you decided to

18   grant a waiver --

19   **A.**   I did.

20   **Q.**   -- correct?

21   **A.**   That's correct, I did.

22   **Q.**   Was that a one-time waiver?

23   **A.**   Yes.

24   **Q.**   All right.  What happened after that, sir?

25   **A.**   There was more than one waiver, just to clarify.

1    He also had an automatic waiver that he could of course

2    play with his son Anthony, who was also in BOSTON for a

3    brief period of time.

4    **Q.**    All right.  At some point, you granted him a

5    one-time waiver to perform with Mr. Goudreau; correct?

6    **A.**    That's correct.

7    **Q.**    Did they then come to you again to ask for an

8    additional waiver?

9    **A.**    They did.

10    **Q.**    And you said no at that point?

11    **A.**    That's correct.

12    **Q.**    Why did you say no at that point?

13    **A.**    Because it was for a series of concert appearances

14    and recording releases in the United States.

15    **Q.**    Very different from their first request?

16    **A.**    Very different.

17    **Q.**    Now, if you could turn to Paragraph -- Exhibit 26,

18    this was a demand letter that you had Ms. Stenger

19    write?

20    **A.**    I see that.

21    **Q.**    And it was written to World Class Rockers.

22          Now, Mr. -- Attorney Baker asked you about the

23    first page or two.  I'd like you to turn, and if we

24    could have focused on the screen, Page 4, it's Bates

25    Stamp No. 643, and particularly, "Contract Violations;"

1    do you see that?

2    **A.**    Yes.

3    **Q.**    And it goes to the next page?

4    **A.**    Yes.

5    **Q.**    Were those the contract violations we were just

6    referencing?

7    **A.**    That's correct.

8    **Q.**    And it was Mr. Cosmo's contract?

9    **A.**    That's correct.

10    **Q.**    And Mr. Goudreau and Mr. Cosmo were proposing to

11    tour together nationally?

12    **A.**    That's right.

13    **Q.**    And you could not agree to that --

14    **A.**    That's correct.

15    **Q.**    -- for the reasons you stated?

16    **A.**    Yes.

17    **Q.**    Now, speaking of people performing together, and I

18    think this will be my final question or two, you were

19    asked about the video; correct?

20    **A.**    Yes.

21    **Q.**    Let me be clear here.  The Ernie and the

22    Automatics video?

23    **A.**    Yes.

24    **Q.**    And you were present in the courtroom when we had

25    a pop-up appear; correct?

1    **A.**    Yes.

2    **Q.**    And do you recall the first pop-up that appeared

3    there?

4    **A.**    All right.  I'm not sure which was the first one,

5    and I --

6    **Q.**    Well, let me remind you, sir.

7        MR. GREEN:  And Ms. Stenger, I don't know if we

8    can get this up?  It's only six seconds into it, so I

9    don't think I'm wasting too much time here, if I may,

10   Your Honor?

11       THE COURT:  Exhibit -- this was 57.

12       MS. STENGER:  57.

13       THE COURT:  57.

14   **A.**    I'm sorry.  I wasn't able to see it from my seat,

15   and I --

16   **Q.**    All right.  Well --

17       MR. BAKER:  Judge, I would ask that it be played

18   through the pop-up, not just stopped there.

19       MR. GREEN:  Well --

20       THE COURT:  Well, I'll let Counsel show what --

21       MR. GREEN:  This is my questioning, Your Honor.

22       THE COURT:  Yes, I'll let counsel show what --

23   so can it be made bigger?

24       (Video played)

25       MR. GREEN:  Stop, please.  Okay.

1    **A.**    Yes, that's the one I remember.

2    **Q.**    All right.  I will represent to you, sir, that

3    this pop-up first came six seconds into the video?

4    **A.**    Yes.

5    **Q.**    You understand this is the first pop-up?

6    **A.**    Yes.

7    **Q.**    Can you read what this says?

