1                  UNITED STATES DISTRICT COURT
2                    DISTRICT OF MASSACHUSETTS

3  _____

   DONALD THOMAS SCHOLZ,
4
                      Plaintiff,          Civil Action
5                                         No. 13-10951-DJC
   V.
6                                         October 24, 2016
   BARRY GOUDREAU,                        8:58 a.m.
7
                      Defendant.
8  _____

9

10              TRANSCRIPT OF JURY TRIAL DAY 1

11          BEFORE THE HONORABLE DENISE J. CASPER

12             UNITED STATES DISTRICT COURT

13          JOHN J. MOAKLEY U.S. COURTHOUSE

14                 1 COURTHOUSE WAY

15                BOSTON, MA   02210

16

17

18

19
               DEBRA M. JOYCE, RMR, CRR, FCRR
20                  Official Court Reporter
               John J. Moakley U.S. Courthouse
21             1 Courthouse Way, Room 5204
                    Boston, MA   02210
22                 joycedebra@gmail.com

23

24

25

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:

 3    LAWRENCE G. GREEN, ESQ.
      SUSAN E. STENGER, ESQ.
 4    Burns & Levinson LLP
      125 Summer Street
 5    Boston, MA 02110
      617-345-3000
 6
      FOR THE DEFENDANT:
 7
      JEFFREY S. BAKER, ESQ.
 8    Baker & Associates
      2 West Hill Place
 9    Suite 100
      Boston, MA 02114
10    617-573-9505

11    DAVID M. GIVEN, ESQ.
      Phillips, Erlewine, Given & Carlin LLP
12    39 Mesa Street, Suite 201 - The Presidio
      San Francisco, CA 94129
13    415-398-0900

14    DANIEL P. TARLOW, ESQ.
      Copani Tarlow & Cranney
15    265 Broadway
      Methuen, MA 01844
16    978-686-0010

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

(The following proceedings were held in open

court before the Honorable Denise J. Casper, United States

District Judge, United States District Court, District of

Massachusetts, at the John J. Moakley United States Courthouse,

1 Courthouse Way, Boston, Massachusetts, on October 24, 2016.)

THE CLERK:  Court is in session.  Please be seated.

Civil action 13-10951, <u>Scholz v. Goudreau</u>.

Would counsel please state your name for the record.

MR. GREEN:  Good morning, your Honor.  Lawrence Green

with Susan Stenger.  We also have Linda McIlvene.  If I may

introduce Mr. Scholz, he's in the back with his wife, your

Honor.

THE COURT:  Good morning, counsel.

Good morning, sir.

MR. BAKER:  Your Honor, for the defendant, Goudreau,

my name is Jeffrey Baker.  To my left, your right, Dan Tarlow

and David Given.  My client is sitting right behind with his

family as well, your Honor.

THE COURT:  Good morning.

Counsel, I wanted to return to a few matters from the

final pretrial conference and then address some matters before

we get jurors today.

Counsel, bear with me as I read in my decisions on a

few of the outstanding matters from the final pretrial.  I

1    appreciate that we're addressing these matters today.  Last

2    week when we had scheduled a further pretrial, as counsel may

3    be aware, I was in the midst of another trial.

4            Counsel, just to return to the defendant,

5    Mr. Goudreau's omnibus motion in limine, Docket 202, there were

6    certain portions of that that I reserved on, and I want to

7    address those now.

8            The first was in regard to the plaintiff's intention

9    to introduce alleged evidence of infringement other than

09:00 10   related to Ernie and the Automatics.  Since I've heard your

11   arguments and had the benefit of your initial filings on this

12   matter, I also received Docket 221, which is the plaintiff's

13   identification of which of the contested exhibits they plan to

14   introduce, they plan to introduce in this regard.  I also

15   received the further objection to those exhibits, Docket 226.

16   Having reviewed those matters and thought further about this

17   matter, as I initially indicated, I'm going to exclude this

18   evidence in light of my summary judgment ruling and also on 403

19   grounds.

09:01 20        I know that the Ernie and the Automatics relationship

21   was in the period 2007 to 2011.  The proffered exhibits in

22   evidence related to a much broader period of time, 2005 to

23   2016, and related to other instances and relationships.

24            I do think, given my previous ruling, this falls

25   within 403, not just because of those rulings and my likely

1    jury instructions on the two remaining trademark claims and

2    breach claims, particularly given that the focus of the two

3    trademark claims is on the amount of control that Mr. Goudreau

4    exercised in relationship to Ernie and the Automatics, which I

5    think is very particular to that relationship.

6        I did consider, Mr. Green, the further argument that

7    this falls under 406 in regards to defendant's habit or his

8    regular practice.  I'm not sure that that is apt here, given

9    the different relationships that would be presented by

09:02 10   organizations and bands other than Ernie and the Automatics,

11   but to the extent that it would apply, I think it's still

12   subject to the same 403 analysis.  So that's my ruling on that

13   remaining portion of Docket 202.

14       In regards to the defendant seeking to exclude what is

15   now three witnesses, I think it's Mr. Steffanelli, the

16   individual who's referred to as Cosmo, and I know he's the

17   subject of a motion to quash, and Mr. Pihl.  Given my ruling

18   about, as I've just said, excluding matters other than Ernie

19   and the Automatics, I would exclude their testimony to the

09:03 20   extent that it applies to these other matters.  But, Mr. Green,

21   I understood that you may be offering these witnesses on issues

22   other than that.

23       MR. GREEN:  That's correct, your Honor.  We're

24   offering these witnesses on issues primarily relating to the

25   trademark and to the integrity of the trademark.

1    THE COURT:  So I'm not going to wholesale exclude

2    them, counsel, but my ruling as to it being limited to Ernie

3    and the Automatics stands.

4    Counsel, I'm going to return to the motion to quash at

5    the end my addressing these other outstanding issues.

6    Counsel, also as related to Docket 202, the defendant

7    was seeking to keep from the jury the issue of profit,

8    disgorgement, and accounting.  I heard counsel on this issue as

9    well at the final pretrial.

09:04 10    As I indicated I was inclined to do, I'm inclined,

11    counsel, to allow this to go to the jury as a special question.

12    I think it would be prudent to have it broken down as contract

13    versus trademark claims and damages.  I've had a chance to

14    review each of your prospective verdict forms, and I think

15    we'll return to that phrasing in questions when we get closer

16    to the end of this case as part of the jury charge conference.

17    I guess, counsel, whether or not it's advisory to me

18    on this issue or if it's binding on me, I'll reserve for

19    another day, but that will go to the jury.  So I deny the

09:04 20    defendant's motion in that regard.

21    Also, relating to Docket 202 was the defendant's

22    seeking to exclude evidence related to "Just Another Band Out

23    of Boston."  Upon further reflection, I get Mr. Green's point

24    that this is at least relevant or material to the trademark

25    claims here to the extent it bears upon the issue of the

1    defendant's control over Ernie and the Automatics as

2    circumstantial evidence of same.  And I think, to the extent

3    there is any 403 concern, counsel, I can give, as I think

4    Mr. Green suggested in his papers, a limiting instruction that

5    the plaintiff isn't entitled to damages for use of this phrase

6    but just that the jury can consider it as it bears upon the

7    claims that are before them.  For that reason, I'm going to

8    deny exclusion of evidence on that point.

9         Counsel, the other piece of 202 that was remaining

09:06 10   was, Mr. Green, I think you were intending to introduce what

11   was marked as 7 T and 7 U, this is Mr. Montgomery introducing

12   Mr. Goudreau at Johnny D's on March 11th of 2016.  I've had a

13   chance to review those video clips.

14        I guess what I wasn't clear on, given my ruling about

15   excluding anything other than Ernie and the Automatics, do you

16   still press this?  I mean, I understand you'd reserve your

17   objection to me ruling in that way, but I guess I wasn't --

18        MR. GREEN:  Given -- the two issues are very much the

19   same, your Honor.  Given your ruling, we won't press it.  We

09:07 20   obviously preserve our objection.

21        THE COURT:  Objection is reserved, but consistent with

22   my previous ruling, that is excluded for the same reasons.

23        I believe there were two issues -- that's everything,

24   Ms. Hourihan, in regards to 202.

25        In regards to 200, which is the plaintiff's omnibus

1    motion, I believe there are two issues I still had reserved

2    upon.  The first was in regards to defendant's alleged damages

3    on the counterclaims that had not been previously produced in

4    discovery.  As I understood the argument, this had been

5    produced in August but after the discovery deadline.

6    Defendant's response was that the underlying evidence had been

7    produced in discovery but was produced in spreadsheet form in

8    connection with, I think, proffered damages testimony.

9         Counsel, given the representations on either side, I'm

09:08 10   not inclined to exclude it on timeliness grounds, especially

11   since it has now been produced in August at any rate.  Counsel,

12   I don't think there was another argument in this regard?

13   Mr. Green, this was in regards to --

14        MR. GREEN:  There was no other argument.

15        THE COURT:  So I will not exclude it on that ground.

16   That relates to Docket 200.

17        The other issue that was outstanding as to Docket 200

18   was plaintiff seeking to exclude Mr. Goudreau's reliance on the

19   1977 Suffolk Superior Court complaint, in which I think both

09:08 20   parties were plaintiffs.  This is the matter against Alf

21   Management.

22        I was not inclined to exclude it on lack of disclosure

23   grounds.  I guess, counsel, I'm not seeing the relevance of it

24   here, given that even the breach of contract counterclaims and

25   the breach of implied covenant claim relate to a settlement

1    agreement, if I'm recalling, in 1983 -- am I recalling the date

2    correctly?  And this complaint goes back to 1977.  So I had a

3    question about relevance as it bears upon the claims here, but

4    I think the only ground to exclude it that was raised was as to

5    timeliness.

6              Mr. Green.

7              MR. GREEN:  I do believe we are also contending we

8    have an issue on relevance here.  If that was not clear in our

9    papers, I apologize.

09:10 10         THE COURT:  I guess, counsel -- and I don't know when

11   you expect this to come up, and I know we have other matters

12   that are a little more timely, but, counsel, do you want to say

13   anything about relevance?

14             MR. BAKER:  Your Honor?

15             THE COURT:  Yes.

16             MR. BAKER:  Certainly if Mr. Scholz were to get on the

17   witness stand and make testimony that's inconsistent with that

18   sworn statement, we would use it to impeach him --

19             THE COURT:  And is this the sworn statement about who

09:10 20    were original members of the band?

21             MR. BAKER:  Yes, Judge, it goes to that issue.  And

22   secondly, which is probably something -- a subject you'll

23   undoubtedly talk about, our position on this case is the fair

24   use defense applies, and there is a dispute over the use of the

25   word "original" in some of the advertisements that Mr. Boch had

1    presented.  And for that reason, we seek to introduce this

2    language as a factual basis for our position that Mr. Goudreau

3    was, in fact, an original member.  Because the paragraph we're

4    referring to --

5            THE COURT:  As a factual matter.

6            MR. BAKER:  Yes, Judge, impeachment and factual.  But

7    the factual issue -- I just want to make sure you're clear

8    about our position -- would relate to Mr. Goudreau's status as

9    an original member of the band BOSTON.  Because the of the

09:11 10    sworn statement by Mr. Scholz is he, together with

11    Mr. Goudreau, formed the band BOSTON.

12            THE COURT:  Okay.

13            Thank you.

14            Mr. Green, do you want to respond briefly to that?

15            MR. GREEN:  We disagree the complaint is any way a

16    prior inconsistent statement.  I think you can defer ruling on

17    that until you hear the actual testimony.

18            THE COURT:  Okay.

19            MR. GREEN:  I do note more generally, your Honor,

09:11 20    Mr. Goudreau is a party to the 1983 agreement, which is central

21    to this case.  He has agreed in that agreement that he can only

22    refer to himself as a former member, and I do believe that the

23    effort in this case is they're going to try to relitigate

24    something he's already agreed to.  We're more than happy to

25    respond to that at the appropriate time.

1          THE COURT:  So, counsel, I'm going to reserve on this

2     issue.  I think the issue of impeachment may be different from

3     whether or not the complaint or the statements have any

4     independent relevance, but I'll reserve on this issue.

5          Counsel, I guess I would -- as with all of the other

6     issues, when you expect this issue to come up, if you can give

7     advance notice so I can hear counsel about it more thoroughly,

8     and I can look at the complaint.

9          MR. BAKER:  Judge, I had intended to refer to that in

09:12 10    my opening, that Mr. Goudreau and Mr. Scholz formed the band.

11    I don't have to *a fortiori* refer to the document, but I want to

12    make sure the Court is aware of that.

13         THE COURT:  Counsel, where I think there's not

14    reference to the complaint, I would allow that.

15         MR. GREEN:  I would agree, your Honor.

16         THE COURT:  Okay.

17         Counsel, just to -- oh, and I guess the last thing --

18    counsel, those were all the matters I had on my list having

19    reserved on at the final pretrial.  There's some other matters

09:13 20    I want to turn to as well.

21         I guess the last outstanding motion issue, counsel, is

22    Docket 239, which was the motion to quash by the witness that I

23    think was -- that, Mr. Green, the plaintiff was planning to

24    call.  This is Cosmo.  I did review the motion.  I saw the

25    response from defense and not objecting to, I guess, the motion

1    to quash.  Did you have any position on this?

2         MR. GREEN:  We take no position, your Honor, on the

3    motion to quash.

4         However, your Honor, we do take exception to two of

5    the conditions set forth by the defendant that are the basis of

6    his opposition.

7         THE COURT:  This was in regards to depo, stipulations,

8    and something about a production of an agreement.

9         MR. GREEN:  That's correct, your Honor.

09:14 10       And if I may, they -- obviously, if Mr. Migliaccio is

11   not going to be present, both sides have the right, since he's

12   unavailable, to cite to portions of his deposition, and I'm

13   sure we both will, but they have added two conditions beyond

14   that, which, frankly, are totally inappropriate.

15        The first one, your Honor, is they have said we also

16   want to cite from depositions in other cases.  There's been no

17   designation to us of any depositions in other cases.  We have

18   not heard of this.  I'm aware of no filings on this to so

19   request.  There hasn't been any identification of exhibits on

09:14 20   that.  So that's the first one.

21        And the second, your Honor, is they want to get a

22   settlement agreement that was entered into between

23   Mr. Migliaccio and Mr. Scholz on something that has nothing to

24   do with this case, so we object on relevance.  We also object

25   on the fact that it is a settlement agreement and, therefore,

1    inadmissible under the Federal Rules of Evidence.

2          And finally, your Honor, we object on the grounds here

3    of timeliness.  If they wanted this settlement agreement, they

4    could have sought this as discovery from one party or another

5    here.  To my knowledge, it's never been sought.  I think it's

6    totally inappropriate to raise it at this time.

7          So for those three reasons, your Honor, we have no

8    issue with their response.  We do take issues --

9          THE COURT:  Counsel, do you want to respond?

09:15 10          MR. BAKER:  Can Attorney Given respond?

11          THE COURT:  Sure.

12          MR. GIVEN:  Thank you, again, for allowing me to

13    appear before your Honor.

14          So there's no dispute with respect to the deposition

15    testimony that's been given in this case, and both sides will

16    be able to use that freely, obviously subject to any rulings on

17    relevance and so forth.  The only other deposition we

18    identified was the deposition that was taken by Mr. Scholz in

19    another case, and I don't see how there's any prejudice in

09:16 20    connection with using that deposition testimony since

21    Mr. Scholz was a party in that case and was asking the

22    questions.

23          With respect to the settlement agreement, I've never

24    heard of a rule that excludes a settlement agreement as

25    evidence in a federal court.  That's one.

         1              Two, you're aware, your Honor, of this other case

         2    because you cited it in your summary judgment decision.  This

         3    was the case that Mr. Scholz started against Fran Cosmo in the

         4    Western District of Washington, and he went in on that case for

         5    preliminary injunction, and he lost.  Subsequent to the

         6    decision by that court denying the motion for preliminary

         7    injunction, which, incidentally, raised the same or

         8    substantially the same claims that are being raised here,

         9    trademark claims on the same or substantially the same basis,

09:17   10    and I refer your Honor to the very well-reasoned decision of

        11    the judge in that case, which you cited in your summary

        12    judgment decision.  That settlement agreement goes to the

        13    subject of intent, which is one of the Pignons factors in the

        14    1st Circuit.  It's going to show, we think, that Mr. Scholz's

        15    intent in bringing these actions, both the action here and the

        16    action in Seattle, was to gain royalty rights from these two

        17    other artists, in the case of the case in Washington,

        18    Mr. Cosmo, and in the case we have before your Honor,

        19    Mr. Goudreau.  We'd like to see that settlement agreement.

09:17   20    Mr. Scholz has that settlement agreement.  There can't possibly

        21    be any prejudice with respect to timeliness of a request to see

        22    a document that Mr. Scholz presumably has signed and entered

        23    into with Mr. Cosmo.

        24              We intended to ask Mr. Cosmo some questions about that

        25    settlement.  He's not going to be here.  The quickest way to

1    get the best evidence of that subject is to see the document

2    itself.

3            THE COURT:  Okay.

4            So, counsel, here's my ruling.  In regards to the

5    motion to quash, as I said, having reviewed the bases for it,

6    which were both hardship relating to the witness' medical

7    condition, which is supported by a doctor's note, and the fact

8    that he lives more than a hundred miles outside of the

9    district, I believe he lives in Utica, if I'm recalling

09:18 10  correctly, I'm going to allow the motion to quash, and I don't

11   hear either side objecting to the basis for the motion to

12   quash.

13           I agree that that means portions of his deposition can

14   be designated by either side.  And, counsel, I guess at some

15   point today or some point early in the trial, we should talk

16   about when I should get those designations and

17   cross-designations so I can rule on them and how it's going to

18   be presented to the jury, so we should do that.

19           Having said that, and having allowed the motion to

09:19 20  quash, I think these other issues that are raised by the

21   defense don't relate to my motion to quash.  I think, one, to

22   the extent it's seeking production or discovery, I don't think

23   that's timely at this point.  And also in regards to other

24   depositions, I don't see how that relates to the present motion

25   before me.

1          Counsel, if there are other matters I need to take up,

2     I can take those up separately, but just note my ruling on this

3     matter isn't allowing the other relief sought in the

4     defendant's response, Docket 240.

5          Counsel, I do want to turn to some other matters

6     before we get jurors.

7          The first is a few logistical matters.  I'm intending

8     to tell the jury pool that I expect this trial will last about

9     a week and a half, going into the middle of next week.  Is that

09:20 10   fair, counsel?

11          MR. GREEN:  Given this Court's time limitations, I

12     think that is fair, your Honor.

13          THE COURT:  Counsel?

14          MR. BAKER:  Seems reasonable, Judge.

15          THE COURT:  Counsel, just so I don't have to tell you

16     before the jury, please always rise when addressing the Court.

17          MR. BAKER:  I'm sorry, your Honor.

18          THE COURT:  Thank you.

19          In regards to opening statements, I don't know if I

09:20 20   got this response from both sides, but, counsel, 20 minutes is

21     sort of --

22          MR. GREEN:  We had requested 20 minutes, your Honor.

23     I don't think I'm going to need 20 minutes, and I think the

24     clerk had suggested we ask for a warning time from the Court.

25          THE COURT:  Yes.

1        MR. GREEN:  I would ask for two-minutes' warning.

2        THE COURT:  I will do that.

3        Counsel, any -- this is your time to use.  The only

4   reason I ask is just for scheduling with the jury.

5        MR. BAKER:  We request 30 minutes, and like Mr. Green

6   says, the two-minute warning would be helpful to us as well.

7        THE COURT:  Okay.

8        Counsel, in terms of the list of potential

9   witnesses -- and this may have changed slightly in regards to

09:21 10   the rulings I have just given you the benefit of -- but are

11   there any of these -- are there any witnesses that are coming

12   off the list?  Again, this is just for the purposes of noting

13   this for the jury.  I suppose the witness whose motion to quash

14   I just allowed, I'm going to take him off the list.

15        MR. GREEN:  Correct, your Honor.

16        THE COURT:  Anybody else?

17        MR. GREEN:  Haley Dunn would be taken off our list,

18   your Honor.  But, otherwise, no changes in our list.

19        THE COURT:  Are there two -- were there two Cosmo

09:22 20   witnesses, Anthony and Fran?

21        MR. GREEN:  That's correct, your Honor.

22        THE COURT:  Are they both coming off?

23        MR. GREEN:  No.  I believe it's just Fran Cosmo.

24        MR. BAKER:  Fran is the witness -- I'm sorry,

25   Mr. Green.

```
 1              MR. GREEN:  Anthony is still on our witness list.
 2              THE COURT:  Okay.
 3              MR. GREEN:  Thank you, your Honor.
 4              MR. BAKER:  Fran Cosmo is the person who submitted to
 5      your Honor the protective order.
 6              THE COURT:  Thank you.
 7              And can you pronounce the last name for me?
 8              MR. GREEN:  Migliaccio.  Fran Cosmo is like a stage
 9      name, your Honor.
09:22 10        THE COURT:  Okay.
11              I notice there's one counsel name, Ms. Stenger.  Are
12      you on the witness list?
13              MS. STENGER:  I'm on their witness list, your Honor.
14              MR. GREEN:  We had asked them if they really need to
15      call Ms. Stenger.
16              I was told by Mr. Tarlow perhaps only to identify
17      documents.  We hope she will not be called as a witness, we can
18      just stipulate.
19              THE COURT:  Counsel?
09:23 20        MR. TARLOW:  Your Honor, it's not something we want to
21      do.  We don't need Ms. Stenger for identification of documents.
22              I can anticipate some testimony coming in because
23      certain letters were sent by Ms. Stenger, depending upon what a
24      witness' testimony would be as to how that occurred, it could
25      become relevant.  It's not something we want to do and are
```

1    going to try to avoid it.  We can't say for certain how the

2    testimony will develop.

