UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

DONALD THOMAS SCHOLZ,

                  Plaintiff,        Civil Action
                                    No. 13-10951-DJC
  V.
                                  October 25, 2016
BARRY GOUDREAU,                 10:46 a.m.

                  Defendant.
_____




TRANSCRIPT OF JURY TRIAL DAY 2

BEFORE THE HONORABLE DENISE J. CASPER

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210

DEBRA M. JOYCE, RMR, CRR, FCRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA  02210
joycedebra@gmail.com

1    APPEARANCES:

2    FOR THE PLAINTIFF:

3    LAWRENCE G. GREEN, ESQ.
     SUSAN E. STENGER, ESQ.
4    Burns & Levinson LLP
     125 Summer Street
5    Boston, MA 02110
     617-345-3000
6
     FOR THE DEFENDANT:
7
     JEFFREY S. BAKER, ESQ.
8    Baker & Associates
     2 West Hill Place
9    Suite 100
     Boston, MA 02114
10   617-573-9505

11   DAVID M. GIVEN, ESQ.
     Phillips, Erlewine, Given & Carlin LLP
12   39 Mesa Street, Suite 201 - The Presidio
     San Francisco, CA 94129
13   415-398-0900

14   DANIEL P. TARLOW, ESQ.
     Copani Tarlow & Cranney
15   265 Broadway
     Methuen, MA 01844
16   978-686-0010

17

18

19

20

21

22

23

24

25

```
  1                    P R O C E E D I N G S

  2              (The following proceedings were held in open

  3     court before the Honorable Denise J. Casper, United States

  4     District Judge, United States District Court, District of

  5     Massachusetts, at the John J. Moakley United States Courthouse,

  6     1 Courthouse Way, Boston, Massachusetts, on October 25, 2016.)

  7              THE CLERK:  Court is in session.  Please be seated.

  8              THE COURT:  Good morning, counsel.

  9              ALL:  Good morning, your Honor.

10:46 10          THE COURT:  Counsel, anything we need to take up

 11     before we get jurors?

 12              I did receive and review Docket 243, which is the

 13     plaintiff's filing about a video.

 14              MR. GREEN:  That's correct, your Honor.

 15              We have three matters we'd like to call to your

 16     attention that may well come up during Mr. Boch's testimony.

 17              THE COURT:  Sure.

 18              MR. GREEN:  One is the video, your Honor.  It's set

 19     forth in the filing that we made this morning.  This only came

10:47 20    to our attention late last week.  We obtained a copy.  As soon

 21     as we obtained a copy, we had it transmitted to opposing

 22     counsel.  It is something that was called for in discovery,

 23     frankly, from both Mr. Goudreau and Mr. Boch.  You have

 24     reviewed what it is, and it's a very important piece of

 25     evidence here because it clearly was done to promote a video,
```

1    clearly contains all of the wrong language that should have

2    been there as far as Mr. Goudreau is concerned.

3         When we raised this -- when we sent this on Friday,

4    your Honor, to the other side, again, that was within a day of

5    our getting it, we received back -- and the only correspondence

6    we received back was an e-mail from Attorney Given, which

7    basically said, Oh, this is inadmissible, check out the L.L.

8    Bean case.

9         Well, the L.L. Bean case has nothing to do with this

10:48 10    case, your Honor.  The L.L. Bean case talks about First

11    Amendment principles, talks about parody.  This video is not a

12    parody of the band BOSTON.  This video is basically promotional

13    material that used all the incorrect language.  And

14    interestingly, in Mr. Given's transmission to us, nothing is

15    raised as to timing or anything like that.  The only ground he

16    asserts is this L.L. Bean case.  He can speak to it if he

17    likes, but it is clearly a case that is totally inapposite to

18    this case.  We would ask that we be permitted to refer to this.

19         There are two other items I want to address.  I defer

10:49 20    to the Court whether you want to hear argument from opposing

21    counsel first or you want to --

22         THE COURT:  Counsel.

23         MR. GIVEN:  Very quickly, your Honor.

24         As Attorney Green just pointed out, they discovered

25    the video on the internet.  It's been on the internet.  It's

1    been publically available to anyone who cares to look at it.

2    So they had access to it from the very beginning of this case.

3    Number two, the videos were not responsive to any

4    discovery that was propounded to Mr. Goudreau in this case,

5    primarily because the video is not in the possession, custody,

6    or control of Mr. Goudreau.  It's in the possession, custody,

7    and control of Mr. Boch and the Ernie and the Automatics, LLC,

8    which is a separate and distinct legal entity that we have no

9    control over.

10:49  10    I can't speak to what discovery was propounded on

11    Mr. Boch, but most of what's discussed in this piece of paper

12    that was filed either last night or this morning discusses the

13    discovery that was propounded on Mr. Goudreau.  And this video

14    was not in Mr. Goudreau's possession, custody, or control.

15    THE COURT:  So putting that aside.  Let's assume that

16    it should have been produced by Mr. Boch.  Do you have any

17    objection to it?

18    MR. GIVEN:  Yes.  I have a fundamental objection to

19    these videos coming in.  I think there's two.  There's one that

10:50  20    is just the video of the performance of the music video,

21    there's a second video that has pop-ups in it.  They show in

22    their papers what the text of the pop-ups are.

23    The music video is expressive speech, and the L.L.

24    Bean case, which is the seminal case, as I understand it, in

25    the 1st Circuit says that in the -- in the ordinary case, where

1   expressive speech is at issue, the First Amendment -- and it's

2   non-commercial, and this video is, the video is not sold in any

3   way, shape, or form, it's a piece of expressive speech, a

4   creative work that's subject to copyright law, it is absolutely

5   protected by the First Amendment.

6         And the problem with allowing this video to come in,

7   your Honor, is the jury is not going to be able to sort between

8   the fundamental right of First Amendment speech and the alleged

9   trademark infringement that's embodied, I suppose, in some of

10:51 10   the commentary that appears in the pop-up video version of the

11   video.

12         Now, I also understand there's also attached to some

13   of these videos comments that are on the YouTube page.  My

14   understanding is Mr. Green and Ms. Stenger intend to offer

15   those as well into evidence.

16         MR. GREEN:  That is not correct.  We're not offering

17   any of the comments.

18         MR. GIVEN:  Okay, great.  So we got that out of the

19   way.

10:51 20         So our view of this is the L.L. Bean case and its

21   progeny -- the 1st Circuit stands -- I wrote an article about

22   this several years ago -- the 1st Circuit stands in

23   juxtaposition to many of the other circuits on this subject.

24   And if you read the L.L. Bean case, it's quite clear the 1st

25   Circuit absolutely protects -- Andy Warhol cannot be sued by

1    the Campbell's Soup Company for doing a version of their logo

2    and their soup can and creating a work of expressive visual

3    art.

4            The same goes for this music video.  It is absolutely

5    protected by the First Amendment.

6            THE COURT:  But, presumably, isn't it being offered

7    for the purposes of the representations about the affiliation

8    with the band BOSTON?

9            MR. GREEN:  Yes, your Honor, and for promoting a CD

10:52 10   that was about to come out.

11           This has nothing do with Andy Warhol and Campbell's

12   Soup cans.

13           This was a video that came out to promote a recently

14   released CD, to promote it.

15           And just as the defendants have agreed as stipulated

16   exhibits to a number of promotional ads that are agreed-upon

17   exhibits, this is no different whatsoever.

18           MR. GIVEN:  The text, incidentally, your Honor, refers

19   to the content of the song.  It features Mr. Goudreau.  There

10:53 20   is footage in there that features Mr. Delp and Mr. Goudreau and

21   Mr. Hashian back in the day.  This is a work of expressive art.

22           The commentary in the pop-ups are self-referential,

23   and they refer to the content of the song.  This is dead bang

24   protected by the First Amendment, and there's no basis

25   whatsoever to raise an issue of trademark infringement in

1    connection with this expressive work of art.  It is absolutely

2    barred under 1st Circuit authority.

3         MR. GREEN:  It's clearly not a parody, your Honor.

4    But even if he were right on everything that he said about

5    trademark law -- this is their trademark expert -- and I'll

6    defer you to read the L.L. Bean case.  It's a parody case.

7    Even if he were right on that, this video should come in for

8    the very least on our claim for implied covenant of good faith

9    and fair dealing here, because right in the first minute of the

10:54  10    video, one of the first pop-ups that appears is here is Barry

11    Goudreau, a former original member of the band BOSTON.  Worse

12    yet, they put "former" in quotes, like there's something going

13    on here.  Maybe he's not former, maybe he's an original member.

14         The reason why opposing counsel is contesting this so

15    vigorously is this is a smoking gun that is absolutely the

16    death knell of Mr. Goudreau's defense in this case.

17         MR. GIVEN:  I'm opposing it vigorously because I'm a

18    great believer in First Amendment rights, your Honor.  There is

19    a principle at stake in this that is fundamental to the way the

10:55  20    First Amendment works and the intersection between --

21         THE COURT:  But if it's not being offered for

22    liability for the expressive language of the performance but

23    for the representations about Mr. Goudreau's association with

24    BOSTON, which is very much relevant in this case --

25         Counsel, do you have it cued up?  Do you have it cued

 1    up on the system?

 2                MS. STENGER:  We can play it, your Honor.

 3                (Pause.)

 4                THE COURT:  What were the other two issues, counsel?

 5                MR. GREEN:  Let me get to the second issue, which I

 6    hope is a non-issue.

 7                We had subpoenaed Mr. Boch, and we had requested that

 8    he produce documents consisting of his contracts with the

 9    performance venues.  They produced I believe it was four

10:55 10    contracts, and we are going to be offering those, your Honor.

11    We did serve those upon the other side as soon as they were

12    received from Mr. Boch's attorney.

13                THE COURT:  Okay.

14                Counsel, what was the last issue?

15                MR. GREEN:  The last issue, your Honor, is an

16    exhibit --

17                (Discussion off the record.)

18                MR. GREEN:  -- plaintiff's contested 7 Q, your Honor,

19    and we can also put that up on the screen here.

10:56 20                Maybe we can do one thing at a time, your Honor.  I

21    think it's best seen if we put that up on the screen.

22                The video is ready to go.

23                THE COURT:  Okay.

24                MR. GREEN:  I'm going to suggest we play the video

25    from the beginning, but we're going to stop -- I'm going to ask

1    the --

2            THE COURT:  How long is it?

3            MR. GREEN:  Is that all right with the Court?

4            THE COURT:  How long is it?

5            (Played recording.)

6            MR. GREEN:  Can we stop there right there?

7            THE COURT:  Okay.

8            MR. GREEN:  This right in the first few seconds of the

9    video, your Honor.  This is the primary point that we want to

10:57 10    make about this video.

11            Again, it was to promote a CD that was coming out from

12    early 2009 from Ernie and the Automatics, and I think the

13    language here speaks for itself, your Honor.

14            THE COURT:  All right.

15            MR. GREEN:  I think you understand our point.

16            MR. GIVEN:  First of all, this is BOSTON reincarnated,

17    I guess.

18            I don't have any objection to the screenshot.  If they

19    want to use the screenshot, they can use it.  Play the video,

10:58 20    absolutely not.

21            THE COURT:  What is it -- again, what is it about the

22    video?

23            MR. GIVEN:  At the fear of repeating myself, your

24    Honor --

25            THE COURT:  I know, but I guess what -- counsel, I

1    understand the strenuousness with which you're arguing it, but

2    I guess what I'm saying is, here, where it's not being offered

3    for any liability for playing the song but for what

4    representations are made during the course of the video --

5          MR. GIVEN:  There is a 403 problem embedded in this,

6    your Honor, and it's twofold:  One is my First Amendment

7    argument, and I'm going to stick to it, which is there's an

8    absolutely right to create an expressive work of art without

9    fear of being sued for trademark infringement.  Andy Warhol did

10:59 10   it, Maroon 5 did it when they did that song called "Moves Like

11   Jagger."  I mean, Mick Jagger didn't show up and have his hand

12   out and say, Pay me for my right of publicity.

13         THE COURT:  Maybe I'm missing something.

14         Are they playing a BOSTON song?

15         MR. GIVEN:  They are not playing a BOSTON song.

16   That's absolutely clear.

17         The other thing is that where the -- so the jury on

18   the one hand could be confused about the First Amendment piece

19   of this.

10:59 20         The other problem that's embedded in this is that this

21   is a creative work of art that's subject to copyright law, not

22   trademark law.  I'd even go so far as to say copyright law

23   probably preempts any ability to raise liability on trademark

24   grounds, but I'm not even going to try to delve into that

25   subject.

1          THE COURT:  Counsel, I want to -- I think we have all

2     of our jurors, so I don't want to delay this too much.

3          I guess -- counsel, can you just play a little more

4     clip of the video for a second?

5          (Played recording.)

6          THE COURT:  I guess, counsel, first of all, the

7     copyright issue isn't before the jury, and it won't be.

8          Second, the representations here are relevant, I

9     think, to the extent that this is a promotional piece put

11:00 10    together by Ernie and the Automatics; and I see the

11    representations that are made in the pop-ups.  So to the extent

12    that that's the basis for an objection to it, I would overrule

13    that, counsel.  Your objection is certainly noted for the

14    record.

15         Counsel, in terms of what's being showed on it, I'm

16    not sure it needs to be showed in its entirety.  I know from

17    page 4 of your motion, you've identified the pop-ups that begin

18    at the beginning of the video, and there are a few others.  I

19    would suggest moving forward to those clips.

11:01 20         MR. GREEN:  Thank you, your Honor.  We will proceed

21    ahead accordingly.

22         I think on the other one, your Honor, what I'm going

23    to do is -- especially because the jurors are here, I don't

24    want to hold off further -- I will set the foundation for 7 Q,

25    and we'll deal with it then.  Otherwise, we're ready to proceed

1    ahead.

2         MR. BAKER:  Judge, just so we're clear, Mr. Green will

3    play the video that includes the pop-ups, and then he will

4    stop.

5         THE COURT:  Right.  I guess what I'm saying is, fast

6    forward to the other places.  I'm looking at pages 4 through 5.

7    There are a few that are highlighted.

8         MR. GREEN:  We'll be prepared to do that, your Honor.

9         MR. BAKER:  Because there's this old footage that we

11:02 10   have the problem with.  I just want to make sure Mr. Green

11   isn't intending on publishing that outside of your Honor's

12   ruling.

13         (Discussion off the record.)

14         MR. GREEN:  Well, I think we were intending to do

15   that.  There is old footage.  At the end of the video, again,

16   it's a promotional video --

17         THE COURT:  Is it old footage of BOSTON?

18         MR. GREEN:  -- of BOSTON in the '70s.

19         THE COURT:  How is that different than the association

11:02 20   with BOSTON?  That to me seems relevant here.

21         MR. BAKER:  This song, your Honor, is about hurt

22   feelings and all of that.  It is not used for promotion.  And

23   if the Court -- in the interest of keeping perhaps the more

24   legally problematic part of the video out, we can accept the

25   fact that it's the promotional part, if you will.

         1              THE COURT:  Right.

         2              I guess -- I understand your arguments to the

         3    contrary.

         4              I'm not seeing anything legally problematic, given

         5    what it's being offered for.  Part of it is -- the particularly

         6    relevant parts seem to be about representations about

         7    connection to BOSTON.  Whether or not those are pop-ups or old

         8    footage of BOSTON, I think both are relevant.  So --

         9              MR. GREEN:  Thank you, your Honor.

11:03   10              MR. BAKER:  One last comment, please, Judge.

        11              Not every video that is on the internet is for

        12    promotional purposes.  We submit to your Honor that is not the

        13    intent of this video.  Perhaps some inquiry from Mr. Boch may

        14    lend some insight.

        15              THE COURT:  Well, you'll get the opportunity for

        16    cross-examination, and presumably Mr. Green is going to set a

        17    foundation before he offers it anyway.

        18              MR. GREEN:  Thank you, your Honor.

        19              THE COURT:  We'll get the jurors.

11:04   20              MR. GIVEN:  We have two things, but what I'm going to

        21    suggest is defer until the end of the day, one was in

        22    connection with the opening statement, and one small

        23    housekeeping matter with respect to a subpoenaed witness.

        24              THE COURT:  And the opening statement was to be heard

        25    on the issue you reserved on?

```
 1              MR. GIVEN:  Correct.
 2              THE COURT:  Counsel, we're probably going to take 15
 3     minutes at 12:45, and we're probably going to end a little bit
 4     before 2:00 just for everyone's --
 5              MR. GREEN:  Thank you, your Honor.
 6              (Pause.)
 7              THE COURT:  Sir, you can come forward to the witness
 8     stand again.  The jurors are coming down.
 9              (Discussion off the record.)
10              (Jury entered the courtroom.)
11              THE COURT:  Good morning, jurors.
12              ALL:  Good morning.
13              THE COURT:  We'll get started again.
14              Mr. Boch, I just remind you, you remain under oath.
15              THE WITNESS:  Okay.
16              THE COURT:  Mr. Green.
17              MR. GREEN:  Thanks, your Honor.
18              ERNEST BOCH, JR, having been previously duly sworn by
19     the Clerk, was further examined and testified as follows:
20                     CONTINUED DIRECT EXAMINATION
21     BY MR. GREEN:
22     Q.   Good morning, Mr. Boch.
23     A.   Good morning.
24     Q.   I would like to put before you an exhibit that has been
25     agreed upon in this case, it's Exhibit 56, and if we can have
```

1    that projected.

2         MR. GREEN:  Your Honor, with the Court's permission,

3    may I have Ms. Stenger approach --

4         THE COURT:  So no objection, counsel, 56?

5         MR. TARLOW:  No objection.

6         THE COURT:  It may be admitted and published.

7         (Exhibit 56 received into evidence.)

8         MR. GREEN:  Now, just for the jurors' reference, I

9    just note that this says, "Boch 8" at the top, this was a

11:06 10   deposition exhibit.  I will represent to the Court and the

11   jurors this is Exhibit Number 56.

12   BY MR. GREEN:

13   Q.    Now, yesterday, Mr. Boch, we were talking about the time

14   frame in which Ernie and the Automatics performed, and I simply

15   put this before you just to ask you, this is a multipage

16   exhibit which talks about payments made to Mr. Goudreau that

17   begin on January 7, 2009 and go -- turning to the last page --

18   to September 21, 2011.

19   A.    Okay.

11:07 20   Q.    Does that refresh your recollection as to when, in

21   essence, Ernie and the Automatics was performing?

22   A.    Yesterday you asked me all these dates, and I was -- I'm

23   still not super clear, but what I did do, is I -- on the

24   Facebook page of the website, Ernie and the Automatics, which

25   doesn't work right now, I had -- because, you know, the band

1   was over, and I wanted to put when the band was, and it was

2   2004 to 2011.  But the first couple years really wasn't Ernie

3   and the Automatics, we were kind of just jamming in the

4   basement really.  So to say when the band became Ernie and the

5   Automatics, I'm not -- I don't know that exact date.

6   Q.   All right.

7        I'm more interested, sir, in asking when the band was

8   performing as Ernie and the Automatics.  So does Exhibit 56

9   help us in that regard, to define the parameter of the time

11:08 10   period?

11   A.   Okay.  Well, the first one is '09, and we were performing

12   way before '09.

