1                UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS
2

3    _____

4    DONALD THOMAS SCHOLZ,

5                    Plaintiff,          Civil Action
                                         No. 13-10951-DJC
6    V.
                                         October 26, 2016
7    BARRY GOUDREAU,                     8:46 a.m.

8                    Defendant.
     _____
9

10

11              TRANSCRIPT OF JURY TRIAL DAY 3

12          BEFORE THE HONORABLE DENISE J. CASPER

13              UNITED STATES DISTRICT COURT

14          JOHN J. MOAKLEY U.S. COURTHOUSE

15                   1 COURTHOUSE WAY

16                  BOSTON, MA  02210

17

18

19

20
             DEBRA M. JOYCE, RMR, CRR, FCRR
21                Official Court Reporter
             John J. Moakley U.S. Courthouse
22            1 Courthouse Way, Room 5204
                    Boston, MA  02210
23               joycedebra@gmail.com

24

25

1    APPEARANCES:

2    FOR THE PLAINTIFF:

3    LAWRENCE G. GREEN, ESQ.
     SUSAN E. STENGER, ESQ.
4    Burns & Levinson LLP
     125 Summer Street
5    Boston, MA 02110
     617-345-3000
6
     FOR THE DEFENDANT:
7
     JEFFREY S. BAKER, ESQ.
8    Baker & Associates
     2 West Hill Place
9    Suite 100
     Boston, MA 02114
10   617-573-9505

11   DAVID M. GIVEN, ESQ.
     Phillips, Erlewine, Given & Carlin LLP
12   39 Mesa Street, Suite 201 - The Presidio
     San Francisco, CA 94129
13   415-398-0900

14   DANIEL P. TARLOW, ESQ.
     Copani Tarlow & Cranney
15   265 Broadway
     Methuen, MA 01844
16   978-686-0010

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

          (The following proceedings were held in open

court before the Honorable Denise J. Casper, United States

District Judge, United States District Court, District of

Massachusetts, at the John J. Moakley United States Courthouse,

1 Courthouse Way, Boston, Massachusetts, on October 26, 2016.)

          THE COURT:  Good morning, counsel.

          ALL:  Good morning, your Honor.

          THE COURT:  Counsel, I think, Mr. Given, at the end of

yesterday, there were two things you wanted to raise.  One was

in regards to the issue you had reserved on in regards to the

opening.

          MR. GIVEN:  Yes, ma'am.

          THE COURT:  Okay.

          MR. GIVEN:  And the other had to do with Paul Geary,

who is an out-of-state witness.

          THE COURT:  Okay.  For Thursday.

          MR. GIVEN:  Let's take the second matter first.

          Mr. Green and I conferred last night.  We have agreed

to take Mr. Geary out of order beginning at 9:00 a.m.  He was

served with a trial subpoena, and he's available to testify.

          Thank you, your Honor.

          THE COURT:  Counsel, just remind me in the morning,

and I'll give them an instruction about that.

          MR. GIVEN:  We'll do that.

1          THE COURT:  Okay.

2          MR. GIVEN:  As to the matter reserved, your Honor,

3   following the opening statement of Attorney Green, we now move

4   under Federal Rule of Civil Procedure 50 for judgment as a

5   matter of law on one of the three remaining counts of

6   Mr. Scholz, that count being the claim for breach of the

7   implied covenant of good faith and fair dealing.

8          THE COURT:  Okay.

9          MR. GIVEN:  Now, in the trial brief that we received a

08:47 10   week before this trial began, it became clear that plaintiff

11   Scholz has now abandoned his so-called affiliation case, and I

12   refer in particular to the operative pleading, document 43 at

13   paragraph 36 and paragraph 39.

14          This is no longer a case, as I understand it, based

15   both upon the trial brief and the opening statement of Attorney

16   Green, for affiliation.  Rather, the opening statement

17   confirmed without question that this is a counterfeit case.  In

18   fact, Mr. Green used the expression "new incarnation of BOSTON"

19   three separate times in his opening statement.

08:48 20          Why did he do that?  He did that because this is not a

21   case for actual damages.  I think we're all quite clear on that

22   subtlety point.  And we didn't hear one word in the opening

23   statement about damages.

24          This is a case for disgorgement of profit, both as to

25   the two remaining secondary liability counts for trademark

1    infringement and with respect to the remaining Count IV, breach

2    of the implied covenant of good faith and fair dealing.

3            The other thing that we heard no mention of in the

4    opening statement -- and the reason we're bringing this motion

5    to the Court's attention at this time -- is we heard nothing

6    whatsoever about fiduciary obligation.  Nothing whatsoever

7    about fiduciary duty running between the named parties,

8    Mr. Scholz and Mr. Goudreau.  Zero.  And in fact, that matter

9    was neither pled in the complaint, discussed in the trial

08:49 10   brief, or mentioned in any way, shape or form in the opening

11   statement.

12            Now, as it pertains to plaintiff's claim for the

13   implied covenant, because there is no actual damages being

14   claimed, the only claim remaining as to that count is

15   disgorgement of profit.

16            Can you pull up the slide?

17            Is the slide before your Honor?

18            I wanted to make reference to Exhibit -- this is a

19   contested exhibit, it's Exhibit 80 -- excuse me, 8-O.

08:50 20         Can you put it up on the screen?

21            (Discussion off the record.)

22            MR. GIVEN:  08?

23            THE COURT:  I see it now.

24            MR. GIVEN:  In any event, it's before your Honor now.

25            This is an example of a 1099 that was issued by Paul

         1   Ahern, doing business as Ahern Associates, payable to

         2   Mr. Goudreau reflecting his payments of record royalties for

         3   the year 2010.

         4        I will say this is an exhibit that the plaintiff

         5   proposes to proffer, but what it shows is that any payments

         6   with regard to the record royalties, which is the sole

         7   remaining subject of the claim of profit as to the implied

         8   covenant of good faith and fair dealing, is not paid by

         9   Mr. Scholz; it's paid by a third party.  So this is not a

08:51   10   restitution claim.  This is a claim for disgorgement of profit.

        11        Mr. Goudreau is being paid by a third party,

        12   Mr. Ahern, and Mr. Scholz is claiming that he has a right to

        13   those payments as a result of the alleged breach of the implied

        14   covenant of good faith and fair dealing on the part of

        15   Mr. Goudreau.

        16        Now, we have briefed this subject on two separate

        17   occasions, your Honor.  I make reference to document 203 at

        18   pages 16 and 17, as well as document 230 at pages 4 and 5.  I'm

        19   sorry, 3 and 4.

08:51   20        Bear with me.  I just started wearing these glasses,

        21   and it's difficult to do this standing up.

        22        THE COURT:  Counsel, before, you mentioned something

        23   about the plaintiff's trial brief.

        24        MR. GIVEN:  Yes.

        25        THE COURT:  What was your point -- your point in that

1    regard was some abandonment of the theory from the complaint

2    basically on the association?

3          MR. GIVEN:  Exactly right.

4          This is not a claim for an unlawful affiliation,

5    unlawful sponsorship, unlawful endorsement under the federal

6    Lanham Act by Mr. Scholz against Mr. Goudreau for what we

7    contend is the lawful use of the word "BOSTON" in describing

8    Mr. Goudreau's former affiliation with that band.

9          Now, put all the stuff aside about former versus

08:52 10   original, all that stuff, that is out of this case.  This is a

11   straight-up counterfeit case at this point.

12         The contention of Mr. Scholz and his attorneys at this

13   point in time is that the band Ernie and the Automatics

14   intended to pass themselves off as an Aristos version of the

15   band BOSTON.

16         So, if you look at the case law in this circuit and in

17   this state, which I educated myself on before coming here last

18   week, the law is crystal clear that there is no claim for

19   disgorgement of profit for a claim of breach of contract/breach

08:53 20   of the implied covenant of good faith and fair dealing if there

21   is no fiduciary duty running between the two parties.  And we

22   cited case law starting at page 4, document 230.  Kansas v.

23   Nebraska, which is a Supreme Court case citing the Restatement

24   of Contracts at Section 12.7(4) at page 171; and the

25   Chedd-Angier case, 756 F.2d 930, jump cite 937.  Quote, Under

1    Massachusetts law, an equitable accounting -- which is the

2    equivalent of a claim for discouragement of profit, as I

3    understand it, under Massachusetts law -- is available only if

4    there exists a fiduciary or trust relationship between the

5    parties.

6            We also cited Farnsworth on Contracts on the same

7    subject.  This is, again, at document 230, page 4.

8            On the subject of remedies -- Farnsworth is my

9    personal favorite on the subject of contracts.  That's Section

08:54 10    12.20a, page 338 et seq., quote, Close examination of such

11    disgorgement principles, suggests: first, it is not sound as a

12    general proposition; and second, there is nonetheless a case

13    for its limited application.  Explaining further, that such

14    case -- meaning this case for limited application -- involves

15    either a fiduciary relationship or the sale of land.

16            In the State of Massachusetts and in this circuit, as

17    I understand it, the latter is not pertinent, and it's

18    certainly not pertinent in this case.

19            And as I said before, there is no claim of any

08:55 20    fiduciary relationship running between Mr. Scholz and

21    Mr. Goudreau.  I haven't heard one word about it, hasn't been

22    pled, wasn't discussed in the trial brief, wasn't discussed in

23    the opening statement.  Accordingly, we move that the count for

24    implied covenant of good faith and fair dealing by Mr. Scholz

25    against Mr. Goudreau be dismissed at this time.

1          Thank you, your Honor.

2          THE COURT:  Thank you, counsel.

3          Mr. Green.

4          MR. GREEN:  Yes, your Honor.

5          May I pass up to the Court two cases for the Court's

6    consideration?

7          THE COURT:  If you've shared them with your brothers,

8    yes.

9          MR. GREEN:  I'm sharing them now.

08:56 10          If my paralegal could pass these up.

11          THE COURT:  Sure.

12          MR. GREEN:  Your Honor, we begin with the Franchi

13    case, where the 1st Circuit has set forth what the standard is

14    for ruling on this type of motion.  And I call the Court's

15    attention to the language that we highlighted on page 6, where

16    the 1st Circuit instructs, While the district court has the

17    power to direct a verdict following the plaintiff's opening

18    statement, to warrant the exercise of that power, quote, it

19    must clearly appear after resolving all doubts in plaintiff's

08:56 20    favor that no cause of action exists.  The court went on to

21    basically affirm the district court did not err in refusing to

22    grant the motion.  That's the law of the 1st Circuit as to what

23    the standard is for this type of motion.

24          I now want to call the Court's attention to the Bruno

25    case, which is a decision by Judge Woodlock.  It basically

1    summarizes other District of Massachusetts law on the covenant
2    of good faith and fair dealing.  I've called the Court's
3    attention to page 5.  And in page 5, the court, citing to all
4    kinds of state and federal law, says that the covenant of good
5    faith and fair dealing -- you have to show bad faith, but bad
6    faith is a lack of good faith that can mean acting in a manner
7    that does not comport with the parties' reasonable expectations
8    as to performance, acting with honest -- acting with dishonest
9    purpose or conscious wrongdoing, or exercising discretionary
08:58 10   power under the contract to recapture opportunities forgone on
11   contracting as determined by the other party's reasonable
12   expectations.
13          There is nothing here, your Honor, about fiduciary
14   duty.  That is not what the covenant of good faith and fair
15   dealing is based upon.
16          And with all respect to my brother, he -- I'm sure it
17   was not intentional, but he has twisted everything he can to
18   come up with this contorted basis for his motion.
19          We begin, your Honor, with your Memorandum and Order
08:58 20   of September 21.  That is the law of the case here.  And you in
21   various places in this, but calling the Court's attention to
22   pages 15 and 16, you basically said that the question here is
23   we have a dispute as to a material fact on the following
24   issue -- at the bottom of 15.  "It may be reasonably inferred
25   from the evidence that Goudreau did not attempt to prevent Boch

1     from promoting him as an original member for some period of

2     time."

3          Further down on 16, "Whether Goudreau exercised

4     sufficient ability to direct and control the promotions and

5     thus to establish contributory infringement is the subject of

6     factual dispute, must be resolved by the jury."  It's similar

7     language in dealing with the other claim for trademark

8     infringement here.

9          As to the issue of damages here, again, I believe that

08:59 10    Mr. Given, with all due respect, doesn't understand the damage

11    claim here.  I did, in fact, make reference to damages.  What I

12    said was we're going to put on an expert, Mr. Scally, who's

13    going to testify on damages.  I agreed to a 20-minute limit.  I

14    said you're going to hear from him later on.  I certainly

15    didn't say we don't have damages here.

16          But what Mr. Given doesn't understand here is that if

17    we are right, your Honor, if the jury comes back our way and

18    finds that there is a breach of contract, there are

19    repercussions for that.  Not only is it for past royalties, but

09:00 20    it is for future royalties.  It is black letter law.  It is

21    black letter law, your Honor, that a material breach of a

22    contract excuses a party from further obligations under the

23    contract.

24          Mr. Given is dead wrong in suggesting here that Paul

25    Ahern pays Mr. Goudreau.  The evidence will be that Tom Scholz

1    controls the royalty payments.  He instructs CBS, it is done

2    through Mr. Ahern, and Mr. Goudreau is paid.

3           Tom Scholz has complete direction on that.  Tom Scholz

4    controls the royalties, and upon a breach of the covenant of

5    good faith and fair dealing, a material breach, Mr. Scholz

6    would be excused from any future payments on royalties.  You'll

7    recall, your Honor, from the pretrial that we deferred to the

8    Court ultimately to rule on that as a matter of law.  If you

9    want to ask the jury an advisory question on that, that's

09:01 10   within the Court's discretion, of course.  And that is quite

11   apart from the past royalties that we do have a right to

12   recoup.

13           We also --

14           THE COURT:  Counsel, give me one moment.

15           (Discussion off the record.)

16           THE COURT:  Sorry, Mr. Green.

17           Counsel.

18           MR. GREEN:  We do call the Court's attention to pages

19   16 and 17 -- well, apart from that, on our trial brief.  We

09:01 20   have briefed this issue your Honor.  If there's any further

21   briefing here, when I hear citations to Nebraska law, if

22   there's any doubt whatsoever in the Court's mind, we'll be

23   happy to brief the issue.

24           But just getting back to the beginning point here,

25   this is not the type of motion that should be granted at this

1   point in time.  I heard Mr. Given say this was never a case

2   that should have been about this way, they should have moved to

3   dismiss, they should have moved for summary judgment.  We're

4   here today to try the case.  We're here this week, and we think

5   we should be proceeding on this count and that the motion

6   should be denied.

7           MR. GIVEN:  Very briefly, Judge.  There is --

8           THE COURT:  Counsel, give me one second.

9           Mr. Green, what about Mr. Given's argument about the

09:02 10  theory for the breach of the implied covenant, that it's not

11  about association?

12          MR. GREEN:  I disagree with him.  Again, I think he is

13  misinterpreting what we are saying here.

14          We heard from Mr. Boch yesterday that he entered into

15  a contract with Mr. Goudreau, which defined their

16  responsibilities, which defined how they were going to be

17  dividing up what was going on here.

18          When Mr. Given further says here this case is not

19  about originally of BOSTON versus formally of BOSTON, this is

09:03 20  what this case is all about under this Court's ruling on

21  summary judgment here.

22          So, again, unfortunately, I believe that he has

23  misinterpreted what we are talking about here.

24          THE COURT:  Mr. Given?

25          MR. GIVEN:  I tend not to misinterpret and I try to --

1          THE COURT:  I'm sure he meant that respectfully.

2          MR. GIVEN:  Understood.  And I take Attorney Green's

3     comments in that fashion.

4          Number one, there is no breach of contract case

5     running from Mr. Scholz as against Mr. Goudreau.  In fact, your

6     Honor dismissed that count.  So that's no longer an issue.

7          Item two, I've looked at the case law.  I accept the

8     proposition that there is -- that the standard as stated in

9     this 1st Circuit case is, in fact, the standard that's

09:04 10     appropriate under these circumstances.  This district court

11     case, however, that's being cited for various propositions

12     doesn't address the central issue that we raise before your

13     Honor.

14          The problem with this claim -- and I will say, the

15     notion that they can put 35 years of royalties and royalties in

16     perpetuity in issue in this case in their count for breach of

17     the implied covenant is outrageous.  There is no causal

18     connection whatsoever between the claims that are being made by

19     Mr. Scholz of secondary trademark infringement, contributory

09:04 20     and vicarious trademark infringement, i.e., infringement of

21     Mr. Boch that somehow Mr. Scholz wants to hold Mr. Goudreau

22     responsible for, and the royalty entitlements that Mr. Goudreau

23     has a contract -- that Mr. Goudreau has a right to under an

24     oral partnership agreement that's 40 years old that provides

25     for payments from a third party.  I didn't hear one word from

1    Attorney Green on the subject of fiduciary duty.  Not one.  And

2    there's a controlling 1st Circuit case directly on point on

3    this subject.

4        THE COURT:  Counsel, I understand the arguments on

5    either side.

6        Here's what I'm going to do -- and I did review your

7    papers in regards to the arguments in this regard, but I'm also

8    going to keep them in mind as we go forward.

9        I'm going to deny the motion, counsel, but I expect

09:05 10    that at the end of the plaintiff's case, you'll want to be

11    heard again, I imagine.

12        I will, as I said, review the papers again with that

13    in mind and will be listening to the evidence on this point.

14        I understand that the parties have a fundamental

15    difference of opinion about what the law requires in regards to

16    this claim.

17        I can't say under the standard that applies,

18    Mr. Given, after the opening that dismissal is warranted at

19    this juncture, but I will hear you after the close of

09:06 20    plaintiff's case.

21        MR. GIVEN:  Thank you, your Honor.

22        MR. GREEN:  Thank you, your Honor.

23        Could I just note for the record here we are not

24    seeking to go back for 35 years of royalties, your Honor, we're

25    seeking --

1          THE COURT:  Well, I didn't think that given my

2    previous ruling, but I could be -- counsel, my memory is that I

3    ruled on how far you could go back in regards to how it relates

4    to --

5          MR. GREEN:  Just so it's clear, we're going back to

6    2007, when Ernie and the Automatics began, not a day before.

7          MR. GIVEN:  I believe I was making a rhetorical point.

8          THE COURT:  Mr. Green, I did recall that from my

9    earlier rulings.

09:06 10          MR. GREEN:  Thank you.

11          THE COURT:  Counsel, just for the record, the only

12   reason we've gone a little past 9:00 is because I think we're

13   still waiting on one juror.

14          MR. GREEN:  I wanted to call to the Court's attention

15   two points that may come up in Mr. Goudreau's testimony.

16          THE COURT:  And Mr. Goudreau is coming on second if I

17   recall?

18          MR. GREEN:  He will be coming up as the next witness

19   after Mr. Boch.

09:07 20          The first point here, your Honor -- and I trust that

21   there is no dispute on this -- Mr. Baker has been certainly

22   engaged in cross-examining leading questions with Mr. Boch.

23   With Mr. Goudreau, this is his own witness, his own party here,

24   and the commentary under 611 makes it quite clear that

25   cross-examination is not appropriate there.

1          So rather than me stepping up every time and object to

2     leading questions, I just wanted to make sure that we were

3     clear on that at this point in time.

4          MR. TARLOW:  Your Honor, may I address that?

5          THE COURT:  Yes, you may.

6          MR. TARLOW:  My understanding is that general practice

7     in federal court is as to matters addressed on direct, I am

8     allowed to lead on cross.  If I am to bring you new items, your

9     Honor, I would have to ask them as direct questions.  If they

09:07 10   call Mr. Goudreau as a witness, I'm entitled to cross him

11    because he is on cross.

12          It's also my understanding in general what occurs,

13    your Honor, is it's very difficult to decide what's new matters

14    and what is on direct, so, therefore, some latitude is given.

15    But if I do explore new matters, I will ask them as direct

16    matters.  But as to any questions asked on direct, I have every

17    right to cross.

18          THE COURT:  Mr. Green, I think I've had this come up

19    before.

09:08 20         Given that you're seeking, obviously, to cross because

21    he's an adverse party --

22          MR. GREEN:  Certainly.

23          THE COURT:  -- but I'm not sure that the converse is

24    true as Mr. Tarlow is pointing out under 611, and I have it in

25    front of me, (c)(1) and (2).

1          MR. GREEN:  Could I call the Court's attention to the

2     advisory notes under 611, your Honor?

3          THE COURT:  You may.

4          MR. GREEN:  In particular, the note to subsection (c),

5     because that's where we are.

6          (Pause.)

7          MR. GREEN:  The second paragraph.  The rule also

8     conforms to tradition in making the use of leading questions on

9     cross-examination a matter of right.  The purpose of the

09:09 10     qualification ordinarily, which is, of course, in the rule,

11     your Honor, is to furnish a basis for denying the use of

12     leading questions when the cross-examination is

13     cross-examination informed only and not in fact.  As for

14     example, the cross-examination of a party by his own counsel

15     after being called by the opponent.

16          That's exactly what we're talking about here, your

17     Honor.

18          THE COURT:  Mr. Tarlow, what do you say to that?

19          And I do have that in front of me, Mr. Green.

09:09 20          MR. TARLOW:  Your Honor, I'm not looking at the rule

21     book, but I will restate my understanding of the practice and

22     of the rules is that, again, as to matters addressed on direct

23     by Mr. Green, I'm entitled to cross-examination.  As to new

24     matters that I would go into, I would have to ask direct

25     questions.

1          THE COURT:  Counsel, I'll just represent to you that

2     what Mr. Green read is how the commentary appears.  Give me a

3     second.

4          (Pause.)

5          THE COURT:  Well, I think Mr. Green has a point

6     reading this commentary.  It's not explicitly provided in the

7     language of 611(c), but I think the advisory commentary

8     supports Mr. Green's point in this regard.

9          Counsel, I think as it relates to any material matter

09:11 10     where it's your own party, I shouldn't let you lead, counsel.

11     But I'm going to take it question by question.  I imagine -- I

12     think I'm more concerned about material matters than I am about

13     any background information that you might want to bring out on

14     your cross that Mr. Green might not necessarily bring out on

15     his direct.  Do you understand my point?

16          MR. TARLOW:  I do, your Honor.

17          And in my -- the way I would -- I would -- if you just

18     note for the record the way I intended to proceed was as to

19     matters addressed by Mr. Green, I did intend to use what I

09:11 20     believe is my right to use leading questions, and as to new

21     matters, I intended to use direct questions.

22          If you could just note my position for the record, I

23     take your Honor's comments in ruling.  However, I would also

24     state that a good lawyer recognizes that the best question is a

25     non-leading question in the first place, so I will act

1    accordingly.

2              THE COURT:  Okay.

3              MR. GREEN:  Thank you, your Honor.  Thank you,

4    Mr. Tarlow.

5              The only other thing I wanted to call to the Court's

6    attention -- again, this is just to save time and any

7    interruption.  We do intend to put on the W-2s when

8    Mr. Goudreau testifies.  They are a contested exhibit at this

9    point in time.  An example is one of the ones that Mr. Given

09:12 10   just showed you in the previous argument, your Honor -- excuse

11   me, 1099s.

12             And frankly, I'm not sure what the basis is for the

13   objection, but I just wanted to raise --

14             THE COURT:  Well, I took from the argument it's a

15   relevance objection given the defendant's position.  But,

16   counsel, having heard your arguments, I wouldn't sustain it on

17   that basis.  It can be noted for the record obviously.

