1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3       _____

4       DONALD THOMAS SCHOLZ,

5                    Plaintiff,          Civil Action
                                         No. 13-10951-DJC
6       V.
                                         October 27, 2016
7       BARRY GOUDREAU,                  8:45 a.m.

8                    Defendant.
        _____
9

10

11               TRANSCRIPT OF JURY TRIAL DAY 4

12          BEFORE THE HONORABLE DENISE J. CASPER

13             UNITED STATES DISTRICT COURT

14          JOHN J. MOAKLEY U.S. COURTHOUSE

15                 1 COURTHOUSE WAY

16                BOSTON, MA  02210

17

18

19

20
             DEBRA M. JOYCE, RMR, CRR, FCRR
21                Official Court Reporter
             John J. Moakley U.S. Courthouse
22            1 Courthouse Way, Room 5204
                  Boston, MA  02210
23                joycedebra@gmail.com

24

25

 1   APPEARANCES:

 2   FOR THE PLAINTIFF:

 3   LAWRENCE G. GREEN, ESQ.
     SUSAN E. STENGER, ESQ.
 4   Burns & Levinson LLP
     125 Summer Street
 5   Boston, MA 02110
     617-345-3000
 6
     FOR THE DEFENDANT:
 7
     JEFFREY S. BAKER, ESQ.
 8   Baker & Associates
     2 West Hill Place
 9   Suite 100
     Boston, MA 02114
10   617-573-9505

11   DAVID M. GIVEN, ESQ.
     Phillips, Erlewine, Given & Carlin LLP
12   39 Mesa Street, Suite 201 - The Presidio
     San Francisco, CA 94129
13   415-398-0900

14   DANIEL P. TARLOW, ESQ.
     Copani Tarlow & Cranney
15   265 Broadway
     Methuen, MA 01844
16   978-686-0010

17

18

19

20

21

22

23

24

25

<pre>
 1                    P R O C E E D I N G S

 2              (The following proceedings were held in open

 3    court before the Honorable Denise J. Casper, United States

 4    District Judge, United States District Court, District of

 5    Massachusetts, at the John J. Moakley United States Courthouse,

 6    1 Courthouse Way, Boston, Massachusetts, on October 27, 2016.)

 7              THE CLERK:  Court is in session.  Please be seated.

 8              THE COURT:  Good morning, counsel.

 9    Good morning.

10    ALL:  Good morning.

11              THE COURT:  Counsel, I want to return to where we were

12    at the end of the yesterday, and then I'll see if counsel has

13    anything before we start with the jury.

14              Counsel, I gave further thought to the issue that

15    Mr. Baker raised at the end of yesterday, which I know I've

16    discussed with counsel before and had reserved on until the

17    evidence got under way.  This is the issue of how much counsel

18    should be able to get into any prior litigation or threat of

19    litigation.

20              Counsel, at the final pretrial, I had addressed this

21    issue when I granted the motion to exclude evidence of

22    settlement offers and otherwise limit evidence about the

23    litigation.  I did reserve on the issue to the extent I thought

24    it might go to bias between the parties.

25              I also understand Mr. Baker's point, having gone back
</pre>

1    to the answer and counterclaim, as well as my September 21,

2    2015 Memo and Order, about how this issue might bear upon the

3    two remaining contract counterclaims.  I've thought about all

4    of that and done so in light of the arguments that have been

5    made to me at various points on this issue.

6         At base, I think the basis of the remaining

7    counterclaims are really about the plaintiff -- whether or not

8    the plaintiff was denying or interfering with Mr. Goudreau's

9    right to promote himself.  I said as much in my Memo and Order,

08:47 10    and I think that's a fair characterization.  I understand,

11    Mr. Baker, that some part of that is related to litigation or

12    perhaps the threat of litigation.

13         I do, however, as I noted before, have 403 concerns,

14    particularly as to juror confusion in regards to other

15    litigation, and also in light of the fact that I had dismissed

16    at the summary judgment stage the abuse of process

17    counterclaim.

18         I'll only allow some limited questions, as I suggested

19    at the end of yesterday, on this issue.  I do think it goes to

08:48 20    at least bias between the parties, and I understand how it

21    bears, at least in some small part, on the remaining

22    counterclaims.  I'm only going to allow limited questioning on

23    this issue.

24         Counsel, Mr. Baker, my memory is you were intending --

25    and is it Mr. Baker or Mr. Tarlow who is doing this?  Is this

1    going to come up with Mr. Goudreau?

2          MR. TARLOW:  It might come up during Mr. Goudreau's

3    testimony.

4          However, your Honor, not to derail the conversation,

5    but it does -- it's sort of relevant at this point given your

6    Honor's comments.

7          We had intended with respect to our counterclaims to

8    reserve and put them in an orderly fashion when it's our time

9    to put on our case in chief.  So Mr. Goudreau's testimony is

08:49 10    only going to be related to the defensive claims, and then we

11    would like to recall him when we open our case, particularly in

12    light of the fact I would like to do it orderly with our direct

13    and Mr. Green's cross and then our redirect and then recross.

14          So I will not be -- I don't anticipate asking him many

15    questions on our case in chief, if that's okay with the Court.

16          THE COURT:  Understood.

17          MR. BAKER:  Judge, I note, clearly, the Court's --

18          THE COURT:  I probably have a different -- sorry.  I'd

19    probably have a different position if it was a third party that

08:49 20    we were inconveniencing by calling again, but I know

21    Mr. Goudreau is here and will be here.

22          MR. BAKER:  Not going anywhere.

23          THE COURT:  Right, so I understand.

24          MR. BAKER:  Just to make it clear, I understand the

25    scope of the Court's ruling.

             1          THE COURT:  Just to be clearer, nothing about

             2   disposition, nothing about settlement, nothing about --

             3          MR. BAKER:  Nothing whatsoever, Judge.

             4          THE COURT:  And, Mr. Green -- I guess just to turn to

             5   Mr. Green.  At the end of yesterday, I was musing aloud, but I

             6   don't know that I asked you the direct question.  Given what

             7   I've just said, what is -- what is the redirect or what you

             8   would ask to elicit from your --

             9          MR. GREEN:  I'm not sure that there will be much of

    08:50  10   anything, your Honor.  Really depends to what extent this truly

            11   is limited here.

            12          Given what Mr. Tarlow just said, it sounds like this

            13   is not even going to come up at all until they recall

            14   Mr. Goudreau, which is likely to be on Monday.  And I think if

            15   we have any issues, we could address it then.

            16          But given the Court's direction, I'm not anticipating

            17   an issue.

            18          THE COURT:  Counsel, I guess, Mr. Green -- and I was

            19   going to wait to do this at the end of today -- but I will ask

    08:51  20   you at the end of the today where you think you are in the

            21   plaintiff's case for the purposes -- obviously, my interest is

            22   in avoiding any down time for the jury.  So I want your

            23   brothers to know when they should be ready to call their first

            24   witness.  So do you have a sense of that?

            25          MR. GREEN:  That's fine, your Honor.

1          And I can actually respond at this point in time if

2     you'd like.

3          THE COURT:  Sure.

4          MR. GREEN:  As you know, the plaintiff will be calling

5     the plaintiff himself, Mr. Scholz, is our next witness.  We

6     anticipate calling Mr. Scally, who is our expert witness on

7     damages.  And barring some surprise today, I believe that we

8     will be resting at that point in time, other than putting in,

9     perhaps, some of Mr. Migliaccio's deposition testimony.  On

08:51 10  that, we may do that in response to what the other side puts

11    in.

12         THE COURT:  Do you expect that's today, tomorrow?

13         MR. GREEN:  My understanding -- and Mr. Given may be

14    able to chime in on this, but it sounds like we're going to

15    have Mr. Geary -- Mr. Geary is going to take up at least the

16    first hour today.

17         THE COURT:  That's right, okay.

18         MR. GREEN:  Then we have Mr. Goudreau, Mr. Scholz.  So

19    I do anticipate we would be resting sometime tomorrow.  And now

08:52 20  that counsel has clarified they're not putting Mr. Goudreau's

21    case in chief as part of this, they should be, frankly,

22    prepared to proceed with their case tomorrow.  I don't

23    anticipate Mr. Scholz is going to take up all day, and I think

24    Mr. Scally will be a relatively quick witness.

25         I would ask, just as I have done the courtesy of

1    telling them what our witness order is, I would ask that they

2    disclose to me who they would be calling as their witness order

3    at least for tomorrow.

4         MR. TARLOW:  Your Honor, of course we will afford that

5    courtesy to Mr. Green, as he has done to us, without

6    hesitation.

7         Just, again, with respect to -- so I understand how

8    your practice is, your Honor.  We're going to identify very

9    soon the portions of the transcript of Mr. Cosmo that we'd like

08:53 10   to use.  Is it the Court's preference that go in through a

11   reader or do you just want a redacted transcript to be given to

12   the jury?

13        THE COURT:  Counsel, the way it's been done on

14   numerous occasions before me is having been read in by counsel.

15   I usually give them a slight -- a brief preamble about what's

16   going on, and we do it that way.

17        MR. TARLOW:  So we don't need to put a reader on the

18   stand like I've done in state court cases.

19        THE COURT:  Meaning, there's -- one attorney is

08:53 20   reading the questions, one is reading the answers, that's fine,

21   counsel.  I would just explain what is happening.  And then we

22   just mark the transcript, I think as a chalk, just so it's

23   clear on the record.

24        MR. TARLOW:  And also to be clear, we may -- we may

25   also need to recall Mr. Scholz in our counterclaims, depending

1    on how the testimony goes in.

2              THE COURT:  Okay.

3              On the depo designation, are you agreed about those?

4              MR. TARLOW:  We haven't identified yet, but we will do

5    so shortly.

6              THE COURT:  So I guess I should get those -- well,

7    counsel, we can take this up at the end.  Do you think you're

8    going to get there today or this is probably tomorrow?

9              MR. GREEN:  No, I think we will not get there today,

08:54  10   but I think we can work with one another by the close of

11   business today to submit something to the Court.

12             THE COURT:  That would be fine.  If you could e-mail

13   it to Ms. Hourihan so I could take a look at it before I see

14   you in the morning.

15             MR. BAKER:  Judge, do you do the different color

16   markings for the transcripts, what they're putting in --

17             THE COURT:  That's fine, or you can just write in the

18   margin who is seeking what.

19             Counsel -- okay.

08:54  20             So --

21             Counsel, I know, given my exchange with Mr. Given

22   yesterday, you're going to want to be heard after the close of

23   the plaintiff's case?

24             MR. GIVEN:  Absolutely, your Honor.

25             THE COURT:  So I guess the way I would -- well, I

```
  1    guess I'll ask at the end of today, Mr. Green, what your best
  2    guess of when you'd be resting.  It probably will fall around a
  3    time where I would just take a recess and I could hear counsel,
  4    but we'll decide that --
  5            MR. GIVEN:  May I, for a moment, just preview the Rule
  6    50 motion?
  7            There are several subjects.  It's more -- it may be a
  8    little bit more involved than a five-minute spiel, shall we
  9    say.
 10            I have a number of subjects that I'd like to take up
 11    in an orderly fashion.  I would also like the opportunity to
 12    brief it in writing if the Court is inclined to see something
 13    in writing.  What I was thinking is over the weekend we could
 14    work a very short memo up, maybe -- less than five pages,
 15    certainly, file it at the end of the day Sunday so your Honor
 16    will have a chance to look at it on Monday morning, and then we
 17    can decide -- we'll reserve as to it and then we can take it up
 18    whenever the Court is inclined to do so.
 19            THE COURT:  Okay.  Counsel, I'm fine with doing that.
 20    I guess I just want to make sure -- I mean, I understand if you
 21    want to preserve the issue and reserve so I can give you more
 22    time to argue, that's fine, otherwise going forward with the
 23    defense case so we're using the jury's time.
 24            MR. GIVEN:  That's fine.  I understand the jury is
 25    paramount.  I understand that concept entirely.
```

1          If we can shift gears then, let's talk about Paul

2     Geary.

3          THE COURT:  Yes.

4          MR. GIVEN:  He's taken out of order; he's visiting

5     from California; I will establish that on the record.  He was

6     served with a trial subpoena.  He regularly conducts business

7     in the State of Massachusetts and within this district,

8     therefore, he is amenable to a trial subpoena, and he's

9     appearing on that basis in this court today.

08:56 10          I have two very simple slides that I'd like to publish

11     to the jury as demonstrative exhibits, illustrative exhibits,

12     one, because he's going to be talking about his friend Brad

13     Delp, who was an original member of the band BOSTON, the voice

14     of the band BOSTON; I'd like to publish a photo of Mr. Delp.

15     We've been talking about him a lot in this case.

16     Unfortunately, he's no longer with us.  I think it's perfectly

17     appropriate to have a photograph of him on the screen when

18     we're talking about him with --

19          THE COURT:  Is there any objection to that?

08:57 20          MR. GREEN:  Here's our issue, and I don't mean to be

21     difficult.  We already know what Mr. Delp looks like as a

22     so-called original member because we have the cover.

23          The photo, as I understand it, is within a year or two

24     of his suicide, and I don't know what relevance it could

25     possibly have to this case.  He was not in any way involved

1    with Ernie and the Automatics.  Quite frankly, we are

2    concerned -- Mr. Delp was a well-known, well-known artist.  He

3    was the voice of BOSTON.  He was the vocalist.  And his suicide

4    did raise a lot of emotions, and we are concerned -- we didn't

5    have a voir dire about the jury as to how they feel about Brad

6    Delp because, frankly, it had nothing to do with this case.

7    But I don't want to have emotions stirred up on behalf of one

8    member of the jury because they see a picture of Brad Delp.

9            THE COURT:  Counsel, is there something about the

08:58 10    photo itself -- I mean, counsel, remind me how this is relevant

11    here in the defense's --

12            MR. BAKER:  Can you see the picture, your Honor?

13            Is the picture on your screen?

14            THE COURT:  I don't have it yet -- if you have a hard

15    copy --

16            MR. TARLOW:  Your Honor, if I could approach, I'll

17    just --

18            THE COURT:  That's fine.

19            So I guess, Mr. Green, your objection is not to the

08:58 20    photo itself, it's just for the --

21            MR. GREEN:  For the relevance and just the concern,

22    your Honor, that that photo could raise some emotions for

23    people that -- emotions that have nothing do with Ernie and the

24    Automatics, which is what this case is about.

25            THE COURT:  I guess, let me ask, counsel, what's the

1    series of questions that relates to the photo?

2         MR. TARLOW:  Well, there are no questions that relate

3    to the photo.  There are questions that relate to Brad Delp and

4    his relationship to Paul Geary.

5         One of the issues that Mr. Green raised yesterday that

6    he was setting up, assuming, for today's testimony with

7    Mr. Geary was bias with respect to Mr. Boch.

8         (Discussion off the record.)

9         MR. GIVEN:  I will represent to the Court now,

08:59 10   Mr. Geary knows all the players in this case.  Mr. Geary is a

11   top personal manager in the music business.  He's been in the

12   music business for 35 years.  He's from Boston.  He's lived in

13   Boston almost his entire life, moved out to Los Angeles in 2005

14   to join probably the premier personal management firm in the

15   music business, Front Line Management.  He knows Brad Delp.

16   He's going to speak about Brad Delp and his relationship to

17   Brad Delp, as well as his relationship to Barry Goudreau, as

18   well as his --

19        THE COURT:  I guess what I'm asking, counsel -- and I

09:00 20   don't question Mr. Geary's knowledge or background.  I guess

21   what I'm saying is, how is his relationship to Mr. Delp

22   relevant?

23        MR. GIVEN:  Well, he's a fan of BOSTON, as many of

24   us -- I'll be the first to admit I'm a fan of BOSTON, and he's

25   going to testify --

1          THE COURT:  That's all clear, counsel.

2          MR. GIVEN:  Just to be clear, I think everybody in the

3     room, let us say without hesitation.

4          No.  He's going to speak to Brad Delp's --

5     relationship he had with Brad Delp.  He actually did some

6     informal managing of Brad Delp.  He discussed matters relating

7     to BOSTON with Brad Delp.  He's going to talk about Brad Delp's

8     unique talent, the fact that his voice is the voice -- the

9     voice of BOSTON, and that that is a very unique and signature

09:00 10     part of the sound of BOSTON.

11          Look, this is purely for illustrative purposes.  If

12     Mr. Delp were here -- and I wish he were, frankly -- we would

13     see him, we would hear from him.  A photograph can't -- of him

14     a couple of years before his untimely death can't possibly be

15     prejudicial to the jury.

16          THE COURT:  I guess, counsel, I don't think the photo

17     is prejudicial to the jury.  I guess what I'm trying to get at

18     is anticipating what may be relevance objections, counsel, so

19     that's what I'm trying to get at.

09:01 20          Counsel, are you offering this, what, for the issue of

21     infringement?  For what?  Your defense on there not being

22     consumer confusion?

23          MR. GIVEN:  Yes, ma'am.

24          THE COURT:  Okay.

25          MR. GIVEN:  That the sound of BOSTON -- and I think,

1   again, most of us in this courtroom are going to agree, at

2   least with respect to the first two records -- the sound of

3   BOSTON is very unique, and it may have never been repeated in

4   the history of rock music from 1979 on.  There are no

5   imitators, I dare say, and Ernie and the Automatics certainly

6   isn't one of them.

7        So, look, in my trial practice, we routinely use

8   visual representations of things.  It's helpful to the jury to

9   see somebody who's not going to be here, and that was the only

09:02 10   purpose --

11        THE COURT:  Counsel, I'm not particularly worried

12   about the photo, it's more --

13        MR. GIVEN:  I understand.

14        THE COURT:  Counsel, Mr. Green?

15        MR. GREEN:  Mr. Delp passed way in 2007, your Honor,

16   and any issues on confusion and whatever, he was around

17   afterwards.  Now, he was on the earlier recordings.

18        THE COURT:  I guess, counsel --

19        MR. GREEN:  I will not press this, your Honor.

09:02 20        I do think that counsel -- I am concerned that counsel

21   may go far astray on this in dealing with issues that aren't

22   relevant.  I'll reserve to that.  I'll withdraw my objection.

23        THE COURT:  I'll listen carefully.  I don't think

24   there's any issue showing the photo, having Mr. Given sort of

25   explain the nature of the questions.  I understand why defense

1    is offering it.  To the extent that we're not going to go far

2    afield about --

3            MR. GIVEN:  I hope not to --

4            THE COURT:  -- Mr. Delp's passing away, given our past

5    discussions --

6            MR. GIVEN:  And we're not going to get into any of

7    that stuff, let's put it that way.

8            Now, I have one other very short video clip --

9            THE COURT:  Let me just -- Ms. Hourihan, you can get

09:03 10    the jury.

11            I think we have all of the jurors, counsel.

12            MR. GIVEN:  I have a 30-second video clip.

13            Mr. Geary, before he became a full-time personal

14    manager in the music business, was in a band called Extreme.

15    I'm going to walk him through some of that to demonstrate the

16    bona fides of the witness.  The fact that he's been in the

17    music business, both on the talent side as a musician and as a

18    personal manager on the professional side.  I have a short,

19    30-second clip of him performing with the band Extreme from

09:04 20    1990.  I thought it would be nice to show the jury.  They've

21    had this clip for over a week, almost two weeks now.  Again, I

22    don't see why it wouldn't be helpful to the jury to see

23    Mr. Geary from back in the day.

24            THE COURT:  Mr. Green?

25            MR. GREEN:  Again, your Honor, I think he's perfectly

 1    entitled to ask him about his background.  I don't know that

 2    this clip adds anything to this.  So we do have an issue on

 3    relevance here.

 4         THE COURT:  I don't see the relevance, counsel, on

 5    that particular issue.  No disrespect to Mr. Geary and his

 6    music, counsel, but I don't see how the video is relevant,

 7    especially -- we've had a lot of other videos.

 8         MR. GIVEN:  Thirty-second clip.  I understand the

 9    Court's ruling on it.

09:04 10         MR. GREEN:  Thank you, your Honor.

11         THE COURT:  Counsel, in terms of introducing

12    Mr. Geary, I was just going to say, Jurors, we have a witness

13    given scheduling and timing issues --

14         MR. GREEN:  But it's for the defense, your Honor.

15         THE COURT:  I will mention that.

16         THE COURT:  Thank you.

17         THE CLERK:  All rise.

18         (Jury entered the courtroom.)

19         THE CLERK:  Court is in session.  Please be seated.

09:05 20         THE COURT:  Good morning, jurors.

21         You may recall when we broke yesterday, we were in the

22    midst of Mr. Goudreau's cross-examination.  We are going to

23    take a break in that cross-examination just to accommodate the

24    schedule of another witness, a Mr. Geary, who's being called by

25    the defense.  We're taking him out of order because he's out of

```
 1   town but happens to be here in Massachusetts.
 2            So we will later return to Mr. Goudreau's
 3   cross-examination, but we're going to take this witness first.
 4            MR. GIVEN:  Thank you, your Honor.  Defendant calls
 5   Paul Geary.
 6            THE COURT:  He may be called.
 7            PAUL EDWARD GEARY, having been duly sworn by the
 8   Clerk, was examined and testified as follows:
 9            THE CLERK:  Thank you.  Please be seated.
10            THE COURT:  Good morning, sir.
11            THE WITNESS:  Good morning.
12                      DIRECT EXAMINATION
13   BY MR. GIVEN:
14   Q.   Mr. Geary, can you state your full name for the record,
15   please.
16   A.   Paul Edward Geary.
17   Q.   And you reside in Los Angeles, California, sir?
18   A.   I do.
19   Q.   And before that, did you reside in the Boston area for the
20   rest of your life?
21   A.   Yes, born and raised.
22   Q.   Welcome home, I guess.
23   A.   Thank you.
24   Q.   You still have connections in the Boston area?
25   A.   Oh, sure.
```

```
 1    Q.   Friends?

 2    A.   Sure.

 3    Q.   Family?

 4    A.   Yup.

 5    Q.   Business?

 6    A.   Yes.

 7    Q.   You regularly transact business in the District of

 8    Massachusetts in the City of Boston?

 9    A.   Yeah, that's fair.

09:07 10   Q.   You were served with a trial subpoena to appear in court

11    today, were you not, sir?

12    A.   Yes.

13    Q.   And has Mr. Goudreau offered you anything in return for

14    your presence in court here today?

15    A.   No.

16    Q.   What is your current occupation, sir?

17    A.   I'm an artist manager.

18    Q.   And how long have you been an artist manager?

19    A.   I shifted into that career space in 1994.

09:07 20   Q.   And what is the name of your current firm?

21    A.   PGM.

22    Q.   And PGM stands for?

23    A.   Paul Geary Management.

24    Q.   Now, in the interest of full disclosure -- and Attorney

25    Green asked some questions about this yesterday -- Paul Geary
```

1    Management, you have a partner in that concern, do you not,

2    sir?

3    A.    Yes.

4    Q.    And his name is Ernie Boch, Jr.?

5    A.    That's correct.

6    Q.    And what is the nature of that business relationship,

7    briefly?

8    A.    Well, we began in January of 2013 with the hopes of

9    nurturing artists' careers.  Ernie was more a funding partner

09:08 10    than he was an active daily partner, and I was the managing

11    partner in Los Angeles, signing the acts and doing the work.

12    Q.    And how long have you known Mr. Boch?

13    A.    Twenty-plus years.

14    Q.    Do you consider him a friend?

15    A.    Oh, yeah.

16    Q.    Good friend?

17    A.    Yes.

18    Q.    One of your best friends?

19    A.    Yeah.

09:08 20    Q.    You've played music with him?