8    **A.**    "Guitarist Barry Goudreau and drummer Sib Hashian

9    are 'former,'" quotes, "original members of the band

10    BOSTON."

11    **Q.**    All right.  Now, why would that cause you concern?

12    **A.**    Two reasons.  First of all, they weren't original

13    members.  It's untrue.

14         Second of all, they put the "former" in quotes

15    as if to make it look like they weren't really former

16    members.  I think that's confusing.

17    **Q.**    Now, you understood that this was a video to

18    promote the Ernie and the Automatics CD?

19    **A.**    Yes, and they were using -- they were using --

20    even using former members of BOSTON to -- former

21    original members to promote somebody else's CD.  That

22    was the infringing part.

23    **Q.**    All right.  And do you believe, given that this

24    pop-up appears in the first six seconds of the video,

25    that they were trying in any way to take advantage of

1    the goodwill you had created over the years for the

2    band BOSTON?

3    **A.**    Of course.

4            MR. BAKER:  Objection, Judge.

5            THE COURT:  Sustained.  Form.

6    **A.**    Of course -- oh, sorry.

7            THE COURT:  Well, it's sustained, so you can't

8    answer.

9            Counsel.

10    **Q.**    All right.  Let me ask it this way:  Do you

11    believe that this is a violation --

12    **A.**    I do.

13    **Q.**    -- of the BOSTON trademark?

14    **A.**    I do.

15    **Q.**    And of the 1983 agreement?

16    **A.**    Both.

17            MR. GREEN:  Thank you.  I have nothing further.

18            THE COURT:  Any recross, Mr. Baker?

19            MR. BAKER:  Your Honor, I'd like to draw the

20    Court's attention to Exhibit 60.

21            THE COURT:  It should be on the screen.

22            MR. GREEN:  Beyond the scope, Your Honor.  It's

23    the 1099s.  I asked nothing about that.

24            THE COURT:  Okay.  Counsel, what's the question?

25    I understand Mr. Green's objection, given --

1          MR. BAKER:  Mr. Scholz testified that he

2     continues to pay Mr. Goudreau his royalties.

3          THE COURT:  I'm not sure that he did that on

4     redirect, Counsel.

5          MR. GREEN:  He did not.

6          THE COURT:  He didn't.  Sustained as to this.

7     Scope of redirect, Counsel.

8          MR. BAKER:  Okay.

9              **RECROSS EXAMINATION BY MR. BAKER**

10    **Q.**   Sir, you stated that it was never your intention

11    to pay Mr. Goudreau for a lifetime his 20 percent share

12    in the sound recordings; correct?

13    **A.**   When the -- when -- I said that referring to at

14    the start and the outset of the plan to pay them an

15    equal 20 percent, that is correct.

16    **Q.**   You signed the contract in 1983, sir; you recall?

17    **A.**   When I said never, I was referring to at the

18    outset in 1976, that, that decision was made.  It was

19    in the context of being asked about 1976, Why did you

20    decide to split it evenly, and that was in that

21    context, that it was never thought to have been

22    extended for a lifetime.

23    **Q.**   But you signed an agreement in 1983 that confirms

24    in perpetuity Mr. Goudreau's right to receive

25    royalties?

1    **A.**    That's absolutely correct.

2    **Q.**    And at that time, you were represented by a

3    lawyer, were you not?

4    **A.**    I'm not contesting in the least that I totally

5    understood what it meant.

6    **Q.**    Sir, you have no personal knowledge, you weren't

7    there, about any conversations between Barry Goudreau

8    and Ernie Boch about this use of the word "original;"

9    right?

10    **A.**    I wasn't there, that's correct.

11    **Q.**    So when you testify Barry misled Ernie, you don't

12    really know, you weren't there?

13    **A.**    I know what Ernie Boch told me.

14    **Q.**    Okay.  Ernie Boch testified here for two and a

15    half days, and you heard his testimony; you recall?

16    **A.**    Of course.