3            THE COURT:  So I think the way I will handle that is,

4    counsel, at the beginning, I ask counsel to rise and introduce

5    themselves, members of their team and their parties, their

6    clients.  Counsel will be identified as part of that

7    introduction, so I'm not going so separately also list her in

8    the witness list, but any association or knowledge of her would

9    be prompted by my first question.

09:24  10          Counsel, in terms of the defense, any witnesses coming

11   off or no?

12           MR. BAKER:  Just Fran Sheehan, your Honor.

13           THE COURT:  Okay.

14           MR. BAKER:  Otherwise, Fran Cosmo, Fran Sheehan,

15   that's it.

16           THE COURT:  Okay.

17           Counsel, I've had a chance to put together my voir

18   dire questions and my preliminary jury instructions.  I just

19   wanted to read you the brief description I was going to give

09:25  20   the jurors of the case and the claims, just to see if you had

21   any additions or issues with this.  And this is what I read at

22   the beginning of the voir dire before I ask them the voir dire

23   questions.

24           "As I've indicated, the case on which you've been

25   called to sit as jurors is a civil case.  The case involves

1    several claims brought by the plaintiff, Donald Scholz, against

2    the defendant, Barry Goudreau, and several counterclaims

3    brought by Mr. Goudreau back against Mr. Scholz.  Both the

4    plaintiff and the defendant were members of the band BOSTON.

5            "Plaintiff, Mr. Scholz's claims against defendant,

6    Mr. Goudreau, are for contributory trademark infringement and

7    vicarious trademark infringement for the use of the band name

8    BOSTON.  Mr. Scholz also asserts a claim for breach of the

9    implied covenant of good faith and fair dealing relating to

09:26 10    Mr. Goudreau's alleged violation of a settlement agreement

11    between the two regarding the right to identify as a former

12    member of the band BOSTON.  All of these claims relate to

13    Mr. Goudreau's involvement with a group called" -- I guess I

14    should say "a band called Ernie and the Automatics."

15            "Defendant, Mr. Goudreau, also brings claims against

16    plaintiff, Mr. Scholz.  These claims are called counterclaims.

17    Mr. Goudreau asserts counterclaims against Mr. Scholz for

18    breach of contract and breach of the implied covenant of good

19    faith and fair dealing, all of which relate to Mr. Scholz's

09:26 20    alleged violations of the same settlement agreement between

21    them.

22            "Defendant, Mr. Goudreau, denies Mr. Scholz's claims

23    against him; and plaintiff, Mr. Scholz, denies Mr. Goudreau's

24    counterclaims against him.

25            "Those of you who are selected to serve on the jury

1  will of course hear each side's more detailed version of the

2  case in the course of this trial."

3        And then I go on with the questions.

4        Mr. Green?

5        MR. GREEN:  I have no objection to anything that you

6  just read, your Honor.

7        MR. BAKER:  No objection, your Honor.

8        THE COURT:  And then in regards to the preliminary

9  instructions, I give them general instructions just about what

09:27 10  is evidence, their duties, what the burden of proof is, and

11  then I give brief instructions about the claims here.  So let

12  me just read you that.

13        "Jurors, to help you follow the evidence, I'll now

14  give you a very brief description of the claims at issue in

15  this case.  As a said earlier, plaintiff, Mr. Scholz, brings

16  claims for contributory trademark infringement and vicarious

17  trademark infringement for the use of the band name BOSTON, and

18  as related to the settlement agreement between the parties,

19  breach of the implied covenant of good faith and fair dealing.

09:28 20        "As to each of these claims respectively, Mr. Scholz

21  must show by a preponderance of the evidence each of the

22  elements of these claims.

23        "As to the contributory trademark infringement claim,

24  Mr. Scholz must show: one, the existence of a valid enforceable

25  trademark; two, that the defendant supplied his services to a

third party whom he knew or should have known was engaging in
trademark infringement and that the defendant had direct
control and monitoring of the instrumentality used by the third
party to infringe the trademark; three, the trademark
infringement by the third party; and four, that this trademark
infringement harmed the plaintiff.

"As to the vicarious trademark infringement claim,
Mr. Scholz must show that the defendant and a third party had
an actual or apparent partnership; that the defendant and third
party had the authority to bind the other in transactions with
others or exercise joint ownership or control over the
infringing service; trademark infringement by the third party;
and that this trademark infringement harmed the plaintiff.

"As to the breach of the implied covenant of good
faith and fair dealing claim, Mr. Scholz must show the
existence of a contract between the parties, breach of the
implied covenant of good faith and fair dealing inherent in
that contract, and damage to the plaintiff as a result of the
breach.

"Defendant, Mr. Goudreau, brings counterclaims for
breach of contract and breach of the implied covenant of good
faith and fair dealing against plaintiff, Mr. Scholz, all
arising out of the parties' settlement agreement.

"As to each of these counterclaims respectively,
Mr. Goudreau must show by a preponderance of the evidence each

1    of the elements of these counterclaims.

2    "As to the counterclaim for breach of contract,

3    Mr. Goudreau must show: one, the existence of a contract

4    between the parties; plaintiff's breach of the contract; and

5    damage to the defendant as a result of that breach.

6    "As to the counterclaim for breach of the implied

7    covenant of good faith and fair dealing, Mr. Goudreau must show

8    the existence of a contract between the parties, plaintiff's

9    breach of the implied covenant of good faith and fair dealing

09:30 10    inherent in that contract, and damage to the defendant as a

11    result of that breach.

12    "Again, jurors, this is only a very preliminary

13    outline.  At the end of the trial, I'll give you final

14    instructions on these matters, including definitions of

15    important terms.  Those instructions will govern your

16    deliberations."

17    Counsel?

18    MR. GREEN:  Your Honor, my only question is with

19    respect to the instructions on the trademark claims -- and

09:31 20    you're going quickly and I'm sorry if I couldn't follow

21    everything, but I'm looking at your language at the Memorandum

22    and Order of summary judgment dated September 21 --

23    THE COURT:  And I have that here.

24    MR. GREEN:  -- at page 15 at the bottom of the page --

25    and I think you repeated this language a few different times,

```
  1    but I think it appears most prominently there -- you said at

  2    the bottom of the page there's at least a disputed material

  3    fact as to whether Goudreau had the requisite ability to

  4    directly control and monitor EAT's promotions.  And I'm not

  5    sure that what you read was quite the same as this, but this

  6    would have been our preference in terms of how you --

  7             THE COURT:  So I guess, counsel, you may be -- I used

  8    the term "instrumentality."  So I said as to the contributory

  9    trademark infringement claim -- what I said is the second

 10    element is "defendant supplied his services to a third party

 11    whom he knew or should have known was engaging in trademark

 12    infringement and that the defendant had direct control and

 13    monitoring of the instrumentality."  I suppose what I would say

 14    is "instrumentality, i.e., advertising and promotion, used by

 15    the third party to infringe the trademark."

 16             MR. GREEN:  And the only addition I'm suggesting, your

 17    Honor, is -- and I think that this is consistent with the law,

 18    and certainly law of the case here -- "had the requisite

 19    ability to directly control."  In other words, your instruction

 20    seemed to say "had direct control," and it is going to be our

 21    argument at trial he certainly the requisite ability.  I would

 22    prefer that you include that language.

 23             THE COURT:  Okay.

 24             MR. GREEN:  Thank you, your Honor.

 25             MR. TARLOW:  Your Honor, I would object to that
```

```
 1    language because the law is clear on this issue that

 2    Mr. Goudreau had to actually have direct monitoring control

 3    over the instrumentality over those ads.  Whether he has the

 4    ability to may be evidence of that control, but -- it would be

 5    improper to initially tell the jury that the order of proof

 6    that has to be proven is the ability to control.  I think that

 7    would be confusing.

 8              And then I have one other issue I'd like to raise with

 9    your Honor if you don't have questions.

10    THE COURT:  So, counsel, let me think about that.  I

11    take Mr. Green's point pointing out what I said here, which I

12    think was the correct statement here, but let me think about

13    that.

14              MR. GREEN:  Thank you, your Honor.

15              If I may, I'd also like you to review your ruling on

16    page 16, where, consistent with 15, you said, "whether Goudreau

17    exercised sufficient ability to direct and control the

18    promotions," et cetera, and you cited to the Robinson case.

19              So as you review that, I would ask that you review

20    that also, please.

21              THE COURT:  Okay.

22              MR. GREEN:  Thank you, your Honor.

23              THE COURT:  Counsel, you had something else?

24              MR. TARLOW:  Yes, your Honor.

25              As to your reference to breach of the implied covenant
```

```
 1   of good faith and fair dealing, I believe there is an

 2   additional element that Mr. Scholz would have to prove, that

 3   Mr. Goudreau acted with a dishonest purpose or conscious

 4   wrongdoing for a violation of that, and that was missing

 5   from --

 6            THE COURT:  I think, counsel, that is part of the

 7   showing about the breach of the implied covenant, so I think

 8   you may be right that I may be adding language to the final

 9   instruction about that, but in the attempt to just give them an

10   overview and not complicate things, I'm not inclined to add

11   that here.

12            MR. TARLOW:  We would also ask for one additional

13   matter, your Honor.

14            THE COURT:  Sure.

15            MR. GREEN:  Could I just note before he goes to the

16   next point, your Honor, we take exception to counsel's

17   statement of the law on that, and I think it will be ultimately

18   a question of your jury instructions at the end, but I think he

19   has misstated the standard.  And we would agree with you that

20   that issue in terms of how the jury is instructed on the

21   implied covenant can be deferred until a later point.

22            THE COURT:  Okay.

23            MR. TARLOW:  Attorney Given will address the

24   additional matter.

25            MR. GIVEN:  Your Honor, again, like Mr. Green, you
```

1    were speaking quickly --

2          THE COURT:  Sure.  If there's something I need to

3    repeat, I can.

4          MR. GIVEN:  I was focused primarily on the

5    instructions pertaining to contributory vicarious trademark

6    liability.

7          THE COURT:  Yes.

8          MR. GIVEN:  And what I heard in that instruction is

9    the various elements which I have no, as I sit here now, or

09:35 10   stand here now, I guess, have no quarrel with, but I think

11   we're putting the cart before the horse.

12         You don't get to contributory or vicarious liability

13   under trademark law until you have first proved that the third

14   party has infringed the trademark.

15         THE COURT:  Counsel, and I understood the sequence.

16   Having read the proposed verdict forms, I understand defense

17   would like me to put that issue first, and I have mentioned it

18   here.  It was one of the elements, it was not the first.

19         MR. GIVEN:  It seems to me primary in a case of

09:36 20   contributory or vicarious trademark liability that you

21   instruct -- that you instruct the jury in that sequence.  I

22   will come back to this subject later, and I'm sure we'll have

23   an interesting discussion on trademark law on the subject of

24   likelihood of confusion.  These cases rise or fall on the issue

25   of likelihood of confusion.  That is the heart of trademark

1    law.  And it seems to me that that issue is primary.  Before

2    you even get to the subject of whether Mr. Goudreau is liable

3    for Mr. Boch or Ernie and the Automatics' use of the BOSTON

4    word mark, you have to determine whether Ernie Boch and his

5    band infringed that word mark.  And likelihood of confusion is

6    primary in that inquiry.

7          The thing that I did not hear in your instruction on

8    the subject of trademark infringement was anything having to do

9    with fair use.  And again, I commend to your Honor the very

09:37 10   fine decision of the judge in the Western District of

11   Washington in Mr. Scholz's case against Mr. Cosmo, Fran Cosmo,

12   not Tony Cosmo.  In that case, he did a very fine job of

13   walking through the factors of nominative fair use under 9th

14   Circuit authority.

15         Now, this circuit, the 1st Circuit, has adopted

16   nominative fair use, and that's the Building No. 19 case.

17   There can be no question that nominative fair use is going to

18   be central to this case.  Granted, according to the Building

19   No. 19 case, that's an affirmative case -- that's an

09:38 20   affirmative defense as to which Mr. Goudreau bears the burden,

21   and we've drafted our jury instructions and we've drafted our

22   special verdict form to reflect that.  We'll get into that

23   subject, I'm sure, later on when we conference on the subject

24   of jury instruction and special verdict form.  But I would urge

25   the Court to consider at least a preliminary instruction on the

1    subject of fair use because it's going to be a primary defense

2    of Mr. Goudreau, which is really a defense of Mr. Boch who is

3    not a defendant in this case.

4         And I might say, this is a very unusual situation.

5    The primary infringer isn't even a party in this lawsuit.  But

6    putting that aside, Mr. Goudreau intends to raise a defense

7    that is otherwise perfectly available to the primary infringer,

8    Mr. Boch.  And I think a preliminary instruction on that

9    subject is warranted.

09:39 10         THE COURT:  Counsel, Mr. Green?

11         MR. GREEN:  If I can respond, your Honor.

12         Counsel conceded that you properly stated the

13    elements, and that one of the elements is infringement.  I,

14    frankly, think it makes no sense to single out this affirmative

15    defense when there are affirmative defenses raised both ways by

16    each party -- each of the parties to each of the six remaining

17    claims here and why should that be singled out?

18         Obviously when we come to jury instructions at the end

19    of the case, fair use may be an important issue.  Depending on

09:39 20    how the evidence comes in, you can properly instruct them then.

21    All we're talking about now is you advising the jury panel on

22    what this case is about, and I don't think that affirmative

23    defense needs any highlighting more than any other affirmative

24    defense.

25         Thank you, your Honor.

```
 1            THE COURT:  Counsel, here's what I'm going to do.
 2            I do -- again, these are preliminary instructions.
 3   It's just so they have a sense of the claims and of the
 4   elements.  I'm not going to address the defenses.  I don't
 5   usually do that, and I'm not inclined to vary from my usual
 6   practice in this case.  I fully recognize, having read the
 7   proposed jury instructions, counsel, that this is an issue of
 8   discussion at the final jury charge conference, and I'll hear
 9   you on what should be included in the final full instructions
09:40 10  to the jury.
11            Counsel, I will, as I said, think more about the
12   requisite ability to control issue.  I will review those pages
13   when we have -- when I have a moment before I instruct them,
14   but if it's a correct statement of the law, which I recall it
15   to be from the M and O, I'm inclined to add that phrase.
16            Counsel, a few other things.
17            Counsel, I can't recall if I had addressed witness
18   sequestration with counsel beforehand.  Is it being sought
19   here?
09:41 20      MR. GREEN:  I don't believe you have, your Honor.
21            Let me say that the first witness here is going to be
22   Ernie Boch, and then it will be Mr. Goudreau and Mr. Scholz.  I
23   don't know that any other witnesses are intending to show up in
24   that time, but certainly I think it would be appropriate that
25   no other witnesses be present for them.  And then I think we
```

1   proceed from there.  But I think it would be appropriate

2   overall, your Honor, to -- other than the parties to the case,

3   to ensure that there be sequestration.

4           THE COURT:  Okay.

5           So, counsel --

6           MR. BAKER:  We see no need for sequestration, Judge.

7           THE COURT:  Well, I think where one party is

8   essentially seeking it, I would order it.  It doesn't apply to

9   the parties, Mr. Scholz or Mr. Goudreau.  And you can advise

09:42 10   the witnesses, all the other witnesses, in that regard.

11          Counsel, in terms of scheduling, I am going to tell

12   the jury 9:00 to 1:00, except when they get the case for their

13   deliberations.  The one exception to that, which I think

14   Ms. Hourihan has mentioned to you, is tomorrow, where I need to

15   have us sit 11:00 to 2:00.  I'll advise the jury of that in the

16   selection process.

17          Counsel, I think you've also been notified, and I

18   think counsel has already referenced it, having gotten

19   counsel's input, I've given each side 10 hours for

09:42 20   presentation.  This applies to everything: openings, closings,

21   direct, cross-examination, everything.  Counsel, other than the

22   time for openings and closings, where I just want a rough

23   estimate of the time you're going to use, the time is otherwise

24   for you to use at your discretion.  Ms. Hourihan will keep

25   track of the time and will advise you of the time remaining at

1    the end or the beginning of each day.

2            Counsel, I think I've said this in previous

3    conferences, but I do try to keep sidebars to a minimum.

4            We'll meet starting tomorrow at 8:45 --

5            (Discussion off the record.)

6            THE COURT:  -- excuse me, Wednesday at 8:45.  I

7    will -- we'll attempt to start at 10:45 tomorrow, but -- I try

8    to start with counsel 15 minutes beforehand.  Any heads up that

9    you can give me about witnesses coming up or contested exhibits

09:43 10    that are coming up so that I can look at them beforehand with

11    your arguments in mind, that would be helpful.

12            Counsel, I also -- it has become my practice that if

13    there's a sidebar requested that I credit it or debit it

14    against whichever party loses the objection, so just keep that

15    in mind.

16            And, counsel, I also check in with you at the

17    beginning, during the recess, and at the end of the trial day

18    to see if there are any issues you can just give me the heads

19    up on.

09:44 20            Counsel, in terms of jury selection, I think we had

21    reviewed this beforehand, but I'm seating eight.  I'll ask all

22    of the questions of the pool in open court.  Ms. Hourihan will

23    record affirmative answers.

24            Again, the jurors are kept in numerical order in the

25    order in which they appear on your list.  We'll put the first

1    group in the box and the rest will be in the benches.

2         Once all of the affirmative answers are recorded, I'll

3    see the jurors who answered affirmatively with counsel at

4    sidebar.  I'll ask the follow-up questions, but if I sense that

5    counsel may have additional questions or may have a grounds for

6    moving to strike for cause, I'll have the juror step back to

7    the witness stand and hear your proposed additional questions

8    or your motion to strike for cause.  Any cause challenges

9    should be brought up at that time when the juror is at sidebar.

09:45 10        Once we've cleared 16, that is to allow for eight

11   being seated and four peremptories on either side, I'll give

12   you time to collect your thoughts about peremptories, and then

13   I'll hear you about peremptories back at sidebar.  I do those

14   in alternating rounds, plaintiff going first in the first

15   round, defendant going first in the second round until you're

16   satisfied or you've exhausted the challenges.  Then we'll -- in

17   open court, Ms. Hourihan will announce the names and numbers of

18   the jurors who have been seated and we'll excuse the other

19   jurors.

09:46 20        Just so you're clear, there's no bar to whoever you

21   want to strike with the peremptories in the pool.  Just keep in

22   mind that the first eight in number order will be the jurors

23   for this case.  I don't move jurors around at all.  They'll

24   just stay in their seats.  So if Juror Number 1 gets struck for

25   cause, that seat will stay empty.

1          Counsel, I think other than contested exhibits -- and

2     I may ask for your guidance on which ones are likely to come up

3     first -- I don't think there were other outstanding issues that

4     I had on my list.  But, counsel, if there are other matters I

5     should address now --

6          MR. GREEN:  Yes, your Honor.  I believe there are

7     three matters we want to call to the Court's attention, and

8     they all fall within the category of alerting the Court to

9     potential issues that might come up during the day.

09:47 10          I believe it was late last week, defendant's counsel

11     produced to us a series of, quote-unquote, chalks that they

12     intend to use.  Our understanding of federal practice, your

13     Honor, is a chalk is not an exhibit itself, but it is a summary

14     of evidence.

15          We received a number of things that don't consist of

16     chalks in any way here.  They are -- some of these are exhibits

17     that have never been identified in this case either as agreed

18     upon or contested exhibits.  There is a timeline that has all

19     kinds of information in it that we take issue with.  And I

09:48 20     guess my question would be -- I'm not sure when these are going

21     to be used, but to the extent that any of these are going to be

22     used as part of counsel's opening here, we would take

23     exception.  We certainly have no issue with any use or

24     reference to agreed-upon exhibits here, but anything that has

25     not been identified yet, any timeline that relies on

1   information that is not only not in evidence but is referring

2   to things that we challenge, we do take issue with that.

3           THE COURT:  Okay.

4           Counsel.

5           MR. TARLOW:  Your Honor, admittedly, I may not have

6   the many years of experience of my brother, but my

7   understanding of federal practice is a chalk can be anything,

8   your Honor, and it's not evidence in this case; we don't intend

9   to refer to it as evidence in this case.  But a chalk is

09:48 10  anything that will help to explain to the jury, to put things

11  in context, and the jury is instructed that these are chalks

12  and not evidence.

13          We do have documents or chalks that we wish to refer

14  to in our opening.  These are fairly benign, non-prejudicial

15  items which we could preview for you on the screen, your Honor,

16  and go through them one by one.  But to give you an idea,

17  they're simple things like the back cover of the album is a

18  picture of the band.  That's an uncontested exhibit.  Well, the

19  front cover of the album is the BOSTON trademark, and that

09:49 20  BOSTON trademark, the logo, is an uncontested exhibit.  But the

21  jury should be entitled to see as -- to help them understand

22  how it's used in context, not just the registered trademark,

23  your Honor.

24          A picture of Mr. Delp, because we are going to be

25  referring to him, not in context of the lawsuit but referring

         1    to him, so they see the context.  We have a picture of the

         2    apple logo --

         3              THE COURT:  Counsel, do you have a copy on the screen?

         4              MR. TARLOW:  Yes, we can run it, your Honor.

         5              THE COURT:  And this is for openings, counsel?

         6              MR. GIVEN:  Yes, your Honor.  It's a PowerPoint

         7    presentation.