13   Q.   Okay.

14        Well, actually, I said 1/7/09, that was a credit memo.

15   The first, earliest date is July 23 '07.

16   A.   Oh, it goes backwards.

17   Q.   I don't think it goes backwards.  I think the first two

18   are credit memos.  The earliest date is July 23, '07.  Does

19   that sound about right?

11:09 20   A.   For?

21   Q.   For the beginning of Ernie and the Automatics

22   performances?

23   A.   We performed as a quartet before we performed as a sextet,

24   I think that's what they call it with six.

25   Q.   And let me ask this:  Turning to the last page, you see an

1    invoice 9/21/2011 Scallop Festival.  Mr. Goudreau apparently

2    was paid something for that.  Do you see that?

3    A.    Yes.

4    Q.    And is that about the end of the time period for Ernie and

5    the Automatics performances?

6    A.    Yes, 2011.

7    Q.    Okay.

8          And I'll ask you to take a minute or two to review

9    these pages, but do these pages reflect payments that were made

11:09 10    to Mr. Goudreau for various performances during a four-year

11    period from 2007 to 2011?

12    A.    They look like it.  They look like -- you know, we've

13    played these places.

14    Q.    And that was my next question.

15          When you say "these places," the exhibit will speak

16    for itself and the jury will see it when they are deliberating,

17    but do you see that among the places you played were Hard Rock

18    Cafe?

19    A.    Yes.

11:10 20    Q.    Foxwoods Casino?

21    A.    Well, not seeing it, but we have played there.

22    Q.    Mohegan Sun Casino?

23    A.    Yes.

24    Q.    Kowloon?

25    A.    Yup.

1    Q.    Berklee Performance Center?

2    A.    Yes.

3    Q.    Blues Cruise?

4    A.    Yes.

5    Q.    Hampton Beach?

6    A.    At the casino?

7    Q.    I'm just asking, Hampton Beach?

8    A.    I think at the casino, yeah.

9    Q.    Boston Harbor Hotel?

11:10 10    A.    Yeah.  We got fired from that one.

11    Q.    But you performed there?

12    A.    Yeah.

13    Q.    Wilbur Theatre?

14    A.    Wilbur?  Yes.

15    Q.    Fenway Park?

16    A.    Fenway Park.  I think we did a benefit -- we didn't play

17    the park.  We played in -- I think it was -- behind the glass.

18    Q.    Okay.

19          And Hatch Shell?

11:11 20    A.    Hatch Shell, yeah.

21    Q.    Now -- I now want to ask you when it was during this

22    four-year period that you were first told by Mr. Goudreau that

23    you could only hold himself out as formerly of BOSTON as

24    opposed to formerly original member of BOSTON?  As you look at

25    this time period, this exhibit or as you otherwise recall, can

1    you better pinpoint when you were first told of that?

2    A.    Okay.  We started out as basically jamming as a trio, then

3    we added equipment, which was a quartet.  We did like -- we

4    didn't really -- we didn't really play out that much, we just,

5    like, did little things.  And it was when Barry told me --

6    see -- let me preface this.

7            The guys really weren't, like, that involved in the

8    day-to-day, because it was moving so fast.  So Barry did tell

9    me that.  I don't exactly remember, but I remember it was when

11:12 10  we put something out to the public.  I remember doing something

11    to the public, and it was either -- it was either an

12    advertisement or something on the internet or something like

13    that.  When he saw that, he said, It's got to be "former."

14    Q.    Okay.

15    A.    And I didn't -- I didn't think much of it.

16    Q.    I think -- I just want to ask you about the time frame.

17    A.    Like when it first reared its head, I can't tell you when

18    that was.

19    Q.    I think you're anticipating my next question.

11:13 20          You said something went out to the public.  Was that

21    the CD that Ernie and the Automatics came out with and the

22    sticker?

23    A.    No, no, that was way before that.

24    Q.    Well, let me ask you this --

25            MR. GREEN:  Can we put up Mr. Boch's deposition?

|    |    |
|----|----|
| 1  | THE COURT:  Just for the witness.  Wait a second. |
| 2  | Wait, counsel. |
| 3  | (Pause.) |
| 4  | MR. GREEN:  Counsel, I'm referring to page 64, |
| 5  | beginning at line 19. |
| 6  | (Discussion off the record.) |
| 7  | (Pause.) |
| 8  | BY MR. GREEN: |
| 9  | Q.   Now, do you recall, Mr. Boch, that your deposition was |
| 11:14 10 | taken in this place on July 24, 2014? |
| 11 | A.   The deposition? |
| 12 | Q.   Right. |
| 13 | A.   I know I did it; I don't know when. |
| 14 | MR. GREEN:  Could I ask for the Court to explain to |
| 15 | the jury what a deposition is, your Honor? |
| 16 | THE COURT:  Counsel, you can ask a series of |
| 17 | questions. |
| 18 | MR. GREEN:  I will. |
| 19 | BY MR. GREEN: |
| 11:15 20 | Q.   You recall that you were asked to come in for a deposition |
| 21 | in this case and you were put under oath and gave testimony |
| 22 | under oath, correct? |
| 23 | A.   Yes.  Can you tell me where it was physically?  Where did |
| 24 | I go? |
| 25 | Q.   I'll tell you in one moment. |

1  A.   I obviously did it.  I want to just, like, get it in my

2  mind.

3  Q.   This was a deposition held at the office of Hayes Messina

4  Gilman and Hayes, 200 State Street, Boston on July 24, 2014.

5  Does that sound right?

6  A.   I hate to --

7        MR. GREEN:  Your Honor, could I ask Ms. Stenger to put

8  in front of him a clean copy of the deposition?

9        MS. STENGER:  It's right in front of you, Mr. Boch.

11:15 10        THE WITNESS:  I know.  I'm not saying I didn't do it,

11  but do I remember walking into the building?  No.

12  Q.   I wasn't asking that.  I just want to set the stage here.

13        Now, you do recall testifying under oath, correct?

14  A.   Yeah.  I can't pinpoint --

15  Q.   Let me ask you to open up the deposition so there's no

16  mistake about it.

17  A.   I hate to be -- you know, it's just -- I don't -- I mean,

18  I went -- so I went into Boston and they asked me questions.  I

19  kind of remember that.  I'm not denying I didn't do it, I just

11:16 20  can't put myself in the room right now.

21        THE COURT:  Mr. Boch, just wait for Mr. Green's next

22  question.

23  BY MR. GREEN:

24  Q.   Can you look at the first two pages?  Do you see that as

25  the title page saying, "Deposition of Ernest Alexander Boch,

1    Jr."?

2    A.    Yes.

3    Q.    And do you see the reference to July 24, 2014 in the

4    Boston office I just referenced on the second page?

5    A.    Yes.

6    Q.    Do you see -- turning a couple of pages in here to page

7    5 --

8    A.    Kathleen -- does this mean Kathleen was there?  Just

9    asking.

11:16 10    Q.    Yes.  If you turn to the second page, you will see that

11    Ms. Genova was there.

12          For the record, you're talking about Kathleen Genova?

13    A.    Yeah.

14    Q.    She was your counsel on that day?

15    A.    I'm trying to put myself in the room, so I can actually do

16    it, but I can't -- was it like -- was it an office building

17    with a nice view?  Was it a nice view?

18    Q.    I'm sure it was an office building.  I was not there,

19    Mr. Boch.  But it wouldn't surprise --

11:17 20    A.    I'm not denying that I didn't do this.  Go ahead.

21    Q.    Just for the record, Ms. Genova serves as counsel for your

22    business, correct?

23    A.    Yeah.  She goes everywhere with me.

24    Q.    And she -- meaning everywhere -- well, she went that day

25    with you to the deposition, correct?

1    A.   I don't want to sound like -- it says she was there, so

2    she must have been there.

3    Q.   Okay.

4         Let me ask you to turn to page 5, beginning at line 9.

5    It says, "Ernest Alexander Boch, Jr., the witness having been

6    satisfactorily identified by the production of his driver's

7    license and duly sworn by the notary public, was examined and

8    testified as follows and answered to direct interrogatories."

9    Do you see that?

11:18 10   A.   Yes.

11   Q.   Do you have any reason to disbelieve that you were under

12   oath that day?

13   A.   Oh, no.

14   Q.   Okay.

15        And were you trying to be as truthful as possible that

16   day?

17   A.   Yes, as I am now.

18   Q.   And would you agree with me that your memory of events was

19   probably better July 24, 2014, two years and three months

11:18 20   closer to the events, than it is today?

21   A.   No.  And again, I don't want to appear like a space cadet,

22   you know what I mean, I just -- you know, and I'm not denying

23   anything that was here.  If I said it and you wrote it down,

24   I'm not denying it; I just can't put myself in that room.

25   Q.   That's okay.

```
  1                Let's just get to the point.  Let's go to page 64,
  2       line 19.  And you were questioned -- I'm going to read the
  3       question, and I'd like you to read the answer.
  4       A.    Okay.
  5       Q.    "Q.  And do you believe he" -- and it referred to
  6       Mr. Goudreau -- "had told you before the sticker episode, which
  7       was when -- about 2009; is that correct?"
  8                And your answer?
  9       A.    "I will say that he told me after the sticker episode.
11:19 10  Q.    "Q.  About how his name could be used?"
 11                Answer?
 12       A.    "Yes."
 13       Q.    "Q.  Not beforehand?"
 14       A.    Keep reading?
 15                "Not before."
 16       Q.    The question was:  "Not beforehand?"
 17                And your answer?
 18       A.    "Not beforehand."
 19       Yes.  I'm sorry --
11:19 20  Q.    Just so the jury is not confused, I think you read the
 21       question.
 22                "Q.  And about how your name could be used?"
 23                And your answer on line 1?
 24       A.    "Yes."
 25       Q.    "Q.  Not beforehand?
```

1    A.    "I don't know exactly, but I would think after."

2    Q.    All right.  So you were saying in that deposition that you

3    believe that Barry first told you about how his name could be

4    used after the sticker episode, correct?

5    A.    Yeah, but I think --

6    Q.    All right.  You've answered the question.

7         MR. BAKER:  Your Honor, may I please?  Please?  Under

8    Federal Rule 106, there is a question and an answer on the

9    preceding page which in the doctrine of completeness I think

10   should be read.  I can either read it or Mr. --

11        THE COURT:  Just scroll down so I can see it.

12        MR. BAKER:  Judge, please look at page 64, line 11 to

13   line 18.  And then, once again, on the following page.

14        THE COURT:  Does it start "Okay"?

15        MR. BAKER:  Yes.

16        (Pause.)

17        MR. BAKER:  And then read that through to line 4 on

18   page 65, if you would please, Judge.

19        (Pause.)

20        THE COURT:  Counsel, I think in terms of completeness

21   that's appropriate.

22        Can you --

23        MR. GREEN:  I'm glad to do the whole thing here, your

24   Honor.  Just trying to shorten things, but no problem.

25        Would the Court like me to start with the top then?

```
        1              THE COURT:  That would be fine.

        2              MR. GREEN:  Just so we're clear here, your Honor, 64,

        3      line 11 through --

        4              THE COURT:  64, line 11 through what I think you had

        5      read.

        6              MR. GREEN:  Thank you.

        7      BY MR. GREEN:

        8      Q.   Mr. Boch, if you'll indulge us, we're going to go through

        9      this again.  Mr. Goudreau's counsel has requested that we begin

11:21  10      at 64, line 11.

       11              I'm going to read the questions, you read the answer.

       12              "Okay.  Was it -- that conversation with him before --

       13      you testified earlier when Mr. Messina was questioning you

       14      about an episode with the sticker on the CD, was it in

       15      connection with that particular episode that he told you about

       16      how his name needed to be used?"

       17              Answer?

       18      A.   Line 17?

       19      Q.   Yes.

11:22  20      A.       "I don't recall, but it could have been that.  It

       21      could have been that.

       22      Q.       "Q.  And do you believe he had told you before the

       23      sticker episode, which was when -- about February 2009; is that

       24      correct?

       25      A.       "I will say that he told me after the sticker
```

```
 1   episode."
 2           I think there's confusion --
 3           THE COURT:  We'll finish this.
 4           THE WITNESS:  Okay.
 5   BY MR. GREEN:
 6   Q.       "Q.  About how his name could be used?
 7           Answer?
 8   A.       "Yes."
 9   Q.       "Not beforehand?"
10   A.       "Not beforehand."
11   Q.    No, that was the question.
12           And your answer?
13   A.    Sorry.
14           "I don't know exactly, but I would think after."
15   Q.    All right.
16           I'm now going to move on.
17           Now, did Mr. Goudreau in any of your discussions with
18   him tell you why -- did he tell you at any point in time that
19   he would prefer to be held out as an original member of the
20   band BOSTON?
21   A.    There's a little confusion.  He at first said you have to
22   use "former," and that's what we did.  And then I threw in
23   "original," because I didn't -- I didn't think there was a
24   problem.  Then when I did that, that's when that guy John
25   called me.
```

1          And John called me and said, Hey, you know, this -- I

2     said, John, I'll do whatever you want.  And I did whatever he

3     wanted.

4     Q.   Let me ask you this:  Do you ever recall having a

5     discussion with Mr. Goudreau in which he said it would hurt his

6     career unless he was listed as being an original member of the

7     band BOSTON?  Yes or no.

8     A.   "Original" was -- that term -- you seem to be sticking on

9     that term.  I'm the one that put "original" in.

11:24 10    Q.   I now want to call your attention to the same deposition,

11    and we'll turn to 72, line 17.

12    A.   Page 72?

13    Q.   Yes.

14         And at this point in time, you were actually being

15    asked about a previous deposition you were given.

16         Line 17.  I'm going to read the question, and I'm

17    going to ask you to read the answer.

18         MR. GREEN:  Counsel, I'm going to go from there to 73,

19    2.

20    BY MR. GREEN:

21    Q.   "Q.  And, again, on page 112 of the same deposition,

22    starting at line 7, the question that was put to you at the

23    time was:  'I was asking you about what Barry told you was the

24    effect on him of not being able to list himself professionally

25    as having been an original member of the band BOSTON.'"

```
 1              And what was your answer?  The answer there.
 2     A.    Number 12?
 3     Q.    Number 24.
 4     A.    Number 24.
 5              "It would and has hurt his career."
 6     Q.       "Q.  Did he tell you that?
 7     A.       "Yes."
 8     Q.    Thank you.
 9              Now --
10     A.    But that's not --
11     Q.    There's no question before you, sir.
12     A.    Okay.
13     Q.    In your discussions with Mr. Goudreau, did he ever tell
14     you that he felt he got too much credit for being with the band
15     BOSTON?
16     A.    No.
17     Q.    All right.  Well, let's turn to page 94.  And we're going
18     from line 13 to 23.
19              Question, 94, 13:  "Okay.  The question at line 3 is,
20     'Has Barry Goudreau ever said anything to you to the effect he
21     feels he hasn't gotten enough credit for the first two BOSTON
22     albums?'"
23              And what was your answer?
24     A.    I thought you said has.  It's "hasn't"?  What was the
25     original question before you --
```

```
 1    Q.   Let's go back to the original question.

 2            Did you ever say -- Did you ever say that he told you

 3    that it was just the opposite, he never thought he got too much

 4    credit for it because he had only played a couple of songs on

 5    the first two albums?

 6            MR. BAKER:  Your Honor, I object.

 7    A.   That's a little confusing.  Can I interpret that?

 8            THE COURT:  Well, sustained as to that question.  But

 9    you can rephrase.

10    BY MR. GREEN:

11    Q.   Did you ever have a discussion with Mr. Goudreau which you

12    were discussing how much credit he had gotten for the first two

13    BOSTON albums, and he said to you that he felt he got too much

14    credit because he only played on a couple of songs?  Did he

15    ever tell you that?

16    A.   Let me just understand what you're saying.  So you're

17    asking me if Barry said he got too much credit for being on the

18    record.

19    Q.   On the first two albums.

20    A.   On the first two albums.

21    Q.   Yes, that's the question.

22    A.   It's kind of a double negative.  So he -- I just

23    want -- he never said he got too much credit for being on the

24    records, if that's the question.  If I answered the question.

25    Q.   Well, let's read what you said at the deposition.
```

|     |     |
| --- | --- |
| 1   | MR. BAKER:  Objection. |
| 2   | Hang on one second, please. |
| 3   | Your Honor, this relates not to a conversation, but |
| 4   | rather what Mr. Goudreau -- what Mr. Boch thought Mr. Goudreau |
| 5   | thought, that's one; and there's going to be a completeness |
| 6   | issue here as well. |
| 7   | THE COURT:  Counsel, no speaking objections. |
| 8   | MR. BAKER:  I'm sorry, Judge.  I just want to make |
| 9   | sure you understood.  It's a little more complicated. |
| 11:28 10 | THE COURT:  I understood. |
| 11  | MR. BAKER:  Sorry. |
| 12  | BY MR. GREEN: |
| 13  | Q.   Let's read 94 -- |
| 14  | THE COURT:  Well, counsel, give me a second. |
| 15  | MR. GREEN:  Certainly, your Honor. |
| 16  | (Pause.) |
| 17  | THE COURT:  No, overruled as to that objection. |
| 18  | Counsel. |
| 19  | BY MR. GREEN: |
| 11:29 20 | Q.   Again, sir, we're going to go from 13 to 23.  I'll read |
| 21  | the question, you read the answer. |
| 22  | "Q.   Okay.  The question at line 3 is:  'Has Barry |
| 23  | Goudreau ever said anything to you to the effect he feels he |
| 24  | hasn't gotten enough credit for the first two BOSTON albums?'" |
| 25  | And what was your answer?  The answer? |

```
 1   A.    The --
 2              "No.  It's actually just the opposite."
 3   Q.    Keep reading.
 4   A.        "What's the opposite?"
 5              I think that's your question.
 6   Q.    All right.
 7              "What's the opposite?"
 8              And answer?
 9   A.        "He never thought that he's gotten too much credit for
10   it because, as far as I know, I think he played on, like, a
11   couple of songs.'"
12   Q.    Thank you.
13              I'll move on.
14              Now, let's turn to -- could you turn to Exhibit 42,
15   sir?
16   A.    Page 42?
17   Q.    No, we're out of the deposition.  I appreciate your
18   indulgence on that.
19              MR. GREEN:  If we can publish Exhibit 42, your Honor,
20   which is an agreed-upon exhibit.
21              THE COURT:  Any objection?
22              MR. BAKER:  Let me see it first, Judge.
23              No, your Honor.
24              THE COURT:  It may be admitted and published, 42.
25              (Exhibit 42 received into evidence.)
```

11:29 (line 10)
11:30 (line 20)

BY MR. GREEN:

Q.   Do you recognize that document, sir?

A.   Yes.

Q.   And --

A.   It looks like I had something to do with it.  It's got,
like, my feel to it.

Q.   I'm just going to ask you to answer my questions.  If
counsel has further questions, he has every right to ask you on
cross.

         My question is:  Is that a promotional material for
Ernie and the Automatics?

A.   That's a -- that's an internal promotion.  That's an
industry-type of promotion.

Q.   When you say "internal promotion" --

A.   It's, like, not for the public.  It's, like, for trade
magazines, something like that.

Q.   In other words, this was something that Ernie and the
Automatics caused to be put in trade magazines, correct?

A.   It looks like it.

Q.   All right.

         So this was published to the greater world, was it
not?