18             MR. TARLOW:  As long as it's noted for the record,

19   your Honor.

09:12 20             And it's also 403 objection as well.

21             THE COURT:  Okay.

22             MR. GREEN:  Thank you, your Honor.

23             THE COURT:  Okay.

24             Mr. Baker?

25             MR. BAKER:  May I bring to the Court's attention just

1   a couple of matters?

2          THE COURT:  Sure.  Let me just check.

3          (Discussion off the record.)

4          THE COURT:  We have everyone, so I can let you talk

5   until they get down here.

6          MR. BAKER:  Very simple.  I had requested at the close

7   of yesterday's proceeding an instruction about that one

8   question that suggested that the CD was available with the

9   sticker today, or yesterday I should say.

09:13 10          THE COURT:  Right.

11          MR. BAKER:  And you had said remind you this morning.

12          THE COURT:  Sure.

13          MR. BAKER:  I'm asking the Court to instruct the jury

14   questions are not evidence, and they're to disregard that

15   question.  That's one.

16          THE COURT:  And I guess, counsel --

17          MR. BAKER:  I'm sorry.

18          THE COURT:  The reason I hold off on whether or not

19   you still wanted me to ask it, I can if you want me to refer to

09:13 20   the specific question.  I'd be more inclined in an attempt not

21   to emphasize or de-emphasize any particular piece of evidence

22   just to say when I sustain an objection the -- you know, the

23   question is not evidence.  It's the witness' answer.  As

24   opposed to going back to reemphasize it, Mr. Baker, unless you

25   want something different.

 1          MR. BAKER:  I appreciate that, Judge, and normally I

 2    don't really care.  But with respect to this particular

 3    question, we deem it important enough to respectfully request

 4    that you make that instruction concerning the question.

 5          THE COURT:  Okay.

 6          MR. GREEN:  Our position, your Honor, would be that

 7    you should not single this thing out; it should just be a

 8    general comment.

 9          I would also point out, however, our notes are showing

09:14 10   after there was an original objection and sustaining, I did ask

11    a follow-up question.  Mr. Boch gave whatever answer he did.  I

12    heard no objection to the second question.  I heard no motion

13    to strike, and I think there is evidence before the jury.

14          THE CLERK:  All rise for the jury.

15          (Jury entered the courtroom.)

16          MR. GREEN:  Thank you, your Honor.

17          THE COURT:  Counsel, let me see you at sidebar while

18    they're coming in.

19          (At sidebar on the record.)

09:15 20   THE COURT:  Just so I can finish my thought and not in

21    front of them.

22          I'm inclined to point it out.  I think what Mr. Baker

23    was pointing out was the commentary from Mr. Green to the

24    jury --

25          MR. BAKER:  That's exactly right.

1          THE COURT:  -- as opposed to any testimony that came

2   in unobjected to.

3          MR. BAKER:  That's exactly right.

4          MR. GREEN:  Thank you.

5          (End of discussion at sidebar.)

6          THE COURT:  Good morning, jurors.

7          Again, before we get started and continue with the

8   testimony, I just wanted to give you one instruction.

9          You may recall in my preliminary instructions I told

09:15 10   you what holds throughout this case, which is, any commentary

11   by the attorneys is not evidence, right; it's the witnesses who

12   testify who give you the evidence; it's the exhibits that give

13   you the evidence.  That's why I tell the attorneys no speaking

14   objections, no commentary, because they have the opportunity to

15   argue to you and make their arguments to you in their opening

16   statements and again in their closing arguments.  That's also

17   true for any questions by attorneys that are objected to and

18   that I sustain the objection, meaning, I agree that it wasn't a

19   proper question.

09:16 20          There was -- and there are a few times when that

21   happened yesterday.  So, again, you shouldn't guess what the

22   answer would have been, and the question itself is not

23   evidence.

24          There was one question about the purported purchase or

25   ability to purchase a CD on Amazon yesterday by one of the

1    attorneys.  That is not evidence, and that's not before you.

2    But, obviously, any question that I allowed to be answered by

3    the witness, the question and the answer together are the

4    evidence.  So just bear that in mind as we continue.

5            I think we were in the midst of Mr. Boch's

6    cross-examination.  If we could have him come in.

7            (Pause.)

8            THE COURT:  Good morning, sir.

9            THE WITNESS:  Good morning.

09:17 10        THE COURT:  I just remind you, you remain under oath.

11           You can take a seat.  Thank you.

12           MR. BAKER:  May it please the Court, your Honor, I'd

13   like to proceed.

14           THE COURT:  You may.

15           ERNEST BOCH, JR, having been previously duly sworn by

16   the Clerk, was further examined and testified as follows:

17                    CONTINUED CROSS-EXAMINATION

18   BY MR. BAKER:

19   Q.   Mr. Boch, at the conclusion of yesterday's testimony, we

09:18 20  were discussing Trial Exhibit 23, you will recall, sir.

21   A.   I'm sorry, can you say that again?

22   Q.   Sure.

23           When we finished yesterday, we were talking about

24   Exhibit 23, which is on your screen.

25   A.   Yes.

```
 1              MR. BAKER:  Could I publish that to the jury, please,
 2      your Honor?
 3              THE COURT:  Yes, it may be published.
 4              MR. BAKER:  All right.  Mr. Tarlow, could you focus on
 5      the language of the supergroup, please?
 6              That's perfect.
 7      BY MR. BAKER:
 8      Q.   Now, this was a poster you created; am I correct?
 9      A.   Yes.
10      Q.   Every detail on this document was your decision, fair
11      statement?
12      A.   Well, I put it together.
13      Q.   You see where it says, "with the supergroup"?
14      A.   Yes.
15      Q.   Chuck Leavell, do you know who Chuck Leavell is?
16      A.   The legendary piano player, played with the Allman
17      Brothers, Rolling Stones.
18      Q.   To this day -- strike that.
19              The date of this performance, as I understand it, is
20      April 13, 2008.
21      A.   Yes.
22      Q.   You see in the middle?
23      A.   April 13, 2008, yes.
24      Q.   On that date, or on or around that I should time say, was
25      Mr. Leavell a member of the Rolling Stones to your knowledge?
```

09:18  (line 10)
09:19  (line 20)

1    A.    I think he was.  I think he played Gillette yesterday.

2    Q.    Simon Kirke, who's Simon Kirke?

3    A.    Simon Kirke, drummer for Bad Company.

4    Q.    Was he in the band at the time?

5    A.    I don't know if Bad Company was an entity.  I think he's

6    always been in Bad Company.  I don't know if they were actually

7    playing then.

8    Q.    Chad Smith.

9    A.    The Red Hot Chili Peppers, yeah.

09:19 10    Q.    Was he in the band at the time that this advertisement was

11    created?

12    A.    Yes.

13    Q.    Jeff "Skunk" Baxter.  Please tell the jury who "Skunk"

14    Baxter is.

15    A.    Played with Steely Dan, the Doobie Brothers.  Iconic look,

16    long hair with the big, giant mustache.  If you see his

17    picture, you'd know it.

18    Q.    As of Sunday or as of around April 13, 2008, was "Skunk"

19    Baxter in the Doobie Brothers?

09:20 20    A.    I think he plays with them.  Whether he's an official guy,

21    I don't know, but I think he still plays with them.

22    Q.    Tim Ries with the Rolling Stones?

23    A.    Yeah, I don't know --

24    Q.    At that time, were you aware he was still playing --

25    A.    I think he was.  I wasn't that familiar with him.

```
 1   Q.   Okay.

 2        Was Ricky Byrd playing with Joan Jett and the

 3   Blackhearts?

 4   A.   Ricky Byrd.  I think he floats in and out.  I think he's a

 5   part of the band.

 6   Q.   And you referred to John Conte as a member of the Crown

 7   Jewels?

 8   A.   Yes.  I believe.  I didn't know him that well.

 9   Q.   Current or past member of Crown Jewels?

10   A.   Current.

11   Q.   Barry Goudreau, formerly of BOSTON?

12   A.   Oh, yeah.

13   Q.   Want to be very clear.  Where did that phrase "formerly of

14   BOSTON" come as of April 2008?

15   A.   That's what we did.

16   Q.   Where did that phrase come from?  You made the poster.

17   A.   That was -- that was -- by then, that's what we called

18   Barry.

19   Q.   Okay.

20        MR. BAKER:  Could you scroll up for me, Mr. Tarlow,

21   please?

22   Q.   Is that a picture of Ernie and the Automatics?

23   A.   Yes.

24   Q.   Last question on this ad, sir.

25        Did Mr. Goudreau have anything whatsoever to do with
```

```
 1   the creation of this poster?

 2   A.    No.

 3   Q.    Let's move forward, please.

 4         MR. BAKER:  Mr. Tarlow, call up the next ad, please.

 5   Q.    Sir, do you know who Alice Cooper is?

 6   A.    Me, sure.

 7   Q.    Would you tell the jury, please, who Alice Cooper is.

 8   A.    He's '70s icon rock star.

 9         MR. BAKER:  Let the record reflect, please, your

10   Honor, we're examining Exhibit 25.

11         THE COURT:  Noted.

12   BY MR. BAKER:

13   Q.    Did you create this advertisement?

14   A.    Yes.

15   Q.    And was this a performance?

16   A.    Yes, this is just a poster.  This wasn't -- I don't think

17   this was an ad.  This is just a poster.

18   Q.    Okay.

19         And could you describe who the members were that

20   performed with Alice Cooper?  I see, once again, a reference to

21   supergroup.

22   A.    Can we make it bigger?

23         MR. BAKER:  Would you enlarge that, Mr. Tarlow,

24   please?

25   Q.    Is that helpful?
```

```
 1   A.    Yup.

 2   Q.    Okay.

 3         The supergroup.  Did you put all of the names and the

 4   pictures together on this poster?

 5   A.    Yes.

 6   Q.    All right.

 7         The only one that refers to an affiliation as formerly

 8   is that of Mr. Goudreau, correct?

 9   A.    And Ace Frehley.

10   Q.    It says -- beg your pardon.  It also says Ricky Byrd.  You

11   see in the lower left, sir?

12   A.    Right, yeah.

13   Q.    With respect to Mr. Goudreau, was that part of your

14   mindset at this point, refer to him as formerly of BOSTON?

15   A.    Absolutely.  And also, Ace Frehley, the high-profile

16   firing he got from the band.  I mean, that's -- he got thrown

17   out of Kiss.

18   Q.    Mr. Goudreau have any participation in the creation of

19   this ad other than the phrase "formerly of BOSTON"?

20   A.    No.

21   Q.    Let's move -- I beg your pardon.

22         Before we go, looking in the lower left, the Ernie and

23   the Automatics logo?

24   A.    Yes.

25   Q.    And to the right, picture of you guys?
```

1    A.    Yes.

2    Q.    All right.

3          Sir, when you perform, do you wear, like, an

4    automotive mechanics shirt?

5    A.    We used to.

6    Q.    Could you explain how that works for the jury, please?

7    A.    That was actually "Sib's" idea.  "Sib's" idea was to wear

8    that.

9    Q.    All right.

09:24 10          What is it?  Tell us what it is.

11    A.    Just what the old traditional -- what we call them

12    technicians these days, we don't call them mechanics, what the

13    techs wear when they work.

14    Q.    Ever see the band BOSTON wearing similar clothing on

15    stage?

16    A.    No.

17          MR. BAKER:  Mr. Tarlow, the next exhibit, please.

18    Q.    Drawing your attention -- just going back, was it fun

19    playing with Mr. Cooper?

09:25 20    A.    With Barry?

21    Q.    With Alice Cooper.

22    A.    Oh, with Alice Cooper.  Was it fun?  Yeah.

23    Q.    I recall you had testified yesterday you did this for fun.

24    Is this the type of fun gig you were referring?

25    A.    It was a thrill.

```
 1   Q.   Next, this is -- Exhibit Number 31, sir, do you see that?

 2   A.   Yes.

 3   Q.   Admitted Exhibit 31.

 4        Now, this advertisement -- strike that.

 5        What is this document?

 6   A.   This -- it's definitely a poster, but whether it ran, I

 7   don't know.  A lot of the times that we did stuff, I would

 8   document it in poster form or some sort of archive, because I'm

 9   an archive nut.

10   Q.   All right.

11        Sir, sitting on the witness box before you is the

12   original BOSTON album and the Ernie and the Automatics CD.

13   Would you hold up both of those, please, and show them to the

14   jury?  Can you hold them up a little more?

15        Now, in your left hand is the CD that you had issued,

16   correct?

17   A.   Yes.

18   Q.   Describe the cover of that CD to the jury, please.

19   A.   You guys see it, right?  I mean, it's --

20   Q.   Can you describe --

21   A.   It's tattered.  It's like -- what would you say -- like a

22   burlap.  It's not a real burlap, it's --

23   Q.   A photograph of burlap?

24   A.   Yeah, a photograph of burlap and logo with the name of the

25   record.
```

```
 1            THE COURT:  Counsel, just so it's clear, I think this
 2    is Exhibit 5.
 3            MR. BAKER:  The album, I think, is Exhibit 5, Judge.
 4            THE COURT:  Actually, I take that back.  I don't think
 5    it's 5.
 6            Counsel, can we just have a number?
 7            Is it 34?
 8            MR. GREEN:  That is what we're showing your Honor.
 9            THE COURT:  I think it's 34.
10            MR. BAKER:  So the CD is 34, your Honor.
11            THE COURT:  Yes.
12            MR. BAKER:  The original album, what number is that,
13    Mr. Tarlow?
14            THE COURT:  I believe it's 59.  It was admitted
15    yesterday.
16    BY MR. BAKER:
17    Q.    So on the screen right now is Exhibit 34.
18            Would you describe this as a photograph of burlap or
19    that material?
20    A.    Yes, burlap material with the logo and the name of the
21    record.
22    Q.    Why did you choose burlap for your marking?
23    A.    Because it's tattered looking.
24    Q.    Was that the image of the band you wanted to convey, a
25    bunch of loose musicians?
```

1    A.    Yeah.   "Low Expectations," it's kind of funny, actually,

2    if you think about it.

3    Q.    Now, is there a CD in the case?

4    A.    Yes.

5    Q.    Would you pull that out, please?

6          And did you design the art that is on the top of the

7    CD?

8    A.    Yes.

9    Q.    Could you just hold it up?  I don't need to show it

09:28 10    closely to the jury.

11          Is that another image of the burlap?

12    A.    Yes.

13    Q.    Thank you.

14          Now, with respect to the first album, the original

15    album, the BOSTON album, did you try to imitate in any way that

16    cover?

17    A.    No.

18    Q.    Did you try to imitate in any way any cover for BOSTON?

19    A.    No.  No, it's a legendary record.

09:28 20    Q.    Would you pull the record out, the physical photograph

21    that's within, please?

22    A.    God, I haven't done this in years.  Wow.

23    Q.    Looking at the front and back, would you please tell the

24    jury, in your view --

25    A.    I just got chills holding this.

```
 1              I'm sorry, go ahead.
 2     Q.   Would you tell the jury, in your view, what the
 3     quintessential BOSTON song is on that album that presents its
 4     sound if you will?
 5     A.   There's a million of them.  Every single song.  Every
 6     single song.
 7     Q.   Which one in particular?
 8     A.   Every song is played on the radio every day.
 9              What was your question?
10     Q.   Could you single out one song on that album that says to
11     me, This represents the sound of BOSTON?
12     A.   Oh, God.
13              (Pause.)
14     A.   Probably "More Than a Feeling."
15     Q.   Thank you.
16              Now, with respect to the -- you're content with your
17     answer, sir?
18     A.   Well, I mean, it's subjective.  "Rock & Roll Band,"
19     "Smokin'."  I mean, every single song is amazing.
20     Q.   Pulling your attention now to the CD, your CD --
21     A.   Yeah.
22     Q.   -- which of those songs do you recognize as, if there were
23     way to describe it, the quintessential song of Ernie and the
24     Automatics?  The sound, I beg your pardon.
25     A.   I don't know.
```

1          (Pause.)

2    A.   Well, the title, "Low Expectations," that says it all

3    there, the story of it and everything like that.

4    Q.   Okay.

5          Let's advance now, sir, to the advertisement for the

6    CD.

7          MR. BAKER:  Mr. Tarlow, please.

8          Actually, I want to go back to 31, Exhibit 31.

9    Q.   Okay.  This document, who created this document?

09:30 10  A.   The Hard Rock poster?

11   Q.   Yes, sir.

12   A.   That would be me.

13   Q.   Okay.

14         And you chose all of the art, all of the details, the

15   font, everything?

16   A.   Yeah, but, you know, it probably took five minutes.

17   Q.   Mr. Goudreau give you any input beforehand?

18   A.   No.

19   Q.   Did it run on the internet?

09:31 20  A.   I don't know.

21   Q.   Did Mr. Goudreau have anything to do with decisions

22   relative to putting that ad on the internet?

23   A.   No.

24   Q.   Did he have any input whatsoever in putting any of the ads

25   on the internet?

1   A.   No.

2   Q.   Did he have any input whatsoever in putting those ads up

3   at the venue when you played, any ad?

4   A.   No.

5   Q.   Did he have any input with respect to monitoring or

6   keeping an eye on how the ads were being displayed?

7   A.   Well, every once in a while -- maybe more than every once

8   in a while, we would go into a town, mostly outside of New

9   England, and the promoters would -- they would do whatever they

09:31 10   want.  We would tell them what we wanted, they would do

11   whatever they wanted, and if Barry saw it, he would tell me.

12   Q.   When you say if Barry saw it, he would tell you, would

13   that be a complaint?

14   A.   Well, he knew it wasn't me.  It would be like, Shit, look

15   what they're doing.  And I'd be like --

16   Q.   What would your reaction be when you were aware a promoter

17   was doing something that you weren't happy with?

18   A.   First I really tried to get into it and do it, but it's

19   like a lost battle.

09:32 20   Q.   Have you ever heard the phrase "whack-a-mole"?

21   A.   Exactly.

22   Q.   Can you explain what that means, please?

23   A.   You just try and handle it.  It pops up so often that you

24   just try and handle it.

25   Q.   But just so we're clear, sir, my question is:  Was

1    Mr. Goudreau, at any point during the existence of Ernie and

2    the Automatics, involved in monitoring the ads beforehand?

3    A.    No.

4    Q.    Okay.

5          The phrase "Barry Goudreau and 'Sib' Hashian, two

6    former members of the multiplatinum selling band BOSTON have

7    reunited."  Whose text was that?

8    A.    I think I did that.

9    Q.    Did you ask Mr. Goudreau's permission beforehand?

09:33 10   A.    No.

11   Q.    Let's go to the CD, please.

12         MR. BAKER:  Your Honor, I'm looking at trial Exhibit

13   34, please.

14         THE COURT:  Noted.

15         MR. BAKER:  Thank you.

16         Can you make that a little bigger?

17         THE COURT:  We're trying to clear the screen for you,

18   counsel, of those marks.  It's not working, but we'll just

19   proceed.

09:33 20       (Discussion off the record.)

21         THE COURT:  Thank you.

22         MR. BAKER:  Your Honor, we're now looking at trial

23   Exhibit 34.

24         THE COURT:  Noted.

25   BY MR. BAKER:

1    Q.    Mr. Boch, this is what would appear to be two images.  The

2    top is the CD itself, the burlap packaging we just talked

3    about, okay?

4    A.    Yes.

5    Q.    And then below it, it has that label, that little sticker.

6    A.    Yes.

7    Q.    Please explain the process by which that sticker was

8    affixed.

9          When I mean process, I don't mean physically how you

09:34 10    put it on, what was the --

11    A.    The sticker was an afterthought.  The sticker was

12    Baggott's idea.  He wanted to put a sticker on.  It's actually

13    when you take -- they put it over the plastic, so usually a

14    sticker would be on the record itself, but it was on the

15    plastic because they were already sealed.

16    Q.    Okay.

17          So you said it was Mr. Baggott's idea.  Who physically

18    put the sticker on?

19    A.    I guess the company who printed them.  I'm not sure.

09:35 20    Q.    Do you know how many stickers were affixed?

21    A.    If I'm not mistaken, about 2,400 were printed, and

22    probably maybe three-quarters had the sticker on.

23    Q.    With respect to the CDs that were distributed, can you

24    tell me -- strike that.

25          Do you remember testifying yesterday about a man named

1    John Baruck?

2    A.    Oh, the guy that called me.

3    Q.    A gentleman named John?

4    A.    Yes, John.

5    Q.    Okay.

6          Does it refresh your recollection, sir, that his last

7    name is Baruck, B-a-r --

8    A.    I didn't really remember his last name.

9    Q.    Okay.

09:35 10          Tell me how -- let's just refer to him as John.  How

11    did John introduce himself to you?

12    A.    My friend Paul said that John wanted to talk to me.  And I

13    said, Wow, okay, I'll talk to him.  And he called me up and he

14    said, Ernie, can you please do this, this, and this?  And you

15    know, I think you're upsetting Tom.  I said, Hey, I'll do

16    whatever you want.  And I did exactly what he wanted.

17    Q.    Okay.

18          Let's try to be a little more precise.  We need to

19    know what "this, this, and this" is.

09:36 20          Can you explain what John said to you?

21    A.    I'm trying to remember the conversation.

22          It was a good conversation.  Let me just give an

23    overview, so I can walk myself through it.  It was a good

24    conversation; there was no problems.  I was actually -- it was

25    really cool to talk to him because he knew a lot of mutual

1    friends, and he was saying that -- I think -- I think he

2    mentioned the sticker, and he mentioned -- he mentioned

3    original, can you stop doing that?  And I said, Of course.  So

4    I stopped.

5    Q.   Okay.

6         Let's start with who John was.

7         Who did you understand this gentleman John was?

8    A.   I think he was Tom's manager.

9    Q.   Okay.

09:37 10      And do you recall approximately when John's -- Tom's

11   manager called you?

12   A.   I don't know.  I think it was -- I think it was after the

13   CD came out, I think.

14   Q.   Okay.

15        Would it refresh your recollection, sir, to take a

16   quick look at your transcript?  You testified on this subject

17   previously.

18        MR. GREEN:  Objection.  I didn't think --

19        THE COURT:  I understand the objection.

09:37 20      I think perhaps imperfectly, but I'll overrule the

21   objection.

22        This is just for the witness, counsel?

23        MR. BAKER:  Well, I'll publish it.  I'd like to put it

24   on the screens.

25        THE COURT:  Well, it's just for refreshing, so it

1    would just be --

2         THE WITNESS:  Did I get it wrong?

3         THE COURT:  Mr. Boch, just wait for the question.  I

4    think you have another question coming.  Thank you.

5         MR. BAKER:  Judge, if I may just one second -- if the

6    witness were to read from page 13 to, say, 17 just take a

7    minute, I think that will be helpful.

8         THE WITNESS:  I should read this?

9         MR. BAKER:  Yes.  Read it to yourself, Mr. Boch.

09:39 10         (Pause.)

11         THE WITNESS:  I read that page.

12    BY MR. BAKER:

13    Q.    Okay.

14         Sir, did John tell you, Please do not put that sticker

15    on the CD?

16    A.    No.

17    Q.    What did he say?

18    A.    This didn't really help that thing.

19         He called -- he called and he said, Don't do the

09:39 20    original.  There was the sticker -- I just did what he said.

21    It wasn't really a big deal.  I just did exactly what he said.

22    Q.    Did he say, Take the sticker off?

23    A.    I can't remember if he said, Take the sticker off.  I

24    can't remember.