21    A.    I don't think we've ever actually performed together,

22    but --

23    Q.    May have jammed together?

24    A.    Maybe -- yeah, actually we did.

25    Q.    How often do you speak to Mr. Boch on average a week, say?

|  |  |
|---|---|
| 1 | A.   Several times. |
| 2 | Q.   And how often do you see him, say, on a yearly basis? |
| 3 | A.   Maybe every other month. |
| 4 | Q.   And in the 20-plus years that you've known Mr. Boch, did |
| 5 | it ever occur to you to refer to him or characterize him as a, |
| 6 | quote, Boston rock star wanna-be? |
| 7 | A.   No.  I mean, he loved music and he loved to play, but |
| 8 | that's a stretch. |
| 9 | Q.   Let's talk about your relationship with Mr. Goudreau. |
| 09:09 10 | How long have you known Mr. Goudreau? |
| 11 | A.   Probably closer to 30 years, I'd say. |
| 12 | Q.   And who introduced you to Mr. Goudreau? |
| 13 | A.   I think it was Fran Sheehan. |
| 14 | Q.   Another original member of the band BOSTON? |
| 15 | A.   Correct. |
| 16 | Q.   And are you friendly with Mr. Goudreau? |
| 17 | A.   Yes. |
| 18 | Q.   Do you speak to him regularly? |
| 19 | A.   I wouldn't say regularly, no. |
| 09:10 20 | Q.   How often do you see him on average a year? |
| 21 | A.   Oh, not very often.  Maybe at a Christmas party. |
| 22 | Q.   I was about to say do you attend his famed Christmas party |
| 23 | every year? |
| 24 | A.   I've been to that several times. |
| 25 | Q.   You also know or did know Mr. Delp. |

1          MR. GIVEN:  Can we bring that picture of Mr. Delp,

2     please?

3          THE COURT:  Did we mark this, counsel?

4          MR. TARLOW:  Your Honor, it is not marked.

5          THE COURT:  Okay.

6          And just for the witness and Court and counsel.

7          (Pause.)

8          (Discussion off the record.)

9     BY MR. GIVEN:

09:11 10    Q.  How did you meet Mr. Delp?

11    A.  Well, I met him briefly while I was still a touring

12    artist, and we played on the same shows together.  There was a

13    thing called the Kiss Concert that they have at the -- what

14    was -- God, Great Woods at the time back then.  I think that's

15    the first time I actually met him in person.  Then I bought a

16    home in a neighborhood that he owned a home in.  That was early

17    '90s.

18    Q.  And the story I heard is that Mr. Delp knocked on your

19    door one day.

09:12 20    A.  Yeah, that's what happened.

21    Q.  Did you become friends with Mr. Delp?

22    A.  Yes.

23    Q.  Good friends?

24    A.  Yes.

25    Q.  Played golf together?

|   |   |
|---|---|
| 1 | A.   Regularly. |
| 2 | Q.   Had dinners together? |
| 3 | A.   Sure. |
| 4 | Q.   You admired him, did you not, sir? |
| 5 | A.   Oh, yeah. |
| 6 | Q.   As a man? |
| 7 | A.   Yes. |
| 8 | Q.   And as a musician? |
| 9 | A.   Completely. |

09:12  10          MR. GREEN:  Could I ask the counsel not lead, your

11    Honor?

12          THE COURT:  Yes.  Sustained as to that.

13          Counsel, preserving the objection, Mr. Green, as to

14    this exhibit.

15          MR. GREEN:  We have waived the objection, your Honor.

16          THE COURT:  Okay.  So it may be published.

17          Ms. Hourihan, what's the next number?

18          THE CLERK:  62.

19          THE COURT:  Admitted, and it may be published as 62.

09:12  20          (Exhibit 62 received into evidence.)

21    BY MR. GIVEN:

22    Q.   Did Mr. Delp play a musical instrument to your knowledge,

23    Mr. Geary?

24    A.   Excuse me?

25    Q.   Did Mr. Delp play a musical instrument to your knowledge?

 1   A.   Played guitar, I believe.  I don't really know.

 2   Q.   Was he primarily a vocalist?

 3   A.   Yes, that's how I --

 4   Q.   How would you describe his voice?

 5   A.   It was the voice of an angel.

 6   Q.   Very distinctive?

 7   A.   Oh, yeah.

 8   Q.   And would you say that his voice was a unique element of

 9   the sound of the band BOSTON?

09:13 10   A.   Yes.

11   Q.   Also, on the same subject, you also know Mr. Scholz, do

12   you not, sir?

13   A.   As an acquaintance.

14   Q.   And at one time, did your former personal management firm

15   manage Mr. Scholz?

16   A.   The company that I worked for did.

17   Q.   Now, of these things that I've just recited, your relation

18   to Mr. Boch, your friendship with Mr. Goudreau, your friendship

19   with Mr. Delp, and the fact that you once managed Mr. Scholz,

09:13 20   would any of those subjects bias or affect your testimony here

21   in court today in any way, shape, or form?

22   A.   I hope not.  I'm on the stand here, so I don't want to

23   make any mistakes.

24   Q.   Do you have any financial interest in the outcome of this

25   case, sir?

A.    No.

Q.    Could you tell the jury, sir, how you got started in the music business?

A.    Well, I was a fan of music.  I grew up here in Medford, Massachusetts, had all the posters on my wall -- BOSTON, Aerosmith, Led Zeppelin -- all the groups that I loved in the '70s.  And I began to play drums.  And I started a group and eventually got some momentum with that.  And I signed my first major label record deal in 1987 with a company called A&M Records in Los Angeles, and we subsequently put records out in the late '80s and early '90s.

Q.    What was the name of that group?

A.    We were called Extreme.

Q.    And was that band a Boston-based band?

A.    Yes.

Q.    And your role in the band was drummer?

A.    Yes.

Q.    Were you a songwriter as well?

A.    No.

Q.    Did you produce any of Extreme's music?

A.    No.

Q.    I also recall you were the one guy in the band with short hair if I'm not mistaken.

A.    Still short.

Q.    Could you describe briefly for the jury, please, the

1  band's career arc following, say, your signing with A&M

2  Records?

3  A.   We signed in '87, put the first record out in March of

4  '89.  It did pretty well, but it was our second album that

5  really put us on the map.  That came out in 1990.

6  Q.   What was the name of that record?

7  A.   It was called "Pornograffitti."

8  Q.   I remember that record.

9       And what was the hit off of that record?

09:15 10  A.   Well, we had a song called "More Than Words" that did very

11  well for us.

12  Q.   How many records did the band Extreme sell?

13  A.   Collectively maybe about eight or nine million.

14  Q.   Did you tour behind your record releases?

15  A.   Oh, yeah.

16  Q.   Major national tours?

17  A.   International.

18  Q.   Where did you tour?  What countries did you visit on tour?

19  A.   We played 35 countries.  In between each cycle, it would

09:16 20  last about maybe 18, 20 months.

21  Q.   Did you produce music videos in connection with the band?

22  A.   Oh, sure.

23  Q.   How many music videos did you put out?

24  A.   Easily a dozen.

25  Q.   Did the band have outside management?

```
 1    A.   Yeah, at one point.  I was the business guy until the
 2    point where we actually were leaving to go on the road, and
 3    then we -- I personally reached out for help.
 4    Q.   Who did you reach out to?
 5    A.   It was a company in New York called SBK.  The gentleman,
 6    Arma Andon, who was at the time managing Roger Waters and
 7    Wilson Phillips, a group called Wilson Phillips, and he signed
 8    the band and became the group's personal manager.
 9    Q.   Now, you mentioned before that you were the, quote,
10    business guy in the band.  What did you mean by that?
11    A.   Well, you know, when you're a local band and you're coming
12    up, really nobody cares, and it's hard to get anyone to pay
13    attention.  So it was my good fortune that we sort of split up
14    responsibilities.  Because we had one guy who was a very good
15    lyricist but really didn't want to talk to anybody.  Another
16    guy was a virtuoso player but couldn't write lyrics.  And I
17    couldn't do either, but I knocked on doors and shook hands and
18    made our way along.
19    Q.   Is it fair to say that the band Extreme was a reasonably
20    successful venture for you?
21    A.   Oh, sure.
22    Q.   Millions of records sold?
23    A.   Yeah.
24    Q.   And roadies --
25              MR. GREEN:  Again, objection on leading, your Honor.
```

1    I don't want to stand up every time here.

2            THE COURT:  Sustained.  Direct, counsel.

3    BY MR. GIVEN:

4    Q.   Did you have roadies?

5    A.   Yes.

6    Q.   Did you have groupies?

7    A.   I suppose.

8    Q.   All the bells and whistles that go with the rock 'n' roll

9    lifestyle; is that fair to say?

09:18  10   A.   Yeah.

11   Q.   At some point, you made a transition to personal

12   management.  When did that take place?

13   A.   I left in 1994.

14   Q.   Struck out on your own?

15   A.   Yeah.  I left the group in '94 and started my management

16   company shortly after.

17   Q.   Where was the management company based?

18   A.   Well, I lived in New Hampshire, and I initially just

19   started it out of my home just with an assistant, and then

09:18  20   built it from there.

21   Q.   And who was the first major act that you managed on a

22   full-time basis as personal manager once you left the band

23   Extreme?

24   A.   Well, I signed a local band called Godsmack in -- on the

25   club circuit here and built that up over a couple of years to

```
 1    be very successful.
 2    Q.   And by local and here you mean here in the Boston area?
 3    A.   Oh, yeah.
 4    Q.   How well did Godsmack do?
 5    A.   We sold -- well, the first record did very well, sold five
 6    million copies back when that would happen.
 7    Q.   I understand.
 8         Second record did equally well as I recall.
 9    A.   Close.
10         MR. GREEN:  Objection, your Honor.
11         THE COURT:  Sustained.  Just questions; no commentary
12    counsel.
13         MR. GIVEN:  Sure.
14    BY MR. GIVEN:
15    Q.   Second record did how well, as well?
16    A.   Three to four million.
17    Q.   How many records total did Godsmack sell?
18    A.   Fourteen to 15 million collectively.
19    Q.   And you managed them during that entire period?
20    A.   Yes, 14 years.
21    Q.   What other artists and clients did you manage during that
22    period?  This would have been from what, 1996 to when?
23    A.   I want to say I signed them in '96 or '97 and subsequently
24    managed them for 14 years.  I began to sign more clients once
25    they took hold.
```

1   Q.   What were some of the artists -- other artists that you

2   signed?

3   A.   The next one was a group called Fuel out of Pennsylvania

4   that did I did pretty well with.  Then I -- I actually got a

5   call from Los Angeles from Irving Azoff inviting me to come to

6   Los Angeles and bring my clients and join his company.  That

7   was in 2005.

8   Q.   Okay.

9        And at the time that you got that call from Mr. Azoff,

09:20 10  how big a management concern was your personal management

11   entity?  In terms of employees and number of artists.

12   A.   Oh, it was -- I had seven or eight employees, I would say,

13   at that time, and four acts.

14   Q.   What were the four acts?  Let's cover those real quick.

15   A.   Well, Godsmack; Fuel; had a group called Cold I had a

16   couple gold records with; and then there was actually the only

17   rap thing I've ever done with Afroman was the guy's name, but

18   he actually did very well.

19   Q.   Let me just go off piece for a second and ask you about

09:21 20  what personal managers do.

21        Can you explain to the jury what the duties and

22   responsibilities of a personal manager in the music business is

23   or are?

24   A.   Well, sure.  If the group is a company, let's compare them

25   to Microsoft.  The company will hire a president to run their

company, that would be their personal manager in music, that's

what I do; and all the departments, the record company, the

agents, promoters, merchandisers, those all -- all of the

departments of the company report to me as manager, and I

report to the artist.

Q.    You mentioned the record company.  That's the entity that

records, produces, and releases the recorded music for your

clients?

A.    Well, they don't necessarily -- they fund those things,

they don't necessarily do them.

Q.    And they distribute the music?

A.    Typically, yes.

Q.    And you have as is typical for a personal manager to

interact closely with the record label?

A.    Oh, yeah.

Q.    And the same goes for the agent?  And when you mentioned

agent, can you explain to the jury what an agent is in the

music business?

A.    An agent's responsibility is to go secure work.  In most

cases it's live performances.

Q.    Is another term that's used for agent in the music

business "booker"?

A.    I've heard it, sure.

Q.    And then you mentioned merchandisers.  Can you explain to

the jury what a music merchandiser is?

A.    Those companies generally manufacture merchandise,

T-shirts, mugs, whatever it may be, hats.  Typically the way

it's done with us is they manufacture and they distribute to

retail as well as service the live concerts.  So they truck all

the merchandising out there and count it in, count it out, sell

it, you know.

Q.    Okay.

      And you mentioned promoters.  Could you describe to

the jury what a promoter is in the music industry?

A.    The promoter is the company in each market that promotes

the live performance.  They're generally the ones that take the

financial risks, so they will guarantee the artist a certain

sum of money minimally to play, and they will promote the show,

sell the tickets, and organize the event in terms of the

security and the vendors, all of that.

Q.    And just to sum up, it's your testimony that the manager

works closely with all of those individuals or entities that

are connected to your artist client.

A.    That's correct.

Q.    Okay.

      What is the relationship between the manager and the

artist in your experience?

      MR. GREEN:  Objection.  This is not an expert witness.

Could I ask for his own experience, your Honor?

BY MR. GIVEN:

1    Q.   Own experience, please.  That's fine.

2            THE COURT:  Sustained.  It's been reframed.

3            Counsel, do you want to give it to him, again?

4            MR. GIVEN:  Yes, Judge.

5            THE COURT:  You'll hear the question.

6    BY MR. GIVEN:

7    Q.   In your experience, Mr. Geary, what is the relationship

8    like between a manager and an artist?

9    A.   Well, that's the root of it all.  Really -- for me, I can

09:24 10   speak for myself.  I talk to the artist I represent on almost a

11   daily basis and debate the wisdom of each move that the artist

12   may make to protect and sustain their career, build and grow.

13   Q.   Okay.

14           You mentioned in your testimony before Irving Azoff

15   and Azoff Management.  Tell me what Azoff Management was in

16   2005.

17   A.   In 2005 it was still a privately owned company by Irving

18   in Los Angeles, and at that time, I'm guessing in 2005, there

19   were maybe 17 or 18 employees and maybe 40 acts that were

09:25 20   ultimately managed by that firm.

21   Q.   And that was the firm that you merged your management

22   company into in 2005?

23   A.   Yes.

24   Q.   And it was at about that time that you moved from Boston

25   to Los Angeles?

A.    Correct.

Q.    Okay.

      Now, that firm, did it not, eventually became to be known as Front Line Management, correct?

A.    Yes.

Q.    And if I refer to the firm from herein in as Front Line Management, you'll know what I'm talking about?

A.    Yes.

Q.    At the time you merged your management entity into Front Line Management, who were some of the clients at Front Line Management?

A.    At that time -- well, the Eagles were a staple at the company with Irving, but there was also Aerosmith, Jimmy Buffett, Journey, to name a few, Steely Dan.

Q.    You've mentioned the name Irving Azoff.  I know who he is. Could you tell the jury who Irving Azoff is?

A.    He's really a legendary record business guy initially.  I actually take that back.  He started as an agent, as I understand, way back in the day, probably early '70s, late '60s, early '70s.  He managed -- he signed the Eagles in the '70s.  I was just a kid; I wasn't around at that time on that level.  But he grew into a powerful manager and eventually became the president of MCA records.  But he continued to manage the Eagles and -- again, by the time that I actually came to know him in 2003 or four, by that time, he was solely

1  running a private artist management company in L.A.

2  Q.   Now, you mentioned his role at one point in time as

3  president of MCA records, and that sort of dovetails with

4  history that he had with BOSTON, with the band BOSTON.  Could

5  you describe that to the jury, please.

6           MR. GREEN:  Objection, foundation.

7           THE COURT:  Well, sustained as to that question.

8  BY MR. GIVEN:

9  Q.   Did Mr. Azoff -- prior to joining Front Line Management,

09:27 10  did Mr. Azoff have history with the band BOSTON?

11           MR. GREEN:  Objection, foundation.

12           THE COURT:  Sustained, counsel.

13  BY MR. GIVEN:

14  Q.   What did you learn when you joined Front Line Management

15  about Mr. Azoff's history the band BOSTON?

16           MR. GREEN:  Objection, it's now hearsay.

17           MR. GIVEN:  Not necessarily.

18           THE COURT:  Sustained.

19  BY MR. GIVEN:

09:28 20  Q.   At some point after you joined Front Line Management, did

21  you receive a call from Tom Scholz?

22  A.   Yeah, I talked to Tom a couple of times.

23  Q.   And what sort of relationship did you have with Mr. Scholz

24  up to that time?

25  A.   I didn't really know Tom.  We had a lot of mutual friends,

1    you know, both having been in the business for many years, and

2    I was a fan.

3    Q.    At the time of his call, what acts were you actively

4    managing?

5    A.    Smashing Pumpkins, Creed, Scorpions I was doing in North

6    America.  Some of the acts.

7    Q.    And what were -- what was the subject of those -- well,

8    did you subsequently meet with Mr. Scholz following those phone

9    calls?

09:29 10    A.    I once met with Tom for coffee.

11    Q.    And that was here in Boston or in Los Angeles?

12    A.    Yeah, I think -- long time ago.  It's somewhere along 128

13    I think we met.

14    Q.    And what did you and Mr. Scholz talk about?

15    A.    I don't remember verbatim, but it was good -- you know,

16    listen, I've been a fan since forever, so it was a pleasure, a

17    treat for me to sit with the man and talk a little bit.  I

18    don't remember anything substantive.  I remember we just -- we

19    were getting to know each other a little bit as I recall.

09:29 20    Q.    Was he looking for management at that time?

21    A.    Well, there were a lot of conversations about where the

22    music business was at the time, you know, how things were

23    changing, and they were changing dramatically, and he was

24    working on his record "Corporate America," as I remember at

25    that time.  And we were just tossing the bull together about

```
 1   what's next in music and where to go with this stuff and
 2   different ideas.
 3   Q.   Did Mr. Scholz subsequently share some of the music he was
 4   working on at that time with you?
 5   A.   He did, yeah.
 6   Q.   And is it fair for me to assume you took that development
 7   across the hall to Mr. Azoff to discuss?
 8             MR. GREEN:  Objection leading.
 9             THE COURT:  Well, sustained as to form, counsel, but
10   you can rephrase.
11   BY MR. GIVEN:
12   Q.   Did you subsequently take the fact that you spoke to
13   Mr. Scholz and had heard some of the music he was working on
14   across the hall to discuss with Mr. Azoff?
15   A.   Sure, yeah.
16   Q.   And what happened next?
17   A.   Well, those guys, of course, have a lot longer history
18   than myself.
19   Q.   What is that history?
20   A.   Well, Irving and a gentleman named John Baruck, who was a
21   counterpart of mine at the company, had management history with
22   BOSTON, it's my understanding.  Also, Irving with MCA and, you
23   know, I know that they had a relationship there, but it was
24   well before my time.
25   Q.   And what role did you play -- did the band BOSTON and Tom
```

1  Scholz subsequently become an artist/client of Front Line
2  Management?
3  A.   Yes.
4  Q.   And what role did you play subsequent to that taking
5  place?
6  A.   I didn't play a direct role.
7  Q.   You didn't have a day-to-day role, is that what you're
8  saying?
9  A.   Correct.  Well, John Baruck, he -- I mean, for lack of
09:31 10  better terms, was the day-to-day guy there.
11  Q.   Did you have occasion from time to time to discuss
12  Mr. Scholz and the band BOSTON with Mr. Scholz and Mr. Baruck?
13  A.   Well, we were all on the same floor together, so we did
14  visit each other's office and talk about the clients and things
15  we were getting done and sharing information, that sort of
16  thing.
17  Q.   Same question with respect to Mr. Azoff.  Did you have
18  conversations with Mr. Azoff about Tom Scholz and the band
19  BOSTON from time to time?
09:32 20  A.   From time to time.
21  Q.   Did you have a nickname at Front Line Management?
22  A.   I hope not.
23  Q.   Did they call you "The Boston Guy"?
24  A.   Okay, yeah, they did do that.  Referring to the City of
25  Boston.

1    Q.    And why did they refer to you as the Boston guy?

2    A.    Well, I was born and raised here and, you know, continued

3    to maintain a home here and family and being in the music

4    business here, and whenever anything went on in this city, they

5    would usually ask me about it.

6    Q.    Because -- did you have a lot of contacts in the local

7    music scene here in Boston?

8    A.    Oh, sure.

9    Q.    That were developed over the years?

09:33 10   A.    Oh, sure; still do.

11    Q.    With promoters?

12    A.    Yes.

13    Q.    Venues?

14    A.    Yeah.

15    Q.    Radio stations?

16    A.    Sure.

17    Q.    How long did the firm manage Mr. Scholz from that point

18    forward -- let me ask you this:  When did you leave Front Line

19    Management?

09:33 20   A.    January of 2013.

21    Q.    So from 2006 to 2013, did Front Line Management manage

22    Mr. Scholz?

23    A.    The dates I can't confirm.  I mean, in '13 Irving -- it

24    was actually Irving that left the company, and so did I.  My

25    contract was coterminous with his.  So when he left, I was able

1    to go, and I went back to a private business -- because we were

2    a public company by that point.  I went back to running a

3    private business again in Los Angeles.  He left, and I'm

4    unclear because I wasn't involved with BOSTON directly, so

5    wherever it went from there I --

6    Q.   Well, let me ask you this:  From the time period 2006 to

7    when you left Front Line Management in 2013, did you ever see

8    or hear any evidence of any impact that the band Ernie and the

9    Automatics had on BOSTON touring?

09:34 10         MR. GREEN:  Objection, foundation.

11         THE COURT:  Sustained, counsel.  But you can ask other

12   questions to lead up to this one.

13         MR. GIVEN:  Okay.

14   BY MR. GIVEN:

15   Q.   Had you heard of the band Ernie and the Automatics while

16   you were still at Front Line Management?

17   A.   Oh, yeah.

18   Q.   And how did you become aware of Ernie and the Automatics?

19   A.   Well, Ernie is one of my closest friends.

09:34 20   Q.   And I think we established before that you from time to

21   time consulted with Mr. Bolan on matters relating to the band

22   BOSTON and Tom Scholz; is that a fair description of your

23   previous testimony?

24         MR. GREEN:  Objection, leading and

25   mischaracterization.

```
 1              THE COURT:  Well, sustained as to form.
 2   BY MR. GIVEN:
 3   Q.   Well, again, asking about the discussions with Mr. Bolan,
 4   how often did you discuss the band Boston and Tom Scholz with
 5   him?
 6   A.   Are you referring to Baruck --
 7   Q.   Baruck.  I've got his name wrong, sorry.
 8   A.   He came into my office from time to time asking questions
 9   about Ernie and the band.  And Irving a couple of times reached
 10  out.
 11  Q.   And in those conversations and in any other
 12  communications -- by the way, how did you communicate at Front
 13  Line Management?  Did you have memos and stuff that circulated
 14  through the firm and so forth, sharing information about
 15  artists?
 16  A.   We did have --
 17              MR. GREEN:  Objection.
 18              THE COURT:  Sustained as to form.
 19  BY MR. GIVEN:
 20  Q.   How were communications done at Front Line Management
 21  beyond meeting face to face with people?
 22  A.   Beyond that, we had companywide e-mails.
 23  Q.   So you would communicate via e-mail with other managers at
 24  the firm?
 25  A.   Sure.
```

1    Q.    Okay.

2          So in all the conversations that you had with

3    Mr. Azoff and all the conversations that you had with

4    Mr. Baruck and in all the e-mails passing back and forth, did

5    you ever see or hear of any evidence of any impact that Ernie

6    and the Automatics had on the band BOSTON's touring?