17    **Q.**    And he said, "I referred to Barry as an original

18    member on my own;" you recall that?

19    **A.**    I heard what he said.

20    **Q.**    And are you telling us Ernie Boch was lying right

21    now?

22    **A.**    He was incorrect.

23    **Q.**    Are you telling us he's lying, sir?

24    **A.**    The statement was incorrect.

25          MR. BAKER:  No further questions.

1          THE COURT:  Thank you.  Sir, you're excused.

2     You can step down.  Thank you.

3          MR. GREEN:  Plaintiff calls Mr. Scally.

4          THE COURT:  He may be called.

5          (The Witness Was Sworn)

6          THE COURT:  Good afternoon, sir.

7          THE WITNESS:  Good afternoon, Judge.

8          THE COURT:  Mr. Green.

9          MR. GREEN:  Thank you, Your Honor.

10              **DIRECT EXAMINATION BY MR. GREEN**

11     **Q.**    State your name for the record.

12     **A.**    My name is William Scally.

13     **Q.**    Where do you reside, Mr. Scally?

14     **A.**    I reside in Newburyport, Massachusetts.

15     **Q.**    You have family there?

16     **A.**    I do.

17     **Q.**    And who are the members of your family?

18     **A.**    My wife Cindy, and I have an 18-month -- or,

19     actually, now 20-month-old son, Sawyer.

20     **Q.**    Can you describe your formal educational

21     background, beginning with high school?

22     **A.**    I can.  I graduated on the north shore from

23     Wakefield Memorial High School in 1990.  Subsequent to

24     that, I went to the United States Naval Academy.  I

25     graduated in 1994 and was commissioned an Officer in

1    the United States Navy.  I served in the United States

2    Navy for approximately six years as a Civil Engineer

3    Corps Officer, both domestically and abroad.

4            And subsequent to my service, I went to Boston

5    College to receive a Masters Degree in business and

6    completed that Degree in 2001.

7            THE COURT:  And sir, you can feel free to move

8    the microphone down.

9            THE WITNESS:  Oh, thank you.

10           THE COURT:  Thank you.

11   **Q.**   That was an MBA from Boston College?

12   **A.**   Yes, I received an MBA from Boston College and a

13   Bachelors Degree in control systems engineering from

14   the Naval Academy.

15   **Q.**   You mentioned your Naval service.  What was the

16   form your of your discharge from the Navy?

17   **A.**   Honorable discharge.

18   **Q.**   And where did you do your service when you were

19   abroad?

20   **A.**   In Italy.

21   **Q.**   Now, following your obtaining your MBA, can you

22   describe what your employment history has been over the

23   years through the present?

24   **A.**   I can.  Subsequent to my receipt of Degree, I was

25   hired by Price Waterhouse Coopers, and I joined the

1    practice in 2001.  And I've been with Price Waterhouse

2    Coopers from 2001 to the present in various forms, but

3    most all of my time the last 15 years have been in

4    valuing intangible assets, both from -- in the context

5    of financial reporting or tax reporting but also with

6    respect to -- with regard to dispute analysis, such as

7    in this case.

8    **Q.**    Including cases involving intellectual property?

9    **A.**    Yes, intellectual property I refer to as

10   intangible assets.  It's an asset that you can't touch

11   or feel like real property, like manufacturing

12   equipment, but it doesn't mean that it doesn't have

13   significant value in our economy today.  It's more

14   about intangible assets than it is about real property.

15   **Q.**    And what are the types of forms of intangible

16   assets?

17   **A.**    A couple of types would be patents; trademarks, as

18   in this case; trade secrets; customer lists, those

19   types of valuable things to a business or, like in this

20   case, to Mr. Scholz and his trademark.

21   **Q.**    Copyrights would be another example?

22   **A.**    Yes, sir.

23   **Q.**    Now, do you have any professional certifications?

24   **A.**    I do.

25   **Q.**    And what are those certifications?