         8              THE COURT:  Okay.

         9              And is it going to come on this screen?

09:50   10              (Discussion off the record.)

        11              MR. TARLOW:  So Attorney Given can take you through.

        12              MR. GIVEN:  I can narrate this one because I prepared

        13    it.

        14              This is a simple chronology of events starting with

        15    when the two parties in this case fist met.  The first band

        16    they formed together, Mother's Milk, there's not going to be

        17    any dispute about that.  The fact that they formed the band

        18    BOSTON, which, incidentally, is in that Elf Management

        19    complaint.  The first tour the band BOSTON had started in March

09:51   20    of '76.  A picture of the first record.  A picture of the

        21    second record.  The release dates.  The second tour when

        22    Mr. Goudreau was asked to leave BOSTON.  Their settlement

        23    agreement, obviously no dispute there.  The fact that

        24    Mr. Goudreau put out three albums of his own after he left

        25    BOSTON and that he participated in other band projects.  The

1    involvement with Ernie and the Automatics; it's their case.

2    And the date that they filed the complaint.  The two trademark

3    registrations that were originally at issue.  And by the way, I

4    would point out to your Honor that the logo mark is no longer

5    even an issue in this case.  It's just the word mark.  But

6    nothing here is, I don't think, objectionable in any way, shape

7    or form, or misleading or prejudicial.

8            THE COURT:  And is this the end of it, counsel?

9            MR. TARLOW:  No, your Honor.  There's 15 of them.  Do

09:51 10    you want to see the next one?

11            THE COURT:  Yes.

12            (Pause.)

13            THE COURT:  So I guess, counsel, just go back for a

14    second?

15            MR. TARLOW:  Sure.

16            THE COURT:  Thank you.

17            (Pause.)

18            MR. GREEN:  As you look at this, your Honor, I will

19    specifically point out the third entry, Scholz Goudreau form

09:52 20    new band BOSTON.  Needless to say, we take issue with that.

21    The evidence will be that Mr. Goudreau was not an original

22    member.

23            Middle of it, Goudreau asked to leave BOSTON.  He was

24    not asked to leave BOSTON; he left voluntarily here.

25            We don't take issue with these particular album covers

1    here.

2         Those would be our issues here.

3         MR. GIVEN:  Well, if I've just heard my brother

4    correctly, he's making an issue out of whether Mr. Goudreau was

5    an original member of the band BOSTON, which puts in play the

6    Elf Management agreement, because that is a directly contrary

7    statement to what my brother just said.  So that's coming in.

8         And this language and that date come directly from the

9    Elf Management complaint that Mr. Scholz and Mr. Goudreau both

09:53 10    signed in 1977.

11         MR. GREEN:  Just so it's clear, your Honor, we're not

12    the ones putting this in issue.  Counsel well knows

13    Mr. Goudreau is the one putting this in issue.  Having signed a

14    1983 settlement agreement saying it's not an issue, he is

15    trying to relitigate this and say he was an original member.

16         THE COURT:  Counsel, let's move on to the next one.

17         Can you move forward to the next?

18         That's an album cover?

19         MR. GIVEN:  This is a photo of the cover of the first

09:53 20    record.

21         MR. GREEN:  And that we have no objection to.

22         When I stood up originally, your Honor, I wasn't

23    suggesting that we had issues with all 15 of these, but I do

24    think we need to go through a process and review these one by

25    one.

1          MR. GIVEN:  Let's just roll through them then, with

2     your Honor's permission.

3          THE COURT:  Yes.

4          MR. GIVEN:  Back cover, uncontested exhibit.

5          MR. GREEN:  As I said, we have no issue with

6     uncontested exhibits.

7          THE COURT:  Okay.  You don't have to stop if they're

8     uncontested.

9          So just keep going to the next contested one, please.

09:54 10          (Pause.)

11          THE COURT:  I'm assuming this is not contested?

12          MR. GREEN:  I don't believe that this picture has been

13     marked -- is any exhibit, agreed upon or even a contested

14     exhibit, your Honor.

15          MR. GIVEN:  As my brother, Mr. Tarlow, just said, it

16     doesn't have to be an exhibit.  It's used for illustrative

17     purposes.

18          THE COURT:  No, but I think that's different.  I think

19     the timeline, which is illustrative, is different from a

09:54 20     document essentially that's -- that you're not planning to

21     introduce in evidence.  I think they're two different things.

22          But let's keep going, counsel.

23          MR. TARLOW:  Your Honor, the next one is a video,

24     which I will play for your Honor.

25          THE COURT:  Is it contested?

```
 1              MR. TARLOW:  I don't know.

 2              THE COURT:  Mr. Green, is this contested?

 3              MR. GREEN:  None of these videos, your Honor, was

 4    identified --

 5              THE COURT:  So let me just short circuit this.

 6              So in terms of the first -- the timeline, I understand

 7    that there are points on it that are contested between the

 8    parties.  I'm going to very clearly advise the jury before they

 9    hear either opening that what is said in opening is not

10    evidence.  I didn't think anything on the timeline summary rose

11    to 403 concerns, particularly given the instruction I'll give,

12    and I understand, there are certain points on it that are

13    contested, but, again, this isn't an exhibit.

14              To the extent that there are items in the opening that

15    are essentially documents or exhibits that were not agreed to

16    by the parties, I do think those are on different ground here,

17    and I'm not going to allow those because my expectation at this

18    point is they wouldn't be coming in.  But I won't uphold the

19    motion to exclude the timeline summary.

20              So I don't know if there are any other timeline-type

21    exhibits I need to see.

22              MR. TARLOW:  No, your Honor, there aren't.

23              If I'm hearing your Honor correctly, if -- what you're

24    saying is, if it's not an uncontested exhibit, we cannot use it

25    as a chalk in our opening?
```

1          THE COURT:  That's correct.

2          MR. TARLOW:  I would just then ask that almost

3    simultaneously when we were exchanging chalks on Friday, we

4    received a disk with videos and some screen shots --

5          THE COURT:  If it's good for the goose, it's good for

6    the gander.

7          MR. GREEN:  Let me just state on that.  I'm not

8    referring to any chalks in my opening, your Honor.  I will be

9    referring to Mr. Goudreau's paragraph 53 from his counterclaim,

09:57 10   and I will be referring, will be projecting on overhead his

11   deposition testimony confirming paragraph 53.

12         THE COURT:  And haven't I already ruled that 53 is --

13   I know there's --

14         MR. GREEN:  It is an admission, it's not a judicial

15   admission.

16         THE COURT:  Right.

17         MR. GREEN:  That's correct, your Honor.

18         In terms -- we did send counsel one video, your Honor,

19   and I just want to explain, because I don't know that this is

09:57 20   what is good is goose for the gander here.  This falls in a

21   different category.

22         We only late last week found on YouTube a video of

23   Ernie and the Automatics in 2009, which was in the middle of

24   the four-year period, coming out with a video to promote their

25   CD.  Right in the first minute of the video there is a

1    representation there that Mr. Goudreau is an original member of

2    the band BOSTON, which of course was violative of his

3    agreement.

4            The reason why we believe we should be able to use

5    this document, your Honor, is this document should have been

6    produced to us by Mr. Goudreau, who no doubt had it.  It falls

7    within discovery.  He had it.  And I don't intend to make use

8    of it in opening per se, and if the Court wants to defer ruling

9    on this until they see it --

09:58 10         THE COURT:  I guess what I'm saying is, counsel, for

11    the purposes -- I'm very focused on openings, counsel, right?

12           So to the extent there are contested exhibits, which

13    it sounds like this video would fall in, which is why your

14    brother is almost on his feet, I'm not going to allow those in

15    the opening.  I will reserve on what other arguments you may

16    have for me about their admission.

17           MR. GREEN:  Understood, your Honor.

18           THE COURT:  And that goes for both sides.

19           MR. GREEN:  Thank you, your Honor.

09:59 20         THE COURT:  Counsel, anything else that I should

21    address now.

22           MR. GREEN:  One other issue that I think will come up,

23    the first witness, your Honor, although I trust there is not

24    going to be an issue here, is that we do intend to call

25    Mr. Boch as our first witness; and under Federal Rule of

1    Evidence 611(c)(2), we would ask that he be regarded as a

2    hostile witness and that we be permitted to treat the

3    examination as a cross-examination.

4            MR. TARLOW:  Your Honor, if I may address that.

5            THE COURT:  Yes.

6            MR. TARLOW:  If you read Mr. Boch's deposition

7    testimony -- actually if you read it in both cases, the Herald

8    and this case -- Mr. Boch is a huge fan of Mr. Scholz.  There

9    is admiration.  He actually -- there is nothing to suggest that

10:00  10    he will be hostile in any way.

11            If in fact he turns out to be hostile on the stand,

12    your Honor could make a ruling, but I would suggest to you that

13    as a preliminary matter he should not be declared hostile.

14    He's not a party, he hasn't been sued, he has no exposure, and

15    he should not be allowed to lead him just because he was the

16    one who is accused of the infringement, even though he has no

17    exposure and is not a party to the case.

18            MR. GREEN:  If I can be a little more clear here, your

19    Honor.  611(c)(2) --

10:00  20            THE COURT:  And I have it up now.

21            MR. GREEN:  Yes.  We're relying on the last part of

22    this, your Honor.

23            Ordinarily the court should allow leading questions

24    (2) when a party calls a hostile witness, an adverse party, or

25    a witness identified with an adverse party.  That's clearly

1    what we're talking about here.

2          Yes, Mr. Boch said that he's a huge admirer of

3    Mr. Scholz's music.  He's also a friend of Mr. Goudreau.  But

4    the important point here is that they were together involved

5    with Ernie and the Automatics, and that's what this case was

6    about for four years.  They were members of this band.  They

7    worked together, and his interests are very much aligned with

8    those of Mr. Goudreau here.

9          THE COURT:  Counsel, I'm familiar with this rule.

10:01 10   This argument certainly has been made to me in other cases.  I

11   think just looking at (c)(2), it's clear he's not an adverse

12   party.  I'm not ready yet to say he's a hostile witness.  To

13   the extent he's a witness identified with an adverse party,

14   that's probably arguably the category I should be thinking

15   about here.  And I should say that section (c)(2) starts off

16   with the language "ordinarily the court should allow leading

17   questions," which I think leaves it to my discretion.

18          Counsel, I think the one other time I allowed this to

19   apply to witnesses, I frankly regretted it, counsel.  I need to

10:02 20   think more about that.

21          I guess my initial reaction, Mr. Green, is I'm not

22   going to make that before I hear a foundation laid.  So I think

23   that will be my ruling at this point.

24          MR. GREEN:  Thank you, your Honor.

25          MR. BAKER:  Judge, may I raise two issues with the

1    Court, please?

2              THE COURT:  Sure.

3              MR. BAKER:  Mindful of your prior comments, and I

4    think the practice of the Court that motions and objections,

5    and things of that matter, if the parties know they are coming,

6    should be presented outside the earshot of the jury certainly.

7              With respect to motions on -- I don't want to lose my

8    rights on a timeliness basis.  For instance, a motion for a

9    required finding as a matter of law, used to be called a

10:03 10   directed verdict.  If your Honor says, Mr. Baker, put your case

11   on --

12             THE COURT:  So I will -- after plaintiff rests, I will

13   see counsel at sidebar, or we'll take a recess for those

14   purposes.

15             And in terms of objections -- and I should be clear

16   about this -- I mean, you should -- if you have objections, you

17   should make them in a timely fashion.  I ask that there not be

18   speaking objections, that you just say "objection" and a word

19   or so, or if I ask for grounds, you can say a little bit more.

10:03 20   Usually given that we've had discussions before the trial day

21   or at the end of the trial day, sometimes I'll say back to you,

22   Mr. Baker, is this in regards to the discussion we had earlier,

23   just so I understand that we're on the same page.

24             MR. BAKER:  Right.

25             THE COURT:  So you should make the objections that you

1    think you need to make, but just no speaking objections

2    before --

3            MR. BAKER:  And supplemented thereafter is what I

4    think I hear the Court --

5            THE COURT:  Yes.

6            MR. BAKER:  Your Honor, with respect to opening

7    statements, depending on what Mr. Green says obviously, we may

8    wish to present to your Honor a motion for a required finding

9    on one issue.  I would be quite content to reserve that until

10:04 10   after our opening, which would probably be better for the jury,

11   but I just want to bring to the Court's attention how you want

12   to handle that.

13           THE COURT:  Counsel, I guess if you were to stand up

14   and reserve an issue, I could hear you either at a recess or at

15   the end of the trial day.

16           MR. BAKER:  Thank you.

17           And then, secondly, Judge, one other issue if I may.

18           THE COURT:  Yes.

19           MR. BAKER:  We intend to refer in opening to three

10:05 20   other lawsuits filed by Mr. Scholz or threatened to be filed by

21   him against my client in a very short time frame before this

22   case was filed.  And when we were here, your Honor, on

23   September 8th, you left the window open.

24           I just want to be very clear, I intend to refer to

25   that in my opening, and that's all I'm going to do is say that,

        1   because I know the Court's a little sensitive, shall we say, to

        2   introduction of information from other cases.

        3           THE COURT:  Counsel, didn't I resolve that issue?

        4           MR. GREEN:  I thought we had heard from you on that,

        5   your Honor.  I thought we heard from you our way on that.

        6           THE COURT:  Mr. Baker, that's my memory.

        7           MR. BAKER:  It was on the issue of the Herald lawsuit,

        8   your Honor, but that's not with respect to three other lawsuits

        9   threatened, and I've got the transcript right here.

10:06  10           Your comment was, at page 56, that you would -- bear

       11   with me one second, please, Judge.

       12           (Discussion off the record.)

       13           MR. BAKER:  "Counsel, I think there is also an

       14   argument" -- I'm quoting the Court, your Honor, "Also true

       15   again about previous complaints filed by Mr. Scholz.  Again, as

       16   a proposition of exhibits and sort of theory of the case, I

       17   think it's out.  I think the only way -- there's some limited

       18   inquiry on these other matters maybe as to bias, but I probably

       19   do want to have a longer conversation with counsel about how

10:06  20   this is presented to the jury."  So that's why I'm bringing it

       21   to the Court's attention now.

       22           We have the transcript if you wish to look at it,

       23   Judge.

       24           THE COURT:  Counsel, I can pull that up, as well.

       25           Mr. Green.

```
 1              MR. GREEN:  We call your attention to -- when you do
 2     review this, your Honor, we ask you to turn to page 54, where
 3     you basically talked about your intention not to allow any of
 4     this in because you had dismissed the counterclaim about abuse
 5     of process.
 6              THE COURT:  Yes.
 7              Counsel, just give me one second.  I have the
 8     transcript here, so let me just attempt to get to the right
 9     pages.
10:08 10         (Pause.)
11              THE COURT:  Counsel, just give me a moment.  I think
12     these numbers are going to be a little bit different than the
13     numbers you cited to me.
14              MR. BAKER:  Do you want to see the copy we have,
15     Judge?
16              THE COURT:  If you have a hard copy, that would be
17     helpful.
18              (Discussion off the record.)
19              MR. BAKER:  Starting with page 54, your Honor.
10:08 20         THE COURT:  Thank you.
21              (Pause.)
22              THE COURT:  Okay.
23              So, counsel, I think you're both right in the sense
24     that I did allow the motion in regards to excluding evidence of
25     previous litigation.  This was what was asserted in plaintiff's
```

1    omnibus motion.  But I did reserve on sort of the question as

2    it bears upon bias.

3            And I suppose this would come up in, what,

4    cross-examination of Mr. Scholz?

5            MR. BAKER:  That's correct, your Honor.

6            THE COURT:  Okay.

7            So, Mr. Green, you're correct in terms of my motion as

8    to the evidence.  I reserved on to the extent it might be the

9    proper basis for cross-examination as to bias.

10:10 10        MR. GREEN:  Here's where we are, your Honor.  If you

11   were to allow any of this to come in, I, frankly, think that we

12   have been severely prejudiced by the first ruling you announced

13   today.

14           Mr. Scholz -- Mr. Scholz's previous complaints were

15   based upon acts that he felt that Mr. Goudreau engaged in that

16   were violative of the 1983 settlement agreement here.

17           You have ruled that we're not allowed to get any of

18   that in.  You made that ruling.  We've objected, but the ruling

19   is there.  But if you're now going to ask them what about all

10:11 20   of these previous lawsuits and we're not allowed to show what

21   the basis was for any of this, then I think we have been

22   severely prejudiced, your Honor.

23           I would further note here I don't understand what the

24   issue is on bias.  How do these advance the issue of bias one

25   way or the other?  And if there is conceivably any argument to

1    bias, and frankly, I don't see it, I think we then get into 403

2    issues, especially with the initial ruling that you made in

3    this case.

4         THE COURT:  Counsel, here's what I'm going to do on

5    this issue.  You can't open on it.  I'm going to reserve on it.

6         Mr. Scholz you anticipate will be third?

7         MR. GREEN:  The third witness, your Honor.

8         THE COURT:  Okay.

9         I'll want to hear counsel more fully on what the

10:12 10   bounds of cross-examination are on this issue.

11         I mean, I still -- I still -- and this is the reason I

12    allowed that motion -- is I do have 403 concerns, and I need to

13    think more about how that impacts what the scope of

14    cross-examination should be on this issue.

15         So you can't open on it, but I'll reserve on it and

16    hear you before cross-examination from Mr. Scholz or before

17    Mr. Scholz's cross-examination.

18         MR. BAKER:  Your Honor, can I just very briefly

19    address what our intent is so perhaps it will crystallize the

10:13 20   Court's understanding and maybe help you to make --

21         THE COURT:  Counsel, before you do that, let me just

22    check in with Ms. Hourihan.

23         (Discussion off the record.)

24         THE COURT:  Counsel, I'm prepared to hear you now.  I

25    just want to make sure that there's nothing else I need to hear

1    you all on before we get jurors.

2              MR. GREEN:  Not from our end, your Honor.

3              MR. BAKER:  Nothing here, just one simple comment.

4              THE COURT:  Okay.

5              MR. BAKER:  Your Honor, two lawsuits were filed on

6    virtually identical facts as alleged in this case.  Never

7    served.  The third lawsuit was never even filed but given to

8    Mr. Goudreau's counsel.

9              We don't intend, to be very clear, your Honor, to go

10:13 10   into the details of all of that beyond what I just said.

11   Because our breach of contract and covenant of good faith and

12   fair dealing claims, as I understand the law, would permit us

13   to make a factual issue out of the fact that Mr. Scholz did not

14   permit my client to go gently into the night and to further his

15   career.  And if the Court limits my inquiry to the scope -- the

16   breadth of what I just stated, we are satisfied, and that's all

17   we intend to do.

18             I understand your Honor's ruling, no reference in the

19   opening.  I wish your Honor would reconsider that, but I

10:14 20   understand it.  That's the scope of it.

21             THE COURT:  My ruling stands as to openings, but I

22   understand the argument, and I'll keep that in mind, counsel.

23   And I'll raise this issue with you -- or you should raise it

24   with me -- counsel should raise it before Mr. Scholz testifies.

25             Counsel, unless there's anything else, Ms. Hourihan

1    indicates about ten minutes before --

2             MR. GIVEN:  May I raise two issues?

3             THE COURT:  Sure.

4             MR. GIVEN:  I had raised in the final trial brief at

5    page 6, we had asked that the Court reconsider that portion of

6    its summary judgment motion that struck the abuse of process

7    claim.  We did so because at the final pretrial conference

8    plaintiff Scholz withdrew his claim for rescission, and at page

9    34 of your Honor's summary judgment decision you found that the

10:15 10   principal reason for the abuse of process claim being struck

11   was that rescission of the Settlement Agreement that conferred

12   the copyright and royalty payments on Goudreau, however, is a

13   stated purpose in Scholz's complaint.  Immediately following

14   your summary judgment motion and upon the first challenge to

15   that subject, Mr. Scholz withdrew that claim.  And so we submit

16   to your Honor that the abuse of process claim should be

17   reinstated in the matter, and we'd like a ruling on that

18   subject.

19             The second ruling that we were looking for -- and I

10:16 20   may be repeating some of the things that were said by my

21   brother sitting next to me -- was to strike Mr. Scholz's Count

22   IV implied covenant of good faith and fair dealing.  We have

23   said over and over again that there is no basis in law, under

24   Massachusetts law or the 1st Circuit, for damages that are, in

25   effect, a disgorgement of profit unless there's a fiduciary

1    duty claim.  There is no fiduciary duty claim in this case, as

2    I understand it.  There is no fiduciary duty running between

3    the two parties in this case.  The law is crystal clear on this

4    subject.  And Mr. Baker made reference to the fact that we were

5    going to stand up after the opening and make a motion, and that

6    motion is going to be directed to the implied covenant of good

7    faith and fair dealing.  And we have briefed that subject to

8    your Honor.

9         THE COURT:  Okay.

10:17 10         And, counsel -- Ms. Hourihan --

11         (Discussion off the record.)

12         THE COURT:  We have jurors outside.  So, Mr. Green.

13         MR. GREEN:  I'll be very brief, your Honor.

14         We address this in our trial brief.  We call the

15    Court's attention beginning at page 5 of our trial brief.

16         Counsel is asking for reconsideration of a summary

17    judgment ruling that you made back in September of last year.

18    There is no basis whatsoever for it substantively, apart from

19    the timing issue here.

10:17 20         Just because we said that we are no longer seeking

21    rescission does not mean that we do not have bases for relief

22    on all three of our claims, including the particular claim he

23    made reference to.