A.   This particular -- I don't know if this is an actual one
because when you make the advertisements, it goes through a lot
of incarnations.  I don't know if this is the final version.  I

1    don't know.

2    Q.   All right.

3         Were materials like this published by Ernie and the

4    Automatics to trade magazines?

5    A.   It looks like a final, but I couldn't guarantee it.

6    Q.   All right.  We understand that, but the final would have

7    looked something like this, correct?

8    A.   Yes.

9    Q.   And in this, the picture of your band members appears, you

11:32 10   are given first billing there, and then the next line says,

11   "Barry Goudreau, guitars, vocals, former and original member of

12   the multiplatinum selling band BOSTON," correct?

13   A.   Yes.

14   Q.   And that appeared in various trade magazines?

15   A.   I don't know if various, but --

16   Q.   It was published for trade magazines?

17   A.   I would say.  I can't tell you what magazine it was in.

18         (Pause.)

19         THE COURT:  Mr. Green, I don't know if it's you or

11:32 20   someone is inadvertently writing on the screen.

21         THE WITNESS:  Somebody is writing all over the screen.

22         THE COURT:  I think only the Court, counsel, and the

23   witness have access.

24         THE WITNESS:  It's okay.  I can still read it, it just

25   looks funny.

1          Oh, they can see the same thing that I'm seeing?  Oh,

2     that's cool.

3          MR. GREEN:  My outline may have brushed up against it.

4     I apologize.

5          THE COURT:  Counsel, I understand it was inadvertent;

6     I just wanted you to understand what was happening.

7     BY MR. GREEN:

8     Q.   Now, who is Tom Baggott?  And I'm referring to the time

9     period that Ernie and the Automatics was in existence.

11:33 10          MR. GREEN:  Your can take down this exhibit.

11     A.   Tom Baggott was, for lack of a better word, our agent.

12     Q.   And what was his background when he became your agent?

13     A.   He had, like, booked bands.  I'm not absolutely sure of

14     his background.

15          MR. BAKER:  Your Honor, can I ask the witness to be a

16     little more precise about "our agent"?  I want to be a little

17     more precise.

18          THE COURT:  I'll let counsel ask the questions.

19     BY MR. GREEN:

11:34 20     Q.   When you said "our," you meant Ernie and the Automatics?

21     A.   Including the band.

22     Q.   Including Barry Goudreau?

23     A.   Yeah, but I'm the one that dealt with him.

24     Q.   Let me ask you this.  Are you saying that Mr. Goudreau

25     never dealt with Mr. Baggott?

```
 1   A.    Yes.  Nobody dealt with Mr. Baggott.
 2   Q.    Mr. Baggott has submitted an affidavit in this case in
 3   which he said he took instruction from Mr. Goudreau.  Would
 4   that surprise you?
 5         MR. BAKER:  Objection, your Honor.
 6   A.    Yes.
 7         THE COURT:  Sustained as to that, as to foundation,
 8   counsel.
 9   BY MR. GREEN:
10   Q.    We'll cover another point.  Let me move on.
11         Was Mr. Baggott responsible for booking shows?
12   A.    I would say he was responsible for half.
13   Q.    When you say "half," in other words, he started at a
14   certain point in time?
15   A.    No.  He would get us jobs, but we naturally got jobs.
16   Jobs would just naturally come to us.
17   Q.    I see.  I thought you meant time in terms of the half
18   time.
19         He got about half of your shows and the other half
20   naturally came in?
21   A.    Right.
22   Q.    Was he responsible in any way for promoting shows?
23   A.    Not really.  Not really.  He might have got people to the
24   show, but as far as spending any money or anything like that,
25   no.
```

1    Q.    Who was Stan Lewicki, L-e-w-i-c-k-i?

2    A.    Stan Lewicki works for me.

3    Q.    He's an in-house advertiser for the Boch auto dealers?

4    A.    Now he runs Consumer Creativity, which is my in-house

5    advertising.

6    Q.    I'm referring to the time period 2007 to 2011.

7    A.    Stan was like a jack-of-all-trades.  He was tour manager,

8    he was -- he was just like -- he just helped us.

9    Q.    And did he do advertising for the band?

11:35 10    A.    No.

11    Q.    Was he the head of your in-house advertising agency at

12    that time?

13    A.    No.

14    Q.    Now, let's next turn to --

15          (Discussion off the record.)

16          MR. GREEN:  We'll come back to that.

17          Do you have it?

18          (Pause.)

19    BY MR. GREEN:

11:37 20    Q.    At some point in time, sir, was there a biography posted

21    for Ernie and the Automatics?  In fact, I thought you made

22    reference to this yesterday.

23    A.    If so, probably -- I assume on the website.

24    Q.    Well, let me be more specific.

25          MR. GREEN:  Can we put a clean copy of this in front

1    of the witness?

2            This is objected to, your Honor.  Can we publish this

3    just to the witness and to the Court?

4            THE COURT:  You may.

5            What's the letter?

6            MR. GREEN:  7 Q.

7            THE COURT:  7 Q, okay.

8            (Pause.)

9    BY MR. GREEN:

11:38 10    Q.   Do you recognize Plaintiff's Exhibit 7 Q, Mr. Boch?

11    A.   No.

12    Q.   You've never seen this before?

13    A.   I don't think so.  It doesn't -- I mean, I definitely

14    didn't make it.  It looks like some sort of report.

15    Q.   When you talked yesterday -- this does have a reference to

16    website on the second page.  Do you see that there?

17    A.   Oh, second page.

18    Q.   Halfway down.

19    A.   I'm sorry, I see the first page.  It's got the last four

11:39 20    songs that we did.

21            And then the next page --

22    Q.   I'm sorry, the third page, where it says "website."

23    A.   Website, yes.

24    Q.   Does that refresh your recollection that this material

25    appeared on your website?

1    A.    You know, it might have, probably has, but I don't recall

2    it.

3    Q.    All right.

4          Well, when you say it probably has, it's more likely

5    than not that this biographical material appeared on your

6    website?

7    A.    I mean, you know -- probably, I can't say for sure.  I

8    mean, I think we had -- we had a biography on the website, but

9    I can't recall.

11:39 10          MR. GREEN:  I offer this, your Honor.

11          MR. BAKER:  Objection, your Honor.

12          THE COURT:  Sustained given the answer, counsel.

13          MR. BAKER:  Thank you.

14          THE WITNESS:  I apologize if I -- I don't --

15    BY MR. GREEN:

16    Q.    Let me ask you this.  You did on your website hold

17    Mr. Goudreau out as an original member of the band BOSTON,

18    right?

19          MR. BAKER:  Objection, form of the question, your

11:40 20    Honor.

21          THE COURT:  Overruled.  I'll allow that.

22          You can answer, sir.

23    A.    I'm sorry?

24    Q.    You did put together a website, correct?

25    A.    Yes.

1   Q.    And you did hold Mr. Goudreau out as a former original
2   member of the band BOSTON, correct?
3   A.    Yes.  I used that term until the guy John called me, yup.
4   Q.    You've answered the question, sir.
5         Now, when Ernie and the Automatics performed, did it
6   play at many of its events a medley of four songs from BOSTON's
7   first album?
8   A.    I'm not exactly sure which albums they were from, but we
9   did do a medley.
11:40 10   Q.    Did the medley include "More Than a Feeling," "Rock & Roll
11   Band," "Foreplay," and "Smokin'"?
12         MR. BAKER:  Judge, I object.  I don't want to state
13   the grounds, but --
14         THE COURT:  I understand.  I understand the grounds.
15         Overruled.  Overruled.  You can answer.
16   A.    I don't know the exact songs, but there was a medley.
17   Q.    A medley of songs from the band BOSTON?
18   A.    Yeah, we did this --
19   Q.    That you played at your events?
11:41 20   A.    Yeah.  We did like a tip of the hat to everybody that was
21   in the band.  The guys from Peter Wolf's band, we did some
22   Peter Wolf stuff; John Cafferty, we did John Cafferty stuff;
23   and then for the guys that were in BOSTON, we did the BOSTON
24   stuff.
25   Q.    Do you have any idea whether Mr. Goudreau had written any

1    of those songs or had been -- had performed any of those songs

2    as part of the original album?

3    A.    I don't think he wrote any of those songs.

4    Q.    Okay.

5          I'll move on.

6          Now, you do recall that Ernie and the Automatics did

7    release a CD in or around February of 2009?

8    A.    Yes.

9    Q.    And was there -- was there a promotional video that you

11:42 10   put together for this CD?

11   A.    There was a bunch of stuff.

12   Q.    Let me show you one.

13         MR. GREEN:  And we're now getting to the video, your

14   Honor, that we talked about early this morning, before the jury

15   came in.

16         THE COURT:  Okay.

17         MR. GIVEN:  Same objection.

18         THE COURT:  Same objection noted.

19         I think, counsel, you have to show a little piece of

11:43 20   it to show the witness for foundation purposes.

21         MR. GREEN:  Let's just go to the first part of the

22   video and then --

23         (Discussion off the record.)

24         THE COURT:  Just show it to --

25         MR. GREEN:  I'm just showing the cover screen.

```
 1   BY MR. GREEN:

 2   Q.   Do you see the video in front of you?

 3   A.   Yes.

 4   Q.   And we're just going to play the first few parts to you.

 5        My question will be:  Do you recognize this as a video

 6   that you put together or that you had put together in

 7   connection with the promotion of your CD?

 8        MR. GREEN:  Just play the first 10 seconds without the

 9   sound.

10        (Played recording.)

11   A.   Ian did this video, this version, I can tell.

12   Q.   Let's not go too quickly.

13        Who is Ian?

14   A.   Ian Barrett is our friend who has a video production

15   company.

16   Q.   All right.

17        And was Ian retained by you to put together -- to

18   produce a video to promote your first --

19   A.   I don't think I paid him.  I think he did it because he --

20   you know, he liked us.

21   Q.   All right.

22        But you retained him.  There's no doubt that Ernie and

23   the Automatics retained Ian, correct?

24   A.   We didn't pay him.  Hung around with him; he's still my

25   friend.
```

11:43 (line 10)
11:44 (line 20)

```
 1    Q.    All right.

 2          You hired him.

 3    A.    I don't think I paid him.

 4    Q.    All right.

 5          My question is:  Did he put together a video --

 6    putting aside payment -- at your request to promote the first

 7    album?  I'm sorry, to promote your CD, it was only one CD.

 8    A.    Yes, but not this one.

 9    Q.    What is this video?

10    A.    This is one that he said that he wanted to do like a

11    pop-up video.  I think from the thing that came up because --

12    the video that we did didn't have that in it.

13    Q.    Now, he said he wanted to do a pop-up video, but the

14    pop-up video was posted on the internet, was it not?

15    A.    We posted everything on the internet.

16    Q.    Including this pop-up video, correct?

17    A.    Probably, yes.

18    Q.    All right.

19          MR. GREEN:  I will now -- I would now like this to be

20    published to the jury, your Honor, and we'll try to stop at

21    various points here.

22          MR. GIVEN:  Same objection, and no foundation.

23          THE COURT:  Same objection noted for the record.

24          Counsel, I think there has been testimony about

25    engagement here.
```

```
 1              Counsel, do you want to make clear on the record what
 2      the purpose of this was?
 3      BY MR. GREEN:
 4      Q.   This was a video that came out around the time of the --
 5      that was prepared by this gentleman to come out and was
 6      published on the internet around the time of your CD, correct?
 7      A.   Yes.
 8      Q.   All right.
 9              Now let's move on.
11:46 10        Let's move on to the first screen here --
11              MR. GREEN:  And I do ask this be published to the
12      jury.  We're not going to play the whole thing.  I just want to
13      point out a few things.
14              MR. GIVEN:  Same objection.
15              THE COURT:  Noted.  Overruled.  It can be published.
16              We'll make this whatever the next number is.
17              What's the next number?
18              Counsel, what's the next available number?
19              MS. STENGER:  57.
11:46 20        THE COURT:  57?
21              MS. STENGER:  Yes.
22              (Exhibit 57 received into evidence.)
23              MR. GREEN:  I just want to play with the sound the
24      first 15 seconds of this, and we're going to stop at a certain
25      point.
```

1          Can you play it, please?

2          (Played recording.)

3          MR. GREEN:  Stop.

4    BY MR. GREEN:

5    Q.   Do you see that pop-up there?

6    A.   Yes.

7    Q.   So this is the first pop-up that appears in this video,

8    correct?

9    A.   I wasn't paying attention, I'm sorry, but -- I guess.

11:47 10   Q.   Okay.

11          And it says, "Guitarist Barry Goudreau and drummer

12   'Sib' Hashian are former original members of the band BOSTON."

13   Do you see that?  That's what it says.

14   A.   Yes.

15   Q.   All right.

16          MR. GREEN:  Let's keep going.  And I'll ask

17   Ms. Stenger to instruct the paralegal when to stop here.

18          (Played recording.)

19   Q.   All right.  Now, just for the record here, they're not

11:47 20   singing a BOSTON song, are they?

21   A.   No.  No, this is an original Ernie and the Automatics

22   song.

23   Q.   But the next pop-up we have is:  "BOSTON's first record is

24   the biggest selling debut in history with 17 million units

25   sold."  Do you see that?

A.   Yes.

Q.   And "BOSTON" referred to not the city Boston, but the band
BOSTON, correct?

A.   Yes.

Q.   Let's keep going.

         MR. GREEN:  Again, I'll ask Ms. Stenger to have the
paralegal stop.

         (Played recording.)

         MR. BAKER:  Judge, could I ask that the music be
played a little louder, not a lot, just a little?  Because I
want the jury to hear the sound as well.

         THE WITNESS:  Crank it.

         THE COURT:  Okay.

         MR. GREEN:  We want to stop there.

BY MR. GREEN:

Q.   This pop-up, am I reading it correctly, "The original
cover art for BOSTON'S first record was a head of Boston
lettuce, not the guitar spaceship?"  Do you see that?

A.   Yes.

Q.   And you're referring to --

A.   I'm not -- see, Ian did this.  Ian put this together.  I
might have watched it once and said, Ian, what is this?  What
you got going?  He goes, It's a thing on pop-up videos.

         If you've watched pop-up videos, it always has, like,
where the girl from the video in the corner, her hometown or

1   whatever.  And he just did it.  I said -- I didn't really

2   analyze this.

3   Q.   Okay.

4        But you were aware that this was posted on the

5   internet.

6   A.   Right.  But I couldn't tell you exactly everything -- I'm

7   not saying that it isn't true --

8        MR. GREEN:  Your Honor, I think he's now going beyond

9   my question.  I'd like to move on in the video.

11:49 10      THE COURT:  Sure.

11       Mr. Boch, just listen for the question.

12       THE WITNESS:  Sorry.

13       THE COURT:  Thank you.

14       MR. GREEN:  Keep going.

15       (Played recording.)

16       THE COURT:  Counsel, can we pause it there?

17       MR. GREEN:  We didn't mean to pause it.

18       THE COURT:  Did you mean to fast forward?

19       (Discussion off the record.)

11:50 20  BY MR. GREEN:

21   Q.   While they're fast forwarding there -- by the way, this

22   took place in one of your auto dealerships, correct?

23   A.   We had three locations for this.

24   Q.   All within your auto dealerships?

25   A.   None of them in the auto dealerships.

```
 1   Q.   I see cars here.  Aren't those Boch cars?

 2   A.   We brought those in.  That's my hangar.

 3   Q.   This was a hangar?

 4   A.   A hangar.

 5   Q.   A personal hangar where you arranged to have Boch cars

 6   brought in?

 7   A.   Nice cars, yeah.

 8   Q.   Okay.  That's fine.

 9        Let's fast forward to the --

10        (Discussion off the record.)

11        MR. BAKER:  Judge, can we have the video played, not

12   fast-forwarded, but played in its entirety?

13        THE COURT:  Well, counsel, if that's -- given our

14   discussion beforehand, I was having counsel fast forward to the

15   parts that were deemed relevant based on my prior ruling.

16        MR. BAKER:  Understood.  I get it.

17        THE COURT:  No offense to the musicians in the room,

18   it was just to get to the relevant pieces.

19        Counsel?

20        (Played recording.)

21        MR. BAKER:  Volume, please?

22        MR. GREEN:  Can we bring up the volume?

23        (Played recording.)

24        MR. GREEN:  Stop here, please.

25        THE COURT:  Counsel, do you have the markers for these
```

1    other items?  Do you have the time markers so you can jump to

2    them?

3            MR. GREEN:  This is one of them, your Honor.

4            MS. STENGER:  We're skipping ahead some on that list.

5            THE COURT:  Okay.

6    BY MR. GREEN:

7    Q.   Just to be clear here, as we stop right here, in this

8    video, it is saying Ernie and the Automatics studio debut is

9    called "Low Expectations," right?

11:52 10   A.   Correct.

11   Q.   That was the name of your CD?

12   A.   Yes.

13           MR. GREEN:  Can we fast-forward to the next part?

14           (Played recording.)

15   Q.   What is depicted there?

16   A.   It looks like a sketch of the original band.

17   Q.   Not the original band Ernie and the Automatics, the

18   original band BOSTON, correct?

19   A.   Yeah.

11:53 20   Q.   And that would be Mr. Scholz in the back left?

21   A.   Yeah.  I would say it would be "Sibby," Barry, Fran, Tom,

22   and Brad.

23           MR. GREEN:  All right.  Can you --

24           (Played recording.)

25   Q.   And now what is being depicted here?

```
 1   A.    This was Ian's idea.

 2   Q.    And can you describe for the jury what this is?

 3   A.    Like, old footage.

 4   Q.    Old footage of the band BOSTON?

 5   A.    Yeah -- and the crowd.  You guys can see it, right?  And

 6   the crowd.

 7   Q.    I'm going to ask from this point on that we play this old

 8   footage.

 9         Go ahead.

10         (Played recording.)

11   Q.    All right.  So, again, that was old footage from the band

12   BOSTON, it appears in this promotional video, correct?

13   A.    Yes.

14   Q.    Okay.

15         I'm going to move on.

16         MR. GREEN:  Could we now look at the CD?  And,

17   Ms. Stenger, if you could pull out the CD with the wrap?

18         (Discussion off the record.)

19         MR. GREEN:  Could I ask Ms. Stenger to approach the

20   witness to show this?

21         THE COURT:  You may.

22         MR. GREEN:  If I could ask Ms. McIlvene to publish 34,

23   which is an agreed-upon exhibit.

24         THE COURT:  No objection?  34, you said?

25         Any objection?
```

          1              MR. BAKER:  No objection.  It's fine.  No objection to

          2    this exhibit.

          3              THE COURT:  It may be admitted and published.

          4              (Exhibit 34 received into evidence.)

          5    BY MR. GREEN:

          6    Q.   Now, Mr. Boch, I'm putting before you the exhibit on the

          7    screen, but Ms. Stenger also presented to you the CD itself.

          8    Do you recognize that as --

          9    A.   Yeah, I haven't seen it in a while.

11:56    10              Yeah.  It's kind of cool.