25         But whatever he said, I did.

Q.   Did he tell you, sir, that you can't use the word
"original"?
A.   He told me not to.  He said, Just please, just please
don't do it.  I said, I won't.
Q.   And in reaction to that, is it not true that you removed
the sticker?
A.   I think the sticker eventually came off.
Q.   Okay.
          So approximately how much time was the sticker on the
CD?  A few days?
A.   Well, it wasn't on, and then it was on, and then I think
it was off -- I don't really -- I'm --
Q.   Did any purchaser come to you and express their
dissatisfaction because they thought this was a BOSTON CD?
A.   No, no.  It wasn't like that.
Q.   Even while the sticker was on?
A.   Yeah.  No, it wasn't -- no.
Q.   E records, Open E Records.  What is Open E Records,
please?
A.   Open E is an entity that I started to release this under.
It was an imprint off of -- I want to say Deaf Jam.
Q.   Is the reference to Open E a particular type of tuning of
a guitar?
A.   Yeah.
Q.   Could you explain to the Court what that is?

1   A.   Open E is a chord, rock 'n' roll chord.  It was a play on

2   words, E, open E, Open E, guitar chord.

3   Q.   Was that a record label you created?

4   A.   Nobody got that, by the way.

5   Q.   Was that a record label that you created?

6   A.   Yes.

7   Q.   And what was the purpose of the label?

8   A.   The purpose was to release the -- our record underneath

9   and some other little -- little projects that I was just

09:42 10   helping friends with.

11   Q.   Okay.

12       Did any other company distribute your CD other than

13   Open E Records?

14   A.   No.  I don't think -- no.  We carved it out of -- yeah,

15   we -- yeah.  Yeah, we carved it -- we had another thing with a

16   band called Steel Panther, but we carved out Ernie and the

17   Automatics and James Montgomery.  So, no, just --

18   Q.   So, really, it was you distributing your own CD?

19   A.   Right.

09:42 20   Q.   Okay.

21       Now, sir, would you turn your attention, please, to

22   Exhibit 30?

23       Before I ask you questions on this exhibit, let's just

24   table that for a moment, please.

25       Was there a record release party at the Hard Rock

1   Cafe?

2   A.   Yes.

3   Q.   Do you recall when that was?

4   A.   I would say sometime in February of '09.

5   Q.   Okay.

6        And did you have occasion to discuss with Mr. Goudreau

7   his reaction to the poster that had him identified as former

8   original member of the multiplatinum selling band BOSTON at

9   that time?

09:43 10   A.   I don't recall.  I mean -- I might have.  I don't recall.

11   Q.   Did he not say he was upset?

12        MR. GREEN:  Objection.

13        THE COURT:  Sustained.

14   A.   He --

15        THE COURT:  Sustained.  Sustained.  Mr. Boch, that

16   means you can't answer.  I sustained it, but Mr. Baker will

17   have another question.

18        MR. BAKER:  Thank you, Judge.

19   BY MR. BAKER:

09:43 20   Q.   Generally, with respect to this advertisement, the one

21   with the Hard Rock Cafe, did you have a discussion with

22   Mr. Goudreau about his reaction to the language?

23        MR. GREEN:  Same objection.

24        THE COURT:  Sustained.  Not the party opponent,

25   counsel.

```
 1              MR. BAKER:  That's correct, I'm just asking him

 2      generally.

 3              MR. GREEN:  Object.

 4              THE COURT:  Sustained.  He can answer "yes" or "no."

 5              MR. BAKER:  I'm trying to lay some foundation.

 6              THE COURT:  You can answer the question "yes" or "no,"

 7      sir, if you can.

 8              THE WITNESS:  What was the question?

 9              THE COURT:  Generally with respect to this

09:44 10      advertisement, the one with the Hard Rock Cafe, did you have a

11      discussion with Mr. Goudreau about his reaction to the

12      language?  Yes or no?

13      A.   I can't remember an exact conversation on this exact

14      thing, but we definitely had conversations about that word

15      "original."

16      Q.   Tell me what those were, sir.

17      A.   That, you know, I shouldn't do it.  John asked me not to

18      do it, and then when it -- I had no idea it would cause such a

19      problem.

09:44 20      Q.   Was it difficult during the lifetime of the band to

21      control the promoters?

22      A.   Well, I think any band would tell you it's tough to

23      control promoters, but it just added an extra -- just an extra

24      little thing that we always had to watch out for.  Kind of pain

25      in the butt.
```

1    Q.    Can you explain what you mean by an extra layer?

2    A.    Well, usually you just go in -- promoters are going to do

3    whatever they're going to do.  Really, it's almost impossible

4    to control them, and they don't really cause -- they don't

5    really want to cause damage because, you know, they want you

6    here.  They want everybody happy, they want to make money from

7    the show.  So they will basically do anything and say anything

8    to get people to the show.

9    Q.    Would that include promoting Mr. Goudreau as a former

09:45 10   original member of BOSTON?

11   A.    Absolutely.

12              MR. GREEN:  Objection.

13              THE COURT:  Well, sustained as to that question,

14   counsel.

15   BY MR. BAKER:

16   Q.    Would that include, sir, that promoters would do anything,

17   matters relating to Mr. Goudreau?

18   A.    Many times they would say -- if I caught them, they would

19   say, You know, we're going to do this, this, or this.  And I'd

09:46 20   be like, No.  Or if I, in the rare opportunity got to see it

21   before they put it out, or if they called me and asked me for a

22   logo, that was a sure bet that I would say, Okay, what are you

23   doing?

24   Q.    Would that, this, and this include referring to

25   Mr. Goudreau as an original -- former original member of

1    BOSTON?

2    A.    Yeah, yeah -- yeah.  They wanted to -- they wanted to do

3    anything they could do to get people in the seats.

4            MR. BAKER:  Exhibit 37, Mr. Tarlow.

5            I'm getting better at this, Judge.

6    Q.    Okay.  Looking at Exhibit 37, do you see those little

7    lines perpendicular -- that form a square, if you will, at each

8    corner?

9    A.    Yes.

09:47 10    Q.    What is the purpose of those lines?  What do those lines

11    signify to you?

12    A.    It looks like it's something in the making.

13    Q.    Okay.  Is this an ad you created?

14    A.    No -- well, it doesn't look like it has my fingerprints on

15    it.

16    Q.    Okay.

17            Do you have any idea who may have made this ad?

18    A.    I would say Wilberts Food & Music made this ad.

19    Q.    Did you authorize Wilberts to make this ad?

09:47 20    A.    No.  It looks like they took elements from the internet or

21    something, and they just shoved it all together.

22    Q.    How big a venue is Wilberts?

23    A.    I have no idea.

24    Q.    Did you play there?

25    A.    Probably.  I don't even know.

1    Q.    I'm sorry?

2    A.    I don't remember all the places we played.

3          It had to be -- I can tell you this: I don't think

4    it's around here.  Wilberts, I don't think it's around here.

5    Q.    Did you have any -- strike that.

6          Let's look at the next ad, please, 38.

7          (Discussion off the record.)

8    BY MR. BAKER:

9    Q.    Exhibit 38, do you remember this advertisement?

09:48 10    A.    This looks like I did it.

11    Q.    Okay.

12          And do you recall what the date of this is?

13    A.    This is early.

14    Q.    When you say "early," before the record release?

15    A.    Oh, this is way before.  This is all covers.  This -- this

16    is one of our first gigs.

17    Q.    Where was the Real Blues Festival, Mr. Boch?

18    A.    The Cape.

19    Q.    Is that you on the left with the short hair?

09:49 20    A.    A friend of mine was recording the show.  And I asked him

21    to record us, and he said, Already done.  Like, this wasn't

22    meant to be recorded, we just got the recordings.

23    Q.    Were all the songs that you recorded on this CD blues

24    covers?

25    A.    Yeah, I think this was all covers.  This is before we

1   wrote songs.  This is right at the beginning.

2   Q.   For clarity, will you please tell the jury quickly the

3   songs you remember?

4   A.   "Good Time Charlie."

5   Q.   By whom, sir?

6   A.   Oh, I should know that.

7   Q.   If you don't know, that's fine.

8   A.   You know, respected blues artist.  Old song.

9        I think I wrote one song.  I think we did one song of

09:49 10   mine.  And "Messin' With the Kid," another blues classic.  I

11   can't remember all the songs on it.  There weren't many.  There

12   were, like, four or five songs.

13   Q.   And were you exclusively responsible for all the content

14   of this ad?

15   A.   This looks like my -- this looks like I did this.

16   Q.   Okay.

17        Mr. Goudreau had no contribution, correct?

18   A.   No.

19   Q.   Thank you.

09:50 20        MR. BAKER:  Exhibit 40, Mr. Tarlow, please.

21        (Pause.)

22   Q.   Do you recall this advertisement?

23   A.   Yes.

24   Q.   Did you make -- if you look at the lower bottom, it says,

25   "automatictrax.com."  Is that your company?

A.   We put this website out because when the record came out,
we wanted to try to get licensing for films.  It was in two
movies, very low-budget movies.

Q.   Was this advertisement geared towards the consumer or
industry people?

A.   This was an industry -- if I'm not mistaken, I think this
ran in "R&R."

Q.   What does that mean, sir?

A.   "Radio & records."

Q.   Okay.

     And were you exclusively responsible for all the
content of this?

A.   Yes.

Q.   Mr. Goudreau contributed nothing, correct?

A.   Nothing.

     MR. BAKER:  49, Mr. Tarlow, please.

     (Pause.)

Q.   Sir, drawing your attention now to Exhibit 49, are you
familiar with a restaurant called Bull Run Restaurant?

A.   Sure.

Q.   Do you know where it is?

A.   Shirley, Mass.

Q.   Shirley, Mass.

     And can you tell us, please, what the capacity of the
Bull Run Restaurant is?

```
 1   A.   I would say 400.

 2   Q.   Okay.

 3        Did you --

 4   A.   Packed, totally packed would be 400.

 5   Q.   Did you play there?

 6   A.   Yes.

 7   Q.   Do you recall approximately the number of people that were

 8   there?

 9   A.   The first time we played there, there were six people

10   there.  Six.  And I remember that because there were six people

11   there.

12        The World Series was going on, something like that.

13   Q.   Did things get better for you the second time?

14   A.   What I remember about the Bull Run is the first time we

15   played, there were six people there.  And we played there three

16   or four times.  And the last time we played, we sold it out.

17   Q.   Now, sir, do you recognize what this document is?

18   A.   The first paragraph is reminding me this is -- I think

19   Baggott did this.

20   Q.   Do you see at the bottom it says, "bullrunrestaurant.com"?

21   A.   Yes.

22   Q.   Is this something that ran on Ernie and the Automatics'

23   website or a Bull Run Restaurant website?

24   A.   I would definitely say Bull Run.

25   Q.   Okay.
```

```
 1            And did you write -- did you personally write, "If the
 2  name Barry Goudreau sounds familiar, it's because he and
 3  drummer 'Sib' Hashian were original members of classic rock
 4  gods BOSTON"?
 5  A.   No.  This isn't my -- I didn't do the writing.
 6            MR. BAKER:  Can we go to the next exhibit, please?
 7  Exhibit 51.
 8            (Pause.)
 9            MR. BAKER:  Mr. Tarlow, if you could make it a little
10  bigger.
11  Q.   Drawing your attention -- can you see it?
12  A.   Yes.
13  Q.   Can you read it okay?
14  A.   Yeah, I see it.
15  Q.   What do you understand this document to be?
16  A.   This looks like the Scallop Fest was putting on their
17  website that we were playing, and they cut and pasted whatever
18  they found.
19  Q.   Okay.
20            Did you write the content for this article, sir?
21  A.   No.
22  Q.   Did anybody under your direction do so?
23  A.   No.
24  Q.   Okay.
25            Scaling down, you did not state, "If the name Barry
```

 1   Goudreau sounds familiar"... that's not you?

 2   A.   No.  It looks like they cut and pasted it from the other

 3   one.

 4   Q.   Okay.

 5           Let's advance, please.

 6           Thank you.

 7           You had testified earlier that it's just difficult to

 8   control promoters, correct?

 9   A.   Absolutely.

09:55 10   Q.   Would that also apply to media, journalism, things of that

11   nature?

12   A.   Everything.

13   Q.   In fact, did you have occasion, sir, to see the

14   promotional photograph of the band BOSTON for its 2014 40th

15   anniversary reunion tour?

16   A.   That's a good example how it's hard to control.

17   Q.   Explain.

18   A.   When the legendary band BOSTON went out, not the 40th

19   anniversary that they just did, when they went out before when

09:55 20   they had the tour and they announced the tour, they had the

21   original band.  They had -- they had, like, the same as the

22   record, as a picture of the band.

23   Q.   Including Mr. Goudreau?

24   A.   Barry, everybody.

25   Q.   And how long ago was that, approximately?

1    A.    That had to be pre-'80.

2    Q.    When did you see the ad?

3    A.    Oh, basically when it came out.

4    Q.    A couple years ago?

5    A.    Yeah.

6    Q.    Does that, in your view, adequately summarize the problem

7    with controlling the internet and the media?

8    A.    Yeah.  It really wasn't an ad.  It was announcing the

9    tour, and then they just -- somebody just threw a picture --

09:56 10    just jumped on the internet and just threw a picture on.

11    Q.    Sir, yesterday, Mr. Green, Attorney Green, he asked you

12    some questions about whether you were acting on behalf of the

13    band when you would book the band.  Do you recall?

14    A.    Yeah, I guess.

15    Q.    At any time, did you talk to any venue operator, promoter,

16    or owner and say, I'm here on behalf of "Sib" Hashian?

17    A.    It wasn't like that.  I mean, the band was the band.

18    Somebody had to -- somebody had to control it.

19    Q.    And when you say "the band was the band," the band was

09:57 20    Ernie and the Automatics, LLC, correct?

21    A.    Correct.

22    Q.    Okay.

23          And did you ever book the band as Barry Goudreau,

24    "Sib" Hashian performing with you, or was it always Ernie and

25    the Automatics?

```
 1   A.    Always Ernie and the Automatics.

 2   Q.    Okay.

 3         MR. BAKER:  Can we look at Exhibit 58, please?

 4         Judge, this was the series of contracts that became a

 5   related exhibit, so it might be sort of a little arduous --

 6         THE COURT:  Noted.

 7         MR. BAKER:  Judge, may I approach the witness and just

 8   do it --

 9         THE COURT:  Yes, you may approach.

10   BY MR. BAKER:

11   Q.    Sir, do you remember yesterday Exhibit 58 A through -- I

12   think it's E, a series of contracts that you --

13   A.    Yes.

14   Q.    And just tell me on Exhibit A who the artist is.

15   A.    Ernie and the Automatics.

16   Q.    Okay.

17         And this was a performance with whom?

18         I beg your pardon.  This is for whom?  Who was the

19   venue?  What was the venue?

20   A.    Presque Isle, Maine.

21   Q.    Do you recall, sir, at the bottom this was signed by a

22   woman that worked with you that you were not happy with?

23   A.    Well, I mean, you know, she -- we just didn't agree with

24   what she did, so we let her go.

25   Q.    That's fine.
```

```
 1              And above her name, Tracy Burns --

 2    A.   Tricia.

 3    Q.   Tricia Burns, I beg your pardon.  She's signing on behalf

 4    of what entity?

 5    A.   Ernie and the Automatics.

 6    Q.   Okay.

 7              Now, I'm looking at Exhibit 58 B.

 8              Once again, at the very top, does it identify an

 9    artist?

10    A.   Yes.

11    Q.   And what is the name of the artist, please?

12    A.   It says, Ernie and the Automatics, LLC.

13    Q.   I'm sorry?

14    A.   It says, Ernie and the Automatics, LLC.

15    Q.   Okay.

16              And was this document -- does it, again, state the

17    payee is Ernie and the Automatics, LLC?

18    A.   Yes.

19    Q.   All right.

20              Do you recall this performance?

21              (Pause.)

22    A.   I would have to ask questions.  I think this is a fair --

23    we did something for the military and it started raining and we

24    stopped playing.  I think this is that gig.

25    Q.   Sir, again, 58 B, Exhibit 58 B, do you know what you got
```

1   paid for that?

2   A.   Zero.

3   Q.   And do you know what was charged for admission?

4   A.   Zero.

5   Q.   Okay.

6        Drawing or attention to where you sign the document,

7   sir, above your name was it identify the artist?

8   A.   Yes.

9   Q.   What is the name of the artist, sir?

10:00  10   A.   Ernie and the Automatics, LLC.

11   Q.   Now let's take a look at 58 C.

12        Do you remember this contracting party, Firefly's?

13   A.   Firefly's, yes.

14   Q.   Once again, did you enter into an agreement with Firefly's

15   on behalf of Ernie and the Automatics?

16   A.   Well, hang on.

17        I didn't even know -- I didn't even know we put it in

18   writing.

19   Q.   Okay.

10:00  20        Ernie and the Automatics played at Firefly's, correct?

21   A.   Yes, yes.  Last Tuesday or last Thursday of every month.

22   Q.   Did you get paid for that gig?

23   A.   Yes.  We got all the beer and all the barbecue we could

24   eat.

25   Q.   Okay.

1          Looking at Exhibit 58 D, do you see this document?  It

2    refers to --

3    A.   I just want to see if I signed it.

4    Q.   Okay.

5          (Pause.)

6    A.   Okay.

7    Q.   Sir, who is the artist, again, with respect to this

8    contract?

9    A.   Ernie and the Automatics.

10:01 10   Q.   Okay.

11          And was this a free show or were you paid?

12   A.   Hang on.  Well, it says "free show."  Oh -- yeah, the

13   second time we played Presque Isle.

14   Q.   Okay.

15          And, sir --

16          (Pause.)

17   Q.   Mr. Boch, did you ever represent to any third party, I'm

18   Barry Goudreau's Agent?

19   A.   No.

10:01 20   Q.   Did you represent to any third party, I'm "Sib" Hashian's

21   Agent?

22   A.   No.

23   Q.   Or any other member of the band, I'm his agent?

24   A.   No.  I wasn't an agent.

25   Q.   Explain what that means?

         1   A.   There's a manager, which manages the band, and then

         2   there's an agent that books the band.  A good example would be

         3   in California, it's against the law to be a manager and an

         4   agent.  It's against the law; they don't let you do that.  I

         5   guess it's a conflict.

         6   Q.   Did you ever hear Mr. Goudreau say in your presence, Don't

         7   talk to me, go talk to my agent, Mr. Boch?

         8   A.   No.

         9   Q.   I'm sorry?

10:02   10   A.   No.

        11   Q.   Did you ever hear any other member of the band say, Don't

        12   talk to me, my agent is Mr. Boch?

        13   A.   No.

        14   Q.   Exhibit 52, Trial Exhibit 52, Mr. Boch, it's on the

        15   screen.

        16          Do you know a company --

        17          MR. BAKER:  Mr. Tarlow, could you make it just a

        18   little bigger for the title --

        19   Q.   Do you know the company Mixed Media Promo?

10:03   20   A.   I mean, I might know somebody there, but I don't recall

        21   that name.

        22   Q.   Do you have anything to do with Mixed Media?  Do you own

        23   it?

        24   A.   No.

        25   Q.   Do you work for it?

1    A.    No.

2    Q.    Does it work for you?

3    A.    No.

4    Q.    Do you recall August of 2011 playing a charity Rock the

5    Fight Against CHD?

6    A.    Where was the venue?  That will help.

7          Was that at Fenway Park?

8          I'd have to -- you'd have to tell me where it was

9    to -- for me to remember it, because I have no idea.

10:03 10    Q.    Did you write the content of this article?

11    A.    No.

12    Q.    Did you have anything to do with the highlighted

13    statement --

14    A.    No.

15    Q.    -- "guitarist Barry Goudreau and drummer 'Sib' Hashian

16    original members of the legendary rock band BOSTON"?  Did you

17    say that?

18    A.    No.

19    Q.    Did you write that, I should say?

10:04 20    A.    No.

21          MR. BAKER:  Move on, please.

22    A.    I still don't know where that was.

23          MR. BAKER:  Your Honor, yesterday we looked at the

24    video which Mr. Green presented.

25          THE COURT:  Yes, I think it was Exhibit 57.

```
         1              MR. BAKER:  We have the identical video, which was

         2    produced to us by Mr. Green without the pop-ups.  I would like

         3    to introduce that into evidence.  It's the same video.  And I'd

         4    like Mr. Boch to look at it.

         5              THE COURT:  Okay.

         6              MR. GREEN:  No objection to that, your Honor.

         7              THE COURT:  Okay.

         8         You may.

         9              MR. BAKER:  Thank you, Judge.

10:04   10              THE WITNESS:  Can I say one thing?

        11              THE COURT:  Just wait for the next question.

        12              MR. BAKER:  Madam Clerk, what exhibit number would

        13    that be?

        14              THE CLERK:  60.

        15              MR. BAKER:  60.

        16              THE COURT:  Should we just make it 57 A?  Okay.  Let's

        17    just make it 57 A.

        18              (Exhibit 57 A received into evidence.)

        19              MR. BAKER:  It's cued up?  Okay.

10:05   20    BY MR. BAKER:

        21    Q.   Did you wish to supplement your prior answer, sir?

        22    A.   No.  I want to say, in a band, there's always one guy who

        23    knows every venue, every hotel.  There's always one guy in the

        24    band who knows all that, and I'm not that guy.  I don't want

        25    you to think that -- I'm not that guy.
```

1    Q.   All right.

2         We're going to put the video up on the screen, and I'm

3    going to ask you questions at particular moments.

4         The first thing I'd like to do is run the video

5    continuously once.

6         MR. BAKER:  Go ahead, Mr. Tarlow.

7         (Discussion off the record.)

8    BY MR. BOCH:

9    Q.   Mr. Boch, yesterday I think you stated that you did not

10   make the video.

11        THE COURT:  Why don't we -- Mr. Tarlow, why don't we

12   start it from the beginning.  And wait until -- Mr. Baker, did

13   you want to ask --

14        MR. BAKER:  Let's run the video, then I'll ask.  Once

15   continuously.

16        (Played recording.)

17        THE WITNESS:  Not bad.

18   BY MR. BAKER:

19   Q.   Mr. Boch, who wrote that song?

20   A.   That was Barry and I think Brian a little.

21   Q.   The title is "Good Times Never Last," correct?

22   A.   Yes.

23   Q.   Would you consider the subject matter of the song happy,

24   sad, remorseful, sentimental?  How would you describe it?

25   A.   It's kind of a dichotomy.  You know, it's a little sad,

1  yet, it's very happy sounding.

2  Q.    The subject matter, what is the subject matter of the

3  lyrics?  What is the song about?

4  A.    I didn't write the lyrics, so --

5  Q.    Do you know?

6  A.    Well, I would assume --

7            MR. GREEN:  Objection.

8            THE COURT:  Well, sustained as to that, but you can

9  ask another question.

10:12  10  BY MR. BAKER:

11  Q.    I'm not asking you for an assumption.  Do you have any

12  actual knowledge based on conversations with the writers and

13  other awareness of the lyrics as to the meaning of the song?

14            MR. GREEN:  Objection.  Asked and answered.  He said

15  he didn't know.