7          MR. GREEN:  Objection.  Foundation and hearsay.

8          THE COURT:  Well, sustained as to hearsay.

9          Counsel, you can ask a question directly of this

09:36  10   witness' --

11         MR. GIVEN:  Okay.

12   BY MR. GIVEN:

13   Q.    What was your understanding, if any, as to the impact, if

14   any, that the band Ernie and the Automatics had on the band

15   BOSTON's touring?

16         MR. GREEN:  I object because any understanding would

17   have -- would be based on hearsay, your Honor.

18         MR. GIVEN:  Personal knowledge, your Honor.

19         MR. GREEN:  Then he needs to establish a foundation,

09:37  20   your Honor.

21         THE COURT:  Well, overruled as to the foundation.

22         You can answer.

23         If you need the question again --

24         THE WITNESS:  Yes, thanks.

25         THE COURT:  What was your understanding, if any, as to

1   the impact, if any, that the band Ernie and the Automatics had

2   on the band BOSTON's touring?

3   A.   I never knew of any.

4   Q.   Same question with respect to the band BOSTON's

5   merchandise sales.  Were you aware of any evidence of any

6   impact that the band Ernie and the Automatics had on the band

7   BOSTON's merchandise sales?

8           MR. GREEN:  And again, your Honor, this would now be

9   hearsay and best evidence.  Objection.

09:38 10           MR. GIVEN:  I think I've laid the foundation.

11           THE COURT:  Well, counsel, no --

12           MR. GIVEN:  Understood.

13           THE COURT:  -- speaking objections.

14           Overruled as to this question.

15           You can answer.

16   A.   It's the same answer.  I'm unaware.

17   Q.   Same question with respect to the band BOSTON's record

18   sales.  Are you aware of any impact -- any evidence of any

19   impact that the band Ernie and the Automatics had on the band

09:38 20   BOSTON's record sales?

21           MR. GREEN:  Same objection, your Honor.

22           THE COURT:  Noted, counsel.  Overruled.

23           You can answer.

24   A.   I'm not.

25   Q.   Same question with respect to the band BOSTON's

1    advertising and promotion.  Are you aware of any impact that

2    the band Ernie and the Automatics had on the band BOSTON's

3    advertising or promotion?

4            MR. GREEN:  Same objection.

5            THE COURT:  Noted.  Overruled.

6            You can answer.

7    A.    I'm not.

8    Q.    Now, if I ask the same questions and I inserted Barry

9    Goudreau's name for Ernie and the Automatics, would your

09:39 10   response be the same?

11   A.    Yes.

12   Q.    Now, there came a point in time where Mr. Azoff enlisted

13   you -- well, let me ask.

14           Did there come a point in time where Mr. Azoff

15   enlisted you to discuss a buyout of the royalty interests of

16   the Brad Delp family and Barry Goudreau?

17   A.    Yes.

18   Q.    And what -- could you explain?

19   A.    Yeah, sure.

09:39 20         Irving called me --

21           MR. GREEN:  All right.  Objection.  Hearsay and

22   relevance.

23           THE COURT:  Sustained.

24   BY MR. GIVEN:

25   Q.    And when that happened?  Were you aware of any litigation

1    between Mr. Scholz and Mr. Goudreau?

2              MR. GREEN:  Objection, relevance.

3              THE COURT:  Sustained.

4              MR. GIVEN:  Okay.

5              THE COURT:  Also given my discussion with counsel

6    earlier today.

7              (Discussion off the record.)

8    BY MR. GIVEN:

9    Q.   And not to repeat ourselves here, how did you become aware

09:41 10    of the interest of Mr. Scholz in a buyout of the royalty

11    interests of the Brad Delp estate and Mr. Goudreau?

12              MR. GREEN:  Objection.  I think counsel may have

13    misspoke here, but I do object on relevance.

14              THE COURT:  Sustained, counsel.

15    BY MR. GIVEN:

16    Q.   Following your conversation with Mr. Azoff, what steps did

17    you take to execute on his request?

18              MR. GREEN:  Objection.

19              THE COURT:  Counsel, let me see you at sidebar.  Let

09:41 20    me see you at sidebar.

21              (At sidebar on the record.)

22              THE COURT:  So, counsel, I understand how you were

23    trying to push past the hearsay objection with the last

24    question, but I think there is still a relevance objection.  So

25    just let me know where you're --

             1          MR. BAKER:  Could I address that?

             2          THE COURT:  Sure.

             3          MR. BAKER:  Your Honor, Mr. Scholz has put into

             4   prayers for relief of this complaint the royalty streams.

             5   Mr. Green made it clear yesterday that they want the royalty

             6   streams from at least 2007 forward.

             7          THE COURT:  The royalties -- his share of the albums

             8   between those periods of time.

             9          MR. BAKER:  That's exactly right.

09:42    10          And testimony we elicit -- we expect to elicit, and

            11   this is by way of an offering of proof in addition --

            12          THE COURT:  Okay.

            13          MR. BAKER:  -- is that Mr. Geary was asked by Scholz

            14   through management to approach Barry Goudreau to buy his

            15   royalties.  And he made a very, very low offer, an unreasonably

            16   low offer, which was, in fact, rejected.  And it dovetails with

            17   our theory of this case, which is Tom Scholz has always been

            18   after Mr. Goudreau's right to payment for the first record.

            19          MR. GIVEN:  First two records.

09:43    20          MR. BAKER:  First two records.  And there's no doubt

            21   in my mind Mr. Scholz is going to admit to that on the stand.

            22   In fact, he has to, that's the theory of his case, that somehow

            23   he's entitled to this, entitled to that.  And this is our

            24   theory of the case.  It goes way before the allegation of Ernie

            25   and the Automatics' infringement.

1          THE COURT:  So you say it's as a result of a
2     conversation that we're not going to go into with the head of
3     the management company who he went forward to what?  To
4     Mr. Goudreau --
5          MR. BAKER:  Approached --
6          THE COURT:  -- Mr. Goudreau on behalf of --
7          MR. GIVEN:  Delp's family.
8          THE COURT:  On behalf of the plaintiff in regards to
9     what were their one-fifth shares of the royalties under the
09:44 10    Settlement Agreement, under the 1983 Settlement Agreement --
11          MR. BAKER:  That existed before the Settlement
12    Agreement and were reaffirmed.  And the answer is "yes."
13          I do appreciate the Court's concern why are we talking
14    about Brad Delp.  It was kind of a package group; Brad Delp was
15    with Barry Goudreau.
16          MR. GIVEN:  There's a deeper meaning to all of this
17    that I won't get into now that has to do with copyright
18    termination, but maybe we can take it up at a later date.
19          MR. GREEN:  This has nothing do with copyright.
09:44 20          MR. GIVEN:  Yes, it does.
21          MR. GREEN:  I heard a reference to litigation, your
22    Honor.
23          THE COURT:  Yeah.
24          MR. GREEN:  If this was -- whatever took place here
25    was part of a settlement overture in that litigation.  Again,

1    we object on relevance.  It has nothing to do with this case.

2        MR. BAKER:  He had no idea, as he just testified,

3    about this lawsuit, Mr. Geary.  So that's why --

4        MR. GIVEN:  That's why I asked the question.

5        MS. STENGER:  If he were charged to go make an offer

6    because of litigation, it's still a settlement agreement --

7        MR. BAKER:  We don't know that, and neither did he.

8        My point is this, Judge, that Mr. Geary, on behalf of

9    Mr. Scholz, attempted to get Mr. Goudreau's royalty rights.

10   And I think the jury -- we believe, we argue, we feel, that the

11   jury is entitled to know that separate and distinct,

12   independent of any claims that we've made in this lawsuit as

13   Mr. Geary was unaware of them.

14       MR. GIVEN:  That's why I asked the questions, your

15   Honor, because I wanted to establish he --

16       MR. GREEN:  Can you keep down your voice?  We're at

17   sidebar.

18       THE COURT:  Counsel, everybody keep your voices down.

19       Counsel, just address the Court.

20       MR. GREEN:  Thank you, your Honor.

21       THE COURT:  Okay.

22       So on the royalty payments -- and what is it you --

23   just play out the offer of proof here.

24       You expect him to say he approached Mr. Goudreau,

25   Mr. Goudreau rejected it, and then what further testimony will

1    this witness testify to?

2        MR. BAKER:  Separate and distinct of that issue, that

3    pretty much is it, that he was asked by Scholz through the

4    management to approach Mr. Goudreau to try to get

5    Mr. Goudreau's royalties, that request was rebuffed -- and

6    Barry will confirm this when he's on the stand -- because the

7    amount was so unreasonably low.  And that's the end of the

8    testimony that relates to the royalties.

9        I'm sure Mr. Given has got other questions, but that's

09:46 10  the end of this line of inquiry.  And we appreciate Mr. Green's

11   concern about hearsay.  He can lay the foundation, if you'll

12   allow him get to the point, where it's a matter of Front Line

13   Management, and that was what he intended to do.

14       THE COURT:  Counsel, counsel, if I'm not allowing

15   anything further in about litigation, it doesn't sound like

16   this particular witness would know any of that frame.  Doesn't

17   it bear upon what your client's motivation may have been in

18   regards to -- in regards to --

19       MR. GREEN:  I understand they're contending that, your

09:47 20  Honor, but I think there's a supervening evidentiary rule about

21   settlement offers and that this was -- apparently, there's no

22   dispute on this fact, that this was an offer to settle the

23   litigation.  They may have been unwitting to Mr. Geary, but the

24   fact is if that is a settlement offer, under the federal rules,

25   it should not come in.

1          MR. BAKER:  Quite to the contrary, Judge.  Quite the

2     exact opposite.  Mr. Geary had no knowledge that this was an

3     offer in settlement.

4          MS. STENGER:  It doesn't matter.

5          THE COURT:  Counsel, and just have one person on

6     either side lead.

7          I guess the point is -- I understand the distinction

8     you're making this that witness wouldn't necessarily know, but

9     in terms of how the plaintiff responds to it, if it is in

09:48 10     reality part of a settlement offer, which I've already said is

11     out of this case, how do --

12          MR. BAKER:  I can answer that.

13          There was no other terms and conditions.  There was no

14     discussion about wrapping up this settlement.  It was a

15     business transaction.  Otherwise it would go through the

16     lawyers, Judge.  It would not go through Front Line Management.

17     It has nothing do with the lawsuit.

18          THE COURT:  Mr. Green.

19          MR. GREEN:  I think you're changing horses here,

09:48 20     Mr. Baker, with all due respect.

21          I understood that this was raised by Mr. Given -- he

22     asked originally about a litigation, and he is now asking

23     about -- it is my understanding that this offer was made as

24     part of a litigation.  The notion here lawyers weren't

25     involved, they decided apparently to do it this way, but it's

1   still a settlement offer, and it's inadmissible under the

2   Federal Rules of Evidence.

3           MR. BAKER:  Judge, there was -- I think perhaps

4   Mr. Green may have misheard Mr. Given's question.

5           He specifically asked if the witness knew about

6   litigation, and he said, No.  This was not advanced in

7   furtherance of this case.  And that's why we submit --

8           THE COURT:  Yeah, but it mattered -- I'm not going to

9   allow it.

09:49 10        I do agree with Mr. Green's point.  I don't think it

11  matters whether or not this witness knows nothing on the

12  litigation if at base it was part of a compromise or a

13  settlement.

14          So your objection is noted.

15          MR. BAKER:  Let me just add one last thing, maybe I

16  sway you, maybe I don't.  I want the record to be clear.

17          That's not the case.  It was not advanced in any way,

18  shape, or form to broker a deal.  There was no reference that

19  this lawsuit would go away.  Quite to the contrary.  Scholz

09:50 20  wanted his royalties.  This lawsuit is actually independent of

21  that, and I think that it would be important for the jury to

22  know that at all times it was the motive of Mr. Scholz to try

23  to get royalties.

24          THE COURT:  So, counsel, your objection is noted with

25  that further record.

1           Here, where the issue is somewhat convoluted for me

2    and is disputed between the parties, and apparently this

3    witness doesn't have the full context, I'm not going to allow

4    it.

5           MR. BAKER:  Note my objection, Judge.

6           THE COURT:  Okay.

7           (End of discussion at sidebar.)

8           THE COURT:  Counsel.

9    BY MR. GIVEN:

09:51 10   Q.   Did you, Mr. Geary, at any time during your long

11   relationship with Mr. Goudreau provide on an informal basis

12   management advice?

13   A.    Informal, yes.

14   Q.   What was the nature of that?  If you could just describe

15   that briefly for the jury.

16   A.    Well, I've known Barry for many years, and like with all

17   friends, we talk, you know, and discuss things and -- like I

18   was mentioning earlier, the changing times in music and

19   strategies, that sort of thing.

09:51 20   Q.   Did you ever speak to Mr. Goudreau about taking him on as

21   a management client at Front Line Management?

22   A.    No.

23   Q.   Why not?

24   A.    Well, to begin with, you know, where BOSTON was a client

25   of Azoff's and the firm, that wouldn't make sense, it wouldn't

1    work.

2    Q.   Why not?  Why wouldn't it work?

3    A.   Well, it's a conflict to have potentially two artists with

4    conflict -- it just -- I wouldn't have even taken it in there

5    for consideration given the situation with BOSTON having been a

6    client of the company.

7    Q.   And remind us, you left Front Line Management in what

8    year?

9    A.   January of '13.

09:52 10    Q.   And from January 2013 to now, have you managed

11    Mr. Goudreau in any professional capacity at all?

12    A.   No.

13    Q.   Would you be willing to do so?

14    A.   Well, if it means being up here any more than this, I

15    wouldn't think so.

16         MR. GIVEN:  No further questions at this time, your

17    Honor.  Thank you.

18         THE COURT:  Thank you, Mr. Given.

19         Cross-examination?

09:53 20                         CROSS-EXAMINATION

21    BY MR. GREEN:

22    Q.   Mr. Geary, my name is Lawrence Green.  I represent

23    Mr. Scholz.

24         Did you do any preparation for your testimony today in

25    connection with this case?

```
 1   A.   I met with the attorneys.

 2   Q.   On how many occasions did you meet with the attorneys?

 3   A.   Twice.  I was -- there was an introduction meeting in Los

 4   Angeles a couple months ago, and yesterday I spent about 45

 5   minutes with them.

 6   Q.   And how long was the first meeting in Los Angeles?

 7   A.   Thirty minutes maybe.

 8   Q.   And who did you meet with yesterday?

 9   A.   I met with all three of these gentlemen.

10   Q.   Was Mr. Goudreau also present in the room?

11   A.   Yes.

12   Q.   Were you advised of the fact that Mr. Boch testified the

13   last couple of days?

14   A.   I'm actually staying at his home, so, yes, I knew.

15   Q.   At the meeting yesterday, did they tell you about

16   Mr. Boch's testimony?

17   A.   No.

18   Q.   Did Mr. Boch tell you about his testimony?

19   A.   Only that he thought he had done well.  I haven't seen him

20   much since I've been here.

21   Q.   But you're staying at his home.  You have called him, as I

22   understand it, your best friend?

23   A.   We're close, yeah.

24   Q.   In fact, he was the best man at your wedding?

25   A.   He was.
```

```
 1   Q.   Do you have any brothers?

 2   A.   I'm sorry?

 3   Q.   Do you have any brothers?

 4   A.   No.

 5   Q.   All right.  Now, let me ask you about your business

 6   relationship with Mr. Boch.  When did that begin?

 7   A.   January of 2013.

 8   Q.   And it has continued since then through the present date?

 9   A.   Yes.

10   Q.   And this is a for-profit entity, correct?

11   A.   Yes.

12   Q.   And the nature of the business is what, sir?

13   A.   Artist development and artist management.

14   Q.   And can you be more specific, what the business does?

15   A.   Yeah.  We invest in -- we both invest in young artists'

16   careers, trying to develop their career, and we also manage

17   established artists.  When I say "we," it's me and my employees

18   in Los Angeles that do that work.  Ernie is more the backroom

19   guy, the books, the money, that sort of thing.

20   Q.   When you say "the money," I think you testified in

21   response to Mr. Given that Ernie is really the funder of the

22   company, correct?

23   A.   He is -- he shortfalls the company.  He does, yes.

24   Q.   Has this business been involved in any way in getting

25   involved in the purchase of royalty streams?
```

1    A.   We have acquired streams, yes.

2    Q.   Of artists?

3    A.   Yes.

4    Q.   And when you say acquire streams, am I correct in my

5    assumption that you pay the artist some amount of money up

6    front and then you obtain the stream of income coming in?  Is

7    that a fair statement?

8    A.   Yeah.  Well, we have a unique model in management where

9    sometimes if we do invest monetarily in the artist, we do share

09:57 10  in the royalties.

11   Q.   Have you ever had any discussions on behalf of your

12   business with Mr. Goudreau about buying his royalty stream?

13   A.   Personally buying?

14   Q.   No, for the company.

15   A.   Oh, not my company, no.

16   Q.   Have you otherwise had discussion was him about the

17   purchase by you or your company or any entity that Mr. Boch has

18   been involved with in the royalty stream?

19   A.   No.

09:57 20  Q.   Any discussions at all about Mr. Boch buying his royalty

21   stream?

22   A.   No.

23   Q.   Now, at some point in time, you did want to become the

24   manager of BOSTON, did you not?

25   A.   Well, I'd say since I was in management in 1994, one of my

1    favorite all-time groups, I would have been thrilled to manage

2    the band.

3    Q.   And you did, did you not, meet with Mr. Scholz to have a

4    discussion with him in which you were soliciting his interest

5    to retain you as the manager, correct?

6    A.   Mmm.  That's a difficult one to answer.  We didn't go down

7    the road -- go down that road of negotiating to that end.

8    Q.   Well, I'm not asking about the negotiation.  Is it a fair

9    statement that you approached Mr. Scholz and you were hoping to

09:59 10  be appointed the manager for BOSTON?  Yes or no.

11   A.   Hoping -- no, I'd say no.

12   Q.   That never happened.

13   A.   I met with Tom and I spoke with Tom, but I never asked him

14   and he never asked me.

15   Q.   Now, you understand that Mr. Scholz ended up asking that

16   Mr. -- is the name pronounced Baruck?

17   A.   Baruck, yeah.

18   Q.   That Mr. Scholz asked Mr. Baruck to be his manager,

19   correct?  Manager for BOSTON?

09:59 20  A.   Well, that must have happened because it ended up that

21   way.

22   Q.   And you were, were you not, disappointed that Mr. Scholz

23   wanted to work with Mr. Baruck rather than you personally;

24   isn't that a fair statement?

25   A.   No.  I had a pretty full roster at the time.

1    Q.    I see.  In other words, easy come, easy go.  You didn't

2    need the band BOSTON?

3    A.    I was happy to see my company managing the group than be

4    taking on the day-to-day responsibilities.

5    Q.    So no hard feelings at all Mr. Baruck was chosen instead

6    of you?  No hard feelings?

7    A.    No, none.

8    Q.    Did you understand that Mr. Scholz expressed a preference

9    to Mr. Azoff, that he wanted Mr. Baruck and not you as his

10:00 10    manager?

11    A.    I'm sorry, would you repeat that?

12    Q.    Do you understand that Mr. Scholz expressed a preference

13    to your boss, Mr. Azoff, that he wanted Mr. Baruck and not you

14    as his manager?

15    A.    I never heard that.

16    Q.    Never heard it.

17    A.    No.

18    Q.    And that wouldn't have caused any resentment if he did

19    here.

10:00 20    A.    No.

21    Q.    Not at all.

22          Okay.

23          Now, during your time with Azoff Entertainment, which

24    later became, as I understand it Front Line --

25    A.    That's right.

1    Q.    -- you were asked a series of questions about did you know

2    of anything.  It was not your job, because you were not the

3    manager of BOSTON, to be paying attention to record sales,

4    promotions, or the like, was it?

5    A.    Correct.

6    Q.    So when you said you were unaware of anything in that

7    regard, that's because it wasn't your job, correct?

8    A.    Correct.

9    Q.    A couple final questions.

10:01  10         You were asked a question about the possibility of

11   Mr. Goudreau becoming a client of Front Line at the same time

12   that Mr. Scholz and the band BOSTON were there, and your words

13   were that would have been a conflict.  Why do you say that,

14   sir?

15   A.    Well, similar probably in your business.  If two clients

16   with opposing interests are represented by the same group of

17   people, it's not something you do.

18   Q.    And that is, in fact, true of my business.  But just in

19   your business, which is what we're talking about in this case,

10:02  20   when you say "similar," what are you talking about?

21   A.    Well, we're a client-based company, and if two clients

22   with opposing interests are managed by the same company, that

23   will almost surely lead to problems.

24   Q.    But I'm asking about the word "similar."  What did you

25   mean by that just now?

```
 1    A.   Similar -- I mean similar to the law business and whereby

 2    two clients with opposing interests -- I don't want to speak

 3    for your business directly, but it seems to me that's a

 4    conflict of interest.  And I know I've personally had to sign

 5    along the way conflict waivers to make that sort of thing

 6    happen.

 7              MR. GREEN:  May I have one moment, your Honor?

 8              THE COURT:  You may.

 9              (Discussion off the record.)

10:03 10         MR. GREEN:  Nothing further.

11              THE COURT:  Redirect, Mr. Given?

12              MR. TARLOW:  One moment, your Honor.

13              THE COURT:  Yes.

14                         REDIRECT EXAMINATION

15    BY MR. GIVEN:

16    Q.   Mr. Geary, in answer to some of Attorney Green's

17    questions, you used this term "opposing interests."  Can you

18    describe what you mean by opposing interests?

19    A.   Well, I've known for many years that there's been conflict

10:03 20    within --

21              MR. GREEN:  Objection, relevance.

22              THE COURT:  Well --

23              MR. GREEN:  Relying on the previous ruling that you

24    made, your Honor.

25              THE COURT:  Well, overruled, counsel, though, I'm
```

1    going to have you rephrase in the form of a leading question.

2              MR. GIVEN:  A leading question.

3              THE COURT:  A leading question, even though it's

4    redirect, counsel.

5              Leading question that avoids the issues we've

6    discussed.

7              MR. GIVEN:  I'll do my best, your Honor.

8              THE COURT:  Thank you.

9              (Pause.)

10:04 10          MR. GIVEN:  One moment, your Honor.

11             THE COURT:  Sure.

12             (Discussion off the record.)

13   BY MR. GIVEN:

14   Q.   So, Mr. Geary, when you used the phrase "opposing

15   interest," did you mean to say that Tom Scholz did not want

16   Barry Goudreau managed by Front Line Management?

17             MR. GREEN:  Objection, calls for speculation.

18             THE COURT:  Well, sustained as to that, counsel.

19   BY MR. GIVEN:

10:05 20   Q.   Did you have that understanding?

21   A.   No.

22             MR. GIVEN:  One moment, your Honor.

23             THE COURT:  Sure.

24             (Discussion off the record.)

25             THE COURT:  Jurors, just so you understand, you've

heard me refer to leading questions or open-ended questions.

There's certain rules of evidence that apply.  So when you're

examining a witness you call, generally there's a prohibition

against asking questions that assume the answer.  That's

different when you're doing cross-examination.  There's

sometimes when I give permission to the attorneys to ask

leading questions based on my legal rulings of which they're

aware.  So sometimes that takes some further thought by

counsel.  So bear with us.  There are reasons for all of these

things.

MR. BAKER:  Your Honor, may we have a sidebar briefly?

THE COURT:  Counsel, not on this issue.

Counsel, is it in terms of the phrasing?