1    **A.**    Subsequent to my Degree from Boston College, I

2    participated in a program called the Chartered

3    Financial Analyst Program, which is essentially -- it's

4    essentially a graduate program in finance, about

5    900 hours of study, three annual tests, and then I

6    believe it's four years of practice consistent with the

7    education with the study, and the study is the value of

8    assets, portfolio management and just financial

9    analysis in general.

10          MR. GREEN:  If we could put up Mr. Scally's CV,

11    and this is -- we will be offering this, Your Honor.  I

12    just want to get this up on the screen.

13          THE COURT:  Counsel, I'm inclined to just use it

14    as a chalk, but --

15          MR. GREEN:  That's fine.

16          THE COURT:  Okay.  So, Counsel, I think we're up

17    to CC.  We'll make it CC.  You can display it for the

18    purposes of examination.

19          MR. GREEN:  Thank you, Your Honor.

20    **Q.**    Referring to Exhibit CC, sir, can you tell the

21    jury what that is?

22    **A.**    This is my -- this was my current CV at the time

23    that my report in this case was published.

24    **Q.**    All right.  Now, this states that you started with

25    Price Waterhouse Coopers in 2002?

1    **A.**    Yes.

2    **Q.**    And what was your title when you first started?

3    **A.**    I was a Senior Associate.

4    **Q.**    What is your title today?

5    **A.**    I'm a Director with the company.

6    **Q.**    And from 2002 to 2010, you were doing dispute

7    analysis?

8    **A.**    Yes, I focused on dispute analysis through that

9    period.

10    **Q.**    And what did that type of work involve?

11    **A.**    It involved substantially similar analyses to this

12    case today.  My casework involves dispute between

13    parties with respect to intangible assets, such as

14    trademarks, trade names, misappropriation of software,

15    any type of intangible asset that you could possibly

16    think of.  Because they are such valuable assets, you

17    would think that -- well, what happens is that

18    people -- owners of those assets try to protect them.

19    **Q.**    In 2010 to 2012, you worked in valuation?

20    **A.**    I did.  So it's similar work, but instead of in

21    the dispute field, it was more related to business

22    combination accounting.  So when companies buy other

23    companies, they have a -- there's an accounting

24    guidance that, when they buy a company, they have to

25    identify each and every asset that has been purchased

1    so that they can book those assets to their balance

2    sheet.

3         And like I had mentioned before, it's a little

4    bit easier to value real property.  You know, if you

5    buy a manufacturing plant or equipment, it's a -- the

6    analysis and the rigor required to value intangible

7    assets like trade secrets, trademarks, patents and the

8    like is a -- could be a little bit more rigorous

9    analysis involved.

10   **Q.**   And that was part of your practice, doing

11   valuation?

12   **A.**   Yeah, I've worked on hundreds of valuation cases.

13   **Q.**   And then 2012 to 20 -- to the present, it says,

14   "Forensic Services."  What is that?

15   **A.**   Yeah, so I made the decision to -- I had an

16   opportunity to come back in to the forensic services

17   practice, which is essentially the same discipline, the

18   same financial analytics, but it's applying it, in the

19   majority, to disputes and analysis such as this case.

20   **Q.**   Now, what is Price Waterhouse Coopers?

21   **A.**   Price Waterhouse Coopers is a -- it's a firm of

22   basically three services.  We're an advisory firm,

23   we're an assurance firm.  That's -- when I say

24   assurance, it's -- we're a company that provides

25   services to companies and to investors such that, you

1    know, the providers of financial statements, companies,

2    and the users of financial statements, investors,

3    others have a way to communicate with each other.

4         We're a third party who comes in and gives the

5    investing public confidence that a user of those

6    financial statements can trust them and make business

7    decisions, make investing decisions to know that

8    they're worth the paper they're printed on.

9    **Q.**   Thank you.  Now, I just want to run through

10   quickly --

11   **A.**   There's one -- I'm sorry, Counsel.  There was -- I

12   said three services.  There's also tax services as

13   well.  So those are the three pieces of our business.