24         We have damages claims under all three.  We are asking

25    for discouragement; we are asking for damages; and they are

1    there.  The fact that we are not asking for the particular

2    relief of rescission does not mean that we have withdrawn any

3    claim.  That couldn't be further from the truth here, your

4    Honor.

5         THE COURT:  So, counsel, let me say this:  I

6    understand the defendant is pressing these two claims in

7    regards to abuse of process and the breach of implied covenant.

8    I'm not going to strike -- I'm not going to reinstate the abuse

9    of process claim for the reasons I stated before, and I don't

10:18 10   think any position the plaintiff took in connection with the

11    final pretrial changes my analysis of that issue.

12         But, second, in regards to the breach of the implied

13    covenant, counsel, you're free to reserve on this issue, as I

14    think Mr. Baker indicated you might, but I'm not going to

15    strike that claim.

16         Counsel, we're going to take a brief recess so we can

17    bring the jury in, and then we'll begin from there.

18         THE CLERK:  All rise.

19         (Recess taken.)

10:25 20   (Juror panel entered.)

21         THE CLERK:  Court is in session.  Please be seated.

22    This is civil action 13-10951, Scholz v. Goudreau.

23         THE COURT:  Good morning.

24         ALL:  Good morning.

25         THE COURT:  My name is Denise Casper, and I'm the

1   judge who will preside over this session of the United States

2   District Court for the District of Massachusetts.  It's my

3   pleasure to welcome all of you on behalf of all the members of

4   this court as potential jurors in this case.

5          I believe that you watched the "Called to Serve" DVD

6   this morning.  That DVD explained a little bit about the

7   process we're going to begin and what is expected of you if

8   you're selected to serve on the jury in this case.

9          I'll not repeat all of what you saw or heard earlier

10:26 10  this morning, but I do want to stress a few things about the

11  importance of jury service.

12         This case is a civil case.  In both criminal and civil

13  cases, verdicts are rendered by a jury composed of citizens.

14  The founders of our nation believed that the right to a jury

15  was so important that they put it in the U.S. Constitution.

16  The Seventh Amendment guarantees the right to a jury trial in

17  most civil cases.  Juries are composed of citizens taken from

18  all walks of life, each of whom bring their own individual

19  perspective and life experience to the table.  You don't have

10:26 20  to have any particular education or experience to be a juror.

21  What is truly important is that you take your responsibility

22  seriously and that you exercise your authority to the best of

23  your ability.  You have all been truly called to serve.

24         The jury is fundamental to our system of justice.  It

25  is both an obligation of citizenship and an honor and a

1    privilege to serve.  If you are selected to serve, you must

2    exercise your duties responsibly and in accordance with the law

3    as I'll explain it to you.  You should not, however, assume

4    that your service will be burdensome.  Most jurors who I've

5    spoken to after their jury service have found it to be one of

6    the most interesting and rewarding experiences of their lives.

7         Now, many of you are probably nervous about the

8    possible time commitment that will be required if you're

9    selected to serve, so let me jump right to that now.

10:27 10       The lawyers and I expect that this case will take

11   about a week and a half to try, but there's some chance it

12   could be longer and some chance that it could be shorter, but

13   we expect about a week and a half.  And I'll certainly do

14   everything I can do to ensure that that is possible.

15        Our usual trial day will be 9:00 a.m. to 1:00 p.m. in

16   the afternoon.  Although tomorrow we'll start a little bit

17   later at 11:00 and run until 2:00.  We'll always have a short

18   mid-morning break.

19        Once the case is given to the jury, the seated jury

10:28 20  for its deliberation, jurors should expect to sit from

21   approximately 9:00 a.m. to 4:30.

22        Now, let me address jury selection.

23        The parties in this case have a right to a jury that

24   can sit and decide this case fairly and impartially.  You'll

25   hear the words "fairly and impartially" throughout the jury

1    selection process, so it's very important that each of you

2    understand what I mean by the phrase.

3          To serve fair and impartially as a juror means to hear

4    the evidence in this case and decide its outcome without bias

5    in favor of or prejudice against either side, any witness, or

6    any material matter.  It means to base any verdict in this case

7    on the evidence presented during the course of the trial, the

8    law as I'll give it to you, and not on anything you may have

9    heard or read or experienced outside of the courtroom.  That

10:29 10   is, both parties are entitled to a jury that doesn't have its

11   mind made up one way or the other about any of the issues in

12   this case before they hear the evidence and have been

13   instructed by me to begin deliberations.

14          To try to obtain a fair jury we have a selection

15   process that we will soon begin.  This process is not meant to

16   be intrusive.  Its important purpose is to ensure that the

17   parties have a fair and impartial jury to hear this case.  The

18   process will begin with me describing the case in a little

19   greater detail so you know something about it.  I'll then have

10:29 20   the lawyers introduce themselves and the parties they

21   represent, again to see if any of you know them or have any

22   connection to them.  I'll then list the possible witnesses,

23   again to see if you know any of them.  I'll then ask a number

24   of additional questions on other topics.  The purpose of all of

25   these questions is to determine whether or not you should be

1    excused for cause from this case.

2            Once we're through that part of the process, by law

3    the attorneys are required to have an opportunity to challenge

4    a small number of additional prospective jurors with what we

5    call peremptory challenges.  With these challenges, the lawyers

6    don't have to give any particular reason for removing someone

7    from the jury.  When the lawyers are both satisfied with the

8    jury or they've run out of these challenges, we'll have the

9    jury.

10:30 10          We're going to seat eight jurors in this case.  All

11   eight seated jurors will deliberate and vote on the verdict at

12   the end of this case.

13           Ladies and gentlemen, if you're not chosen to sit on

14   this jury, do not think that it reflects upon you personally or

15   your ability to be a good juror.  You should not be in the

16   least concerned if for some reason or the other you're not

17   selected.

18           Your answers to the jury selection questions must be

19   under oath.  In other words, you must swear that your answers

10:31 20   are truthful.  It's very important to the integrity of this

21   process that you give truthful answers.  I'll now ask

22   Ms. Hourihan, the deputy clerk, to swear in the jury pool so we

23   can begin the jury selection process.

24           (Jury panel sworn in by the clerk.)

25           THE CLERK:  Thank you.  Please be seated.

1          THE COURT:  Ladies and gentlemen, as I just indicated,

2     the case on which you've been called to sit as jurors is a

3     civil case.  The case involves several claims brought by the

4     plaintiff, Donald Scholz, against defendant, Barry Goudreau,

5     and several counterclaims brought by Mr. Goudreau back against

6     Mr. Scholz.  Both the plaintiff and the defendant were members

7     of the band BOSTON.  Plaintiff, Mr. Scholz's claims against

8     defendant, Mr. Goudreau, are for what is called contributory

9     trademark infringement and vicarious trademark infringement for

10:32 10     use of the band name BOSTON.

11          Mr. Scholz also asserts a claim for breach of the

12     implied covenant of good faith and fair dealing relating to

13     Mr. Goudreau's alleged violation of a settlement agreement

14     between the two regarding the right to identify as a former

15     member of the band BOSTON.  All of these claims relate to

16     Mr. Goudreau's involvement with the band called Ernie and the

17     Automatics.

18          Defendant, Mr. Goudreau, also brings claims against

19     plaintiff, Mr. Scholz.  These claims are what we call

10:32 20     counterclaims.  Mr. Goudreau asserts counterclaims against

21     Mr. Scholz for breach of contract and breach of the implied

22     covenant of good faith and fair dealing, all of which relate to

23     Mr. Scholz's alleged violations of the same settlement

24     agreement between them.

25          Defendant, Mr. Goudreau, denies Mr. Scholz's claims

1    against him; and plaintiff, Mr. Scholz, denies Mr. Goudreau's

2    counterclaims against him.

3         Those of you who are selected to serve on this jury

4    will, of course, hear each side's more detailed version of the

5    case in the course of the trial.

6         Now, as I said, we're now about to begin the jury

7    selection process.  In a moment, I'll ask counsel on both sides

8    to stand and introduce themselves and their clients.  I'll

9    then, as I said, ask all of you a series of questions.

10:33 10    When I ask a question, if your answer is "yes" or you

11    think your answer is "yes," please stand and remain standing

12    until Ms. Hourihan recognizes you and we've recorded your juror

13    number, which I think appears on your cards, so we can record

14    that you had an affirmative answer.

15         Again, if your answer is "yes," or if you think the

16    answer is "yes," please stand.

17         The time to raise questions is now as I'm seeing

18    jurors at sidebar and not at some point during the course of

19    the trial.

10:34 20    After I've finished asking all of questions and we've

21    kept track of all of the affirmative answers, I'll ask any

22    juror who answered "yes" to any question to come up

23    individually to sidebar so that I, along with counsel for both

24    sides, can inquire further with some follow-up questions.

25         Now, jurors, we'll try to move through this process as

1    efficiently as possible, but please just bear with us and be

2    patient.

3              As I said, I'll now ask for counsel to introduce

4    themselves and their clients.  I would just also ask counsel to

5    state the name of their firm and where the firm is located.

6              MR. GREEN:  Thank you, your Honor.

7              Ladies and gentlemen, my name is Lawrence Green, with

8    my partner, Susan Stenger, we are members of the law firm Burns

9    & Levinson with offices here in Boston.  We're going to be

10:35 10  assisted by our paralegal, Linda McIlvene.  And I'd like to

11   introduce my client, Donald Thomas Scholz, he goes by Tom

12   Scholz; and he's with his wife, Kim Scholz.

13             Thank you, ladies and gentlemen.

14             Thank you, your Honor.

15             THE COURT:  Thank you, counsel.

16             Counsel?

17             MR. BAKER:  Ladies and gentlemen, my name is Jeffrey

18   Baker.  I have an office in Boston called Baker & Associates.

19   To my left is Daniel Tarlow of a different firm called Copani,

10:35 20  Tarlow & Cranney.  And on my right is David Given, who is a

21   visiting attorney here from California.

22             Behind me is my client, Mr. Goudreau -- if you would

23   stand -- sitting together with his wife and his two children.

24             THE COURT:  Thank you, counsel.

25             Jurors, now let me ask you the first series of

questions.

Do you know or are you related to or acquainted with any of the lawyers in this case?  If so, please stand.

(No response.)

THE COURT:  To your knowledge, is anybody in your immediate family or anyone you are close know or are related to or acquainted with any of the attorneys in this case?

(No response.)

THE COURT:  Have you or any member of your immediate family or anyone to whom you are close ever worked for any of the attorneys in this case, their law offices, or had any dealings with them?

(No response.)

THE COURT:  Do you know or are you related to or personally acquainted with the plaintiff, Mr. Scholz?

(No response.)

THE COURT:  To your knowledge, do any members of your immediate family or anyone to whom you are close know or are they related to or personally acquainted with Mr. Scholz?

(No response.)

THE COURT:  Do you know or are you related to or personally acquainted with the defendant, Mr. Goudreau?

(No response.)

THE COURT:  To your knowledge, do any members of your immediate family or anyone to whom you are close know or are

```
 1    related to or personally acquainted with the defendant,

 2    Mr. Goudreau?

 3              (No response.)

 4              THE COURT:  Based upon the brief description that I've

 5    given to you of the case, the claims, the counterclaims, and

 6    the parties' identity, do you have any particular knowledge of

 7    this case or any of the facts in connection with it, including

 8    anything you may have read or seen?

 9              (No response.)

10:37 10          THE COURT:  Now, ladies and gentlemen, the following

11    is a list of witnesses who may be called as witnesses in this

12    case.

13              I've already asked you about the parties, the

14    plaintiff, Mr. Scholz, of Boston, Massachusetts, and the

15    defendant, Mr. Goudreau, of Swampscott, Massachusetts, who will

16    likely be called in this case as witnesses.

17              Now, not all of the people I'm about to identify will

18    necessarily be called, but these are all of the potential

19    witnesses that we expect in this case.

10:38 20          I'd ask you to listen very carefully, because when

21    I've finished reading this list, I'm going to ask you whether

22    or not you know any of these people.

23              Ernie Boch, Jr. of Norwood, Massachusetts; Gail Fee of

24    Hingham, Massachusetts; John Thomas, known as "Sib," Hashian of

25    Lynnfield, Massachusetts; Anthony Migliaccio -- and let me
```

```
 1    spell that -- it's M-i-g-l-i-a-c-c-i-o, also known as Anthony

 2    Cosmo, of Utica, New York; James Montgomery of Newport, Rhode

 3    Island; Gail Parenteau of New York, New York; Gary Pihl, it's

 4    P-i-h-l, of Acton, Massachusetts; Laura Raposa of New Bedford,

 5    Massachusetts; Fran Sheehan of Swampscott, Massachusetts; David

 6    Steffanelli of Hillsboro, New Hampshire; Meg Sullivan of

 7    California -- I don't know if counsel on either side has a city

 8    or town?

 9              MR. GREEN:  We don't, your Honor.

10:39 10         MS. STENGER:  No, your Honor.

11              THE COURT:  Okay.

12              John T. Hashian.  I don't know if that is the same

13    "Sib."

14              MR. BAKER:  It is.

15              MS. STENGER:  Yes, your Honor.

16              THE COURT:  Tom Baggott of Burlington, Vermont; Paul

17    Geary of Los Angeles, California.

18              Having read this list of potential witnesses, jurors,

19    let me ask you these questions:

10:40 20         Do you know or are you related to or personally

21    acquainted with any of these potential witnesses?

22              You have to stand and just give your number.  Thank

23    you.

24              THE CLERK:  And the number on your card.  It's a one-

25    or two-digit number.
```

1          JUROR:  24.

2          THE CLERK:  Thank you.

3          THE COURT:  Thank you.

4          Also in regards to this list of potential witnesses,

5     to your knowledge, does any member of your immediate family or

6     anyone to whom you are close know, related to or personally

7     acquainted with any of the potential witnesses?

8          (No response.)

9          THE COURT:  As I indicated, we expect that this case

10:40 10   will take about a week and a half, taking us to the middle of

11    next week.  The normal trial day, as I said, is 9:00 to 1:00,

12    although tomorrow will be slightly different at 11:00 to 2:00,

13    but, again, not the full day.  Once the jury has this case for

14    its deliberations, the jury should expect to meet for full days

15    roughly 9:00 to 4:30.

16         Now, anyone who serves on a jury will of course be

17    inconvenienced to some extent.  However, I note that the jury

18    service in this trial will not last multiple months, as some

19    trials in this session do, or even a month, as some other

10:41 20   trials do, but a week and a half, as I expect.  That is, I

21    expect the schedule and the length of service anticipated in

22    this case will pose much less of a hardship for most of you as

23    the service might in a trial where the parties and the Court

24    expect the trial to last much longer.

25         Having explained this schedule, will the schedule or

1    the length of the trial pose a serious or extraordinary

2    hardship to anyone?

3                THE CLERK:  Can I have your number, please?

4                JUROR:  30.

5                THE CLERK:  Thank you.

6                Yes.

7                JUROR:  23.

8                JUROR:  Number 12.

9                THE CLERK:  Thank you.

10:42 10                THE COURT:  Some of you may have previously served as

11    a juror in a criminal or civil case in state or federal court

12    or served as a member of the grand jury in either federal or

13    state court.  If you've previously served as a juror, is there

14    anything about that prior service that would affect your

15    ability to serve as a fair and impartial juror in this case?

16                (No response.)

17                THE COURT:  Do you have any strong feelings about the

18    civil justice system or lawsuits or lawyers that might

19    interfere with or affect your ability to serve as a fair and

10:43 20    impartial juror in this case?

21                JUROR:  28.

22                THE COURT:  Thank you.

23                If you, a member of your immediate family, or anyone

24    to whom you are close ever participated in a lawsuit as a party

25    or in any other capacity, was there anything about that

1    experience that would affect your ability to be a fair and

2    impartial juror in this case?

3              (No response.)

4              THE COURT:  Do any of you have any disability,

5    physical or otherwise, that would make serving as a member of

6    the jury difficult or impossible or might substantially

7    interfere with your service as a juror?

8              JUROR:  4.

9              THE COURT:  Thank you.

10             JUROR:  22.

11             THE COURT:  That was 22?

12             THE CLERK:  Yes.

13             THE COURT:  Do you have any difficulty reading or

14   understanding English?

15             (No response.)

16             THE COURT:  As I've said before, and I've now said a

17   few times, this is a civil case.  The plaintiff has the burden

18   of proving his claims by what we call the preponderance of the

19   evidence.  That means for the plaintiff to prevail on his

20   claims, the jury must believe that what he claims is more

21   likely true than not true.  As to the counterclaims, again,

22   these are the defendant, Mr. Goudreau's counterclaims back

23   against the plaintiff, Mr. Scholz, the defendant bears the

24   burden of proof on those counterclaims, and he must prove them

25   by the same preponderance of the evidence standard.

1          Those of you who have sat on a criminal case or heard

2     about criminal cases will have heard about proof beyond a

3     reasonable doubt.  That requirement does not apply to a civil

4     case like this one.

5          Is there anyone who does not accept this basic

6     principle regarding the plaintiff's burden of proof as to his

7     claims and the defendant's burden of proof as to his

8     counterclaims?

9          (No response.)

10:45 10        THE COURT:  You must decide this case solely on the

11    evidence presented in this courtroom during the course of the

12    trial.  Are there any of you who do not accept this principle

13    and would decide the case based on something other than the

14    evidence presented?

15         (No response.)

16         THE COURT:  You must also follow the law as I'll

17    provide it to you in deciding this case.  You must put aside

18    any notions about what you thought the law requires or what you

19    think the law should require and follow only my instructions to

10:45 20   you about the law.  Is there anyone who is not willing and able

21    to apply the law as I'll give it to you?

22         (No response.)

23         THE COURT:  Do you have any personal beliefs that

24    might interfere with or affect your ability to serve as a fair

25    and impartial juror in this case?

```
 1              (No response.)

 2              THE COURT:  Now, ladies and gentlemen, all of the

 3    questions I'm asking you relate to whether or not there's a

 4    basis for excusing you for cause from sitting on this case.

 5              Do you know of any reason that has not been mentioned

 6    or suggested by my previous questions why you cannot sit as a

 7    fair and impartial juror in the trial of this case?

 8              (No response.)

 9              THE COURT:  Jurors, we've -- I've asked the questions

10:46 10    I'm going to ask of all of you.  We now have to turn to the

11    part of the jury selection process where I need to have some

12    follow-up questions with the folks who answered affirmatively.

13    This will take us a little time.  We'll try to move through it

14    as efficiently as possible.  I just ask for your patience in

15    advance.

16              Also, the acoustics in here are pretty bad, so I'd ask

17    you all to remain in your seat silently so we can move through

18    this as efficiently as possible.

19              Counsel, I'll see you at sidebar.

10:47 20              (At sidebar on the record.)

21              THE COURT:  Counsel, I just ask you to stand over

22    here.  I'll have the potential juror face here, and then you

23    can crowd in.

24              (End of discussion at sidebar.)

25              THE CLERK:  Juror number 4, can you come to sidebar,
```

1    please?

2            (Juror at sidebar.)

3            THE COURT:  Good morning, sir.

4            JUROR:  Good morning.

5            THE COURT:  Sir, I think you indicated you might have

6    a disability you wanted to bring to my attention.

7            JUROR:  So I'm not necessarily sure if it's a

8    disability.

9            I'm going through a very, very serious emotional

10:48 10    situation at home with our 16-year-old son.  I think I need to

11    be on call for him 24/7.  He has a major psychological

12    evaluation on Wednesday.  Being without a cell phone already

13    today, I don't know how he's behaving, so I potentially call it

14    temporary disability, but I have difficulty concentrating on

15    anything right now, unfortunately.

16            THE COURT:  Okay.

17            And he's in school now or --

18            JUROR:  Hopefully.

19            THE COURT:  Okay.

10:48 20            JUROR:  If I cannot check in with him, I don't know.

21            THE COURT:  Can I ask you to step back to the witness

22    stand just for a moment?

23            (Juror left sidebar.)

24            THE COURT:  Counsel, do you want me to inquire

25    further?

1          MR. GREEN:  I believe it's clear, your Honor, we're

2    not going to have his attention.  I think he should be excused.

3          MR. BAKER:  Agreed.

4          THE COURT:  Okay.

5          Counsel, I agree with you.  I'm going to strike him,

6    but I'm going to return him to his seat, but you all know he's

7    struck.

8          MR. GREEN:  Thank you, your Honor.

9          THE COURT:  Sir.

10:49  10          (Juror at sidebar.)

11          THE COURT:  Sir, I appreciate you bringing that

12    forward to me.  I'm going to excuse you from this case, but I'm

13    going to ask you just remain in the courtroom for a brief

14    amount of time.  So you can return to your seat.  Thank you.

15          (Juror left sidebar.)

16          THE CLERK:  Number 12.

17          (Juror at sidebar.)

18          THE COURT:  Hi, how are you?

19          JUROR:  Fine, thank you.

10:50  20          THE COURT:  I think you brought up an issue about

21    maybe the schedule being a hardship?

22          JUROR:  Right.  I have a non-refundable air ticket to

23    California on November 2nd with my son and my husband.

24          THE COURT:  November 2nd, okay.

25          And that is -- counsel, remind me of when that is?

```
 1              MR. BAKER:  Wednesday, Judge.

 2              THE COURT:  Next Wednesday.

 3              Okay.  And, I'm sorry, it was to California?

 4              Let me just have you step back to the witness stand

 5      for a moment.

 6              Ma'am, I apologize.

 7              I see you indicated you're retired.

 8              Were you previously employed?

 9              JUROR:  Yes.

10:50 10        THE COURT:  And where was that?

11              JUROR:  Teacher at Boston Public Schools.

12              THE COURT:  And what did you teach?

13              JUROR:  Vietnamese to students.

14              THE COURT:  Okay.

15              JUROR:  For the bilingual program and the ESL.

16              THE COURT:  Thank you.

17              You can step back to the witness stand.

18              (Juror left the sidebar.)

19              MR. BAKER:  Judge, if the witnesses could rotate a

10:51 20     little.

21              THE COURT:  Yes, I will do that.

22              Counsel, I just asked her about her prior employment.

23      She said she worked for the Boston Public Schools in the

24      bilingual education department, and she had previously said

25      that her hardship was in regards to a plane ticket for November
```

1    2nd.