         11    Q.   Would it surprise you, you can still order it from Amazon?

         12    A.   Not this version.  I changed the whole look.  This is the

         13    first generation.  I changed the whole -- the whole thing.  We

         14    got off of the old kind of tattered and tried to clean

         15    ourselves up.

         16    Q.   We'll come back to that.  But in 2009 -- this came out in

         17    early 2009?

         18    A.   I want to say February of 2009, yes.

         19    Q.   Thank you.

11:56    20              And do you see there -- do you see there that this CD

         21    packaging said, in the black circle, "Featuring Barry Goudreau

         22    and 'Sib' Hashian, former original members of the multiplatinum

         23    selling band BOSTON"?

         24    A.   Yeah, the sticker.

         25    Q.   The sticker.

1           And you would agree with me that was on the CD as

2      originally done?

3      A.    This was Tom's idea.   Tom Baggott.

4      Q.    Tom Baggott.

5      A.    Tom Baggott.

6      Q.    So Tom Baggott was one way or another responsible for more

7      than just doing shows, he was responsible for promoting the CD?

8      A.    Everybody has good ideas every once in a while.

9      Q.    So he had a good idea, and that was to say let's put a

11:57 10     wrap on the CD, Ernie, and let's have it depict the fact that

11     the band includes Barry Goudreau and "Sib" Hashian, former

12     original members of the band BOSTON.

13     A.    I'm trying to remember.

14          He -- the CD came out -- this came on after.  This

15     didn't come on the original one.  This came out after, and then

16     he was, like, we got to put a sticker.  Why do we got to put a

17     sticker on it?  We got to put a sticker on it.  What's the

18     sticker going to say?  He said this.  I said, I don't know.  He

19     said, We got to do it.  I said, All right, and we did it.

11:58 20     Q.    All right.  So you approved it?

21     A.    Yeah.

22     Q.    Did Barry approve of it?

23     A.    I don't think these guys -- no, this happened really

24     quick.  But this is why I got the call from John.

25     Q.    Okay.

```
 1              Now, these CDs, they were delivered to record stores

 2     and other outlets for sale?

 3     A.   I mean, you know, I think Newbury Comics carried it, maybe

 4     some other -- you know, we were trying --

 5     Q.   Would it surprise you to know you can go on Amazon today

 6     and still get the same CD?

 7              MR. BAKER:  Objection, Judge.  This --

 8              THE COURT:  Sustained, sustained.

 9              MR. BAKER:  Thank you, Judge.

11:58 10         THE WITNESS:  You mean in this old packaging?

 11              THE COURT:  Well, it was sustained, so next question.

 12              THE WITNESS:  I mean, I think I pressed like 2,400.

 13              MR. GREEN:  Your Honor, could I have Ms. Stenger

 14     approach the witness again?

 15              THE COURT:  You may.

 16              (Discussion off the record.)

 17              MR. BAKER:  Judge, this is already in evidence.

 18              MR. GREEN:  No.

 19              Time frame.  If I can lay the foundation, your Honor,

11:59 20        for this.

 21              I just ask that it be put before the witness.  We're

 22     not publishing this yet.

 23              THE COURT:  Counsel, is it marked for ID?

 24              MR. GREEN:  It is not marked.  It's basically a newer

 25     version of what we just saw, your Honor.  I just want to
```

1    establish time frame for how long this was out.

2             THE COURT:  Okay.

3             It can be marked with a letter, whatever --

4             MR. GREEN:  Could I suggest it be marked as 34 A, your

5    Honor, because it relates to 34.

6             THE COURT:  No.  I want to mark it with a letter.  So

7    whatever the next -- why don't we start with double letters.

8             Let's make it AA, counsel.

9             MR. BAKER:  Judge, we've never seen this document

12:00 10    before.  I don't know what it is.

11             THE WITNESS:  Can I see it?

12             THE COURT:  Well, let's mark it AA.  And was there

13    representation --

14             (Exhibit AA marked for identification.)

15             MR. GREEN:  I'm about to ask the question, your Honor.

16             THE COURT:  You can approach the witness.

17             MR. GREEN:  If --

18    BY MR. GREEN:

19    Q.  Sir, I will represent to you that Ms. Stenger went on the

12:00 20    internet within the last week.

21    A.  Wow.

22    Q.  She put in an order with Amazon, and within a couple of

23    days that's what she got back.

24             MR. BAKER:  Objection, Judge.

25             THE COURT:  Sustained.  Sustained.  You can ask a

1    question about whether or not this witness recognizes --

2    A.    I thought we sold more.  I didn't think you could still

3    get it.  I think -- I think I printed 2,400.

4    Q.    All right.

5    A.    I thought we sold more.

6    Q.    Do you know, sir, whether this is still for sale on

7    Amazon?

8    A.    I have no idea.

9    Q.    Would it surprise you that it still is for sale on Amazon?

12:01 10    A.    Yeah, I mean -- can I open it?

11    Q.    I don't know that you need to open it, but I'm going to

12    ask you --

13    A.    It could be a fake.

14    Q.    Does it have the same sticker that we just saw there as to

15    featuring Barry Goudreau and "Sib" Hashian?  Yes or no.

16    A.    Yes.

17    Q.    Thank you.

18            I'll move on.

19            Turn, if you would, to Exhibit 36.

12:02 20            THE COURT:  Any objection to 36, counsel?

21            MR. BAKER:  No, Judge.

22            THE COURT:  It can be admitted and published if you

23    wish.

24            (Exhibit 36 received into evidence.)

25    BY MR. GREEN:

1   Q.   Do you recognize this exhibit, sir, as a promotional ad

2   for Ernie and the Automatics?

3   A.   It looks like it, but this is -- this is not mine.

4   Q.   Now, when you say this is not yours --

5   A.   Well, I can kind of tell -- I can tell, like, what I did

6   only because of the feel and everything.  This has all the

7   components, but somebody else put this together.

8   Q.   Did someone else put this together under your direction,

9   sir?

12:02  10   A.   No, because I don't like the balance.  I don't -- it's got

11   all the elements, but I wouldn't put it together this way.

12   Q.   All right.

13        Let's turn to your deposition.  You can go back to

14   that.

15        THE COURT:  Just for the witness.

16   BY MR. GREEN:

17   Q.   I'll ask you to turn to page 101.

18        At that point in time, you were asked --

19   A.   I'm not there.

12:03  20   Q.   -- Exhibit 14 at your deposition.  I will represent that

21   is the same Exhibit 36 that we're looking at here.

22        MR. BAKER:  Judge, I'd like to see it.

23        THE WITNESS:  I can't find 101.

24        MR. BAKER:  He's talking about Exhibit 14.  It's just

25   a number in this book.

           1           I'd like to see the exhibit, what he's referring to

           2   specifically.

           3           And if he has to come back to the question, that's

           4   fine.

           5           THE COURT:  Counsel, is there -- do you have something

           6   marked as 14?

           7           THE WITNESS:  I don't think it goes up to 101.

           8           (Discussion off the record.)

           9           MR. GREEN:  Can I ask Ms. Stenger to show counsel?

12:04 10   It's the same exhibit.

          11           THE COURT:  Yes, counsel, you may.

          12           MR. GREEN:  We'll follow up on this.

          13           I'll move on to the next thing, your Honor.

          14           THE COURT:  Okay.

          15           MR. GREEN:  Could you turn to agreed-upon Exhibit 35?

          16           Before -- I'm sorry, before I get off of 36 here.

          17   BY MR. GREEN:

          18   Q.   I just want to understand, sir, when you say you weren't

          19   responsible for this, who was responsible for this?

12:05 20   A.   This looks like -- this looks like either -- if you can

          21   turn around?

          22           THE COURT:  Again, just so the record is clear, we're

          23   still talking about 36?

          24           MR. GREEN:  We are, your Honor.

          25   A.   It looks like -- it says the guy's contact, Jeff Appleton,

        1    and -- this looks like either they put it together or they had

        2    my guys put it together.

        3    Q.   All right.  One way or another, if your guys put it

        4    together, then you were responsible for it, correct?

        5    A.   I guess ultimately.  But, see, with me, I actually touch

        6    everything.  The stuff that goes out of my office to this day

        7    that I don't necessarily approve, sometimes don't even like.

        8    Q.   Well, you do understand that throughout this four-year

        9    time period, you did have ads go out that referred to Barry

12:06 10    Goudreau as a former original member, correct?

       11    A.   Yes, but --

       12    Q.   All right.  You've answered the question.

       13    A.   Only until John --

       14    Q.   You've answered the question.

       15            MR. GREEN:  I move to strike everything else.

       16            THE COURT:  Sustained, but next question, counsel.

       17            MR. GREEN:  Let's move on.

       18            Could we turn to Exhibit 35?

       19            THE COURT:  Just for the witness.

12:06 20            Any objection, 35?

       21            MR. BAKER:  One second, please.

       22            MR. GREEN:  This is an agreed-upon exhibit, your

       23    Honor.

       24            THE COURT:  Okay.

       25            (Pause.)

1          THE COURT:  Counsel, we'll discuss how to address the

2    agreed-upon exhibits at the break, but for the moment, I'm

3    going to ask each time.

4          So 35, no objection?

5          MR. BAKER:  No objection to 35.

6          THE COURT:  So it may be admitted and published.

7          (Exhibit 35 received into evidence.)

8    BY MR. GREEN:

9    Q.   Do you recognize Exhibit 35, sir?

12:07 10    A.   Can you keep going?

11          Yeah, this is definitely not mine.  There's elements,

12    the top, the picture, but on the bottom, I don't think I ever

13    saw that.

14          Keep going.

15    Q.   Do you know who was responsible for this?

16    A.   Entertainment Specialists.

17    Q.   Do you have any idea who they were?

18    A.   No.

19    Q.   Now, you would agree with me that to the extent you were

12:07 20    not responsible -- were these parties that were trying to

21    promote events?

22    A.   It looks like it.  But I don't even remember Entertainment

23    Specialists.

24    Q.   My question is:  Why would other parties try to promote

25    your events?  Were these venues --

1    A.    We would -- we would go -- we were, like, a regional band.

2    Except for the last tour we did, we would be, like, from Ohio

3    down to -- down to just above New York to New England.  And

4    people would promote -- promoters would promote, and they would

5    put stuff that we didn't want them to put.  They just put stuff

6    out.

7            It was extremely tough to -- especially after the

8    phone call with John.  It was real -- when I actually tried to

9    do exactly what he said, it was like -- it was difficult.

12:08 10   Q.    Let's turn to -- you would agree that 35 does refer to

11   Mr. Goudreau and Mr. Hashian as former original members of

12   BOSTON, right?

13   A.    Yes.

14   Q.    Under the picture there?

15   A.    Yes.

16            MR. GREEN:  Turning to Exhibit 40.

17            THE COURT:  Exhibit 40, just for the witness.

18            Any objection, 40?

19            MR. BAKER:  No, Judge.  No objection.

12:09 20          THE COURT:  It may be admitted and published.

21            (Exhibit 40 received into evidence.)

22   BY MR. GREEN:

23   Q.    Do you recognize Exhibit 40, sir?

24   A.    Yes.

25   Q.    What is it?

```
 1   A.    This -- I would say this is mine.

 2   Q.    Okay.

 3         And what is the time frame for this exhibit?

 4   A.    I don't know.  I don't know.

 5   Q.    Could it have been any time during the four years?

 6   A.    Oh, yeah, sure.

 7   Q.    All right.

 8         And in this exhibit, again, we have "Barry Goudreau

 9   and 'Sib' Hashian, two former original members of the

10   multiplatinum selling band BOSTON have reunited."  I read that

11   correctly, right?

12   A.    Yes.

13         So if I were to --

14   Q.    There's nothing before you, sir.

15         THE COURT:  You just have to wait for the next

16   question, Mr. Boch.

17         THE WITNESS:  Oh, sorry.

18         THE COURT:  Thank you.

19         MR. GREEN:  Let's turn to the next exhibit, Exhibit

20   41.

21         THE COURT:  Any objection, 41?

22         Just for the witness.

23         MR. BAKER:  No, your Honor.

24         THE COURT:  It may be admitted and published.

25         (Exhibit 41 received into evidence.)
```

```
 1   BY MR. GREEN:
 2   Q.   Now, this -- I'll ask you first.  Do you recognize this
 3   exhibit?
 4   A.   No, but I would say this is from me.
 5   Q.   And this had to do with the fact that you were releasing
 6   your CD at this time, correct?
 7   A.   Yes.
 8            THE COURT:  Just on behalf of the jury, is there any
 9   way to --
10            THE WITNESS:  Condense.
11            THE COURT:  -- make it fit the screen so the jury and
12   the Court can actually see the document?  So if you put the
13   percentage at like a hundred percent, can we do that?
14            THE WITNESS:  Who's doing that?  Good job.
15            THE COURT:  Is that better?
16            Jurors?
17            THE COURT:  Thank you.
18            MR. GREEN:  Thank you for the suggestion, your Honor.
19   A.   One of the few times we charged.
20   Q.   Now, Exhibit 41 is actually two pages.  Let's take a look
21   at the first page.  That mentioned there's a CD release party.
22   Is this the same page on both?
23   A.   These look like two separate -- I don't think it's two
24   pages.
25   Q.   Let's start with the first page.
```

12:10 (line 10)
12:11 (line 20)

1          MR. GREEN:  We can scroll up to that, please.

2          Thank you.

3    Q.    So Ernie and the Automatics was responsible for this ad,

4    correct?

5    A.    I would say this one, yes.

6    Q.    And this was in conjunction with the fact that you were

7    having a party to announce the release of your CD, correct?

8    A.    Yes.

9    Q.    And you show the picture of the CD there.  You say it's

12:12  10   Tuesday, February 17th, and that would have been 2009?

11          MR. BAKER:  Objection, Judge.

12          THE COURT:  Just to form, counsel?

13          MR. BAKER:  Yes, your Honor.

14          THE COURT:  Sustained as to form.

15   BY MR. GREEN:

16   Q.    What year are we in?

17   A.    You know, it's funny you say that, because I always say

18   you should always put the year down because years later when

19   you look at something, you should know what year it is, and I

12:12  20   broke my own rule there.

21   Q.    But this was 2009?

22   A.    I would say 2009, yes.

23   Q.    Thank you.

24          And right below that, the date, it says, "Barry

25   Goudreau and 'Sib' Hashian, two former original members of the

```
 1    multiplatinum selling band BOSTON, have reunited," correct?

 2    A.    Yes.  This was pre-John phone call.

 3    Q.    All right.

 4          Again, to promote your CD.

 5    A.    Yes.

 6    Q.    Thank you.  We'll move on.

 7          Let's turn to 37.

 8          THE COURT:  Any objection, 37?

 9          MR. BAKER:  No, your Honor.

12:13 10    THE COURT:  Okay.  It may be admitted.

11          (Exhibit 37 received into evidence.)

12    BY MR. GREEN:

13    Q.    John was --

14    A.    I forget the gentleman's last name, and I think it's John.

15    John, yeah.

16          MR. GREEN:  Just for the stenographer, it's

17    B-a-r-u-c-k, but it's pronounced Baruck.

18          MR. BAKER:  We'll stipulate to the name, your Honor.

19    We know who that is.

12:13 20    MR. GREEN:  Thank you, Mr. Baker.

21          MR. BAKER:  You're welcome.

22    BY MR. GREEN:

23    Q.    Did you recognize Exhibit 37?

24    A.    The one in front of me?

25    Q.    Yes.
```

1    A.    This does not look like I did this.

2    Q.    And why do you say that?

3    A.    Because the balance -- it's just not -- it looks like they

4    took elements, but I don't think I did this one.

5    Q.    We'll move on.

6          I was asking you a little while ago about -- strike

7    that.

8          Turn to 42.  I think I was asking you briefly, but I

9    just want to confirm here.  Is this one of yours?

12:14 10          MR. GREEN:  If we could have that reduced.

11          THE WITNESS:  We're back up to 139 percent.

12          THE COURT:  If we go down to 52; you can just type in

13    the number.

14    A.    This looks like mine.

15    Q.    And do you recall the time period for this one?

16    A.    No, but I would say after, after the CD.

17    Q.    So after the CD --

18    A.    Wait a minute.

19          No, before the CD, because it says it's out soon.

12:14 20    Q.    I see.

21          And it does refer to Mr. Goudreau as a former original

22    member?

23    A.    Yes.

24    Q.    Now, let's turn to Exhibit 48.

25          THE COURT:  Any objection to 48?

```
 1              MR. BAKER:  No, Judge.

 2              THE COURT:  It can be admitted and published.

 3              (Exhibit 48 received into evidence.)

 4              THE WITNESS:  Now can you make it bigger?

 5              THE COURT:  Counsel, did you have a question?

 6              MR. GREEN:  Yes.

 7    BY MR. GREEN:

 8    Q.   This begins -- I believe the e-mails read up from the

 9    bottom in terms of timing.

10              Mr. Baggott wrote you an e-mail, if we look at the one

11    on the bottom, dated January 13, 2011.

12    A.   Did I answer it?

13    Q.   I'm just asking, do you recognize that as an e-mail that

14    Mr. Baggott wrote you then?

15    A.   I'm on it, but I never really handled this type of stuff.

16    Like, Stan would do this.

17              Did I answer it?

18              If I answered, I'd know I got it, but I don't -- I

19    don't --

20    Q.   Well, you were copied --

21    A.   I might have read it, but I didn't do anything.

22    Q.   It was addressed to you, and it was asking about using

23    snippets of --

24              MR. BAKER:  Objection, Judge.

25    A.   Did I answer it?
```

         1          THE COURT:  Sustained as to that question.

         2          Sustained.

         3          MR. GREEN:  I'm going to move on.

         4          THE COURT:  Okay.

         5          MR. GREEN:  We can take that down.

         6   BY MR. GREEN:

         7   Q.   Now, you were personally a big fan of BOSTON's first

         8   couple of albums, correct?

         9          MR. BAKER:  Judge, objection.  Form.

12:16   10          THE COURT:  Overruled.  You can answer.

        11   BY MR. GREEN:

        12   Q.   Were you familiar --

        13          THE COURT:  I don't know that was an answer, though.

        14   BY MR. GREEN:

        15   Q.   I thought you said "yes."

        16   A.   Yes.  I mean, who wasn't?

        17   Q.   Were you familiar with the phrase, quote, Just another

        18   band out BOSTON?

        19   A.   I think that's a lyric of the song.

12:17   20   Q.   Of one of BOSTON's songs, correct?

        21   A.   Yes.

        22   Q.   One of the better-known lyrics?

        23   A.   Yes.

        24   Q.   You understood that they would play that regularly at

        25   events?

```
  1              MR. BAKER:  Objection, Judge.

  2              THE COURT:  Sustained --

  3              MR. GREEN:  I'll withdraw it; my apologies.

  4              THE COURT:  Sustained as to that.

  5    BY MR. GREEN:

  6    Q.   Sir, my question to you is:  Did Ernie and the Automatics

  7    ever use that same lyric as part of their performances?

  8              MR. TARLOW:  Objection, your Honor, form.

  9    A.   I think --

 10              THE COURT:  Well --

 11    A.   It might have been a medley that we did.

 12              THE COURT:  Mr. Boch, I have to rule first.

 13              Sustained as to form, counsel.

 14    BY MR. GREEN:

 15    Q.   At any point in time in the four years, did Ernie Boch --

 16    excuse me -- did Ernie and the Automatics as part of its music

 17    use that same line?

 18              MR. TARLOW:  Objection, your Honor.

 19              THE COURT:  Well, counsel, sidebar on this one.

 20              (At sidebar on the record.)

 21              THE COURT:  Counsel, I think -- so I understand the

 22    arguments on either side, I believe, on this particular issue

 23    to return to the argument that was made to me about expression

 24    beforehand.

 25              I guess, counsel, I thought what you were trying to
```

1    get at with this was the extent to which the phrase might have

2    been used for promotional purposes.