16  A.    Well, I said I didn't write it.

17            THE COURT:  Mr. Boch, wait.

18            Overruled as to this question, understanding.

19            You can answer.

10:12  20  A.    That song was about -- from what I understand, again, I

21  didn't write it -- that song is about Barry's experience in

22  bands that he played, his love for Brad, and his frustration

23  with his career.

24  Q.    Okay.

25            And, sir, who shot the video?  Who made the video?

1    A.    Ian.

2    Q.    Who's Ian?

3    A.    Ian is the guy, our friend, that does video.

4    Q.    Okay.

5          This is a different version, is it not, from what we

6    saw yesterday?

7    A.    Yes.

8    Q.    Okay.

9          Did you have any intention with respect to yesterday's

10:13 10   video of writing those pop-ups?

11   A.    No, that was just a thing that he did.

12   Q.    Would you describe this version of the song as expressive

13   or for commercial gain?

14   A.    This was to get played on MTV.

15   Q.    And would you suggest --

16   A.    Which it never did.

17   Q.    The next of it with all the footage and all, that was an

18   expression of art, the work of art.

19   A.    Absolutely.

10:13 20   Q.    I would like to run the video now with the stop and start

21   because I want to ask you questions about particular scenes

22   within it.

23          MR. BAKER:  Mr. Tarlow.

24   Q.    Okay.  Stop right there it.

25          Lower left-hand corner, that's your director,

1    Mr. Barrett, correct.

2    A.   Ian, yes.

3    Q.   Did Mr. Goudreau have anything to do with the creation of

4    this art other plan playing the guitar?

5    A.   No.

6    Q.   How about the other band members?

7    A.   No.

8    Q.   Looking in the back, do you see a travel case?

9    A.   Yes.

10:14 10   Q.   What are the initials on it?

11   A.   RTZ.

12   Q.   What does that denote?  What does that mean?

13   A.   Barry's old band.

14   Q.   Where was this picture taken, this particular part of the

15   video?

16   A.   This was in an abandoned house that we went in that I

17   owned the house where I was just about to gut it to rerent it.

18   So we went in and filmed it.

19   Q.   Is that Mr. Goudreau, a picture of him on the wall?

10:14 20   A.   I think that is Barry.

21        MR. BAKER:  Okay.  Let's go.  Let's move forward.

22   Q.   Okay.

23        Now let's look at the next travel case.

24   A.   That's Orion the Hunter, another one of Barry's bands.

25   Q.   And Mr. Maes, is that the keyboardist?

1    A.   Yes.

2    Q.   What does the shirt say?

3    A.   RTZ.  He was in RTZ.

4    Q.   With Mr. Goudreau?

5    A.   Yes.

6         MR. BAKER:  Forward, please.

7         (Played recording.)

8    Q.   The double record on the wall -- withdrawn.

9         What is Mr. Goudreau sitting on?

10:16 10   A.   The travel case.

11   Q.   Okay.

12        Please forward.

13        MR. BAKER:  Stop right there.

14   Q.   What does the text say?

15   A.   Well, this was a goof.  "The Automatics sign

16   multimillion-dollar deals."  We started in a bar, we got really

17   big, then we lost it all, that's the gist of the video.

18   Q.   Is that the band members, the Ernie band members?

19   A.   Yes.

10:16 20   Q.   Are they wearing the technicians uniform?

21   A.   Yes.  Yes, we are.

22        MR. BAKER:  Please forward.

23        (Played recording.)

24   Q.   What is the text on the kick drum?

25   A.   That's our logo.

1    Q.    Ernie's logo.

2          Excuse me?

3    A.    Yes, Ernie and the Automatics.

4          (Played recording.)

5    Q.    Mr. Boch, when this video was made, was it your intent to

6    steal the goodwill of BOSTON in promoting this video?

7    A.    No.

8    Q.    Was it your intent in making this video to somehow confuse

9    the public with the band BOSTON?

10:18 10    A.    The public would not be confused, no.

11    Q.    Okay.

12          At any one of your performances -- I think you said it

13    was -- how many was it, again?  I'm sorry.

14    A.    Between 250 and three, I'd say.

15    Q.    Three hundred.

16    A.    I didn't count them, but that sounds about right.

17    Q.    At any one of your performances, were you ever mistaken

18    for Tom Scholz?

19    A.    No.

10:18 20    Q.    Did anybody ever demand back money from you because they

21    thought the CD was a BOSTON CD?

22    A.    No.

23    Q.    Did you ever perform with your technicians uniform and the

24    name tag said "Tom Scholz" on it?

25    A.    No.

1    Q.    Did you ever perform or any other band member with any

2    other band member's name of BOSTON other than Barry as Barry

3    and "Sib" as "Sib"?

4    A.    No.  We had our individual names on them.

5    Q.    Did you talk to Tom Scholz on the telephone?

6    A.    Yes, I did.

7    Q.    Okay.

8          Do you recall the conversation?

9    A.    We talked about when he was going to play a tribute to

10:19 10   Brad Delp.

11   Q.    And in fact, you had a number of conversations with him;

12   is that correct?

13   A.    Yes.

14   Q.    Did Mr. Scholz ever in any one of those telephone calls

15   with you say, You are infringing on my trademark?

16   A.    No.

17   Q.    Did he in any one of those calls say, I am going to sue

18   you?

19   A.    No.

10:19 20   Q.    Did he, in fact, sue you, ever?

21   A.    No.

22   Q.    Sir, what is the -- I beg your pardon.  What is the Boch

23   Enterprises automotive -- what is the Boch automotive annual

24   budget for advertising?

25   A.    Well, we're a private company, so that's not public,

1    but --

2    Q.    Just an estimate would be helpful.

3    A.    In the hundreds of thousands.

4          (Pause.)

5    Q.    This CD that you created, did it chart?

6    A.    Yes, it did.

7    Q.    Where did it chart, sir?

8    A.    Billboard has a blues chart, almost never published, but

9    they have a chart on anything, any type of music.  It charted

10:21 10    on the Billboard blues chart.

11    Q.    And do you recall approximately how long it charted for?

12    A.    It debuted at number -- it debuted at number 6 or 7 -- I

13    used to know this -- it debuted at number 6 or 7 and was on the

14    chart six weeks.

15    Q.    Proud of that?

16    A.    Yeah.  I mean, it's a small chart, but --

17    Q.    Six weeks on a chart.

18    A.    Yeah.

19    Q.    Number six?

10:21 20    A.    Well, no, it debuted at six -- the chart is only to 15,

21    they only do the top 15.  After it drops of 15, you're no

22    longer charted.

23          MR. BAKER:  Could I take a look, please, Mr. Tarlow,

24    at Trial Exhibit 55?

25          Judge, what time do you take the morning break?

```
 1              THE COURT:  We'll see where we are, counsel, but
 2     around 11:00.
 3              MR. BAKER:  What I was going to suggest, unless the
 4     Court thinks it's too soon -- I'm almost done with my
 5     examination, perhaps a break, then I can analyze --
 6              THE COURT:  Counsel, I'm inclined to push forward.
 7              MR. BAKER:  That's fine.
 8              (Discussion off the record.)
 9     BY MR. BAKER:
10:23 10   Q.    Mr. Boch, yesterday you testified you thought Barry
11     Goudreau was an employee.  Do you recall -- your employee in
12     some way?
13     A.    Well, it's not an employee, because -- excuse me.
14              It was an LLC, so -- what would that be?  So if it's
15     an LLC, he would be -- he would get 1099'd, not W-2'd.
16     Q.    Okay.
17              And let's take a look at the screen, sir, Exhibit 5.
18     Do you see that?
19     A.    Yes.
10:23 20   Q.    Okay.
21              Consumer Creativity, what is that?
22     A.    Consumer Creativity is the in-house -- my in-house
23     advertising company.
24     Q.    Okay.
25              And so you paid $61,189 to Mr. Goudreau on a 1099
```

```
 1   basis?
 2   A.   Yes.  That is a 1099.
 3        MR. BAKER:  Let's advance to the next exhibit.
 4   Q.   Now, it says, "Open E Records."  Do you see at that?
 5   A.   Yes.
 6   Q.   Did you pay Mr. Goudreau some money through that?
 7   A.   Well, I can only read what it says.  Yes.
 8   Q.   Okay.
 9        And once again, 1099 Miscellaneous.
10   A.   What do you mean?
11   Q.   Correct?
12   A.   What do you mean --
13   Q.   Open E Records?
14   A.   Open E, yeah.
15   Q.   So you know Boch Enterprises has hundreds of employees,
16   fair statement?
17   A.   Yes.
18   Q.   You understand, sir, the difference between 1099 and W-2,
19   do you not?
20   A.   Yes.
21   Q.   I think yesterday you said Barry got a W-2.  Do you
22   recall?
23   A.   Well, no.  I think yesterday you said could he have?  I
24   wasn't -- I got -- I got to get in the mode.  I'm not -- this
25   stuff is not right at the top of my mind.
```

1    Q.    Having looked at this trial exhibit, does it refresh your

2    recollection that he was not an employee?

3    A.    Oh, absolutely.  Everybody was 1099'd.

4    Q.    And that means contract labor.

5    A.    Right.

6            THE COURT:  Counsel, just so we're clear, all of these

7    are part of one exhibit, right?

8            MR. BAKER:  Judge, Trial Exhibit 55.  I just need to

9    look at a couple of them.

10:25 10          THE COURT:  Okay.

11          MR. BAKER:  Mr. Tarlow, could I see Exhibit 56,

12    please?

13          Can you make it a little bigger, please?

14    BY MR. BAKER:

15    Q.    Sir, this is a history -- this is admitted Trial Exhibit

16    56, and it's a history of payments from you to Mr. Goudreau.

17    Do you understand that?

18    A.    Yup.

19    Q.    Okay.

10:26 20          In the column where it says, "description," does that

21    basically identify the performance or the location?

22    A.    Yes.

23    Q.    All right.  Let's just look at a few of them.

24          What's Kowloon?

25    A.    That's a restaurant on the North Shore.

1    Q.   How many people were there or what was the capacity to the

2    best of your knowledge?

3    A.   Well, we would open for people there.  So we opened for,

4    you know, Johnny Winter a couple of times, packed.  I don't

5    know, six, seven hundred.

6    Q.   And we talked about the Hard Rock Cafe, but I don't think

7    I asked you what the capacity is.

8    A.   Well, at first nobody came to see us.  Toward the end, we

9    filled the place up pretty good.

10:27 10    Q.   A couple hundred people?

11    A.   Probably 300.

12    Q.   Firefly's, what was -- you testified -- no, you didn't

13    talk about Firefly's.

14    A.   Firefly's we played either the last Tuesday or last

15    Thursday of every month.  It took us a while to build up, but

16    towards the end, it was a line out front.

17    Q.   Okay.

18         And the capacity is a couple hundred?

19    A.   Yeah.

10:27 20    Q.   All right.

21         The Palace -- what's the Four Seasons gig?  Do you see

22    that one?

23    A.   That was a private gig.  They -- I don't see it, but we

24    only played the Four Seasons once; that was a private gig.

25    Q.   And how many people showed up for that one?

```
 1   A.   That was like a party, probably 200.

 2   Q.   Tommy Doyle's, what's Tommy Doyle's?

 3   A.   Tommy Doyle's, that was horrible.  That's the old -- the

 4   original House of Blues in Cambridge.

 5   Q.   Two hundred people max?

 6   A.   Oh, my God.  There was nobody there.  They hated us.

 7   Q.   I'm not going to go through all this.

 8        You played mostly bars and restaurants, correct?

 9   A.   Yeah, except for when we did the theaters.

10   Q.   Okay.

11        MR. BAKER:  Judge, if I may just have a moment, I want

12   to talk to my colleagues.

13        THE COURT:  You may.

14        (Discussion off the record.)

15   BY MR. BAKER:

16   Q.   Sir, at any of your performances, did you have a table set

17   up sponsoring vegetarianism?

18   A.   Sponsoring what?

19   Q.   Veganism, vegetarianism.  I don't know the difference, so

20   I'll go one by one.

21        At any one of your performances, were you promoting

22   veganism?

23   A.   Not that I'm aware of, no.

24   Q.   At any one of your performances, did you have anybody

25   disseminating any kind of material about anti-bullying?
```

1    A.    I'm trying to think.  We might have played a benefit for

2    anti-bullying, but it wasn't a thing that we did.

3    Q.    Okay.

4    A.    I'm against bullying; get that straight.

5    Q.    Understood.

6          At any one of your performances, were you promoting

7    any kind of healthy lifestyle as your message?

8    A.    No.  If we were -- if anything, we were Music Drives Us.

9    Q.    That was your charity.

10:30  10    A.    Still is, sure.

11    Q.    Sir, the band no longer performs together, correct?

12    A.    Correct.

13    Q.    Was it the objective when you put together any of these

14    ads to try to capitalize somehow on the goodwill that BOSTON

15    had generated for 40 years?

16    A.    No, it wasn't like that.

17          MR. BAKER:  Judge, I have no more questions for this

18    witness.

19          Thank you.

10:31  20          THE COURT:  Thank you.

21          Redirect, Mr. Green?

22          MR. GREEN:  Thank you, your Honor.

23          THE WITNESS:  Him again?

24          Then does he get to go again?

25          THE COURT:  Two rounds, Mr. Boch.  I suspect these

```
 1    will be shorter.
 2            THE WITNESS:  No, no, I'm not complaining; I just
 3    didn't know.
 4            MR. GREEN:  I appreciate your patience, Mr. Boch.  I'm
 5    going to try to move as quickly as I can here.  I do have some
 6    follow-up questions.
 7                      REDIRECT EXAMINATION
 8    BY MR. GREEN:
 9    Q.   Let's go back to Exhibit 55, if we may.
10:31 10           THE COURT:  You may.
11    Q.   Those reflect 1099 payments made to Mr. Goudreau during
12    the years that he was affiliated with Ernie and the Automatics?
13    A.   There's nothing on the screen.
14            (Pause.)
15            MR. GREEN:  I believe there's one for 2007.  If you
16    could scroll up, please.
17    Q.   2007.  That's not Ernie and the Automatics, the LLC making
18    payment, is it?
19    A.   No.  It's --
10:32 20    Q.   I want to go as quickly as possible here.
21            2008, please.
22            That's not Ernie and the Automatics, is it?
23    A.   This is pre Open E.
24    Q.   All right.
25    A.   And pre --
```

1    Q.    2009?

2    A.    -- pre LLC, but, yeah, we started with Consumer Creative,

3    where the money came from.

4    Q.    Sir, you can look through all of these.  My question is:

5    Do you see Ernie and the Automatics as the payor of the amounts

6    to Mr. Goudreau at any point in time in those five years?

7    A.    It wasn't set up like that.

8    Q.    All right.

9          The answer is no, you don't see that.

10:33 10   A.    No.

11   Q.    Okay.

12         Let's move to Exhibit 56.  Let's go to the last page

13   first, please.

14         By the way, one of the entities that paid him was

15   Subaru of New England, correct?

16   A.    I wouldn't -- I don't know, but --

17   Q.    All right.

18   A.    What happened was -- is I didn't really know where to take

19   the money from, and then we eventually --

10:33 20         THE COURT:  Mr. Boch, just wait for the next question.

21   Thank you.

22   BY MR. GREEN:

23   Q.    If you scroll to the last page on 56, do you see that the

24   grand total of what was paid to Mr. Goudreau for his

25   performances was $184,222.60?

1    A.    Yes.

2    Q.    And Ernie and the Automatics, one way or another, he

3    derived those sums for his service for Ernie and the

4    Automatics, correct?

5    A.    Correct.

6    Q.    And we have the breakdown for each of the 250 to 300

7    shows, correct?

8    A.    I don't know if you have all that.

9    Q.    All right.

10:34 10         I think the exhibit will speak for itself.

11         Now, you testified yesterday that by the time you

12    decided to call it quits with Ernie and the Automatics, an

13    objective had been achieved.  You had been playing big time,

14    correct?

15         MR. BAKER:  Judge, I object to the form of the

16    question and --

17    A.    Well, I can answer that.  I wouldn't say "big time."

18         THE COURT:  Mr. Boch, there was an objection.

19         THE WITNESS:  Sorry.

10:34 20         THE COURT:  Sustained as to form, counsel.  You can

21    rephrase.

22         MR. GREEN:  I'll rephrase.

23    BY MR. GREEN:

24    Q.    That same page reflects that Mr. Goudreau performed in

25    connection with Deep Purple, correct?

```
 1            MR. BAKER:  Object.
 2            THE COURT:  Well, overruled.
 3    BY MR. GREEN:
 4    Q.   Ernie and the Automatics performed in connection with Deep
 5    Purple?
 6    A.   We toured with them.
 7    Q.   You toured with them.  You opened for them?
 8    A.   Opened for them, yes.
 9    Q.   And what kind of band is Deep Purple?
10    A.   Legendary rock band, architect of heavy metal.
11    Q.   You wouldn't call them an R and B band, would you?
12    A.   It's funny.  When Glenn Hughes joined the band in the late
13    '70s, he tried to turn it into an R and B band, and that's when
14    Ritchie Blackmore left the band.
15    Q.   But when you toured with them, they were, as you say, a
16    rock band, correct?
17    A.   Classic rock, yes.
18    Q.   Thank you.
19            Now, you had other big jobs, more than a couple
20    hundred people during the four years that EATA toured, correct?
21            MR. BAKER:  Objection, Judge, form.
22    A.   We only toured nationally once.
23            THE COURT:  Counsel, you're objecting to form?
24            Yes.  Sustained on that one.  Sustained.
25            MR. GREEN:  I'll rephrase it.
```

```
 1  BY MR. GREEN:

 2  Q.   Mr. Baker was asking you about the attendance of six up to

 3  attendance of up to 200, 300.  Did you have larger venues where

 4  you played?

 5  A.   We played larger venues, but they didn't come for us; they

 6  came for who we opened for.

 7  Q.   Correct.  Such as Deep Purple, correct?

 8  A.   Yes.

 9  Q.   How many when you performed -- before you when played with

10:36 10  Deep Purple?

11  A.   Before we played with Deep Purple?

12  Q.   While -- yes.  When you were the opening act.

13  A.   Oh, when we were opening act with Deep Purple, average for

14  the venues that we played that they drew I would say 3,000.

15  Q.   As part of a national tour, correct?

16  A.   Yes.

17  Q.   Now, you sold your CDs as part of that same national tour,

18  correct?

19  A.   Yes.  We had a merch. area.

10:36 20  Q.   And when Mr. Baker was asking you yesterday, Well, you

21  tried to sell your CDs into stores, most of your sales were

22  when you performed, correct?

23  A.   I would say yes.

24  Q.   And that video was to promote the CD.

25        MR. BAKER:  Objection, Judge, same basis.
```

1          THE COURT:  Well, sustained as to form, Mr. Green.

2          MR. GREEN:  I think you answered that yesterday.

3          I'm going to ask Ms. McIvene to play -- I'm not going

4    to play the whole thing.

5          THE WITNESS:  Thank you.

6    Q.   I just want to play the first of the CD with the pop-up.

7          MR. GREEN:  Ms. McIlvene, if you can do that.

8    Q.   That wasn't even ten seconds, was it?  That was maybe four

9    seconds, correct?

10:37 10   A.   There's no timer.  I don't know.

11         Oh, six seconds.  It was six seconds.

12   Q.   I'm not going to ask you anything else because the jury

13   saw this yesterday; I don't want to duplicate anything.  But

14   this was the first pop-up that appears on this, correct?

15   A.   Yes.

16   Q.   And this pop-up CD could be found in the same way on the

17   internet as the regular CD?

18         MR. BAKER:  Objection, Judge, form.

19   A.   This isn't a CD.

10:38 20   THE COURT:  Overruled.  He can answer if he can.

21   BY MR. GREEN:

22   Q.   My mistake.  This pop-up video can be found the same way

23   as the other video, correct?

24   A.   No.  This was never really promoted.  Ian kind of just did

25   this.

1    Q.    This -- we found this on the internet?

2          MR. BAKER:  Objection, Judge.

3    A.    You can find anything on the internet.

4          THE COURT:  Sustained.

5          Mr. Boch, wait.  There's still an objection.

6          Sustained.

7          To the extent there was an answer, jurors, you are to

8    disregard it.

9          Mr. Green, the next question.

10:38 10   BY MR. GREEN:

11   Q.    You testified yesterday that this video with the pop-ups

12   appeared in on the internet, correct?

13   A.    Yes.

14   Q.    All right, thank you.

15         Now, I just want to ask you about this one statement

16   here.

17         It speaks for itself here.  I have this question for

18   you:  Why is the word "former" in quotes?

19   A.    I don't know.

10:39 20   Q.    Would you not agree with me, sir, that by putting the word

21   "former" in quotes, there is some suggestion here that these

22   people may not be former members, they may still be members of

23   BOSTON?

24   A.    No.

25         MR. BAKER:  Objection to the form of the question.

```
           1              THE COURT:  Sustained as to form.

           2              Mr. Boch, just give me a second.

           3              THE WITNESS:  Sorry.

           4              THE COURT:  Mr. Green, next question.

           5    BY MR. GREEN:

           6    Q.   Now, Mr. Goudreau was involved, was he not, in advertising

           7    and promotions?

           8    A.   No.

           9    Q.   All right.

10:39     10              Well, let me ask you to turn to your deposition.

          11              MR. GREEN:  If we can put up deposition page 13.

          12              THE COURT:  Just for the witness.

          13              MR. GREEN:  Yes, please.

          14              (Pause.)

          15              THE COURT:  Is there a page?

          16              MR. GREEN:  I'm asking about page 13, line 11 through

          17    line 21.

          18    BY MR. GREEN:

          19    Q.        "Q. -- and I'm asking you to read the answer; I'll

10:40     20    read the question.

          21              "Did Barry Goudreau perform any role in connection

          22    with the promotion of Ernie and the Automatics' performances?"

          23              Answer?

          24    A.   Number 14?

          25    Q.   14 through 16.
```

1    A.        "Barry -- if -- needed" -- God, I sound like a moron

2    when I read myself back -- "if I needed Barry to do TV or radio

3    or record stores or anything like that, he was very willing to

4    do it."

5    Q.        "When you say 'do it,' do you mean show up at events?"

6    A.    Well, we would promote --

7    Q.    Just read the answer, if you would.

8              THE COURT:  Was there --

9    Q.    I'm reading to 21.

10:41 10          "When you say 'do it,' do you mean show up at events?"

11              THE COURT:  Can you read 19, Mr. Boch?

12    A.        "Yes."

13    Q.        "Or be interviewed?

14    A.        "Yes, be interviewed, do radio stuff."

15    Q.    All right.

16          So Barry was involved in the promotion of Ernie and

17    the Automatics, correct?

18    A.    Yes.

19    Q.    And in addition to this, he appeared on the video that we

10:41 20  just looked at that promoted the CD, correct?

21    A.    Correct.

22    Q.    And he was actually paid for his work in promoting the CD,

23    correct?

24    A.    Correct.

25    Q.    Now, Mr. Baker was asking you about the LLC.  Did your

1    concert attendees and the like understand they were viewing an

2    LLC when you performed?

3              MR. BAKER:  Objection, Judge.

4              THE COURT:  Sustained.

5    A.   The whole --

6              THE COURT:  It was sustained, so there will be another

7    question.

8    BY MR. GREEN:

9    Q.   You understood -- you understood that when you were

10:42 10   placing ads, promoting, and the like, you were doing it for the

11   band, correct?