MR. GIVEN:  It's the question that was asked by

Mr. Green --

THE COURT:  And I agree that you get an opportunity to

ask questions about it.  I'm trying to avoid the topic that we

discussed at sidebar.

MR. BAKER:  There's really no way to ask the question

than to have him explain, your Honor, and we want to be very

careful we don't run afoul of what the Court's decided.

THE COURT:  Counsel, I will see you.

(At sidebar on the record.)

THE COURT:  Counsel, I guess just to -- because I

don't want to have a long sidebar on this.

```
 1            MR. BAKER:  I understand.
 2            THE COURT:  I guess, counsel, I didn't want mentioned,
 3     obviously, litigation.  I thought where your question might be
 4     going is were you aware of personal conflict between -- were
 5     you referring to personal conflict as opposed to a business
 6     conflict?  I guess that's what I was trying to do.
 7            I didn't mean to throw counsel off in suggesting
 8     making it a leading question.  I was only, Mr. Green, trying to
 9     avoid what might be extemporaneous -- I don't know what
10     Mr. Geary knows in regards to any litigation, so I was just
11     trying to be preemptive.
12            MR. GREEN:  I have another suggestion, your Honor.
13            I'm glad to withdraw my question and to have the Court
14     instruct the jury not to --
15            THE COURT:  Well, I think the cat's out of the bag.  I
16     think it's one or two questions on this, and if there is -- you
17     know --
18            MR. BAKER:  If I could express, we do not want the
19     question withdrawn.  Thank you.
20            Secondly, I don't know what scalpel exists in this
21     world that allows you to cut out personal from business.  I'm
22     not clear about that, because Mr. Scholz, it's our case, hates
23     Mr. Goudreau and is unhappy with the business arrangement.  So
24     those two go together, personal and business.
25            THE COURT:  No, I'm not saying that.  I'm just saying
```

          1   I didn't want to get into --

          2           MR. GIVEN:  You don't want the litigation.

          3           MR. BAKER:  That's fine.

          4           MR. GIVEN:  I'm trying to avoid it.

          5           MR. BAKER:  Let me finish, Mr. Green.

          6           MR. GREEN:  Of course.

          7           MR. BAKER:  Thank you.

          8           The issue here is he said "opposing interest."  He can

          9   ask it your way is was it because there was personal conflict,

10:09   10   that's the kind of right leading question.  But if he doesn't

         11   say "yes" or "I don't know," then he's got to be able to answer

         12   the question.  Maybe then you'll hear the question, you strike

         13   the answer.  I don't know how to do this where he asked the

         14   question and we can't have the answer.

         15           THE COURT:  That's why I'm allowing you to do it.

         16           So why don't you start with what I suggested, counsel,

         17   and I'll listen for the questions.

         18           MR. BAKER:  Okay, your Honor.

         19           THE COURT:  Thank you.

10:09   20           (End of discussion at sidebar.)

         21           THE COURT:  Mr. Given.

         22   BY MR. GIVEN:

         23   Q.   Getting back to this subject of opposing interests,

         24   Mr. Geary, were you aware of personal conflict between

         25   Mr. Goudreau and Mr. Scholz?

```
 1    A.    Yes.

 2    Q.    Were you aware that Mr. Scholz didn't like Mr. Goudreau?

 3          MR. GREEN:  Objection.

 4          THE COURT:  You can rephrase.

 5    BY MR. GIVEN:

 6    Q.    Did you have an awareness of the personal relationship

 7    between Mr. Goudreau and Mr. Scholz?

 8    A.    To a degree.

 9    Q.    And how would you describe that relationship?

10    A.    Well, it seemed tumultuous.

11    Q.    Can the same be said with respect to their business

12    relationship?

13          MR. GREEN:  Objection.  It's overly broad and object

14    to the form.

15          THE COURT:  Sustained as to form.

16    BY MR. GIVEN:

17    Q.    Were you aware of business conflict between Mr. Goudreau

18    and Mr. Scholz?

19    A.    I was aware, yes.

20    Q.    Were you aware that Mr. Scholz was unhappy with the deal

21    that he made with Mr. Goudreau back in the day?

22          MR. GREEN:  Objection.

23          THE COURT:  Sustained as to that.

24          MR. GIVEN:  One moment, your Honor.

25          (Discussion off the record.)
```

```
 1   BY MR. GIVEN:
 2   Q.   What was your understanding of the business conflict
 3   between Mr. Goudreau and Mr. Scholz?
 4   A.   I don't feel informed or qualified enough to give you any
 5   detail within that.  It's just been a known fact that there's
 6   been turmoil.
 7           MR. GREEN:  Objection to anything further, your Honor,
 8   based upon foundation.
 9           THE COURT:  Well, sustained as to the last sentence,
10   but the first part of the answer can remain.
11           MR. GREEN:  Yes, your Honor.  I want to make it clear
12   it was just to the last part of the answer.  Thank you.
13           MR. GIVEN:  No further questions.
14           THE COURT:  Jurors, that just means I'm striking the
15   last sentence, not the first.
16           Mr. Green --
17           MR. GREEN:  No further questions, your Honor.
18           Thank you, your Honor.
19           THE COURT:  Thank you, sir.  You're excused.
20           Counsel, are we going to resume where we were at this
21   point?
22           MR. TARLOW:  Yes, with the cross of Mr. Goudreau.  I
23   need to set up --
24           THE COURT:  You can set up.
25           Mr. Goudreau, you can come forward.  Thank you.
```

10:12 (line 10)

10:12 (line 20)

1              Good morning, sir.

2              THE WITNESS:  Good morning.

3              THE COURT:  I just remind you that you remain under

4    oath.

5              THE WITNESS:  Yes.

6              MR. TARLOW:  May I place the deposition in front of

7    him?

8              THE COURT:  Sure.

9              MR. TARLOW:  Before I begin, just the 1099s that were

10:14 10   contested Exhibit 8 E were marked in, but I don't have the

11   exhibit number.

12             THE COURT:  Yes.  Those were Exhibit 60.

13             MR. TARLOW:  60, your Honor?

14             THE COURT:  Yes.

15             MR. TARLOW:  Thank you.

16             (Pause.)

17             MR. TARLOW:  May I proceed, your Honor?

18             THE COURT:  You may.

19             BARRY GOUDREAU, having been previously duly sworn by

10:15 20   the Clerk, was further examined and testified as follows:

21                        CONTINUED CROSS-EXAMINATION

22   BY MR. TARLOW:

23   Q.   Good morning, Mr. Goudreau.

24   A.   Good morning.

25   Q.   Mr. Goudreau, just referring back to where we left off

1    yesterday.  In front of you is your deposition, is it not?

2    A.    Yes.

3    Q.    Just to be clear, that large stack of documents, your

4    deposition, is that complete document all transcript or are

5    there other documents with it?

6    A.    I believe part of it's my deposition and the rest are

7    exhibits that I read through during the process.

8    Q.    That large stack of documents is not all your testimony,

9    is it?

10:16 10   A.    No.

11   Q.    Now, sir, if you could just turn, please, to page number

12   90 in your deposition, please.

13          Just let me know when you get there.

14   A.    Okay.

15   Q.    Now, sir, I'm going to read you the questions and answers

16   that followed the deposition testimony you read yesterday, and

17   after I read each line, I'm going to ask you if I read it

18   correctly and if you could please respond.

19          MR. GREEN:  Objection, your Honor.

10:16 20          THE COURT:  This is on the completeness issue we had

21   some issue.

22          MR. GREEN:  Yes, your Honor.

23          MR. TARLOW:  Yes, your Honor.

24          MR. GREEN:  It has nothing to do with completeness,

25   your Honor.

```
 1              THE COURT:  Sustained as to this, counsel.
 2              MR. TARLOW:  Would your Honor just note my objection?
 3     I did intend to read the pages that I referred to yesterday in
 4     the record.
 5              THE COURT:  And having had a chance to review those
 6     and given our extended discussion, I sustain the objection, but
 7     your objection is noted.
 8              MR. TARLOW:  Thank you, your Honor.
 9     BY MR. TARLOW:
10:17 10  Q.   Mr. Goudreau, I want you to turn your attention to back
11     when you had a little bit less gray hair to the first time you
12     met Tom Scholz.  Do you recall when that was?
13     A.   Yes.
14     Q.   When was that, sir?
15     A.   It was 1969, my first year of college at BU.
16     Q.   And were you working a job at that time, sir?
17     A.   No, I was just going to college.
18     Q.   Prior to that, had you been working a job?
19     A.   Well, I had always been in bands and made my money through
10:18 20  music.
21     Q.   Other than making money through music, had you engaged in
22     any other type of occupations?
23     A.   You mean a real job?  No.
24     Q.   So what were the circumstance -- where did you meet
25     Mr. Scholz and what were the circumstances of that meeting,
```

1  sir?

2  A.   Well, I had a band with a high school friend that was

3  going to MIT.  We rehearsed at his fraternity house, and we put

4  an ad in the local paper for a keyboard player, and Tom Scholz

5  answered the ad.

6  Q.   And as a result of that meeting, what happened next?

7  A.   Tom came out and he was a great keyboard player and, you

8  know, he joined up and started playing with us.

9  Q.   And would you give me a time frame again, sir?  What year

10 is this?

11 A.   This is 1969.

12 Q.   And when was the next time you had occasion to engage in

13 any musical endeavors with Mr. Scholz?

14 A.   Well, we continued working from there.  It wasn't long

15 after that, just a few months after that, that we recorded our

16 first demo, a song called "San Francisco Day" that Tom had

17 written.  We --

18 Q.   "San Francisco Day," did that song -- when he presented it

19 to you, what band were you in -- did Mr. Scholz present "San

20 Francisco Day" to you at some point?

21 A.   Yes.

22 Q.   Who wrote "San Francisco Day"?

23 A.   Tom did.

24 Q.   Does that song sound similar to any other song that you

25 know of today?

A.   With the lyrics rewritten, it became "Hitch a Ride" on the first BOSTON record.

Q.   So were you in a particular group with Mr. Scholz when he first showed you "San Francisco Day"?

A.   Well, I think we called it "Freehold," but we only played in the basement of the fraternity house, so the name really didn't mean much.

Q.   Sir, do you claim any authorship in "San Francisco Day"?

A.   No.

Q.   Do you claim any authorship in the song that "San Francisco Day" ultimately became?

A.   No.

Q.   Now, after Freehold, sir -- how long did Freehold last?

A.   Well, we moved out of the fraternity basement into -- Jim Masdea was the drummer at the time, into his basement over in Jamaica Plain.

Q.   Did Freehold ever play any public performances?

A.   Well, like I said, we played at fraternity parties at the fraternity house, but nothing past that.

Q.   So after Freehold -- at some point in time, did Freehold end?

A.   Yes.  Well, the -- Kevin Clarity was the bass player, my high school friend, and he and Tom kind of butted heads.  And Kevin was left behind and we moved into Jim Masdea's basement.

Q.   When you say "we," who is the "we" that moved into

```
 1   Mr. Masdea's Masdea?

 2   A.    Tom, Mr. Masdea, and myself.

 3   Q.    When Mr. Masdea, yourself, and Mr. Scholz moved into

 4   Mr. Masdea's basement, for what purpose did you do that?

 5   A.    Well, Tom was starting to write songs, I had written some

 6   songs, and we started recording some demos.  Tom started

 7   putting together some recording equipment, you know, started

 8   recording some music.

 9   Q.    And was that all taking place at that time in Mr. Masdea's

10   basement?

11   A.    No.  The recording equipment was at Tom's house, but we

12   rehearsed in the basement.

13   Q.    And who purchased the recording equipment, sir?

14   A.    Tom did.

15   Q.    Did you contribute anything to the purchase of that

16   recording equipment?

17   A.    No.

18   Q.    Now, for -- so if you just give me a time frame, for what

19   period of time are you talking about where you're working in

20   Mr. Masdea's basement and these demos are being recorded?

21   A.    It was through the early '70s, '71, two.

22   Q.    Did that trio that you just described, did it have a name

23   at all?  Did it perform under a particular name?

24   A.    Well, I think the first name we used was Middle Earth.

25   Q.    And who came up with the name Middle Earth?
```

1    A.    That was Tom's idea.

2    Q.    Was that, in fact, a reference to the Tolkien trilogy?

3    A.    It was, very popular at the time.

4    Q.    And so after that trio was working together, were you --

5    what was your next musical endeavor?

6    A.    Well, we -- we continued to do demos.  I think the name

7    changed from Middle Earth to Mother's Milk at some point.  We

8    brought a bass player in at some point, Frank Crimoni (phon.) I

9    think was his name, but he didn't play on the recordings.

10:23 10   Middle Earth -- I'm sorry, Mother's Milk did play a few shows,

11    but not very many.

12    Q.    Now, when you say "play on the recordings," were you

13    playing on any recordings at this in time with Mr. Scholz?

14    A.    I was.

15    Q.    And any of the recordings that you played on at that time,

16    did any of those songs or compositions ultimately wind up on

17    either of the first two BOSTON records?

18    A.    Well, one of the songs we worked on at the time was called

19    "90 Days."

10:23 20   Q.    Did "90 Days" have any type of signature piece of music in

21    it?

22    A.    Well, the verse to "90 Days" became the verse in "More

23    Than a Feeling."

24    Q.    And with respect to that song, "90 Days," could you

25    describe what the introduction to "90 Days" sounded like at

1    that time as you were working on it?

2    A.    What it sounded like?

3    Q.    Did it start off with a particular instrument, sir?

4    A.    It was the -- it was the same guitar rift as the beginning

5    of "More Than a Feeling," yes.

6    Q.    And do you claim any authorship in either "90 Days" or

7    what ultimately became "More Than a Feeling," sir?

8    A.    No.

9    Q.    Who wrote that song?

10:24 10   A.    Tom did.

11   Q.    No dispute in your mind, sir?

12   A.    No.

13   Q.    And did you make any recordings of that early song, "90

14   Days," at that time?

15   A.    Yes.  There are several recordings.  In fact, I wrote a

16   couple of songs that we recorded as well.

17   Q.    And what was the purpose of those recordings?

18   A.    Well, I mean, we hoped to get -- at some point try to get

19   a record deal and, you know, have a career in music.

10:25 20   Q.    Okay.

21         So after -- so could you put a time frame on

22   approximately when, if you can recall -- can you recall when

23   you were working on that song "90 Days"?

24   A.    Well, there's -- if you go to the Gonna Hitch a Ride

25   website --

1    Q.    I don't want you to tell me on what's the Hitch a Ride

2    website.  Do you have your own memory as to when that occurred?

3    A.    Can you give me the question again?

4    Q.    Do you have a memory as to approximately what date,

5    perhaps even what year, you were working on that recording, "90

6    Days"?

7    A.    I would say '71, '72.

8    Q.    Okay.

9          Now, do you recall who else played on that recording?

10:25 10    A.    Actually, "Sib" Hashian, another high school friend of

11    mine who played drums, had come back from Vietnam, and I

12    remember we got together at his place in Marblehead and worked

13    on that song.

14    Q.    Do you recall who played bass on that recording?

15    A.    Tom did.

16    Q.    And do you recall who played the guitar on that recording?

17    A.    I did.

18    Q.    Anyone else other than the three of you, Mr. Hashian,

19    Mr. Scholz, yourself, played on that recording?

10:26 20    A.    The instruments, no.

21    Q.    Do you remember who sang on that recording?

22    A.    The recording we did in "Sib's" basement, I'm not sure --

23    I'm not sure, to tell you the truth.  We worked with two or

24    three singers through that period.

25    Q.    At this time, did you -- had you even known Mr. Delp at

1    that point in time?

2    A.    Yes.  I met Brad when I was in high school.  I went to

3    audition for the band he was in.  I didn't get the gig, but I

4    was really impressed with the way he sang.

5    Q.    So after you were working on these recordings with

6    Mr. Scholz, do you recall was there a period of time after this

7    that you were doing -- you engaged in any musical performing

8    group that didn't involve Mr. Scholz?

9    A.    No.

10:27 10    Q.    So after -- after this recording in '71, '72, sir, what's

11    the next significant memory you have of performing or recording

12    with Mr. Scholz?

13    A.    Well, in, let's see, 1974, it was Mother's Milk at that

14    point, and --

15    Q.    Let me stop you there, sir.

16        MR. GREEN:  Objection.  I thought he was going to

17    answer the question, your Honor.  He was in the middle of an

18    answer.

19        THE COURT:  Well --

10:28 20        THE WITNESS:  Could you give me the question again?

21        THE COURT:  Overruled, counsel.

22        You can ask the question again.

23        Mr. Tarlow, just let the witness answer.  There have

24    been a few times when you have been stepping on the answer,

25    which I know is inadvertent.

1          MR. TARLOW:  Yes, I apologize.

2    BY MR. TARLOW:

3    Q.    Do you recall the band Mother's Milk, sir?

4    A.    Yes.

5    Q.    Who was in Mother's Milk?

6    A.    It was Jim Masdea, Tom Scholz, myself, Frank Crimoni on

7    bass, and there were -- there was a singer, he called himself

8    "Rabid."  Honestly, I don't think I ever knew his last name.

9    Q.    What instrument did you say Mr. Crimoni --

10:28 10   A.    He was a bass player.

11   Q.    And what instrument did you play in Mother's Milk?

12   A.    I was a guitar player.

13   Q.    And what instrument did Mr. Masdea play in Mother's Milk?

14   A.    Drummer.

15   Q.    What instrument or instruments did Tom Scholz play in

16   Mother's Milk?

17   A.    He played the keyboards and guitar.

18   Q.    Do you remember when Mother's Milk began recording or

19   performing -- performing first?

10:29 20   A.    Well, we did very, very few shows.  I think the first

21   shows we did -- I think it was 1974.  This is a long time ago.

22   Q.    All right.

23   A.    We signed up with a manager -- what was his name?  Paul

24   Macci had a company called ELF Management.  And we signed with

25   him, and he sponsored us to do a few gigs.  We did, I think,

1    three shows as Mother's Milk, one of them in Harvard Square.  I

2    remember that one.

3    Q.    Prior to your first public performances with Mother's

4    Milk, did Mother's Milk rehearse together?

5    A.    Yeah, we rehearsed.

6    Q.    Do you recall when you first began to rehearse together?

7    A.    Well, this was kind of a continuous process through the

8    '70s.  It's hard to, you know, give specific dates to all this

9    stuff.

10:30 10    Q.    Okay.

11          If you can give an approximate year as to when

12    Mother's Milk began to work together musically.

13    A.    Oh, I would say '73.

14    Q.    So beginning in 1973, you were working with Mother's Milk.

15          Did Mother's Milk have more than one singer?

16    A.    Yes.

17    Q.    How many singers did Mother's Milk have?

18    A.    Well, there were -- let me get this straight.  There's a

19    singer named Dana, who sang on that song "San Francisco Day"

10:30 20    which was before Mother's Milk.  And "Rabid" was the singer who

21    did the most of the live shows.  And then I introduced Brad

22    Delp to Tom, and Brad Delp came in and did one show with us, I

23    think it was Sandy's Jazz Club up in Salem.

24    Q.    Do you recall when you introduced Brad Delp to Tom Scholz?

25    A.    I would say it's '73.

1    Q.    Do you know if -- strike that.

2          At some point, you just testified that you -- strike

3    that.

4          You testified a few moments ago that you recalled

5    signing a management agreement with ELF Management; is that

6    correct?

7    A.    Yes.

8    Q.    And do you recall which members of Mother's Milk signed

9    that management agreement?

10:31 10  A.    It was just Tom Scholz and myself.  Brad Delp had just

11   gotten married at the time and took a job at Hot Watt, making

12   heating elements for Mr. Coffee machines and didn't want to

13   commit to the band at the time, so he didn't want to sign the

14   agreement.

15   Q.    So -- and you just testified that you played three shows

16   while you were under management from ELF Management; is that

17   correct?

18   A.    Yeah, I believe it was -- we played Boston College and

19   Harvard Square and Sandy's Jazz Club.

10:32 20  Q.    Did you participate in any recordings at that time with

21   Mr. Scholz?

22   A.    I was still playing on the recordings at that point, yes.

23   Q.    And where were these recordings being made?

24   A.    In Tom's basement.

25   Q.    How often at that time were you going to Tom's basement?

A.    Fairly often.  At this point, I had left college and taken

over running my father's auto body shop, and Tom was a

full-time engineer.  So it was mostly just on nights and

weekends.

Q.    And at some point in time, did you do anything with any of

those recordings that you were making with Mr. Scholz?  Did you

attempt to do anything with any of those recordings that you

were taking?

A.    Well, before the ELF Management thing, Tom and I took some

of the recordings we had made down to New York.  We drove down

in my car, went around to the record companies with our tapes

in the hopes that somebody would pick up on them, but we didn't

get past the front desk.

Q.    Now, at some point, did -- what happened with Mother's

Milk?  What happened with that band?  At some point, did

something occur?

      Would you like me to repeat the question?

A.    Yeah, I'm not sure --

Q.    How did Mother's Milk end?

A.    Well, I guess, you know, we hadn't gotten a recording

contract.  I think we just kind of moved on to the next thing

really.

Q.    And what was the next thing you moved on to, sir?

A.    Well, at this point, Tom had bought some new equipment and

upgraded the studio to some really quality equipment and

1  started recording -- rerecording some of the demos we had done

2  and some new material, and of course in the hopes to get a

3  record deal.

4  Q.   All right.

5       And when you say rerecording some of the material you

6  had done, do you recall what any of that material was?

7  A.   Well, the "San Francisco Day," "90 Days," some other

8  songs.

9  Q.   Just to remind me, sir, "San Francisco Day" became what

10:35 10  song?

11  A.   "Hitch a Ride."

12  Q.   And "90 Days" became what song?

13  A.   "More Than a Feeling."

14  Q.   Now, with respect to the last demos that you recall being

15  recorded of "More Than a Feeling," did you play on that demo,

16  sir?

17  A.   I didn't.

18  Q.   And with respect to "Hitch a Ride," did you play on that

19  demo, sir?

10:35 20  A.   The second demo, no.

21  Q.   Have you ever claimed that you played on those demos, sir?

22  A.   No.

23  Q.   At the time when those demos were being made, were you

24  still rehearsing music with Mr. Scholz?

25  A.   Yes.

```
 1    Q.   And who was involved in those rehearsals, sir?
 2    A.   It was still Jim Masdea on drums; Tom was playing guitar,
 3    keys, and bass; and Brad Delp was singing.
 4    Q.   And do you recall what type -- what songs that you were
 5    rehearsing at that time?
 6    A.   Well, some of the songs from the first record --
 7    Q.   Do you recall what those were, sir?
 8    A.   Gee, I'd have to look at the record.
 9         MR. TARLOW:  Your Honor, may I have the record
10    delivered to the witness?
11         THE COURT:  You may approach.
12         (Pause.)
13    A.   Well, "Smokin'" -- one of the early demos was called
14    "Shakin'," that became "Smokin'."  "San Francisco Day" became
15    "Hitch a Ride."  Let's see.
16         (Pause.)
17    A.   I guess I should have gone back and looked at the demo.
18         Honestly, I'm not totally sure which songs were
19    involved.  I think "Piece of Mind" was an early version of
20    "Something About You" with a different title.  I'm not sure
21    what the title was.
22    Q.   Were you rehearsing "90 Days" at that point or were you
23    rehearsing it as "More Than a Feeling" at that point?
24    A.   "More Than a Feeling" didn't come until after that last
25    demo.  That was after the demo tape that was sent in to the
```

1    record company that got the record deal.  I think Tom came up

2    with the last version of "More Than a Feeling" after that.

3    That would be late in '75, I think.

4    Q.   So those group of musicians that were rehearsing at that

5    time, where were you rehearsing?