14   My business sits within the advisory business and

15   specifically forensic services.

16   **Q.**   Thank you.  And sorry to interrupt you.

17   **A.**   That's okay.

18   **Q.**   Referring to the bottom of the page, this makes

19   reference to your MBA and your service at the Naval

20   Academy?

21   **A.**   Yes.

22   **Q.**   What is Chartered Financial Analyst?

23   **A.**   That is the program that I talked about.

24   Subsequent to my Masters Degree at Boston College, I

25   participated in another program.

1    **Q.**    And I don't want to have you repeat your

2    testimony.  That was the 900 hours you talked about?

3    **A.**    Yes, sir.

4    **Q.**    And what is Boston Security Analyst Society?

5    **A.**    It's just a social society here in Boston that is

6    related to the CFA Institute.  They're members like

7    myself who have spent a large amount of their

8    professional time to advance a certain study in

9    finance, and it's a way for us to stay connected.

10   **Q.**    And, finally, what is the Genesis Park Leadership

11   Program that's referred to at the bottom of the page?

12   **A.**    It's a program within Price Waterhouse Coopers

13   where certain individuals are selected to participate

14   in some advanced leadership courses and have an

15   opportunity to work with our member firms around the

16   world to come together and create different networks,

17   so to speak.

18         So, you know, for six months, I worked with

19   25 different people around the world to work together,

20   such that, you know, when an opportunity for a case

21   comes up and it requires some sort of global knowledge,

22   I have my own personal network that I've really

23   invested in where people will, you know, if I lift up

24   the phone to call them, they'll help connect me to the

25   folks that I might need to speak to.

1            We find that it's just another way to make

2       our -- the value of our network within the firm a

3       little bit more valuable.

4       **Q.**   Now, you have been retained in this case as an

5       expert witness?

6       **A.**   Yes, sir, I have.

7       **Q.**   Have you previously been engaged by any party as

8       an expert witness?

9       **A.**   I have, yes.

10      **Q.**   On how many occasions, sir?

11      **A.**   Approximately 15 times I've been hired as an

12      expert witness or a report signatory.

13      **Q.**   Have you previously testified in court as an

14      expert witness?

15      **A.**   I have not.

16      **Q.**   Have you ever worked in connection with Mr. Scholz

17      before?

18      **A.**   I have not.

19      **Q.**   All right.  Now, you were engaged in this case to

20      serve as an expert witness for Mr. Scholz?

21      **A.**   Yes.

22      **Q.**   What was the assignment that was given to you,

23      sir, as it related to Ernie and the Automatics and

24      Barry Goudreau?

25      **A.**   Okay.  My assignment was two-fold.  First of all,

1      I was asked to do an accounting of royalty payments

2   received by Mr. Goudreau under the settlement agreement

3   contract, assuming infringement has been established,

4   from 2007 to present.

5           And I was also asked to do an analysis of moneys

6   earned by Mr. Goudreau for performance income as a

7   musician, and subsequently that's been more limited to

8   income that he earned specifically with respect to his

9   tenure with Ernie and the Automatics.

10  **Q.**   What did you do to -- what tasks did you do to do

11  your work to handle these assignments?

12  **A.**   Well, just like any valuation assignment, it's

13  to -- it's stepping back and looking at the facts of

14  the case and understanding which financial principles

15  apply best to the facts and circumstances of the case

16  and then, finally, making sure that the analysis is

17  consistent with remedies available at law for certain

18  damage calculations.

19  **Q.**   Now, when you say remedies available at law, what

20  familiarity or expertise do you have in that regard?

21  **A.**   Well, I'm not a lawyer, but --

22          MR. BAKER:  Objection, Judge.  This --

23          THE COURT:  Well, sustained as to the form of

24  the question, Counsel, to the extent that you're asking

25  him what he did.