2          Counsel?

3          MR. GREEN:  I think there's at least a 50/50 shot,

4    your Honor, that we're still going to be here at least until

5    November 2, so I would recommend that she be excused.

6          THE COURT:  Counsel?

7          MR. GIVEN:  No objection.

8          THE COURT:  I'm going to do the same thing.  I'll let

9    her know she's excused, but she's going to go back to her seat.

10:51 10          (Juror at sidebar.)

11          THE COURT:  Ma'am, in light of your travel plans for

12    next Wednesday, I'm going to excuse you, but I'm going to have

13    you stay in the courtroom until we've gotten further in the

14    process.

15          JUROR:  No problem.  Thank you very much.

16          THE COURT:  Thank you.

17          (Juror left sidebar.)

18          THE COURT:  Counsel, Number 6, who had not answered

19    any questions indicated "retired."  I was just going to bring

10:52 20    her up to ask what her prior employment was.

21          MR. GREEN:  Thank you, your Honor.

22          THE CLERK:  Juror number 6, can you just come to

23    sidebar for one second, please?

24          (Juror at sidebar.)

25          THE COURT:  How are you?

1           JUROR:  Good.

2           THE COURT:  Ma'am, on your questionnaire you indicated

3       you're retired now.

4           JUROR:  Yes.

5           THE COURT:  Were you previously employed outside of

6       the home?

7           JUROR:  Yes.

8           THE COURT:  And where was that?

9           JUROR:  Delta Airlines.

10:53 10    THE COURT:  And what did you do for Delta Airlines?

11          JUROR:  Ticket and gate agent.

12          THE COURT:  Counsel, anything further in that regard?

13          MR. GREEN:  No, thank you, your Honor.

14          THE COURT:  Thank you.  You can return to your seat.

15      Thank you.

16          (Juror left sidebar.)

17          (Discussion off the record.)

18          THE CLERK:  22.

19          (Juror at sidebar.)

10:54 20    THE COURT:  Hi, how are you?

21          JUROR:  Good.

22          The court officer just said that you couldn't bring

23      any drink in, and I just need to have a bottle of water,

24      otherwise, if I start coughing, it will be very disruptive.

25          THE COURT:  And that's what you wanted to bring to our

1    attention?

2             JUROR:  That's right.  I just wanted to bring -- yes,

3    because the court officer kept saying "no water."

4             THE COURT:  We'll make sure you have water.

5             That was 22.

6             (Juror left sidebar.)

7             THE COURT:  So, counsel, through 22, that is 20,

8    because I have taken out jurors 4 and 1, which exceeds the 16

9    that we need, so I'm inclined to stop here and give you a

10:54 10   moment to collect your thoughts and then hear you on peremptory

11   challenges.

12            And again, we do that in alternating rounds, plaintiff

13   going first, and then defense.

14            MR. GREEN:  Yes, your Honor.

15            THE COURT:  So at the end of each round, there's one

16   party that's going back to back if you understand.

17            MR. BAKER:  Question on sequestration of witnesses --

18   I know it's not related -- we think there's witnesses in here

19   now.  Does that matter at this moment?

10:55 20   THE COURT:  Well, I'm more concerned about their

21   presence during testimony.

22            MR. GREEN:  It's not a problem for us, your Honor.  We

23   were the ones that made the request.  It's not a problem.

24            THE COURT:  So I don't think it's an issue now.  I

25   would just ask counsel during the presentation of evidence just

1    to be alert to that.

2              MR. GREEN:  Thank you.

3              MR. BAKER:  Thank you.

4              THE COURT:  So I'll give you a few moments and then

5    I'll call you back.

6              (End of discussion at sidebar.)

7              THE COURT:  Ladies and gentlemen, I appreciate your

8    continued patience.  We've finished that phase of jury

9    selection.  I'm just giving counsel a few moments to collect

10:56 10   their thoughts about exercising peremptory challenges, so just

11   bear with us.

12             Thank you.

13             (Pause.)

14             (At sidebar on the record.)

15             THE COURT:  Counsel, in terms of peremptories,

16   plaintiff goes first.

17             MR. GREEN:  The plaintiff is exercising its first

18   peremptory challenge as to Juror 8.

19             THE COURT:  Number 8.

10:59 20        Defense.

21             MR. GIVEN:  The defendant would like to thank and

22   excuse Juror Number 2.

23             THE COURT:  Number 2.

24        Okay.  Second round, defense goes again.

25             (Pause.)

| | |
|---|---|
| 1 | THE COURT:  Defense goes again. |
| 2 | MR. GIVEN:  The defendant would like to thank and |
| 3 | excuse Juror Number 15. |
| 4 | THE COURT:  Number 15. |
| 5 | Now plaintiff goes. |
| 6 | MR. GREEN:  The plaintiff will exercise as to Juror |
| 7 | 16. |
| 8 | THE COURT:  Number 16. |
| 9 | Beginning of the third round, plaintiff goes again. |
| 11:01 10 | MR. GREEN:  Subject to hearing further from the |
| 11 | defendant, the plaintiff is content, your Honor. |
| 12 | THE COURT:  Okay. |
| 13 | Well, if you're content, I would take that to be you |
| 14 | weren't going to exercise anymore peremptories. |
| 15 | MR. GREEN:  I don't intend to exercise anymore. |
| 16 | Yes, we'll leave it at that, your Honor. |
| 17 | THE COURT:  Okay. |
| 18 | Okay.  So defense? |
| 19 | MR. GIVEN:  The defendant would like to thank and |
| 11:01 20 | excuse Juror Number 14. |
| 21 | THE COURT:  14. |
| 22 | Okay.  And then defense has one more. |
| 23 | (Pause.) |
| 24 | MR. GIVEN:  The defendant is content. |
| 25 | THE COURT:  Okay. |

1           Okay.  So what I'm going to have Ms. Hourihan do now
2     is to read the names and the numbers of the jurors, the seated
3     jurors, in the order in which they'll be seated.
4           Ms. Hourihan.
5           MR. GIVEN:  Can we take a short break before openings?
6           THE COURT:  Yes.  And I had one issue I wanted to
7     discuss with counsel.
8           THE CLERK:  Juror Number 1 in seat number one, Juror
9     Number 3 will be in seat number two, Juror Number 5 will be in
11:02 10    seat number 3, Juror Number 6 will be in seat number 4, Juror
11    Number 7 will be in seat number five, Juror Number 9 will be in
12    seat number six.
13          MR. GIVEN:  Stop.  Didn't you preempt on 9?
14          MR. GREEN:  No, I didn't.
15          MR. GIVEN:  Okay.
16          THE CLERK:  Juror Number 10 will be in seat number
17    seven, Juror Number 11 will be in seat number 8.
18          THE COURT:  Okay.
19          So in a moment when we go back into open court,
11:03 20    Ms. Hourihan will announce the names and the numbers of the
21    seated jurors, and then we'll excuse the rest of the jurors and
22    we'll reassemble the seated jurors so they're in their right
23    seats.
24          Counsel, what I'm inclined to do is give them my brief
25    preliminary instructions first, then take a break before we do

1    openings so that they have the benefit of my instructions about

2    not talking about the case and all of that stuff.  Then I'll

3    give you a break to get yourselves together, and then we'll do

4    openings.

5                MR. GREEN:  That's fine.  Thank you, your Honor.

6                THE COURT:  Counsel, just in regards to the one --

7    since you're all here -- in regards to the one issue I left

8    open as to my preliminary instructions -- this was about

9    whether or not I should add the language about has the ability

11:04  10    to control or does have direct control in monitoring -- I did

11    go back to the case that, Mr. Green, I think you had cited,

12    Robinson, and to the language there.  I think the language

13    that's here refers to the extent of control being exercised

14    over the third parties.  So I think I'll add language in

15    regards to the extent of control.  So that's what I'm inclined

16    to do.  I can hear you further on further refinement for the

17    final charge, but that's what I'd be inclined to do now.

18                MR. GREEN:  I would simply note for the Court that we

19    had taken your summary judgment ruling, your Honor, as the law

11:05  20    of the case, and I believe the ability states there.  So if the

21    Court would simply note my objection to that.

22                THE COURT:  And I'll hear you further on whether

23    there's further language I should include in the final charge,

24    but just --

25                MR. GREEN:  Certainly, your Honor.

1          THE COURT:  Okay.

2          Thank you.

3          (End of discussion at sidebar.)

4          THE COURT:  Ladies and gentlemen, thank you for your

5    patience this morning.  We've now completed the jury selection

6    process.  In a moment, Ms. Hourihan is going to read the juror

7    numbers and names of the folks who have been seated as the jury

8    in this case.  If you do not hear your number and your name,

9    that means you're excused from this case, but you do need to go

11:06 10   back down to the second floor and check in.  There may be other

11   cases or trials going on today that you might be seated on.

12         If you are not selected for this case, I want to thank

13   you for your willingness to serve.

14         Obviously the jurors who hear their names should

15   remain here for further instructions from us about getting

16   assembled in the jury box.

17         Ms. Hourihan.

18         THE CLERK:  Juror Number 1, Lynn Davis; Juror Number

19   3, Christopher Morra; Juror Number 5, Scott Forsythe; Juror

11:06 20   Number 6, Donna Kelly; Juror Number 7, Jeffrey Nelson; Juror

21   Number 9, Erin English; Juror Number 10, Christopher Henry; and

22   Juror Number 11, Myrtha Jean, please remain in the courtroom.

23   All others are excused.  Please go down to the jury room on the

24   second floor.

25         (Juror venire left the courtroom and seated jurors

1    were reseated in the jury box.)

2         THE COURT:  Jurors, we have one last piece of business

3    to fully complete jury selection, which is now we have to swear

4    you as the seated jury in this case.

5         Ms. Hourihan?

6         THE CLERK:  Members of the jury, please rise, and if

7    you please raise your right hand.

8         (Jury sworn in by the clerk.)

9         THE CLERK:  Thank you.  Please be seated.

11:08 10    THE COURT:  Jurors, before we go any further, let me

11    just say something about the rest of the day's schedule.

12         I'm going to now give you some preliminary

13    instructions just to give you a framework for thinking about

14    this case before you hear from the attorneys in their opening

15    statements.

16         After I've given these preliminary instructions, we're

17    going to take a short break.  We understand everybody has been

18    sitting in this courtroom and downstairs for a while.  We want

19    to give you a little break.  We'll take about a 20-minute

11:09 20    break, and then when we resume.  You'll hear opening

21    statements.  So just to give you a sense of that.  And today's

22    session won't run past 1:00.

23         Jurors, good morning again.  I want to talk a little

24    to you about your duties as jurors and give you, as I said,

25    some brief preliminary instructions on the law that you are to

1    follow.  At the end of the trial, I'll give you more complete

2    and more detailed instructions on the law.  As I suggested, the

3    reason I give you some instructions now is so that you have

4    some framework for considering the evidence and helping you

5    understand it.  I do not want you to think that these

6    preliminary instructions are the only ones that matter or that

7    they're somehow more important than the ones that come at the

8    end of the trial.  You must apply the instructions I give you

9    at the end of the trial as a whole.

11:10  10         It is your duty, jurors, to decide from the evidence

11   what the facts are.  You and you alone are the judges of the

12   facts.  You will hear the evidence, decide what the facts are,

13   and then apply the law as I give it to you to those facts.  In

14   doing so, you must follow the law as I explain it to you,

15   whether you agree with it or not.  You must decide this case on

16   the evidence before you and the law as I'll give it to you.

17         Sometimes jurors are curious about what I think,

18   whether I think, for example, a particular witness is

19   believable or how I think the case should come out.  My

11:10  20   opinion, if I have one, and I certainly don't at this point, is

21   not relevant.  It is your role, not mine, to decide those

22   issues.  You should not interpret anything I may say or do

23   during the course of this trial as indicating what I think

24   about a witness or what I think your verdict should be.

25         As I have now mentioned a few times this morning, this

1    is a civil case.  The plaintiff, Mr. Scholz, has the burden of

2    proving his claims by what is called the preponderance of the

3    evidence.  That means that for the plaintiff to prevail on his

4    claims, the jury must believe that what he claims is more

5    likely true than not true.  To put it another way, if you were

6    to put the plaintiff's evidence and the defendant's evidence on

7    opposite sides of a scale, the plaintiff would have to make the

8    scale tip somewhat in his favor.

9         In addition, the defendant, Mr. Goudreau, has the

11:11 10   burden of proving his counterclaims, -- again, these are the

11   claims that the defendant has back against the plaintiff -- by

12   the same standard, by the preponderance of the evidence

13   standard.

14        As I advised before, but let me say again, for those

15   of you who have heard the standard of proof of proof beyond a

16   reasonable doubt that applies in a criminal case, that is not a

17   requirement and is not the burden of proof that applies here.

18        Now, to help you follow the evidence, let me give you

19   a very brief description of the claims at issue here.  As I

11:12 20   said earlier, plaintiff, Mr. Scholz, brings claims for

21   contributory trademark infringement and vicarious trademark

22   infringement for the use of the band name BOSTON, and as

23   related to the settlement agreement between the parties, breach

24   of the implied covenant of good faith and fair dealing.  As to

25   each of these claims respectively, Mr. Scholz must show by a

preponderance of the evidence each of the elements of these claims.

As to the contributory trademark infringement claim, Mr. Scholz must show: one, the existence of a valid enforceable trademark; two, that the defendant supplied his services to a third party whom he knew or should have known was engaging in trademark infringement and the extent to which the defendant had direct control in monitoring of the instrumentality used by the third party to infringe the trademark; trademark infringement by the third party; and that the trademark infringement harmed the plaintiff.

As to the vicarious trademark infringement claim, Mr. Scholz must show the defendant and third party had an actual or apparent partnership, that the defendant and the third party had the authority to bind the other in transactions with others or exercise joint ownership or control over the infringing service, the trademark infringement by the third party, and that the trademark infringement harmed the plaintiff.

As to the breach of implied covenant of good faith and fair dealing claim, Mr. Scholz must show the existence of a contract between the parties, breach of the implied covenant of good faith and fair dealing inherent in the contract, and damages to the plaintiff as a result of the breach.

Defendant, Mr. Goudreau, brings counterclaims for

1    breach of contract and breach of the implied covenant of good

2    faith and fair dealing against the plaintiff, Mr. Scholz, all

3    arising out of the parties' settlement agreement.

4         As to each of these counterclaims respectively,

5    Mr. Goudreau must show by a preponderance of the evidence each

6    of the elements of these counterclaims.  As to the counterclaim

7    for breach of contract, the defendant, Mr. Goudreau, must show:

8    one, the existence of a contract between the parties; two, the

9    plaintiff's breach of that contract; and damage to the

11:14 10   defendant as a result of that breach.

11        As to the counterclaim for breach of the implied

12   covenant of good faith and fair dealing, Mr. Goudreau must

13   show: one, the existence of a contract between the parties,

14   plaintiff's breach of the implied covenant of good faith and

15   fair dealing inherent in that contract, and damage to the

16   defendant as a result of that breach.

17        Again, jurors, this is only a very preliminary

18   outline.  At the end of the trial, I'll give you final

19   instructions on these matters, including definitions of

11:15 20   important terms.  Those instructions will govern your

21   deliberations.

22        Now, you've heard me mention the term "evidence" a few

23   times.  I expect that the evidence in this case will include

24   the testimony of witnesses, documents and other things received

25   as exhibits, and any facts on which the parties have agreed.

There are rules that control what you may consider as evidence.

When the lawyer asks a question or offers something as evidence and the lawyer on the other side thinks that it's not permitted by the rules of evidence, that lawyer may object.  It simply means that the lawyer is requesting that I make a decision on the application of a particular rule to a particular exhibit or part of testimony.  It may be necessary for me to discuss the issue with the lawyers outside of your hearing, either at a sidebar conference or during a recess.  Please understand that I, along with counsel, will do all that we can to keep these sidebars to a minimum.  The purpose of any conference is usually so I can make a decision on an objection raised by one party or the other.  We're not trying to keep things from you to frustrate you, it's just sometimes important that we discuss certain matters outside of your hearing.

Certain things, jurors, are not evidence:  Statements and arguments by lawyers are not evidence.  The lawyers are not witnesses.  Questions by lawyers standing alone are not evidence.  Again, the lawyers aren't witnesses.  The question and the answer taken together are the evidence.

Objections are not evidence.  Lawyers have a duty to their respective clients to object when they think something is improper under the rules of evidence.  If I sustain an objection, in other words, if I agree with the attorney objecting, you must ignore the question or exhibit and must not

1    try to guess what the answer might have been or what the

2    exhibit might have contained.

3              Anything I tell you to disregard is not evidence and

4    must not be considered by you.  Anything you see or hear about

5    this case outside of the courtroom or outside of the trial is

6    not evidence.  You must decide the case based on what is

7    presented during the course of the evidence in this case.

8              Sometimes, jurors, a particular piece of evidence may

9    be received for a limited purpose only.  That is, it can be

11:17 10   used by you only for one particular purpose and not for any

11    other purpose.  I'll tell you when that occurs and instruct you

12    on the purposes for which you can consider that item or not

13    consider it.

14              Jurors, in deciding what the facts are, you may have

15    to decide what testimony you believe and what testimony you

16    don't believe.  You may believe everything a witness says or

17    only part of it or none of it.  It's entirely up to you.  I'll

18    give you some suggestions at the end of the trial for you to

19    consider in assessing the credibility of witnesses.

11:17 20             Now, jurors, let me turn to the subject of how you

21    should conduct yourselves during the course of this trial.  All

22    of these rules are to ensure fairness in the process, so you

23    must follow these rules.

24              First, do not talk among yourselves about this case or

25    about anyone involved in it until the end of the case when you

1    go to the jury room to decide your verdict.  You should feel

2    free, obviously, to get to know each other and talk about any

3    other matters, just not about this case.

4         Second, do not make up your mind about what the

5    verdict should be until you've gotten to the end of this case

6    and you go to the jury room to decide the case and you and your

7    fellow jurors have discussed the evidence.  Keep an open mind

8    until then.

9         Third, do not talk with anyone else about this case or

11:18 10   about anyone who has anything to do with it until the trial has

11   ended and I've discharged you as jurors.  Anyone else obviously

12   includes your work colleagues, members of your family, your

13   friends.  You may tell them that you've been seated as a juror,

14   but do not tell them anything about the case until the end of

15   the trial when you've been discharged.

16        Fourth, do not mention or discuss this case in any

17   electronic form.  So to the extent that I just said you can't

18   talk to anyone else about it, you also can't communicate in any

19   other form about this case with anyone, and that includes in

11:19 20   electronic form.  So that means don't send an e-mail or text or

21   use Twitter or post anything on a blog or on Facebook or

22   anything like that.

23        Fifth, don't let anyone else talk to you about this

24   case or about anyone who has anything to do with it.  If

25   someone should try to talk to you, please report it to

1    Ms. Hourihan or the court security officer so it can be brought

2    to my attention.

3            Sixth, during the trial, do not talk with or speak

4    with any of the parties, the lawyers, or the witnesses involved

5    in this case.  It is important that you not only do justice in

6    this case, but that you also give the appearance of doing

7    justice.  If someone saw you talking to someone involved in

8    this case, even if you were just trying to be polite, it might

9    arouse suspicion, so just don't do it.  If one of the lawyers

11:20 10    or parties or witnesses doesn't speak to you when you pass in

11    the hallway or in the elevator, again, they're not being rude,

12    it's only because they're not supposed to speak with you.

13            Seventh, do not read any news stories or articles

14    about the case or anyone involved in it or listen to any radio

15    or television reports about the case or anyone involved in it.

16    If you should happen upon a news article or TV coverage or

17    radio coverage, you should just turn it off, not read it, not

18    listen to it, not watch it.

19            Eighth, do not do any research on your own.  Don't

11:20 20    Google, don't do any other internet searches or conduct

21    research of any kind regarding this case, the parties, the

22    claims, the counterclaims or the law.  Don't make any kind of

23    investigation about this case on your own.

24            Finally, during the course of the trial, if you have

25    any issue of any kind, just let us know.  If an attorney steps

1    between you and your view of the witness, let us know, we'll

2    have the attorney move.  If you're having problems hearing, let

3    us know.  I usually do a good job of having the witnesses keep

4    their voice up, but let us know and we'll correct that.

5          We do take a mid-morning break, as we're going to this

6    morning.  We usually take it around 11:00, but if there's

7    another time at which you need to use the bathroom or get a

8    glass of water, let us know and we'll take a brief recess.

9          Again, all of these rules are important, and please

10   follow them.

11         Jurors, I am going to permit you to take notes if

12   you'd like to during the course of this case.  I don't know if

13   Ms. Hourihan has handed them out yet, but she will soon.  The

14   first thing you should do is just put your seat number on the

15   front of the notebook, it will be your notebook for the

16   duration of this case.

17         If you decide to take notes, let me just give you a

18   few instructions about doing so.  First and foremost, you're

19   not required to take notes, and you may choose not to do so.