3              MR. GREEN:  That's correct.

4              THE COURT:  As opposed to as a form of expression.

5              And where is your third party?

6              MR. BAKER:  He went to the bathroom, which, by the

7    way, Judge, a morning break would be greatly appreciated.

8              THE COURT:  I was going to take it at 12:45, if that

9    makes sense, but if there's need for it --

12:19 10          MR. BAKER:  12:30 would be greatly appreciated.

11             MR. GREEN:  I was actually --

12             THE COURT:  And that's why I was sustaining the

13   objections to form.  Because I understood that you were trying

14   to get at it in terms of how that might have been used to

15   promote as opposed to expression.

16             MR. GREEN:  I was actually going to be asking was this

17   used to introduce the act on a number of occasions.  So I would

18   like to rephrase it that way.

19             MR. TARLOW:  Your Honor, if you could just note our

12:19 20   objection for the it.  Record is our position that there is no

21   common law rights to the mark "just another band."  So we would

22   object on relevance and 403 for the record.

23             THE COURT:  But I think given the arguments I've heard

24   before, it's at least relevant to the issue before them.

25             Okay.

```
 1              MR. BAKER:  Judge, one other issue -- and I'm
 2    embarrassed -- I can't remember exactly what but it's in my
 3    notes -- there was a colloquy with the witness that Mr. Green
 4    conducted that relates to the right to sing the songs, and you
 5    allowed it in.  I appreciate that.  We objected; fair enough.
 6    But I would request that the Court give an instruction to the
 7    jury --
 8              THE COURT:  Well, I was thinking about that, counsel,
 9    and I don't know -- I was thinking about that for the final
10    charge.
11              MR. BAKER:  Okay.
12              THE COURT:  I've been listening -- I guess, Mr. Baker,
13    what I'll say is I'm listening carefully with the defense
14    concerns about that issue.  I was thinking that there should be
15    an instruction, but I don't think the distinction needs to be
16    made now for the jury.
17              MR. BAKER:  Okay.  I get it.
18              THE COURT:  Thank you.
19              (End of discussion at sidebar.)
20              THE COURT:  Counsel, let me tell the jury.
21              Jurors, thank you for your patience.  As I said, we'll
22    keep sidebars as a rare occurrence, but while we were over
23    there, we addressed a few issues.
24              Counsel?
25    BY MR. GREEN:
```

1    Q.   Was the phrase "just another band out of Boston" ever used

2    by EATA, Ernie and the Automatics, to introduce itself at

3    performances?

4    A.   We had -- we had a recorded intro.  I don't know if that

5    was in it.

6    Q.   You do recall -- you personally appeared at virtually all

7    the performances of Ernie and the Automatics, correct?

8    A.   Probably 98 percent.  The last ones I didn't.

9    Q.   Just to state the obvious, you were the Ernie.

12:21 10   A.   True.

11   Q.   Now, do you recall at any point in time being introduced

12   as just another band out of Boston?

13   A.   What I recall with that phrase is that Baggott wanted to

14   use that phrase at some point, and we told him no.  We did have

15   a recorded introduction.  I don't know if that phrase was in

16   the recorded introduction.  So if that's what you mean --

17   Q.   All right.  When you told Baggott, no, but, you know, in

18   fact, you were introduced from time to time with that phrase?

19        MR. BAKER:  Objection, Judge.

12:22 20        THE COURT:  Overruled.

21   A.   Like, people would say it?

22   Q.   Right.

23   A.   Like a guy would intro with it?

24   Q.   Right.

25   A.   I don't think so.

```
 1   Q.    You never -- you performed approximately 250 times?
 2         MR. BAKER:  Objection, Judge.
 3   A.    Probably, yeah --
 4         THE COURT:  Well --
 5   A.    -- maybe more.
 6         THE COURT:  Mr. Boch, just wait for my ruling when
 7   there's an objection.
 8         THE WITNESS:  Sorry.
 9         THE COURT:  Mr. Baker, form?
10         MR. BAKER:  That's correct, Judge.
11         THE COURT:  Sustained.
12   BY MR. GREEN:
13   Q.    How many performances were there over the four years?
14   A.    Two hundred fifty sounds right.  That sounds right.
15   Q.    And is it your testimony that at no time during the 250
16   performances that you were ever introduced as just another band
17   out of Boston?
18   A.    If somebody physically stood up and said, "Ernie and the
19   Automatics, just another band out of Boston," I don't remember
20   that, but we did have a recorded introduction, and I don't know
21   if it was in that because I haven't heard that recorded
22   introduction in a while.
23   Q.    All right.
24         Thank you.  I'll move on.
25         (Pause.)
```

1    Q.    Actually, Ms. Stenger is reminding me, can you turn to

2    your deposition at page 35?

3          (Pause.)

4    A.    It's kind of confusing --

5          MR. GREEN:  I'm actually going to withdraw this.

6          Let's move on.

7    Q.    Now, did Ernie and the Automatics run any promotional ads

8    on radio and/or TV?

9    A.    Yes.

12:24 10   Q.    In both of those mediums?

11   A.    Yes.

12   Q.    And do you recall ever running an ad referring to Barry

13   Goudreau and "Sib" Hashian as former original members of

14   BOSTON?

15   A.    I don't remember the exact thing, but if I used that

16   phrase, that was pre-John phone call.

17   Q.    All right.  But you do recall using that phrase in ads

18   before John Baruck?

19   A.    I would say probably.  You know, I know ads were -- but,

12:24 20   again, I haven't heard them in a while.  I wouldn't doubt it.

21   Q.    All right.

22          Are you familiar with the radio show called "Lost 45s"

23   hosted by a DJ named Barry Scott?

24   A.    Yes.

25   Q.    And did you advertise at all in connection with that radio

1    show?

2    A.    Yeah, he's -- he's kind of a friend of mine, and he's

3    hounded me for years to advertise on his show.

4    Q.    In connection with any of those ads, did you advertise

5    promotionally for Ernie and the Automatics making reference to

6    Barry Goudreau and "Sib" Hashian as former original members of

7    the band BOSTON?

8    A.    On his -- I don't know exactly what ran on his show.

9    Q.    Could you turn -- I'm going to come back to that.

12:26 10          Now, did you enter into contracts with the various

11    venues that -- at which Ernie and the Automatics performed?

12    A.    I'd say most of the time.

13    Q.    And did the contracts say anything about how you were to

14    be promoted?

15    A.    I think it did.  I think it did.  Again, it's been a while

16    since I've seen any of that stuff, but I think it did.

17    Q.    You understand that when we served you with a subpoena for

18    you to come in at trial this week, you were asked to produce

19    some documents?

12:26 20    A.    Yes.

21    Q.    And you understand that Ms. Genova, your counsel, produced

22    to us four different contracts?

23    A.    Yes.

24          MR. GREEN:  Could I have Ms. Stenger approach, your

25    Honor, to put them before the witness?

```
      1              THE COURT:  You may.

      2    A.   I haven't looked at what --

      3    Q.   We're going to give you time, sir.

      4              (Pause.)

      5              THE COURT:  Have these been premarked, counsel?

      6              MR. GREEN:  These are the ones we spoke of this

      7    morning.  I understand there's no objection, but they can.

      8              THE COURT:  Should we make them BB, or is there no

      9    objection?

12:28 10              MR. BAKER:  We don't object, however, we don't have

     11    copies --

     12              (Discussion off the record.)

     13              MR. BAKER:  No objection, your Honor.

     14              THE COURT:  So we'll make it the next number, which I

     15    believe might be 58.

     16              THE CLERK:  Yes.

     17              MR. GREEN:  They can all be marked together.

     18              THE COURT:  We'll make it 58.  If there needs to be

     19    subparts, A through D.

12:28 20              MR. BAKER:  Exhibit 58, Judge?

     21              THE COURT:  Yes.

     22              (Exhibits 58 A through D received into evidence.)

     23    BY MR. GREEN:

     24    Q.   Mr. Boch, take your time, but do you recognize those as

     25    contracts that you arranged to have your attorney produce to us
```

1    in response to the subpoena?

2    A.    She was asked to bring the stuff because I don't have

3    anything, and we moved from an old building to a new building,

4    so she brought these.  And I'm looking at them for the first

5    time.

6    Q.    Can you identify these as contracts that Ernie and the

7    Automatics entered into with various venues?

8    A.    I can say that I see my signature on three --

9            THE COURT:  It can be published.

12:29 10    A.    I see my signature on two, so I must have read those.

11    Q.    All right.

12            Let's do these one at a time.

13            Are there dates for these?  We're going to do these

14    chronologically.  Can you tell me what the different dates are

15    for these four?

16    A.    Me?

17    Q.    Yes.

18    A.    August 28, 2009.

19    Q.    And is that the first chronologically?

12:29 20    A.    Yes.

21    Q.    All right.

22            Now, this would have been after you spoke to

23    Mr. Baruck, correct?

24    A.    Probably.

25    Q.    The CD came out with the sticker --

1    A.     February.

2    Q.     -- in February.  You receive a call from Mr. Baruck about

3    the sticker, and then you said some things changed after that.

4              MR. BAKER:  Objection, form.

5    A.    I didn't sign this.  I never saw this.

6    Q.    The first one you never saw.

7              Did someone sign this for Ernie and the Automatics?

8    A.    Oh, this is Trish Burns.

9    Q.    And who is she?

12:30 10    A.    She used to -- she was our first manager.

11    Q.    Okay.

12              So did she sign this with your authority on behalf --

13    A.    No.  She did all sorts of stuff without my authority, with

14    all due respect to her.  That's why she wasn't with us anymore.

15    Q.    Is this a venue that you performed at?

16    A.    Presque Isle, Maine.  Yeah.

17              THE COURT:  Counsel, I think having had discussion

18    with counsel at sidebar, I think this is where we should take a

19    break.

12:30 20              MR. GREEN:  Thank you, your Honor.

21              THE COURT:  And, Mr. Boch, you can step down.

22              Why don't we -- we'll take 20 minutes, jurors.

23              (Discussion off the record.)

24              THE COURT:  So you'll be happy to know I think there's

25    snack for you upstairs.  So we'll take 20 minutes.

             1              THE CLERK:  All rise.

             2              (Jury left the courtroom.)

             3              THE COURT:  Everyone, quiet in the courtroom; the jury

             4    is leaving.

             5              MR. GREEN:  My apologies.

             6              THE COURT:  Sir, you can step down.  We're going to

             7    take 20 minutes.

             8              Counsel, I won't keep you too much for the purposes of

             9    personal comfort.

12:31 10              Counsel, just a few things for the benefit of the

            11    jury, and this goes for both sides, but it's directed at

            12    plaintiff just because you're up right now.  There hasn't been

            13    perfect coordination between what the witness is being asked

            14    about and what's being shown on the screen.  So to the extent

            15    that there can be coordination about that, that would be

            16    helpful.

            17              The other thing is, counsel -- and my preference is to

            18    do this in front of the jury -- if there's no objection to any

            19    of the agreed-to exhibits, I can certainly have you note that

12:31 20    on the record.  And then any number that counsel on either side

            21    offers to put up on the screen, Ms. Hourihan will know that it

            22    goes to all screens, because Ms. Hourihan, quite rightly, does

            23    not show anything on the jurors' screens until I say it's okay.

            24              So if counsel is agreed, I'll just ask you in front of

            25    the jury is there an agreement that exhibits premarked as 1

1    through 56, to the extent that they haven't already been

2    offered, are now admitted and can be freely published.

3              MR. TARLOW:  That would be our preference as well,

4    your Honor.

5              MR. GREEN:  Thank you, your Honor.

6              THE COURT:  In terms of depositions.  I think it's

7    useful for me to be able to see it to the extent that there are

8    questions about what the witness can be asked about.  I would

9    just -- I would just ask your team to wait before putting it up

12:32 10   on the screen so that Ms. Hourihan knows to shut the jurors'

11   screens down.

12             MR. GREEN:  Thank you, your Honor.  We'll do that.

13             THE COURT:  So I know some of this always happens with

14   the first witness.

15             The other thing, Mr. Green, I didn't want to say

16   anything in front of the jury, but anything that touches the

17   screen, including your papers, makes a scribble on it.

18             MR. GREEN:  I have figured that out kind of slowly,

19   but I think I'm with you now, your Honor.  Sorry to be slow --

12:33 20   THE COURT:  No, no, it's fine.

21             To the extent, as I pointed out, squeezing down the

22   documents just because it was hard for me to follow it.  I

23   assumed it was difficult for the jurors.

24             Counsel, anything before we break?

25             Okay.  Thank you.

1              THE CLERK:  All rise.

2              (Recess taken.)

3              (Jury entered the courtroom.)

4              THE CLERK:  Court is in session.  Please be seated.

5              THE COURT:  Jurors, before we continue with the

6    examination, counsel, I just wanted to address one issue on the

7    record.

8              In regards to the exhibits that have been premarked as

9    1 through 56, to the extent that they haven't already been

12:52 10    offered and admitted, do both sides agree that they should be

11    noted as admitted at this point?

12              Mr. Green?

13              MR. GREEN:  Thank you, your Honor.  So confirmed.

14              THE COURT:  Mr. Baker or --

15              MR. TARLOW:  Yes, your Honor.  Thank you.

16              THE COURT:  So 1 through 56 is admitted and may be

17    published as counsel wishes on either side.

18              (Exhibits 1 through 56 received into evidence.)

19    BY MR. GREEN:

12:52 20    Q.    Mr. Boch, I'm now calling to your attention to the

21    contracts that were produced pursuant to the subpoena.  They

22    have been marked 58, four have been marked separately A, B, C,

23    and D chronologically here.

24              Now, referring to the first contract, you said

25    Ms. Burns didn't last long with you people?

```
 1   A.   Well, I mean, you know, she -- we didn't keep her.
 2   Q.   All right.
 3         She was authorized to sign this type of contract while
 4   she was there, correct?
 5   A.   Yeah, I mean, she did it, you know.
 6   Q.   Let me ask you, on the first contract, you recognize this
 7   to be a contract where you performed in Presque Isle, Maine?
 8   A.   I never saw this, but we did perform in Presque Isle,
 9   Maine.
12:53 10   Q.   Can you turn -- and we'll ask Ms. McIlvene to scroll down
11   to the third page, Ms. McIlvene -- this page includes
12   references that have to do with advertising?
13   A.   You know, I never saw this, so this could say anything.  I
14   don't want to be difficult, but I don't -- to me -- you know,
15   can we get to the one I signed?  At least I might know
16   something about that one.
17   Q.   All right.  Why don't we do that.
18         Let's turn to 58 B.
19         Did you sign that document?
12:54 20   A.   Hang on.  Let me look.
21         Yes, that is my signature.
22   Q.   You have a beautiful signature, but I want to make sure
23   the jury understands it.  Is that at the bottom of the second
24   page?
25   A.   Yes.  That signature is -- I didn't read it; I had to sign
```

1  it.  It's a free show anyway.  I can almost guarantee I never

2  read this, because it doesn't matter, it was a free show.

3  Q.   Let me ask you a question generally, sir.

4       You were familiar with the fact that you were entering

5  into contracts from time to time with performance venues,

6  correct.

7  A.   Yeah, but we were a little bar band.  It didn't really --

8  there wasn't -- it didn't matter.

9  Q.   Let me ask it this way, sir.  Do you recall at any point

12:55 10  in time including in your contracts a provision that Barry

11  Goudreau could only be held out as formerly of Boston as

12  opposed to former original of BOSTON?

13  A.   We might have done that.

14  Q.   Do you see that anywhere --

15  A.   I'll tell you one thing, after I talked to John, I really

16  tried to get that done.

17  Q.   Let's turn to 58 C, because this is after you talked to

18  John.

19       Do you recognize -- is that your signature on 58 C?

12:55 20  A.   No.

21  Q.   Do you recognize this as a contract that was entered into

22  to perform at Q Cafe in Marlboro?

23  A.   Yeah, but I never saw this -- if I didn't sign it, I

24  didn't see it.  Even if I signed it -- I don't mean to be

25  casual about it, but, you know, there was like -- we were a

1    soft ticket item.  We weren't -- almost nobody paid to see us.

2    Q.   I guess my question is this, sir:  Whose signature is that

3    on the third page?

4    A.   Let's see.  I don't know whose that is.  I recognize Trish

5    because -- I don't know who that is.

6         Oh, okay, it says "Firefly."  That's probably the

7    owner of Firefly, and then the act.  That might be Stan's.

8    Q.   And who is Stan again?

9    A.   Stan Lewicki.  He would do stuff like that.

12:56 10   Q.   On behalf of Ernie and the Automatics.

11   A.   Yeah.

12   Q.   Now, you said that after you spoke to John Baruck, you

13   made sure things were done differently --

14   A.   Tried.

15   Q.   Tried.  Is there anything you see in this contract where

16   the venue is told how Mr. Goudreau is to be referred to?

17   A.   Oh, I don't know.  I mean, I didn't read the whole thing,

18   but --

19   Q.   I think it will speak for itself and we'll move on.

12:56 20   A.   All right.

21   Q.   You don't recall as you sit there?

22   A.   I don't think we would have put it in a contract.  I don't

23   know.

24   Q.   That may be the answer to the question.  That is the

25   answer.

1              So let's move on to 58 D.

2              Do you recognize that?

3    A.   58 D?

4    Q.   Yes.  The final page there.

5              (Pause.)

6    Q.   Do you see the signature there?

7    A.   Yeah, that's not mine -- even though it says my name,

8    that's not me.  That's probably Stan.  Again, I think this was

9    a free show.  They wheeled us in on a flatbed, and we played on

12:57 10   a football field.  Kind of cool.

11   Q.   This was July 27, 2010.  If we can scroll up to the top of

12   the page?

13   A.   Yes, 7/27 2010.

14   Q.   Which would have been about a year and five months after

15   you spoke to Mr. Baruck?

16   A.   Yes.

17   Q.   Do you see anything there where you're telling this venue

18   how Mr. Goudreau is to be holding himself out?

19   A.   No.

12:58 20   Q.   I want to move on.

21             One other contract I'll ask you to look at is Exhibit

22   29.

23             Now, this is a multipage document.

24             Do you recognize this document, sir?

25   A.   Can we make it smaller?

1    Q.    Why don't we just do smaller one page at a time.

2          I believe it is a five-page document, so why don't you

3    tell us --

4    A.    Let's get to the end and see if I signed it.  That will

5    say if I looked at it.