12   A.   Correct.

13   Q.   And the band consisted of, among other members, Barry

14   Goudreau, correct?

15   A.   Correct.

16   Q.   Thank you.

17              Now, you were asked a series of questions about

18   exhibits -- and I'm just going to try to run through these very

19   quickly.

10:43 20              We could turn first -- before we turn to the exhibits,

21   you did testify yesterday that you created a web page, and on

22   the web page it did at least at some point in time refer to

23   Barry Goudreau as an original member of BOSTON, correct?

24   A.   I don't recall if it did.  Did you show me something that

25   was on it?

1   Q.   I was just asking you, that was your testimony yesterday.

2   A.   I don't want to sound like an idiot, but I don't know.

3   Q.   Is it not true, sir -- are you changing your testimony

4   today?

5   A.   No.  You got to kind of just -- you said I said this, and

6   if I'm going to say that I said it, I got to, like, remember

7   what it was.

8   Q.   Well, we don't have a transcript of yesterday's testimony,

9   but I'll just move on, sir.

10:43 10        When you talk about different promoters and media

11   publishing, what they do, would you not expect that one of the

12   sources of their information would be your website?

13   A.   Yes.

14   Q.   Thank you.

15        Let's now move on to 23.

16        Now, this is one that you say you created, correct?

17   A.   The Chuck Berry poster?

18   Q.   Right.

19   A.   Yes.

10:44 20   Q.   Then we move to number 31.  This was a poster you created.

21        Just going back to 23, you testified that you didn't

22   use the word "original" in 23 because that was your mindset at

23   that point in time, and you understood that he was not an

24   original member.

25        MR. BAKER:  Objection.  That is not the testimony.

1    A.    I --

2           THE COURT:  Well, counsel, I'll allow the question.

3    He can answer.

4    A.    I still think Barry an original member of the band.

5    That's just my opinion.  Obviously we're here and somebody else

6    has a different opinion, but, like, when I went to the show and

7    saw the band and got the record, "Sibby's" an original

8    member -- I mean, that's the band to me.  I'm sorry.

9    Q.    So your statement that he was an original member is based

10:45 10   upon an assumption when you first saw the band in what year?

11   A.    Junior high.

12   Q.    You were a kid.

13   A.    Kid.

14   Q.    Okay.

15          You saw the band, you bought the first album, you saw

16   Barry's picture.  Did you have any information then -- do you

17   have any information today as to what happened before they

18   first performed and before that first album came out?

19          MR. BAKER:  Objection, Judge.

10:46 20   A.    Only --

21          THE COURT:  Overruled.  You can answer.

22   A.    Only what's common knowledge or what's on the -- I'm not a

23   historian.  I'm sure you could look it up.

24   Q.    Do you have any firsthand knowledge of anything that

25   happened before -- firsthand knowledge, in other words, you

1    were there, saw it, as to what happened before the band

2    performed or what happened before the first album came out?

3    A.    No.

4    Q.    All right.  Thank you.

5          Now, you did say in response to 23 that at that point

6    in time, Barry had told me, Don't refer to me as original,

7    correct?

8    A.    The original -- Barry said it when it appeared.  So

9    whenever that was.

10:46 10   Q.    And Mr. Baker showed you 23.  But then we come to 31, if

11   we can look at that.  This is a poster that you created,

12   correct?

13   A.    That looks like me, yes.

14   Q.    And you're referring here to Barry as an original.  Just

15   "yes" or "no"?

16   A.    Yes.

17   Q.    All right.

18         I'm just going to quickly run through this, sir.  I

19   don't want to cover, again, yesterday's testimony here.

10:47 20   Did it again happen in 40?

21         If we can show that.

22         Do you see the reference to original there?  Right in

23   the first line.  Barry Goudreau --

24   A.    Yes.

25   Q.    And you were responsible for that, correct?

1    A.    Yes.

2    Q.    41, same thing.

3    A.    This is prephone call, I think.

4    Q.    Okay.

5          So let's get that straight.

6          Are you talking now about the John Baruck phone call?

7    A.    Yes.

8    Q.    So even though Barry -- yesterday you testified that Barry

9    only spoke to you after the phone call.  Does that now set this

10:48 10    straight?

11    A.    Talked to me about what?

12    Q.    Not to use original.

13    A.    Barry said "original" -- I don't know when it was when it

14    started to pop up.  And then when it hit the sticker or around

15    the sticker, John called me.

16    Q.    All right.  One way or another, you were responsible for

17    41 and the word "original" appears there, correct?

18    A.    Yes.

19    Q.    And this was February 17th of 2009 we established

10:48 20    yesterday?

21    A.    It says, February 17th.

22    Q.    I won't repeat yesterday's testimony.

23          On Exhibit 42, that's another one referring to

24    original, correct?

25    A.    Yes.

Q.   Now, I could show you more but I don't want to belabor the

point.  I'm going to move on here.

You then talked about what Mr. Baggott did.  Now,

Mr. Baggott worked for Ernie and the Automatics, correct?

A.   No, Mr. Baggott worked -- he had a boss.  He was -- he was

our -- let's see -- he was our manager.  I'd call him a

manager, not an agent.  I think because we used agents.  I

think he was the manager.

Q.   Well, wasn't he taking his decisions from you, sir?

A.   No, manager -- the band doesn't control the manager.  The

manager controls the band.  If the band controlled the manager,

you wouldn't need a manager.

Q.   I believe you said, looking at 49, that he was responsible

for writing this.

A.   Oh, it's -- it's got his fingerprints on it.  It's got his

fingerprints on.  It seem -- I don't know if he actually did

it, but it seems like him.

Q.   Whatever he did in connection with the Ernie and the

Automatics, someone was ultimately responsible, and that was

you, was it not?

A.   I can't -- I can't agree with that.

Q.   He was serving a band, and the band consisted of the five

members, correct?

A.   Correct.

Q.   That's fine.

1          Now -- let me move on.

2          In connection --

3          MR. GREEN:  Bear with me one moment, your Honor.

4          THE COURT:  Yes.

5          (Pause.)

6     BY MR. GREEN:

7     Q.   Are you familiar with Paul Geary, sir?

8     A.   Yes.

9     Q.   And who is Paul Geary?

10:51 10   A.   Paul Geary is a very old friend of mine.

11    Q.   How do you know Mr. Geary?

12    A.   I know Mr. Geary through mutual friends.

13    Q.   And how long have you known him?

14    A.   Since -- when did the Patriots go to the Super Bowl?  In

15    '97 or '96?

16    Q.   I actually think they first went to the Super Bowl in --

17    A.   Was it '96 or -- if you tell me that, I can tell you the

18    exact month I met Paul Geary.

19    Q.   It was sometime in the 1990s?

10:51 20   A.   Yeah.

21    Q.   Have you maintained a relationship with Paul Geary over

22    the years?

23    A.   Yes.

24    Q.   Do you have a business relationship with Paul Geary as of

25    today?

1    A.    Yes.

2    Q.    And what is that business relationship, sir?

3    A.    We have a very, very, very small rock 'n' roll management

4    company.

5    Q.    And as part of what that company does, does it work with

6    artists in connection with their royalty agreements?

7    A.    No.  We have one artist -- two artists -- two artists that

8    we work with royalty streams.

9    Q.    And when you say "work with royalty streams," what do you

10   do in that regard?

11   A.    Well, they're with Paul Geary Management and Open E

12   Entertainment.

13   Q.    I want to see if we understand, sir.

14          Are you affiliated with Mr. Geary in connection with

15   each of those entities?

16   A.    Like -- I'd have to look at the paperwork, but, yeah.  I'd

17   say, yes.

18   Q.    You have an interest in an entity with Paul Geary that

19   works with artists on their royal streams, correct?

20   A.    Just two artists.

21          MR. BAKER:  Judge, I object to this entire line of

22   questioning.

23          THE COURT:  No speaking objections, but scope,

24   counsel?

25          Is scope the basis?

```
 1              MR. BAKER:  Scope and another basis, but I'll leave it
 2     to your Honor.
 3              THE COURT:  Okay.
 4              Counsel, scope --
 5              MR. GREEN:  I'm going to focus it now, your Honor.
 6              THE COURT:  Let me hear.
 7     BY MR. GREEN:
 8     Q.   Is Mr. Goudreau one of those artists?
 9     A.   No.
10     Q.   Have you ever had any interest in connection with
11     Mr. Goudreau's stream of income?
12     A.   No.
13     Q.   Has Mr. Geary, to your knowledge?
14     A.   Not to my knowledge.
15     Q.   Now, have you met at all with Mr. Goudreau's counsel in
16     preparation for your testimony today?
17              MR. BAKER:  Judge, objection.
18              THE COURT:  Overruled.
19     A.   Before this?
20     Q.   Yes.
21     A.   Yes.
22     Q.   On how many occasions did you meet with Mr. Goudreau's
23     counsel in connection with your testimony?
24     A.   Once or twice.
25     Q.   And when was that, sir?
```

1    A.    Maybe two weeks before this.

2    Q.    And for how long did you meet when you met with them?

3    A.    An hour maybe.

4    Q.    Did they review with you the questions and answers that

5    you would be receiving?

6    A.    No.

7    Q.    Did they inform you of -- what did they tell you, sir?

8    A.    This is what they did -- I've never been in this

9    environment, which is kind of cool, you know, it looks just

10:54 10    like TV.  But I've done depositions.  I've prepared for stuff

11    like this, and I've done depositions -- depositions, right?

12    Depositions.  Is that what you call it?  Depositions -- did I

13    do a deposition for this?

14    Q.    Yes, we showed you that.

15    A.    So before a deposition -- I've done many, many

16    depositions.  So before a deposition, the counsel always meets

17    with me.  And that's just standard, I thought.  I don't know.

18    Q.    And did -- not your own counsel, did Mr. Goudreau's

19    counsel meet with you in connection with your appearance today?

10:55 20    A.    Yes.

21    Q.    And was it on that one occasion a couple of weeks ago or

22    more than one occasion?

23    A.    It's either one or two.

24    Q.    Now, are you, sir, or are any of your entities -- so you

25    individually or through any of your entities -- paying for any

1    of Mr. Goudreau's attorneys?

2    A.    No.

3    Q.    Directly or indirectly?

4    A.    No.

5    Q.    Let me ask you now to turn to -- well, before I ask that,

6    I'll ask this question:  You have been asked about the "Come on

7    down" phrase, correct?

8            MR. BAKER:  Objection, Judge, scope.

9            THE COURT:  Well, overruled.  It was within the

10:56 10   cross-examination.

11   A.    You started something about that the other day.

12           THE COURT:  Mr. Boch, thank you, though.

13   BY MR. GREEN:

14   Q.    "Come on down," you have actually had trademarked,

15   correct?

16   A.    Correct.

17   Q.    There's no logo associated with that, there's no design

18   with that, correct?

19           MR. BAKER:  Objection, Judge.

10:56 20   THE COURT:  Overruled given the scope of cross.  I'll

21   allow this question.

22   A.    There might be a font.  I'm not really sure.

23   Q.    What you trademarked were the words "Come on down,"

24   correct?

25   A.    There might be a font, yes.

```
 1   Q.   Could you turn to Exhibit 10, please?

 2             We'll first turn to 11, actually.

 3             I'm going to show you two exhibits, sir, both relating

 4   to Mr. Scholz's trademark.

 5             First is Exhibit 11.  You see a trademark with a

 6   particular design, correct?

 7   A.   Absolutely.

 8   Q.   Now I'll show you Exhibit 10, and I'll represent to you,

 9   sir, that is the other trademark that is at issue in this case.

10:57 10             MR. GREEN:  Can you turn to 10, please?

11   Q.   And you see that it is a word mark "BOSTON" and it

12   mentions the content of its usage.  Do you see that?

13   A.   No.

14             What am I looking at?

15             There's no font on --

16   Q.   Word mark "BOSTON"?

17   A.   Word mark "BOSTON," yes.

18   Q.   Okay.

19             Just as "Come on down" is a word mark, correct?

10:57 20             MR. BAKER:  Objection, Judge.  There's no --

21             THE COURT:  Counsel, no speaking objections.

22             Overruled as to this question.

23   A.   Say the question again.

24   Q.   "Come on down" is similarly a word trademark?

25   A.   It's a slogan.
```

 1                  THE COURT:  Well, overruled.

 2                  Actually, as to that question, to the extent there is

 3       an answer, it's struck.

 4                  Counsel, you can ask another question.

 5                  MR. GIVEN:  Your Honor, I think you meant "sustained."

 6                  THE COURT:  I'm sorry, sustained.

 7                  You can ask another question.

 8       BY MR. GREEN:

 9       Q.   Now, at any point in time, did you ever receive anything

10:58 10       in writing from Mr. Goudreau saying, Ernie, don't do it this

11       way?

12       A.   Not that I --

13       Q.   The reference to the original?

14       A.   Not that I recall.

15       Q.   And let's now turn to Exhibit 29.

16                  You have been asked about this.  You recall that this

17       is an agreement that was entered into between Ernie and the

18       Automatics, and turning to the last page, all of the musicians,

19       the artists?

10:59 20       A.   Yes.

21       Q.   And in 7 and 8, if you just read those to yourself, call

22       your attention to that.

23       A.   Can you make it a little bigger, please?

24       Q.   Certainly.

25                  Let's focus on 7 first.

1                    (Pause.)

2    A.    Okay.

3    Q.    What did you understand paragraph 7 to mean?

4    A.    Well, what this -- this is not -- -- this is a legal

5    document, but it's not -- it's like -- we just grab stuff from

6    other things.  This was not -- isn't like -- we're not -- we

7    weren't Nirvana.  This is not anything -- this was like a

8    necessary evil.  So looking into any of this stuff doesn't

9    really mean anything, but I'll answer your question.

11:00 10   Q.    The necessary evil, as you just described it, included a

11   provision whereby Mr. Goudreau and the other musicians gave

12   Ernie and the Automatics the perpetual right to use and

13   authorize his name and biographical material for purposes of

14   advertising, promotion, and trade and in connection with any

15   other merchandising of any kind, including, but not limited to,

16   basically give you a license to use him name and bio however

17   Ernie and the Automatics chose, correct?

18              MR. BAKER:  Objection, Judge.

19              THE COURT:  Counsel, in a word, the basis on this one?

11:01 20             MR. BAKER:  It's leading, and the document speaks for

21   itself.  He can ask him what it meant to him.

22              THE COURT:  Sustained as to form, counsel.

23   BY MR. GREEN:

24   Q.    Did you understand, sir, that by virtue of paragraph 7,

25   Mr. Goudreau was assigning the right to Ernie and the

1    Automatics to use his name and biographical information in any

2    way that Ernie and the Automatics chose to use it?

3    A.    I would say -- I would say if that's your interpretation,

4    yes.  I mean, it is what it is.  I would -- I could use any of

5    their names without even this -- without even this

6    documentation.

7    Q.    And in fact, you did.  You did use any of their names --

8    because this documentation, in fact, came out in February 2009,

9    correct?

11:02 10    A.    I don't know, but I would say --

11    Q.    Well, look at the first page, if you would.

12    A.    Yeah, this came out -- this came when the record came out.

13    That's really the only reason why we did it.

14    Q.    Well, let me take -- this came out when the record came

15    out, but we talked yesterday related to the album and each of

16    the works for the album were for promotion, correct?

17    A.    Well, you list -- they list the songs here.

18    Q.    To promote the album and the songs, correct?

19    A.    No.  This came out -- this particular piece of paper was

11:02 20    generated in case or with the hopes that it made any sort of

21    money.  And any time money is involved, you should always just

22    get it on paper so there's no arguments, there's no problems.

23    Q.    Let me go back to your answer about two minutes ago.

24         You said even without this, you had the right to use

25    their names in any way you saw fit, correct?

1    A.    Well, I didn't think -- yeah, I don't think there would be

2    a problem.

3    Q.    Mr. Goudreau, in fact, gave you that right to use his name

4    in any way you saw fit.  You were the decision maker, correct?

5    A.    Yeah.  You make it sound a little weird, but, yeah, I

6    could do -- I would promote him, "Sibby," any of them.

7    Q.    With his authority, you were doing so with his authority.

8    A.    Now you're getting technical.  That's -- I mean, you

9    can -- that's not right, what you're saying there.  You're

11:03 10    making it sound like it's, you know --

11    Q.    I'm not trying to do anything, sir, other than to elicit

12    your testimony.  So I'll ask you, did you ever feel that you

13    promoted the band and him in any way in which he did not so

14    authorize?

15    A.    Oh, yeah.

16    Q.    And when was that?

17    A.    The word "original," which keeps popping up, you know,

18    again, with the various promoters, agents.  I mean, it was,

19    like we said, a whack-a-mole.  I don't think there was -- there

11:04 20    was no -- there was an implied blanket policy that I could do

21    whatever was best for us to promote the band.

22    Q.    Well, let's stop you there.  An implied blanket policy.

23    He was one of the people who agreed to that implied blanket

24    policy that you could do whatever you wanted to do.

25    A.    Yeah, but it's --

1    Q.    Okay.

2    A.    The way you said it is, you know, you got to interpret it.

3    Q.    I'm just repeating your words.

4    A.    Yeah, I know, but -- okay.

5         MR. GREEN:  Your Honor, I think I am completed, if I

6    could suggest we take the morning break here.  I just want to

7    check with --

8         THE COURT:  Counsel, I'm inclined to push forward.

9    I'm aware of the time.

11:05 10        MR. GREEN:  Could I take one moment with Ms. Stenger?

11         THE COURT:  You may.

12         (Discussion off the record.)

13         MR. GREEN:  Nothing further.

14         Thank you, Mr. Boch.

15         THE COURT:  Thank you.

16         Mr. Baker, recross?

17         MR. BAKER:  Thank you, Judge.

18         THE COURT:  If it's brief, you can do it from there.

19         THE WITNESS:  Does he get to go again, the other guy?

11:05 20        THE COURT:  Last round.

21         THE WITNESS:  Okay.

22                        RECROSS-EXAMINATION

23    BY MR. BAKER:

24    Q.   Sir, in all of your travels, experiences, concert going,

25    did you ever see the band BOSTON without the art logo?

1    A.    Oh, I don't know.  I don't know.  I can't -- I mean, I can

2    close my eyes and I'm at the show, but I don't remember the

3    background.

4    Q.    Ninty-nine percent of the time that logo was always

5    prominently featured?

6    A.    I would assume.

7    Q.    Not assume, based on your experience.

8    A.    Sure.

9    Q.    Okay.

11:06 10          And Mr. Green, Attorney Green, asked you a number of

11    questions about all these different companies that paid

12    Mr. Goudreau.  Was there any rhyme or reason to where the money

13    came from?

14    A.    As I said before, the band kind of just happened.  It

15    just -- nothing was planned, it just kind of happened.  So at

16    first I said, All right, I have to charge the money somewhere,

17    so I grabbed it out of Consumer, which is my in-house

18    advertising.  So we would funnel -- that's not a bad thing,

19    it's just where the money comes -- so we take the money from

11:06 20    there.  And then, as it started getting more and more and the

21    record came out, it was suggested that we start an LLC.  And

22    that's eventually what happened.

23          And then the Open E happened, and that's when it gets

24    muddy.  That's when the lawyers get together and that's when

25    the tax issues and all this stuff -- so you have to build in

1    accordance to law all that stuff.  And I was, you know,

2    involved overseeing it to the point I signed off on it but

3    didn't retain it.  That's not -- that's not what I do.

4              MR. BAKER:  Exhibit 48, Mr. Tarlow.

5              MR. GREEN:  Objection.  Beyond the scope, your Honor.

6              MR. BAKER:  Judge, Mr. Green asked him a number of

7    questions about Mr. Baggott and his authority and what he did.

8              THE COURT:  I'll allow it and listen for the

9    questions, counsel.  But I'm focused on scope.  Overruled.

11:08 10   BY MR. BAKER:

11   Q.   Okay.

12             Looking at Exhibit 48 at the very bottom -- the

13   bottom -- let me say this:  Tom Baggott, he was -- what was Tom

14   Baggott again.

15   A.   I would say manager.

16   Q.   He was the fellow who was always kind of pushing the whole

17   marketing --

18   A.   Always.

19   Q.   Did you ever want to play BOSTON songs behind some ad that

11:08 20   you had on the radio?

21   A.   No.

22   Q.   Did you want to record BOSTON songs to promote your band?

23   A.   No.

24             MR. BAKER:  No further questions, Judge.  Thank you.

25             THE COURT:  With that, Mr. Boch, you're done.

```
 1              Thank you.  You're excused.
 2              THE WITNESS:  All right, thank you.
 3              THE COURT:  Jurors, thank you for being patient with
 4    us.  I just wanted to push through so we could finish with this
 5    witness.  We'll take our 20-minute break and then resume.
 6              Thank you.
 7              THE CLERK:  All rise.
 8              (Jury left the courtroom.)
 9              THE COURT:  Counsel, anything pressing before we take
10    our 20 minutes?
11              MR. GREEN:  Nothing, your Honor.
12              (Recess taken.)
13              (Jury entered the courtroom.)
14              THE COURT:  We'll continue with the evidence.
15              Mr. Green?
16              MR. GREEN:  Thank you, your Honor.
17              The plaintiff calls Mr. Barry Goudreau.
18              THE COURT:  He may be called.
19              BARRY GOUDREAU, having been duly sworn by the Clerk,
20    was examined and testified as follows:
21              THE COURT:  Good morning, sir.
22              THE WITNESS:  Good morning.
23              THE COURT:  Mr. Green.
24                           DIRECT EXAMINATION
25    BY MR. GREEN:
```

```
 1    Q.   State your name for the record, please.

 2    A.   Barry Goudreau.

 3    Q.   Where do you reside, Mr. Green?

 4    A.   ███████████████████ in Swampscott, Massachusetts.

 5         THE COURT:  Just for the record, we'll just keep the

 6    town on record.

 7         MR. GREEN:  Thank you, your Honor.

 8    BY MR. GREEN:

 9    Q.   And you are and have been for most of your life a guitar

10    player?

11    A.   I am.

12    Q.   Now, you're familiar with Mr. Scholz, of course?

13    A.   Of course.

14    Q.   And at some point in time, were you familiar with the fact

15    that Mr. Scholz created demo tapes in his basement studio that

16    he sent to Epic Records at CBS which caused CBS to sign a

17    recording contract?

18    A.   I'm familiar with that, yes.

19    Q.   And you did not play on any of those demo tapes, correct?

20    A.   I played on earlier demo tapes, but I didn't play on the

21    demo tapes that he sent to Epic that got the recording

22    contract.

23    Q.   Thank you.

24         Now, let's turn to the recording contract, sir.

25         This is Exhibit 1.  If you could focus on the first
```

1    page.  Start with the top paragraph.

2         Were you familiar with the fact that CBS entered into

3    agreement with Paul Ahern on December 15 -- excuse me, February

4    1 of 1976?

5    A.   Well, this is dated December '76.

6    Q.   I think they projected --

7         (Discussion off the record.)

8         MS. STENGER:  Your Honor, if I can clarify.  By

9    agreement with Mr. Tarlow.

11:33 10         MR. TARLOW:  Your Honor, I thought she was going to

11   explain that the wrong exhibit was put up.

12        THE COURT:  Do you need to confer off-line?  Why don't

13   you do that.

14        (Discussion off the record.)

15        MS. STENGER:  Excuse me, your Honor.

16        THE COURT:  Yes.

17        (Discussion off the record.)