6    A.   It was in Tom's basement.

7    Q.   Did that group of musicians publicly perform at any time

8    during the time period we're describing now when these

9    rehearsals were happening and these demos were being made?

10:38 10    A.   No.  No.  The first time we did any real performance I

11    guess you could call it was when we did the showcase in the end

12    of '75 for the record label.

13    Q.   We'll get to that in a moment sir.

14        We've been using the word "demo" a lot.  Could you

15    explain what a demo is?

16    A.   Well, it's a recording of a song that you're doing to try

17    to get a record company interested so you can rerecord it and,

18    you know, more professional environment and put a record out.

19    Q.   So is there usually a difference between a demo and what

10:38 20    ultimately might wind up on a released record?

21    A.   Well, with the BOSTON demo there wasn't much of a

22    difference at all.  The demo was record quality, which is why

23    the band got signed.

24    Q.   And who engineered those demos, sir?

25    A.   Tom Scholz.

1    Q.   Have you ever claimed any credit for taking any part in

2    the engineering of those demos?

3    A.   No.

4    Q.   Have you ever claimed to have been the author of any of

5    the compositions that were on any of those demos?

6    A.   No.

7    Q.   When I say "have you ever claimed," have you ever done so

8    privately?

9    A.   No.

10:39  10   Q.   Have you ever done so publicly?

11   A.   No.

12   Q.   Now, at some point, sir, did -- at some point, sir, you

13   testified earlier that you played a showcase for a record

14   company.  Do you recall that testimony?

15   A.   Yes.

16   Q.   Could you describe the events leading up to that -- well,

17   could you first explain what a showcase was at that time for a

18   record company?

19   A.   Well, when the record label had an interest in the

10:40  20   recordings they heard, they wanted to see the band live and see

21   the people and see that music performed.

22   Q.   And could you -- and do you recall which record label you

23   performed at a showcase for at that time?

24   A.   It was for Epic Records/CBS.

25   Q.   When you say "Epic Records/CBS," what was the relationship

1    between Epic Records and CBS at that time?

2    A.    Epic was a subsidiary of CBS.

3    Q.    So do you recall when that showcase occurred,

4    approximately what year, what month?

5    A.    It was the day after Thanksgiving in 1975.

6    Q.    Could you describe the events, as you remember them, that

7    led up to playing that showcase?

8    A.    Well, Tom had sent out that demo tape to a bunch of record

9    labels, and there was a fellow named Charlie McKenzie who was a

10:41 10    radio promotion guy.  And he was apparently walking through one

11    of the record label's office, I think it was A&M, and heard

12    some music playing behind the door.  And when the person left

13    the office, he went in and took the number off of the demo

14    tape, which was, of course, Tom Scholz's number, and called him

15    and said that he liked the music and wanted to work with him.

16    Q.    And as you recall what happened --

17    A.    And Charlie McKenzie brought that to Paul Ahern, and the

18    two of them took us on as managers.

19    Q.    So who was Paul -- who did you understand Paul Ahern to be

10:41 20    at that time?

21    A.    Paul Ahern was also a radio promotion person.

22    Q.    And could you describe what a radio promotion person did

23    at that time?

24    A.    They would go to the record stations -- the -- I'm sorry.

25          They would go to the radio stations to get acts'

1    records played.

2    Q.    Do you know if at that time Paul Ahern -- could you

3    explain the difference, as you understood it, the difference

4    between a radio promotions person and a manager?

5    A.    Well, the radio promotion person is hired by the record

6    label to bring the songs to the radio stations to get them

7    played.  Manager would be handling the affairs of the band, not

8    necessarily going to radio stations.

9    Q.    At that time, did you know if Mr. Ahern had any managerial

10:42 10   experience as far as --

11   A.    No, he didn't, as far as I know.

12   Q.    When was the first time you met Mr. Ahern?

13         (Pause.)

14   A.    I'm not really certain.  It was before the showcase.  This

15   was a long time ago.  Honestly, I don't remember the first time

16   I met him.

17   Q.    Do you recall the circumstances under which you met

18   Mr. Ahern?

19   A.    I'm bad.  No, I'm sorry, I don't.

10:43 20   Q.    So at some point in time, you learned that there was going

21   to be this showcase with Epic/CBS; is that correct, sir?

22   A.    Yes.

23   Q.    When did you learn that this showcase was going to occur,

24   was going to happen?

25   A.    Well, it was several months before it happened.

1    Q.    Do you recall how you learned about the showcase?

2    A.    It would have been through Tom.

3    Q.    And did you do anything to prepare for playing this

4    showcase?

5    A.    Well, at that time, Tom had already given them the demo

6    tape which got the record label interested.  He was back in the

7    studio working on some more songs, one of which turned out to

8    be "More Than a Feeling."  And I was working with the band

9    rehearsing for the showcase that was coming up.

10:44 10    Q.    And what band were you working with to rehearse that

11    showcase?  Who was going to be in that band?

12    A.    Well, there's Fran Sheehan was playing bass, Brad Delp

13    singing.  At this point, Jim Masdea wasn't involved, and we

14    brought in another drummer, Dave Courier, to play for the

15    showcase.

16    Q.    Do you recall the circumstances as to how Fran Sheehan

17    became a member of that performing group?

18    A.    I introduced him to Tom.

19    Q.    And do you recall the circumstances as to -- who was going

10:44 20    to be singing --

21    A.    That was Brad Delp.

22    Q.    Do you recall the circumstances as to how Brad Delp wound

23    up being chosen to sing for that group?

24    A.    I introduced him to Tom as well.

25    Q.    And the drummer, sir, who was performing in that showcase,

1    do you recall the circumstances how he became to be a member of

2    that group?

3    A.    Well, Dave Courier played drums at the showcase, but after

4    the showcase, he dropped out.  He wasn't involved anymore.

5    Q.    But do you recall how Mr. Courier got involved with the

6    group?

7    A.    I think Fran Sheehan suggested him.

8    Q.    So how often did you rehearse that group prior to the

9    showcase?

10:45 10    A.    We rehearsed at Fran Sheehan's house several days a week.

11    We put quite a bit of time in it.

12    Q.    And did Mr. Scholz attend any of those rehearsals?

13    A.    Some of them, but he was in the studio working on the new

14    material.  So we were getting the band ready for the showcase.

15    Q.    And did any particular member of that group take a role in

16    directing those rehearsals?

17    A.    Yeah, I would say I was doing that.

18    Q.    And were you communicating with Mr. Scholz at this time as

19    to the status of how the band rehearsals were going?

10:46 20    A.    Oh, sure.

21    Q.    And how often were you communicating with him at that

22    time?

23    A.    We spoke all the time.  I mean, at one point, I -- between

24    apartments, I lived in his house for a while.

25    Q.    Now, where was this showcase?  Where did it take place?

1    A.   It was at a warehouse that belonged to the band Aerosmith.

2    Q.   And could you just describe the setting so that we can

3    describe what a showcase -- I'll get to that in a second.

4         Are you familiar with the term "major label"?

5    A.   Sure.

6    Q.   What is the term "major label" as you understand it to be,

7    sir?

8    A.   Well, at that time, there were several big labels, you

9    know, that had distribution worldwide.  Not an independent

10:47 10   label, which would be, you know, on a small scale.

11   Q.   Would it be fair to say that a major label was -- meant

12   one of the big five or six record labels in the country?

13   A.   Yes.

14   Q.   As you understood it at that time, sir, was Epic/CBS a

15   major label?

16   A.   Oh, sure.  CBS was one of the biggest.

17   Q.   Was this, in fact, a big deal, to be showcasing for a

18   major label in the '70s?

19   A.   Oh, yeah.  It was our big break.

10:47 20   Q.   Can you describe the setting, sir, for us?  How you set up

21   for this showcase -- was it at the Aerosmith rehearsal space?

22   A.   Yeah.  It was basically a big, empty room with a stage.

23   At the time, we didn't have a whole lot of equipment, so we

24   hobbled together enough equipment to do the showcase.  I think

25   we only had about 20 minutes' worth of material.

1  Q.   And do you recall what material you performed at that

2  showcase?

3  A.   It was the songs on the demo tape.

4  Q.   And do you recall what those songs were?

5  A.   Okay.

6  Q.   I'm sorry, sir.  Is it the same songs you couldn't

7  remember --

8  A.   Yes.  I'm getting old.  I am old.  Put it that way.

9  Q.   And do you recall who from Epic/CBS was present at that

10:48 10  showcase?

11  A.   I believe it was Lenny Petze and Lenny Columns (phon.) was

12  the regional promotional guy.  I believe he was there.  There

13  were only four or five people; a few friends.  "Sib" Hashian,

14  who ended up being the drummer in BOSTON, was there on my

15  invitation as well.

16  Q.   Was he there to perform, sir?

17  A.   No.

18  Q.   Was Mr. Ahern at that showcase?

19  A.   I don't know if he was.  I think Charlie McKenzie was

10:49 20  there.  I don't remember Paul Ahern being there.

21  Q.   So after that showcase, did you continue to perform and/or

22  work on demos with Mr. Scholz?

23  A.   Well, he recorded another few songs.  Like I said, it was

24  "More Than a Feeling" -- I didn't play on those as well, but

25  after the recording was -- can you give me the question again?

1    I got confused there.

2    Q.   So after that showcase, did you continue to perform

3    with --

4    A.   Oh, perform, no.

5    Q.   -- with Mr. Scholz?

6    A.   That was our only performance until we began touring.

7    Q.   Okay.

8         Did you -- after that performance -- did you have

9    occasion to hear any of the subsequent demos that were recorded

10:50  10   by Mr. Scholz after the showcase?

11   A.   Oh, sure.  We were -- we were in touch all the time.

12   Q.   Were you with him during the recording process at any

13   point of those demos?

14   A.   No.

15   Q.   Have you claimed to be with him during the recording

16   process of those demos?

17   A.   No.

18   Q.   Have you ever claimed publicly or privately to have been

19   part of the recording process of those demos?

10:50  20   A.   No.  I've never tried to take credit for things I didn't

21   do.

22   Q.   So now at some point in time, sir, did -- strike that.

23        Did you have a particular name?  Was the group using a

24   particular name at that point in time?

25   A.   No.  We didn't have any name at all at that point.

1    Q.   All right.  When do you recall -- do you recall the

2    circumstances of how the band BOSTON got its name?

3    A.   I've heard two or three different versions of how that

4    happened.

5    Q.   Your memory.  Do you recall -- do you have a memory of how

6    the band BOSTON got its name?

7         MR. GREEN:  Objection.  Can we lay a foundation here,

8    your Honor?

9         THE COURT:  Well, sustained as to that.  You can lay a

10:51 10   foundation.

11        MR. TARLOW:  I thought that was a foundation.

12   BY MR. TARLOW:

13   Q.   Do you have personal knowledge as to how the band BOSTON

14   got its name?

15   A.   Well, the band hadn't been named, and it was almost

16   through the recording process with the first record.  I heard

17   one story that --

18   Q.   No, sir, your personal knowledge.

19        THE COURT:  Yes, your personal knowledge.

10:51 20   A.   My personal knowledge.

21        No.  Like I said, I've heard several versions.  I'm

22   not sure which one is the real one.

23   Q.   What is your first memory that the band named BOSTON, as

24   to when it was used?

25   A.   Well, I remember the suggestion that it be called BOSTON,

1    and, of course, Chicago was a big band at the time and, you

2    know, we weren't really sure whether that was the way to go.  I

3    don't think Tom was particularly excited about it at first, but

4    I don't know, it just kind of made sense, I guess.

5    Q.   Do you recall ultimately -- strike that.

6              As you understand it, as you recall it, who

7    ultimately -- what were the names of the members that

8    ultimately became the band BOSTON?

9    A.   It was Tom Scholz, Brad Delp, myself, "Sib" Hashian, and

10   Fran Sheehan.

11   Q.   Do you recall how that group came to be formed?

12   A.   Well, it was a long process over the course of many years.

13   It's kind of an open-ended question.

14   Q.   Well, if we just refer to those names you just mentioned

15   as the final lineup, do you have a memory as to when the final

16   lineup became established?

17   A.   Everybody was involved except for "Sib" Hashian at the

18   showcase.  And when David Courier, the drummer who played the

19   showcase, dropped out, "Sib" Hashian came in.

20   Q.   Do you recall --

21   A.   Became the drummer.

22   Q.   Do you recall how "Sib" Hashian came to be a member of the

23   band?

24   A.   Well, I introduced him to Tom.  I brought him in.  He had

25   played with us years earlier.

1  Q.   And how soon after the showcase did that final lineup get

2  solidified?

3  A.   Right afterwards.

4  Q.   There wasn't any lapse in duration in time between the

5  showcase and the final lineup being solidified?

6  A.   No.

7  Q.   Now, at some point in time, sir, there was a record

8  contract with CBS/Epic, was there not?

9  A.   Yes.

10:54  10       (Pause.)

11  Q.   Do you recall approximately when that record contract was

12  signed?

13  A.   The first record deal was, I believe, February of '76.

14       MR. TARLOW:  Your Honor, I'd like to publish Exhibit

15  Number 6 to the jury.

16       THE COURT:  You may.

17       THE WITNESS:  I got it wrong.

18       THE COURT:  It may be published if it's --

19       MR. TARLOW:  You know what, I thought I was looking at

10:55  20  the stickered exhibits -- oh, it is.  The sticker is at the

21  bottom.

22       This is the correct exhibit, your Honor.

23       THE COURT:  Okay.  There it is.

24  BY MR. TARLOW:

25  Q.   Mr. Goudreau, I'm going to show you what has been marked

1    Exhibit 6, sir.  Do you see that document?

2    A.   Yes.

3    Q.   And I'm going to scroll down to the -- actually, could you

4    just read the first paragraph --

5         THE COURT:  Just speaking for myself, you may want to

6    make it bigger.

7         MR. TARLOW:  Thank you, your Honor.

8         THE WITNESS:  Thank you.

9    BY MR. TARLOW:

10:56 10   Q.   Where it says, "Gentlemen:  Reference" -- could you read

11   that through the first paragraph?

12   A.   "Reference is made to the agreement between us dated

13   February 1, 1976, in respect of the services of the recording

14   artist P/K/A "BOSTON" (the artist) (CRU 76-74)" -- whatever

15   that is -- "as such agreement has been heretofore modified or

16   amended or the term thereof extended (hereinafter collectively

17   referred to as the Agreement)."

18   Q.   That's fine, sir.

19        Do you happen to know what "P/K/A" stands for?

10:56 20   A.   Publicly known as.

21   Q.   Is that your understanding?

22   A.   I think so.

23   Q.   Let's go down to the last page of this document, sir, this

24   exhibit.

25        And do you -- could you just state for the record -- I

1    know the jury can see it, but whose signatures appear at the

2    end of this document?

3    A.    Yes.  Do you want me to read them?

4    Q.    Yes, please.

5    A.    Donald T. Scholz, Bradley Delp, Barry Goudreau, Fran

6    Sheehan, and "Sib" Hashian.

7    Q.    If I go to the first page, sir, if you just look right

8    here.  Can you read what date the document is made as of?

9    A.    It says as of December 15, 1976.

10:57 10   Q.    Do you know if you actually signed this document on that

11   date?

12   A.    No, I don't remember.

13   Q.    Now, at this point in time, when you and Mr. Hashian,

14   Mr. Scholz and Mr. Sheehan and Mr. Delp signed this agreement,

15   did you know if there was a prior agreement with any of those

16   members -- any of those members with CBS/Epic?

17   A.    My understanding was that Tom and Brad signed some sort of

18   agreement with Paul Ahern.

19   Q.    And did you know of that -- when did you learn about that

10:58 20   agreement, sir?

21   A.    The agreement with Ahern?

22   Q.    Yes, sir.

23   A.    Around the time that it happened.

24   Q.    And did you know Mr. Ahern at some point had signed a deal

25   on behalf of Mr. Scholz and Mr. Delp with CBS/Epic?

1    A.    That was my understanding, sure.

2    Q.    Did you have an understanding at that time as to why only

3    Mr. Scholz and Mr. Delp had signed the agreement with

4    Mr. Ahern?

5    A.    Well, I was told by Tom and Paul Ahern that it was the

6    practice of the record label to sign the main songwriter and

7    the singer.

8    Q.    And did you have any complaints at that time -- did you

9    have any concerns at that time as to why you were not signed to

10:59 10    the first deal with Mr. Ahern or why Mr. Ahern didn't sign you

11    to the deal with CBS/Epic?

12    A.    No.  We were told that, you know, we would be signed at

13    some point.  It wasn't something to be concerned about.

14    Q.    And did that, in fact, happen, sir?

15    A.    It did.

16    Q.    And the document we're looking at, Exhibit 6, is that, in

17    fact, the document that you signed?

18    A.    Yes.

19          THE COURT:  Counsel, given the time, is this a good

10:59 20    place to break or are you --

21          MR. TARLOW:  Be very welcome from me, your Honor, if

22    we could take a break.

23          THE COURT:  Sir, we're going to take 20 minutes.  You

24    can step down.

25          Jurors, we'll take our 20-minute break and then we'll

 1    resume.

 2                THE CLERK:  All rise.

 3                (Jury left the courtroom.)

 4                THE COURT:  Counsel, anything before we break?

 5                MR. GREEN:  No, your Honor.

 6                THE COURT:  Twenty minutes.

 7                MR. BAKER:  Thank you, Judge.

 8                (Recess taken.)

 9                THE CLERK:  Court is in session.  Please be seated.

10    BY MR. TARLOW:

11    Q.   Can we please look at Exhibit 59.

12                Is there any delineation on the debut album as to who

13    performed which instruments on which song?

14    A.   No.

15    Q.   Is there any delineation as to who produced any particular

16    song that's on that debut album?

17    A.   No.

18    Q.   Have you ever taken any credit for producing "Let Me Take

19    You Home Tonight"?

11:30 20    A.   No.

21    Q.   Have you done that publicly or privately?

22    A.   No.

23    Q.   After -- was "Let Me Take You Home Tonight" mixed in

24    California as well?

25    A.   I believe Tom mixed that back in Watertown.

1    Q.    Were you there during the mixing process of that?

2    A.    No.

3    Q.    Have you ever taken any credit for the mixing of that

4    song?

5    A.    No.

6    Q.    Other than "Let Me Take You Home Tonight," did you play on

7    any other recordings on the debut album?

8    A.    Yes.

9    Q.    Which ones, sir?

11:31 10    A.    I played on "Foreplay," on the song "Long Time," and "Let

11    Me Take You Home Tonight."

12    Q.    Now, "Foreplay," "Long Time," how are they -- that

13    composition or those compositions, how are they listed on the

14    back of the debut album?

15    A.    It's "Foreplay/Long Time."

16    Q.    Sir, as you understand it, is it one composition or two?

17    A.    Well, "Foreplay" is an instrumental piece, and "Long Time"

18    is a song with vocals.  I would say it's two pieces, but that's

19    a matter of opinion, I suppose.

11:31 20    Q.    Could there be an argument that they're one piece?

21    A.    Sure.

22    Q.    To your memory, were they recorded as one piece or were

23    they recorded as two separate tracks?

24    A.    Well, they were recorded separately and then put together.

25    Q.    Now, after the record -- the debut record was finished,

1    what do you recall -- what's your next significant memory as to
2    what happened with the band BOSTON?
3    A.    Well, before the recording was done, we started rehearsing
4    for the tour that we knew would be coming up.
5    Q.    And where were you rehearsing?
6    A.    That's a good question.  We had been rehearsing at Fran
7    Sheehan's house.  It's a very long time ago.
8    Q.    So the songs that you were rehearsing, were they, in
9    fact -- do you recall what songs you were rehearsing at that
11:33 10    time?
11    A.    Well, it's all the songs on the first record.
12    Q.    Any other songs?
13    A.    We had another few pieces that we added in, kind of a
14    blues song -- I mean, the record is only 38 minutes long, so we
15    had to kind of stretch to get a whole set out of it.
16    Q.    And did Mr. Scholz participate in those early rehearsals?
17    A.    Well, he was still working in the studio early on.  So he
18    did later on, but not early on.
19    Q.    And was any particular member of the band sort of
11:33 20    supervising or conducting the rehearsals?
21    A.    I would say I was.
22    Q.    And how did you rehearse the band -- at some point, did
23    you go on a tour to support the debut album?
24    A.    Yes.  We started touring as soon as the record came out.
25                MR. GREEN:  Excuse me, your Honor.  Can I make a

1    suggestion since we're off this exhibit, just so there's no

2    distraction, that it can be shut off?

3            THE COURT:  It can be shut off.

4            MR. GREEN:  Thank you.

5    BY MR. TARLOW:

6    Q.    So how long had you rehearsed the band until you began the

7    first tour?  Do you recall how long that occurred?

8    A.    It would be several months.

9    Q.    Did you have any source of income during that period of

10   time?

11   A.    No.

12   Q.    How were you supporting yourself?

13   A.    I lived really cheaply.

14   Q.    Now, the first tour, do you remember when it began?

15   A.    We did a few dates right around the time that the record

16   came out.  It was just a matter of weeks afterwards that we

17   started doing regular shows.

18   Q.    And at some point, did the record begin to -- did the

19   record begin to gain some traction?

20   A.    Oh, it took off like a rocket.

21   Q.    Do you recall what the first song that took off like a

22   rocket off the debut album was?

23   A.    It was "More Than a Feeling."

24   Q.    At some point in time, did your life change as a result of

25   that song?

1    A.    Oh, yeah.

2    Q.    And could you explain to me what happened as soon as that

3    song started to take off like a rocket?

4    A.    Well, we -- we had expected it would be a long, hard road.

5    You know, at that period, most bands, took them, you know, two

6    or three records to really get established and go out on the

7    road and do lots and lots of tours and dates to build it up.

8    This all happened so fast that, you know, we didn't even have

9    the equipment together or road crew or anything.  So, you know,

11:36 10    the first dates we started to do was just kind of hobbled

11    together.

12    Q.    And from the point when -- from the point when Mr. Hashian

13    joined the band to the point when you left the band, had that

14    original lineup ever changed?

15    A.    No.

16    Q.    Now, let's talk about the first tour, and I want you to

17    move past in your mind those first handful of gigs before the

18    record took off like a rocket.

19    A.    Sure.

11:36 20    Q.    Do you recall the first significant venue you played the

21    band BOSTON?

22    A.    Well, the first dates we did were out in the Midwest.

23    They booked us in a short tour of clubs in the Midwest.

24    Q.    Following the short tour of clubs in the Midwest, what was

25    the next set of dates you recall?

          1    A.    Well, the first major tour we did was opening up for Black

          2    Sabbath.

          3    Q.    And how many dates did you do with Black Sabbath?

          4    A.    We toured the whole following '76.  I'm not entirely sure.

          5    Q.    Up until that point, had you played each and every show

          6    with the band BOSTON?

          7    A.    Yes.

          8    Q.    Did you do publicity for the band BOSTON?

          9    A.    Yes.

11:37    10    Q.    Can you just explain what doing publicity means or meant

         11    at that time?

         12    A.    At that time, you used to do in-store appearances, where

         13    you'd go to a record store and sign autographs.  We went to

         14    radio stations in pretty much every city we went to.

         15    Q.    By the way, when you were doing publicity at that time, do

         16    you know who set up those publicity events?

         17    A.    That would be through the record label.

         18    Q.    Did you have any control over those publicity events?

         19    A.    No.

11:37    20    Q.    How did you know to participate in those events?

         21    A.    Well, our manager would tell us where to show up, and we'd

         22    show up.

         23    Q.    Do you know if the band BOSTON was getting any press

         24    advertising at that time?

         25    A.    Oh, yes.

1    Q.    Did you have any control of the placement of that press

2    advertising?