1          MR. GREEN:  Yes.

2    **Q.**    Let me ask you this, sir:  As a result of the work

3    that you just described, did you come to any

4    conclusions, any expert opinions, as -- in this case?

5    **A.**    Yes, I did.

6          MR. GIVEN:  Objection, Your Honor.  An expert

7    needs to be qualified, moved in as an expert.

8          THE COURT:  Counsel --

9          MR. GIVEN:  I would like an opportunity for

10    voir dire.

11          THE COURT:  Counsel, overruled on that point,

12    given both timing and previous discussions.

13          Counsel, can you just ask a series of questions

14    about what the nature of the opinion is?

15          MR. GREEN:  Certainly.

16    **Q.**    What is -- did you come to opinions in this case?

17    **A.**    I did, yes.

18    **Q.**    What is the nature of the opinions that you came

19    to?

20    **A.**    Related to both of the analyses or the work that I

21    was asked to do, I did perform that accounting with

22    respect to royalty payments received by Mr. Goudreau

23    over the alleged infringing period beginning with 2007.

24          I also performed an analysis of, you know,

25    through financial records, what was the income received

1  by Mr. Goudreau for his performance income through

2  Ernie and the Automatics from 2007 forward as well.

3  **Q.**   Now, why were you looking at royalty payments?

4  What were you trying to do there?

5  **A.**   Well, looking at the guidance for how do you value

6  certain intellectual -- or intangible assets,

7  particularly when they're subject to a dispute.

8  There's Federal guidance on how you might go about the

9  analysis.

10          And so that's what my work that I looked at,

11  what were the remedies available at law and what were

12  the -- what was the economic consideration that was

13  transferred between the parties?  That's the starting

14  point in any financial analysis is to understand what

15  income was given and what income was received to start

16  to make a -- do a financial assessment.

17          MR. GIVEN:  Objection.  Move to strike.

18          THE COURT:  Overruled.

19  **Q.**   Did you actually -- did you actually do some

20  calculations as to the royalty payments --

21  **A.**   I --

22  **Q.**   -- particularly -- go ahead.

23  **A.**   It wasn't a difficult calculation because the

24  income associated with the economic activity between

25  the parties was so clear.  It was just a payment -- a

1    lot of times, these types of analyses get more

2    complicated because they rely on an understanding of

3    what revenue was generated, what costs are associated

4    with that revenue, there are overhead and other

5    operating costs that you need to look at.

6          The facts and circumstances of this case didn't

7    lend themselves to that type of analysis.

8    **Q.**   And why was that, sir?

9    **A.**   Because the economic activity was clear, it was --

10   to me, it was like a license agreement.  In fact the

11   settlement agreement performed exactly as a license

12   agreement but in reverse.

13         Typically, a potential user of a license will

14   pay a fee for the use of a trademark or -- in this

15   case, the economics are substantially similar, but it's

16   reverse.  It was a payment was made specifically not to

17   use the trademark.  And so, from my perspective as a

18   damages expert, that's the correct stream of income to

19   look at, assuming the jury and the Court finds that

20   liability has been established with respect to

21   infringement of the trademark.

22         MR. GIVEN:  Objection.  Move to strike.  Beyond

23   the scope of the report.

24         THE COURT:  Overruled.  But Counsel, we're going

25   to stop here, given the time.

1          MR. GREEN:  Yes, Your Honor.

2          THE COURT:  Before I let the jurors go -- and

3     Mr. Scally, you can step down.

4          THE WITNESS:  Yes, Judge.  Thank you.

5          THE COURT:  We're going to have to continue on

6     Monday.

7          Before, Jurors, I let you go, let me just confer

8     with Counsel for a moment at sidebar.