20   It's a personal preference and choice.  If you do decide to

21   take notes, do not allow your note-taking to distract you from

22   listening carefully to the testimony that's being presented.

23   It's important that you observe and listen to the witnesses to

24   assess their credibility.  If you prefer not to take any notes

25   at all but simply to listen, please feel free to do so.

1          Please also remember that not everything you write

2     down is necessarily what was said.  Thus, when you return to

3     the jury room at the end of this case to discuss this case with

4     your fellow jurors to decide the verdict, do not assume simply

5     because something appears in somebody's notes that it

6     necessarily took place in court.  Notes are an aid to

7     recollection, nothing more.  The fact that it's written down

8     doesn't necessarily mean that it's accurate.  It's your

9     collective memory of the evidence that governs during your

11:23 10    deliberations.

11          When we have a recess, you can just leave your

12    notebooks on your chairs.  You cannot take your notes home or

13    anywhere outside of the courtroom or the jury room.  I'll have

14    Ms. Hourihan collect them at the end of the each day.  Nobody

15    will look at them.  They'll be returned to you each morning.

16    When the case is over, your notes will be destroyed.  All of

17    these steps are in line with my earlier instruction to you that

18    it's important that you not discuss the case with anyone or

19    permit anyone to discuss it with you.

11:23 20          As you may have noticed this morning, we have a court

21    reporter, Ms. Joyce, who's creating a record of everything that

22    is said during the course of this trial.  Sometimes jurors

23    think that they'll be able to have a transcript of the trial

24    when they conduct their deliberations.  Let me just tell you

25    now that that's not true.  You will not have a transcript for

1   your deliberations.  Ms. Joyce has a very difficult job of

2   transcribing everything that's said, and it's actually quite a

3   time-consuming process to take what she's creating now and turn

4   it into a final transcript.  So all of this to say you won't

5   have a final transcript so you should, therefore, listen to the

6   testimony and the evidence and take whatever notes you think

7   may be necessary to help you remember the testimony.

8         Now, jurors, as I suggested before, the first step in

9   the trial will be the parties' opening statements.  In their

11:24 10   opening statements, the lawyers for each party will tell you

11   about the evidence that they intend to put before you.  Again,

12   the opening statements are not themselves evidence.  Their

13   purpose is to provide a road map regarding the evidence that

14   the parties expect that you will see and hear.  Their purpose

15   is only to help you understand what the evidence will be and

16   what the parties will try to prove.  In the openings, the

17   attorneys may reference what they believe the applicable law is

18   in this case.  It is, however, for me to instruct you fully on

19   the applicable law, and, as I mentioned before, I'll do that

11:25 20   fully at the end of this case.

21         What happens after that is plaintiff will then offer

22   evidence that he says will support his claims against the

23   defendant.  The defendants will have the opportunity to put on

24   their own evidence in defense and also in support of their

25   counterclaims -- of his counterclaims.  Both sides will, of

course, have the opportunity to cross each other's witnesses.

After you've heard all of the evidence on both sides, both sides will also be given a chance for what we call their closing arguments. The lawyers for both sides will at that point attempt to summarize the evidence you've heard and help you understand the evidence that they say supports their respective positions. Again, the closing arguments are not themselves evidence.

The final part of the trial will occur when I instruct you about the rules of law that you are to apply in reaching your verdict. After you hear my instructions, you'll leave the courtroom together to make your decision. Your deliberations will be secret but you'll announce your verdict at the end of this case.

Now, as I indicated before, generally our trial day will be 9:00 a.m. to 1:00 p.m. To make this work properly and to ensure that the trial schedule moves along, we all have to be disciplined about it and keep to the schedule. We will begin every trial day at 9:00 a.m. sharp. Just so you know, I meet with counsel before then so that we are ready to go, but we can't start any presentation of evidence until all eight of you are here. So every one of you needs to be here. So please make your very best efforts to do that each day. Tomorrow we have a slightly different schedule which is that we're going to start at 11:00, so you just need to be here a few minutes

1    before 11:00 tomorrow.

2            When it comes time to deliberate, you should be

3    prepared to meet all day, roughly 9:00 a.m. to 4:30.  And I'll

4    certainly keep you informed of when I expect you'll get this

5    case for your deliberations as we move forward.

6            Jurors, just know that counsel and I and all of my

7    court personnel have worked really hard during the pretrial

8    phases of this case to ensure that the trial schedule works

9    smoothly and efficiently.  Now, there's sometimes, and this

11:27 10    happens in every trial, where counsel and I may need to tend to

11    something outside of your presence, either at a sidebar or

12    during a recess.  Just please all bear of that preparation in

13    mind and be patient if we have to do that at any point.

14            As I said, I'll strive to keep you informed of the

15    schedule as we move along.

16            Jurors, as I said, those are my preliminary

17    instructions to you.  Keep those all in mind.  We're going to

18    take about a 20-minute break now.

19            The most important instructions for you to keep in

11:28 20    mind right now are don't discuss the case among yourselves, and

21    that will hold true until you get this case for your

22    deliberations.  Keep an open mind.  Don't let anyone else speak

23    to you about this case.

24            Ms. Hourihan is going to take you out the back way to

25    show you where the jury room is and how you'll enter the

```
  1   building for the remainder of this case.  As I said, we'll take
  2   20 minutes and come back and hear opening statements.
  3           Thank you.
  4           THE CLERK:  All rise.
  5           (Jury left the courtroom.)
  6           THE COURT:  Counsel, anything before we take the
  7   break?
  8           I will point out there is a podium that can be moved
  9   if anyone wants to move if you feel you should need it.
11:29 10       MR. BAKER:  One question, Judge.  I know you said you
 11   didn't want the witnesses here for testimony.  I prefer the
 12   witnesses did not hear the opening statements as well.
 13           THE COURT:  Counsel?
 14           MR. GREEN:  That's fine by me.  Obviously the parties
 15   are here.
 16           THE COURT:  I think that's appropriate.  It doesn't
 17   apply obviously to the parties themselves --
 18           MR. BAKER:  Understood, Judge.
 19           THE COURT:  -- but all other witnesses.
11:29 20       MR. GREEN:  Thank you, your Honor.  We have nothing
 21   else.
 22           THE COURT:  We'll take 20 minutes.
 23           (Jury entered the courtroom.)
 24           THE CLERK:  Court is in session.  Please be seated.
 25           THE COURT:  Jurors, as I said, we'll now begin with
```

1    opening statements.  Plaintiff's side will go first.

2            Mr. Green?

3            MR. GREEN:  Thank you, your Honor.

4            Ladies and gentlemen of the jury, once again, my name

5    is Larry Green.  I'm assisted by Susan Stenger and Linda

6    McIlvene, and we represent the plaintiff, Donald Thomas Scholz,

7    who goes by Tom Scholz.

8            I'd ask Mr. Scholz to stand up again.  He's here today

9    with his wife, Kim, as he will be throughout the entire trial.

11:53 10          Many of you are familiar with the following quote:

11    Genius is one percent inspiration, 99 percent perspiration.

12    You may not know the source of the quote, but I'll tell you

13    that it was one of America's greatest inventors, Thomas Edison

14    who said that.

15            What he was referring to was the fact that genius

16    requires brilliance, but, even more importantly, it requires a

17    great deal of work.  Genius comes in many forms.  Edison was a

18    scientific genius; Steve Jobs was a business genius; Bill

19    Belichick is a coaching genius; and my client, Tom Scholz, is

11:54 20    an artistic genius.  In all of these cases, genius was one

21    percent inspiration and 99 percent perspiration because success

22    only came as a result of some very hard work and perseverance.

23            Tom Scholz, as an MIT grad, is the holder of multiple

24    patents.  He is brilliant, but his musical genius is a result

25    of a lot of perspiration, years of hard work in writing songs,

1    in playing various instruments, in coordinating recordings,

2    designing sets, inventing audio signal processors -- all to

3    develop a very unique sound that became known as the band

4    BOSTON, making BOSTON one of the most successful rock bands of

5    all time.

6         The thing about geniuses -- and we certainly know this

7    from people like Edison, Jobs, and Belichick -- is that they're

8    perfectionists, and that certainly has been true of Tom Scholz.

9         For the past four decades -- and, indeed, the band

11:55 10   BOSTON just celebrated a very successful 40th anniversary

11   concert tour -- Tom Scholz has worked long and hard to develop

12   and maintain the unique brand and quality that has been

13   associated with the band BOSTON.  He obtained federal

14   trademarks for the name BOSTON, and he has taken action to

15   ensure that the brand will not be adulterated and that there is

16   no confusion as to who BOSTON is and as to the distinct quality

17   of BOSTON's music.

18        Now, the case that brings us here today and for the

19   coming week and a half arises out of the misconduct of the

11:55 20   defendant, Barry Goudreau, in violating both federal trademark

21   law and in violating contractual obligations of good faith and

22   fair dealing that he had to Mr. Scholz.

23        Barry Goudreau was not an original member of the band

24   BOSTON, but he was a talented guitarist who joined the band

25   after Mr. Scholz and Brad Delp had secured a management

1    contract, a production contract, and a recording contract with

2    Epic Records to produce albums.

3          Mr. Goudreau was a member of the band in its early

4    years, and he parted ways with Mr. Scholz in the early 1980s,

5    and he did so voluntarily.

6          In 1983, Mr. Scholz and Mr. Goudreau entered into a

7    contract.  You'll be seeing this contract.  It was entered into

8    with the other members of the band BOSTON at that point in

9    time, and it very clearly defined what Mr. Goudreau's rights

11:56 10   and responsibilities would be as he was now a former member of

11   the band BOSTON.

12         Mr. Scholz was, in fact, very generous to Mr. Goudreau

13   by agreeing to permit Mr. Goudreau to receive one-fifth of all

14   artist royalties from sales of BOSTON's first two albums, even

15   though Mr. Goudreau admits that he played on only a few of the

16   16 songs of those hugely successful albums.  And Mr. Goudreau

17   received every penny due to him under the 1983 agreement.

18         As part of that same agreement, it was also expressly

19   agreed that Mr. Goudreau could pursue his own musical career,

11:57 20   and the 1983 agreement defined exactly how that would be done

21   and how he would be referring to himself.  And it was very

22   clear you're referring to yourself "formerly of BOSTON," rather

23   than an "original member of BOSTON," rather than a "former

24   original member."  "Formerly of BOSTON."

25         We now fast forward 24 years from 1983 to 2007.

1         Mr. Goudreau has been receiving his royalty payments

2    throughout under the 1983 agreement.  And at that point in

3    time, he's receiving those royalties, as I say, even for songs

4    that he never performed on.  But he joins up with Ernie Boch,

5    Jr. -- yes, the highly successful, highly visible car dealer --

6    and another former member of BOSTON, "Sib" Hashian, and they

7    join together in a band called "Ernie and the Automatics."  And

8    notwithstanding the fact that Mr. Goudreau fully understood

9    that he was contractually prohibited from holding himself in

11:58 10   any way other than "formerly of BOSTON," what then happens is

11   that Ernie and the Automatics, for the four years that they

12   proceed to play from 2007 to 2011, frequently hold him out as a

13   "former original member of the band BOSTON."  And "original" is

14   highlighted in many of the exhibits you'll be seeing here.

15        Ernie and the Automatics proceed to do 250-some-odd

16   concerts over a four-year period.  You'll be seeing evidence

17   from a variety of promotional materials from those concerts

18   where the referral was not as it was supposed to be, "formerly

19   of BOSTON," under the contract.  It happened over and over that

11:59 20   he was being referred to as a "former original member of the

21   band BOSTON" when, in fact, he was not.

22        Ernie and the Automatics actually came out with a CD

23   that had a prominent sticker on the front of it in which they

24   made reference to Mr. Goudreau as a "former original member of

25   the band BOSTON," even though that was not supposed to be

1    happening.

2        They created a web page, and on the web page, once

3    again, it has the improper listing.

4        What Mr. Goudreau and Mr. Boch were doing was holding

5    themselves out as some type of new incarnation of the band

6    BOSTON in the form of Ernie and the Automatics.  They were

7    trading on the goodwill that Tom Scholz, through a great deal

8    of hard work and perspiration, had taken years to establish.

9    Not only was it contrary to the 1983 agreement, it was in

12:00 10    violation of the trademarks that Mr. Scholz had obtained.

11        Interestingly, it was only well into this four-year

12    history, about two years in, the evidence will be that

13    Mr. Goudreau says to Mr. Boch for the first time, You know

14    what?  I have a 1983 agreement.  I'm not supposed to be

15    referred to as "a former original member," just as a "former

16    member."  Took him two years to say that, even though he sees

17    all of these promos going out, even though he sees the CD.

18    Despite this disclosure, even from 2009 to 2011, Ernie and the

19    Automatics is continuing to perform, and they're continuing to

12:00 20    do it in violation of the 1983 agreement.

21        The rampant use of the "BOSTON" trademark would not

22    have happened if Mr. Goudreau had abided by the 1983 agreement.

23    It happened because he and Mr. Boch intentionally wanted to

24    hold themselves out as some new incarnation of BOSTON and take

25    undue advantage of the vast appeal and goodwill that the band

1     BOSTON had developed over the years.

2             There will be evidence before you from Mr. Goudreau

3     himself that he says that the biggest regret in his

4     professional career is that he left the band BOSTON.  That was

5     his regret, and he was trying to recreate the old times.

6             You'll also hear evidence from Mr. Boch, a very highly

7     successful businessman, but at best an amateur musician, he

8     idolized Tom Scholz.  He was a BOSTON rock star wanna-be, and

9     here he is playing in a band with two of the former, but not

12:01 10     former original members, of the band BOSTON, and he is having

11     his fantasy fulfilled.

12             It was in both of those -- both of their interests to

13     hold themselves out as having former original members of the

14     band BOSTON, not only to trade off of Mr. Scholz's goodwill,

15     but to improve their bookings, to appeal to the outside.  That

16     is how they did it, and it was violative of the contract, and

17     it was violative of trademark law.

18             Now, as is his right, Mr. Scholz has asserted claim

19     under federal trademark law and for breach of the implied

12:02 20     covenant under the contract.  You'll be hearing in this case

21     about the importance of trademarks.

22             Mr. Scholz took great pains, and at great expense he

23     designed, registered, and protected the "BOSTON" trademark.

24     There is no dispute from the other side that that was a fully

25     valid trademark.  That's not something they're going to be

1    disputing here.

2         Indeed, Mr. Boch, who is actually going to be the

3    first witness we're going to be hearing from, he understood the

4    importance of trademarks.  Probably you've all heard the

5    expression that his father first coined, Ernie Boch, Sr., "Come

6    on Down."  Ernie Boch, Sr. actually had that trademarked.  That

7    was a registered trademark.  And you're probably familiar with

8    Bob's Furniture store.  They don't sell cars; they sell

9    furniture.  When Bob's Furniture store said, Come on down, he

12:03 10  was met with a complaint from Ernie Boch, Jr. saying, You know

11   what?  That's my registered trademark; you're not supposed to

12   be doing that.

13        Mr. Scholz felt even more strongly about his trademark

14   because here we had people competing with him in the same

15   industry improperly holding themselves out as some incarnation

16   of the band BOSTON.

17        Mr. Scholz has brought this lawsuit because Barry

18   Goudreau has been complicit in what is actually the hijacking

19   of the "BOSTON" trademark.  The "BOSTON" trademark means

12:04 20  something.  It stands for the unique nature and distinct

21   quality of Mr. Scholz's music.  It stands for the integrity of

22   BOSTON.  Like all great acts, the band BOSTON is not just about

23   the music.  It stands for values.  It stands for lifestyle.

24   Probably familiar with the Grateful Dead.  They're the hippy

25   lifestyle.  Jimmy buffet is all about the island lifestyle.

1    Nirvana is about the grunge lifestyle.  Well, BOSTON is about a

2    lifestyle that is anti-violent, anti-bullying, vegetarianism,

3    animal rights.  And over the years, Mr. Scholz and the band

4    BOSTON have raised millions of dollars for charities that

5    educate people that embodied these values.  And that's why he

6    so much cares about the trademark, and that's why he was so

7    offended when, year after year, performance after performance,

8    the trademark of "BOSTON" is being used.  And moreover, they're

9    holding out two musicians as original members of the band when

10   they were not.

11        This lawsuit is brought first and foremost to defend

12   the integrity of the "BOSTON" trademark and everything it

13   stands for.  This lawsuit is also brought because Mr. Scholz

14   breached his covenant of good faith and fair dealing under the

15   1983 agreement.  Contracts are at the very cornerstone of

16   American commerce, American democracy.  And when contracts are

17   breached, there are consequences, and that is part of the

18   reason why we are here.

19        Now, I'm not going to go into damages at this point in

20   time.  You're going to be hearing from an economist, an expert

21   witness, as to what the proper measure of damages are in a

22   trademark case, in breach of contract, and you'll be hearing on

23   damages here.

24        You've heard all of this, and you're probably saying,

25   Well, what's the defense?

1        Well, Mr. Goudreau does acknowledge he was a party to

2    the 1983 agreement and that he could only hold himself out as a

3    "former member" of the band as opposed to a "former original

4    member" of the band.  And, as I said, he and his legal team are

5    not in any way challenging the trademarks.

6        So what's the defense?  Well, first, Mr. Goudreau and

7    his attorneys have decided that the best defense is a good

8    offense.  And he countersues Mr. Scholz saying that somehow

9    Mr. Scholz has impeded his music career.  The evidence will be

12:06 10   that the counterclaims are completely baseless.  At no time did

11   Mr. Scholz prevent Mr. Goudreau from pursuing a musical career;

12   and indeed, Mr. Goudreau had a successful musical career

13   following his departure from BOSTON.

14       Mr. Scholz at no point took any action to prevent

15   Mr. Goudreau from performing, other than when Mr. Goudreau was

16   violating trademark law and violating his obligations under the

17   1983 agreement.  He was otherwise free to perform.  He had

18   every right to do so.  And if he is suggesting in one way

19   before any of you that Mr. Scholz prevented him from

12:07 20   performing, we're going to put him to the proof.  There is

21   absolutely no proof of that.  In fact, he did perform over the

22   years.

23       So what's left of the defense?  Well, essentially what

24   they're saying is, Mmm, you know what?  I, Mr. Goudreau, really

25   didn't have control over Mr. Boch and the promoters that

1    Mr. Boch hired.  It simply makes no sense at all.

2             There were multiple violations over four years.  This

3    is a small band.  They talk to one another.  They had a

4    website.  They had a CD.

5             In fact, you're going to be hearing from Mr. Boch.

6    Mr. Boch said he listened to Mr. Goudreau.  There will be

7    evidence that Mr. Baggott, the concert promoter, he said he

8    listened to Mr. Goudreau.  So if everybody is listening to

9    Mr. Goudreau, how is it that performance after performance over

12:08 10   four years, how is it on a website, how is it on a CD that

11   there is violation after violation here?

12            And I think the answer is that it was in

13   Mr. Goudreau's interest, it was in Mr. Boch's interest, it was

14   in Mr. Baggott's interest, as their promoter, to go out and get

15   the biggest crowd they could, and that meant trading on the

16   goodwill of the name BOSTON.  That meant, Gee, we have original

17   members here, when they were not.

18            Indeed, as part of the defense here -- even though he

19   signed an agreement in 1983, a contract -- again, the

12:08 20   cornerstone of our democracy and commerce -- that said I can

21   only hold myself out one way and that was not as an original

22   member, it was simply as a former member, we're going to be

23   hearing testimony here from 2016, 40 years after the band

24   BOSTON was formed, revisionist history where Mr. Goudreau is

25   going to say, You know what?  I am an original member.  He

1    signed a contract that says he's not, and he's going come in

2    here and say to you, I'm an original member, accordingly, we

3    didn't do anything wrong with those promotions, and don't hold

4    me liable for this.

5         He's also going to say, You know what?  I really

6    didn't have control over these people; it happened.  He's

7    saying two things out of the same mouth, and neither one makes

8    sense.

9         What undercuts Mr. Goudreau's case is a filing that he

12:09 10    made in this case.  There are all kinds of things that undercut

11   the case, but there's going to be one document I show you

12   because it's coming from Mr. Goudreau himself.

13        Do you have this up on your projectors?

14        (Discussion off the record.)

15        THE COURT:  Jurors in the back row, in between the

16   seats, in between every other seat, there's a little case.  If

17   you open it up, there's a monitor in there.

18        (Pause.)

19        MR. GREEN:  So, in this case, Mr. Goudreau has filed

12:10 20   something called an answer to the complaint and a counterclaim.

21   I want to call your attention to paragraph 53.

22        Again, these are his words right out of the

23   counterclaim:  In 2011 and 2012, Goudreau participated in a

24   small number of live performances.  In each instance, Goudreau,

25   as he always does, made sure that all venues, managers, and

1    others involved referred to Goudreau as a former member of the

2    band BOSTON in any biographical or other materials associated

3    with Goudreau's performance.  Using the truthful and accurate

4    descriptive designations of "formerly of BOSTON" -- and here

5    are the words that completely undercut his case or his

6    defense -- or as "an original member of BOSTON."

7            Now, I haven't seen the script of -- defendant's

8    counsel is going to stand up before you.  He's certainly not

9    required to show me his script of his opening ahead of time --

12:11  10    I'm necessarily not responding to everything that he might say,

11    but if he is going to stand up before you and say, Well, that's

12    some type of typo, they must have made a mistake, I will tell

13    you that the testimony in this trial that will come from

14    Mr. Goudreau himself is that when he wrote that paragraph -- he

15    confirmed in his deposition testimony -- Judge Casper will be

16    telling you about this, a pretrial discovery mechanism in which

17    a person is questioned under oath -- and he will confirm it

18    here, that when he wrote that, he was accurate and that was

19    truthful.