6    Q.    Go to the last page.

7    A.    Yes.  I remember this, yes.

8    Q.    And do you recognize Mr. Goudreau's signature there?

9    A.    Yes.

12:58 10        MR. GREEN:  Your Honor, if Ms. Stenger could approach,

11   she'll give the witness a clean copy.

12              THE COURT:  Sure.

13   BY MR. GREEN:

14   Q.    Mr. Boch, feel free to look at the screen, but Ms. Stenger

15   is also giving you a five-page clean copy here.

16              Now that you see this, can you identify this document

17   for the record, please?

18   A.    This would be -- this would be the -- kind of the

19   agreement of the band.

12:59 20   Q.    And this was entered into on what date?

21   A.    It says February 6th.

22   Q.    Of 2009?

23   A.    So before the record came out.

24   Q.    So the band had already been in existence a couple of

25   years, but this contract was entered into on or about February

1    6, 2009?

2    A.    Yeah, it was an actual record, God forbid it was a hit and

3    it started making money.  We wanted to figure out what we would

4    do.

5    Q.    And this includes a provision -- if we can turn to page 4,

6    I'll call your attention and the jury's attention to section

7    11.

8    A.    Yes.

9    Q.    That is a provision that deals with logos and artwork?

01:00 10    A.    Yes.

11    Q.    And that refers to works and album.  What did "works"

12    mean?  Actually, it's defined on page 1.

13          MR. GREEN:  Go back to page 1.

14    Q.    Do you see in paragraph 1 the term "works" is defined?

15          (Pause.)

16    A.    Yes.

17    Q.    And the works include the songs that appear under it?

18    A.    Yes.

19    Q.    And then the album is basically the CD that came out?

01:00 20    A.    Yes.

21    Q.    Turn back to page 4, Section 11.

22          This is a provision under which the band is defining

23    what should be happening with logos and artwork?

24    A.    Yes.

25    Q.    Do you see anything here that relates to how Mr. Goudreau

```
 1   is to be held out?
 2   A.   Well, it says that without written prior consent, which,
 3   you know, you can throw that out the window, nobody -- you
 4   never know what's going to happen.  So we tried to -- you know,
 5   you try to contain it, but, you know --
 6   Q.   You do understand that you had Mr. Goudreau's -- you were
 7   in charge of the advertising overall, correct?
 8   A.   Yeah, but we weren't -- this was a little -- why, sure.
 9   Q.   We mentioned various forms of advertising.  Did you
10   understand that you were acting on behalf of the various
11   members of the band in that regard?
12   A.   Yeah, but it wasn't --
13   Q.   Just yes or no, sir.
14   A.   Yes, but it wasn't like serious like that.
15   Q.   Okay.
16        And did you understand that Mr. Goudreau was one such
17   member of the band?
18   A.   What band?
19   Q.   EATA.
20   A.   Oh, yeah, sure, absolutely.
21   Q.   So when you engaged in the various advertising and
22   promotions we were talking about, you were representing the
23   entire band, including Mr. Goudreau.
24   A.   Yeah, you know, the band, yeah.
25   Q.   All right, thank you.
```

      1            A few final questions, sir.

      2            At some point in time, Ernie and the Automatics broke

      3    up?

      4    A.    Yes.

      5    Q.    That was when, sir?

      6    A.    June of '11.

      7    Q.    And whose decision was that?

      8    A.    Mine.

      9    Q.    And why did you come to that decision?

01:02 10    A.    Well, it's a little bit of a story.

     11            When the band, like, happened, I never really -- I

     12    never meant to start a band.  I never meant -- it was "Sibby"

     13    Hashian.  One thing led to another, then we started getting

     14    jobs.  Our first gig we opened for B.B. King at the Opera

     15    House.  I was scared out of my mind.  It was ridiculous.  And

     16    it kind of just happened.  And then when I figured that, hey,

     17    this is a band and then I'm a goals guy, I'm a short-term -- I

     18    like to do short-term -- I don't like to win the war, I like to

     19    win the battles which will win the war.  I said I want to bring

01:03 20    this band to play theaters.  We want to play theaters,

     21    beautiful theaters around the United States, beautiful

     22    theaters.  And we achieved that when we went out with Deep

     23    Purple.  We played the theaters, you know, and then we were

     24    in -- there's the Holiday Inn, then there's the Holiday Inn

     25    Express, then there's like the Garden Holiday Inn, and then

1    there's even Holiday Inns under that.  We were like $29 a room.

2    I had never experienced anything like that.  I'm sorry, I just

3    haven't.  So it just kind of -- we played -- I was done.

4    Q.    Thank you.  You have answered the question.

5          So this was your decision?

6    A.    Yes.

7    Q.    Did Tom Scholz have anything to do with Ernie and the

8    Automatics breaking up?

9    A.    No.

01:04 10    Q.    Did Tom Scholz in any way interfere with Ernie and the

11    Automatics playing any gigs?

12    A.    No.

13    Q.    Did Tom Scholz ever do or say anything that made it

14    difficult for Ernie and the Automatics to get gigs?

15    A.    No.

16    Q.    Did Tom Scholz ever stop you from playing any gigs?

17    A.    That I don't know.  No -- no, I'd say no.

18    Q.    One or two final questions.

19          How would you describe the music of Ernie and the

01:05 20    Automatics?

21    A.    Original blues-based rock 'n' roll.

22    Q.    So it included rock 'n' roll, correct?

23    A.    Oh, yeah.

24          MR. GREEN:  Thank you.

25          I have nothing further.

          1              Thank you, Mr. Boch.

          2              THE COURT:  Thank you.

          3              Counsel, cross-examination?

          4              MR. BAKER:  Your Honor --

          5              MR. TARLOW:  I'm going to ask Mr. Green if he can take

          6      down the screen, please.

          7              MR. GREEN:  Oh, certainly.

          8              Can you do that?

          9              THE COURT:  I don't think there's anything displayed

01:06    10      now.

         11              MR. BAKER:  There was just a moment ago.

         12              THE COURT:  It's not to the jury, counsel.

         13              MR. BAKER:  Okay.

         14                              CROSS-EXAMINATION

         15      BY MR. BAKER:

         16      Q.   Mr. Boch, did you put this band, Ernie and the Automatics,

         17      together to make money?

         18      A.   No.  I never took -- I never took a dime for it.  I always

         19      gave -- if we ever made money on a gig or if we were ever going

01:06    20      to give money, I'd give it to our foundation, Music Drives Us.

         21      Q.   Was the purpose to have fun?

         22      A.   Absolutely.

         23      Q.   Did you also seek to maybe add some revenue to your

         24      foundation?

         25      A.   Yes.

```
 1    Q.   Would you be kind enough to tell the jury what your
 2    foundation is, please?
 3    A.   Music Drives Us is at musicdrivesus.org.  Our goal is to
 4    keep music in the schools.  We do fund-raisers and scrape
 5    together and then we put grants out and the teachers -- or
 6    share various people -- if it's a sustainable situation, we'll
 7    grant them money.  Ten years I've been doing this.
 8         Dave Mustaine, he's playing at the Hard Rock December
 9    17th for Music Drives Us.
10         THE COURT:  All right.  Just wait for the next
11    question.
12         THE WITNESS:  It's going to be a big one.
13         THE COURT:  Counsel.
14         MR. BAKER:  Thank you, Judge.
15    BY MR. BAKER:
16    Q.   I would like you to tell the jury, please, a little bit
17    about your -- the way you earn your living.  Would you tell the
18    Court, please, what Boch Enterprises is?
19    A.   Boch Enterprises -- my grandfather started the business.
20    He hobbled together a business in the '40s, and then in the
21    late '50s, my father, after coming home from the war, got into
22    the business with his brothers.  My father did the front of the
23    business, my father's brother did the back of the business.
24    And my father was a go-getter and was very good at sales and
25    elevated the company.  And then in 1964, he went on television,
```

1    and there were three channels.  And just for the fact of being

2    on TV it was -- you know, and promoting your own company, he

3    was one of the first guys, and it really skyrocketed the

4    company.  And he was kind of a -- like kind of a folk hero type

5    of deal.  He was -- he was -- he was my father.

6    Q.    Are you in the business of selling automotives, sir?

7    A.    Yes.

8    Q.    Which brands, please?

9    A.    I used to -- I just sold -- I used to have a bunch of

01:09 10    dealerships.  I had Toyotas, Hondas, Mitsubishis, Kias, Dodge

11    at one point.  But I sold everything, and I kept

12    Ferrari/Maserati because I really like the cars.

13         And I also distribute Subarus throughout New England.

14    There's two separate -- there's retail and then there's the

15    Subaru.  Altogether I think it's -- I think it's, like, 27, 28

16    businesses.

17    Q.    Tell us, please, about New England Subaru.  How many cars

18    do you distribute typically on an annual basis?

19    A.    New England --

01:09 20         MR. GREEN:  Objection, relevance.

21         THE COURT:  Counsel, I'll allow this question.  We'll

22    see for the moment where it's going.

23    BY MR. BAKER:

24    Q.    How many cars --

25    A.    We got the distributorship in Subaru in 1971.  Subaru was

1    nothing like it is today.  It was a little car with 12-inch

2    tires.  And my father built it up to a very successful

3    distribution of Subarus throughout New England, and I brought

4    it to -- I am the number one private distributor for Subaru on

5    the planet as of right now.

6    Q.   In fact, you sell more Subarus than the entire country of

7    China; isn't that correct?

8    A.   Subaru of New England in the six states of New England

9    sells more Subarus than the country of Canada, the continent of

01:10  10  Australia, the country of Russia.  And China has two

11   distributors.  If you take both distributors and put them

12   together, I sell more than China.

13   Q.   Now, sir, you are an officer or director of, in the past

14   20 years, 106 companies; isn't that correct?

15   A.   On and off, yeah.  Some companies come, some companies go.

16   Q.   We can agree, can we not, sir, you are a busy man?

17   A.   Yes.  But when you're your own boss, you can get a lot

18   done.

19   Q.   Okay.

01:11  20       Now, drawing your attention, sir, to -- with respect

21   to your business advertising.  Do you participate -- are you

22   involved in advertising in your car business?

23   A.   In the automotive industry.  Yes, I control the

24   advertising that comes out of the retail stores.  Even though I

25   don't own them, I still help them with the marketing, and I'm

1  still the face of the company.  And with Subaru, even though

2  you don't see me, all those ads, all the cool jingles and all

3  that stuff comes out of my office.

4  Q.   Please tell the jury from the moment you have an idea to

5  we see it on the TV, the process.

6  A.   We just -- we do it.  We can turn stuff around very

7  quickly, extremely quickly.

8  Q.   You have an idea.  You have an in-house ad agency,

9  correct?

01:12 10  A.   Yes.

11  Q.   Tell me how that works, how the idea goes from you to the

12  ad agency.

13  A.   Just by doing business.  For example, we -- I can do it by

14  examples rather than the whole thing.

15          In November -- we've had a jingle for Subaru for --

16  maybe the last four or five years, and it was getting really

17  tired, it was just getting tired.  So my buddy, Andy, and I who

18  do them, he's, like, I got an idea, this and that, and we had

19  the thing written, done, on the air within two weeks.

01:12 20  Q.   Are you -- do you participate in the musical aspect of

21  your commercials?

22  A.   Yeah, I try.

23  Q.   Do you write some of the jingles?

24  A.   I try.

25  Q.   Okay.

1        Do you certainly consult with the professional

2   musicians who write those jingles?

3   A.   Well, no.  It's only me and Andy.

4   Q.   Now, with respect to the filming, are you involved in the

5   filming of the commercials?

6   A.   Yeah, we don't do filming anymore.  We do running footage

7   and Getty images.

8   Q.   Explain what that means, please.

9   A.   I used to do -- I used to get a camera crew and film, and

01:13 10   I'd be in the showroom or I'd film scenes.  But now with Getty

11   images, you pay one price a month and you can -- like, I don't

12   know if you're familiar with the commercials, like the girls

13   running on the beach, that's Getty images; people walking in

14   the woods, that's Getty images.  For a short amount of money

15   every month you can pick from tens of thousands of high-quality

16   television-ready images, and you just piece them together.

17   Q.   Okay.

18        Do you also advertise on PBS, Public Broadcasting

19   System?

01:13 20   A.   Yes.

21   Q.   Do you have a charity that advertises there?

22   A.   Well, they're not really advertising.  What I do on PBS is

23   I started with -- I have a friend that animates.  One thing led

24   to another, and I really like PBS, I mean, I have kids.  PBS is

25   amazing.  I don't -- I do these little things, these little,

1   like, learning things with the kids.

2   Q.   Are you the Ernie in those cartoons where you're driving

3   along?

4   A.   Yes.

5   Q.   Sir, with respect to the advertising that occurred with

6   Ernie and the Automatics, was that your responsibility?

7   A.   Yeah.  My responsibility -- it was -- when the band became

8   an actual band, then I tried to get it some sort of profile so

9   we could get gigs so ultimately we could play in theaters and

01:14 10   just do it.  It wasn't really -- it really -- I mean, on -- our

11  band -- you know, we were a local bar band.  Although I would

12  love to say we had a higher profile, believe me, I tried to get

13  us a higher profile.  It was what it was.

14  Q.   We saw a number of ads today.  Did Mr. Goudreau write the

15  copy on any of those ads?

16  A.   No.

17  Q.   Did Mr. Hashian?

18  A.   No.

19  Q.   Any of the other band members?

01:15 20  A.   No.

21  Q.   Was that you in the entirety?

22  A.   Yes.

23  Q.   Okay.

24       I think you referred a number of times in your

25  testimony -- correct me if I'm wrong -- to the fact that you

1    considered yourself a little bar band.

2    A.    I mean --

3    Q.    Would you explain that, please?

4    A.    We started -- just a regular band.  We started in bars.

5    The goal was theaters, and we did theaters.

6    Q.    Would you tell the jury, please, what the typical size

7    audience was when Ernie and the Automatics was a headlining

8    act?

9    A.    Come on.  We were -- we were mostly soft tickets, which is

01:15 10    soft -- it's a hard ticket where you actually pay, and a soft

11    ticket where you play something that charges no admission.  We

12    were mostly soft ticket items.  And any time we -- any time

13    we -- should I say this -- should I keep going?  I don't know.

14    Q.    Just asking, sir, what the size of your typical

15    performance --

16    A.    So any time that we played in front of people, it would

17    be -- we'd be opening for some band.  Actually, that's what I

18    liked the most about the band towards the end is meeting all

19    these heroes of mine and actually being able to hang out with

01:16 20    them and talk to them.  That was -- you know, it's just

21    exciting because I'm -- even though I'm not a great musician, I

22    have -- you know, I really respect it.  You know, since we're

23    talking here, I'm a little giddy that Tom Scholz is here in

24    this room.  This is cool, super cool.

25    Q.    Mr. Boch, I'm going to ask you, again, just focus on the

1    question.

2    A.    Sorry.

3    Q.    When you were the main event, when you were stand-alone

4    Ernie and the Automatics, what was the average --

5    A.    You're killing me.  Maybe 200 people.

6    Q.    Okay.

7    A.    Three hundred if we really pushed.

8    Q.    Was there a portion of those 200 people that were friends

9    and family?

01:17 10    A.    Oh, yeah, absolutely.

11    Q.    Can you make a determination of the approximate number of

12    your friends and family --

13    A.    "Sibby" would have the most.  "Sibby" would get the most

14    people out there.  And then -- so he'd have the core, and then

15    everybody else would be, you know, it was -- I don't know.  You

16    know, it's -- people either like it or they don't.  That's what

17    it was.

18    Q.    When you started Ernie and the Automatics in your

19    basement, was it your intent to dislodge the band BOSTON in its

01:17 20    marketplace?

21    A.    Actually, it wasn't my basement.  But, no, no.  What?

22    Q.    Did you try to imitate the band BOSTON?

23    A.    No.

24    Q.    Do you think the music you played -- I heard you testify

25    blues-based rock 'n' roll -- is identical to that which BOSTON

1    plays?

2    A.    No.

3    Q.    Okay.

4          Did you try to imitate the way BOSTON produced its

5    sound, its production values?

6    A.    No.  We did do -- we did do the -- we had a BOSTON medley,

7    we had a Peter Wolf medley, we had a John Cafferty medley.

8    Q.    Let us talk about that, sir.

9          Do you understand the phrase "a tip of the hat"?

01:18 10    A.    And that's exactly what we did.

11    Q.    Tell us what that means, sir.

12    A.    Ernie and the Automatics was Ernie; Barry Goudreau and

13    "Sibby" Hashian from the band BOSTON; "Tunes," Michael Antunes,

14    from Beaver Brown Band -- John Cafferty and the Beaver Brown

15    Band; and Timmy Archibald and Brian Maes were from Peter Wolf's

16    band.  I mean, it was unbelievable.

17    Q.    Let's start with Timmy Archibald and Brian Maes.  What

18    instrument did --

19    A.    Timmy plays bass, Brian plays keyboards.

01:19 20    Q.    Did you state that they came from Peter Wolf's band?

21    A.    Yes.

22    Q.    There may be somebody on the jury who doesn't know who

23    Peter Wolf --

24    A.    Everybody knows who -- we're from Boston here.  Everybody

25    knows who Peter Wolf is, right?  And the J. Geils Band?  Can I

1   talk to you guys directly?  Is that okay?

2        THE COURT:  Mr. Boch, I'm sure -- why don't we just

3   wait for the next question.

4   BY MR. BAKER:

5   Q.   Sir, you're testifying.

6        Please explain to all us who Peter Wolf is.

7   A.   Peter Wolf is legendary Boston-based musician, cover of

8   the Rolling Stone.  The J. Geils Band.  Just an incredible guy.

9   I personally know him, actually.

01:19 10  Q.   Did you, during your performances, ever play songs by J.

11  Geils?

12  A.   Absolutely.

13  Q.   Did you ever play songs from Peter Wolf's solo recordings?

14  A.   I don't know if we ever did anything from his solo stuff.

15  Q.   But when you said we gave a tip of the hat to Peter Wolf,

16  you were playing the old J. Geils?

17  A.   The J. Geils Band, yes.

18  Q.   Do you recall the titles?

19  A.   "First I Look at the Purse," I know that one.  "First I

01:20 20  Look at the Purse" -- I don't know.

21  Q.   "Freeze Frame"?

22  A.   No, we didn't -- we did the older stuff, the blues-based

23  stuff.

24  Q.   Three or four songs by J. Geils?

25  A.   Yes.

1   Q.   Now, you mentioned a gentleman named "Tunes."  Who's

2   "Tunes"?

3   A.   "Tunes" is the original sax player for the band -- John

4   Cafferty and the Beaver Brown Band.  He was in that movie

5   "Eddie and the Cruisers."

6   Q.   Did you play any songs by Beaver Brown?

7   A.   Absolutely.

8   Q.   Tip of the hat yet again?

9   A.   Yeah, their two biggest hits.

01:20 10   Q.   What were they, if you recall?

11   A.   They're big hits.

12   Q.   "On the Dark Side"?

13   A.   "On the Dark Side" and --

14   Q.   Let me describe it.  The other song with the long whaling

15   saxophone?

16   A.   Yeah, right, iconic.

17   Q.   To your knowledge -- you testified you're a huge fan of

18   BOSTON.

19   A.   Yes.

01:21 20   Q.   You ever hear a saxophone in any of BOSTON's songs?