18   BY MR. GREEN:

19   Q.   Do you see in the first paragraph it says, "Agreement made

11:34 20   this first day of February 1976"?

21   A.   Yes.

22   Q.   And who was Paul Ahern at that point in time?

23   A.   Paul Ahern was our manager.

24   Q.   Now, when you say "our manager," let's turn to the last

25   page of this contract.  You see two names there, do you not?

A.    I do.

Q.    One name is Mr. Scholz?

A.    Yes.

Q.    One name is Brad Delp, correct?

A.    That's right.

Q.    Let's go back to the first page.

      Calling your attention to 2.01 -- if we could just magnify that, please.  2.01, during the term of this agreement, you will furnish the services of the recording group professionally known as BOSTON comprised of the members listed on Exhibit -- something -- hereto -- hereinafter jointly and severally referred to as the artists to perform for the purposes of making phonograph record as provided in Article III.  Do you see that?

A.    I do.

Q.    Could you turn now to Exhibit 2?

      Did you understand that Exhibit 2 is the exhibit to the February 1, 1976 agreement?  And it lists the following individuals, comprise the group Boston: Donald T. Scholz, Bradley E. Delp.

A.    I see that.

      MR. TARLOW:  Objection, your Honor.

BY MR. GREEN:

Q.    You're --

      THE COURT:  I'm sorry, objection?

1          MR. TARLOW:  Foundation.

2          THE COURT:  Well, I think in regards to what the

3     answer is, overruled.  I'll let it stand.

4     BY MR. GREEN:

5     Q.   Your name does not appear there, does it?

6     A.   No.

7     Q.   And Mr. Ahern, who is the manager, signed this.  Do you

8     see that?

9     A.   I do.

11:36 10    Q.   Now, when did the first album of BOSTON come out?

11     A.   It was August of 1976.

12     Q.   It wasn't until after that that you become a party to the

13     contract with CBS, correct?

14     A.   After the album's release, yes.

15     Q.   Specifically, if we can turn to Exhibit 6.  Let's look at

16     the date.  This document is dated as of December 15, 1976,

17     correct?

18     A.   Yes.

19     Q.   This is after the album is released, correct?

11:37 20    A.   Yes.

21     Q.   And if we can turn to the last page.

22          You are now listed as an artist, correct?

23     A.   Yes.

24     Q.   So you would agree with me you were not part of the

25     original band BOSTON as set forth in Exhibits 1 and 2; that was

1    only formalized on December 15, 1976, correct?

2    A.   Well, maybe not on paper, but I consider myself a member

3    of the group.

4    Q.   Well, let's follow up on that.

5         Just going back to Trial Exhibit 2 -- I'm sorry, Trial

6    Exhibit 1, page 22.

7         Do you see language --

8         MR. GREEN:  Ms. Stenger, if you could just give me a

9    moment, here.

11:39 10        (Discussion off the record.)

11        MR. GREEN:  I meant to go to the last page, excuse me.

12   Q.   Do you see in the last page of Exhibit 1 it says, In order

13   to induce CBS Records to enter into the foregoing agreement

14   with Ahern Associates, each of the undersigns hereby assents --

15   and it reads on from there.  Do you see that?

16   A.   Yes.

17   Q.   And, again, you're not a party to that.

18   A.   No.

19   Q.   Now, let me call your attention to be the first album.

11:39 20        Was the album successful, sir?

21   A.   Extremely successful.

22   Q.   It sold over 17 million copies?

23   A.   Yes.

24   Q.   It, in fact, broke the record for the largest-selling

25   debut album in the history of rock music at that time?

1     A.    At that time.  Guns N' Roses went past us, but --

2     Q.    Sometime after that.

3     A.    Yes.

4     Q.    But at that time, it was the largest-selling debut album

5     in history.

6     A.    It was.

7     Q.    The album consisted of eight tracks, correct?

8     A.    Yes.

9     Q.    You did not write any of the songs that appeared on that

11:40 10     first album, did you?

11    A.    I did not.

12    Q.    Did you arrange any of the songs that appear on the first

13    album?

14    A.    No.

15    Q.    Did you produce any of the songs that appear on the first

16    album?

17    A.    I did not.

18    Q.    Did you engineer any of the songs that appear on the first

19    album?

11:40 20    A.    I did not.

21    Q.    Did you -- you did not play on the first song of that

22    album called "More Than a Feeling," did you?

23    A.    I didn't play in "More Than a Feeling," no.

24    Q.    And that was BOSTON's biggest hit ever, correct?

25    A.    It was.

1    Q.    And you heard Mr. Boch on the stand saying that that song,

2    more than any other, is BOSTON's greatest hit, correct?

3    A.    Yes.

4    Q.    And you did not play on that.

5    A.    I did not.

6    Q.    You did not play on the hit "Peace of Mind"?

7    A.    No, I did not.

8    Q.    That was also a big hit?

9    A.    Yes.

11:41 10    Q.    How about on "Smokin'"?

11    A.    No, I didn't play on that as well.

12    Q.    That was also a big hit?

13    A.    It was.

14    Q.    Did you play on the big hit -- did you play on "Rock &

15    Roll Band"?

16    A.    I did not.

17    Q.    Was that a big hit?

18    A.    All the songs were big hits.

19    Q.    And on that last one, song called, quote, "Rock & Roll

11:41 20    Band," do you recall -- you didn't play on it, but do you

21    recall what the first lines were of that song?

22    A.    "Just another band out of Boston."

23    Q.    "We Were Just another band out of Boston," right?

24    A.    Right.

25    Q.    Is that the first time you heard that in connection with

1    BOSTON?

2    A.    One more time?

3    Q.    Had you ever heard of that line before you became

4    affiliated with BOSTON?

5    A.    No.

6    Q.    You never heard another band use that line?

7    A.    No.

8    Q.    And is it fair to say it became an iconic line of the band

9    BOSTON?

11:42 10    A.    It is.

11    Q.    Now, it is -- even as of today, it's recognized that way,

12    correct?

13    A.    Yes.

14    Q.    I'm going to come back to the first album, but just while

15    we're on this subject, you did -- you were a member of Ernie

16    and the Automatics 2000 to 2011?

17    A.    2000?

18    Q.    Excuse me.  I misspoke.

19          2007 to 2011.

11:42 20    A.    Yes.

21    Q.    You played at approximately 250 to 300 performances?

22    A.    I think it's more 200 to 250, but something like that,

23    yes.

24    Q.    Do you recall being introduced at some of those

25    performances when Ernie and the Automatics came out as, "Just

1  another band out of Boston"?

2  A.    No.  We were never introduced that way.

3  Q.    Never.  Never in among the 250 to 300 performances, never

4  happened.

5  A.    Never happened.

6  Q.    Okay.

7        You do recall that when you were touring with BOSTON,

8  that was a line that was frequently used to introduce the band,

9  correct?

11:43 10  A.    Yes.

11  Q.    And the concerts often started off with the song that it

12  came from, "Rock & Roll Band," correct?

13  A.    Yes.

14  Q.    BOSTON concerts.

15        Now, you did do two things on the first album.  You

16  played guitar on two songs, correct?

17        (Pause.)

18  Q.    Would it refresh your recollection the album had eight

19  songs, correct?

11:44 20  A.    Right.

21  Q.    "Foreplay" and "Long Time" were together as one song?

22  A.    Yes, I guess you count them as one, sure.

23  Q.    On "Foreplay" you played rhythm guitar, correct?

24  A.    Yes.

25  Q.    On "Long Time," associated with "Foreplay," you also

1  played guitar and rhythm guitar?

2  A.   I played the rhythm guitar and the lead guitar.

3  Q.   And on a song entitled "Let Me Take You Home Tonight," you

4  played guitar and rhythm guitar?

5  A.   Rhythm and lead guitar, yes.

6  Q.   So your playing guitar on those couple of songs, that was

7  your total contribution to that first album, correct?

8  A.   The recording, yes.

9  Q.   Now, BOSTON -- BOSTON was known for its sound, was it not,

11:44 10  described as a choir of guitars?

11  A.   I've heard that, yes.

12  Q.   And on the songs that you played guitar, was Mr. Scholz

13  was one of the guitarists?

14  A.   I don't believe he played on "Let Me Take You Home

15  Tonight," but he did play acoustic guitar on "Long Time."

16  Q.   And he played on -- he played many tracks of guitar within

17  each of the songs?

18  A.   Most of the songs, yes.

19  Q.   He also played keyboards and other instruments in

11:45 20  connection with those songs?

21  A.   Yes, he did.

22  Q.   Now, artist royalties are monies that a musician or singer

23  receives from the sale of recordings, correct?

24  A.   Yes.

25  Q.   And despite the fact that you only played on two of the

1    eight songs on the original album, Mr. Scholz agreed to give

2    you a one-fifth share of all of the artist royalties for all

3    eight songs; is that not true?

4    A.    That's true.

5    Q.    And you did, in fact, receive a one-fifth share on all

6    artist royalties of all eight songs on the first album.

7    A.    I did.

8    Q.    So that means the sale of the album as well as sale of the

9    individual songs?

11:46 10    A.    Yes.

11    Q.    Now, let's turn your attention to the second album.  That

12    was entitled "Don't Look Back."

13    A.    Yes.

14    Q.    And when was that released, sir?

15    A.    1978.

16    Q.    August of that year?

17    A.    Yes.

18    Q.    And how was that album received?

19    A.    Very well.

11:46 20    Q.    Did it also contain eight tracks?

21    A.    Yes.

22    Q.    Let me run through some of the same questions again.

23          Did you write any of the songs on the second album?

24    A.    I did not.

25    Q.    Of the eight tracks on the second album, how many did you

1   play guitar on?

2   A.   I played on "Don't Look Back," an instrumental piece

3   called "The Journey," and the song Brad wrote, "Used to Bad

4   News."

5   Q.   So you wrote -- you didn't write any of the songs, but you

6   play guitar on three of the eight songs?

7   A.   Yes.

8   Q.   And on those songs, did Mr. Scholz also play guitar parts?

9   A.   Yes.

11:47 10   Q.   Did you arrange, produce, or engineer any of the music on

11   the second album?

12   A.   I did not.

13   Q.   And even though you played on only three of the eight

14   songs on the second album, "Don't Look Back," did you receive

15   one-fifth of the artist royalties for the album on all of the

16   eight songs?

17   A.   I did.

18   Q.   From the release of the two albums in 1976 and 1978, you

19   have received millions of dollars of artist royalties.

11:47 20   A.   That's true.

21   Q.   Through the present day?

22   A.   That's true.

23   Q.   Now, at some point in time during the second tour of the

24   band BOSTON, you were unhappy, were you not?

25   A.   When we did a tour of Europe, towards the end of the

1    touring cycle for the second record, Tom Scholz didn't want to

2    go on our tour to Europe.  He was very unhappy, and he seemed

3    to be taking it out on me.  So, yes, I was pretty distraught by

4    the end of that tour.

5    Q.    And when was that tour?

6    A.    That was the fall of 1979.

7    Q.    And you decided to leave the band BOSTON, did you not?

8    A.    No, I did not.

9    Q.    At some point, did you leave the band BOSTON?

11:48 10    A.    I was asked to leave the band BOSTON.

11    Q.    Describe the circumstances under which you were asked to

12    leave the band BOSTON.

13    A.    Tom Scholz called a meeting at his house in January of

14    1980 and told the band that he would no longer work with me and

15    that the partnership would buy me out of my share of the

16    partnership.

17    Q.    And you -- you then did your own solo album in 1980,

18    correct?

19    A.    I did.

11:49 20    Q.    And Mr. Scholz did not restrict that in any way, did he?

21    A.    That's not really clear.

22    Q.    Can you point to any facts that he somehow restricted your

23    work on your solo album in 1980?

24    A.    Walter Yetnikoff, the head of CBS Records, I had a meeting

25    in his office, and he told me that Thomas Scholz --

1          MR. GREEN:  Objection, calls for hearsay.

2          MR. TARLOW:  He called for the question -- for the

3     answer, your Honor.

4          THE COURT:  Counsel, I'll allow -- well, I'll allow it

5     with a "yes" or "no" answer to this question.

6          Can you point to any facts that he somehow restricted

7     your work on the solo album?  Is your answer "yes" or "no,"

8     sir?

9          THE WITNESS:  Yes.

11:50 10          THE COURT:  Counsel.

11     BY MR. GREEN:

12     Q.   I'll move on.

13          Now, at some point in time, you entered into an

14     agreement with Mr. Scholz and the other members of the band

15     BOSTON basically settling all differences?

16     A.   I did sign a settlement agreement, yes.

17     Q.   And in fact, it was called a Settlement Agreement.

18          Let's turn now to Exhibit 8.  Let's just turn to the

19     last page.  I'm going to go through page by page, but I just

11:50 20     want you to identify your signature on the last page.

21     A.   Yes, that's my signature.

22     Q.   Now, let's go back to this first page.  We're going to try

23     to run through quickly paragraph by paragraph, focusing on the

24     first paragraph.

25          The agreement was entered into in -- as of May 9,

1    1983, correct?

2    A.    Yes.

3    Q.    So this was after the first two BOSTON albums were

4    released but before the third BOSTON album, correct?

5    A.    Yes.

6    Q.    The third album was not released until three years later

7    in 1986?

8    A.    Yes.

9    Q.    And you understood that all of the members of the band

11:51 10    BOSTON, including Mr. Scholz, Mr. Delp, Mr. Hashian,

11    Mr. Sheehan, and yourself, entered into this agreement.

12    A.    Yes.

13    Q.    Now, I want to take you through this here.

14        There is a "whereas" clause that says -- the first

15    "whereas" clause says that you had been an equal partner in an

16    oral partnership known as BOSTON?

17    A.    I see that.

18    Q.    And that you had been a one-fifth shareholder in BOSTON

19    World Tours, Inc.?

11:52 20    A.    Yes.

21    Q.    And what was BOSTON World Tours, Inc.?

22    A.    That was the company we had to handle the touring aspect.

23    Q.    And in the third "whereas" clause, it says, "Goudreau

24    became involved in disputes with the other members of BOSTON

25    resulting in Goudreau's having commenced litigation against

1    said members, which litigation Goudreau is now willing to

2    discontinue with prejudice in consideration of this agreement."

3    Do you see that?

4    A.    Yes.

5    Q.    And in the fourth "whereas" clause, it says, "Goudreau now

6    wishes to retire from BOSTON and to cease performing with the

7    group professionally known as BOSTON."  Did I read that

8    properly?

9    A.    Yes.

11:53 10    Q.    And it says, "Finally, Goudreau now wishes to sell all his

11    interest in BWT."

12    A.    Yes.

13    Q.    So you signed an agreement that had all of those clauses,

14    correct?

15    A.    I did.

16    Q.    Now, let's turn to page 2.

17          In paragraph 18, you are acknowledging that you are no

18    longer -- and you have ceased to be a partner in BOSTON.  Do

19    you see that?

11:53 20    A.    I do.

21    Q.    And that you have no interest, right, or title to the name

22    BOSTON, correct?

23    A.    Yes.

24    Q.    And you understood that, correct, when you signed this?

25    A.    Yes.

1   Q.   Now, you then see in paragraph 2, that as consideration

2   for your retirement, you are to receive -- and it mentions

3   various income that you are to receive, correct?

4   A.   Various income?

5   Q.   Well, it has something about future recordings.  You were

6   to receive $100,000 in future recordings?

7          2 A.

8          (Pause.)

9   A.   Yes.

11:54 10   Q.   Now, Mr. Scholz, in fact, made sure that you received

11   $100,000, did he not?

12   A.   I did receive $100,000, yes.

13   Q.   And, in fact, a request had been made to pay that early,

14   and Mr. Scholz saw to that.  Did he not do that?

15   A.   I don't remember that.

16   Q.   Let me see if I can refresh your recollection.

17          Can you turn to Exhibit 9?

18          Do you recognize that as a letter calling for the

19   payment of the $100,000?

11:55 20          (Pause.)

21   A.   Yes.

22   Q.   And the purpose of the $100,000 was to buy you out of any

23   interest in future recordings, correct?  As opposed to the two

24   albums that had already come out.

25   A.   Yes.

1  Q.    So for the two albums that had already come out, you were

2  going to continue to receive -- and let's turn now back to

3  Exhibit 8, page 5 -- you would continue to receive your

4  one-fifth royalty, correct?

5  A.    Yes.

6  Q.    And that has, in fact, been paid over the years.

7  A.    It has.

8  Q.    2 D at the bottom of the page also said that you were to

9  be reimbursed expenses of $16,000 and change.

11:56 10          THE COURT:  Counsel, I don't --

11  A.    2 D, I don't see that.

12          (Discussion off the record.)

13  A.    I see it now.

14  Q.    And you did receive that amount, correct?

15  A.    Yes.  I think that was money I had already put towards the

16  recording of the third record.

17  Q.    Now, next let's turn to paragraph D that appears on the

18  bottom of page 7, and it continues to page 8.

19          It reads, The name BOSTON:  "The parties hereto

11:57 20  expressly agree that Goudreau may use the term 'formerly of

21  BOSTON' for and in conjunction with any biographical usage with

22  respect to future performances, but except to this extent

23  Goudreau shall have no other interest, right or title to the

24  name BOSTON.  Without limiting the foregoing, Goudreau may not

25  use the name BOSTON for or in conjunction with any

1    advertisement or promotion."

2            Did I read that properly?

3    A.   You did.

4    Q.   And that's what you agreed to, correct?

5    A.   I did.

6    Q.   It does not provide, does it, that you can use the term

7    "original member of BOSTON," correct?

8    A.   No.

9    Q.   Or "former original member of BOSTON."

11:58 10   A.   No.

11   Q.   Or "former member of the multiplatinum selling band

12   BOSTON," correct?

13   A.   No.

14   Q.   Or the phrase "Just another band out of Boston," correct?

15   A.   No.

16   Q.   Now, let's turn to page 28 of this, paragraph 3.

17            This includes an acknowledgement by the parties that

18   there exists a recording royalty deferment plan with CBS.  Were

19   you familiar with that?

11:59 20   A.   Yes.

21   Q.   And it goes on to say, "Goudreau's interest in said sums

22   shall be unaffected by this agreement and Goudreau shall be

23   entitled to his full share as if he were still a one-fifth

24   partner in BOSTON," correct?

25   A.   Correct.

1    Q.   You would agree with me you were being treated pretty

2    generously under this agreement by getting a one-fifth share

3    for your work as you described it on the first two albums?

4    A.   It was what I was entitled to according to the partnership

5    agreement.

6    Q.   According to this agreement that we're looking at.

7    A.   Well, I was a one-fifth partner in the band.

8    Q.   Okay.

9         Now, let's turn now to paragraph 5.

12:00 10       This paragraph gives you the right to access financial

11   information and to do audits at any point?

12        MR. TARLOW:  Objection, your Honor.  The document

13   speaks for itself.

14        THE COURT:  Overruled.

15   A.   Yes.

16   Q.   And just above -- I'm sorry.  Just going back to paragraph

17   4.  I'll cover this briefly.

18        You were also entitled to a $72,000 profit sharing

19   plan?

12:00 20       (Pause.)

21   A.   Yes.  Although I can't say I remember that part of it.

22   Q.   You have no reason, as you sit here today in 2016, to

23   dispute that.

24   A.   No.

25   Q.   Or that you received that amount?

A.    I would assume I did, sure.

Q.    Thank you.

        Now, calling your attention -- calling your attention to -- we're now at Exhibits 8 E, H, M, O, R, T, and X.

        MR. GREEN:  These are all exhibits that we will be offering, your Honor.

        THE COURT:  If, counsel, you're going to show them to the witness, just for the witness.

        MR. GREEN:  That's fine.

12:01   THE COURT:  Counsel --

        MR. GREEN:  To make this easier, your Honor --

        THE COURT:  I think I see what they're in regard to.

        Counsel, other than your prior objection, any other objection?

        MR. TARLOW:  So long as my prior objection is preserved for the record, your Honor.

        THE COURT:  It is, counsel.

        MS. STENGER:  May I approach?

        THE COURT:  You may.

12:02   And, counsel, these are -- counsel, remind me, there's a certain category of these exhibits that have, if I'm recalling correctly, already been admitted because counsel had asked about them previously.  I think it was Mr. Baker.  I think it was 55, counsel?  Am I --

        MR. GREEN:  I think this is a different set of forms,

1       your Honor.

2               THE COURT:  It's a different set.

3               MR. GREEN:  Right.

4               We would ask that these be collectively marked as the

5       next exhibit once I have the witness identify them.

6               THE COURT:  Sure.

7               Counsel, this will be 60.  Ms. Hourihan?

8               THE CLERK:  Yes.

9       BY MR. GREEN:

12:03  10       Q.   Mr. Goudreau, take your time, but can you look through

11      those documents, and can you confirm that those documents

12      reflect royalties paid to you for the years 2007 through 2013?

13              (Pause.)

14      A.   Yes.

15      Q.   And these are all the 20 percent royalties for the first

16      two albums, correct?

17      A.   Yes.

18      Q.   I do want to ask you about the 2013 form.

19              THE COURT:  Counsel, are you moving to admit these

12:03  20       now?

21              MR. GREEN:  Yes, I am.  Thank you, your Honor.

22              THE COURT:  Counsel, noting the defense's objection,

23      they may be admitted and published if you wish.

24              Counsel, I think you should keep the subletters as you

25      have them.

1          MR. GREEN:  That is fine by us, your Honor.

2          (Exhibits 60 E, H, M, O, R, T, and X received into

3    evidence.)

4    BY MR. GREEN:

5    Q.   Before we move on to the next exhibit, sir, I want to ask

6    you about -- one question on 2013.

7          MR. GREEN:  If we could have that shown.  This will be

8    8 X.

9    Q.   Do you have that before you, sir?

12:04 10    A.   Yes.

11    Q.   That has a records to royalties of 48,290.86?

12    A.   Yes.

13    Q.   But below it there's a circled number, 20,000, for

14    non-employee compensation.  Do you see that?

15    A.   I do.

16    Q.   Do you know what that's about?

17    A.   No, I -- I have no idea what that is.

18    Q.   All right.

19          Let's move on.

12:05 20          Following your departure from BOSTON, you came out

21    with a solo album, correct?

22    A.   Well, my solo record actually came out before I left

23    BOSTON.

24    Q.   Before you left BOSTON?

25    A.   Yes.

1    Q.    All right.

2            And then, later on, you were part of the band Orion

3    the Hunter?

4    A.    That's true.

5    Q.    Sony actually issued one of their albums, reissued an

6    album of Orion the Hunter?

7    A.    It was reissued, yes.

8    Q.    That was in 2011?

9    A.    That sounds right.

12:05 10    Q.    You were also, after leaving BOSTON, part of the RTZ band?

11    A.    I was.

12    Q.    And is that all before you become a member of Ernie and

13    the Automatics?

14    A.    Yes.

15    Q.    And that was when, 2007, when you were part of the Ernie

16    and the Automatics?

17    A.    2007 was our first real show, but we had been rehearsing

18    before that.

19    Q.    When you say "we," that included you and Mr. Boch and

12:06 20    Mr. Hashian?

21    A.    Yes.

22    Q.    Anybody else?

23    A.    It was just three of us to start.

24    Q.    And Mr. Hashian actually introduced you to Mr. Boch?

25    A.    He did.

1    Q.    Mr. Hashian, at that point in time, was also a former

2    member of the band BOSTON?