3    A.    No.

4    Q.    Would you -- do you know what a photo shoot is?

5    A.    Sure.

6    Q.    What's a photo shoot?

7    A.    Taking pictures for publicity.

8    Q.    And did you participate in photo shoots with the band

9    BOSTON at that time?

11:38 10    A.    Yes.

11    Q.    If you could possibly quantify it, how many?

12    A.    I couldn't tell you really.

13    Q.    Now, when you would do these photo shoots, if you could

14    direct your attention to the debut album again, do you see any

15    type of -- could you describe a graphic on the front of that

16    record?  Do you see one?

17    A.    The front --

18    Q.    Yeah.

19    A.    Yeah.

11:38 20    Q.    Do you see where the word "BOSTON" appears on the record?

21    A.    Yeah.

22    Q.    And do you see the logo, I'll refer to it as, on the first

23    record?

24    A.    Sure.

25    Q.    When you did those photo shoots, did the logo ever appear?

A.    Sometimes.

Q.    What about when you toured live, did the logo ever appear in any of your stage productions?

A.    Yes.  We had a banner that would be put up behind the band with the logo on it.

Q.    Did you have any merchandise at that time for the band BOSTON?

A.    It took us a while to get that together, but we had T-shirts eventually.

Q.    And the T-shirts that you had at that time, do you recall whether or not they had any particular mark on them?

A.    Yeah, they had the BOSTON spaceship on them.

Q.    Do you remember whether any of the T-shirts had just the name BOSTON without that mark?

A.    No.

Q.    No, you don't recall or, no, they didn't?

A.    No, they didn't.  It was this.

Q.    How long did you -- once you got on sort of the big part of the tour, how long did you tour for behind that debut album?

A.    We toured from August '76 to the end of '77.

Q.    And what mode of transportation did you use during that tour, sir?

A.    Well, early on, we drove around in rental cars.  But when we got into 1977, we had our own airplane.

Q.    Did that airplane bear any particular logo, sir?

1   A.   Yes.  It had a BOSTON logo on the side, sure.

2   Q.   On the outside of the plane or the inside, sir?

3   A.   Oh, on the outside.

4   Q.   Did anywhere on the outside just the word "BOSTON" appear

5   without that logo, sir?

6   A.   No.

7   Q.   Now, were you away from home for long periods of time

8   during that first tour?

9   A.   Oh, sure.

11:40 10   Q.   Now, at some point in time -- would you characterize that

11   first tour as somewhat successful?

12   A.   Oh, wildly successful, sure.

13   Q.   Now, after the first tour -- do you recall when that first

14   tour came to an end?

15   A.   Like I said, it was late in '77, fall of '77.

16   Q.   So what did you do with respect to your musical career --

17   what did you do after that first tour ended?

18   A.   Well, went home and take a rest mostly.

19   Q.   After you caught up on some rest.

11:41 20   A.   Well, the record label was already asking when the next

21   record would come out, so, you know, the next order of business

22   was putting another record together.

23   Q.   On the second record, sir, had any of the songs or the

24   compositions for the second record been written by the time you

25   ended the first tour?

A.   I believe there were a couple of songs that were developed

earlier.  "Don't Be Afraid" I think we had went back to before

the first record.  That ended up on the second record, but I

think that might have been the only one.

Q.   Can you describe the process of recording the second

record?  How did BOSTON record the second record?

A.   It was done the same way, in Tom's basement.

Q.   This time did you need to engage in the same rouse as you

did for the first round?

A.   No, no.

Q.   Would it be fair to say the cat was out of the bag at that

point in time?

A.   Yes.  By then, everybody wanted to do their record out of

their basement.

Q.   Now, on the second record, did you participate in the

recording process?

A.   I did.

Q.   And could you describe what your participation was in the

recording process of the second record?

A.   I played guitar on one, two, or three of the songs.

Q.   And do you recall what those songs were, sir?

A.   "Don't Look Back," a certain instrumental piece called

"The Journey," and a song that Brad wrote, "Used to Bad News."

Q.   And where did you record your tracks on the second record?

A.   In Tom's studio.

1    Q.    And other than playing on those songs, did you have any

2    other participation in the second record?

3    A.    In the recording process?

4    Q.    In the recording process.

5    A.    No.

6    Q.    Have you ever claimed publicly or privately to have any

7    other participation on the second record other than what you've

8    just testified to?

9    A.    No.

11:43 10    Q.    Who did the engineering for the tracking of the second

11    record?

12    A.    I think Tom had a couple of different assistants.

13    Q.    Who was primarily responsible?

14    A.    Tom was primarily responsible.

15    Q.    Have you ever claimed any credit for engineering the

16    second record?

17    A.    No.

18    Q.    Who mixed the second record?

19    A.    Tom did.

11:43 20    Q.    Have you ever claimed publicly or privately to have any

21    credit for the mixing of the second album?

22    A.    No.

23    Q.    Did you write any songs on the second record?

24    A.    No.

25    Q.    Have you ever claimed publicly or privately to have

1    written any of the songs on the second record?

2    A.    No, no.

3    Q.    After the second record was completed, I think musicians

4    call it in the can; is that correct?

5    A.    Yes.

6    Q.    After the second record was in the can, what happened

7    next?

8    A.    Well, we went out on our second tour, which was bigger

9    than the first tour.

11:44 10    Q.    How was the second record received publicly?

11    A.    It was a big hit.

12    Q.    Was it as big a hit as the first record?

13    A.    Well, it didn't sell as many copies, but it was still a

14    big hit.

15    Q.    How would you describe Mr. Scholz's musical abilities,

16    sir, back then and still today?

17    A.    Well, I think he's been described as a genius, and I would

18    agree with that.

19    Q.    Have you ever disagreed with that characterization of

11:45 20    Mr. Scholz, either publicly or privately, as to his musical

21    abilities?

22    A.    No.

23    Q.    Now, how was your mode of transportation on the tour

24    behind the second record?

25    A.    We had an airplane again.

```
 1    Q.    Was it the same airplane?

 2    A.    Well, still had a logo.  Whether it was the exact same

 3    plane, I couldn't be sure.  We leased it; we didn't own it.

 4    Q.    And the cover of the second record -- this is back when we

 5    still used records, correct?

 6    A.    Yes.

 7    Q.    The cover of the record, sir, what was on the cover of the

 8    second record, if you remember?

 9    A.    Well, it was a different version of the spaceship.

10    Q.    And did it have the same BOSTON logo on it, sir?

11    A.    It did.

12    Q.    Now -- could you just -- on the back of the second record,

13    if you could --

14    A.    I don't --

15    Q.    The first record, sir, if you could just hold that up.

16          That particular photo, sir, that's you on the left,

17    correct?

18    A.    That's me.

19          THE COURT:  Again, the album we've been talking about

20    a few times is Exhibit 59.

21          MR. TARLOW:  Thank you, your Honor.

22          THE COURT:  Counsel.

23    BY MR. TARLOW:

24    Q.    That particular photo, if you could hold that up, sir.

25    Have you seen that photo used anyplace else other than on the
```

1    back of that record?

2    A.    I've seen it in promotions, sure.

3    Q.    To this day, do you see it anyplace else other than on the

4    back of that record?

5    A.    Well, actually, I saw it used to promote Tom's --

6                MR. GREEN:  Objection.

7                THE COURT:  Counsel, in a word?

8                MR. GREEN:  Best evidence here, and relevance, your

9    Honor.

11:46 10                THE COURT:  Overruled.  I'll allow it.

11                Counsel, I don't know if you want to state the

12    question again.

13    BY MR. TARLOW:

14    Q.    Have you seen that photo used anyplace else in the last

15    three years other than on the back of that record?

16    A.    Yes.  There was a ticket agency selling tickets for the

17    2014 tour, and this picture was used in the promotion.  It was

18    up for the whole tour.

19    Q.    2014 tour of who?

11:47 20    A.    BOSTON.

21    Q.    Did you authorize that picture to be used for the

22    promotion of the 2014 BOSTON tour, sir?

23    A.    No.

24    Q.    Now, at some point in time, sir, did you part ways with

25    the band BOSTON?

```
 1    A.    I did.

 2    Q.    Could you describe the circumstances as to how you parted

 3    ways with the band BOSTON?

 4    A.    Tom called us together for a meeting in his house.  It was

 5    January of 1981.  And he said that he would no longer work with

 6    me, and he wanted the partnership to buy out my share of the

 7    band.

 8    Q.    Now, what was your understanding of the partnership up

 9    until that point, sir?

10    A.    Well, it was a five-way partnership.  We all owned an

11    equal share in BOSTON.

12    Q.    And when did you understand that partnership to have

13    began, sir?

14    A.    I would assume -- I can't assume, can I?

15          With the recording of the first record.

16    Q.    Now, sir, when did you consider yourself to become a

17    member of the band BOSTON?

18    A.    I was involved long before it was BOSTON, so I always felt

19    I was a member.

20    Q.    Now, if you could just put a date on it.  When do you

21    recall the meeting that you just described occurring.

22    A.    The meeting where I was asked to leave?

23    Q.    Yes, sir.

24    A.    I believe it was January of 1981.

25    Q.    And at some point in time, did you reach an agreement with
```

11:48 (line 10)

11:49 (line 20)

1    all of the members of the band BOSTON as to how you were going

2    to exit the band?

3    A.    Eventually we did, sure.

4         MR. TARLOW:  Your Honor, I'd like to publish Exhibit

5    Number 8 for the jury.

6         THE COURT:  You may.

7    BY MR. TARLOW:

8    Q.    Now, was that agreement as to how you were going to exit

9    the band BOSTON reduced to writing?

11:50 10    A.    Produced in writing?

11    Q.    Yes, reduced to writing.

12    A.    Yes, yes.

13    Q.    I'm showing you, sir, Exhibit 8.  Is that, in fact, the

14    agreement that you reached as to how you were going to exit the

15    band?

16    A.    Yes.

17    Q.    Now, I'm going to just go back to the last page of Exhibit

18    8, sir.

19         And who signed this agreement?  I know it's signed

11:50 20    multiple times, you don't need to repeat the names, but who

21    signed this agreement?

22    A.    Donald T. Scholz, Brad Delp, "Sib" Hashian, Barry

23    Goudreau, and Fran Sheehan.

24    Q.    Now, above everybody's name but yours, sir, would you look

25    on the left-hand side -- and I'll make a little bit bigger so

1    you can see it -- there's the word "BOSTON."  Do you see that,

2    sir?

3    A.    Yes.

4    Q.    And that's on the left-hand side?

5    A.    Yes.

6    Q.    And on the right-hand side, you don't see the word

7    "BOSTON"; is that correct?

8    A.    Correct.

9    Q.    When you entered into this agreement, did you enter into

11:51 10    this agreement with Mr. Scholz or with a group of individuals?

11    A.    With the whole partnership, the whole band.

12    Q.    Now, sir, I'm going to direct your attention back to the

13    first page of the agreement.

14          You can see where I'm indicating with my little mouse

15    pointer here, little recitation where it begins "whereas."

16    A.    Yes.

17    Q.    Could you please read that out loud to the jury?

18    A.    It says, "Whereas, Goudreau is and has been an equal

19    partner in the Massachusetts oral partnership known as BOSTON."

11:51 20    Q.    And at the time when you signed this, was it your

21    understanding that you were and had been an equal partner in

22    the Massachusetts oral partnership known as BOSTON?

23    A.    Yes.

24    Q.    And then the second recitation, what was BOSTON World

25    Tours?

1    A.    That was the entity we had to deal with the touring

2    aspect.

3    Q.    Very, very briefly, could you describe, if you know, sir,

4    why the band would be as one form of entity for recording

5    purposes and the touring entity would be separate?

6    A.    I couldn't tell you.

7    Q.    Okay.

8          Now, would you agree with me, sir, that you were

9    relinquishing any interest you had in BOSTON World Tours, a

11:52 10    touring entity, as well as all interest you had in that

11    partnership BOSTON by this agreement, correct?

12    A.    Yes, I understood that.

13    Q.    Now, before signing this agreement, sir, you had in

14    fact -- had you, in fact, been receiving a one-fifth or a 20

15    percent share of all income from the band BOSTON since its

16    inception?

17    A.    Yes.

18    Q.    Now, as a result of the record contract with CBS, would

19    you agree with me that there are different streams of income

11:53 20    that derive from the record that was created or the records

21    that were created under that deal?

22    A.    Yes.

23    Q.    Now, are you familiar with the term "record royalty"?

24    A.    Yes.

25    Q.    What is a record royalty?

1    A.    Monies paid for performing on the record.

2    Q.    Okay.

3            And did you, in fact, receive 20 percent of those

4    record royalties from day one from the inception of the band

5    BOSTON?

6    A.    Yes.

7    Q.    And do you still receive those today?

8    A.    I do.

9    Q.    Now, there are, in fact, other royalties that are paid as

11:54 10    a result of releasing recordings like this, aren't there?

11    A.    Yes.

12    Q.    Could you name one of the other income streams, one of the

13    other royalties that would be paid as a result of the

14    compositions being released by the record label?

15    A.    Well, there's royalties paid to the writers.

16    Q.    Okay.

17            And you -- so who were the writers on the first two

18    BOSTON records?

19    A.    Mostly Tom, and Brad had a little bit of credit.

11:54 20    Q.    Did you ever share in any of those writer's royalties on

21    the first two records?

22    A.    No.

23    Q.    Did you ever seek to share in those writer's royalties?

24    A.    No.

25    Q.    And with respect to -- other than the writer's royalties,

1  which you didn't share in, were there any other royalties that

2  are paid as a result of the release of the first two records?

3  A.   There are publishing royalties.

4  Q.   When you say "publishing royalties," what do you mean by

5  publishing royalties?

6  A.   My understanding is it's for the use of the songs, or the

7  use of the recordings.  I'm not --

8  Q.   Are you talking about -- are you familiar with the term

9  "mechanical royalties," sir?

11:55 10  A.   Yes.

11  Q.   In fact, those are mechanical royalties paid for what?

12  A.   For the use of the song.

13  Q.   Those would go into the writer's royalties, do you know?

14  A.   I'm not clear.

15  Q.   Are there producer's royalties that are paid?

16  A.   Yes.

17  Q.   Do you know if CBS/Epic paid any producer's royalties with

18  respect to the first two records?

19  A.   Oh, sure.

11:55 20  Q.   Did you share in any of those producer's royalties?

21  A.   No.

22  Q.   Did you ever seek to share in those producer's royalties?

23  A.   No, no.

24  Q.   So the only share that you shared equally in with the

25  other band members were the actual record royalties, correct?

1    A.    Artist royalties, yes.

2    Q.    And was that your understanding as to how the oral

3    partnership was going to work from the beginning?

4    A.    Yes.

5    Q.    And did you ever seek to do anything or take any action

6    other than to engage in business as to how you understood it

7    was going to be from the beginning?

8          That was a really poorly worded --

9    A.    You lost me there.  Can you rephrase that?

11:56 10   Q.    I'll move on.

11         Now, when you signed the Settlement Agreement, what

12   was your understanding as to how you could refer to your

13   previous affiliation with the band BOSTON from that day

14   forward?

15   A.    I could bill myself as "formerly of BOSTON."

16   Q.    From the time when you signed this agreement, from that

17   day forward, can you recall a time when you had not billed

18   yourself or directed someone to bill yourself as "formerly of

19   BOSTON"?

11:57 20   A.    No.

21   Q.    And when you say "formerly of BOSTON," do you have any

22   memory of directing anyone to bill yourself as a "former member

23   of the band BOSTON"?

24   A.    "Former member"?

25   Q.    Yes.

1    A.    I've always said "formerly of BOSTON."

2    Q.    And why do you always use that exact phrase, "formerly of

3    BOSTON"?

4          MR. GREEN:    Object.    I didn't think the witness was

5    done with his last answer, your Honor.

6          THE COURT:    Were you done?

7          THE WITNESS:    Yeah.

8          MR. GREEN:    Excuse me.

9          Thank you, your Honor.

11:57 10       THE COURT:    Mr. Tarlow, you might want to ask that

11    again.

12    BY MR. TARLOW:

13    Q.    And why did you always use the phrase "formerly of

14    BOSTON"?

15    A.    Because that's what my settlement allowed me to do.

16    Q.    So let's talk a little bit about the post-Settlement

17    Agreement career.

18          Well, actually let's build in one little piece before

19    we do that.

11:58 20       Prior to signing the Settlement Agreement, had you

21    released a record under any moniker other than the name BOSTON?

22    A.    Before this?

23    Q.    Yes.

24    A.    I had a solo record, yes.

25    Q.    And when did that solo record come out?

```
 1    A.    1980.

 2    Q.    So after that solo record and after you had signed this

 3    Settlement Agreement -- what label was the solo record on?

 4    A.    That was on Portrait, which was a subsidiary of CBS.

 5    Q.    So after you signed the Settlement Agreement, what's the

 6    next professional music group that you formed?

 7    A.    I had a group called Orion the Hunter in the mid-'80s.

 8    Q.    Who was in Orion the Hunter?

 9    A.    It was myself, Fran Cosmo on vocals, Michael Derosier on

10    drums, and Michael Smith on bass.

11    Q.    With respect to your solo record, who played on that?

12    A.    It was me, Brad Delp, "Sib" Hashian played drums, and Fran

13    Cosmo also sang on it.

14    Q.    The other members of the band BOSTON were on your solo

15    record?

16    A.    Some of them.

17    Q.    How long had you known them?

18    A.    Since I was kid.

19    Q.    Why did you choose them?

20    A.    They were my best friends and people I had always worked

21    with.

22    Q.    When you did that solo record, did you have any intent to

23    somehow trade on the goodwill of BOSTON, you personally?

24    A.    No.

25    Q.    But at that time were you, in fact, still a member of the
```

1    band BOSTON?

2    A.    I was.

3    Q.    And this was prior to your -- any prohibitions on you as

4    to the use of the name BOSTON; is that correct?

5    A.    That's correct.

6    Q.    Did Mr. Scholz ever express to you any displeasure of the

7    fact that you did this solo record with your friends?

8    A.    After it came out, yes.

9    Q.    And what displeasure did he express to you at that time?

12:00 10    A.    I was asked to leave BOSTON.

11    Q.    Now, sir, Orion the Hunter, did you get a label deal?

12    A.    Excuse me?

13    Q.    Did you get a label did with Orion the Hunter?

14    A.    Yes.

15    Q.    A major label deal?

16    A.    Yes, CBS.

17    Q.    Did you release a record?

18    A.    I did.

19    Q.    How many records did it sell?

12:00 20    A.    I think about 125,000.

21    Q.    Did you do a tour?

22    A.    I did.

23    Q.    When did Orion the Hunter end?

24    A.    The record came out in '84.  I think we were done by the

25    next year.

1    Q.    And after Orion the Hunter, what was the next musical

2    endeavor you engaged in?

3    A.    I had a band called RTZ in 1990.

4    Q.    What did "RTZ" stand for?

5    A.    Return to Zero.

6    Q.    Did that have any significance to you, that name?

7    A.    It was basically starting over again.

8    Q.    In a recording studio, RTZ, did it stand for anything in

9    particular?

12:01 10    A.    "RTZ" is a button you press on the machine to go back to

11    the beginning.

12    Q.    That's back when we worked with analog tape?

13    A.    When you used tape, yes.

14    Q.    And did RTZ release a record?

15    A.    We did.

16    Q.    Who were the members of RTZ?

17    A.    It was myself, Brad Delp, Tim Archibald on bass, Brian

18    Maes on keyboards.

19    Q.    With respect to Orion the Hunter, to your knowledge, did

12:01 20    Mr. Scholz ever interfere with how you publicized or performed

21    with Orion the Hunter?

22    A.    No.

23    Q.    What about RTZ, to your knowledge, did he ever interfere

24    with how you publicized or worked with RTZ?

25    A.    No.

|  |  |
|---|---|
| 1 | Q.   Did RTZ do a tour? |
| 2 | A.   We did. |
| 3 | Q.   And did ultimately -- I don't know if I asked you this -- |
| 4 | did it release a record? |
| 5 | A.   We did. |
| 6 | Q.   And what's the name of that record? |
| 7 | A.   RTZ. |
| 8 | Q.   There was no subtitle to that record? |
| 9 |         How many records did that sell? |
| 12:02 10 | A.   I think that one was in the 150, 175 thousand range, |
| 11 | something like that. |
| 12 | Q.   Did a single on that record chart? |
| 13 | A.   Yeah, we had a single that did pretty well. |
| 14 | Q.   What chart did it hit? |
| 15 | A.   The pop chart. |
| 16 | Q.   And do you remember what the song was? |
| 17 | A.   "Until Your Love Comes Back Around." |
| 18 | Q.   Who wrote that song? |
| 19 | A.   Brian Maes. |
| 12:02 20 | Q.   I'm just going to fast-forward.  Did "Until Your Love |
| 21 | Comes Back Around" wind up in a different version as part of an |
| 22 | Ernie and the Automatics repertoire? |
| 23 | A.   No, we didn't do that with the Automatics. |
| 24 | Q.   Now, when did RTZ break up? |
| 25 | A.   Well, the record came out in '90, '91, and I think it was |

```
 1    '90 -- '92 we stopped.  Brad left the band to go back with
 2    BOSTON.
 3              MR. TARLOW:  Madam clerk, my screen has sort of gone
 4    to my home screen; it may be distracting for the jury.
 5              Thank you.
 6    BY MR. TARLOW:
 7    Q.   And after RTZ ended, what's the next musical endeavor that
 8    you recall performing with?
 9    A.   I did a self-produced CD with Brad Delp called
10    "Delp-Goudreau."
11    Q.   And did you -- as far as your knowledge, did Mr. Scholz
12    interfere with you playing with Mr. Delp in releasing
13    "Delp-Goudreau"?
14    A.   No.
15    Q.   How did you release -- was "Delp-Goudreau" released on a
16    major label?
17    A.   No, it was self-released, self-produced, self-released.
18    Q.   How did you distribute the copies of "Delp-Goudreau"?
19    A.   There's a company called CD Baby that you go to over the
20    internet, and they ship them for you.
21    Q.   And is that record still available today?
22    A.   It is.
23    Q.   And did you ever publicly perform with Delp-Goudreau?
24    A.   No.
25    Q.   So that was just solely a studio project?
```

12:03 (line 10)
12:04 (line 20)

1  A.   Well, Brad and I had gotten together and written some

2  songs, and when we got to the point where we had enough songs

3  for a whole CD, we decided to go ahead and put it out

4  ourselves.

5  Q.   Other than putting it on the internet, was there any

6  publicity for the "Delp-Goudreau" record?

7  A.   Very little.  We did it just for the love of the music

8  really.

9  Q.   After the "Delp-Goudreau" project, what's the -- and just

12:05 10  if you could put a year on that, about when --

11  A.   That was 2003.

12  Q.   So when is the next significant musical project that you

13  engaged in after "Delp-Goudreau"?

14  A.   As far as recording?

15  Q.   Yes, as far as recording.

16  A.   Nothing.

17  Q.   Well, we know, sir, that you did wind up recording with

18  Ernie and the Automatics.

19  A.   Oh, okay.  Ernie and the Automatics, sure.

12:05 20  Q.   I'm not going to rehash all the testimony you've heard,

21  but I do want to go through it very briefly for some

22  background, sir.

23       How did Ernie and the Automatics start?

24  A.   "Sib" Hashian had met Ernie.  Ernie backed a play that he

25  was involved with about the Vietnam era, and I went to the

1    opening of the play and Ernie was there.  And that was the

2    first time I met him.

3    Q.   And do you recall the first time that you played music

4    with Mr. Boch?