9          (Discussion at sidebar)

10         THE COURT:  Counsel, I'd like to give the Jurors

11    a rough sense of when we think they're going to get the

12    case.  It sounds like you'll be resting pretty early on

13    Monday.

14         MR. GREEN:  That's correct, Your Honor.  I have

15    maybe 15 minutes more with Scally.  You'll have to ask

16    Mr. Given --

17         THE COURT:  And quiet in the courtroom, please.

18         Thank you.

19         MR. GREEN:  I'll tell you what we're trying to

20    do, and then you can ask them how long they expect on

21    cross-examination, whatever, but I would say only 15

22    minutes more with Mr. Scally and then probably will be

23    ten or 15 minutes Manugliacho reading in the

24    deposition.

25         THE COURT:  And then you'd rest, okay.

1          MR. GREEN:  And then we're resting.

2          THE COURT:  Okay.  And so, Counsel, given that

3     we're going to -- and I'll talk to you about the

4     scheduling for Monday afternoon about the charge when

5     they break, but there's a great possibility they will

6     have this case on Tuesday, so I was just going to give

7     them the signal that, based on what I know, I suspect

8     that Tuesday will be the first day they have to -- they

9     should be prepared to stay all day; okay?

10         MR. BAKER:  Could I just ask, madam, how much

11    time --

12         THE COURT:  We can do it afterwards.

13         MR. BAKER:  Okay.

14         THE COURT:  Okay.

15         MR. BAKER:  Okay, got it.

16         (End of discussion at sidebar)

17         THE COURT:  Jurors, thank you for bearing with

18    us.  I just wanted to get a better sense of where we

19    were in the schedule.  So, again, we're very much on

20    schedule.  Based on what I understand of the case and

21    what counsel has shared with me, I expect that you may

22    have this case for your deliberations on Tuesday, and I

23    say that all just so you all can prepare that

24    potentially Tuesday will be a day that you need to be

25    here all day.  So, obviously, I'll give you an update

1    on Monday, I'll have a better sense of that on Monday,

2    but that's my sense of things at this point.

3           On Monday, we'll be, again, 9:00 to 1:00.  So

4    have a great weekend.  Keep all of my cautionary

5    instructions in mind.  Don't discuss the case with

6    anyone, don't do any research, keep an open mind, and

7    we'll see you on Monday at 9:00.

8           Thank you.

9           (The jury is not present for the following)

10          THE COURT:  All right.  Everyone can be seated.

11          Counsel, it's been a long week all the way

12   around, so I won't keep you long today.  Anything we

13   should discuss before -- well, I do have one thing,

14   which is scheduling for Monday afternoon, but from your

15   perspective, anything we should discuss?

16          MR. GREEN:  Not from our end, Your Honor.

17          MR. TARLOW:  Your Honor, as far as scheduling,

18   we're intending to call Sib Hashian -- most likely in

19   this order, Your Honor --

20          THE COURT:  Okay.

21          MR. TARLOW:  -- Sib Hashian, who I don't expect

22   I will be more than 20 minutes with on direct;

23   James Montgomery, who I expect to be about 15 or

24   20 minutes on direct; and then Mr. Goudreau, which I

25   expect to be about 35 minutes if -- but if the Court

1    please, don't hold me to this because I'm famous for

2    under-estimating my time.

3         THE COURT:  Okay.  So -- and, obviously, I know

4    you don't know how much time Mr. Green will spend, but

5    from your perspective, you expect the defense may

6    likely rest on Monday?

7         MR. BAKER:  That's accurate, Judge.

8         MR. TARLOW:  Yes, Your Honor.

9         THE COURT:  Okay.  So, Counsel, I think we'll

10   see where we are on Monday, but I wouldn't -- just for

11   your planning purposes, I wouldn't expect you to be

12   ready to close until Tuesday because we have the other

13   matters to take up where I need to see you outside of

14   the presence of the jury.  So we'll end on Monday and

15   go from there, Counsel.  I don't think the jurors will

16   mind if they are released a little early on Monday.

17        MR. TARLOW:  Your Honor, there's one -- I was

18   hoping to try to put whatever -- the exhibits have

19   gotten away from us a little bit.

20        THE COURT:  Yeah, and Counsel, just before you

21   say that, I just want to say one thing before I forget.