12:12  20            He's admitting here --

21            THE COURT:  Counsel, two minutes to 20.

22            MR. GREEN:  Thank you, your Honor.

23            He is admitting here that he always made sure,

24    therefore, exercising control that the concert promoters would

25    hold himself out as formerly of BOSTON, that might have been

1    okay, or an original member of BOSTON, that was not okay, and

2    that's exactly what happened here.

3            When all is said and done, ladies and gentlemen of the

4    jury, we are asking that you confirm that my client is entitled

5    to relief both under the trademark claims and under the

6    contract claims here.  What happened here should not have

7    happened here.

8            I thank you in advance, ladies and gentlemen of the

9    jury, for your time today, for your time in the coming week

12:12 10   ahead, and we ask you to ultimately consider all of the

11   evidence.  And we believe that when you consider all of this,

12   you will come back and you will award the relief we are

13   requesting on behalf of Mr. Scholz.

14           Thank you very much.

15           THE COURT:  Thank you, counsel.

16           MR. GIVEN:  Your Honor, a motion to reserve to the end

17   of the day.

18           THE COURT:  Reserved and noted for the record.

19           Counsel?

12:13 20         MR. BAKER:  May I proceed, your Honor?

21           THE COURT:  You may.

22           MR. BAKER:  Ladies and gentlemen, my name is Jeff

23   Baker.  I introduced myself to you earlier this morning.

24           That's Mr. Goudreau right there, the defendant, and

25   his wife, his two children.

1          I like to describe the opening statement as the

2   blueprint of our proof.  We're giving you -- I'm going to give

3   you an outline of how we intend to prove our case and how we

4   see the evidence to come in.

5          The evidence in this case will be as follows:  -- I

6   start with the fact that Mr. Goudreau is a working musician.

7   Mr. Goudreau is a humble man.  All his adult life he has made a

8   living playing the guitar.  Lifetime Boston resident, 64 years

9   old.  Supports his family; plans for his retirement.

12:14 10        Mr. Scholz, that man right there, is trying to take

11  that away from him.

12         The evidence in this case, ladies and gentlemen, is

13  not about trademark infringement, as we will demonstrate.  It

14  has been brought by Mr. Scholz for spiteful and dishonest

15  purpose -- to punish Mr. Goudreau and to try to retain, to grab

16  from Mr. Goudreau, his earned royalty rights to the first two

17  albums.

18         You will hear testimony, and I believe it will come

19  from Mr. Scholz, that he made a bad deal back in 1976.

12:15 20        Now, we prepared a timeline slide of the events that

21  relate to the band BOSTON.

22         Your Honor.

23         THE COURT:  You may.

24         (Pause.)

25         MR. BAKER:  We're going to proceed when the slide

1    comes up, that's okay.

2         You're going to hear for approximately 13 years, from

3    1969 to 1981, Mr. Goudreau wrote, played, performed, and

4    recorded music with Mr. Scholz.  They were friends.  For a

5    period of time, they lived together.

6         Mr. Goudreau started a band called "Freehold."  He

7    invited Mr. Scholz to join.  They performed together.  The two

8    of them started a band called "Mother's Milk."  They played

9    together.  Mother's Milk became BOSTON, the famous band BOSTON.

12:16 10        Mr. Goudreau played in BOSTON with Mr. Scholz from the

11   beginning.

12        Before BOSTON got signed to a record deal,

13   Mr. Goudreau, the testimony will be, drove to New York City

14   with Mr. Scholz to promote a demo tape, going from record

15   company to record company to record company, trying to get a

16   deal.  The evidence will also show, ladies and gentlemen, that

17   before BOSTON was signed, when it was just another band trying

18   to get a deal, Mr. Goudreau played in a showcase with

19   Mr. Scholz.  A showcase, ladies and gentlemen, the evidence

12:17 20   will be, is a special kind of live performance exclusively

21   calculated, designed to show a record label what your music is.

22        They got a deal.  They signed a deal with CBS Records,

23   a label that I'm sure you are all familiar with.  Michael

24   Jackson, Bruce Springsteen, Bob Dylan, all on CBS Records, and

25   also BOSTON.

1           There was a contract signed.  You will hear testimony

2    that Mr. Goudreau, like Mr. Scholz and three other members, I'm

3    going to refer to them as "original members," all signed a

4    contract with CBS Records.

5           Now, ladies and gentlemen, the band made a record, and

6    I have a copy of the album.

7           Your Honor, may I publish this closer to the jury,

8    please?

9           THE COURT:  You may.

12:18 10          MR. BAKER:  Thank you.

11          This is the original album BOSTON.  And if you look on

12   the front of the album, ladies and gentlemen, that is the

13   "BOSTON" trademark.  Stylized writing -- we don't write this

14   way, outline, a delineation.  That's the "BOSTON" trademark

15   that we've all come to know.

16          And on the backside of this original album, ladies and

17   gentlemen, Mr. Goudreau.  A little more gray hair these days,

18   but there he was.  There's Mr. Scholz.  Shoulder to shoulder.

19          And the evidence will show, when you get a chance to

12:18 20   look at this closer, that there's a biography on the back about

21   how the band was formed.  And in addition to that, there is a

22   statement, the personnel, the liner notes.  Barry Goudreau,

23   lead and rhythm guitarist.  That's the logo right there, ladies

24   and gentlemen.

25          Now, Mr. Goudreau will testify that he introduced Tom

1    Scholz to the lead singer of the band, that famous distinctive

2    voice, Brad Delp.  And, in fact, Mr. Goudreau introduced Tom

3    Scholz to every other member of the band.

4         They went, after the record deal, on an 18-month

5    national tour, and then a follow-up tour sometime thereafter

6    for another year.  Two-and-a-half years of nonstop touring over

7    a period of time -- slightly longer than two-and-a-half years.

8    And during that period of time, they played over 300 live

9    performances.  Mr. Goudreau played those performances.  Once

12:19 10   again, shoulder to shoulder with Mr. Scholz on the stage.

11        As is often the case in the music business, when

12   artists decide that they can no longer work together, they part

13   ways.  Mr. Goudreau left BOSTON.  That was 35 years ago.  They

14   entered into an agreement -- not just Mr. Scholz and

15   Mr. Goudreau, but all of the band members, as we will

16   demonstrate.  It's called a "settlement agreement."  There's

17   some key statements in that document.  And if you look at the

18   first page, which is on the screen, the document recites

19   Mr. Goudreau is and has been -- present and past tense, is and

12:20 20   has been -- an equal partner in that partnership known as

21   BOSTON.

22        So from the very beginning, the evidence will show, he

23   was a partner, equal partner.  The document also states --

24   confirming the previous arrangement that all five members of

25   the band would share equally in record royalties from the

1    band's first two albums.

2         Now, there's another paragraph that relates to

3    Mr. Goudreau.  Paragraph 2(d).  Paragraph 2(d) will state --

4    states:  Mr. Goudreau had the right -- has the right to refer

5    to himself as "formerly of BOSTON."  That document gave him

6    that right.  And we claim in this lawsuit, ladies and

7    gentlemen, that Mr. Scholz violated that provision, that he has

8    in part brought a lawsuit to prohibit Mr. Goudreau from

9    referring to himself as "formerly of BOSTON."

12:21 10         Now, this settlement agreement that you're looking at

11   does not change the fact that Mr. Goudreau was an original

12   member of the band BOSTON.  And the reason why I say that,

13   ladies and gentlemen, is because that's history.  He was there

14   from the beginning.  In fact, Mr. Goudreau was there before the

15   beginning.  And despite what Mr. Scholz might conjure up in his

16   mind or state on the witness stand, he cannot change what is

17   history, which is Mr. Goudreau was an original member of that

18   band.  And anybody else, other than Mr. Goudreau, can say that,

19   and there's a simple reason for that.  Because it's true.

12:22 20         Now, after Mr. Goudreau left, BOSTON still toured,

21   still put out its records, sold millions and millions of

22   records, and was enormously successful.  No dispute.  And he

23   will show you that for approximately 25 years, the parties

24   lived in relative peace, and that all changed when the lead

25   singer, Brad Delp, died in March 2007.

1          Now, the evidence will show that before he died, Barry

2    Goudreau and Brad Delp were the best of friends, professional

3    collaborators, and related by marriage, brothers-in-law.

4          After Mr. Delp died, however, the evidence will be

5    that Mr. Scholz no longer had a reason to be civil to

6    Mr. Goudreau.  Because, as the evidence will show, Mr. Scholz

7    routinely used Mr. Delp as one of his vocalists for his band

8    and understood the close relationship.  Brad Delp died;

9    Mr. Scholz decides now is the time to punish and hurt

12:23 10   Mr. Goudreau.  The evidence will be as a direct result of the

11   legal onslaught brought by Mr. Scholz, Mr. Goudreau's career

12   laid in ruins.

13          I want to talk to you about trademark infringement.

14   There were 13 claims brought in this case.  Ten such claims

15   where Mr. Scholz has accused my client of direct trademark

16   infringement have been dismissed.

17          MR. GREEN:  Objection.

18          THE COURT:  Sustained.

19          MR. BAKER:  There are three remaining claims -- your

12:24 20   Honor --

21          THE COURT:  And I'll just interrupt here to say,

22   jurors, the claims that are before you are the three claims

23   that I advised you about.

24          Counsel.

25          MR. BAKER:  There are three claims remaining.

1          Mr. Scholz is trying to hold Mr. Goudreau responsible

2     for the actions of someone else.  That someone else is the car

3     dealer, Ernie Boch, Jr.

4          The evidence will show in 2007, Ernie Boch, Jr.

5     started a band called "Ernie and the Automatics."  It bears his

6     name.

7          Tom Scholz wants you to find that Barry Goudreau is

8     responsible for the use by Ernie and the Automatics of the word

9     "BOSTON" in his advertisements.  Mr. Boch used the word

12:24 10     "BOSTON" to describe Mr. Goudreau's past role in the band.

11          The evidence will show that Mr. Boch used that word in

12     advertisements for Mr. Boch's band.  Mr. Boch, however, ladies

13     and gentlemen, is not a defendant in this case.  The evidence

14     will show that Mr. Scholz did not sue either Ernie's band or

15     Mr. Boch.

16          Now, Mr. Boch is going to be Mr. Scholz's first

17     witness.  We expect he will testify as follows:  Mr. Boch runs

18     an enormous and highly successful car business.  Mr. Boch's

19     band name -- his band was named after him, Ernie and the

12:25 20     Automatics.  We believe he will testify that he and he alone

21     with his support staff -- not Mr. Goudreau -- ran the business

22     of Ernie's band.  All decisions relating to Ernie's band

23     relating to promotion and advertising was made by Ernie Boch,

24     Jr.

25          Mr. Boch will testify, contrary to what Mr. Green

said, that not two years into the relationship but from the
very beginning, ladies and gentlemen, Mr. Goudreau told him,
Mr. Boch, please only refer to me as "formerly of BOSTON."

Mr. Boch will also testify Mr. Goudreau never asked
him to be identified as an "original member of the band
BOSTON."

Finally, Mr. Boch will tell you that in any instance
where his advertisements, Mr. Boch's advertisements, related
to, referred to Mr. Goudreau as a former original member of
BOSTON were done by Mr. Boch and Mr. Boch alone.

Mr. Scholz is going to try to convince you of the
following:  That Mr. Boch intended to trick people into
believing that when Goudreau played with Ernie's band, people
were somehow going to hear the band BOSTON.  I heard Mr. Green
say "newly incarnated" band BOSTON.

We're going to show you advertisements, the same ads
that they're going to rely upon to demonstrate this confusion
that Mr. Boch tried to create in the minds of the audience.

And if you look at the ad, it shows the headlining act
in the middle towards the bottom.  It has a picture of Ernie
and the Automatics, and in very small writing underneath the
names of "Sib" Hashian and Barry Goudreau, it says, "Former
members of the band BOSTON."

And Mr. Scholz is going to try to convince you that
this ad deceived the public into believing when they saw this,

1    they were going to see the band BOSTON.

2          In addition to that, there's a CD -- I want to see the

3    CD -- a CD that was released by Mr. Boch -- not by

4    Mr. Goudreau, but by Mr. Boch.  And if you look at the image

5    below, you see the black label.  That says, "Featuring former

6    original members of the multiplatinum selling band BOSTON."

7    Mr. Boch will tell you he put that label on, and he will also

8    tell you he got a call from management from Mr. Scholz and

9    immediately took the label off.

12:28 10          The purpose of a trademark, ladies and gentlemen, is

11    very simple.  It is to identify the source, the origin, the

12    place where something came from, a product or a service.  It is

13    calculated.  It is designed to identify a particular product.

14          I'll give you an example.  Apple.  Apple iPhone, Apple

15    Computer.  On every Apple computer or iPhone is a little image

16    of an apple with a bite missing.  You see that you go, That's

17    Apple Computers.  I've been using those computers for 10 years,

18    20 years, 15 years or five years, and I know that that's a good

19    product.

12:29 20          The purpose of a logo is to tell you that when you see

21    that logo, you can expect all the quality that you have grown

22    accustom to expect after years of being an Apple customer.  The

23    Apple logo, ladies and gentlemen, as we all know, is

24    distinctive.  You could recognize it if you saw a thousand

25    images, Oh, that's the Apple logo.

1         The BOSTON logo.  Distinctive.  Stylized writing, not

2    the way you sign your name, block lettering, script, a special

3    kind of font.  An image that delineates around it.  That's the

4    logo.

5         Just like the Apple logo, we will show you, it has

6    been in existence for over 40 years.  It's on everything

7    relating to this band: on the plane, on the album, behind the

8    stage, on posters, on the BOSTON website.  Almost every single

9    piece of merchandise that Tom Scholz sells bears that image,

12:30 10   not simply the name BOSTON, that image.  So if you saw this

11   image, you'd go, BOSTON's here.

12        The evidence will be, ladies and gentlemen, that this

13   logo was not used in one single instance by Ernie Boch and

14   Ernie and the Automatics.  Not once.

15        A typical trademark case involves the phony Rolex.

16   Hey, I got this great deal on a Rolex watch on Washington

17   Street for $10.  Look at the beautiful Gucci handbag I bought

18   with the big "G" on it for $25.

19        What Mr. Scholz is asking you to believe in this case

12:31 20   is that Ernie's band -- Mr. Green said it -- Ernie's band was a

21   counterfeit BOSTON, newly incarnate.

22        In order to prevail on a claim for infringement, the

23   plaintiff has to demonstrate that the consumer was confused

24   when he saw these ads.

25        What you will not hear in this courtroom, in this

1    court of law, ladies and gentlemen, is one single witness who

2    will walk in, sit in that witness box, and say to you under

3    oath, When I went to see Ernie's band play, I thought it was

4    BOSTON.  When somebody gave me a CD, I thought it was a BOSTON

5    CD.

6          I want you to consider the nature of these two bands.

7    On the one hand, you've got the band BOSTON.  Classic rock.

8    The testimony will be that Ernie and the Automatics was a blues

9    band.  You'll hear testimony that they had a CD on the

12:32 10   Billboard blues chart.

11          BOSTON sold tens of millions of CDs over its career.

12    Ernie and the Automatics -- Mr. Boch is going to testify he

13    gave away a maximum of or sold a total of a thousand CDs.

14          The 40th anniversary tour and all the other tours.  We

15    will present evidence to you, they played, the band BOSTON, a

16    great band, a successful band, before tens of millions of

17    people.  Mr. Boch will tell you that they played maybe before a

18    hundred people at a rib joint called Dante's or Firefly's.

19    Ticket price:  $50, $75, $100; VIP, $150; $200 meet-and-greet.

12:33 20   Ernie and the Automatics:  Free.

21          The use of the word "BOSTON" by Mr. Boch was used in a

22    particular context.  It was used for one purpose:  To describe

23    the fact that Mr. Goudreau had played before in the band

24    BOSTON.

25          We will submit to you that fans want to know where the

1    artist comes from.

2        We suggest to you in our proof that the use of the

3    word "BOSTON" was accurate and fair; and, furthermore, that the

4    law permits this.

5        The use of the word "BOSTON" certainly does not

6    suggest -- the use by Mr. Boch of the word "BOSTON" -- never of

7    the logo, ladies and gentlemen -- does not suggest that

8    Mr. Boch intended to palm off his band as BOSTON.

9        Mr. Scholz is going to demonstrate no harm -- no harm

12:34 10    from the use by Mr. Boch of the name BOSTON.  He will

11    demonstrate no evidence of lost sales, no evidence of lost

12    concert revenue or merchandise revenue.

13        I want to talk about the use of the word "original."

14    As you are now aware, it's going to be an issue in this case.

15        What Mr. Scholz is going to attempt to convince you of

16    is that somehow it was wrong for Mr. Boch to describe

17    Mr. Goudreau as a former original member.  Ladies and

18    gentlemen, this is a non-event.  This is a red herring designed

19    to distract you.

12:35 20        We're going to ask you to focus on the overall effect

21    of the advertisement, not one little word or a phrase here, but

22    focus on the overall effect of the advertisement, and decide,

23    as is your obligation, as I understand it, did Mr. Boch attempt

24    to deceive the public into believing his band was BOSTON?  And

25    we submit to you we will prove to your satisfaction that with

1    or without the use of this word "original," it doesn't change

2    one important fact: nobody was deceived by Ernie's ads.

3         Mr. Scholz has an additional burden of proof, as we

4    understand it.  We believe that he will have to show you that

5    in addition to the infringement and the harm he has suffered,

6    that Mr. Goudreau was monitoring and controlling Mr. Boch, and

7    that, further, somehow Mr. Goudreau is responsible for

8    Mr. Boch's actions.

9         We will introduce evidence -- and you'll hear it right

12:36 10   from Ernie Boch's mouth -- nobody tells him what to do.  Nobody

11   controls him.  He is his own boss.  He runs a multibillion

12   dollar business, and he makes decisions on a moment's notice.

13        I want to talk to you about Mr. Goudreau's

14   counterclaims.

15        Mr. Goudreau, as a result of this lawsuit, because

16   this lawsuit was filed, has brought two counterclaims.  They're

17   both contract-related claims.

18        The first one relates to paragraph 2(d), where

19   Mr. Scholz agreed to permit Mr. Goudreau to promote himself as

12:36 20   "formerly of BOSTON."  It is our position that by bringing this

21   lawsuit, Mr. Scholz has interfered with that ability to get on

22   with his life, leave the band BOSTON, promote himself as

23   "formerly of BOSTON," and perform.  We believe he violated the

24   contract.

25        The second claim, again, it's a contract-related

1    claim, but let me just give you a moment to show you our proof

2    on that issue.

3          The second claim says Mr. Scholz had a duty arising

4    from the settlement agreement to allow Mr. Goudreau -- again,

5    that phrase -- to get on with his life and to make a living

6    playing music, and that Mr. Scholz sought to prevent and did,

7    in fact, interfere with Mr. Goudreau's ability to do so.

8          Mr. Scholz wanted to and continues to want to get back

9    from Mr. Goudreau what he earned and what he's entitled to, the

12:37 10    original royalty rights to those two albums.  He has interfered

11    with Mr. Goudreau's career routinely, repetitively, and

12    constantly.  And you will hear testimony that the overall fear

13    from Mr. Goudreau to perform as a professional musician was

14    tainted by the actions of Mr. Scholz such that people didn't

15    want to deal with him anymore.

16          In conclusion, ladies and gentlemen, I'm going to ask

17    you to do the following, please:  I'm going to ask you to find

18    that Ernie's band has not infringed on the "BOSTON" mark in any

19    way, that Mr. Goudreau is not liable as a result of the

12:38 20    behavior of Mr. Boch to Mr. Scholz on any of his claims.  We

21    would also ask you to find that by Mr. Scholz's actions, he, in

22    fact, has breached the contract that Mr. Scholz entered into

23    with Mr. Goudreau.  We're going to ask you to award

24    Mr. Goudreau a monetary sum of damages based on the evidence

25    and grounded in fairness, what you think is fair.

           1          One last thing, ladies and gentlemen.  Please allow me

           2   to remind you one last time, Mr. Scholz is suing Mr. Goudreau

           3   for something Mr. Boch did, but, Mr. Scholz is not suing

           4   Mr. Boch.

           5          Thank you all.

           6          Thank you, your Honor.

           7          THE COURT:  Thank you, counsel.

           8          Counsel, can I just ask that you move the podium back

           9   in the corner?  Thank you.

12:40 10          (Pause.)

          11          THE COURT:  Plaintiff may call its first witness.

          12          MR. GREEN:  Thank you, your Honor.

          13          The plaintiff calls Ernie Boch, Jr.

          14          THE COURT:  He may be called.

          15          ERNEST BOCH, JR, having been duly sworn by the Clerk,

          16   was examined and testified as follows:

          17          THE CLERK:  Thank you.  Please be seated.

          18          THE COURT:  Good afternoon, sir.  Good afternoon.

          19          THE WITNESS:  Hi.

12:41 20          THE COURT:  Counsel, you can begin.

          21          MR. GREEN:  Thank you, your Honor.

          22                       DIRECT EXAMINATION

          23   BY MR. GREEN:

          24   Q.   Mr. Boch, can you state your name for the record, please.

          25   A.   Ernest Boch, Jr.

1    Q.    Where do you reside, Mr. Boch?

2    A.    Norwood, Massachusetts.

3    Q.    My name is Lawrence Green.  I represent Tom Scholz.

4          Have we ever met before?

5    A.    I don't think so.

6    Q.    You understand you're here today pursuant to a subpoena

7    that our office served upon you on behalf of Mr. Scholz?