21   A.   No.

22   Q.   Okay.

23        The other members of the band that you honored with a

24   tip of the hat.  Who else?  Other than Mr. Hashian and

25   Mr. Goudreau.

1    A.    RTZ.   Barry's band, RTZ.

2    Q.    We talked about Tim Archibald and we talked about Brian

3    Maes.

4    A.    They were in RTZ, too.

5    Q.    We talked about "Tunes."

6          Did you play BOSTON songs?

7    A.    We had a BOSTON medley.

8    Q.    Okay.

9          And how many songs was that?

01:21 10   A.    I think four.

11   Q.    Okay.

12          Now, would you play these songs with the other songs

13   when you were doing one set or two sets?

14   A.    We almost always did two sets.  They always made us do two

15   sets in clubs.

16   Q.    Let me restate the question.

17          Did you always do a tip of the hat to all of these

18   different musicians that you just identified?

19   A.    Sure.

01:22 20   Q.    Every show?

21   A.    Well, I don't know about that.  I mean, "Sibby" would do

22   the set list, and the set list would be determined on the mood

23   he's in.

24   Q.    Okay.

25          So sometimes the set was laid more with J. Geils

1    music, other times Beaver Brown.

2    A.    But was only a small part of the thing.  It was -- we

3    concentrated on the original music of Ernie and the Automatics.

4    Q.    Okay.

5          Talk about that.  I want the jury to understand what

6    the music is.

7          You said you concentrated on Ernie and the Automatics.

8    A.    We -- at first when we started, we didn't know -- the only

9    songs we knew were covers, and then I got sick of playing

01:22 10   covers because -- and I casually said to Brian, I hate playing

11   covers, we should do our own songs.  And Brian said, Hey, let's

12   do a record.  I said, "A record?"  So we did it.

13   Q.    On the CD that we've been discussing today, were they

14   cover songs or original songs?

15   A.    All original.

16   Q.    And who wrote them?

17   A.    Well, if you take a look at the publishing, the official

18   thing, we split it.  We all split it.  But the little booklet

19   that I had will tell who actually wrote the songs.  Even though

01:23 20   we split the publishing monies evenly, people did write

21   particular songs.  Brian wrote most of them.

22   Q.    You testified you distributed about a thousand CDs, did I

23   hear that --

24   A.    I think printed 2,400.

25   Q.    But I want to know how many found its way into the hands

1    of people.

2    A.    I don't know.  I have no idea.

3    Q.    Do you recall distributing more or less a thousand?

4    A.    I don't know.  I mean, Newbury Comics got some, CD Baby

5    got some, sold them at shows.  That's probably where most of

6    them were sold, at shows.

7    Q.    Did you give any away?

8    A.    Oh, yeah.

9    Q.    You say, "oh, yeah."  Would you explain the circumstances?

01:24 10    A.    Well, when the band ended, I had a lot of T-shirts left,

11    and we actually sent them to -- we sent them to a monastery

12    that has an orphanage in Burma, because I had done a Music

13    Drives Us funding for an orphanage there.  And we said,

14    Wouldn't that be cool -- because they needed clothes, we had

15    these T-shirts, let's send them.

16    Q.    Thank you for that, but I was asking you about CDs.

17    A.    I still have some left.

18    Q.    Okay.

19          Newbury Comics.

01:24 20    A.    Yes.

21    Q.    Do you know a gentleman named Mike Dreese?

22    A.    Mike Dreese is a friend of mine.  He owns and started

23    Newbury Comics.

24    Q.    Was that your way in to get the CDs?

25    A.    I called him up and I said, Mike, you got to put the CD in

1    the store.

2    Q.    To your knowledge, was the CD offered at any other retail

3    store?

4    A.    We tried to get them in -- it's very few.  We couldn't get

5    them in big box store which sells 90 percent of all the

6    records.  We couldn't get them into the Wal-Marts and stuff

7    like that.  I think we played a record store up in Maine, Moose

8    Jaw Records or Bear Records or something.  We got a few in

9    there.

01:25 10    Q.    Other than Moose Jaw or Moose Bear and Newbury Comics, to

11    your recollection today, any other retail outlets?

12    A.    Physical?

13    Q.    Yes, sold --

14    A.    I don't think so.

15    Q.    -- on a shelf, customer comes in?

16    A.    I don't think so.

17    Q.    Did you offer the CD for sale on your website?

18    A.    Yes.

19    Q.    Did you give CDs away at the CD release party?

01:25 20    A.    I think we tried to sell them then.

21    Q.    Did you give any of them away?

22    A.    Yes.

23    Q.    Sir, you mentioned a moment ago a medley that your band,

24    Ernie and the Automatics, would perform a medley of BOSTON

25    songs.  Do you recall?

A.    Yes.

Q.    Is a medley each song in its entirety or just --

A.    No, just little piece.

Q.    Okay.

      How long approximately did the medley last?

A.    It's funny, the little pieces, the ones that I can play,
because that's hard stuff; that's not easy stuff to play.  You
know, Barry would get upset with me when I couldn't get the
leads.

01:26  Q.    Let's talk about the complexities of the music.  How would
you describe BOSTON songs?

A.    Oh, my God, revolutionary.  Incredible.  Just amazing.

Q.    Let's talk about the chord changes and the structure.
They were hard to play?

A.    No, no, they're basic in that.  It was the intricacies and
the -- you know, the subtlety and the nuance was amazing.  And
the bends, my God.

Q.    Interesting stuff; fair to say?

      Would you --

01:27        THE COURT:  Was that a question?

      MR. BAKER:  It was.  He didn't answer.  I just moved
on, Judge.

      THE COURT:  Withdrawn, I take it.

      MR. BAKER:  Withdrawn, the question.  Thank you,
Judge.

1    BY MR. BAKER:

2    Q.    Mr. Boch, would you describe the blues as a very simple

3    form of music?

4    A.    No.

5    Q.    How would you describe it?

6    A.    Well, to play it right, it's as difficult as anything, but

7    it's manageable.  But we were a blues-based rock 'n' roll.

8    There's a difference.  Some are country-based rock 'n' roll.

9    Some are blues-based, some Chicago blues, Memphis blues.  We

01:27 10   were classic rock blues-based band.

11   Q.    Would you say, sir, that your production technique for the

12   Ernie and the Automatics CD you released is different from that

13   of BOSTON?

14   A.    Yeah.

15   Q.    Could you explain, please?

16   A.    We just regular -- just a recording studio.  We did it

17   digitally.  If I'm not mistaken, BOSTON was analog, which makes

18   it completely unbelievable.

19   Q.    Could you explain to the jury what analog is?

01:28 20   A.    Well, you know, you got the tape, you know, you record on

21   a tape.  That's, like, unheard of.  Nobody does that anymore.

22   And then you just do it on a computer.

23   Q.    Okay.

24   A.    That's digital.  I think they know that.

25   Q.    Sir, when did you first meet Mr. Goudreau?

1    A.    I met Barry Goudreau from "Sibby."  "Sibby" introduced me.

2    Q.    And at the time you met him, did you believe that Barry

3    Goudreau -- well, strike that.

4          Do you remember the date?

5    A.    I think it was the second time we were in the basement.  I

6    think Barry came the second time.

7    Q.    Whose basement?

8    A.    I think "Kook's" basement.

9    Q.    Who's "Kook"?

01:29 10    A.    "Kook" is a mutual friend.  I think it was "Kook's."

11    Q.    Do you remember approximately what time?  I'm talking in

12    terms of date.

13    A.    Late, because -- not like 2:00 in the morning, but I go to

14    bed early.

15    Q.    Date, month, year, anything?

16    A.    Oh, I would say somewhere -- somewhere in '04.

17    Q.    2004.

18          And at the time you met Mr. Goudreau, was it your

19    understanding that he was still a member of the band BOSTON?

01:29 20    A.    No.  I knew he was not still a member of the band BOSTON.

21    Q.    Okay.

22          Now, sir, you testified yesterday it was common

23    knowledge, at least from your perspective, that Barry Goudreau

24    was an original member of the band BOSTON?

25          MR. GREEN:  Objection.  Mischaracterizes.

1          THE COURT:  Sustained as to form, counsel.

2    BY MR. BAKER:

3    Q.    Sir, at the time that you met Mr. Goudreau, what was your

4    understanding of his relationship with the band BOSTON?

5    A.    Well, it seems in this whole thing here, that that

6    "original" is like a sticking word or something.  You know,

7    like when I was a kid and I went to see the band, the band was

8    on stage, and when I got the record, the band was on the

9    record.  And that's the band.  I mean, I don't know -- I don't

01:30 10   think it broke it down on who's original member or who isn't;

11   it's the band.

12   Q.    Did you go see the band when you were young?

13   A.    Yes.

14   Q.    What year was that approximately?

15   A.    I have no idea.  At the Boston Garden.

16   Q.    Was Mr. Goudreau performing?

17   A.    Yes.

18   Q.    Did you buy the original record?

19   A.    Did I buy the original record?  Yes.

01:30 20   Q.    We have a copy of it.  My colleague is holding it up.

21   A.    Classic friggin' record.

22          THE COURT:  Is that an exhibit, counsel?

23          MR. BAKER:  Yes, it is, Judge.

24          What number is it?

25          MR. TARLOW:  Your Honor, just for clarification, the

1    back cover of that is a stipulated exhibit.  The front cover is

2    not.

3                THE COURT:  Okay.

4                Are we offering it, counsel?

5                MR. BAKER:  Yes, we are.

6                THE COURT:  Obviously anything we show to the jury

7    we're offering.

8                MR. GREEN:  No objection.

9                THE COURT:  We'll make it the next number.

01:31 10                Mark it 59.

11                (Exhibit 59 received into evidence.)

12                MR. TARLOW:  Is it okay if we substitute it so we

13    don't mark --

14                THE WITNESS:  You never see those things.

15                MR. BAKER:  Can you hand it to the witness, please?

16                THE COURT:  You may.

17                (Discussion off the record.)

18                MR. BAKER:  Mr. Tarlow, would you call up the front

19    page -- or the front side of the album.

01:32 20                (Discussion off the record.)

21                MR. BAKER:  Judge, I've got it on the screen now.

22                THE COURT:  That may be shown.

23    BY MR. BAKER:

24    Q.   Mr. Boch, do you recognize the emblem, the symbol on the

25    front of the album?

1   A.   Yeah.

2   Q.   What do you understand it to be?

3   A.   It's the front of the record.

4   Q.   Drawing your attention to the word "BOSTON" with the

5   delineation around it --

6   A.   Yeah.

7   Q.   -- the yellow lettering, sir --

8   A.   Yeah.

9   Q.   -- are you familiar with that design?

01:32 10   A.   Yes.

11   Q.   Would you consider it a logo?

12   A.   Yes.

13   Q.   Have you seen that from when you bought this record to the

14   present over and over and over again?

15   A.   Yes.

16   Q.   Okay.

17        What do you understand it to be, sir?

18   A.   It's the name of the band.

19   Q.   The logo of BOSTON?

01:33 20   A.   It's the name of the band.

21   Q.   The BOSTON trademark?

22        MR. GREEN:  Objection.

23        THE COURT:  Sustained as to form, counsel.

24        MR. BAKER:  That's fine.

25   BY MR. BAKER:

1    Q.   Do you understand that to be a trademark?

2    A.   I assume it's a trademark.  I'm looking --

3    Q.   Do you understand it to be a trademark for BOSTON?

4    A.   I assume it's a trademark for BOSTON.  I don't know if

5    it's trademarked.

6    Q.   Let's refer to it as the BOSTON design.

7         Did you ever in any single instance use that design on

8    any of your marketing material for Ernie and the Automatics?

9    A.   No, no.

01:33 10   Q.   Are you sure?

11   A.   Yes.

12   Q.   Okay.

13        When you put the word "BOSTON" on some of these

14   advertisements that you testified to yesterday and today, was

15   it your intent to deceive the public into believing you were

16   BOSTON?

17        (Pause.)

18   A.   Sorry.  This was recorded in Watertown.  I didn't know

19   that.  Some of it.

01:34 20        Okay, sorry.

21        THE COURT:  Mr. Boch, there's a pending question.

22   I'll read it back.

23        When you put the word "BOSTON" on some of the

24   advertisements that you testified to yesterday and today, was

25   it your intent to deceive the public into believing you were

          1   BOSTON?

          2   A.    No.   I've never even heard that.

          3   Q.    Sir, did you buy the second BOSTON album, "Don't Look

          4   Back"?

          5   A.    It's a long time ago.  Yes.  I think I did, yes.

          6   Q.    Do you recall seeing the BOSTON logo on that album?

          7   A.    I can't -- I assume it's on it.  I don't -- I don't have

          8   it in my mind.

          9   Q.    Okay.

01:34    10         I'm going to ask you to turn to the back of the album.

         11         (Discussion off the record.)

         12   Q.    Do you see the backside?

         13   A.    Yes.

         14   Q.    Do you recognize the images of the musicians on it?

         15   A.    Yes.

         16   Q.    Would you tell the jury --

         17         MR. BAKER:  First off, we need to publish it, Judge.

         18         THE COURT:  Sure.  Is it Exhibit 5, counsel?

         19         MR. BAKER:  Yes, Judge.

01:35    20         MR. TARLOW:  I'll bring it up on the screen.

         21         THE COURT:  It can be published.

         22         (Discussion off the record.)

         23   BY MR. BAKER:

         24   Q.    Drawing your attention to the picture, who are the people

         25   on the back?

1   A.   Barry, Tom, "Sibby," Brad, and Fran.

2   Q.   Barry, our defendant in this case.

3   A.   Yes.

4   Q.   Tom our plaintiff, correct?

5   A.   I don't know how you mix them up like that, but, yeah.

6   Q.   Okay.

7        Now, sir, drawing your attention to the right side of

8   the printed material --

9        MR. BAKER:  We don't have the right picture on the

01:36 10  screen, Judge, but that's okay.  I'll just have the witness

11   read it.

12  Q.   Does it identify Barry Goudreau on the right?

13  A.   Yeah.  It says, BOSTON is Tom Scholz, Brad Delp, Barry

14  Goudreau, "Sib" Hashian.

15       MR. BAKER:  Your Honor, may I come closer to the jury?

16  They're not going to be able to see it.

17       THE COURT:  This is Exhibit 5.

18       MS. STENGER:  Your Honor, if I may clarify, the agreed

19  exhibit is the CD version that came out later.  This is the LP.

01:37 20       MR. GREEN:  We have no problem.

21       THE COURT:  Okay.

22       MS. STENGER:  Just to be clear.

23       MR. TARLOW:  If I could go to black, I could pull it

24  up on the screen.

25       THE CLERK:  It's all set.

```
 1  BY MR. BAKER:
 2  Q.   Sir, does the album identify Mr. Goudreau's name as guitar
 3  player on it?
 4  A.   Yes, lead and rhythm guitars.
 5       MR. BAKER:  Can I give it to the jury, your Honor?
 6  It's just easier.
 7       THE COURT:  You may.
 8       (Pause.)
 9  BY MR. BAKER:
10  Q.   Now, sir, do you see a description on the back of the
11  album where the way in which the music was produced is
12  identified?
13  A.   I don't understand the question.
14       MR. BAKER:  May I approach the witness, your Honor,
15  please?
16       THE COURT:  You may.
17       (Discussion off the record.)
18  A.   I haven't read this in a while.
19  Q.   Would you read how the music is produced as identified on
20  the back?  Slowly, please.
21  A.   Read it?
22  Q.   Yes.
23  A.   Aloud?
24  Q.   Yes, please.
25  A.   "If you insist on having it further spelled out for you,
```

1    consider this.  What distinguishes Boston's music is although

2    it's by definition heavy rock & roll, it evidences a great

3    concern for melodic and harmonic flow than practically any band

4    you can think of working the same general territory."

5           Wow.  Made a lot more sense when I was a kid.

6    Q.   Please keep reading.

7    A.   "Also, consider the use of technology as an instrument,

8    all the more remarkable because this is a first album."  Which

9    is true.  "Of the tendency for technology to take over in the

01:39 10   hands of lesser practitioners"...  mmm.

11   Q.   Sir, is this -- was this the objective of Ernie and the

12   Automatics when it recorded its first CD, to use --

13   A.   No, this is a whole different thing.

14   Q.   Explain, please.

15   A.   This is friggin' BOSTON.  I mean, this is legendary.  They

16   said that they -- that this couldn't be reproduced live.  They

17   were like -- when you go out there, no way they can do this

18   live.  It was like Steely Dan.  Remember when Steely first came

19   out?  There's no way he can do that live.  They did this live.

01:39 20   It's unbelievable.

21   Q.   Did you ever see offered for sale a live performance of

22   the band BOSTON?

23   A.   For sale?

24   Q.   Yes.

25   A.   Oh, I don't know.

1    Q.    Do you have one?

2    A.    No, I don't -- well, no, because that's fake crowds --

3    from what I understand, that's fake crowds that were in that.

4    Q.    Going back to the question to your knowledge was Barry

5    Goudreau an original member of BOSTON, can you tell me if you

6    understood that he was?

7    A.    Growing up, I understood that this was the band.

8    Q.    Okay.

9          And please tell the jury the basis for that

01:40 10    understanding.  You just referred to the album.  Anything else?

11    A.    Well, you go to the show, you see the band, you buy the

12    record, you go to the -- they even had -- they were on South

13    Park.  You guys see South Park when they had BOSTON on there?

14    That's who they put on.  That's who they put on.  Especially

15    "Sib."  "Sib" was an iconic -- you could take a silhouette of

16    "Sib" with the hair and say what band was this from and people

17    would know what band it was.

18    Q.    You just mentioned South Park.  Can you explain please?

19    A.    They had a little thing on BOSTON.  It's like the

01:41 20    Aerosmith was on the Simpsons, same type of deal.

21    Q.    Did you see when BOSTON was on South Park?

22    A.    Yeah.

23    Q.    Okay.

24          And what did you recognize to be the lineup at that

25    time on South Park?

1    A.    This lineup.

2    Q.    Cartoon figures, correct?

3    A.    Yeah, cartoon figures.

4    Q.    And you had no problem identifying "Sib," the Afro?

5    A.    Just like the Simpsons.

6    Q.    Barry?

7    A.    Yeah.

8    Q.    Tom?

9    A.    Barry was like -- Barry has that iconic '70s look.

01:41 10    Q.    Whose idea was it to make the Ernie and the Automatics CD?

11    A.    Brian came up with the idea, and I ran with it.

12    Q.    Brian Maes?

13    A.    Yes.

14    Q.    Talented musician?

15    A.    Very talented.

16    Q.    Was he the band leader?

17    A.    Yeah, he was the musical director.  I would say him and

18    Barry -- more Brian, I think.

19    Q.    Explain to the jury, please, what a band director is -- or

01:42 20    musical director, I beg your pardon.

21    A.    He's the -- I never wanted to call it Ernie and the

22    Automatics.  That was "Sib's" idea.  But Brian was -- he was

23    the one who wrote most of the songs, and if we were going to do

24    a cover, he would bang out the chords, stuff like that.

25    Q.    Well, is it true, sir, that in any band, there's got to be

1    somebody in charge for rehearsals?