3    A.    Correct.

4    Q.    Now, Mr. Boch testified that he -- I'll withdraw that.

5          At some point in time, you start playing together in

6    someone's basement?

7    A.    Can you give me some reference as to --

8    Q.    Let's just track the evolution of Ernie and the

9    Automatics.

12:07 10          It starts with the three of you.  Where are you

11    playing out of?

12    A.    The first time I played with Ernie, it was actually the

13    keyboard player of Doug Flutie's band, in his basement.  It was

14    just Ernie, "Sib," and I.

15    Q.    And how did it evolve from there?

16    A.    The three of us got together and played a couple of times,

17    and Ernie said it would be great if we could have a little band

18    and do some charity work.  So we brought Brian Maes into the

19    band.  Then we brought "Tunes" Antunes in.  I'm sorry, Tim

12:07 20    Archibald, the bass player, came in first; and then Brian Maes

21    came in.

22    Q.    All right.

23          And then, at some point in time, you start performing,

24    correct?

25    A.    Yes.

1    Q.    Sometime around July of 2007?

2    A.    Yes.  I believe the Cape Cod Melody Tent was our first

3    show.

4    Q.    And that continues until September of 2011?

5    A.    Yes.

6    Q.    And if you turn -- when you say you're playing charity,

7    you ended up playing at events in addition to charity events,

8    correct?

9    A.    Most of the shows did have some charitable component to

12:08 10   it.

11   Q.    But you were earning a fee for your time you performed

12   with the band, correct?

13   A.    I was, yes.

14   Q.    And let's turn to Exhibit 56, and we looked at it with

15   Mr. Boch so I don't want to belabor it, but I'll just ask you,

16   sir -- and take your time to look at it -- does this exhibit

17   reflect the performances of the Ernie and the Automatics band

18   as from 2007 to 2011 and the payments that you received?

19   A.    Yeah, that looks right.

12:09 20   Q.    And it also reflects some of the -- the forums where you

21   played at, correct?

22   A.    Yes.

23   Q.    You did play at Mohegan Sun casino, correct?

24   A.    Well, we played at the bar in the casino, not the arena.

25   Q.    You played at the Hatch Shell in Boston?

A.    We did.

Q.    The band traveled to a number of states to perform?

A.    We did a few shows in the Midwest and we went up to Maine for a few shows, went down to New York City for one, I think. Two.  Two in New York City.

Q.    Did you make any public appearances on radio stations or record stores?

A.    We did.

Q.    And at some point in time, you actually recorded an album with Ernie and the Automatics called "Low Expectations," correct?

A.    Yes, we did.

Q.    And when was that released?

A.    I believe it was February 2009.

Q.    And you recorded various musical videos in connection with Ernie and the Automatics, correct?

A.    I think we only did the one video.

Q.    All right.

     Is that the one that was portrayed in this courtroom this morning?

A.    Yes.

Q.    You willingly participated in that video?

A.    Yes.

Q.    And who is Ian?  Just remind me of his last name.

A.    Ian Barrett.

1    Q.   Who did you understand -- was Ian Barrett the producer of

2    that video?

3    A.   Yes.

4    Q.   Who did you understand Ian Barrett to be when that video

5    was produced?

6    A.   He was a friend of Ernie's.

7    Q.   Did you understand him to be a professional film producer?

8    A.   Well, I think wanna-be professional film producer is

9    probably a little more accurate.

12:10 10   Q.   Okay.

11        You understood that you were being filmed in a video

12   to promote Ernie and the Automatics' CD.

13   A.   Yes.

14   Q.   And you willingly participated in that, correct?

15   A.   I did.

16   Q.   And you had -- throughout the four years with Ernie and

17   the Automatics, you appeared on radio and at times on

18   television to promote the CD -- to promote the band?

19   A.   Yes.

12:11 20   Q.   And just for the record, what did you understand the band

21   to consist of?

22   A.   The members?

23   Q.   Yes.

24   A.   It was Ernie Boch, myself, "Sib" Hashian, Brian Maes, Tim

25   Archibald, and "Tunes" Antunes.

1    Q.    Now, did you have any contract with Ernie and the

2    Automatics?

3    A.    We didn't have a contract until right before the record

4    was about to be released, then we had a contract for the

5    record.

6    Q.    And just to confirm, can you turn to Exhibit 29?

7          Is that the contract you're referring to?

8    A.    Yes.

9    Q.    Now, prior to this point in time, you were all performing

12:12 10    together, correct?

11    A.    We were.

12    Q.    Did you consider yourself to be a member of the band Ernie

13    and the Automatics?

14    A.    Yes.

15    Q.    And who was the -- who was the decision maker for Ernie

16    and the Automatics?

17    A.    It was Ernie.

18    Q.    Did you understand that you were, as a member of the band,

19    empowering him with authority to make decisions?

12:13 20    A.    Yes.  I trusted Ernie to do the right thing.

21    Q.    You gave him the authority to do the right thing, right?

22    A.    Well, I mean, we didn't get together and say Ernie asked

23    for the authority, we just -- it was his band, and we let him

24    run it the way he wanted to run it.

25    Q.    As far as you were concerned, during the entire four-year

1   period, he was authorized to act on your behalf, correct?

2   A.   He did act in our behalf, but there was no real authority.

3   We -- there was no agreement, no written agreement or any of

4   that.

5   Q.   Well, I understand.  We're going to look at Exhibit 29.

6   This is the first agreement.  But you understood before then he

7   was out there promoting, advertising, doing whatever for the

8   band, and you, as a member of the band, gave him authority to

9   do so.

12:14 10   A.   Well, Ernie had done pretty well for himself, so we

11   trusted him to do the right thing.

12   Q.   So the answer to the question is "yes," correct?

13   A.   Yes, yes.

14   Q.   In fact, Ernie had done pretty well for himself.  He was a

15   multi, multimillionaire at that point in time?

16   A.   I think he's a billionaire, actually.

17   Q.   I'll stand corrected.

18        So you gave this billionaire the authority, and he did

19   his thing, right?

12:14 20   A.   Yes.

21   Q.   At any point in time, did you ever put anything in writing

22   to him where you challenged anything that he did?

23   A.   In writing ?

24   Q.   Right.

25   A.   No, not in writing.

1    Q.    Now, let's turn now to Exhibit 29.   This -- and let's turn

2    to the last page just so we can see who the signatories are.

3              You recognize your signature on the last page?

4    A.    I do.

5    Q.    And does the last page also reflect the signatures of all

6    of the band members?

7    A.    Yes.

8    Q.    And did you understand that this was to design what the

9    parties' rights would be in connection with -- in connection --

12:15  10    turning back to the first page -- with the album and each of

11    the works thereon?

12    A.    The album, yes.

13    Q.    You were agreeing as to, in essence, a one-sixth division

14    with respect to the album or any of the works thereon, correct?

15    A.    If we got to the point of making any money, yes.

16    Q.    But you also -- let's turn -- by the way, the date of this

17    agreement was what, looking at the first page?

18    A.    February 6, 2009.

19    Q.    Let's turn to page 3 and the paragraph "Merchandising,"

12:16  20    and I'll just ask you to read that to yourself.

21              (Pause.)

22    Q.    You can tell me when you're done, sir.

23    A.    Okay.

24    Q.    Did you understand that, pursuant to this paragraph, which

25    is entitled "Merchandising," you were giving Ernie and the

1   Automatics the right to use your name and biographical

2   material, in essence, in any way they chose to promote the

3   album and the songs?

4   A.   To tell you the truth, I never read the agreement.  I just

5   took Ernie's word for it and I signed it.  I never even read

6   it.

7   Q.   Do you believe you were deceived by Mr. Boch in any way?

8   A.   No.

9   Q.   Now, I think you and I are about the same age here.  You

12:17 10   were a grownup when you signed this contract, correct?

11   A.   Yes.

12   Q.   You understood that this was a legal agreement.

13   A.   Yes.

14   Q.   You -- he didn't deprive you of the right to sign it, did

15   he?

16   A.   Deprive me of the right --

17          MR. TARLOW:  Objection.

18          THE COURT:  Well, sustained as to the form, counsel.

19          MR. GREEN:  I misspoke.

12:17 20   BY MR. GREEN:

21   Q.   Did he deprive you of the right to review the agreement?

22   A.   No, no.

23   Q.   And you understood that this agreement had set forth what

24   the parties' obligations were with respect to the album and the

25   songs, correct?

1    A.    Yes.

2    Q.    And you also understood at this point in time in 2009 that

3    you were still a party to the 1983 agreement with Mr. Scholz

4    and the members of the band BOSTON, that you could only refer

5    to yourself as formerly of BOSTON, correct?

6    A.    Yes.

7    Q.    Just turning to paragraph 8.  If you could just read that

8    to yourself and I'll ask you a question or two.

9          (Pause.)

12:18 10    Q.    Did you understand, sir, that in that paragraph that there

11    was a perpetual right being given to the use and -- of your

12    name and biographical material in connection with the promotion

13    of the album?

14    A.    Again, I honestly didn't even read it.

15    Q.    Do you have any different understanding as you look at it

16    today?

17    A.    Do I have, excuse me, a different understanding?

18    Q.    Do you have any contrary understanding as you read this

19    today as to what I just said?

12:19 20    A.    No, no.

21    Q.    Thank you.

22          Now, is there any reason, sir, why you did not put in

23    this agreement any provision that if Mr. Boch were to do any

24    promotion for the album or any of the songs, he could only

25    refer to you as Barry Goudreau formerly of BOSTON?

A.    Well, I didn't put anything into the agreement.  I had

no --

Q.    Did you ask that be put into the agreement?

A.    We had talked about being -- me being billed as formerly

from the very first time we played music.  So I understood that

he knew that.

Q.    You also understood, did you not, that on various

occasions, he proceeded with advertising that did not comply

with that understanding, correct?

A.    Well, that didn't happen until after this.

Q.    That never happened before this?

A.    No, never.

Q.    All right.  So you signed this agreement, but nowhere in

this agreement did you say -- did you memorialize any

understanding here that you could only be referred to as

formerly of BOSTON?

        MR. TARLOW:  Objection, your Honor.  Asked and

answered.

        THE COURT:  Sustained as to that.

BY MR. GREEN:

Q.    Now, you live in Swampscott?

A.    I do.

Q.    And you've lived there for a number of years?

A.    Forty years in the same house.

Q.    And Mr. Hashian lives in Lynnfield, about 15 miles away?

1    A.    Yes.

2    Q.    You've been friends for a long time, since high school?

3    A.    Since we were 15.

4    Q.    Your wives are also friends?

5    A.    They are.

6    Q.    Have you ever held out yourself and Mr. Hashian as

7    reuniting?

8    A.    Have I held myself out --

9    Q.    Yes.

12:21 10    A.    No.

11    Q.    Now, were you familiar with the fact that Ernie and the

12    Automatics had a web page?

13    A.    Yes.

14    Q.    And did you make any contributions to the web page?

15    A.    No.

16    Q.    Were you familiar with the fact that it listed on the web

17    page you as a former original member of BOSTON?

18    A.    To tell you the truth, I don't know if I even looked at

19    it.

12:22 20    Q.    All right.

21          You really -- you deferred to Mr. Boch on that.

22          MR. TARLOW:  Objection, your Honor.

23          THE COURT:  Overruled.  You can answer.

24    A.    Yes.

25    Q.    Now, what, if anything -- strike that.

```
 1              MR. GREEN:  Could we now turn to and project paragraph
 2    53 of Mr. Goudreau's counterclaim?
 3              THE COURT:  And did we mark this yesterday?  I know
 4    it's, obviously, subject of pretrial filings.
 5              MR. GREEN:  We ask that it be marked, your Honor.
 6              (Discussion off the record.)
 7              THE COURT:  Okay.
 8              Counsel, I'm assuming, based on my prior rulings -- is
 9    there an excerpt that can be marked here?
12:23 10          MR. TARLOW:  I think I was provided with a document
11    before opening.  Is that the document we're marking?
12              MS. STENGER:  Yes.
13              MR. TARLOW:  Can I see it again?
14              If I could just see it.
15              THE COURT:  Yes.  Counsel, you can confer just to show
16    your brother, Mr. Tarlow.
17              (Discussion off the record.)
18              MR. TARLOW:  Your Honor, I would ask the entire page
19    be marked that contains the paragraph.
12:23 20          MR. GREEN:  We have no problem with that.
21              THE COURT:  That's fine.
22              Counsel, noting the objection for the record, we can
23    mark this excerpt as Exhibit 61.  It may be admitted and
24    published.
25              (Exhibit 61 received into evidence.)
```

1           MR. GREEN:  Your Honor, I misspoke, we just want to

2    put in paragraph 53.

3           MR. TARLOW:  Your Honor, it's already been published

4    to the jury.  I would suggest that it needs to stay up.

5           THE COURT:  Counsel, there was a flash of it for a

6    second.

7           Can I just see what we're talking about?  It's now

8    just on my screen and not in the jury's.  Can we --

9           MR. GREEN:  Show the whole page.

12:24 10           THE COURT:  Yes, thank you.

11           (Pause.)

12           THE COURT:  Okay.

13           Mr. Tarlow, was there an objection to this form?

14           MR. TARLOW:  Your Honor, I would ask for paragraphs 52

15    and 53 -- I would ask that the entire page be marked in, but,

16    in light of your Honor's earlier rulings, I can understand

17    paragraph 51 and above being redacted.  But I would suggest

18    that to read paragraph 53, you need to read it in context of

19    paragraph 52, so I would ask those two paragraphs --

12:25 20           THE COURT:  If I can just look at it.

21           (Pause.)

22           THE COURT:  Counsel, Mr. Green, you're just offering

23    this for paragraph 53?

24           MR. GREEN:  That's correct, your Honor.

25           THE COURT:  Counsel, this is the answer?

          1              MR. TARLOW:  Correct.

          2              MR. GREEN:  This is paragraph 53 of the counterclaim,

          3      your Honor.  It's part of the overall answer and counterclaim,

          4      but this is in the counterclaim.

          5              THE COURT:  Right.

          6              Counsel, based on all of my rulings before, I'm going

          7      to allow only paragraph 53.

          8              MR. TARLOW:  Your Honor -- if I may ask, your Honor,

          9      if you note my objection.

12:26    10              THE COURT:  Yes, noted.

         11              MR. TARLOW:  If you could just redact the page, I'd

         12      like the top header and I would like the paragraph -- the

         13      reading of the section before paragraph 53 remain.  Just redact

         14      the intervening paragraph.

         15              MR. GREEN:  We would object to the header

         16              THE COURT:  Counsel just for my benefit so I can

         17      understand what Mr. Tarlow --

         18              MR. TARLOW:  I'd ask counsel to go to the top of the

         19      document.

12:27    20              The document number at the top, I would like

         21      redactions from where it starts the first part to --

         22              THE COURT:  Okay.

         23              Counsel, I'll take this up with you afterwards.

         24              I'll say now I'm only allowing admission of paragraph

         25      53 based on having heard counsel previously on this issue.  It

1    can be done in redacted form.

2            Mr. Tarlow, I'll hear you in more substance later on.

3            MR. TARLOW:  Thank you, your Honor.

4            MR. GREEN:  We're going to now project just paragraph

5    53, your Honor.

6            THE COURT:  Okay.

7            Jurors, we're not -- let me just say this.

8            As you probably are aware, because I've made reference

9    to it, so as not to waste your time in the box, there's a lot

12:28 10    of time that I spend with counsel before and after we see you

11    each day.  There's certain rulings that I've made prior to the

12    evidence coming up in court after having had the benefit of

13    arguments on either side.  So here counsel has a disagreement

14    about how my ruling played out here, and that's what we're

15    discussing.

16            Thank you for bearing with us.

17            Mr. Green.

18    BY MR. GREEN:

19    Q.   I'm going to read paragraph 53, Mr. Goudreau.

12:28 20            You understand that you have filed a counterclaim in

21    this case?

22    A.   Yes.

23    Q.   And you understand that paragraph 53 is a part of your

24    counterclaim, correct?

25    A.   It is.

1    Q.    I'll read this:  "In 2011 and 2012, Goudreau participated

2    in a small number of live performances.  In each instance,

3    Goudreau, as he always does, made sure that all venues,

4    managers, and others involved referred to Goudreau as a former

5    member of the band BOSTON in any biographical and other

6    materials associated with Goudreau's performance, using the

7    truthful and accurate descriptive designations of formerly of

8    BOSTON or as an original member of BOSTON."

9            Did I read that properly?

12:29 10  A.    You read it properly, but --

11   Q.    You've answered my question.

12            Now, this is paragraph 53 from your counterclaim.  Was

13   that paragraph accurate?  Yes or no.

14   A.    No.

15   Q.    Now, you do recognize that you have given sworn testimony

16   in this case where you -- you attested to the accuracy of this

17   paragraph.  Do you recall your deposition taking place?

18            MR. TARLOW:  Your Honor, compound question.

19            THE COURT:  Well, sustained as to form, counsel.  Do

12:30 20  you want to break it down?

21            MR. GREEN:  I will.  My apologies, your Honor.

22   BY MR. GREEN:

23   Q.    Do you recall having your deposition taken place in this

24   case?

25   A.    I do.

1    MR. GREEN:  And if we could put up the cover page from

2  the deposition.

3    THE COURT:  Just for the witness.

4    MR. GREEN:  Yes.

5    (Pause.)

6    THE COURT:  Counsel.

7  BY MR. GREEN:

8  Q.  Do you see that page, Mr. Goudreau?

9  A.  The cover page?

10  Q.  Yes.

11  A.  Yes.

12  Q.  Do you recall that you were deposed in this case on

13  February 24, 2014?

14  A.  Yes.

15  Q.  And this was -- turn to the next page.

16    This took place at the law offices of McCarter &

17  English in Boston?

18  A.  Yes.

19  Q.  And you were represented by counsel as of that time?

20  A.  Yes.

21  Q.  And that was Mr. Joseph Messina, an attorney in Boston?

22  A.  Yes.

23  Q.  Now, could we turn to page 66 of the deposition?

24    MR. TARLOW:  Your Honor -- I'm sorry, I thought this

25  was being published.

          1              THE COURT:  I think Mr. Green is getting us to the

          2     right page.

          3              MR. GREEN:  I'm attempting to.

          4              (Discussion off the record.)

          5              MR. GREEN:  We'll come back to that.  I don't want to

          6     take up anybody's time.

          7              THE COURT:  Okay.

          8     BY MR. GREEN:

          9     Q.   Let's go back to paragraph 53 itself.

12:32    10              As I understand it, you're now saying this paragraph

         11     is not accurate, correct?

         12     A.   No, it's not.

         13     Q.   All right.

         14              Let's parse through it.

         15              In the first line, it says --

         16     A.   Could you put it up?  I'm not seeing it.

         17              THE COURT:  It can be published again.  Exhibit 61.

         18              (Discussion off the record.)

         19              MR. GREEN:  Thank you.

12:33    20     BY MR. GREEN:

         21     Q.   Do you have that before you now, Mr. Goudreau?

         22     A.   Yes.

         23     Q.   I want to ask you in detail how this is inaccurate.

         24     There's a sentence at the top line, "In 2011 and 2012, Goudreau

         25     participated in a small number of live performances."  Was that

1    accurate?

2    A.   Yes.

3    Q.   In the next line it says, "In each instance, Goudreau, as

4    he always does, made sure that all venues, managers, and other

5    involved referred to Goudreau as a former member of the band

6    BOSTON in any biographical and other materials associated with

7    Goudreau's performance, using the truthful and accurate

8    descriptive designations of formerly of BOSTON or as an

9    original member of BOSTON."

12:33 10         That's a long second sentence.  What parts, if any, of

11    the second sentence are not accurate?

12    A.   I never told anybody to say I was an original member of

13    BOSTON.  I always said "formerly of BOSTON."

14    Q.   This does say here -- let's take it one at a time.

15         In the second line, it says that you always have made

16    sure that venues, managers, and others involved refer to you as

17    a former member of the band BOSTON.  Let's stop there.  Is that

18    accurate?

19    A.   Up to that point, yes.

12:34 20    Q.   And when you say up to that point, it says "always."  Did

21    that include any time after you left the band BOSTON?

22    A.   Can you repeat that?

23    Q.   In the second line it says, "In each instance, Goudreau,

24    as he always does" -- I'm trying to figure out what you mean by

25    "always."  Does that mean for the entire time period after you

1    left BOSTON?

2    A.    Yes.

3    Q.    So all the time after you left BOSTON, whenever you

4    performed, you made sure that venues, managers, and others

5    involved referred to you as a former member, correct?

6    A.    Former member, yes.

7    Q.    What did do you in that regard to make sure that was

8    taking place?

9    A.    I would always tell them I needed to be booked as formerly

12:35 10    of.  Just the way I had myself billed.

11    Q.    All right.

12          And did that include your time with Ernie and the

13    Automatics?

14    A.    Yes.  I told Ernie from the first time we did a show that

15    I needed to be billed as formerly of.

16    Q.    And -- but this -- Ernie was not a venue, was he?

17    A.    No.

18    Q.    This says, "In each instance, Goudreau, as he always does,

19    made sure that all venues, managers, and others involved"...

12:35 20    when you were with Ernie and the Automatics, did you speak to

21    venues?

22    A.    No.

23    Q.    Did you speak to managers?

24    A.    No.

25    Q.    Now, you basically spoke to Ernie, correct?

1    A.    Yes.

2    Q.    And you empowered Ernie to take care of this.

3    A.    I did.

4    Q.    And we'll move on here.

5          Is your disagreement, sir, with the last few words of

6    this paragraph?  Would this paragraph otherwise be correct, or

7    as an original member of BOSTON?

8    A.    If you took out "or as an original member of BOSTON," it

9    would be correct, yes.

12:36 10   Q.    It is otherwise correct, but you take issue with that,

11   even though it was in your counterclaim?

12   A.    Yes.

13   Q.    And even though -- we'll now turn to your deposition --

14         THE COURT:  Just for the witness.

15         Okay.

16   BY MR. GREEN:

17   Q.    Could you turn, sir -- I have the minuscript here.  We are

18   on page 89, beginning at line 11.

19         THE COURT:  We need to switch over, I suppose.  You're

12:37 20   on the computer now.

21         Okay.

22   BY MR. GREEN:

23   Q.    Do you have your deposition in front of you?  You have it

24   projected --

25         THE COURT:  It's now on the screen.

1           MR. GREEN:  Thank you.

2   BY MR. GREEN:

3   Q.   You recall that on February 24th, you were sworn under

4   oath?

5   A.   Yes.

6   Q.   And you were -- you attempted to give accurate and honest

7   answers?

8   A.   Yes.

9   Q.   Now, beginning at line 11, Exhibit 3 was marked for

12:37 10   identification -- and I'll represent, sir, that is the same

11   answer and counterclaim we just spoke of -- but let's read the

12   questions and answers.

13           We're going to go from 89, 12, through 90, 17.

14           MR. TARLOW:  Your Honor, there's a completeness issue

15   here.

16           THE COURT:  Okay.

17           Can I just -- can we make it smaller so I can just

18   read ahead to what Mr. Green indicated?

19           And, Mr. Tarlow, what is the other --

12:38 20           MR. TARLOW:  I would request, your Honor, that the

21   section I anticipate my brother is going to elicit testimony on

22   is going to be very narrow, and to understand the answer

23   completely, you would need to read from 89, line 12 to page 97,

24   line 6.

25           THE COURT:  Counsel, I've read this page.  Go onto the

1    next.