5    A.   Yes.  "Sib" called me and said he had gotten together and

6    played with Ernie a little bit and asked me if I wanted to come

7    over, so -- and we went over and jammed in the basement.

8    Q.   What kind of music were you playing at that time?

9    A.   You know, it's kind of a blues, faux jazz, I guess you

12:06 10   could say.

11   Q.   And for what purpose were you getting together and

12   jamming?

13   A.   Just for the fun of it.

14   Q.   Was it fun?

15   A.   Yes.

16   Q.   And at some point, did it begin to -- did you begin to jam

17   with other people?

18   A.   Ernie said, Geez, it would be great if, you know, we had a

19   whole band so we could do some events for charity here and

12:07 20   there.  So first we brought in Tim Archibald on the bass, who I

21   had worked with in RTZ.  And we did our first show at the Cape

22   Cod Melody Tent show with that lineup.  And then we brought

23   Brian Maes in on keyboards.

24   Q.   I hate to put you on spot, but we are on trial.  Could you

25   describe -- how would you describe Ernie Boch's musical

1    abilities?

2    A.    He was very enthusiastic.

3          (Laughter.)

4    Q.    At some point in time -- do you recall the first show you

5    played -- strike that.

6          At some point in time, did the band become known as

7    Ernie and the Automatics?

8    A.    Yes.

9    Q.    Who came up with the name?

12:07 10    A.    "Sib."

11    Q.    And were you there when the band was named?

12    A.    No.

13    Q.    So do you recall the first show you played with Ernie and

14    the Automatics?

15    A.    It was the Cape Cod Melody Tent.

16    Q.    Now, when did you realize that this little group that you

17    had been jamming with was actually going to be a band and was

18    going to try to go out -- you guys call it a gig, right?

19    A.    Yeah.

12:08 20    Q.    When did you guys learn you were going to go out and gig?

21    A.    I suppose it was the Cape Cod Melody Tent.  Early on,

22    everything we did had some charitable component to it because

23    that was the idea when we first decided to make it a band.

24    Q.    And what was the charitable component?

25    A.    I'd have to look at the poster.  I don't remember.

1    Q.   Okay.

2         Prior to that first gig at the Cape Cod Melody Tent --

3    do you recall when that was, the Cape Cod Melody Tent gig was?

4    A.   I believe it was 2006.

5         MR. TARLOW:  I'm going to publish Exhibit Number 20

6    for the jury, your Honor.

7         THE COURT:  You may.

8         (Pause.)

9    A.   2007.

12:09 10    Q.   I'm showing you, sir, what's been marked as Exhibit Number

11    20.

12         Is this, in fact, the Cape Cod Melody Tent show you're

13    talking about?

14    A.   Yes.

15    Q.   Prior to this show, to your knowledge, had you seen any

16    advertisement, marketing, or promotions for Ernie and the

17    Automatics?

18    A.   No.

19    Q.   Now, at some point, did you have a concern -- at some

12:09 20    point, did you become aware that there might be some

21    advertising or promotion in connection with the band Ernie and

22    the Automatics?

23    A.   Sure.

24    Q.   And did that cause you some concern?

25    A.   Sure.

```
 1    Q.    Why?

 2    A.    Because I wanted to be billed as formerly of BOSTON.

 3    Q.    Why, sir?

 4    A.    Because that's what my Settlement Agreement allowed.

 5    Q.    So what actions did you take to make sure that you would

 6    be billed as formerly of BOSTON prior to July 26th of 2007?

 7    A.    I told Ernie, Bill me as a former member of BOSTON.

 8    Q.    Did you ever authorize him to bill you as anything other

 9    than as a former member of BOSTON?

10    A.    No.

11    Q.    Do you recall approximately when that conversation took

12    place?

13    A.    It was -- exactly, no, but it would have been before we

14    did the show.

15    Q.    Do you recall in your mind having that conversation with

16    Mr. Boch?

17    A.    Oh, sure.

18    Q.    And after that conversation, did you have any reason to

19    believe that Mr. Boch would do -- would bill you as anything

20    other than as a former member of the band BOSTON?

21    A.    No.  I expected him to do the right thing.

22    Q.    Were you and Mr. Boch friends at that time?

23    A.    Yes.

24    Q.    Had you -- had you been friends -- at what point in time,

25    if you can pin it down, did you consider him to become a friend
```

1  of yours?

2  A.   Well, I had met him probably a year before this, and we

3  were getting together to play music.  Yeah, you know, honestly,

4  he's a very likable guy.  I felt like we were friends pretty

5  early on.

6  Q.   Did you know who he was before you met him?

7  A.   Yes.

8  Q.   How did you know who he was before you met him?

9  A.   Because he's on TV every ten minutes.

12:11 10  Q.   Other than TV, had you seen any other advertisements or

11  promotions that involved Ernie Boch?

12  A.   No, I only knew him from the TV stuff.

13  Q.   Did you feel like you had some understanding of who he was

14  from the TV advertisements that you had seen?

15  A.   From the TV ads?

16  Q.   Not personally.  What he was, what type of business he was

17  in.

18  A.   Oh, yeah, sure, sure.

19  Q.   Now, Ernie and the Automatics, the band, when you talk

12:12 20  about being in the band, do you differentiate being in the band

21  versus owning or controlling the band?

22  A.   Sure.

23  Q.   Can you explain how you differentiate that?

24  A.   The great thing about Ernie and the Automatics is all I

25  had to do was show up and play guitar.

1    Q.    And other than showing up and playing guitar, did you do

2    anything else?

3    A.    No.

4    Q.    Who owned Ernie and the Automatics, the band?

5    A.    Ernie.

6    Q.    Did you ever invest a nickel of your money into Ernie's

7    band?

8    A.    No.

9    Q.    Did you ever wind up being a member or a manager of what

12:13 10    ultimately became Ernie and the Automatics, LLC?

11    A.    No.

12    Q.    Did you ever have any financial interest in Ernie and the

13    Automatics either before its incarnation as an LLC or after?

14    A.    No.

15    Q.    Did you ever have an interest in Open E Records?

16    A.    No.

17    Q.    Were you ever a manager or member or officer or director

18    or a stockholder of Open E Records?

19    A.    No.

12:13 20    Q.    What about Consumer Creativity?  Have you ever had any

21    financial interest in that company?

22    A.    No.

23    Q.    Any ownership or control of that company?

24    A.    No.

25    Q.    Now, I'm not going to go over each and every ad that we've

1    all seen here for the last three days, but you've seen them,

2    sir, sitting in the courtroom, correct?

3    A.    Yes.

4    Q.    With respect to any one of those advertisements or posters

5    or promotional materials, had you seen any one of them before

6    they were used by Ernie for Ernie's band?

7          (Interruption.)

8          MS. STENGER:  Your Honor, I'm so sorry about that.

9          THE COURT:  We'll have the question again, sir.

12:14 10          MR. TARLOW:  I just realized what happened there.

11    BY MR. TARLOW:

12    Q.    Let me break it down, make it a little more simple.

13          When is the first time you saw Exhibit 20, the ad we

14    just saw?

15    A.    Probably when I showed up at the gig.

16    Q.    And when you saw it, how were you -- down the bottom

17    right-hand, sir, how were you billed?

18    A.    "Sib" Hashian, Barry Goudreau, former members of BOSTON.

19    Q.    When you saw that, did that reaffirm anything in your

12:14 20    mind?

21    A.    Well, it reassured me that Ernie was doing the right

22    thing.

23    Q.    And from that point on -- and after that point on, did you

24    have any reason to believe that he was going to do anything

25    other than the right thing?

A.    No.

Q.    And at some point in time -- strike that.

With respect to any of the advertisements that may or may not have been produced by Mr. Boch, did you have any role in creating them?

A.    No.

Q.    Did have you any role in paying for them?

A.    No.

Q.    Had you seen them prior to Mr. Boch using them in any fashion, if, in fact, he used them?

A.    No.

Q.    Did Mr. Boch discuss with you his intention to create any one of those particular ads or promotional pieces?

A.    No.

Q.    Did you find that odd, sir?

A.    No.  You know, Ernie was in control, and Ernie does what he wants to do.

Q.    How did you view -- what was your role in Ernie and the Automatics?  How did you view your role?

A.    I was the guitar player.  I showed up and I played guitar and we had a good time and, you know, we helped out some charities.

Q.    Did you ever see the BOSTON logo used in any of those instrumentalities that Mr. Boch had created?

A.    No.

1    Q.   Now, I'm going to sort of fast-forward.  I want you to

2    fast-forward in your mind to the CD release party.

3    A.   Okay.

4    Q.   At some point time -- I want to back up a little bit so

5    you're clear.

6             At some point in time, did you record an album with

7    Ernie Boch?

8    A.   We did.

9    Q.   And that album is called "Low Expectations."

12:16 10    A.   Yes.

11    Q.   At the time when you recorded it, when you began the

12    recording process -- whose idea was it to record that record?

13    A.   Ernie's.

14    Q.   And at the time when you began to record that record,

15    did -- strike that.

16             When did you first begin to begin the recording

17    process of "Low Expectations"?  That's the Ernie and the

18    Automatics record, correct?

19    A.   When did we begin the recording process?

12:17 20    Q.   When did you begin the recording process?

21    A.   I don't remember exactly, but probably about six months

22    before it came out.

23    Q.   And what was your role in the recording process for that

24    record?

25    A.   Well, I did some of the writing, and I played guitar.

1    Q.    Now, other than doing some of the writing and playing the

2    guitar -- who was the musical director for that record?

3    A.    Brian Maes, the keyboard player.

4    Q.    So while you were -- when you did the "Delp-Goudreau"

5    record -- there was artwork associated with that record?

6    A.    Yeah, there was a picture of Brad and I on the front.

7    Q.    Who put together that artwork?  Who did that?

8    A.    That was Dave Steffanelli who handled my website.

9    Q.    And under whose direction and control did Mr. Steffanelli

12:18 10    do the "Delp-Goudreau" record?

11    A.    Mine.

12    Q.    Now, fast-forward to the Ernie and the Automatics record.

13          Was there artwork put together for that record?

14    A.    Yes.

15    Q.    Did you have any hand in doing the artwork or any input

16    for the artwork for that record?

17    A.    No.

18    Q.    Who did that?

19    A.    Ernie did it with his in-house people.

12:18 20    Q.    Now, at some point in time, did you understand that

21    Mr. Boch wanted to release this album, "Low Expectations," for

22    sale?

23    A.    Sure.

24    Q.    And prior to that record being released, did you have any

25    expectations that this album would make any profit?

```
 1    A.    What was the title again?

 2    Q.    "Low Expectations."

 3    A.    No.

 4          (Laughter.)

 5    Q.    The recording of that record, who paid for it?

 6    A.    Ernie.

 7    Q.    And when I say "paid for it," was this recorded in

 8    someone's basement or was this recorded in a professional

 9    studio or studios?

12:19 10    A.    No, it was professional studio, sure.

11    Q.    And based upon your experience, there are different levels

12    of studios.  Were these sort of nice studios or little small --

13    A.    No, no, nice studios.

14    Q.    Were these expensive studios?

15    A.    Yes.

16    Q.    And did you choose the studio where it was recorded?

17    A.    No.

18    Q.    Who chose it?

19    A.    Ernie.

12:19 20    Q.    How did you know when to be at the particular recording

21    session?

22    A.    Stan Lewicki, who acted as our road manager, would send me

23    an e-mail and tell me when to show up.

24    Q.    And did you show up when you were told?

25    A.    I did.
```

1    Q.    After the record was in the can, when did you learn that

2    there was going to be a public release of the record?

3    A.    I'm not really sure.  Obviously, we made it, so it would

4    come out at some point.

5    Q.    But you do recall there was a CD release party that was

6    scheduled, correct?

7    A.    Yes.

8    Q.    Okay.

9          Now, prior -- between the record being in the can and

12:20 10    prior to the CD release party, did you have occasion to sign

11    any particular written agreement with Mr. Boch or Ernie and the

12    Automatics, LLC?

13    A.    Yeah.  Right before the record came out, Ernie said we

14    needed to have some paper, so we came up with a contract.

15    Q.    When you say  "we came up with a contract," who came up

16    with a contract, sir?

17    A.    Ernie did.

18    Q.    Do you recall when that contract was presented to you?

19    A.    Not exactly, no.

12:21 20          I know it was before the record was released.

21          MR. TARLOW:  Your Honor, I would like to publish for

22    the jury Exhibit Number 29.

23          THE COURT:  You may.

24    BY MR. TARLOW:

25    Q.    Now, sir, I'm showing you what has been marked as Exhibit

29.   Is this, in fact, the contract you had signed?

A.    Yes.

Q.    Now, I notice in the top it says, "Confirmatory Recording Artist Agreement."  Do you see that, sir?

A.    Yes.

Q.    Do you happen to know why the word "confirmatory" is used?

A.    No.

Q.    Who is your lawyer at the time when this agreement was presented to you?

A.    It was you, Mr. Tarlow.

Q.    Did you ever show this document to me?

A.    No.

Q.    Did you ever show this document to any other lawyer?

A.    I didn't even read it.

Q.    That wasn't my question, sir.

      Did you ever show this document to any other lawyer who was working for you?

A.    Well, you were my only lawyer at that point, but, no, I didn't.

Q.    You testified earlier on direct that you believe you're entitled to a one-sixth interest in any of the profits that were paid as a result of the release of "Low Expectations."  Do you recall that, sir?

A.    Yes.

Q.    Is that, in fact, what you were entitled to as your

1  understanding pursuant to this agreement if the record ever

2  made any profits?

3  A.    In the chance that it made any profit, yes.

4  Q.    Well, sir, were any of the profits of this -- pursuant to

5  this agreement, were they directed at any particular charity?

6  A.    Well, I've learned after the fact that it was 50 percent

7  to the split between the band and 50 percent for his charity.

8  But, like I said, I just signed it.  It didn't really matter to

9  me.

12:23 10  Q.    Okay.

11         At the time when you signed this agreement -- let's

12  just go to the -- I think the date may be on the signature

13  page.  Let's take a look.

14         Let's go to the first page.

15         So I will read to you, sir, that in the first page of

16  the agreement it says, This Confirmatory Agreement is made this

17  5th of day February 2009, sir.  Do you have any reason to

18  believe this document was signed at any other time than about

19  that date?

12:23 20  A.    It would be that date, sure.

21  Q.    Now, had you signed any other prior written agreement with

22  Mr. Boch or any of Mr. Boch's entities prior to this date?

23  A.    No.

24  Q.    At the time when you signed this document, had Mr. Boch

25  done anything with respect to your advertising or billing for

1    any of the shows you had played other than designate you as a

2    former member of the band BOSTON?

3    A.   Not that I'm aware of.

4    Q.   Did you have any reason to believe that after you signed

5    this document that Mr. Boch was going to do anything other than

6    continue to promote you as a former member of the band BOSTON?

7    A.   No.

8    Q.   Did you have any intent in signing this agreement to

9    convey any greater authority among Mr. Boch as to how he should

12:24 10    bill you other than as a former member of the band BOSTON?

11    A.   No.

12    Q.   So now let's turn your attention to the CD release party.

13    Where was the CD release party?

14    A.   It was the Hard Rock Cafe.

15    Q.   Do you recall that night when you went to the -- was it at

16    night, sir?

17    A.   Yes.

18    Q.   Do you recall that night?

19    A.   Yes.

12:25 20    Q.   Was it kind of a fun night?

21    A.   Sure.

22    Q.   As you're walking up to the venue that night, sir --

23    that's the Hard Rock here in downtown?

24    A.   Yes, the new location.

25    Q.   Had you been given a copy of the CD before?

|    |    |
|----|----|
| 1 | A.   No. |
| 2 | Q.   So as you're walking up to the venue, did you see any |
| 3 | advertising or promotion as you're walking up to the venue that |
| 4 | night? |
| 5 | A.   Walking in the venue? |
| 6 | Q.   Yeah. |
| 7 | A.   There would have been posters, sure. |
| 8 | Q.   Did you see any posters that advertised you as anything |
| 9 | other than a former member?  Do you recall that? |
| 12:25 10 | A.   No. |
| 11 | Q.   So you walk in the venue that night, right? |
| 12 | A.   Right. |
| 13 | Q.   And when is the first time you see Ernie? |
| 14 | A.   I honestly don't remember.  I don't know. |
| 15 | Q.   When is the first time on that -- on that date did you, in |
| 16 | fact, get a copy of the CD, "Low Expectations"? |
| 17 | A.   That's the first time I saw it, sure. |
| 18 | Q.   Do you recall actually receiving that copy that night?  Do |
| 19 | you recall in your mind that moment? |
| 12:26 20 | A.   Yeah, sure. |
| 21 | Q.   Do you know who handed it to you, how you got it? |
| 22 | A.   I don't remember who handed it to me. |
| 23 | Q.   Do you recall looking at it when you first got -- |
| 24 | A.   Yes, I do. |
| 25 | Q.   Now, let me -- when you worked hard on a record, is it a |

 1    significant moment when you finally see the final product for

 2    any artist?

 3    A.    Yes, sure.

 4    Q.    So when you looked at that record, what went through your

 5    mind.  It's a CD, not a record.

 6    A.    CD.

 7    Q.    When you looked at it, what's the first thing that went

 8    through your mind?

 9    A.    Oh, no.

12:26 10    Q.    Why?

11    A.    Because it had a sticker on it saying "original member."

12    Q.    Prior to that moment on the CD release party, did you have

13    any knowledge that that sticker was going to be affixed to the

14    CD, "Low Expectations"?

15    A.    No idea, no.

16    Q.    As soon as you saw that CD, what did do -- by the way, the

17    sticker, was it actually on the inside of the packaging or the

18    outside of the packaging?

19    A.    It was stuck on the plastic outside.  Shrink wrap.

12:27 20            MR. TARLOW:  Your Honor, I'd like to publish for the

21    jury --

22            THE COURT:  I think it's 5.

23            MR. TARLOW:  Thank you, your Honor.

24            No, your Honor.

25            THE COURT:  I'm sorry.  No, you're right.  It's -- it

```
 1    is 34, if I'm --

 2              MR. TARLOW:  Yes, your Honor.  I'd like to publish for

 3    the jury Exhibit 34.

 4              THE COURT:  You may.

 5              MR. TARLOW:  Thank you.

 6    BY MR. TARLOW:

 7    Q.   Is this, in fact, the sticker you saw that night?

 8    A.   That's it.

 9    Q.   As soon as you saw that sticker, what did you do next?

12:28 10   A.   I went to Ernie.

11    Q.   Why?

12    A.   Because I was upset.

13    Q.   Did you express your displeasure to Mr. Boch?

14    A.   I did.

15    Q.   And how did Mr. Boch react when you expressed that

16    displeasure?

17    A.   I'll take care it; I'll take care of it.

18    Q.   When he said, "I'll take care of it," did you direct him

19    to do anything as to how he should take care of it?

12:28 20   A.   No.

21    Q.   Did you assume any control as to how he should take care

22    of it?

23    A.   No.

24    Q.   Did you rely on him, Mr. Boch, to take care of it?

25    A.   Yes.
```

1    Q.   Was there any doubt in your mind that after you expressed

2    your displeasure to Mr. Boch that he would, in fact, take care

3    of it?

4    A.   Well, I hoped he would.

5    Q.   Do you know if, in fact, if he did make some attempts to

6    take care of it?

7    A.   Well, I know it went away at some point.  Whether it was

8    because of something I said or something else, I have no way of

9    knowing.

12:29 10   Q.   Now, to be clear, sir, when -- looking at Exhibit 34, when

11   you were handed that CD that night, did it have this price of

12   $9.99, that price tag?

13   A.   No.  Actually, you get a free CD when you paid the $10 to

14   get in.

15          (Pause.)

16          (Discussion off the record.)

17   Q.   Mr. Goudreau -- and I'm not going to get into it in the

18   same detail that Mr. Boch testified to it -- but with respect

19   to the performances, the live performances of Ernie and the

12:30 20   Automatics, in the beginning, in the first few years, did they,

21   in fact, meet what you would anticipate as your low

22   expectations?

23   A.   Honestly, we were just having a good time.  It was a good

24   time.  It was a great group of guys; we got along terrific.

25   Q.   But you weren't doing it just to have a good time.  Was

1    Mr. Boch, in fact, paying you --

2    A.    He was paying me, sure.

3    Q.    When you traveled to these shows, the local shows in

4    particular, how did you travel?

5    A.    We usually took Ernie's limo.

6    Q.    And did you -- when you had to travel to a show like Cape

7    Cod Melody Tent, would you travel from your home from

8    Swampscott down to Cape Cod?

9    A.    Yes.

12:31 10    Q.    And were you paid the same whether you traveled two or

11    three hours down to the Cape or traveled eight or nine hours to

12    a different venue?

13    A.    Yes.

14    Q.    And these shows, the actual performances, do you have

15    knowledge as to whether or not Ernie Boch ever made more money

16    from the performances than it cost him to actually bring the

17    band to perform?

18    A.    I doubt it.

19    Q.    So now how much -- how much were you paid in the beginning

12:32 20    per show from Mr. Boch?

21    A.    I think it was $300.

22    Q.    So this would be whether it involved two or three hours or

23    five, six, seven hours for a show?

24    A.    Yes.

25    Q.    And you had to bring your own equipment?

1    A.    Well, one of his people from one of his car dealerships

2    handled the equipment for us.

3    Q.    And Mr. Boch arranged for that.

4    A.    Yes.

5    Q.    And with respect to the booking of the shows, did you have

6    any role in the booking of the shows for Ernie and the

7    Automatics?

8    A.    No.

9    Q.    Now, at some point in time, did Mr. Boch -- did Mr. Boch

12:32  10    pay you more than $300 per show?

11   A.    A couple of years in we went up to $700 a show, I think.

12   Q.    When you were paid by Mr. Boch, were you generally paid by

13   check?

14   A.    Yes.

15   Q.    And did these checks come from any one particular entity?

16   A.    Well, it changed over the course of it.

17   Q.    Any of the entities that the checks were paid from, did

18   you have any interest whatsoever in any of those entities?

19   A.    No, none.

12:33  20    Q.    And did Mr. Boch, in fact, send you any sort of documents

21   for tax reporting purposes?

22   A.    Yes.

23   Q.    Sure.  And you had to pay taxes on that money, did you

24   not?

25   A.    Yes.

1   Q.   And did you have any expenses associated yourself with

2   going to some of these shows or the travel expenses?

3   A.   Well, sure.

4   Q.   And did you, in fact, pay those?

5   A.   Yes.

6   Q.   And your own personal instrument, did you have to use --

7   did Mr. Boch provide instruments or did you use your own

8   personal instruments?

9   A.   I used my own gear.

12:34 10   Q.   Did that gear suffer any sort of wear and tear as a result

11   of going to these shows?

12   A.   Yeah, I suppose.

13   Q.   Now, I think you testified on direct that you thought you

14   did around 250 shows, right?

15   A.   Sounds about right, sure.

16   Q.   And other than -- and the advertisements that we've seen,

17   the promotional material that we've seen during the course of

18   this trial, other than those particular -- those shows, do you

19   recall seeing any other advertisements that use the word

12:34 20   "original" in them for any of the other 200 call it 45 shows?

21   A.   No.

22   Q.   You were paid for those shows, right?

23   A.   Sure.

24   Q.   Were you paid the same amount for those shows as the shows

25   that might have been promoted using the word "original"?

A.    Yes.

Q.    Did you ever earn a nickel from the CD sales of "Low Expectations"?

A.    No.

         (Pause.)

Q.    Do you recall on direct, sir, Mr. Green had asked you and you had responded you had earned millions of dollars from the record royalties from the sale of the first two records?  Do you recall that testimony, sir?