22   On depo. counter-designations, can you get those to me

23   before the end of today, just so I have them or --

24   let's say this:  I'm not going to look at them before

25   tomorrow afternoon, so sometime before then, if you can

1    e-mail them to Ms. Hourihan; okay?

2          MR. TARLOW:  Yes, Your Honor, I will do that.

3          On -- I think the exhibits from on both sides,

4    and I say this respectively, they've kind of gotten

5    away from us a little bit.  We have some paper and

6    exhibits floating around, and I know we submit things

7    on the juror system.  As to this -- the -- I'll call it

8    the admission that keeps coming up from the amended

9    complaint --

10          THE COURT:  Yes.

11          MR. TARLOW:  -- we've had that sort of folded

12    one --

13          THE COURT:  Yes.  Yeah, yeah.

14          MR. TARLOW:  -- and what I was suggesting,

15    Your Honor, is that it should, at the very least, have

16    the signature of the attorney behind it because it's

17    come up -- it was raised by my brother that --

18    something to the effect that this is that loud

19    objection that I raised, I caught the tail of it and

20    jumped up and woke everybody up, that, you know, you're

21    not in the habit of signing, you know, these pleadings.

22          And I want the -- I think the jury should see

23    who signed it.  There's testimony to it, so the second

24    page, at the very least, should have the signature of

25    Mr. Messina on it, and I would suggest at least the

 1    caption so that they can see it in context, that it's

 2    in this case.

 3           MR. GREEN:  I have no objection to that,

 4    Your Honor.

 5           THE COURT:  Okay, that's fine, Counsel.  And I

 6    guess what I would say about exhibits, before the case

 7    goes to the jury, I always have Counsel review the

 8    exhibits together and certify on the record to

 9    Ms. Hourihan they're in order.

10           On these particular redaction issues, I'm sure

11    you'll reach agreement, but if there's any issue, you

12    can raise it with me before then.

13           Counsel, I think this is a case where you're

14    intending to give the exhibits to the jury not just in

15    hard copy but also in the electronic form so they can

16    look at it on the juror system?

17           MR. TARLOW:  Yes, I would --

18           THE COURT:  Okay.  So you'll be certifying both

19    as to the hard copies and that everything has been

20    uploaded in a way that both parties are agreeable with.

21           MR. TARLOW:  The only issue is as to documents

22    that have only come in on paper.  I don't know how

23    we're going to scan them necessarily with the exhibit

24    stickers on, but maybe we can work together to figure

25    out how to --

```
1              MR. GREEN:  I'm sure we can.

2              THE COURT:  Okay.

3              MR. GIVEN:  May I raise one scheduling matter?

4              THE COURT:  Yes.

5              MR. GIVEN:  I'm going to have the happy task of

6    going through the instructions and the special verdict

7    form.  Any ETA on a draft that we can start work on?

8    And should we be prepared on Monday afternoon for a

9    charging conference?

10             THE COURT:  You should be prepared on Monday

11   afternoon.  Counsel will get it before the conference,

12   and if, in the morning, I have -- in the morning before

13   we get the jury, if I have particular issues that I'm

14   focused on, I'll let Counsel know; okay?

15             MR. GIVEN:  Thank you, Your Honor.

16             THE COURT:  Okay.  Counsel, anything?

17             MR. GREEN:  Not from our end, Your Honor.

18             THE COURT:  Okay.  And Counsel, the one thing

19   I'll ask you on Monday, again, for planning purposes on

20   Tuesday, is how long you expect your closings to be;

21   okay?

22             MR. GIVEN:  Certainly.

23             THE COURT:  All right.  Thank you.  Have a good

24   weekend.

25             (Adjourned, 1:05 p.m.)
```

C E R T I F I C A T I O N

        I, Debra D. Lajoie, RPR-FCRR-CRI-RMR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.




                /s/ Debra D. Lajoie




                10/28/16