8    A.    Yes.

9    Q.    And the subpoena also called for you to produce certain

12:41 10   documents that you had produced through counsel to our office?

11    A.    Yes.

12    Q.    And you also understand that we shared those documents

13    with defendant's counsel.

14    A.    Okay.

15    Q.    We'll be getting to the documents a little bit later.  But

16    let's cover a few background matters first.

17          THE WITNESS:  Can I get comfortable?  Is that okay?

18          (Pause.)

19          THE COURT:  Counsel, you can feel free to ask your

12:42 20   questions from there or use the podium.  Your choice.

21    BY MR. GREEN:

22    Q.    Can you describe for the Court and the jury what your

23    formal education is, Mr. Boch?

24    A.    I was brought up in Norwood, Massachusetts.  I went to

25    Prescott School grammar school, then I went to Norwood Junior

1    High, then I went to Norwood High, and then I went to Berklee.

2    Q.    And for the record, Berklee is the Berklee School of

3    Music?

4    A.    Berklee College of Music.

5    Q.    Berklee College of Music.  Thank you for correcting that.

6          When were you there?

7    A.    '76 to '82.

8    Q.    Did you receive any degree or certification from Berklee?

9    A.    Yes, I did.

12:43 10   Q.    And what was your degree or certification?

11   A.    My degree was a Bachelor of Arts, I think.

12   Q.    Did you study music at Berklee?

13   A.    Yes.

14   Q.    And was there a particular instrument that you studied at

15   Berklee?

16   A.    Yes.

17   Q.    Is that guitar?

18   A.    Yes.

19   Q.    Now, at some point in time, did you go into the automobile

12:43 20   business?

21   A.    Yes.

22   Q.    And can you describe the circumstances under which you

23   went into the automobile business?

24   A.    Oh, that's a long story.  Do you want to hear that?

25   Q.    We don't need to hear the whole long story.  If you could

1    just provide us the summary.

2    A.   Let's see.  I graduated Berklee in the -- I want to say

3    '82 -- '81 or '82 or '83, I'm not really sure.  And I had

4    always played in bands, and they were always horrible, horrible

5    bands.  And when I graduated Berklee, I played around and, you

6    know, I just -- it just wasn't working, you know, because I'm

7    really not that great of a guitar player.  So I was living in

8    Boston and I wasn't making any money and I asked the old man,

9    my father, for a loan.  I told him, Listen, Dad, I am in debt,

12:44 10   and, you know, I don't know what to do.  Can you give me a

11   loan?  He said, How much are you in debt?  I said, $600.  And

12   he said, $600?  All right.  I'll loan you the $600 and you work

13   it off.  And that's how it started.  I just -- I went there --

14   I went from making $150 a week to $1,500 a week in a week.  So

15   I stayed.

16   Q.   And just for the record, your father was Ernie Boch, Sr.?

17   A.   Yes.

18   Q.   And he passed away, when, sir?

19   A.   July 13, 2003.

12:45 20   Q.   Okay.

21        As of that date, just before he had passed, were you

22   affiliated with any of the Boch businesses?

23   A.   Oh, yes.

24   Q.   And what was your title as of that point in time?

25   A.   I never really had a title, but I basically was running

1    the whole thing, the retail end.

2    Q.    And what did that consist of as of that point in time?

3    A.    Running the retail stores.

4    Q.    And what do the retail stores consist of?

5    A.    A couple of Toyota stores, a couple of Honda stores, Kia,

6    Mitsubishi back then.

7    Q.    These were all so called at the Miracle Mile at Route 1 --

8    A.    Most of them.  One was in Attleboro and one was in

9    Westford.

12:45 10   Q.    After your father passed, did you stay along with the

11   companies?

12   A.    Oh, absolutely.

13   Q.    And did your responsibilities and duties change after your

14   father passed?

15   A.    Yes.

16   Q.    And in what manner, sir?

17   A.    Well, I ended up running everything.

18   Q.    And what did "everything" consist of?  I'll ask for the

19   time period that we're involved with in this case, which is

12:46 20   approximately 2007 to 2011.

21   A.    I'd be -- 36, 38 companies, something like that.

22   Q.    All automobile dealerships?

23   A.    Or affiliated.

24   Q.    Now, you were a friend and continue to be a friend of the

25   defendant, Mr. Goudreau, correct?

```
 1   A.   Yes.

 2   Q.   How did you first meet Mr. Goudreau?

 3   A.   Well, you mean like met him, like, Hi, this is Ernie?

 4   Q.   Sure.

 5   A.   I was friends with "Sibby" Hashian, and "Sibby" Hashian

 6   introduced me to Barry.

 7   Q.   And who did you understand "Sibby" Hashian to be?

 8   A.   "Sibby" Hashian was a friend of my friend Jeff Myrow.

 9   Q.   Did you understand him to be a former member of the band

12:47 10   BOSTON?

11   A.   I eventually learned that he was a former member of the

12   band BOSTON.

13   Q.   He introduced you to Mr. Goudreau, and did you understand

14   Mr. Goudreau also to be a former member of the band BOSTON?

15   A.   Yes.

16   Q.   Now, when -- what year are we talking about?  Your best

17   estimate.

18   A.   I would only -- 2006, 2007, maybe 2005.  I'm not really

19   sure.

12:47 20   Q.   At some point in time, do the three of you, joined by

21   others, start playing music together?

22   A.   Yeah, yeah.  It was -- do you -- can I tell it?

23   Q.   Please, please.

24   A.   "Sibby," I met "Sibby" through Jeff Myrow, a very good

25   friend of mine.  When I met "Sibby," "Sibby" and I were just
```

 1    friendly.  We just hit it off.  He's my friend as of today.

 2    And he kept on saying, Hey, Ernie, you play guitar, you play

 3    guitar, we should jam sometime.  I said, "Sibby," "Sibby," I'm

 4    not jamming with you, I suck and you've sold millions of

 5    records; I'm not jamming with you.  And then he just kept

 6    saying it.  I said, All right.  I got the courage, and I played

 7    with just me and him.  And he liked it.  And he said -- he

 8    said, Hey, I got a friend that plays guitar, maybe we should

 9    ask him if he wants to play.  And it ended up being Barry.

12:48 10   Q.   And as of that point in time, you described how your music

11    aptitude was when you were back at Berklee --

12    A.   I was terrible all the time.  Don't even have to go into

13    it.

14    Q.   You're anticipating my next question.

15         You kept up with the guitar over the years?

16    A.   Yeah, I still play.  Except I cut the top of my finger

17    off, and it's really tough for me to play now, but I play all

18    the time.

19    Q.   I'm referring to the 2006 to 2007 time period.  Would you

12:49 20   consider yourself to be an amateur musician at that time?

21    A.   I would consider myself to be an amateur musician at every

22    time.

23    Q.   Now, at some point in time, did the three of you, joined

24    by one or two others, form the band Ernie and the Automatics?

25    A.   Yeah, but it was a very -- yes, yes.

```
        1    Q.   And this was around 2007, sir?
        2    A.   I couldn't tell you exactly.  It was "Sibby's" idea to
        3    call it Ernie and the Automatics.  I didn't want to call it
        4    Ernie and the Automatics.
        5    Q.   But that's how the band came to be called, correct?
        6    A.   Yes.
        7    Q.   When you say you can't remember the exact period, was it
        8    sometime around 2007 or --
        9    A.   Yeah, I would say it's somewhere around there.
12:49  10    Q.   Now, as of that point in time, were you familiar with the
       11    name Tom Scholz?
       12    A.   Oh, my God, who isn't?
       13    Q.   And who did you understand Tom Scholz to be as of the time
       14    you formed Ernie and the Automatics?
       15    A.   Tom Scholz is in the band BOSTON.
       16    Q.   Did you -- was he one of your idols?
       17    A.   Well, yeah.  I mean, I grew up in Boston.  You know, I
       18    mean, when BOSTON was big, there was no bigger band.
       19    Q.   Had you regarded Tom Scholz as a musical genius?
12:50  20    A.   I would put him in that category, absolutely.
       21    Q.   You would.
       22    A.   (Nodded head.)
       23    Q.   Okay.
       24         Now, Boch, the various Boch entities, when they were
       25    under your dad -- I'm old enough to remember the expression,
```

1    "Come On Down," and your dad would be on TV.  You recall that,

2    right?

3    A.    Oh, yeah.

4    Q.    Was that expression, "Come On Down," trademarked at any

5    time?

6    A.    Yeah, I think it is trademarked now.

7    Q.    And were you responsible in any way for getting that

8    expression trademarked?

9    A.    I don't know.  I don't know.  I mean -- it was probably

12:51 10    during the course of business.

11    Q.    You understood, though, that that has been a Boch

12    trademark over the years before and after your dad's passing,

13    correct?

14    A.    Yes.

15    Q.    And what did you as -- following your father's passing,

16    what do you understand that trademark to mean legally?  I know

17    you're not a lawyer, but what --

18    A.    It's a slogan.  It's a slogan.

19    Q.    And what does the trademark do for that slogan?

12:51 20         MR. BAKER:  Objection, your Honor.

21         MR. GREEN:  I'm just asking for his layperson's

22    understanding.

23         THE COURT:  I'm going to sustain the objection to

24    this, counsel, at the end of this series of questions.

25    BY MR. GREEN:

1    Q.   And at some point in time, did you come to understand that

2    Bob's Furniture was using the same expression?

3              MR. BAKER:   Renew the objection, your Honor.

4              THE COURT:   Sustained.

5              THE WITNESS:   I don't know what "sustained" means.

6              THE COURT:   So when I say "sustained," that means I'm

7    sustaining the objection and you aren't to answer.

8              THE WITNESS:   So I have to answer it?

9              THE COURT:   No, you aren't.

12:52 10              THE WITNESS:   Okay, I see.

11   BY MR. GREEN:

12   Q.   Did you on behalf of any of your automobile dealerships

13   take legal action against Bob's Furniture to protect your

14   trademark?

15             MR. BAKER:   Objection, Judge.   Same basis.

16             THE COURT:   Sustained.

17   BY MR. GREEN:

18   Q.   Now, at some point in time, Ernie and the Automatics began

19   to perform, correct?

12:52 20   A.   Yes.

21   Q.   And how long did Ernie and the Automatics perform?

22   A.   Again, I'd be guessing.   Like '05 to '11 or '06 to '11.

23   Q.   Could it have been '07 to '11?

24   A.   Could have been.

25   Q.   Now, when you started to perform, did you take action to

1   promote your events?

2   A.   After a while, yeah.

3   Q.   And what did do you to promote events?

4   A.   We did some print stuff.  We did -- social media was kind

5   of -- it wasn't what it is now, so we didn't really do a lot of

6   that.  But tried to get a mailing list, normal stuff.

7   Q.   Did you advertise?

8   A.   Yes.

9   Q.   Did you -- did you develop a website?

12:53 10   A.   Yes.

11   Q.   And the website was to further promote Ernie and the

12   Automatics?

13   A.   Yes.

14   Q.   Were you personally familiar with the development of the

15   website?

16   A.   I didn't do it, but I --

17   Q.   Did you oversee it?

18   A.   Yes.

19   Q.   Now, who were the members of the band as of the time that

12:54 20   you began performing?

21   A.   Well, at the beginning it was just me, Barry, "Sibby," and

22   Tim.

23   Q.   And just for the record -- we know who Barry is, we know

24   who "Sibby" is, we know who you are.  Who are the others?

25   A.   Well, Tim Archibald was the bass player.  He's a very,

1    very, very well-respected bass player in the Boston area.

2    Q.    All right.

3          And you mentioned I thought one other name, or was

4    that it?

5    A.    Well, that's at the beginning.

6    Q.    At the beginning.

7          So the four of you started performing together.  Was

8    that about when you put together your website?

9    A.    No.

12:54 10   Q.    When did the website come?

11   A.    I think we put together the website when we added Brian

12   and "Tunes."

13   Q.    And for the record, who is Brian?

14   A.    Brian is a very, very talented local musician.  Played

15   with Peter Wolf, along with Tim.

16   Q.    And Brian's last name?

17   A.    Brian Maes.

18   Q.    And the other person, "Tunes"?

19   A.    "Tunes," Michael Antunes from the John Cafferty Beaver

12:55 20   Brown Band.

21   Q.    So there were six of you, if my count is right, as of the

22   time that the website came out?

23   A.    I can't be absolutely sure, but I'd say, yes.

24   Q.    All right.

25          Did you consult with your other band members as you

1  proceeded ahead with the website?

2  A.   Not really.

3  Q.   Did you review any content with them that you needed to

4  put together the website?

5  A.   No.  I mean, I basically did it.  Everything was --

6  everything moves so fast because along with this band thing, I

7  was running companies, so there wasn't a lot of -- I just made

8  it happen.

9  Q.   Now, the website you understood included some biographical

12:56 10  material about each of the band members, right?

11  A.   Yes.

12  Q.   And did Mr. Goudreau provide you his information or his

13  biographical listing?

14  A.   Not that I recall.  What normally probably would have

15  happened is we just grabbed whatever is on the internet.

16  Q.   And do you understand that what was put on the website

17  referred to Mr. Goudreau as a former original member of BOSTON?

18        MR. BAKER:  Objection, Judge.  Leading.

19        THE COURT:  To -- okay.

12:56 20        Well, sustained as to form, counsel, but you can

21  rephrase.

22  BY MR. GREEN:

23  Q.   Do you have any understanding, sir, as to how Mr. Goudreau

24  was listed on your website in terms of any history with the

25  band BOSTON?

1   A.   I haven't looked at the website in a while.  I don't

2   even -- I think it's -- I don't think the links or anything

3   work anymore, but -- I think I put -- I put original member of

4   the band BOSTON.

5   Q.   All right.

6          And why did you do that, sir?

7   A.   Because when I was a kid and I saw the band and I bought

8   the record, Barry was on it.

9   Q.   Okay.

12:57 10         Are you talking about the first album from BOSTON?

11   A.   The one with the picture on it.

12   Q.   Right.

13         You don't know -- you didn't have any personal

14   knowledge, did you, as to whether he was actually an original

15   member, did you?

16   A.   Well, I think it's kind of -- I think to me it was common

17   knowledge.

18   Q.   All right.  You made an assumption, correct?

19   A.   Yes.

12:57 20   Q.   All right.

21         Now, you said that this was -- the website was put up

22   a couple of years -- I'm sorry, I don't know the time frame.

23   But you had six as opposed to four.  So how many years was that

24   into Ernie and the Automatics?

25   A.   I don't really know.  I mean, it's folded out.  I never

1    planned on putting together a band.  I never -- it just

2    happened.

3    Q.   All right.

4         Let me ask you this, sir:  It was sometime after the

5    original four of you started, correct?

6    A.   Yes.

7    Q.   Now, we heard -- you weren't present, but we heard in

8    opening argument from Barry's counsel -- I'll withdraw the

9    question.  I'm going to ask this question first.

12:58 10       When you put up the biographical information for him

11   calling him original, were you trying to be accurate, truthful?

12   A.   Sure.

13   Q.   We just heard in opening statement from Mr. Goudreau's

14   counsel that he told you right up front, right when the

15   relationship started that --

16        MR. BAKER:  Objection, Judge --

17        THE COURT:  Well, let him finish, counsel.

18        Mr. Baker, I can hear you.

19   BY MR. GREEN:

12:59 20  Q.   -- that you referred to as a former member and not

21   original member.

22        MR. BAKER:  Objection, Judge.  Opening, witness,

23   statement, outside.

24        THE COURT:  Well, it's a question, so overruled.

25        THE WITNESS:  Can you ask that again, please?

1              MR. GREEN:  I'll ask it in a different form here.

2      BY MR. GREEN:

3      Q.   When Mr. Goudreau first started with you, with Ernie and

4      the Automatics, and you had four people as opposed to six, did

5      he say, Ernie, I can only be listed as a former member of the

6      band BOSTON, don't use the word "original"?  Do you recall

7      anything like that at the outset?

8      A.   I think, if my memory serves me correct, that I was just

9      building the website or doing -- just doing it and didn't

12:59 10   think -- didn't -- it wasn't an issue.  It wasn't an issue.

11     Nothing was an issue until Barry told me that -- to say

12     "former."

13     Q.   That's what I'm trying to get at, sir.

14            When did he first say to you in the four years you

15     were together, I can only have you say "former," Ernie, you

16     can't say anything else?  Do you know when that was?

17     A.   I think it was after -- I don't know, maybe when we got

18     some sort of profile or after -- I'm not really -- I'll tell

19     you one thing, though.  When I -- I had no idea about, like,

01:00 20   you know, the words and all that different thing.  And

21     whenever -- see, the guys really weren't -- like, it was the

22     guys and then me, and I did, like, everything.  You know what I

23     mean?  There was no -- there was no real talking -- because

24     everything moved so fast.  I was --

25     Q.   That's beyond my question.  If I can proceed to the next

1    question.  I think you've answered the question the best you

2    can.  I just have another question or two because I know we're

3    going to break soon.

4            Would it refresh your recollection if I told you that

5    he had this discussion with you after John Baruck from

6    Mr. Scholz -- Mr. Scholz's representative said you cannot have

7    a sticker on your CD?

8            MR. BAKER:  Objection, Judge, same basis.

9    BY MR. GREEN:

01:01 10   Q.   Does that refresh your recollection at all?

11           MR. BAKER:  Leading question.

12           THE COURT:  Sustained as to form, counsel.

13   BY MR. GREEN:

14   Q.   Would it refresh your recollection, sir, as to when he

15   told you that, it was after your being notified that there was

16   a problem with the sticker on your CD?

17   A.   That guy John you mentioned --

18   Q.   Right.

19   A.   -- he called me when -- like, I would write what I

01:01 20   thought.  Like, I didn't know there was any restrictions on

21   anything.  I mean, like I said, when I was a kid and I saw the

22   band, that was the band.  When I got the record, I held the

23   record, that was the band.  I didn't think anything of it.

24           And then this guy John called me.  My friend Paul

25   said, Hey, John wants to call you.  And I go, Why does he want

1    to talk to me?  He just wants to talk to you about -- and then

2    John called me and said, Hey, Ernie, can you please just do

3    this, this, this, and this?  And I said, Yeah.  I said, I'll do

4    whatever you want.  And whatever he said to do, I did.

5    Q.    And was one of those things to tell you that -- by this

6    point in time, you had a CD that had come out from the band,

7    correct?

8    A.    I can't put those times together, but probably.

9    Q.    We'll come back to that.  We're going to need to come back

01:02 10    tomorrow, but I just want to ask another question, too.

11          The band did come out with a CD at some point in time,

12    correct?

13    A.    Yes.

14    Q.    And the band originally put on the CD a sticker that says,

15    "Former Original Members of BOSTON" in referring to Barry

16    Goudreau and "Sib" Hashian, correct?

17          MR. BAKER:  Objection, Judge?

18          THE COURT:  Overruled.  I'll allow that.

19    A.    The sticker -- the CD -- the CD originally didn't have a

01:03 20    sticker.  The sticker wasn't even -- we were -- I didn't even

21    know you could put stickers on CDs.  And what happened was -- I

22    think the reason we did that is that our management wanted us

23    to do that.  I think Tom wanted -- Tom Baggott, he wanted us to

24    do that.

25          THE COURT:  Mr. Green, we're going to have to stop

1    there.

2            Mr. Boch, we're going to have to resume in the

3    morning.

4            You can step down for the moment.

5            THE WITNESS:  Okay.  Thank you.

6            THE COURT:  Jurors, we're going to break for the day.

7            Tomorrow is the one day where our schedule is a little

8    bit different.  You may recall I said this before.  Instead of

9    starting at 9:00, we're going to start at 11:00 and go until

01:04 10  2:00, so a little bit later, and finishing a little bit later.

11   But if you could be here a little bit before 11:00 so we can

12   start promptly at 11:00.

13           Again, as always, every day at the end of trial, keep

14   all of my cautionary instructions in mind.  Don't talk to each

15   other or anyone else about this case.  Don't do any outside

16   research, and keep an open mind.  Thank you.

17           THE CLERK:  All rise.

18           (Jury left the courtroom.)

19           THE COURT:  Counsel, given the time, and also the fact

01:04 20  that I'm due downstairs, is there anything quick that needs to

21   be addressed?

22           I'm going to -- I think we should plan to meet at

23   10:45, so any issues -- we'll have some time to discuss any

24   issues before we resume with the jury.

25           Anything?

1          MR. BAKER:  One issue I want to bring to the Court's

2     attention.  I believe his name is Gary Pihl; he's a witness in

3     this case.  He sat through the testimony.

4          MS. STENGER:  I'm sorry, your Honor.  He left the room

5     for openings and didn't understand.

6          THE COURT:  If there's any issue, we'll take that up.

7     I presume counsel will make that clear to their witnesses.

8          MR. GREEN:  We will, your Honor.

9          THE COURT:  Thank you, counsel.

01:05 10          (Court adjourned at 1:05 p.m.)

11               - - - - - - - - - - - -

12                    CERTIFICATION

13          I certify that the foregoing is a correct transcript

14     of the record of proceedings in the above-entitled matter to

15     the best of my skill and ability.

16

17

18

19     /s/Debra M. Joyce_____          June 8, 2017_____
       Debra M. Joyce, RMR, CRR, FCRR     Date
20     Official Court Reporter

21

22

23

24

25

INDEX


WITNESS                                                          PAGE


ERNEST BOCH, JR

    Direct Examination                                            123
    By Mr. Green