2    A.    Absolutely.

3    Q.    And when the band performs live, there's got to be

4    somebody up there calling the shots?

5    A.    Absolutely.

6    Q.    Was that person Brian Maes?

7    A.    Yes.

8    Q.    What was Barry Goudreau's job in the band?

9    A.    Guitar player.

01:43 10   Q.    Beginning and ending?

11   A.    What do you mean?

12   Q.    Nothing more, nothing else?

13   A.    Well, no, I mean, he was in the band.  He -- he brought

14   songs in and he was showing me -- Brian would say, Here are the

15   chords; Barry would go, Here are the chords.

16   Q.    Now, sir, at some point, did you create a limited

17   liability company, Ernie and the Automatics?

18   A.    Probably.

19         (Discussion off the record.)

01:43 20         MR. BAKER:  Your Honor, I'd like to turn to Exhibit

21   54.  Mr. Tarlow will put it on the screen.

22         THE COURT:  Yes.

23         MR. BAKER:  It's an admitted exhibit.

24   BY MR. BAKER:

25   Q.    Do you recognize that smiling face up at the top, sir?

1    A.    Oh, yeah, the -- Galvin.

2    Q.    Do you recognize this document?

3          (Pause.)

4    A.    No.

5          MR. BAKER:  Stop right there, please.

6    Q.    Do you see it says, Ernie and the Automatics, LLC?

7    A.    This is a necessary evil.  You know, as the band started

8    to travel and insurance -- especially with me there and

9    everything, all this different stuff had to kick in.  I let it

01:44 10   basically happen.  I listened to my CFO and Kathleen, You got

11   to do this, you got to do that.  I said, Okay.

12   Q.    Kathleen is your lawyer?

13   A.    Yeah, my in-house.

14   Q.    So let's take a look at the statement.  It says, "Summary

15   For," do you see that on the document, sir?

16   A.    Yes.

17   Q.    And then it has the name Ernie and the Automatics, LLC?

18   A.    Yes.

19   Q.    Do you understand this document to be a document of

01:45 20   incorporation for Ernie and the Automatics?

21   A.    Yes.

22   Q.    Okay.

23         Now let's look at the date of it.

24         Do you see the date?  It says November 3, 2008.

25   A.    Yes.

```
 1   Q.   Is that right in the middle of the band's activities?
 2   A.   That's when it started to, you know -- we started to get
 3   more work.
 4   Q.   111 Morse Street, Norwood, the corporate address of this
 5   LLC, we'll call it the Ernie LLC.  Do you see that?
 6   A.   Yes.
 7   Q.   Whose address is 111 Morse Street, Norwood?
 8   A.   Hang on.
 9        Mmm.
10        That's my new address that was nonexistent when this
11   document was made.
12   Q.   Okay.
13        You see below it, it says, "95 Morse Street"?
14   A.   That's the old building, yes.
15   Q.   Is 111 Morse Street today the headquarters of Ernie
16   Boch --
17   A.   Subaru of New England, yes.
18   Q.   And it identifies you and a gentleman by the name of
19   Robert Wakely as the manager.  Do you see that?
20   A.   Yes.
21   Q.   And it identifies further in the document your name again
22   and Mr. Wakely.
23   A.   Yes.
24   Q.   Does Mr. Wakely work for you, sir?
25   A.   Yes, he's my CFO.
```

1    Q.    Okay.

2          Let's go to the second page.

3          Just sort of a round out, a closing of the document;

4    fair to say?

5    A.    Yes.

6    Q.    Okay.

7          Did Barry Goudreau own any interest in this limited

8    liability company?

9    A.    No.

01:46 10  Q.    Did you make Barry Goudreau an officer or a director of

11   this company?

12   A.    I don't think so.

13   Q.    Did you make him an employee of this company?

14   A.    I don't really know, like, the exact breakdown to the

15   structure.  Again, we did this because we had to.

16   Q.    Did you ever issue to Barry Goudreau a W-2 from Ernie and

17   the Automatics, LLC?

18   A.    Probably.

19   Q.    For being an employee of this company as a guitar player,

01:47 20  correct?

21   A.    Yes.

22   Q.    Okay.

23         Did he have any managerial authority?

24   A.    No.  They ran away.  The rest of the band ran away from

25   managerial authority.

1    Q.    What does that mean?

2    A.    They just didn't have any interest in it.

3    Q.    Sir, when you were creating the ads that Attorney Green

4    showed you this morning, did you consult before these ads were

5    made with Mr. Goudreau?

6    A.    No.

7    Q.    Did you say to Mr. Goudreau, I want to make sure I get

8    this right, please let me run this by you?

9    A.    No.

01:47 10    Q.    Okay.

11          And did you do that with any other band member?

12    A.    No.

13    Q.    In fact, it was you and your advertising agency that did

14    all of it?

15    A.    Yes.

16    Q.    Okay.

17          Did Mr. Goudreau control any aspect of the business of

18    Ernie and the Automatics other than playing the guitar?

19    A.    No.

01:48 20    Q.    Anyone else in the band?

21    A.    No.

22          (Pause.)

23    Q.    Sir, with respect to Ernie and the Automatics, is this a

24    fair statement:  You make all the decisions?

25    A.    Yes.

1           MR. GREEN:  Objection.

2   A.   At the time, yes.

3           THE COURT:  Well, overruled.  The answer can stand.

4   BY MR. BAKER:

5   Q.   At the time, did you make all the decisions relating to

6   Ernie and the Automatics?  At the time meaning, let's choose

7   the period from 2007 to 2011.

8   A.   Yeah, we would have band meetings, but it was more like

9   "Sibby" didn't want to do two gigs in one day, you know, stuff

01:49 10   like that.  You know, we need road equipment, like, you know

11   what I mean.  We're, like, we got to get road equipment because

12   it's starting to this and that, that type of stuff.

13   Q.   Sir, do you know what a travel case is for musical

14   equipment?

15   A.   Yes.

16   Q.   Would you please explain to the jury what it is?

17   A.   You know those big containers that have all the

18   instruments in it.  You see them backstage.  Everybody has

19   them.

01:49 20   Q.   Okay.  Did you -- did Ernie and the Automatics have a

21   collection of travel cases?

22   A.   Well, when it came time where we had to actually move it

23   other than down the street or the next state over, you needed,

24   you know, some sturdy cases for the equipment because the

25   equipment was valuable and fragile.

1    Q.    Did the members of your band all sort of pot luck

2    contribute their cases?

3    A.    Yeah, some had -- Brian had some, Barry had some, I think

4    "Sibby" had a couple, and then I bought some.

5    Q.    Now, with respect to the travel cases that Barry and

6    "Sibby" had, did they originally have the BOSTON logo on it?

7    A.    They did.

8    Q.    And once those travel cases became your property, did you

9    do anything with respect to those logos?

01:50  10    A.    I painted them all red.  Our travel cases were red because

11    backstage everybody was black.  So you had to watch your stuff.

12    So I painted them red and put "Ernie and the Automatics" on

13    them.

14    Q.    Stamped it of right over --

15    A.    Stencilled it.  Looked really cool.

16    Q.    Couldn't see the BOSTON logo, correct?

17    A.    No.  But I'll tell you, back in the day, they used to make

18    a stencil and spray it, because if you take a look at all the

19    road cases, you can tell that's what they did.  Now they have

01:51  20    adhesive stickers, but I literally did the spray paint.

21    Q.    When did you do that, sir?

22    A.    When we started to use them.

23    Q.    Okay.

24          And why was that?  Why did you paint over the BOSTON

25    logo?

1    A.    Because we needed road cases and we needed them for Ernie

2    and the Automatics and I wanted to -- I wanted to paint them

3    red to distinguish ours backstage so the roadies, when they

4    grabbed them, they knew exactly -- nobody else had red, and I

5    wanted to put the names on them so it looked cool.

6    Q.    Okay.

7          MR. BAKER:  I'd like to look at some ads, Mr. Tarlow,

8    please.

9          (Discussion off the record.)

01:52 10          MR. BAKER:  Judge, Exhibit 20, please.

11          THE COURT:  It may be published.

12          MR. BAKER:  All right.

13          Now, I want to show the picture in its entirety, then

14    I want to focus on some of the language.  So I'm going to have

15    Mr. Tarlow blow it up periodically, Judge.

16    BY MR. BAKER:

17    Q.    Sir, taking a look at this exhibit, do you recall this

18    document as an Ernie and the Automatics advertisement?

19    A.    Yeah, but this doesn't have my fingerprints on it.

01:52 20    Q.    Okay.

21          Drawing your attention, sir, to the date, you see it

22    says, Thursday, July 26, 2007?

23    A.    Yeah.

24    Q.    Looking below, do you see a picture of Ernie and the

25    Automatics?

```
 1    A.    Well, this was before --

 2    Q.    Do you see a picture of Ernie and the Automatics?  I'm

 3    asking a question.

 4    A.    No.  No, this was before.

 5    Q.    Underneath that -- it does show some musicians, does it

 6    not?

 7    A.    Yes.

 8    Q.    Tim Archibald on the far right?

 9    A.    Yes.

10    Q.    "Sib" Hashian next?

11    A.    Yes.

12    Q.    Barry Goudreau?

13    A.    Yes.

14    Q.    Then that looks like Jim Belushi?

15    A.    Yeah, he wasn't part of the band.

16    Q.    And who's the person next, the next image?

17    A.    That looks like James Montgomery.

18    Q.    There's a guitar player.  Is that you?

19    A.    That's me.

20    Q.    All right.  You look pretty good.

21    A.    Yeah.

22    Q.    Now, sir, it says, feature -- above that, I beg your

23    pardon, it says, "Ernie and the Automatics"?

24    A.    That's funny.  I didn't think we called ourselves Ernie

25    and the Automatics until we got Brian.
```

Q.   Okay.

Drawing your attention, sir, to the notation below where it says, "featuring 'Sibby' Hashian and Barry Goudreau former members of BOSTON."  Do you see that?

A.   Yes.

Q.   That use of the word "former," what is your understanding of where it came from?

A.   Well, this does not -- this isn't our -- I didn't make this, but it looks like somebody took the elements --

MR. GREEN:  Objection, your Honor.

THE COURT:  Sustained.

MR. GREEN:  Objection to foundation.

THE COURT:  Sustained as to that given the answer.

MR. BAKER:  It's an admitted exhibit, your Honor.  I can ask him questions on it as I understand it.

THE COURT:  I understand that, but it's what questions you can ask given the lack of foundation as to this question given the prior answer.

BY MR. BAKER:

Q.   Sir, did you assist in or participate in putting together this ad with anybody?

A.   No.  It doesn't look like it has my fingerprints on it. But the elements, somebody took the elements and put it all together.

Q.   Do you see where it says, "'Sibby' Hashian and Barry

1    Goudreau"?

2    A.    Yes.

3    Q.    Underneath it, it says, "former members"?

4    A.    Yes.

5    Q.    Would that come from you?

6    A.    Yeah, the font and everything -- they took this from

7    somewhere and put it together.

8    Q.    So with respect just to the statement "'Sibby' Hashian and

9    Barry Goudreau former members of BOSTON," where did you learn

01:55 10    to refer to them as former members of BOSTON?

11    A.    When we first started playing, I didn't know there was an

12    issue with anything, and then Barry told me that you have to --

13    you had to do -- had to do it a certain way because he had some

14    deal.  And I got to be right upfront.  At the beginning, I

15    didn't really pay that much attention to it because to me it

16    wasn't -- I didn't understand the repercussions.  I had no

17    idea.  So I'm, like, yeah, yeah, yeah.

18    Q.    Looking at the date, July 26, 2007, does that confirm in

19    your mind that at least as late as July 26, 2007 you knew that

01:55 20    you had to refer to Barry as former member?

21    A.    Yeah, yeah.  That was -- yeah, I would think -- again, I'm

22    really not great on dates.  I would say before that.

23    Q.    Okay.

24         Approximately how long before that, sir?

25    A.    Only when -- only when it started to come up.  Only when

1    stuff -- only when Barry would see an ad or something --

2    because, at first, we didn't -- we never put anything, it

3    didn't even matter.

4            (Discussion off the record.)

5    Q.   Was this the first real live performance you did out,

6    shall we say?

7    A.   This is the Cape Cod Melody Tent, yes.  This is -- we

8    didn't have Brian, we didn't have "Tunes."

9    Q.   So that's the first one you did, correct?

01:57 10   A.   Yeah, that was the first -- that was the first, like --

11   yes.  Yeah, in front of people on a stage.  And I didn't

12   realize we called it Ernie and the Automatics back then.

13   Q.   Who is Kenny Wayne Shepherd?

14   A.   Kenny Wayne Shepherd, legendary blues guitar player.

15   Young kid, but very, very good.

16   Q.   Were you the supporting act, sir?

17   A.   Yes.

18   Q.   Did you play -- what kind of music did you play?

19   A.   I think we played covers.

01:57 20   Q.   Do you remember the songs?

21   A.   I think -- I think -- there might have been -- there might

22   have been an original one or two from me, but this is before.

23   This wasn't -- this wasn't -- "Good Time Charlie," I know we

24   played that.

25   Q.   Well, you were supporting a blues --

1    A.    Well, they were all blues tunes that we did, that I know.

2    Q.    That's what I want.  All right.

3          Now, let's take a look at Exhibit 21.  Actually, I

4    want to go to Exhibit 23.

5          Sir, this Chuck Berry ad, did you put this

6    advertisement together?

7    A.    That's not an add.

8    Q.    I beg your pardon?

9    A.    That's a poster.

01:58 10   Q.    Did you make a poster?

11   A.    Yes.

12   Q.    Did Ernie and the Automatics play with Chuck Berry?

13   A.    Yes.

14   Q.    As if he needs no introduction, please tell the jury.

15   A.    Just turned --

16   Q.    Ninety?

17   A.    Ninety, two days ago.  Amazing.  Chuck Berry, architect of

18   rock 'n' roll.

19   Q.    Did you consider it a great honor to --

01:58 20   A.    Incredible honor.

21   Q.    I'm sorry?

22   A.    Incredible honor.

23   Q.    Identify the supergroup.

24   A.    Well --

25   Q.    Well, explain why there's a so-called supergroup?

A.   Well, this is Woody Giessmann's foundation.  He's the
original drummer for the band The Del Fuegos.  And he has a
foundation, a business, a nonprofit business, called Right
Turn, and he helps musicians with drug problems.  So he would
do concerts to raise money for that, and we would play.  But
over and above Chuck Berry, I mean, Chuck Leavell from the
Allman Brothers; Simon Kirk from Bad Company; Chad Smith stayed
at my house that night because he had to get up early for a
rehearsal.  And "Skunk" Baxter from Steely Dan, Ricky Byrd from
Joan Jett.  It was unbelievable.

          THE COURT:  I hate to cut it off at this point, but
given the time, I'm going to, as we said we'd stop at 2:00 for
the jury.

          MR. BAKER:  Okay, Judge.  I'm sorry.

          THE COURT:  Mr. Boch, we're going to have to stop here
for the day.

          THE WITNESS:  Do I have to come back tomorrow?

          THE COURT:  You do.

          THE WITNESS:  Okay.

          THE COURT:  Thank you, Mr. Boch.

          THE WITNESS:  Thank you.

          THE COURT:  Jurors, given that it's 2:00, just keep
all of my cautionary instructions in mind.  You're still
hearing evidence, so keep an open mind.  Don't talk to each
other or anybody else about the case.

1          Tomorrow we return to our normal 9:00 to 1:00

2    schedule.  So if you can be here a little before 9:00.

3          Okay.  Thank you for your attention.

4          (Jury left the courtroom.)

5          THE COURT:  Mr. Boch, you can step down.  Thank you.

6          Counsel, anything that can't wait until tomorrow at

7    8:45?

8          MR. GREEN:  Not from our end, your Honor.

9          MR. BAKER:  Nothing that can't wait, Judge --

02:01 10          THE COURT:  And I know that you wanted to be heard on

11   the other issue --

12          MR. GIVEN:  Yes, your Honor.

13          THE COURT:  -- which has been reserved.

14          MR. GIVEN:  Understood.

15          May I -- there is one small housekeeping matter.  We

16   served a subpoena on Paul Geary.  He's a resident of Los

17   Angeles.

18          THE COURT:  What's the name again?

19          MR. GIVEN:  Geary, G-e-a-r-y.

02:01 20          I understand he's in the Boston area.  He's from the

21   Boston area.  He's very anxious to get back to Los Angeles.

22   I'd like to take him out of order with the Court's indulgence.

23   I'm thinking Thursday morning 9 A.  I probably only need about

24   an hour with him.

25          THE COURT:  Well, I've certainly taken witnesses out

1    of order in other cases.  I just ask you to talk with your

2    brother and see what can be worked out and just remind me

3    tomorrow morning.

4         MR. GIVEN:  Thank you, your Honor.

5         MR. BAKER:  Judge, one comment.

6         Defendant requests an instruction you give to the

7    jury.  There was one question asked today about the purchase of

8    the CD, and there was a representation --

9         THE COURT:  And I think I struck it, counsel, if I

02:02 10    recall correctly.

11         MR. BAKER:  I know you struck it.  I'm requesting an

12    instruction.  Ladies and gentlemen of the jury, that was a

13    question, there was no answer.  The question is not evidence.

14    Disregard it.

15         THE COURT:  Counsel, if you still want me to do that

16    tomorrow, remind me in the morning.

17         MR. BAKER:  I will do so, Judge.

18         THE COURT:  Thank you.

19         (Court adjourned at 2:02 p.m.)

20              - - - - - - - - - - - -

21

22

23

24

25

1                         CERTIFICATION

2           I certify that the foregoing is a correct transcript

3    of the record of proceedings in the above-entitled matter to

4    the best of my skill and ability.

5

6

7    /s/Debra M. Joyce____            June 8, 2017_____
     Debra M. Joyce, RMR, CRR, FCRR        Date
8    Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2

3    WITNESS                                                    PAGE

4

     ERNEST BOCH, JR
5
        Continued Direct Examination                            15
6       By Mr. Green
        Cross-Examination                                       91
7       By Mr. Baker

8

9
                              E X H I B I T S
10

11   Exhibit No.            Description                    Received

12
        56          Printout of payments from Ernie Boch,     16
13                  Jr.
                    (entities) to Barry Goudreau
14
        42          Promotional Material for Ernie and        33
15                  the
                    Automatics - Booking Photo
16
        57          YouTube video                             45
17
        34          CD - Ernie and the Automatics "Low        52
18                  Expectations" (including cover and
                    cellophane)
19
        AA          Ernie and the Automatics CD               55
20
        36          Open E Records - "The Good Times          56
21                  (never last)"

22      35          Open E Records Presents . . .              60

23      40          Promotional Material for Ernie and        61
                    the
24                  Automatics - "Music for Films"

25

1                    INDEX  (Cont'd)

2      41           Promotional Material for Ernie and    62
                    the
3                   Automatics – CD release Party 2/17

4      37           Wilberts Food & Music                        65

5      48           Email from Tom Baggott to Stanley            67
                    Lewicki, re:
6                   "Boston songs"

7      58 A through Ernie and the Automatics contracts           76
       D
8      1 through 56 Agreed–To Trial Exhibits                     81

9      59           Album cover                                 111

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25