2              (Pause.)

3              THE COURT:  Mr. Green, where were you going to stop?

4              MR. GREEN:  I was stopping at 90, 17, your Honor.

5              THE COURT:  Okay.

6              And let me -- next page.

7              (Pause.)

8              THE COURT:  Next page.

9              (Pause.)

12:39 10       THE COURT:  You said to 97, 6?

11             MR. TARLOW:  Yes, your Honor.

12             THE COURT:  Keep going.

13             Next page, please.

14             (Pause.)

15             THE COURT:  Next page.

16             (Pause.)

17             THE COURT:  Next page.

18             (Pause.)

19             THE COURT:  Next page.

12:39 20       (Pause.)

21             THE COURT:  And the last page.

22             (Pause.)

23             THE COURT:  Counsel, I'm not going to allow that given

24    the piece that Mr. Green is offering.  Obviously you have an

25    opportunity for cross-examination on this issue, too.

1              MR. TARLOW:  Thank you, your Honor.

2              THE COURT:  Mr. Green, you can go back to the portion

3       you were going to ask about.

4              MR. GREEN:  Thank you, your Honor.

5       BY MR. GREEN:

6       Q.   Line 11 -- I'm going to read the questions, Mr. Goudreau;

7       I'll ask you to read the answer.

8              9, 11, Exhibit 3 marked for identification.

9              "Q.  Mr. Goudreau, I'm showing you what has been

12:40 10      marked as Exhibit 3, which is a document entitled, 'Barry

11      Goudreau's Answer, Affirmative Defenses, and Counterclaims.'

12             Answer?

13      A.      "Yeah.

14      Q.      "Have you seen this document before?

15      A.      "I have.

16      Q.      "And do you recognize this as being your actual

17      affirmative defenses -- answer, affirmative defenses, and

18      counterclaims?

19      A.      "Yes.

12:41 20  Q.      "If you could turn, please, to paragraph 29, 53 says,

21      'In 2011 and 2012, Goudreau participated in a small number of

22      live performances.  In each instance, Goudreau, as he always

23      does, made sure that all venues, managers, and others -- I'm

24      sorry -- and others involved referred to Goudreau as a former

25      member of the band BOSTON in any biographical and other

```
        1   materials associated with Goudreau's performance using the

        2   truthful and accurate descriptive designations of formerly of

        3   BOSTON or as an original member of BOSTON.'  So my -- and you

        4   see that, right?

        5   A.      "Yeah.

        6   Q.      "And is that accurate, what I've just read?"

        7   A.   It says, "yes," but I don't agree with that.

        8   Q.   But you would agree with me the answer at line 13 says,

        9   "yes," correct?

12:42  10   A.   It does say "yes."

       11   Q.   We just have one more question and answer.

       12           Question at 14:

       13           "All right.  Not only did I read it accurately, but do

       14   you believe that the content of this is accurate?"

       15           And your answer?

       16           MR. TARLOW:  Objection, your Honor.  He misread it.

       17           MR. GREEN:  I'll read it again.

       18           MR. TARLOW:  It's material.

       19           THE COURT:  Read it again, counsel.

12:42  20   BY MR. GREEN:

       21   Q.      "All right.  Not only did I read it accurately, but do

       22   you believe that the content of that is accurate?"

       23           And your answer?

       24   A.   My answer was "yes," but --

       25   Q.   That's fine.
```

1          THE COURT:  Well, Mr. Goudreau, your counsel will have

2    opportunity for cross-examination.

3          THE WITNESS:  Okay.

4    BY MR. GREEN:

5    Q.   Now, that deposition, you would agree with me, was taken

6    more than two-and-a-half years ago on February 24, 2014,

7    correct?

8    A.   It was.

9    Q.   You were under oath that day?

12:43 10   A.   I was.

11   Q.   It was two-and-a-half years closer in time to the events

12   in question?

13   A.   It was.

14   Q.   It was -- nothing more on that.

15          Just a couple final questions, sir.

16          Have you ever said to anybody that your biggest

17   professional regret was leaving the band BOSTON?  Yes or no.

18   A.   I did say that.

19   Q.   Thank you.

12:43 20         MR. GREEN:  I have nothing further.

21          THE COURT:  Thank you, Mr. Green.

22          Mr. Tarlow?

23          MR. TARLOW:  Thank you, your Honor.

24          Your Honor, I'm going to actually -- since I'm the

25   only attorney here who knows how to operate the technology --

1        THE COURT:  No comment, counsel.

2        MR. TARLOW:  If I could have a moment to just move my

3    system over to here.

4        THE COURT:  You may.

5        (Pause.)

6        (Discussion off the record.)

7        MR. TARLOW:  Your Honor, I know it might be charged

8    against me, but in reading this transcript, there might be

9    something that may need be to redacted and I wanted to address

12:45 10   it with the Court.

11        THE COURT:  In regards to --

12        MR. TARLOW:  Motion in limine.

13        THE COURT:  Counsel, why don't I see you briefly at

14    sidebar so you can explain it.

15        (At sidebar on the record.)

16        THE COURT:  Okay.

17        And this is in regard to what you're offering for

18    completeness?

19        MR. TARLOW:  Yes, under rehabilitation.

12:45 20   The word "Herald," your Honor, is the lawsuit appears.

21        (Pause.)

22        (Indicating.)

23        THE COURT:  Okay.

24        Counsel, they're not going to see this, so is there an

25    objection?

1          MR. GREEN:  There is, your Honor.

2          As far as I'm concerned, everything that counsel is

3    attempting to offer here has nothing to do with completeness.

4    It's just further --

5          THE COURT:  Just keep your voice down.

6          MR. GREEN:  It's just further testimony, your Honor,

7    on related points.

8          He was asked a simple question:  "Is that answer

9    accurate?"  He said "yes."

12:46  10          He was then asked to go on and say, Well, how did you

11    do this, how did you do that, and these are different questions

12    altogether.  It has nothing to do with completeness.  So I

13    object to anything he's trying to add on at this point.

14          MR. TARLOW:  Except, your Honor, Mr. Green went into

15    the fact that he talked about all -- every time -- the

16    paragraph in the complaint and counterclaim says, "I played a

17    small number of performances."  The testimony is they were on

18    tour with Deep Purple in 2011.  He says, "I played small

19    performances."  We're only talking about James Montgomery and

12:47  20    we're talking about the All-Star Band.  And he clears up his

21    answer to make it clear he's talking only about formerly.  So

22    I'm entitled to read the rest of it.

23          MR. GREEN:  He just said on the stand it was

24    everything from leaving BOSTON and on.

25          THE COURT:  Counsel, let me see if I can clarify this.

1          Certainly you can ask him questions about the context

2     of what his answer was, about the accuracy of paragraph 53.  I

3     will tell you, having read through all of this, I thought it

4     was beyond completeness.  There may have been some section in

5     there you thought gave some context, but I didn't think all of

6     it related to completeness.

7          You certainly can ask him about the contents of why

8     he -- why he may have said one thing at the deposition and why

9     he said something otherwise.

12:48 10          MR. TARLOW:  How about -- your Honor, what I'll do --

11     and my brother can object as I go -- I don't need that

12     paragraph regarding the Herald lawsuit.  I will use the

13     paragraphs I need for completeness.

14          MR. GREEN:  I objected to everything.

15          I thought you just ruled on everything.

16          THE COURT:  Well -- and I'll hear Mr. Baker briefly.

17          MR. BAKER:  Judge, the issue here is that it is a

18     prior sworn statement whereby Mr. Goudreau explains, I only

19     referred in performing with this band to formerly.  I only

12:48 20     referred to performing with that band formerly.  And the issue

21     here is recent fabrication.

22          This is sworn testimony at exactly the same time, and

23     the question asked under paragraph 53 was:  Did you ever refer

24     to yourself as an original member?  And Mr. Goudreau did not

25     understand the question, and the statements thereafter make

1    that clear.

2         So that's why I say it's got to be read together in

3    fairness, and that's what the rule allows.

4    THE COURT:  Well, counsel, this is what I'm going to

5    do:  I'll allow you to ask him the lead up in regards to his

6    answer at the deposition so I can have a better sense of how

7    this would relate to completeness.

8         I understand the points on either side.

9    MR. TARLOW:  No matter what, I will make sure I stay

12:49 10    away from this area of the transcript that deals with the

11    Herald lawsuit.  Because this is clear, he says, "a small

12    number of performances," that's what it's relating to.  Bill

13    Johnson --

14    MR. GREEN:  I'm sorry.  He just testified it related

15    to every performance he ever did after Ernie and the

16    Automatics.  So now I hear counsel trying to impeach trial

17    testimony he just given.

18    MR. BAKER:  We have every right to explain his answer,

19    counsel.

12:49 20    MR. GREEN:  So have him explain it.

21    THE COURT:  Counsel, this is what we're going to do:

22    You're going to ask him the questions directly, and when we get

23    to the transcript, I have to hear.

24    MR. TARLOW:  Thank you, your Honor.

25    MR. GREEN:  Thank you.

1        THE COURT:  Counsel, we're going to stop at 1:00.

2        MR. TARLOW:  Thank you.

3        (End of discussion at sidebar.)

4        MR. TARLOW:  May I proceed, your Honor?

5        THE COURT:  You may.

6        (Discussion off the record.)

7        THE COURT:  Mr. Tarlow.

8        MR. TARLOW:  Yes.

9                        CROSS-EXAMINATION

10   BY MR. TARLOW:

11   Q.   Mr. Goudreau --

12   A.   Yes.

13   Q.   -- do you recall Attorney Green just asked you some

14   questions about your document titled your "Answer to the First

15   Amended Complaint, Affirmative Defenses, and Counterclaims"?

16   Do you recall that?

17   A.   Yes.

18   Q.   You also recall he asked you some questions about a

19   deposition that you gave in February of 2014; is that correct,

12:51 20   sir?

21   A.   Yes.

22   Q.   At the time when you gave that deposition and you gave the

23   answers that Mr. Green had just had you recite, for how long

24   had you been testifying, sir?

25   A.   I think it was four or five hours at that point.

1    Q.    Now --

2              MR. TARLOW:  May I approach the witness, your Honor?

3              THE COURT:  You may.

4    BY MR. TARLOW:

5    Q.    Mr. Goudreau, is this, in fact, a copy of that deposition

6    transcript?

7              (Bangs deposition on table.)

8              THE COURT:  Yeah --

9    A.    That's it.

12:52 10              THE COURT:  Don't startle the witness.

11              THE WITNESS:  I don't know if I can lift it.

12    BY MR. TARLOW:

13    Q.    With respect to paragraph 53, the document that Mr. Green

14    just asked you about, had you, in fact, seen that document that

15    was captioned "Barry Goudreau's Answer to the First Amended

16    Complaint and Affirmative Defenses and Counterclaims" prior to

17    giving that deposition?

18    A.    I saw it.  I didn't really read it.

19              MR. TARLOW:  May I approach one more time, your Honor?

12:52 20              THE COURT:  You may, without the drama.

21    BY MR. TARLOW:

22    Q.    Is this, in fact, the document that you saw prior to

23    giving your deposition testimony?

24    A.    Yeah, that looks like it.

25    Q.    Prior to giving that deposition on that day in 2014,

1    February, had you ever actually read that document?

2    A.    No.

3    Q.    How many pages is that document, Mr. Goudreau?

4    A.    Forty.

5    Q.    And approximately how many numbered paragraphs are

6    contained in that document?

7    A.    Eighty-two.

8    Q.    Do you recall Mr. Green's opening statement he made a

9    reference to a document that you had written, sir?  Do you

12:53 10    recall hearing that?

11    A.    Yes.

12    Q.    Did you write a single word in that amended complaint, in

13    that document?

14    A.    No.  I'm not a lawyer.

15    Q.    Did you sign that document, Mr. Goudreau?

16    A.    No.

17    Q.    Who signed it?

18    A.    Joseph Messina, my former attorney.

19    Q.    Joseph Messina, your former attorney from this case, sir?

12:54 20    A.    Yes.

21    Q.    Does he represent you in this case any longer?

22    A.    No.

23    Q.    Do you have knowledge as to who actually drafted that

24    document?

25    A.    His assistant was Brian Bosworth, so I think he did it.

1    Q.    Do you know -- I'm not asking you to guess.

2    A.    Do I know for sure?  No, I don't know.

3    Q.    But did you draft any part of that document?

4    A.    No.

5    Q.    Do you know what that document actually is?

6    A.    It's my answers to Tom Scholz's claims against me and my

7    claims against Tom Scholz.

8    Q.    So specifically, with respect to paragraph 53 in that

9    document, turn your attention to paragraph 53 -- let me know

12:55 10    when you get there, sir.

11          Are you there, sir?  Are you looking at it?

12    A.    53?

13    Q.    In your counterclaim, not paragraph 53 in the claims

14    against you, paragraph 53 in your counterclaim.

15          MR. TARLOW:  May I assist?

16    A.    It's --

17          THE COURT:  It's probably at the end.  Do you have a

18    page, counsel, that we could give?

19    BY MR. TARLOW:

12:55 20    Q.    Page 29, Mr. Goudreau.

21    A.    Page what?

22    Q.    29.

23    A.    Something must have got mixed up.

24          THE COURT:  Counsel, can you approach?  I think that

25    would be helpful.

```
 1   A.   Can you straighten this out for me?

 2            (Discussion off the record.)

 3            (Pause.)

 4   A.   Okay, sorry about that.

 5   Q.   Are you looking at paragraph 53?

 6   A.   Yes.

 7   Q.   When is the first time you actually -- have you ever read

 8   that paragraph prior to taking -- giving that deposition in

 9   February of 2014?

10   A.   No.

11   Q.   Sir, during 2011 through 2012, had you ever directed any

12   person to refer to you or to advertise you or to otherwise bill

13   you as an original member of the band BOSTON?

14   A.   No, I never did that.

15   Q.   In fact, in the last ten years, can you remember a single

16   instance where you directed any venue, manager, person to bill

17   you or advertise you or refer to you as an original member of

18   the band BOSTON?

19            MR. GREEN:  Objection, leading.

20            THE COURT:  Well, sustained as to form.  But you can

21   rephrase.

22   BY MR. TARLOW:

23   Q.   Do you recall in the past ten years ever -- do you recall

24   in the past ten years ever requesting any person -- strike

25   that.
```

1          In the past ten years, how did you request every

2     venue, manager, person you had actual contact with to bill you

3     with respect to any potential performances?

4     A.    Always as formerly of.

5     Q.    Do you recall telling anyone to bill you in any other

6     fashion?

7     A.    No.

8     Q.    In fact, since signing the 1973 Settlement Agreement, how

9     have you requested venues, managers, other people you do

12:58 10     business with to bill you in connection with your performances?

11          MR. GREEN:  Objection, leading.

12          THE COURT:  No, overruled.

13          You can answer that question.

14     A.    Always formerly of.

15     Q.    So, sir, when you answered -- when Mr. Green had you

16     answer the deposition and he stopped you in a particular

17     section -- do you recall that happening when you were on direct

18     testimony?

19     A.    Yes.

12:58 20     Q.    And when you were asked the following question -- if you

21     could look in your deposition, go to page 90, line 14, please.

22     If you look at that and tell me when you get there.  There's a

23     pen stuck in there to help you find it.

24          (Pause.)

25     A.    Okay.

1    Q.    So you were asked in your deposition -- the question was

2    beginning at line 14, and I'll read the question:  "All right.

3    Not only did I read it accurately, but do you believe that the

4    content of that is accurate?"

5              And your answer was "Yes," was it not, sir?

6    A.    Yes.

7    Q.    And then -- when you gave that question -- when you

8    answered that question "yes," what was going through your mind?

9    What were you thinking you were being asked?

12:59 10    A.    They had asked me if I -- if they had read it correctly,

11    and I thought they were saying did they read it correctly, did

12    I read the content correctly, that's how I -- that's how I

13    heard it.

14    Q.    If -- and who asked -- who took that deposition?  Do you

15    recall?

16    A.    It was Eric Belt.

17    Q.    Who is Eric Belt?

18    A.    He's Tom Scholz's former attorney.

19    Q.    When you say "former attorney," you don't know if he

01:00 20    currently represents him in other matters?

21    A.    I wouldn't know.

22    Q.    Is he in the courtroom here today?

23    A.    I wouldn't recognize him if he was.

24              THE COURT:  Counsel, given the time, we'll stop here.

25              MR. TARLOW:  Thank you, your Honor.

```
 1            THE COURT:  Mr. Goudreau, we're going to have to
 2   finish in the morning.  You can step down.
 3            THE WITNESS:  Okay.
 4            THE COURT:  Thank you.
 5            Jurors, given the time, I'm going to excuse you for
 6   the day.  As always, keep all of my cautionary instructions in
 7   mind.  Don't discuss the case with anyone, keep an open mind,
 8   and we'll see you at 9:00 tomorrow morning.
 9            Thank you very much.
10            THE CLERK:  All rise.
11            (Jury left the courtroom.)
12            THE COURT:  Everyone else can be seated.
13            Counsel, anything before we break?
14            MR. GREEN:  Not from our end, your Honor.
15            THE COURT:  Mr. Baker?
16            MR. BAKER:  Judge, we anticipate questions for both
17   Mr. Goudreau and Mr. Scholz that are going to address the
18   following subjects: the death of Brad Delp, as well as the
19   three other lawsuits that Mr. Scholz filed or threatened
20   against Mr. Goudreau.  And it is our intent to refer to
21   Mr. Delp's death only as a suicide, nothing else said.  And
22   with respect to the lawsuits, we intend to just refer to the
23   fact that they were filed and threatened against Mr. Goudreau,
24   and that's the extent of it.
25            I just want the Court to be aware of that if there's a
```

01:00 (line 10)

01:01 (line 20)

1  ruling relating to that.

2          THE COURT:  Okay.

3          And so your questions that are intended are, what,

4  that there was threatened litigation?  Nothing about the

5  subject matter?

6          MR. BAKER:  There were two other lawsuits filed and

7  not served, and then another lawsuit which the complaint was

8  never filed but given to counsel.  And it goes to the issue of

9  this atmosphere of litigation.  We're not going to go into the

01:02 10  merits of any of that.  That's the extent of the questioning.

11          THE COURT:  And nothing about the disposition of those

12  matters.

13          MR. BAKER:  That is absolutely correct, Judge.

14          THE COURT:  Okay.

15          Mr. Green, did you want to be heard on that?

16          MR. GREEN:  We do have problems with this, your Honor.

17          You have already dismissed the abuse of process claim

18  where they did cite to each of these lawsuits.  So I'm not sure

19  that it is relevant to anything here.

01:02 20          Moreover, as I said to the Court, I believe it was at

21  our first hearing Monday --

22          THE COURT:  Yes.

23          MR. GREEN:  -- you have already ruled that we are not

24  going to be entitled to bring in exhibits as to what

25  Mr. Goudreau did before and after Ernie and the Automatics,

1    which is what some of this relates to here.  And if they are

2    going to be entitled to refer to complaints, and their

3    suggestion is going to be this is just baseless complaints,

4    you're making threats, and if we're not allowed to include the

5    exhibits, I think we're being prejudiced.

6         THE COURT:  Well, counsel, let me just play this out

7    for a moment.

8         So if I allow Mr. Baker and his colleagues to ask the

9    bare-bones questions about the lawsuits, then at some point,

01:03 10   you get to stand up and redirect, and you would want to ask

11   questions.

12        So, Mr. Baker, if I allow you to ask these questions,

13   why don't I get Mr. Green -- why doesn't Mr. Green get

14   permitted to ask, for example, his client on the stand:  Did

15   you believe you had a basis for the lawsuits that you filed?

16        MR. BAKER:  I don't have a problem with that if it's

17   limited.  But I just want to point out to your Honor, in your

18   summary judgment ruling at page 31, you're addressing our

19   breach of contract claim, which is really why I'm bringing it

01:04 20   up.

21        You write, he -- referring to Goudreau -- he further

22   argues that Scholz breached the Settlement Agreement by

23   pursuing or threatening legal action against Goudreau related

24   to promotions or advertisements that conform to the parameters

25   of the Settlement Agreement.

1          I don't have a problem with Mr. Green asking that

2    question.  That seems reasonable.  What I feel is essential to

3    my proof is to be able to present to the jury three other

4    lawsuits, two filed never served, one never file and delivered

5    to his attorney, to create this atmosphere of litigation,

6    which, your Honor, is the essence of our counterclaims for

7    breach of contract and for covenant of good faith and fair

8    dealing.

9          THE COURT:  Okay.

01:05 10          MS. STENGER:  May I add one thing, your Honor?

11          The complaints that they're talking about have

12    numerous exhibits to them which are the -- and details in

13    there, but all the Best of Boston exhibits, all of the issues

14    at summary judgment that your Honor has excluded as trial

15    exhibits.

16          MR. BAKER:  We don't intend to go into any of that.

17          THE COURT:  I guess, counsel, I'm going to give this

18    some further thought.

19          Counsel, obviously I've already communicated, and I

01:05 20    suppose this is why Mr. Baker is proposing the questions he is,

21    if I allow anything, it's going to be limited.  I guess what I

22    was trying to work out, which I need to think a little bit more

23    about is if I allow Mr. Baker to ask, or whoever is asking, it

24    might be Mr. Tarlow, but whatever limited universe of

25    questions, then I understand, Mr. Green, that you'd like an

1    opportunity to respond with questions of your own, and I need

2    to think about what that looks like.

3           I understand what I've excluded.  I've made very clear

4    that we weren't going to go into this litigation history

5    between the parties at this trial, but I want to think about it

6    as to Mr. Baker's limited argument.

7           MR. BAKER:  Thank you, Judge.

8           THE COURT:  And I'll talk to you again in the morning.

9           Counsel, anything else?

01:06 10          MR. GIVEN:  Just a reminder, your Honor, we're going

11   to take Paul Geary out of order at 9:00 a.m. tomorrow.

12          THE COURT:  Just remind me, and I'll just say we're

13   suspending for the moment Mr. Goudreau's cross-examination --

14          MR. GIVEN:  Not to interrupt, your Honor.  I may have

15   one or two demonstrative exhibits.  They've been produced as

16   chalks.  I'll cover that with my brother and sister overnight,

17   hopefully we'll resolve that.

18          THE COURT:  Okay.  Counsel, see you in the morning.

19   Thank you.

01:06 20          THE CLERK:  All rise.

21          (Court adjourned at 1:06 p.m.)

22                   - - - - - - - - - - - -

23

24

25

```
1                          CERTIFICATION

2            I certify that the foregoing is a correct transcript

3    of the record of proceedings in the above-entitled matter to

4    the best of my skill and ability.

5

6

7

8    /s/Debra M. Joyce                    June 8, 2017
     Debra M. Joyce, RMR, CRR, FCRR       Date
9    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

INDEX

WITNESS                                                      PAGE

ERNEST BOCH, JR

    Continued Cross-Examination                               24
    By Mr. Baker
    Redirect Examination                                      76
    By Mr. Green
    Recross-Examination                                      101
    By Mr. Baker

BARRY GOUDREAU

    Direct Examination                                       104
    By Mr. Green
    Cross-Examination                                        159
    By Mr. Tarlow


                        E X H I B I T S


Exhibit No.              Description                      Received

    57 A             Video of Ernie and the Automatics       61

    60 E, H, M,      Royalty payments to Mr. Goudreau        127
    O, R, T, and
    X
    61               Paragraph 53 of counterclaim            140