A.    Yes.

Q.    And you, in fact, testified that that was true, you had earned millions of dollars from those record royalties, correct?

A.    I've never tried to figure it out, but, yeah.

Q.    Over what period of time had that money been paid to you, sir?

A.    Forty years.

Q.    So millions of dollars but over 40 years.  Can you -- do you have an understanding as to whether or not any -- the bulk of that money was earned during any particular time period versus a later time period?

A.    Mostly late '70s through the '80s.

Q.    At the time while you were in band before you left, before the 1983 Settlement Agreement, do you have any idea of how much money you earned just from the record royalties -- I'm not

1    talking about performance income -- if you could quantify it as

2    best you can, sir.

3    A.    Before --

4    Q.    Before you exited the band in 1983.

5    A.    Well, the bulk of the money was later because of the

6    record sales.

7    Q.    At some point, did those royalties begin to decline?

8    A.    Oh, sure.

9    Q.    And when did they begin to decline?

12:37 10    A.    They started down in the '90s, and we got into the 2000s,

11    it went way down, when people started stealing music rather

12    than paying for it.

13            MR. TARLOW:  Your Honor, I'm going to need to use the

14    projector to project Trial Exhibit Number 60 for the jury.

15            THE COURT:  You may.

16    BY MR. TARLOW:

17    Q.    Mr. Goudreau, I show to you now Trial Exhibit 60, a page

18    of the exhibit.  I'll represent it's a 1099 from 2012 from Paul

19    Ahern Associates.

12:38 20    A.    Yes.

21    Q.    And who is Paul Ahern/Ahern Associates/Pure Songs as you

22    understand it to be?

23    A.    Paul Ahern is our former manager.  I'm paid through his

24    company.

25    Q.    And that's pursuant to the 1983 Settlement Agreement?

1   A.   Yes.

2   Q.   And in 2012, looking at this exhibit, sir, would this

3   figure, where it says "royalties," accurately depict how much

4   you received in record royalties from Mr. Ahern?

5   A.   Yes.

6   Q.   Would you agree with me that's $50,016.29?

7   A.   Yes.

8   Q.   And did an event occur, as you understand it, in 2007

9   which led to an increase in record sales for the first two

12:39 10   BOSTON albums?

11   A.   Yes.

12   Q.   And what was that event, sir?

13   A.   Unfortunately, it was Brad Delp's death.

14   Q.   Sir, I'm going to turn to the first page of Exhibit Number

15   60.  I'm going to show you this 1099.  I represent to you it's

16   the same 1099 from Mr. Ahern.  Would you agree with me, sir,

17   that in 2007 you received 88,461.31 in royalties?

18   A.   Yes.

19   Q.   And turning, sir, to 2008 1099, it's also contained in

12:39 20   Exhibit Number 60, sir, you would agree with me that you

21   received $93,008.61 in that year, correct?

22   A.   Yes.

23   Q.   Are these numbers in 2007 and 2008 consistent with the

24   record royalties you had been receiving for the years prior to

25   2007 and 2008 and after 2008?

A.    Well, unfortunately, Brad's death -- well, it led to more interest in the band, and the income went up.

Q.    When you were in Ernie and the Automatics, sir, other than these two anomalous years, 2007, 2008, do you recall approximately what your record royalties were on the first two records, if you can give a ballpark for those years?

A.    During the Automatics?

Q.    During the Automatics years.

A.    I think it was in the order of 40, 50 thousand, something like that.

Q.    So when you testified that you had earned millions of dollars from the royalties from the first two records, has that, in fact, declined over the years?

A.    Oh, yes.

Q.    Do you think Ernie and the Automatics had anything to do with that decline?

A.    No.

Q.    And those royalties that you receive as part of your Settlement Agreement, when you signed that agreement, did you enter into that agreement with Mr. Scholz alone or with any other individuals?

A.    No.  It was -- I was leaving the partnership, the agreement was with the partnership.

Q.    And those royalties that you received as a result of that 1983 Settlement Agreement, had you been earning those royalties

```
 1    since your involvement with the band BOSTON from the beginning.

 2          Had you been receiving those royalties -- had you been

 3    receiving 20 percent of the royalties from the very first time

 4    a record royalty was paid as a result of the debut alum?

 5    A.   Yes, yes.

 6    Q.   Did that agreement, that oral partnership that you had

 7    referred to, change in any way until the 1983 Settlement

 8    Agreement?

 9    A.   No.

10          MR. TARLOW:  May I just confer with my co-counsel for

11    a moment, your Honor?

12          THE COURT:  You may.

13          (Discussion off the record.)

14          MR. TARLOW:  Your Honor, other than reserving the

15    right to recall Mr. Goudreau in our case in chief on the

16    counterclaims, I'm finished with my questions.

17          THE COURT:  Okay.

18          Redirect, Mr. Green?

19          MR. GREEN:  Yes, your Honor.  If you may give me a

20    moment to set up here.

21          THE COURT:  Yes.

22          MR. TARLOW:  I'll clean out for Mr. Green.  I'll leave

23    my computer here for the moment.

24          MR. GREEN:  Certainly.

25          MR. TARLOW:  If it won't disturb you.
```

12:42 (line 10)
12:43 (line 20)

                        REDIRECT EXAMINATION

1    BY MR. GREEN:

2    Q.    Mr. Goudreau, did I hear you say in response to questions

3    from Mr. Tarlow that the only thing you did at Ernie and the

4    Automatics was to show up and play the guitar?

5    A.    Yes.

6    Q.    Well, that isn't quite right, is it?

7    A.    I think it is.

8    Q.    Well, let me suggest a couple of other things.

9          You were personally involved in a number of

10   promotional activities, were you not?

11   A.    Like what?

12   Q.    Well, let's start with the video, which I won't play again

13   because it's been seen, but you understood that the video was a

14   promotional item, correct?

15   A.    If it made it anywhere, yeah, I suppose.

16   Q.    All right.

17         So you would agree with me that you participated in

18   the making of a video that was to promote Ernie and the

19   Automatics and the CD in particular, correct?

20   A.    That's what we hoped, sure.

21   Q.    So you were involved in that promotional activity,

22   correct?

23   A.    Yes.

24   Q.    And going back to your original statement that the only

1    thing you did was show up and play the guitar, you heard

2    Mr. Boch testify yesterday that you would show up and help out

3    with radio and TV ads.  Did you hear him testify on that?

4    A.   We did a few in-store appearances.  I don't remember

5    any -- oh, yeah, we did appear on some -- a couple morning

6    television shows, sure.

7    Q.   And that was, again, to promote Ernie and the Automatics,

8    correct?

9    A.   Yes.

12:45 10   Q.   So that wasn't just showing up and playing the guitar.

11   That was participating in a promotion, correct?

12   A.   Yeah, look at it that way, sure.

13   Q.   And also on radio?

14   A.   Well, we did a few in-store appearances.  I don't know if

15   we did anything on radio.

16   Q.   Well, let me ask you this:  Mr. Boch testified yesterday

17   that whenever he wanted you to show up in radio, you would do

18   so.  Do you have any reason to contradict his testimony?

19   A.   No.

12:46 20   Q.   And in addition, you understood that a web page was going

21   up for Ernie and the Automatics, correct?

22   A.   Yes.

23   Q.   Now, you also understood that he was engaged in a number

24   of advertisements on behalf of Ernie and the Automatics,

25   correct?

A.   I knew there were advertisements, sure.

Q.   And I believe that you testified yesterday that you understood he was out there representing the band in doing so, correct?

A.   Yes.

Q.   The band entrusted Ernie with his authority, correct?

A.   Yes.

Q.   And you were a member of the band, correct?

A.   Yes.

12:47 Q.   Now, when Mr. -- when Attorney Tarlow was asking you about what ads you saw, what shows, you would agree with me that a CD could promote all shows thereafter, correct?

A.   CD would promote a show?

Q.   Let me ask you this.

     You came out with a CD, the CD was put out to the broader public, correct?

A.   Yes.

Q.   So if the band's out of Boston, if I'm in -- you went as far out as the Midwest?

12:47 A.   Yes.

Q.   If I'm in Ohio and I purchase a copy of the CD, would you agree with me that I might be more interested in seeing a show once you came out there because I had heard some music on the CD, correct?

A.   Yeah, that makes sense.

1    Q.    Just as radio and television would generally promote the

2    band, correct?

3    A.    Yes.

4    Q.    And just as a website would generally promote the band.

5    A.    Yes.

6    Q.    Now, let me ask you to turn to Exhibit 29.

7             MR. GREEN:  If you can put that up.

8             THE COURT:  You may.

9    BY MR. GREEN:

12:48 10    Q.    Now, did I hear properly that you said you did not read

11    this before you signed it?

12    A.    Yes.

13    Q.    In the same way that you did not read and sign your

14    counterclaim before it was filed --

15             MR. TARLOW:  Objection, your Honor.

16             THE COURT:  Counsel, overruled.

17             MR. TARLOW:  I know you don't want speaking

18    objections.

19             THE COURT:  Right.  And I can hear you.

12:49 20             Just for what it's worth.

21             MR. TARLOW:  Sorry, your Honor.

22             THE COURT:  Counsel.

23    BY MR. GREEN:

24    Q.    Could you answer the question?

25    A.    Could you give my that again?

1    Q.    You just said that you did not read Exhibit 29 before you

2    but you signed it, correct?

3    A.    I did.

4    Q.    And is that akin to your not reading your counterclaim

5    before it was filed?  Would you agree with me there's some

6    similarity there, sir?

7    A.    In that I didn't read it.

8    Q.    Yeah.

9          Now, let me ask you this:  You did sign this, correct?

12:49 10    A.    This?

11    Q.    Exhibit 29.

12          THE COURT:  It's on your screen.

13    A.    This I signed, yes.

14    Q.    And I'm not going to belabor this because I believe we

15    covered this yesterday.  You signed this when you were an adult

16    of sane mind, correct?

17    A.    I think so.

18    Q.    Appear that way to me.

19          You understood that you were signing a legal document.

12:50 20    A.    Yes.

21    Q.    And you understood that under a legal document, you were

22    signing something that would set forth the parties' rights and

23    obligations.

24    A.    Sure.

25    Q.    And if we could turn back to page -- page 3.  I asked you

1    yesterday if that -- paragraph 7 and 8, correct?

2              (Discussion off the record.)

3              MR. GREEN:  Can we go to page 3, please, and paragraph

4    7 and 8?

5              If it's easier, you can just do 7 first.  We'll do

6    that.

7    Q.    Now, apparently, you didn't read this paragraph because

8    you didn't read the entire agreement, correct?

9    A.    Right.

12:51 10   Q.    But the paragraph does say that you were giving Ernie

11   Boch, or Ernie and the Automatics controlled by Ernie Boch, the

12   perpetual right to use your name and biographic material as

13   they saw fit, correct?

14   A.    If that's what it says.

15   Q.    And similarly, in number 8, you warrant and represented

16   that we -- and I'll represent to you that that meant Ernie and

17   the Automatics represented by Ernie Boch -- shall have a

18   perpetual right to use and authorize other persons to use your

19   name and biographical material, correct?

12:52 20   A.    Yes.

21   Q.    So this was a legal document that you signed, correct,

22   sir?

23   A.    Yes.

24   Q.    And whatever happened to that, you were entrusting Ernie

25   to do his thing, but you gave away the perpetual right, let him

1    do his thing, correct?

2    A.    I trusted Ernie to do the right thing, yes.

3    Q.    And he didn't always do the right thing, did he?

4    A.    Apparently not.

5    Q.    And promoters, such as Mr. Baggott, didn't always do the

6    right thing, correct?

7    A.    What are you referring to?

8    Q.    Well -- you were here when Mr. Boch -- when we showed him

9    one of the ads.  He said, Oh, that was Mr. Baggott; that wasn't

12:52 10   me.  Do you recall that?

11   A.    Yes.

12   Q.    But you understand in number 8 that it wasn't only Ernie

13   and the Automatics that could do whatever they want, it was any

14   of those promoters, any of these third parties that could do

15   whatever they want, correct?

16   A.    I didn't understand it that way.  Like I said, I didn't

17   read it.

18   Q.    Well, you didn't -- that's right.  You didn't understand

19   it that way because you didn't read it.  But you understand as

12:53 20   a grown, sane man that you're responsible for your acts,

21   correct?

22   A.    Yes.

23   Q.    All right.

24         You were, were you not, giving a lot of people a

25   license to hijack the trade name BOSTON?  Were you not?

```
 1   A.   No.

 2   Q.   Okay.

 3        But that is the result, was it not?

 4   A.   Hijacked the name BOSTON?  Absolutely not.

 5        MR. TARLOW:  Objection, your Honor.

 6        THE COURT:  Sustained as to this.

 7        MR. GREEN:  I'll move on.

 8        THE COURT:  To the extent there was an answer, it's

 9   struck.

12:53 10  BY MR. GREEN:

11   Q.   Now, you were just being asked about a series of payments

12   that you received -- and I'm not going to belabor the point.

13        Would you agree with me, sir, that all of the amounts

14   that you received were from companies other than Ernie and the

15   Automatics, correct?  I mean, we can put up Exhibit 60 again.

16   I'm just trying to save a little time.

17   A.   It didn't say "Ernie and the Automatics" on it.

18   Q.   Clearly it was for Ernie and the Automatics services that

19   you performed, correct?

12:54 20  A.   Yes.

21   Q.   You never performed any services for any of the other

22   companies that are listed on the exhibit that Mr. Tarlow just

23   showed you.

24   A.   No.

25   Q.   Now, let me next ask you to turn to Exhibit 8.
```

1              You understood that this was a legal document,

2    correct?

3    A.    Yes.

4    Q.    And you signed that document, correct?

5    A.    I did.

6    Q.    Did you read that document, sir, before signing it?

7    A.    Yes.

8    Q.    So this one did you read, correct?

9    A.    Oh, sure.

12:55 10   Q.    And you did understand this document, did you not?

11   A.    Well, I don't know if I'd say that, but I did read it.

12   Q.    Well, you did, in particular, understand -- if we could

13   turn to page 7, paragraph d there.

14              MR. GREEN:  Can we enlarge the bottom paragraph?  The

15   name BOSTON.  And it continues over to the next page.  I want

16   to be fair to you, if Ms. McIlvene can just scroll that up.

17   Q.    Did have you a good understanding, sir, of that paragraph?

18              (Pause.)

19   A.    Well, I thought the language was a little fuzzy, but,

12:56 20   yeah, I suppose.

21   Q.    What did you find fuzzy about the language?

22   A.    Well, it kind of tells me what I can do, but it doesn't

23   really say what I can't do.

24   Q.    Well, let me ask you this:  It says that you can hold

25   yourself out using the term "formerly of BOSTON," correct?

```
 1   A.   Yes.
 2   Q.   But you're saying it's a little fuzzy because it doesn't
 3   say what you can't do, correct?
 4   A.   Right.
 5   Q.   Let me ask you -- I'm asking about your understanding when
 6   you read and signed this back in 1983.  Did you have an
 7   understanding that since it didn't say you can't do it, that
 8   you could hold yourself out as formerly originally of BOSTON?
 9   A.   I never did that.
10   Q.   I'm asking you what your understanding was, sir.
11   A.   I didn't think I could do that.  I never did do that.
12   Q.   All right.  I'm just asking for your understanding.
13        So you would agree that as of that point in time, even
14   though the word "original" isn't there, you understood you
15   couldn't hold yourself using the word "original," correct?
16   A.   Yes.
17   Q.   And you did agree to that.  You read this ahead of time
18   and you agreed to that?
19   A.   I did.
20   Q.   And you were thereby confirming, were you not, that you
21   were not an original member of the band BOSTON, correct?
22   A.   No.
23   Q.   Let me ask you this.  Turning to the first page, the
24   "whereas" clause, "Goudreau is and has been."  If we could
25   focus in on that, please.
```

1           Now, the year in question is 1983, correct?

2    A.    Yes.

3    Q.    The band had gone back into the '70s, correct?

4    A.    Yes.

5    Q.    This doesn't say "is and always has been," does it?

6    A.    No.

7    Q.    Now, I meant to ask you one other question about Ernie and

8    the Automatics.

9           At any point in time, did you say to Ernie that you

12:59 10   won't perform unless these advertisements or promos that talk

11   about original stop?  Yes or no.

12   A.    One more time?

13   Q.    At any point in time during your tenure with Ernie and the

14   Automatics, knowing that sometimes mistakes were made, did you

15   ever say, This has to stop or else I'm going to stop

16   performing?

17          MR. GIVEN:  Objection, relevance.

18          THE COURT:  Only one person gets to object.

19          So, Mr. Tarlow, do you want to object?

12:59 20        MR. TARLOW:  Yes, if I can adopt my brother's

21   objection.

22          I'll do -- relevance is fine.

23          THE COURT:  So the question was:  At any point in

24   time, did you say to Ernie that you wouldn't perform unless

25   these advertisements or promos that talk about original stop?

1    Yes or no.

2            Mr. Tarlow is objecting.

3            MR. TARLOW:  I'd also object to the form of the

4    question as it was read back.

5            THE COURT:  Well, overruled as to form given 611.

6    Overruled on substance.

7            You can answer.

8    BY MR. GREEN:

9    Q.   Yes or no, sir.

01:00  10           THE COURT:  Do you need it again?

11            THE WITNESS:  I'm sorry, can you give --

12            THE COURT:  At any point in time during your tenure

13    with Ernie and the Automatics -- at any point in time, did you

14    say to Ernie you won't perform unless these advertisements or

15    promos that talk about original stop?

16    A.   Okay.

17            No.

18    Q.   Thank you.

19            A couple of final questions, sir.

01:00  20           Mr. Tarlow yesterday began your deposition with, I'll

21    call it, a dramatic thud.  He put that book in front of you

22    there, correct?

23    A.   Yes.

24    Q.   And he asked you how long the deposition was.  I just want

25    to clarify this.

1          Could you turn to page 5 of the deposition -- and I

2     think we can do this very quickly.

3          Will you agree with me, sir, that the deposition began

4     at 10:00 a.m. on February 24, 2014?

5     A.   10:00 a.m., yes.

6     Q.   And the page that I was asking about -- I'm going to ask

7     you to turn to page 90.

8          Do you see that?

9     A.   The page, yeah.

01:01 10     Q.   Now, that page doesn't have a time on it, but I'm going to

11     ask -- we're going to come back to 90, so if you don't mind

12     keeping your finger there, I'm going to ask you to turn to page

13     124, correct?

14          If you could go to that.

15     A.   Okay.

16     Q.   Do you see that there was a lunch recess that was taken

17     beginning at 12:39 p.m.?

18     A.   I do.

19     Q.   So at 124 -- page 124, two hours and 39 minutes had

01:02 20     transpired, correct?

21     A.   Well, it seemed like four hours.  Yes.

22     Q.   All right.  Let's turn back to page 90.

23          You would agree that that was within the first couple

24     of hours, correct?

25     A.   Yes.

Q.    And when you were asked -- and if we can put this -- when

you were asked at line 14:  "All right.  Not only did I read it

accurately, but do you believe that the content of that is

accurate?

        You did say "Yes," correct?

A.    I did say "Yes."

Q.    And you understood that to be the content of paragraph 53?

A.    No, I didn't.

Q.    You didn't understand that?

A.    I didn't understand that, no.

Q.    Even though it says, "But do you believe that the content

of that is accurate?"  And you said, "Yes."

A.    I was given lawyers speak on that, and I misspoke.

Q.    Well, did you have a lawyer whisper something in your ear

when you gave that answer?

A.    I did not.

Q.    All right.

        MR. GREEN:  I have nothing further.

        Thank you.

        THE COURT:  Any recross?

        MR. TARLOW:  Yes, your Honor, but I'm probably going

to be at least 10 or 15 minutes, so given the hour if you want

me --

        THE COURT:  We can pause here.

        Mr. Goudreau, you can step down.  We'll continue in

1    the morning.

2              Counsel, can I just see you at sidebar?

3              Jurors, I'm aware of the time.  I just want to talk to

4    counsel about scheduling so I can give you an update.

5              (At sidebar on the record.)

6              MR. BAKER:  Judge, I remember you saying no talking

7    objections; I never heard you say no shouting objections.

8              (Laughter.)

9              THE COURT:  It's okay.

01:04 10              And no double-teaming, counsel.  I don't know if I

11    explicitly said that.  Whoever has the witness gets to object.

12              MR. GIVEN:  I'll obey going forward.  My apologies.

13              THE COURT:  Counsel, just hopefully ten minutes was an

14    overestimation of how much time you have left.

15              MR. TARLOW:  I think it's about six questions, seven

16    questions.

17              THE COURT:  That's fine.

18              So, counsel, I just want to give them an update.  Is

19    it fair to represent that we're on schedule, and I'll give them

01:04 20    a further update tomorrow?

21              MR. GREEN:  Yes.  I believe -- my best estimate, your

22    Honor, is I'll be about two hours with Mr. Scholz, no longer.

23    I have no idea how long they'll be on cross-exam, but we do

24    hope to get to our expert tomorrow, who I think will be a short

25    witness.  We're hoping to complete them both.

         1          THE COURT:  I'm not going to promise the plaintiff is

         2  going to rest tomorrow.  I'll just say I've conferred with

         3  counsel and we're on target.

         4          MR. BAKER:  We had a conversation during one of the

         5  breaks, and our belief is the evidence will be completed by

         6  Monday.

         7          Do you guys feel that way?

         8          THE COURT:  Let me let the jury go without --

         9          MR. BAKER:  Okay.

01:05 10          (End of discussion at sidebar.)

        11          THE COURT:  Jurors, we're going to let you go for the

        12  day.  Tomorrow, again, will be 9:00 to 1:00.  Just get here a

        13  little before 9:00 so we can start again on time.

        14          Having conferred with counsel and understanding what

        15  the parties are intending to introduce, we're still very much

        16  on schedule.  I'll give you a further update about where we are

        17  at the end of tomorrow.

        18          So just bear all of my cautionary instructions in

        19  mind.  Don't talk to anyone about the case.  Don't do any

01:06 20  research.  Keep an open mind.  We'll see you tomorrow.  Thank

        21  you.

        22          (Jury left the courtroom.)

        23          THE COURT:  Counsel, anything -- I know we talked

        24  briefly about scheduling, we can talk a little bit more about

        25  that in the morning.

```
 1              Anything we need to take up now?

 2              (Discussion off the record.)

 3              THE COURT:  Okay.

 4              MR. BAKER:  Madam Clerk, do you have an update on our

 5     time?

 6              THE CLERK:  Yes.

 7              MR. BAKER:  I just want to know where we are with

 8     that.

 9              THE COURT:  Ms. Hourihan will give you an update.

10     I'll see you in the morning.

11              Thank you.

12              (Court adjourned at 1:07 p.m.)

13              - - - - - - - - - - - -

14                         CERTIFICATION

15              I certify that the foregoing is a correct transcript

16     of the record of proceedings in the above-entitled matter to

17     the best of my skill and ability.

18

19

20

21     /s/Debra M. Joyce                 June 8, 2017
       Debra M. Joyce, RMR, CRR, FCRR    Date
22     Official Court Reporter

23

24

25
```

The `01:07` timestamp appears beside line 10.

INDEX


WITNESS                                                          PAGE


PAUL EDWARD GEARY

    Direct Examination                                            18
    By Mr. Given
    Cross-Examination                                             53
    By Mr. Green
    Redirect Examination                                          60
    By Mr. Given

BARRY GOUDREAU

    Continued Cross-Examination                                   67
    By Mr. Tarlow
    Redirect Examination                                         153
    By Mr. Green




                        E X H I B I T S


Exhibit No.             Description                      Received


    62              Photo of Brad Delp                        23