1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
2

3    _____

4    DONALD THOMAS SCHOLZ,

5              Plaintiff,         Civil Action
                                  No. 13-10951-DJC
6    V.
                                  October 31, 2016
7    BARRY GOUDREAU,              8:47 a.m.

8              Defendant.
     _____
9

10

11          TRANSCRIPT OF JURY TRIAL DAY 6

12       BEFORE THE HONORABLE DENISE J. CASPER

13          UNITED STATES DISTRICT COURT

14        JOHN J. MOAKLEY U.S. COURTHOUSE

15              1 COURTHOUSE WAY

16             BOSTON, MA  02210

17

18

19

20
              DEBRA M. JOYCE, RMR, CRR, FCRR
21                Official Court Reporter
             John J. Moakley U.S. Courthouse
22            1 Courthouse Way, Room 5204
                  Boston, MA  02210
23              joycedebra@gmail.com

24

25

1    APPEARANCES:

2    FOR THE PLAINTIFF:

3    LAWRENCE G. GREEN, ESQ.
     SUSAN E. STENGER, ESQ.
4    Burns & Levinson LLP
     125 Summer Street
5    Boston, MA 02110
     617-345-3000
6
     FOR THE DEFENDANT:
7
     JEFFREY S. BAKER, ESQ.
8    Baker & Associates
     2 West Hill Place
9    Suite 100
     Boston, MA 02114
10   617-573-9505

11   DAVID M. GIVEN, ESQ.
     Phillips, Erlewine, Given & Carlin LLP
12   39 Mesa Street, Suite 201 - The Presidio
     San Francisco, CA 94129
13   415-398-0900

14   DANIEL P. TARLOW, ESQ.
     Copani Tarlow & Cranney
15   265 Broadway
     Methuen, MA 01844
16   978-686-0010

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              (The following proceedings were held in open

3    court before the Honorable Denise J. Casper, United States

4    District Judge, United States District Court, District of

5    Massachusetts, at the John J. Moakley United States Courthouse,

6    1 Courthouse Way, Boston, Massachusetts, on October 31, 2016.)

7              THE COURT:  Good morning, counsel.

8              ALL:  Good morning.

9              THE COURT:  Counsel, I know we're in the middle of the

08:48 10   examination of the plaintiff's expert.  Other matters today

11   from the plaintiff's side?

12             MR. GREEN:  We have a couple of matters.

13             As you know, we have filed a formal motion under Rule

14   15(b)(2).  We're prepared to present short argument on that at

15   this point in time, or we defer to the Court as to when you'd

16   like to hear that.

17             In addition, your Honor, I have two other matters that

18   I wanted to bring to the Court's attention.

19             One, in connection with Mr. Scally, Mr. Given was

08:48 20   making reference to a formal motion to qualify and to request

21   voir dire.  Although there's nothing in the rules that requires

22   this, if he wants to do voir dire, I'm glad to make a formal

23   motion, your Honor.

24             I defer to the Court as to how you want to deal with

25   this procedurally, but I thought we should handle it now before

1    we get into any arguments or unnecessary sidebars once the

2    trial starts.

3         MR. GIVEN:  As long as we know what he's going to be

4    certified as an expert on, I don't know that I need any voir

5    dire on the matter, your Honor.

6         THE COURT:  Okay.

7         Counsel?

8         MR. GIVEN:  As I understand it, it's quite limited.

9    It's just a matter of totaling up some royalties and totaling

08:49 10    up some performance --

11         MR. GREEN:  No, Mr. Given -- your Honor, as Mr. Given

12    should well know, because we have previously briefed this as

13    part of the Daubert motion, and you ruled our way on this, he's

14    testifying to more than arithmetic here.  He is testifying to a

15    methodology for the damage calculation that he sought to adopt

16    as part of the analysis of trademark damages in this case.  It

17    does involve arithmetic, but it involves other considerations

18    here.  So that is what he is being asked to provide an expert

19    opinion on.

08:49 20         We believe that he's well qualified, but I'll be glad

21    to formally move.

22         MR. GIVEN:  We had this discussion; I do recall it.  I

23    believe I was here for it.

24         The problem I have is that it started to eke into

25    subjects about legal conclusions, and your Honor actually made

1    a comment on the record about it and said we don't want this

2    expert saying this is an appropriate remedy.  The Court is

3    going to instruct the jury on those subjects.  And as long as

4    he stays away from that, I think I'm okay.  But if he starts to

5    veer in the direction of saying, Well, this is an appropriate

6    trademark remedy because -- that's a problem.

7          THE COURT:  Well, I think he can give an opinion on

8    what he was asked to do and what his opinion is.  I think it's

9    a separate instruction to the jury about how they are charged

08:50  10    as a matter of law to calculate those damages.

11          MR. GREEN:  And he --

12          THE COURT:  That's what I -- Mr. Given, that was what

13    I -- that was what I was sustaining the objections on.

14    Meaning, I think he's entitled to explain -- and I think,

15    Mr. Green, after I sustained those objections, you focused the

16    questions in these ways.  I think you're permitted, given my

17    prior ruling on this matter, to elicit his opinion on what he

18    was asked to do and what he did.

19          MR. GREEN:  Right.

08:51  20          THE COURT:  And what theory that reflects, separate

21    and apart of how I'll instruct them.

22          MR. GREEN:  Yes.  We certainly will proceed that way,

23    your Honor.

24          One other matter, your Honor -- and this is moving

25    ahead to what we understand Mr. Montgomery may be testifying

1    on -- we wanted to call your attention to 7 Q -- and are you

2    able to project that?

3              Again, your Honor, this is to avoid any sidebars here.

4    But this is an exhibit that we --

5              THE COURT:  I don't see it yet, but maybe it's coming

6    up.

7              (Discussion off the record.)

8              MR. GREEN:  Perhaps my letters are wrong here.

9              THE COURT:  Do you want to just give me a description

08:52 10   of it?

11             (Discussion off the record.)

12             MR. GREEN:  My apologies, your Honor.

13             THE COURT:  7 K, okay.

14             MR. GREEN:  7 K.

15             And I don't know if the other side is going to be

16   introducing it, but as part of my cross-examination, I do want

17   to make reference to this.

18             It's been objected to, I guess.  I'm not sure what the

19   nature of the objection is.  If I could ask the Court to ask

08:53 20   the other side what their objection is, I'll be glad to respond

21   why we think this should be coming into evidence.

22             MR. TARLOW:  Can I ask it be made a little bigger?

23             THE COURT:  Yes.  I can't see the -- can it be

24   enlarged, please?

25             (Pause.)

1          THE COURT:  Is there an objection to this?

2          MR. TARLOW:  Your Honor, I would object to this under

3     the motion in limine.

4          The testimony of Mr. Montgomery is going to be as to

5     some lost performance opportunities relative to actions that we

6     believe are attributable to Mr. Scholz's activities, and so --

7     also, I would just point out that there's no evidence that this

8     was created by Mr. Montgomery.  You've already ruled that

9     Mr. Goudreau had no control over what Mr. Montgomery did.  If

08:54 10    you look at the bottom it does say, "former band member from

11    the band BOSTON."  I would suggest 403, and also that it will

12    be not relevant to the testimony of Mr. Montgomery.

13         THE COURT:  I guess, counsel, my initial reaction is

14    in line with Mr. Tarlow's argument about my previous ruling.  I

15    will be -- I guess, Mr. Montgomery, it sounds like, is being

16    offered on the counterclaims in some regard.  I suppose I'll

17    have to listen to whether or not I think any door is opened

18    here, but as an initial matter, I don't think the fact that

19    he's being called opens the door to the non-Ernie and the

08:54 20    Automatics --

21         MR. GREEN:  If I could just say --

22         THE COURT:  -- instances.

23         MR. GREEN:  When I hear that Mr. Montgomery could have

24    been promoting him or -- here is a situation where he is not

25    promoting him properly.  And we believe if this is the type of

1    promotion they were engaged in, that this is highly relevant to

2    the case.

3          MR. TARLOW:  It doesn't appear to me, at least looking

4    at the document, that this is -- it looks like it's from their

5    website.  As we've seen from prior testimony, there are third

6    parties that advertise on the web, and it's -- if anything, it

7    would be an example of how these third parties go beyond

8    anything they may be directed to do.

9          Again, my objection is based upon the same --

08:55 10          THE COURT:  Mr. Green, I'll be listening to the

11    examination.  I think it would take a fair amount to open this

12    door given my previous rulings on this matter, but I'll listen

13    carefully.  If you think there's an instance that has, you

14    should be asked to be heard at sidebar before you bring it up.

15          MR. GREEN:  Thank you.

16          Just going back to the original subject that I raised.

17    What is the Court's predilection in terms of any argument on

18    the Rule 15 motion?

19          THE COURT:  I'm inclined to hold it, counsel, because

08:56 20    I think there are a few legal matters related to the charge and

21    what I take to be the defendant's motion after the close of the

22    plaintiff's case, which I think I'll end up hearing you about

23    this afternoon.

24          MR. GREEN:  Thank you, your Honor.

25          MR. GIVEN:  Your Honor, we're prepared on the Rule 50

1    motion -- I have a short memorandum on the subject.  We will

2    hand it up at the close of the plaintiff's case.  We are

3    prepared to argue that today.

4            THE COURT:  Okay.

5            So, counsel, I think -- my usual practice is after the

6    close of the plaintiff's case, I tell the jury this is a

7    juncture where I need to speak with counsel.  I'll hear you at

8    sidebar, counsel.  You can reserve then, and I'll reserve

9    argument until later today.

08:56 10            Counsel, other matters?

11            The deposition designations, is that coming up after

12    Mr. --

13            MR. GREEN:  Right after Mr. Scally we will be putting

14    those in, your Honor.  Ms. Stenger will be reading the

15    questions to Ms. McIlvene, who will take the stand.

16            THE COURT:  Okay.

17            (Pause.)

18            THE COURT:  Okay, counsel, why don't we --

19            (Discussion off the record.)

08:57 20            THE COURT:  Counsel, why don't we stand in recess

21    until we check on the jurors; and I may have to see you at

22    sidebar about the depos.

23            We'll stand in recess.

24            (Recess taken.)

25            (Jury entered the courtroom.)

|   |   |
|---|---|
| 1 | THE COURT:  Good morning, jurors. |
| 2 | We'll continue with the testimony. |
| 3 | Mr. Scally can come back to the stand.  Thank you. |
| 4 | Sir, I just remind you, you remain under oath. |
| 5 | THE WITNESS:  Yes, ma'am. |
| 6 | THE COURT:  Mr. Green. |
| 7 | MR. GREEN:  Thank you, your Honor. |
| 8 | WILLIAM SCALLY, having been previously duly sworn by |
| 9 | the Clerk, was further examined and testified as follows: |
| 09:05 10 | CONTINUED DIRECT EXAMINATION |
| 11 | BY MR. GREEN: |
| 12 | Q.   Mr. Scally, when we broke last Friday, we were talking |
| 13 | about your credentials -- and I don't want to repeat any |
| 14 | testimony, but I just want to ask, Ms. McIlvene, can we put CC |
| 15 | up again? |
| 16 | You recall on Friday you were testifying about your |
| 17 | various credentials, correct? |
| 18 | A.   Yes. |
| 19 | Q.   Including your three previous positions at Price |
| 09:06 20 | Waterhouse? |
| 21 | A.   Yes. |
| 22 | Q.   Now, again, what was the particular assignment that you |
| 23 | had in this case, sir? |
| 24 | A.   There were two elements of my assignment.  One was an |
| 25 | accounting of the royalties received by Mr. Goudreau subject to |

the agreement between the parties, between Mr. Goudreau and

Mr. Scholz, as well as to provide an analysis of income

received by Mr. Goudreau related to his performances

specifically with Ernie and the Automatics.

Q.   And what did you understand those two different tasks to

be part of in terms of the overall assignment?

A.   Well, I've assumed that infringement will be established

by the Court and -- so my work is to assist the Court to

understand damages should infringement and a breach of covenant

be found.

Q.   Now, what -- we've looked at your overall credentials.

What particular parts of your training and professional

experience did you bring to this assignment that assisted you?

A.   Consistent with any assignment that you work on, whether

it's with respect to a damages analysis or evaluation analysis

for a different purpose, all of my training relates to the

valuation of assets and specifically in this case it's not

necessarily the valuation of an asset, but the valuation of the

misuse of an asset.  And that's consistent with my training, my

education, and my 15 years of experience.

Q.   Based upon your training, your education, your 15 years of

experience, your application of professional skills to this

case, did you form any opinions as to the measure of damages?

A.   Yes, I did.

          MR. GIVEN:   Objection.

```
 1              THE COURT:  Overruled.  Overruled.  Noted for the
 2    record, though.
 3    BY MR. GREEN:
 4    Q.   And what opinion or opinions did you form, sir?
 5    A.   My opinions are as follows:  Should the Court and the jury
 6    find infringement of the trademark, the damages associated with
 7    that cause of action, the contributory infringement caused,
 8    that would be $184,000.  And with regard to damages related to
 9    the breach of covenant -- the breach of implied covenant of
10    good faith and fair dealing, that would be approximately
11    $544,000, totaling --
12    Q.   Now, before we get into the numbers themselves and how the
13    numbers were computed, what methodology did you use to come up
14    with these figures?
15              MR. GIVEN:  Objection.
16              THE COURT:  Overruled.
17    A.   As with any analysis, I looked at the most relevant stream
18    of income associated with the alleged bad faith.  And in
19    addition to that -- in addition to doing an economic analysis,
20    an accounting of the royalties as well as analysis of
21    Mr. Goudreau's performance income, I also need to make sure
22    that my damages calculations were consistent with the guidance,
23    legal guidance, regarding damages in trademark matters.
24              MR. GIVEN:  Objection, move to strike.
25              THE COURT:  Well, struck as to the last phrase.
```

1           So, jurors, as I'll instruct you further on in the

2  final jury instructions, expert witnesses are witnesses that,

3  based on their expertise and background, are allowed to provide

4  an opinion.  That's what this witness is proffering on behalf

5  of the plaintiff in this case.

6           What the appropriate damages might be, if you reach

7  that issue in this case, will be for you to determine

8  consistent with my legal instructions to you.

9           One of the pieces of evidence that you have to

09:10 10  consider, however, is the opinions -- the opinion of any expert

11  along with any of the other evidence before you.

12           MR. GREEN:  Thank you, your Honor.

13           THE COURT:  Mr. Green.

14  BY MR. GREEN:

15  Q.   Now, you just described the methodology that you followed,

16  Mr. Scally.  Were there any methodologies that you considered

17  but rejected as part of your expert testimony work?

18  A.   There were methodologies that I considered and rejected,

19  yes.

09:10 20  Q.   And what were those and why did you reject them?

21  A.   With respect to the stream of income associated with

22  Mr. Goudreau's performance income, that -- my analysis is based

23  on disgorgement of those benefits received.

24           I also considered looking at lost profits from the

25  perspective of Mr. Scholz, but the facts of the case didn't

1    allow me to conduct that sort of analysis, so I didn't take

2    that on.

3         I also considered a reasonable royalty type of

4    analysis for the infringement claim, but at that point, I

5    would -- I found myself in a position where I would have

6    double-counted damages related to the disgorgement of royalties

7    paid under the Settlement Agreement, so I couldn't consider the

8    same stream of income in my analysis for the trademark

9    infringement related to Mr. Goudreau's performance income.

09:11 10         MR. GIVEN:  I object and move to strike.  Beyond the

11    scope of the report.

12         THE COURT:  Overruled.

13         MR. GREEN:  Now, could I ask Ms. McIlvene to project

14    Exhibit 56, your Honor?

15         THE COURT:  You may.

16    BY MR. GREEN:

17    Q.   And if we could -- on the first page, do you see where it

18    says there "Goudreau payments"?

19    A.   Yes, I see that.

09:12 20    Q.   And what did you understand this exhibit to reflect, sir?

21    A.   So my understanding of this exhibit was this -- I

22    understand this to be a payments-to-Goudreau file produced by

23    Ernie Boch, Jr.  So I looked at these payments to Mr. Goudreau,

24    and I matched them up against Mr. Goudreau's tax filings.  I

25    also matched them up against Mr. Goudreau's answers to

1    interrogatories to ensure there was consistency between these

2    three sources of income for Mr. Goudreau.

3    Q.    And if we could scroll down to the final page and to the

4    grand total.

5          The $184,222.60 figure, is that the figure you were

6    referring to?

7    A.    Yes, that's the figure.

8    Q.    Now, that refers to payments to Mr. Goudreau, correct?

9    A.    Yes, it does.

10   Q.    From Ernie and the Automatics.

11   A.    That's correct.

12   Q.    Now, you also said that there was a second part of your

13   analysis that related to royalty damages?

14   A.    Yes.

15   Q.    And the figure on that was approximately $544,000?

16   A.    Yes.

17   Q.    What did that figure consist of and how did you compute

18   it?

19   A.    It consisted of just an accounting of the royalty payments

20   received by Mr. Goudreau under the Settlement Agreement that

21   governed the behavior between the two parties, Mr. Goudreau and

22   Mr. Scholz.

23   Q.    And for what years were you looking?

24   A.    From 2007 forward to present.

25   Q.    And why did you begin in 2007, sir?

```
 1    A.   I was asked to assume that the infringing behavior began
 2    on or around 2007.
 3              MR. GREEN:  I have nothing further.
 4              Thank you, Mr. Scally.
 5              THE COURT:  Cross-examination, Mr. Given?
 6              MR. GIVEN:  May I proceed, your Honor.
 7              THE COURT:  You may.
 8                        CROSS-EXAMINATION
 9    BY MR. GIVEN:
10    Q.   Mr. Scally, you're being paid for your work in this
11    matter?
12    A.   Yes, I am.
13    Q.   And what is your hourly rate?
14    A.   Well, my firm is being paid.  My hourly rate is $565 an
15    hour.
16    Q.   And how much has your firm been paid for the work you've
17    done in this case thus far?
18    A.   To complete the report that was offered to the Court, if
19    memory serves, I spent I full week of time on the report, 40 to
20    50 hours, and I had an associate that had an equivalent amount
21    of time, so the charge was between $40,000 and $50,000.
22    Q.   When we were looking at Exhibit CC before, I did not see
23    the words either "trademark" or "trademark infringement" on
24    that document.  Did I have that right?
25    A.   Can you repeat the question?
```

1  Q.   When you were looking at your CV, I didn't see the word

2  "trademark" or "trademark infringement" on it.

3  A.   I'd have to refer to it.

4  Q.   Referring to Exhibit 1, your report, sir, that's

5  substantially an identical document to the document we were

6  just looking at, correct?

7  A.   Yes.

8  Q.   And nowhere on that document are the words either

9  "trademark" or "trademark infringement," correct?

09:15 10  A.   I don't have any reason to believe that that's not true.

11  Q.   And in this document, unlike document CC that we were

12  looking at before, you mentioned two cases in which you were

13  designated as an expert witness.  Were either two of those

14  cases a trademark case?

15  A.   As I sit here currently on the stand, sir, or at the time

16  that my report was issued?

17  Q.   I'm asking were either of the two cases that are mentioned

18  in Exhibit 1 to your report trademark infringement cases?

19  A.   They are trade secret -- misappropriation of trade secret

09:16 20  cases.

21  Q.   So that's a "no"?

22  A.   Yes, sir.

23  Q.   Okay.

24       And at the time that you were retained for your expert

25  opinion in this case, was this the first trademark infringement

1    case that you had?

2    A.   It was the first trademark infringement case that I've

3    worked on, yes.

4    Q.   And you've assumed trademark infringement for purposes of

5    your opinion in this case, correct?

6    A.   Yes.

7    Q.   And you've assumed breach of the implied covenant of good

8    faith and fair dealing on the part of Mr. Goudreau, correct?

9    A.   Yes.

09:16 10   Q.   Is this your first music business case?

11   A.   Yes.

12   Q.   Is it fair to say that you have no specialized experience

13   or expertise in the music business?

14   A.   Say that --

15   Q.   Is it fair to say, Mr. Scally, that you bring no

16   specialized expertise or experience in the music business to

17   this case?

18   A.   My experience relates generally to calculation of damages.

19   I don't have industry expertise in the music business.

09:16 20   Q.   Thank you.

21        Now, as you sit here today, Mr. Scally, you can't say

22   why someone attended an Ernie and the Automatics show, correct?

23   A.   That's correct.

24   Q.   You can't say why somebody bought an Ernie and the

25   Automatics CD, right?

1  A.   No, sir.

2  Q.   You can't say why somebody bought an Ernie and the

3  Automatics T-shirt, can you?

4  A.   No.

5  Q.   You can't say why someone did any of that as a result of

6  any misuse by EATA, assuming there is a misuse, of Mr. Scholz's

7  mark, right?

8  A.   My opinion relies on the fact that liability has been

9  established.  None of that was part of my assignment, sir.

09:17 10  Q.   Were you asked to do a consumer confusion survey?

11  A.   I was not.

12  Q.   Do you know what a consumer survey is?

13  A.   I do.

14  Q.   Explain to the jury what it is.

15  A.   I'm not a survey expert, but it would be an analysis where

16  an expert would go out to the marketplace and understand what

17  potential buyers of a service -- how they perceived the

18  marketplace, whether they felt that -- let me step back.

19        If it was the sale of a product, an actual

09:18 20  manufactured product that was allegedly infringing, did the

21  marketplace feel that they were confused by the addition of a

22  new product in the marketplace?  So that's not my expertise.

23  Q.   There is expertise, however, at your firm on that subject,

24  is there not, sir?

25  A.   I'm not sure if there is or not.

1    Q.    But you have resources available to you to go out and find

2    an expert in that field, correct?

3    A.    I'm sure I could ask around, but I'm not aware of one as I

4    sit here today.

5    Q.    Now, referring, again, to Exhibit 1 to your report, sir,

6    your CV says you have experience and expertise, and I'm

7    quoting, in business valuation and intellectual property

8    valuation.  Do I have that right?

9    A.    Correct.

09:18 10    Q.    This is not a business valuation case, right?

11    A.    It's not.

12    Q.    And you have not been asked, have you, sir, to render an

13    opinion of the value in dollars and cents of Mr. Scholz's

14    trademarks, right?

15    A.    I've been asked to value the misuse of his trademark.

16    Q.    That's not the question, sir.

17         The question is:  You have not been asked in this case

18    to render an opinion with respect to the value in dollars and

19    cents of Mr. Scholz's trademarks.  Yes or no?

09:19 20    A.    My assignment did not relate to the value and total of his

21    trademark.  It represented the value of the alleged misuse of

22    his trademark.

23    Q.    So that's a "no" to my question.

24    A.    I don't think I could just answer "no" to the question.

25    Q.    And for purposes of your opinion in court today, sir, you

1    did not distinguish between the word mark and the logo mark,

2    right?

3    A.    I did not.

4    Q.    You understand the difference between the two.

5    A.    I do, and I was asked to assume that both of those were

6    infringed.

7    Q.    And for purposes of your opinion today, you did not

8    distinguish between the use of the Ernie and the Automatics'

9    logo and the use of the BOSTON logo, correct?

09:20 10    A.    I was not asked to do that.

11    Q.    And for purposes of your opinion today, you did not

12    distinguish between the music of the two bands.

13    A.    Nothing of my assignment involved a determination of

14    liability.  I was assuming liability from the start to

15    calculate damages.

16    Q.    Now, with respect your damages calculation, you did not

17    review any financial data about Mr. Scholz's or BOSTON's

18    performance income to render an opinion on lost sales or

19    profits as a result of any trademark infringement in this case,

09:20 20    correct?

21    A.    I think my previous testimony reflects exactly that.  I

22    considered a lost profits analysis from the perspective of

23    Mr. Scholz.  The facts and circumstances within this case,

24    however, directed me more towards a disgorgement analysis in

25    focusing on Mr. Goudreau's compensation as a --

```
 1   Q.   Did you discuss those subjects with Mr. Scholz and his
 2   attorneys?
 3   A.   I'm sorry?
 4   Q.   Did you discuss those subjects with Mr. Scholz and his
 5   attorneys, the subject --
 6            MR. GREEN:  Objection.
 7   BY MR. GIVEN:
 8   Q.   -- the subject of receiving performance income data from
 9   Mr. Scholz and looking at that data to render an opinion?
10            MR. GREEN:  Objection.
11            THE COURT:  Overruled.
12   A.   When I was -- back when I was originally engaged in the
13   matter, that was a potential approach that was in play that we
14   chose not to --
15   Q.   You discussed it with them though, didn't you?  You had a
16   conversation about looking at the actual financial data that
17   Mr. Scholz has with respect to touring, with respect to
18   merchandise sales, and with respect to record sales?  Yes or
19   no.
20   A.   That would be consistent with looking at both a lost
21   profits analysis from the perspective of Mr. Scholz, but also
22   statutory guidance allows for a disgorgement of defendant's
23   profits as well.
24            MR. GIVEN:  Object and move to strike, your Honor.
25   That's --
```

```
 1            THE COURT:  No, overruled.
 2   BY MR. GIVEN:
 3   Q.   Okay.
 4        You didn't have a conversation with Mr. Scholz or his
 5   attorneys where you said, Let's look at the actual data that
 6   Mr. Scholz has on his performance income and his merchandise
 7   income and his record sales to see if we can figure out if he
 8   actually lost any profits?
 9   A.   Generally speaking, I think we looked at the facts and
10   circumstances that existed and said -- I made a determination
11   in my opinion it was best to approach a disgorgement approach,
12   lost profit perspective from the defendant.
13   Q.   And you made that decision because, in consultation with
14   Mr. Scholz and his attorneys, they said to you, We don't want
15   to put all those millions of dollars on the board when what
16   we're doing is suing a little bar band that has a regular gig
17   at Firefly's where they get paid in beer and free ribs.
18            MR. GREEN:  Objection to form.  Overall objection to
19   the question.
20            THE COURT:  Sustained.
21   BY MR. GIVEN:
22   Q.   Sir, during your engagement in this matter, were you
23   provided any profit, loss, or other financial data pertaining
24   to the band BOSTON's live performances or touring for the time
25   period covered by your opinion?  Yes or no.
```

A.    No.

Q.    During your engagement in this matter, were you provided with any profit, loss, or other financial data pertaining to the band BOSTON's merchandise sales for the time period covered by your opinion?

A.    It wouldn't be consistent with my opinion and the approach that I took in this damages --

Q.    So the answer is "no."

A.    No.

Q.    During your engagement in this matter, sir, were you provided any profit, loss, or other financial data pertaining to the band BOSTON's record sales for the time period in question?

A.    No, I did not.

Q.    During your engagement in this matter, sir, were you provided any cost reporting or other financial data pertaining to the band BOSTON's advertising or promotion for the time period covered by your opinion?

A.    Nothing in the available discovery that I used to formulate my opinion relates to financial information from the perspective of Mr. Scholz.

Q.    So it's fair to say, sir, that you have seen no financial data derived from Mr. Scholz's books and records that would support his claim that he was harmed in this case, correct?

A.    The information that I used to support my opinion relates

```
 1  specifically to defendant's financial gain.
 2  Q.   Okay.
 3       So the answer is "no."
 4  A.   It wasn't relevant to my opinion.
 5  Q.   So the answer is "no," sir?
 6  A.   That's correct.
 7  Q.   Okay.
 8       No such data derived from Mr. Scholz's books and
 9  records to support a finding of injury to his or the band
10  BOSTON's reputation, correct, sir?
11  A.   Again, my analysis did not look at actual or direct
12  damages from the perspective of the plaintiff, Mr. Scholz.  So
13  the answer is obviously "no."
14  Q.   Okay.
15       No such data from Mr. Scholz's books and records to
16  support a finding of injury to his or the band BOSTON's
17  goodwill.
18  A.   Consistent with my previous response, that's correct, sir.
19  Q.   So the answer is "no."
20  A.   Right.
21  Q.   No such data to support any claim to his or the band
22  BOSTON's lost profits, that's opposed to Mr. Goudreau's
23  supposed profits, correct?
24  A.   That's correct, yes.
25  Q.   You have not seen any such data?
```

```
 1   A.    I have not.
 2   Q.    No such data to support a claim that Mr. Scholz or the
 3   band BOSTON incurred any cost or expense to prevent customers
 4   from being deceived by Ernie and the Automatics, correct?
 5   A.    That's correct.
 6   Q.    No such data to support a claim that Mr. Scholz or the
 7   band BOSTON incurred any cost or expense in connection with any
 8   corrective advertising?
 9   A.    Consistent with my damages calculation, none of that data
10   was relevant to my analysis, sir.
11   Q.    So am I correct, sir, that basically all you did was you
12   took the data for everything that Mr. Goudreau made by way of
13   royalties and added them up, right?
14   A.    Well, I did conduct an accounting of all royalties paid to
15   Mr. Goudreau under the Settlement Agreement for the relevant
16   period of time, and I did additional analyses related to his
17   income for musical performances from Ernie and the Automatics.
18   So, yes.
19   Q.    In fact, in your original report, you totaled up all of
20   the money that he made, didn't you, for his performance income?
21   In your original report?
22           MR. GREEN:  Objection, relevance.
23           THE COURT:  Overruled.
24   BY MR. GIVEN:
25   Q.    Sir, in your original report --
```

```
 1              THE COURT:  Well, Mr. Green, you're talking about
 2    prior ruling?
 3              MR. GREEN:  Yes.
 4              THE COURT:  Sustained as to that.
 5              MR. GREEN:  Thank you, your Honor.
 6    BY MR. GIVEN:
 7    Q.   So let me get this straight.  You took all the income from
 8    Ernie and the Automatics, and you totaled it up, right?
 9    A.   Yes.
10    Q.   You took all of the royalties that Mr. Goudreau has earned
11    from 2007 to the present, correct, and totaled it up?
12    A.   Yes.
13    Q.   You didn't make any attempt to allocate -- for example,
14    are you aware, sir, of how many offending ads there are at
15    issue in this case?
16    A.   I have a general understanding that there are print ads
17    and radio ads.
18    Q.   Do you know how many print ads there are?
19    A.   I don't.
20    Q.   If I told you there were less than ten, would that affect
21    your opinion in this case?
22              MR. GREEN:  Objection.
23              THE COURT:  Overruled.
24              I'm not sure there was an answer.
25              So let me just ask the question:  If I told you there
```

```
  1    were less than ten, meaning ads, would that affect your opinion
  2    in this case?
  3    A.   It wouldn't affect my opinion because I was asked to
  4    assume that liability has been established.
  5    Q.   No, it's not affecting your opinion because you were told
  6    to put the biggest number on the board you could, right?
  7    A.   That's not what my assignment was.
  8    Q.   Because you wanted to put the fear of God in Mr. Goudreau.
  9    A.   That's not why I was engaged.
09:27 10          MR. GIVEN:  No further questions, your Honor.
 11          THE COURT:  Redirect?
 12          MR. GREEN:  Brief follow-up, your Honor.
 13          THE COURT:  Yes.
 14                    REDIRECT EXAMINATION
 15    BY MR. GREEN:
 16    Q.   Mr. Scally, you were asked about CC and Exhibit 1 to your
 17    report which was an earlier version of your CV.
 18          MR. GREEN:  Can we put up CC, please?
 19    Q.   And in particular, you were asked about whether the word
09:28 20    "trademarks" appears there.
 21          Does this make reference, sir, to intellectual
 22    property assets?
 23    A.   It does.
 24    Q.   And is trademark a form of intellectual property assets?
 25    A.   It is.
```

1          MR. GREEN:  You can take that down.  Thank you.

2    Q.   Now, in response to Mr. Given, you were talking about the

3    use of a disgorgement methodology, correct?

4    A.   Yes.

5    Q.   He asked you a series of questions about lost profit

6    analysis, Mr. Scholz's income, et cetera.  And you said that

7    that was not relevant to disgorgement.

8          MR. GIVEN:  Objection, leading.

9          THE COURT:  Well, sustained as to form, but you can

09:29 10   rephrase.

11   BY MR. GREEN:

12   Q.   You were asked a series of questions.  Did you consider

13   any of that as part of your disgorgement analysis?

14   A.   I didn't consider an actual damages approach that looked

15   at Mr. Scholz's profits in my disgorgement analysis.  It

16   wouldn't be relevant because disgorgement requires the expert

17   to look at defendant's profits.

18   Q.   And that's what you looked at?

19   A.   Yes.

09:29 20   Q.   Now, you were also asked to -- about particular ads.  Do

21   you have an understanding -- you did assume liability in this

22   case, correct?

23   A.   I did, yes.

24   Q.   Do you have an understanding as to the various media the

25   infringement took place through, or the alleged infringement?

     1    A.    Yes, I do.

     2              MR. GIVEN:  Objection.

     3              THE COURT:  Overruled.  He can ask.

     4    BY MR. GREEN:

     5    Q.    And what is your understanding, sir?

     6    A.    It was various types of ads.  It was ads for shows, as

     7    well as radio ads, as well as a CD, and the promotion of the

     8    CD, video associated with the CD.

     9    Q.    Web page?

09:30 10    A.    Web page as well, yes.

    11    Q.    Could you make a disgorgement -- well, with that -- strike

    12    that.

    13              Given that, did that argue in favor of looking at

    14    particular shows or doing some other analysis?

    15              MR. GIVEN:  Objection.

    16              THE COURT:  Overruled.  He can answer.

    17    A.    In my analysis of the record, I didn't see specific

    18    instances of starting and stopping the alleged infringing

    19    behavior.  The alleged behavior sat across the whole period in

09:30 20    question, and so I wasn't able to determine if particular ads

    21    related to, you know, one particular show.  However, to the

    22    extent that defendant had offsets, either in cost or specific

    23    shows to consider, I would have considered those.

    24    Q.    And did you ever hear defendant's counsel presenting you

    25    any offsets as to any particular shows?

```
 1    A.   I was deposed in this matter and defendant's previous

 2    counsel did --

 3          MR. GIVEN:  Objection.  Hearsay.

 4          THE COURT:  Sustained as to this, counsel.

 5          MR. GREEN:  I have nothing further.

 6          Thank you, Mr. Scally.

 7          MR. GIVEN:  Can I ask one question from here, your

 8    Honor, or do you want me --

 9          THE COURT:  You may.  If it's brief, you can do it

10    there.

11                        RECROSS-EXAMINATION

12    BY MR. GIVEN:

13    Q.   Sir, the reason you didn't do a lost profit analysis is

14    because there was no lost profits, right?

15    A.   I not sure if there was or not.  I didn't do that

16    analysis.

17          MR. GIVEN:  Thank you.

18          THE COURT:  Was that it, Mr. Given?

19          MR. GIVEN:  Yes, ma'am.

20          THE COURT:  Sir, you're excused.  Thank you.

21          MR. TARLOW:  Your Honor --

22          THE COURT:  Mr. Green?

23          MR. GREEN:  The plaintiff now asks that portions that

24    have been designated and submitted to the Court of the

25    deposition of Fran Migliaccio be read in as the final part of
```

1    our case in chief, your Honor.

2         THE COURT:  Can I see counsel at sidebar for a moment,

3    please?

4              (At sidebar on the record.)

5         THE COURT:  Mr. Green, just so I understand,

6    Mr. Migliaccio is offered for what general purpose?  Meaning,

7    are you offering him both for your affirmative case and also in

8    response to the counterclaim?

9         MS. STENGER:  Yes, and we didn't distinguish.

09:32 10        THE COURT:  Okay.

11        And the counterclaim in regards to whether or not your

12   client interfered with Mr. Goudreau's ability to perform in

13   certain places?

14        MS. STENGER:  Yes.

15        THE COURT:  Okay.

16        So, counsel, on the designations and

17   cross-designations, with that understanding, I just -- there

18   were a few -- well, there were a few objections that I took to

19   be objections but that if I didn't allow the objection to

09:33 20   require additional lines to be read.  Is that what you're

21   prepared to --

22        MR. TARLOW:  Those were mine, your Honor.

23        THE COURT:  Okay.

24        MR. TARLOW:  Yes.

25        THE COURT:  So how were you planning to handle that?

1    Meaning, what was the presentation going to be?

2         MS. STENGER:  Well, your Honor, did you want us

3    separately in our cases to read portions of the deposition or

4    were we going to read all the designations?

5         THE COURT:  That's what I'm asking.

6         MR. GREEN:  Can I make the suggestion, your Honor?

7    Where you are ruling that additional should lines be read, then

8    we will read in the lines as part of our case in chief.

9         THE COURT:  That's what I'm asking.

09:33 10         MR. TARLOW:  So where I indicated "objection," then I

11    wouldn't be objecting in that position, as long as the

12    additional lines were read.

13         THE COURT:  Okay.

14         And then, counsel, with the others with objections,

15    there was one that -- 32 to 33 -- so you've answered the

16    relevance as to -- and I'm assuming, Mr. Tarlow, that a number

17    of these were relevance objections?

18         MR. TARLOW:  I'd have to look at each one.  I did

19    quickly this weekend, your Honor, but, yes, my primary

09:34 20    objection would be relevance.

21         THE COURT:  Okay.

22         And I understood.  So I had that question on some of

23    them, but I understand now that they relate to -- that they

24    relate to the counterclaim of interference against the

25    plaintiff where I think they are relevant.

```
 1            MR. TARLOW:  Your Honor, to be clear, our counterclaim

 2    is not that -- let me be careful about this.  I actually

 3    shouldn't say that, because I guess it could -- a piece could

 4    dovetail in, so I'm going to --

 5            THE COURT:  So, counsel, I guess just for -- I don't

 6    want to waste the jury's time, but was your plan that you were

 7    going to register an objection, I'll just rule in real time,

 8    and then we'll do the same with the counter designations?

 9            MR. TARLOW:  That might be the easiest way to create a

09:35 10    clear record.

11            THE COURT:  The only things I would say are there were

12    a few places, one, two, three -- there were a few places where

13    I thought including the additional lines was appropriate, so

14    I'll leave it for you --

15            MR. TARLOW:  But for the record to be clear, in case I

16    miss an objection, because I'm going to be following along

17    quickly, I would like this to stand as my general objections to

18    the testimony just for a clear record.

19            THE COURT:  Okay.

09:35 20            But I guess what I'm saying is, as opposed to going

21    through now sustaining/overruling, I'll do it in real time.

22            MR. BAKER:  Understood, Judge.

23            MS. STENGER:  Did your Honor receive -- I e-mailed

24    short --

25            THE COURT:  I did see that.
```

1          MS. STENGER:  -- a couple of places where he wanted to
2     fill in some lines, I then filled in some other lines so it
3     would be continuous.
4          THE COURT:  So we'll do it essentially direct, cross,
5     and then redirect, right?  Because then there might be some
6     lines that you're responding to.
7          MR. TARLOW:  So we're going to read -- so it might be
8     easier -- I took Attorney Stenger's -- she was kind enough to
9     give me her yellow markup; I just made ours in a different
09:36 10     color to make it somewhat easier.
11          MS. STENGER:  I have another copy, and I added yours.
12          So to be clear, am I reading just ours or reading them
13     all?
14          THE COURT:  I guess what I'm saying, as to the ones
15     where there was additional lines, I thought in interest of
16     completeness, they should be read.  So I was just giving you
17     that heads up.
18          MR. GREEN:  And we will read those.
19          MS. STENGER:  But, otherwise, don't read his
09:37 20     designations.
21          THE COURT:  Right.  Because then I'll give you an
22     opportunity to read those designations.
23          MR. TARLOW:  And that will be right after hers in the
24     same case?
25          THE COURT:  Right.

```
 1              And, Ms. Stenger, after Mr. Tarlow reads, if there are
 2      still ones --
 3              MS. STENGER:  Thank you.
 4              THE COURT:  Are you doing it with another attorney?
 5              MR. GREEN:  Ms. McIlvene will be helping us.
 6              THE COURT:  Thank you.
 7              (End of discussion at sidebar.)
 8              THE COURT:  So, jurors, just to explain what's
 9      happening now -- and I was talking with counsel to work out the
10      mechanics to present to you -- now, instead of having a live
11      witness, there's a witness whose sworn testimony was taken on a
12      previous occasion.  This is testimony that you can consider the
13      same way you can consider any of the live testimony you've
14      heard.  The reason you see a familiar face on the witness stand
15      and the attorneys will be presenting the testimony is that she
16      is taking the place of the witness just for the purposes of
17      reading the testimony.
18              Much the way the live testimony went, where the
19      plaintiff's side had the opportunity to ask questions and then
20      the defense had the opportunity to, we're going to have the
21      same thing here.  There are going to be a set of questions and
22      answers that are read from the plaintiff's side, and then I
23      expect a series of questions and answers that will be read from
24      the transcript -- the same transcript by the defense.
25              Again, this is testimony that you can consider and
```

```
 1   give whatever weight you choose in the way you would have if

 2   this witness had come in live to testify.

 3            Ms. Stenger, you can proceed.

 4            MS. STENGER:  Thank you, your Honor.

 5            Ms. McIlvene, you're going to be Mr. Fran Cosmo this

 6   morning.

 7            THE COURT:  For the ease of reference by opposing

 8   counsel and by the Court, when you start on a new page, can you

 9   just say so?

10            MS. STENGER:  Of course.

11            THE COURT:  Thank you.

12            MS. STENGER:  Starting on page 9.

13            (Reading from deposition transcript of Francis

14   Migliaccio.)

15   Q.   Good morning.  Could you state your name for the record?

16   A.   Fran Cosmo.

17   Q.   And your full name just to make it --

18   A.   Fran Cosmo Migliaccio.

19   Q.   But you go by Fran Cosmo?

20   A.   Yeah.

21            MS. STENGER:  Page 10.

22   Q.   Do you know Barry Goudreau?

23   A.   Yeah, many years.

24   Q.   How do you know him?

25   A.   I met him way back in the late '70s before he did a solo
```

1    project.  He had asked me to be part of that record with Brad

2    Delp, him, and "Sib" and to do that record and I appeared on, I

3    think, three songs on it and wrote three songs for it, and

4    that's when I first met Barry at that time.

5    Q.    That was Barry Goudreau's solo album?

6    A.    Yeah.

7         MS. STENGER:  Page 11.

8    Q.    Is Barry Goudreau a friend of yours?

9    A.    Yeah.

09:40 10  Q.    Do you consider him a close friend?

11   A.    As close as you can be.  We live so many miles apart and

12   we haven't seen each other.  We go years and years of not even

13   seeing each other, but when we work together, we're close

14   friends and all that.  Yeah, sure.

15        MS. STENGER:  Page 16.

16   Q.    After recording that Barry Goudreau solo album with him,

17   when was the next time you had any professional relationship

18   with Barry?

19   A.    After that record, we formed a band called Orion the

09:40 20  Hunter with Michael Derosier, the drummer from Heart was in it,

21   Bruce Smith on the bass, me, and Barry, and it was called Orion

22   the Hunter, and we went on tour with that band.

23   Q.    When did you form Orion the Hunter?

24   A.    The record came out in '84, and I'm assuming we formed

25   probably about -- had to be around '82 or so or '83.

1    Q.    You recorded an album, Orion the Hunter?

2    A.    Yes.

3    Q.    That sounds about right?

4    A.    Yup.

5    Q.    And you sang songs on that?

6    A.    I wrote the songs, most of the record with Barry.  Yeah, I

7    was the total lead singer of that band and one of the main

8    songwriters.

9          MS. STENGER:  Page 17.

09:41 10   Q.    Did you tour?  Did Orion the Hunter tour?

11   A.    We toured, yeah.

12   Q.    Did you know whether -- do you believe that Tom Scholz

13   exerted any pressure on anybody to not record the album?

14   A.    I don't think it was Tom personally, maybe.  I can't say

15   it was him personally, but it was on the same label if I

16   understand.

17         MS. STENGER:  And read the blue part, please.

18   A.    I think the -- excuse me.

19         I think the same record label, and I do know that his

09:41 20   record was due for release, that 1987 record, "Third State,"

21   and it could have had a thing to do with the company, you know

22   what I mean.  Who knows, but I don't know.

23   Q.    Did you ever discuss with Barry Goudreau why a second

24   record never came out?

25   A.    We discussed a little bit here and there about it, but we

1    really don't know the whole reason, you know what I mean,

2    behind why the band got dropped after the first record.

3              MS. STENGER:  Page 20.

4    Q.   After the Orion the Hunter album came out, when was that,

5    about 1984?

6    A.   Came out '84.  That's when we toured.

7    Q.   Do you know what the record sold?

8    A.   You know, I don't know.  I think we checked it at one

9    time.  It may have been around 90,000 or so.  I don't even

09:42 10   know.

11             MS. STENGER:  Page 23.

12   Q.   You toured with Orion the Hunter?

13   A.   We toured Orion the Hunter.  We went out for Aerosmith in

14   the "Back of the Saddle" tour when we reformed.  It was fun.

15   Q.   You were the opening band for Aerosmith?

16   A.   We were opening for Aerosmith.

17             MS. STENGER:  Page 31.

18   Q.   Have you ever spoken with Barry in any of the shows you've

19   done about how he used the name BOSTON?

09:42 20   A.   No.  I don't know what he can use and not use.

21             MS. STENGER:  Page 32 to 33.

22   Q.   And just so we're clear --

23             MR. TARLOW:  Objection, your Honor.

24             THE COURT:  Here, I think 32, 3 to 9.

25             MS. STENGER:  I'm sorry, I'll go back.

```
 1              Page 32.
 2    Q.   You've never had that discussion with him about what he
 3    can say --
 4              MR. TARLOW:  Objection, your Honor.  It's not starting
 5    at the correct line.
 6              THE COURT:  Counsel, just -- Mr. Tarlow, which line?
 7              MR. TARLOW:  Start with line 24 and go through line
 8    16.
 9              MS. STENGER:  Very well.
09:43 10   Q.   He's never told you, this is how --
11    A.   I'm assuming he can say "former member of BOSTON" like
12    anyone else.
13    Q.   You never had that discussion with him about what he can
14    say and cannot say?
15    A.   I think he's mentioned he can say "former member of
16    BOSTON."
17    Q.   Has he ever told you that he can use "original member of
18    BOSTON"?
19    A.   He's never said that to me.
09:43 20   Q.   And just so we're clear, he has not told you what he could
21    say or could not say?
22    A.   No, I'm assuming --
23    Q.   I don't want you to assume.  I just want you to tell me
24    whether you recall.
25    A.   No, he hasn't said anything about what he would say.  He's
```

1     very private about his life.

2              MS. STENGER:  Page 35.

3     Q.    We'll come back to Barry Goudreau.  Let's talk about your

4     background with BOSTON.  You were in the band BOSTON?

5     A.    Yes.

6     Q.    From when to when?

7     A.    I met Tom, I think, in 1990 or so, around then, and I

8     auditioned for singer.  That's when I met Tom, and I guess he

9     chose me to be the other singer on the "Walk On" record, and in

09:44 10    1992, I think we signed -- yeah, that's when we signed, and he

11    let me go in 2006.  That's when I got the letter from Tom,

12    some -- early 2006 I got a letter from Tom saying he won't be

13    needing me in the band at this point, or something like that.

14    It was just before -- I think they did a show, the Doug Flutie

15    show or something in Boston, and I wasn't part of that one.

16    Q.    You were in the band, you think you signed with him

17    sometime in '92?

18    A.    I signed in 1992 with him.  I don't think, I know.  That's

19    what the contract reads.

09:44 20             MS. STENGER:  Page 36.  That's still you.

21    A.    I thought it was 1992 because I remember seeing 1992 on a

22    contract.  Well, this one says 1993.

23    Q.    That was September '93?

24    A.    '93.  I'm sorry, I made a mistake there.

25             MS. STENGER:  Page 37.

```
    1    Q.   You were hired to be a vocalist and a side musician for

    2    the band BOSTON?

    3    A.   Yeah.

    4    Q.   Did you also play an instrument?

    5    A.   I played guitar and sang.

    6    Q.   And in fact, as part of the agreement, you agreed that you

    7    would not play with former members of the band BOSTON for a

    8    period of five years; is that correct?

    9    A.   Yes.

09:45 10              MR. TARLOW:  Object -- oh.

   11              THE COURT:  There's no objection there.

   12              MR. TARLOW:  Yes.

   13              THE COURT:  Okay.

   14    Q.   When you signed the agreement, you acknowledged Tom Scholz

   15    owned the trademark BOSTON; is that correct?

   16    A.   Yes.

   17    Q.   You agreed you would not use the name BOSTON in promoting

   18    any musical endeavors that you were doing outside of the

   19    BOSTON --

09:45 20              THE COURT:  I'm sorry, counsel, where are you reading

   21    from?

   22              MS. STENGER:  The top of page 38.  I thought that

   23    was --

   24              THE COURT:  Yes, and then -- and you're reading

   25    through --
```

1              MS. STENGER:  Line 6.

2              THE COURT:  1 through -- I thought it was 1 through 9.

3         Mr. Tarlow, correct?

4              MR. TARLOW:  That's correct.

5              THE COURT:  Thank you.

6              MS. STENGER:  At the top of page 38.

7    Q.   You agreed you would not use the name BOSTON in promoting

8    any musical endeavors that you were doing outside of BOSTON; is

9    that correct?

09:46 10   A.   What do you mean not use the name BOSTON?  When I was in

11   the band, you know, Fran Cosmo, former singer of BOSTON.

12             MS. STENGER:  Turn to page 45.

13   Q.   In any of the times over the years starting with his solo

14   album, did you ever have a conversation with Barry Goudreau

15   about where Barry said he wanted to use his past affiliation

16   with BOSTON in order to promote his act, sell records, or

17   attract an audience?

18   A.   I thought we went over this already.  I don't know how he

19   promotes himself or what he can do personally.  He never said

09:46 20   anything to me.

21   Q.   That was my question.  Did you ever have that conversation

22   with him?  Yes or no.

23   A.   I don't know.  We may have.  Who knows in passing.  I

24   don't know.  We've had conversations.  You mean years ago?

25   Q.   At any time.

```
 1   A.   I have no idea.  I'm not sure what he can say or not, you
 2   know what I mean.  Until recently, I don't know.  There may
 3   have been something in an e-mail way back, I don't know.  When
 4   we were trying to get Orion the Hunter back, I don't even know.
 5          MS. STENGER:  Turning to page 58, to the top of 59.
 6   Q.   So getting back to Exhibit 2.  Just to confirm, this is an
 7   e-mail conversation you were having with Tom Scholz; is that
 8   correct?
 9   A.   Yes.
10   Q.   And the second line at the end begins, "I'm fine with all
11   my BOSTON years.  As a matter of fact, it was the only time I
12   was happy."
13          Was that true when you stated that?
14   A.   I was a little exaggerated, but, you know, I've been happy
15   through my life, but I guess what I meant, that's the happiest
16   I've ever been is with BOSTON because it was my biggest
17   endeavor in musical -- of my life, musical part of my life.
18   That's what I mean.  It's not like I've never been happy at
19   all, ever.
20   Q.   But you were the happiest?
21   A.   Yeah, I was.  Musically, of course.
22          MS. STENGER:  Page 60.
23   Q.   You're referring to here is the line that says, "Like when
24   we were in Dallas, you knew how much a Dallas Cowboys fan I was
25   and you came to me with a Dallas hat and that showed me what
```

1  kind of person you really are."

2  A.   Yeah.  I like that side of Tom and that was a really nice

3  thing and that's what stuck.  I'd rather have memories like

4  that than thinking of negativity things.

5  Q.   You had other such fond memories of Tom?  Tom showed you

6  that side?

7  A.   Like I said, at that time, it was really nice.  The band,

8  we did the tours, the radio tours, it as wall nice, very nice.

9  I can't say anything bad about it.

09:48 10  Q.   Tom was nice to you during these tours?

11  A.   Yeah, very nice.

12  Q.   Tom was nice to you when you were recording the albums?

13  A.   Yeah.  The "Walk On" record?

14  Q.   Yeah.

15  A.   Of course.

16  Q.   Did you ever feel that Tom bullied you?

17  A.   No, but Tom has a way, he's strict in his ways, and when

18  Tom wants something done, he has his ways of doing business.

19  He's the leader of the band, and if he does get strict with

09:48 20  you, if you feel he's a little bully, it's not really that.  He

21  knows what he wants and he knows what he has to do to get it

22  and he's the leader because he's the boss.

23  Q.   You regard Tom to be a perfectionist in the way he records

24  his music?

25  A.   Very much.

Q.   And he wants to have a certain sound?

A.   Exactly.

Q.   And did you respect that?

A.   Of course.

Q.   And Tom was -- during the band when you were touring with him, he was civil with you?

A.   Very much.

MR. TARLOW:  Note my objection to the next page, your Honor.  It's page 67.

09:49   THE COURT:  I think it's page 76.

MR. TARLOW:  I'm sorry, page 76.

THE COURT:  Counsel, just give me one moment.  I believe this is the section that I mentioned at sidebar.  Hold on.

(Pause.)

THE COURT:  Noted, counsel, but overruled given my commentary at the sidebar about counterclaims.

Counsel.

MS. STENGER:  Page 76.

09:50   Q.   So I've shown you Exhibit 6, and when you finish reading Exhibit 6 --

A.   Yeah, that is not about Orion the Hunter, or else it would've said it.  This was about my own record deal and what he thought about Barry playing on the record with me, that's it.  It's not really about Orion the Hunter; I can see it.

```
 1   Q.   So you wanted to -- just so I understand it, this is in
 2   about December of 2006?
 3   A.   Uh-huh.
 4   Q.   At that time, you wanted -- were you requesting a waiver
 5   from Tom so that you could play with Barry Goudreau?
 6   A.   It's not play with.  I wanted to feature him on a record
 7   that I was doing.  I thought it would be nice to have him play
 8   on the record like Orion the Hunter, like the old time we
 9   played together.  It's not so we can go play.  We weren't even
10   thinking about playing together.  It was just a record in
11   Europe.
12            MS. STENGER:  Page 78.
13   Q.   Why were you asking Tom --
14            MR. TARLOW:  Note my objection.
15            THE COURT:  There was an objection noted.
16            Counsel, Mr. Tarlow, since I have it in front of me,
17   I'll note your objection to the portions of 76, 77, 78, and
18   79 --
19            MR. TARLOW:  Thank you, your Honor.
20            THE COURT:  -- in this series.
21            Okay.
22            Counsel?
23            MS. STENGER:  Again, on page 78.
24   Q.   Why were you asking Tom or why were you communicating with
25   Tom regarding your playing with Barry?
```

1   A.   Because it was still in the clause in the contract,

2   five-year thing, I guess, so I wanted to make sure I go ask his

3   permission or what he thought.  Would it be okay if a record

4   came out in Europe with Barry playing with me on it and see

5   what he thought.

6   Q.   And did Tom say that he would waive the restrictions in

7   the agreement so that you could, in fact, play with Barry

8   Goudreau?

9   A.   Here's the letter that Tom wrote back right here.  He

09:51 10   explains things about Barry's record and things like that.  You

11   can read it right here.  Just a letter, so I guess he was okay

12   with it as long as everything was biographically described the

13   members of how we in BOSTON in print, you know, and things like

14   that, and that's exactly what he said to me.

15        MS. STENGER:  Move ahead to page 96.

16   Q.   Do you feel, by the way, that Tom was trying to work with

17   you at this point so that you could, in fact, go and reform

18   Orion the Hunter with Barry Goudreau?

19   A.   I just think it was too much to get it going and, I don't

09:52 20   know, I lost my interest.

21   Q.   That wasn't my question though, but your answer leads me

22   to another question.

23        First of all, do you believe at this time that Tom was

24   honestly trying to work with you so you could, in fact, go and

25   play with Barry Goudreau?

A.    Yeah, I thought he was making the effort and trying his

best.

Q.    He didn't want to stop either you or Barry from playing

together?

A.    It didn't seem to be that way by the conversations.

MS. STENGER:  Page 97.

Q.    And ultimately, you decided not to play with Barry at this

time, not because of anything Tom was doing, but because of

other things going on in your life?

A.    I kind of think we both came to that conclusion.  I know

Barry didn't want to do it.  It wasn't in his heart so much;

and me, I just had so many things going on at that point that I

was trying to get it together.  I always wanted to do another

record with Orion the Hunter, but I just can't never get it

together.  I had so many things going on in my life at that

point, it didn't seem anything at the point I wanted to pursue

anymore.  I think Barry felt the same way.

MR. TARLOW:  Your Honor, at this point, for contextual

purposes and completeness, because the portion that I've

designated follows directly after page 97, I would ask that

page 97, line 18 to page 100, line 5 be read so that the jury

can hear it in context.

THE COURT:  Okay.  From line 18, and what was the end

of what you said?

MR. TARLOW:  To page 100, line 5.

```
 1            THE COURT:  Okay.

 2            Counsel, just give me a moment.

 3            (Pause.)

 4            THE COURT:  Well, counsel, I'll allow 18 through 25.

 5   Counsel, I think what goes on -- what starts at 97 through the

 6   beginning of 100 is a little bit different, but I'll allow 18

 7   through 25.

 8            MR. TARLOW:  Thank you, your Honor.

 9            MS. STENGER:  On page 97?

10            THE COURT:  Yes.

11            MS. STENGER:  You mean 18 through 23 perhaps?

12            THE COURT:  18 through 23, yes, thank you.

13   Q.   Was that based on conversations you had with Barry?

14   A.   It's not based on anything.  I just don't think Barry at

15   any given point was so excited by Orion the Hunter.  That's my

16   feelings.

17            MS. STENGER:  Turning to page 101.

18   Q.   And ultimately, you, in fact, did not reform Orion the

19   Hunter?

20   A.   Yeah.  At that point, none of us -- because we went

21   through a lot of stuff to even get to this point, and I think

22   that it's tiring and I think other things in my life are very

23   more important than me forming Orion the Hunter at this point.

24   Q.   But it was not because of anything Tom was doing to

25   prevent you from doing Orion the Hunter?
```

```
 1              MR. TARLOW:  Note my objection, your Honor.
 2              THE COURT:  Counsel, just give me one moment, here.
 3              (Pause.)
 4              THE COURT:  Well, I think 1 to 5 is fine, counsel.
 5              MS. STENGER:  Starting at the bottom of 101.
 6    Q.   But it was not because of anything Tom was doing to
 7    prevent you from doing Orion the Hunter?
 8    A.   No, not really.  I just think we lost interest in the
 9    whole thing.
10    Q.   And in fact, you did play with Barry in a few shows here
11    and there in the last few years, didn't you?
12    A.   No, I just remember that one there.  It was a while back.
13    Q.   There was one maybe in Las Vegas?
14    A.   That's the only thing I remember at The Joint or
15    something.  It was like an audition or something.
16    Q.   Was there one in Florida at Epcot?
17    A.   I remember one in Florida and I do remember that one -- we
18    did one in Florida.  No, he didn't play Epcot with me.  That
19    was my band.
20    Q.   That was your band?
21    A.   That was my band.  He played the one in Florida.  That was
22    it.
23    Q.   You played one in Florida with Barry that was not Epcot?
24    A.   No, it wasn't Epcot.  It was some kind of rib fest or
25    something.  I remember that.
```

1    Q.   And Tom Scholz did not do anything to prevent you from

2    playing with Barry in that concert?

3    A.   Not that I can remember.  I can't remember that either.

4         THE COURT:  Counsel, Mr. Tarlow, your objections to

5    102, 103, the portions are noted.

6         MS. STENGER:  Going to page 108.

7    Q.   Do you believe there's anything that Tom Scholz did to

8    interfere with your getting back together with Barry to play in

9    shows?

09:57 10    A.   I don't think that was the main issue, no.  The contract

11    was up and we kind of knew we would play together.  Legally we

12    could go play.  I can play with just about anybody in the band

13    if I like to --

14         THE COURT:  Counsel, one second.

15    A.   -- but at this point I decided no, I'll just keep to

16    myself.  It's a lot easier.

17         THE COURT:  Just pause there.

18         MR. TARLOW:  I believe it was misread, your Honor.

19         THE COURT:  Okay.  Counsel, give me one second.

09:57 20         (Pause.)

21         THE COURT:  And if we can just start from the

22    bottom -- I think you were reading from the bottom of 108, if

23    you can do that again.

24         Mr. Tarlow, I understood it through -- you wanted the

25    full section 1 to 11.

1          MR. TARLOW:  Yes, your Honor.

2          THE COURT:  Okay.

3          So can we just start again at the bottom of 108?

4          MS. McILVENE:  With the answer?

5          THE COURT:  Let's start with the question.

6     Q.   Do you believe if there's anything that Tom Scholz did to

7     interfere with your getting back together with Barry to play in

8     shows?

9     A.   I don't think that was the main issue, no.  The contract

09:58 10  was up and we kind of knew we would play together.  Legally we

11    could go play.  I can play with just about anybody in the band

12    if I like to, but at this point I decided, no, I'll just keep

13    to myself.  It's a lot easier.

14    Q.   Did Barry ever express to you any reason for not wanting

15    to get back together to play in shows with you?

16    A.   Not really.  Barry, I don't think, really think he wanted

17    to do it.  I don't think his heart was really into it.  His

18    heart was into doing other things, and I really believe that.

19         MS. STENGER:  Advance to page 151.

09:59 20  Q.   Despite album sales for "Corporate America" being very low

21    and the 2004 tour not being a financial success, you received

22    roughly a million dollars from Mr. Scholz between 1995 and

23    2004, correct?

24         And what was your answer?

25    A.   I think that's correct.

1    Q.    Do you recall that Mr. Scholz gave advances to you over

2    the years?

3    A.    Yes, I got advances.  I remember that.

4    Q.    He didn't ask you to pay the money back?

5    A.    No.

6    Q.    So if a record wasn't profitable and he advanced you

7    money --

8    A.    Yeah.

9    Q.    -- he didn't ask you for the money back?

09:59 10    A.    No, he didn't.

11    Q.    Would you say that Tom was generous with you?

12    A.    Yeah, I think he was fine.  I said that the last time

13    here, too.  Yes.  I don't know how many times we can answer it,

14    though.  I'm saying the same thing over and over.  I feel like

15    I have to defend myself all the time.

16            Showing a document.

17    Q.    Can you tell me what that is?

18    A.    It was a loan.  I took an advancement on my pay, a

19    recoupable, and it was some kind of interest or something on

10:00 20    it.

21    Q.    Is this a loan that Tom Scholz made to you so that you

22    could buy a house?

23    A.    Yes, it is.

24    Q.    You asked Tom to lend you the money?

25    A.    Yeah -- it was very nice of him to give me that, and it

1    was great.

2              MR. TARLOW:  Objection, your Honor.

3              THE COURT:  Well, I think there was something skipped

4    there.  Can we go back.

5    Q.   You had asked Tom to lend you the money?

6    A.   Yeah, it was paid back, though.  It was very nice of him

7    to give me that and it was great.

8              THE COURT:  I think that was all you had.

9              MS. STENGER:  No further questions.

10:01 10         THE COURT:  Mr. Tarlow, you had designations.

11             MR. TARLOW:  Yes, your Honor.

12             Mr. Given will be the reader.

13             THE COURT:  Sure.

14             And same thing, counsel, if you could just say the

15   page so I can follow along.

16             MR. TARLOW:  I'll be identifying the page and line

17   numbers because Mr. Given's copy is not actually highlighted.

18             THE COURT:  Okay.

19             MR. GIVEN:  So this is what it's like.

10:01 20        MR. TARLOW:  May I proceed, your Honor?

21             THE COURT:  Yes.

22             Counsel, there were -- just for the benefit of

23   counsel, there were a few entries with asterisks.

24             MR. TARLOW:  I will not be reading those portions,

25   your Honor.

1           THE COURT:  Okay.

2           Counsel, just give me a moment here.

3           Okay.

4           (Reading from deposition of Francis Migliaccio.)

5           MR. TARLOW:  May I proceed, your Honor?

6           THE COURT:  You may.

7           MR. TARLOW:  For the record, David Given, attorney for

8    Barry Goudreau, will be reading the deposition responses of

9    Anthony Migliaccio, a/k/a Anthony Cosmo.

10:02 10          THE COURT:  Okay.

11          MR. TARLOW:  Mr. Given, if you could please turn to

12   page 28, and I'm asking you to read lines 23 to 25.

13          Let me know when you're there.

14   Q.   Did you have the ability to control how you were being

15   promoted?

16   A.   We had the ability to say don't do this --

17          MR. TARLOW:  And on to page 29.  Please read lines 2

18   through 12.

19   A.   -- but it's happened dozens of times already.  Even the

10:03 20   contract that I have, they're so clad in how you should

21   advertise.  It's so persistently constantly reminding them in

22   the contract, and yet, it goes out there and, yet, this

23   ambiguous promoter who thinks he's going to get away with

24   something says something and it happens, and then we have to

25   control it again, try to control it and say you can't do this,

1    you can't do this, you can't do this.  It happens constantly.

2           MR. TARLOW:  Mr. Given, if you could please -- I'm

3    going turn to page 30, and I'm going to read lines 12 to 21.

4    Please let me know when you are there.  Beginning at line 12 on

5    page 30.

6    Q.   Let me just -- so we have a clean record, I'll ask you the

7    question.  You have the ability to control how the promoter

8    promotes you?

9    A.   It's in the contract, like I said, how they should promote

10:03 10   me, but if it's third party and they're going to do it without

11   me knowing it, how do you control that all the time if it

12   happens.  Sometimes you don't see it until a month later.

13          MR. TARLOW:  Mr. Given, if you could please turn to

14   page 42.  I'm going to direct you to lines 13 through 25 on

15   page 42.  Please let me know when you get there, to line 13.

16          MR. GIVEN:  Got it.

17   Q.   Why would you want to talk about your affiliation with

18   BOSTON in any advertisement?

19   A.   What do you mean why?  Because it's an accomplishment that

10:04 20   I have achieved and I was with the band for quite a long time

21   and I sang over a million records on the "Walk On" as a lead

22   singer.  Why wouldn't I want to say that so that I can make

23   money for my family?  Why wouldn't I?  Why would I just want it

24   to say anybody who never sang in a band like that, and what's

25   that going to do for my career or for me even getting work?

```
 1              MR. TARLOW:  Okay.  Mr. Given, if you could please

 2      direct your attention to page 43.  I'm going to be getting to

 3      two-thirds of the way through line 13 and ask you a question.

 4              Are you there?

 5              MR. GIVEN:  Yup.

 6      Q.   Do you feel that you need to refer to your affiliation

 7      with BOSTON in advertisements in order to attract people to

 8      come to your shows?

 9      A.   Of course.  I can tell you why.  Did you go to school to

10:05 10  be a lawyer?

11      Q.   I did.

12      A.   After your schooling, if you can't become a lawyer and you

13      can't say you went to school to be a lawyer, what's it going to

14      do for you?  Okay?  You own a nice firm, and now you can

15      advertise it.  You did this and that.  And I have to do the

16      same thing in my life.  I have to do the same as anyone else

17      who goes to school for years.  You have to use your credentials

18      to make your living.  I know Tom understands that.  He's never

19      had a problem with me saying "former member" or "former singer

10:05 20  of BOSTON" all them years because it's a biographical thing and

21      the word "BOSTON" is smaller underneath my name, which,

22      according to law, is perfectly legal.

23              MR. TARLOW:  Just for the record, from the word "life"

24      to the word "legal," that was on page 44.

25              Mr. Given, I'm going to direct you on that same page
```

1    44.  We're going to read lines 11 through 20.

2              MR. GIVEN:  Okay.

3              MR. TARLOW:  Sorry -- yes, lines 11 through 20.

4    Q.   So my question is, just to make sure it's clear:  And do

5    you feel in referring to your past affiliation with BOSTON in

6    advertisement will get you --

7    A.   Of course it's going to get me more stuff.  Of course it's

8    going to get me a little more work.  You know, I don't work a

9    lot.  It's not like fantastic, no.  It's a complete different

10   thing.  It's being in the band BOSTON, of course.

11             MR. TARLOW:  Mr. Given, if you could turn to page

12   65 --

13             THE COURT:  I think -- was there an objection here,

14   counsel?

15             MS. STENGER:  Yes, your Honor.

16             THE COURT:  Okay.  Give me one second.

17             MS. STENGER:  Designation.

18             THE COURT:  I see.  It starts -- it's in the middle of

19   an answer.

20             MR. TARLOW:  It's supposed to be page 64, there's a

21   typo, your Honor.  64, lines 7 through 9.  I apologize for

22   that.

23             THE COURT:  Any objection to that?

24             MS. STENGER:  No, your Honor.

25             THE COURT:  Okay.  You may read that.

1           MR. TARLOW:  I'm sorry, your Honor.

2           So, Mr. Given, page 64, line 7 through -- actually,

3    your Honor, 7 through 9.

4           MR. GIVEN:  Got it.

5           MR. TARLOW:  Actually, it should have been lines 7

6    through 17, your Honor.

7           Is there an objection to that?

8           THE COURT:  Counsel, an objection to that?

9           MS. STENGER:  No, your Honor.

10:07 10           THE COURT:  Okay.  You can read 7 through 17.

11    BY MR. TARLOW:

12    Q.    Did you, in fact, reorganize?

13    A.    We never got to do it, no.

14    Q.    Why not?

15    A.    We couldn't get it together.  I think Tom had his

16    stipulations, and I don't know what happened.  Then I just

17    think that afterwards I just says, you know, we're going back

18    and forth with this for now a couple of years or so and I

19    said -- decided to say, Well, let's just not do it and get

10:08 20    going with my life and start playing.

21           MR. TARLOW:  If you could turn to page 65, Mr. Given,

22    line 24, and I would ask you to read 66 through lines 8.

23           MR. GIVEN:  Got it.

24    Q.    Did you feel that you needed Tom's permission?

25    A.    I think at that point, yes, because it was Orion the

1    Hunter.  I knew that there was a stipulation, I think still

2    that it had come through it if Tom would let me do it or not.

3    I think, I'm not sure, it was, like, a five-year thing.  I'm

4    not sure if the five-year thing was up.

5         MR. TARLOW:  If you could turn to page 97, Mr. Given.

6    I'd direct your attention to lines 18 through 25.

7         Your Honor, I'd like to read the previous question

8    that Ms. Stenger read just for context.

9         THE COURT:  Counsel, was this read before?

10:09 10    MR. TARLOW:  I'm sorry, yes, it was, but I'm going to

11    continue to read through 99 to page 100 through line 5.

12         MS. STENGER:  Your Honor, just from 97 through line

13    23, I have no objection to him repeating the last question and

14    answer.

15         THE COURT:  Okay.

16         MR. TARLOW:  So may I proceed, your Honor?

17         THE COURT:  You may.

18         And there's no objection to the other portion?

19         MS. STENGER:  Correct.

10:09 20    THE COURT:  Okay.

21         MR. TARLOW:  So, Mr. Given, I know we're going to be

22    repeating a little bit of testimony.  We're going to begin from

23    page 97 and go through page 100, line 5.

24    Q.   And ultimately you decided not to play with Barry at this

25    time not because of anything that Tom was doing, but because of

1   other things going on in your life?

2   A.   I kind of think we both came to that conclusion.  I know

3   Barry didn't want to do it.  It wasn't in his heart so much,

4   and me, I just had so many things going on at that point that I

5   was trying to get it together.  I always wanted to do another

6   record with Orion the Hunter, but I just can't never get it

7   together.  I had so many things going on in my life at that

8   point, it didn't seem anything at that point I wanted to pursue

9   anymore.  I think Barry felt the same way.

10:10 10   Q.   Was that based on any conversations you had with Barry?

11   A.   It's not based on anything.  I just don't think Barry at

12   any given point was so excited about Orion the Hunter.  That's

13   my feelings.

14   Q.   Let me show you what we've marked Exhibit 13, and there is

15   an e-mail chain, several e-mails in the period of February 21

16   between you and Tom and some others, and let me direct your

17   attention now to the second page.  There's an e-mail dated --

18   it's in the middle of the page dated February 21, 2007 at 2:22

19   p.m., and was that an e-mail you sent to Maggie Lane, Tom's

10:10 20   attorney?

21   A.   Uh-huh.

22   Q.   Is that a yes?

23   A.   Yes.

24   Q.   It says, "Hi, Maggie.  How are you?  This is Fran Cosmo.

25   As this reads, I'm still not sure what we can do and cannot do

1    like advertising.  Can we say Formerly From the Band BOSTON in

2    our ads?  I did write to Tom about this a few nights ago.  I

3    told Tom that Barry already had a contract with Tom for a

4    number of years.  I don't think he would like to change

5    anything in that contract to play with me at this point in his

6    life.  What started out with a lot of hope, I think Barry is

7    now moving onto other things because he said he would not do it

8    unless it was very clear as to what we could do."

9          Does that refresh your recollection that you were, in

10:11 10    fact, having conversations with Barry?

11    A.   Yes, and I think I know what he's saying here.  I don't

12    think he just -- I think he wants to know perfectly what we can

13    say because if we don't get it perfectly, exactly what we can

14    do or say -- it's not like we can't say this because it's --

15    I'm not doing it.  What I think what he means is, unless it's

16    so clearly to him, it's not worth doing it because it can make

17    trouble and nobody wants to do anything that's going to make

18    trouble.

19    Q.   In the next e-mail above that, Maggie's reply to you is

10:12 20    telling you specifically that you can and can't do; is that

21    correct?

22    A.   Yes.

23    Q.   And, in fact, what she is saying is, "You can say you were

24    former members of BOSTON on interviews on the website, but you

25    can't use the term 'BOSTON' in any advertisement or promotion

```
 1    of any shows."  Does that make it more clear for you?
 2    A.    Yeah, it was a little clearer.  Yes.
 3              MR. TARLOW:  I would ask you to go to page 143.
 4              THE COURT:  Are there objections here?
 5              MS. STENGER:  Yes, your Honor, 143 and 144.
 6              THE COURT:  Counsel, let me just get there.
 7              (Pause.)
 8              THE COURT:  And 144 through 23?
 9              MS. STENGER:  Yes.
10              (Pause.)
11              THE COURT:  Well, sustained as to the first part, 143
12    through -- 11 through 25.  Yeah, sustained as to that, counsel.
13              MR. TARLOW:  As to 143 and 144, your Honor?
14              THE COURT:  Yeah.  Just so the record's clear, 11
15    through 25 on 143, and 2 through -- the continuation on 2
16    through 23 on 44.
17              MR. TARLOW:  Thank you, your Honor.
18              Note my objection.
19              THE COURT:  Noted.
20              MR. TARLOW:  If you could turn to page 148, Mr. Given.
21              THE COURT:  No, 148, 11 --
22              MS. STENGER:  Objection.
23              THE COURT:  This is the same objection, 11 to 15, as
24    on the top of 143.  So sustained as to that.
25              MS. STENGER:  Thank you.
```

```
 1              MR. TARLOW:  Could you turn to page 170, Mr. Given?
 2              MR. GIVEN:  Okay.
 3              MR. TARLOW:  And this would be lines 15 through 25,
 4    your Honor.
 5              MS. STENGER:  Objection.
 6              (Pause.)
 7              THE COURT:  Well, I think this relates to something
 8    that was drawn out on direct if I'm recalling correctly,
 9    Mr. Tarlow.
10:15 10         MR. TARLOW:  Yes, your Honor.  But I indicated earlier
11    I was not going to read page 171, so let's make sure -- I want
12    to make sure that that --
13              THE COURT:  Right.
14              So -- counsel, I think Mr. Tarlow is starting with 170
15    at 15 through 25.  That's what I was focused on.  Was there an
16    objection?
17              MS. STENGER:  Yes.
18              MR. TARLOW:  I'm not going to read those portions of
19    the transcript in light of the Court's orders in limine.
10:15 20         MS. STENGER:  Thank you.
21              THE COURT:  Okay.
22              Next portion.
23              MR. TARLOW:  185, lines 23 to 25.
24              MS. STENGER:  Objection.
25              THE COURT:  Okay.
```

```
 1              (Pause.)

 2              MS. STENGER:  I'll withdraw that, your Honor.

 3              THE COURT:  Okay.

 4              Is that withdrawn as to 23 to 25 through 2 to 26 on

 5     186?

 6              MS. STENGER:  Correct.

 7              THE COURT:  Okay.

 8              You may read those.

 9              MR. TARLOW:  So, Mr. Given, we're going to start at

10     page 185, lines 23 to 25.  We're going to read through lines 26

11     on the following page.

12     Q.   Do you recall your testimony where Mr. Belt was trying to

13     get to you agree that you control these people?

14     A.   Control them?

15              MS. STENGER:  Excuse me, your Honor, objection.  I'm

16     just looking to see if there's a reference to something your

17     Honor has made a ruling on.

18              (Pause.)

19              MS. STENGER:  I will withdraw that.  Thank you.

20              THE COURT:  Okay.

21              Why don't you start again, Mr. Tarlow.

22     BY MR. TARLOW:

23     Q.   Do you recall your testimony where Mr. Belt was trying to

24     get to you agree that you control these people?

25     A.   That I control them?
```

1   Q.   Yes.

2   A.   I can't control them.  They control themselves, that's the

3   problem.

4   Q.   All you can do is do everything you can to inform them

5   about what they can and cannot say about you, but you have no

6   control over what these people ultimately do; is that fair to

7   say?

8   A.   Exactly.  Here's what happens.  We send them a contract.

9   Everything from radio ads, Joe, to what they can say about me

10:17 10  as a singer, what they can say about BOSTON, how big the print

11  even, what size the print is, it goes on and on and on.  It's

12  all in my contract.  I can't control what they do after that.

13  The problem is that some of these people think it's okay to do

14  something new, twist the words around, and do an all BOSTON

15  hits show, no.  On the poster, they can put things like I'm

16  singing "Walk On," "Living For You," the songs that I sing on

17  and maybe a couple of the BOSTON songs, and that's it on the

18  side, you know, performing the songs and that would be it and

19  that's the limits.  So when they go above and beyond, how can I

10:18 20  control that?  Half the time we don't catch it until four weeks

21  later, a couple of weeks later.  It's, like, ridiculous.

22        MR. TARLOW:  Your Honor, turning to page 190, 5

23  through 11.

24        MS. STENGER:  Objection.

25        MR. TARLOW:  Actually, your Honor, I would withdraw

1    that.

2            THE COURT:  Okay.

3            MS. STENGER:  Thank you.

4            THE COURT:  Mr. Tarlow, is that --

5            MR. TARLOW:  That's --

6            THE COURT:  That's the end.

7            Were there any --

8            MR. GIVEN:  Am I excused, your Honor?

9            THE COURT:  Just to counsel table.

10:18 10            MR. GIVEN:  I've never done that before.

11            THE COURT:  Counsel, were there any other

12    designations?

13            I don't think so.  I think we covered them all.

14            MS. STENGER:  No, your Honor.

15            MR. GREEN:  Thank you, your Honor.

16            The plaintiff rests.

17            MR. TARLOW:  Your Honor, we reserve as to the matter

18    previously discussed.

19            THE COURT:  I'll see counsel at sidebar for a moment.

10:18 20            Jurors, the plaintiff has rested, which means the

21    plaintiff has closed the evidence on -- the evidence they're

22    offering that support the plaintiff's claims.  This is a

23    juncture where I need to speak briefly with counsel.

24            (At sidebar on the record.)

25            MR. GIVEN:  We have a motion, which I'd like to hand

```
 1   file under Federal Rule of Civil Procedure 50.  Copy for my
 2   brother, copy for my sister, a copy for your Honor.
 3           THE COURT:  Thank you.
 4           Counsel, as I indicated before, this motion is
 5   reserved on for the moment.  I'll hear counsel later this
 6   afternoon, after the jury is excused for the day.
 7           MR. GIVEN:  Understood.
 8           THE COURT:  Counsel, in terms of timing, who's up now
 9   from the defense case?  Because now I'm going to turn to
10   defense --
11           MR. TARLOW:  "Sib" Hashian will be about 20 minutes,
12   and then James Montgomery maybe 15 minutes, and then Barry
13   Goudreau, hopefully 40 minutes, 45 minutes.
14           THE COURT:  Okay.  So we'll get started and we'll take
15   our break probably around the same time.
16           MR. GIVEN:  Thank you, your Honor.
17           MR. GREEN:  Thank you.
18           (End of discussion at sidebar.)
19           MR. TARLOW:  Your Honor, if I may set up at the
20   podium?
21           THE COURT:  You may.
22           Jurors, at this juncture, now that the plaintiff has
23   rested, the defendant can offer evidence that he claims
24   supports his defenses and his counterclaims.  So we're now
25   going to turn to the defense and their first witness.
```

1          Mr. Tarlow.

2          MR. TARLOW:  Yes, your Honor.

3          THE COURT:  Who is being called?

4          MR. TARLOW:  Mr. "Sib" Hashian.

5          THE COURT:  He may be called.

6          MR. GIVEN:  Your Honor, he's visiting the men's room.

7    He'll be in shortly.

8          THE COURT:  We'll let Mr. Tarlow set up, and then we

9    should all be ready.

10:21 10          JOHN "SIB" HASHIAN, having been duly sworn by the

11   Clerk, was examined and testified as follows:

12          THE CLERK:  Thank you.  Please be seated.

13          THE COURT:  Good morning, sir.

14          THE WITNESS:  Good morning.

15          THE COURT:  Counsel.

16          MR. TARLOW:  Thank you, your Honor.

17                         DIRECT EXAMINATION

18   BY MR. TARLOW:

19   Q.   Would you please state your name for the record, sir.

10:22 20   A.   John "Sib" Hashian.

21   Q.   And, Mr. Hashian, just so we're clear, have I ever

22   represented you as an attorney?

23   A.   Yes.

24   Q.   And have I represented you over the past ten years?

25   A.   Yes, at some time or another.

1    Q.    And did I, in fact, represent you at a deposition in this

2    matter before I was counsel of record?

3    A.    Yes.

4    Q.    And have I interviewed you prior to your testimony here

5    today about this matter?

6    A.    No.

7    Q.    Now, have I told you any questions that -- strike that.

8          When I say "interviewed you" -- I've spoken to you

9    about this matter in preparation for your testimony here today,

10   correct?

11   A.    Yes.

12   Q.    Have I told you about the testimony of any of the

13   witnesses that have already testified in this matter?

14   A.    No, you haven't.

15   Q.    Okay.

16         If you could just turn your mind back to the mid-'70s.

17   What was your occupation?

18   A.    Mid-'70s?

19   Q.    Yes.

20   A.    Active musician, drummer, singer.

21   Q.    And did you perform with a particular band?

22   A.    In the '70s, several.

23   Q.    Turning your attention to 1975, 1976, what band did you

24   perform with, sir?

25   A.    '75 I had just joined up with Tom and Barry to do the

1    BOSTON album.

2    Q.    Okay.

3          What's the instrument that you play, sir?

4    A.    I would play the percussion and drums.

5    Q.    And do you, sir, have personal knowledge as to who the

6    original members of the band BOSTON are?

7    A.    Yes, I do.

8    Q.    Who are the original members of the band BOSTON?

9    A.    Fran Sheehan, Brad Delp, Barry Goudreau, "Sib" Hashian,

10:23 10   and Tom Scholz.

11   Q.    And at some point, did you exit the band BOSTON?

12   A.    I'm sorry?

13   Q.    At some point, did you leave the band BOSTON?

14   A.    Yes, I did.

15   Q.    Do you recall when that occurred?

16   A.    Let me think.  I think that was around 1982.

17   Q.    Well, sir, did you sign an agreement that dealt with your

18   leaving the band BOSTON?

19   A.    Yes, I did.

10:24 20   Q.    Okay.

21          MR. TARLOW:  May I approach, your Honor?

22          THE COURT:  You may.

23          (Pause.)

24   BY MR. TARLOW:

25   Q.    Mr. Hashian, do you recognize that document?

1    A.    Not really.

2    Q.    Could you read just the first paragraph of that document,

3    sir?

4          MR. GREEN:  Objection.  Settlement Agreement, and

5    relevance, your Honor.

6          THE COURT:  Okay.

7          Different than Exhibit 28?

8          MR. GREEN:  Yes, it is, your Honor.  Different

9    circumstances.

10:25 10          THE COURT:  Well, counsel, are you offering it here,

11    or is it just for refreshing?

12          MR. TARLOW:  I'm putting it into the context of the

13    date, your Honor.

14          THE COURT:  Sure.

15          I think it's just being used to refresh.

16          MR. GREEN:  With that understanding, I'll withdraw the

17    objection, your Honor.  I didn't understand it that way.

18    BY MR. TARLOW:

19    Q.    If you could just read to yourself the first paragraph of

10:25 20    that document.

21          Have you read that, sir?

22    A.    The first paragraph?

23    Q.    Yes.

24    A.    Yes.

25    Q.    Does that clarify your understanding of the date you left

1    the band BOSTON?

2    A.    Yes.

3    Q.    And what is the date you left the band BOSTON?

4    A.    7th of March 1991.

5    Q.    Okay.

6          And when you left the band BOSTON, was there any

7    restriction on your ability to use the name BOSTON?

8    A.    Yes, there was.

9    Q.    And what's your understanding as to what that restriction

10   was, sir?

11   A.    My understanding was that I was only allowed to have my

12   name no bigger than the word "BOSTON."  So if it was going to

13   be "Sib" Hashian, you know, formerly -- I could only use

14   "formerly," that I remember, and BOSTON, BOSTON couldn't be

15   bigger than "Sib" Hashian.

16   Q.    Now, at some point, sir, did you begin to perform with a

17   band called Ernie and the Automatics?

18   A.    Yes, I did.

19   Q.    Could you describe very briefly, sir, how that came to

20   pass?

21   A.    Well, very briefly -- I don't know if I could do it

22   briefly, but I'll try to make as short as possible.

23         In the year 2001, my fellow classmate, Art Devine, who

24   was also a fellow Vietnam veteran, wrote a play for Cape Rep.

25   Theater in Harwich.  We performed that play.  I was acting and

1    I was a technical consultant, and we performed that, had a

2    great run.  So we wanted to move it up in 2004 to the Tremont

3    Theater and perform it there.  So Artie asked me -- Art Devine

4    asked me if I would be a producer and try to raise money.  So I

5    approached Ernie Boch, Jr., who I had not even met but I had

6    given him some charity items.  This is great because I have a

7    good news/bad news story.  So I called up Artie when I got out

8    of the meeting.  I said, I got good news/bad news.  He said,

9    Give me the bad news.  I said, Well, I asked Ernie for $25,000,

10:27 10   and he turned me down.  He said, What the hell is the good

11   news?  I said, He gave me $30,000.

12   Q.   At some point, did you begin to play music with Mr. Boch?

13   A.   What happened after that transpired is Ernie said, You

14   know, is there any chance that you -- you know, I'm a guitar

15   player.  Is there any chance maybe you'd come over and jam with

16   me and have some fun?  Hell, yeah.

17        So after the play ended, we went to Ernie's hangar,

18   just me and him, set up my drums, and we just had some fun.

19   You know, screwed around, worked on some jazz stuff.  Ernie had

10:28 20   a lot of jazz experience and some rock experience.  And we laid

21   some tracks.  We had some fun.

22        After that, he said, You know what, I want to go on,

23   I'm going to donate $20,000 to the food bank at WAAF, and I'd

24   like me, you -- can you get a guitar player -- Barry Goudreau.

25   He said, Let's go in there, we'll have some fun, play some

1    jazz, some of the stuff we were working on, and we'll give the

2    $20,000 for the food bank, and that was that.  That was the

3    start.

4           Because then we had the three of us, and Ernie let me

5    pick who I wanted on bass, and I wanted Tim Archibald, who was

6    voted best bass player three years in a row.  And that was the

7    start of Ernie and the Automatics.

8           Now, Ernie was against me calling it -- I said, Ernie,

9    I know you don't want your name involved, but I think it's kind

10:29 10  of a cool idea, Ernie and the Automatics, it's like a car

11   thing.  I said, Let's not wear all this rock 'n' roll garb;

12   let's put on work shirts.  So we, actually, all have work

13   shirts with "Ernie and the Automatics" and our names, "Sib,"

14   the same exact shirts, and that was the band.

15          That band performed with James Montgomery and my

16   daughter, Lauren, singing at the Real Blues Festival, and that

17   was in July 2006, and that was our first gig, and we opened up

18   for Los Lobos.

19          After that, we picked up Michael Antunes.  Me and

10:29 20  Barry were doing some charity work in Minnesota, and we met

21   Michael Antunes, the saxophone player from Beaver Brown.

22   Nicest guy you ever want to meet.  Right now he's 76 years

23   young.  He's an unbelievable saxophone -- you hear him play

24   like two notes and you know he's the real deal.

25   Q.   Mr. Hashian, I don't mean to cut you off, but I want to --

1    thank you for the description of how the band started.

2         Now, prior to -- at some point, did you realize that

3    this band was going to do public performances?

4    A.   Well, what had happened is then we picked up Brian Maes,

5    who was a prolific writer and also a great singer.  So it came

6    across, well, you know what, we got a bunch of talented guys in

7    the room here, let's do a record.

8    Q.   No, no, but before the record, sir, at some point, did you

9    realize you were going to -- instead of rehearing and jamming,

10:30 10   you realized you were going to do a public performance?  Yes or

11   no, sir.

12   A.   Yes.

13   Q.   Prior to that occurring, did you have any concerns as to

14   how you would be billed or advertised by Ernie Boch, Jr.?

15   A.   Positively.

16   Q.   And what were those concerns?

17   A.   We made sure -- well, we thought we made sure to Ernie --

18   after our practices and rehearsal in the hangar, we'd all get

19   together in another room, a side room, and we'd have some beers

10:30 20   and we'd talk about what do we want to do, where do we want to

21   go with it.  And Barry and I would tell Ernie, you know, Look,

22   stay out of Tom's way.  Make sure, you know, obey what we can

23   do.  We can say "formerly of," we can say "BOSTON," we can't

24   say "BOSTON" -- we let Ernie know we wanted to stay out of

25   trouble.

1    Q.   And why were you personally concerned?  Did you personally

2    express those concerns?

3    A.   Oh, very much so.

4    Q.   And was this prior or after your first public performance?

5    A.   No, this was prior.

6    Q.   Okay.

7         And at that point when you expressed those concerns,

8    were you concerned at all as to whether or not Ernie Boch, Jr.

9    understood the restrictions that you were under?

10:31  10    A.   No, I'm pretty sure -- I mean, the whole band understood.

11    Q.   With respect to -- what was your role in Ernie and the

12    Automatics?  Did you have any financial interest in the band,

13    any ownership interest in the band?

14    A.   No, I did not.

15    Q.   Were you ever consulted prior to any advertisements of

16    Ernie and the Automatics being placed?

17    A.   No, I was not.

18    Q.   Were you ever consulted with respect to either the design

19    or text of any of the advertisements that were being placed?

10:32  20    A.   No, I was not.

21    Q.   To your knowledge, did Barry Goudreau have any control

22    over the advertisements that were being placed?

23    A.   No, he was not.

24    Q.   At some point in time, you released a CD, "Low

25    Expectations"; is that correct?

A.    Yes.

Q.    Do you recall seeing a sticker on that CD?

A.    Yes, I did, after it came out.

Q.    Okay.

And could you tell me what you did after you saw that sticker?

A.    Well, I was really surprised because, you know, we had spelled out to Ernie, Look, don't do this, you can do this, don't do that.  When I saw the sticker out, you know, I was kind of thrown back because I didn't know he was going to try to use us as a selling tool for the record.  You know, I questioned him about it.  I said, Ernie, what's going on with this?  What's up with this?  I said, You're going to get us in trouble with Tom.

Q.    And what did Mr. Boch say to you in response?

A.    As it turned out, he actually called Tom.  He had got in touch with Tom --

MR. GREEN:  Objection, hearsay.

THE COURT:  Well, sustained as to that.

BY MR. TARLOW:

Q.    After that conversation, did you form any impressions as to whether or not the matter had been resolved?

A.    Yes, I did.

Q.    And what were those impressions?

A.    My impression was that it was resolved, that Ernie had

1  made contact with Tom, and at the same time -- I don't know

2  what it is now, but I think they both shared the same lawyer.

3  Q.   After that conversation, did you have any other concerns

4  that Mr. Boch was going to continue to advertise you as

5  anything other than a former member of the band BOSTON?

6  A.   No, I didn't.

7  Q.   What's the nature of your relationship with Mr. Goudreau?

8  A.   I've been friends with Barry for over 50 years.  When we

9  were growing up, we had a rock 'n' roll band together.  We used

10:33 10  to play down in what they called the Combat Zone, Washington

11  Street in Boston.  We would work seven nights a week, seven

12  sets a night and a matinee on Saturday.  That's 50 sets a week,

13  and sometime we actually signed a contract where we did five

14  weeks in a row.  We did 250 sets.

15  Q.   How would you describe your relationship with Mr. Goudreau

16  as far as personal and professional relationship?

17  A.   Barry's like a brother.

18  Q.   Okay.

19       And has that relationship changed at all over the last

10:34 20  five, six, seven years?

21  A.   Well, it has changed in the last couple of years because

22  of the stress put on of the lawsuit.

23  Q.   Which lawsuit are you talking about, sir?

24  A.   The lawsuit brought on Barry because of Automatics.

25  Q.   When did you first learn about the lawsuit regarding

1   Automatics?

2   A.    When we started going on tour.  We were opening up in the

3   fall of 2011.  We were opening up for Deep Purple, and we had a

4   North American tour.  And when we got together to do the tour,

5   Barry was all pissed off and in a really bad mood.  I said,

6   What's up?  He said I got sued by Tom.

7          MR. GREEN:  Objection.  Objection.  Hearsay.

8          THE COURT:  Well, sustained as not the party opponent

9   here, so --

10         MR. TARLOW:  Is the whole answer stricken, your Honor?

11         THE COURT:  Counsel, the last part -- the last part of

12   it about the statement.

13         MR. TARLOW:  Okay.

14  BY MR. TARLOW:

15  Q.    After -- at that time, did you make any observations about

16  Mr. Goudreau, not what he said, but any observations that -- of

17  his behavior at that time?

18  A.    Oh, yeah, positively.  He was in a rotten mood.

19  Q.    And did that affect your relationship with him, sir?

20  A.    Well, actually, we were rooming together, and he was in a

21  rotten mood and I was sick with lyme disease, so it was

22  beautiful.

23  Q.    Now, do you still perform with Mr. Goudreau?

24  A.    Yes, I do.

25  Q.    Do you perform with him often?

```
 1   A.    Not -- no, we don't.

 2   Q.    Why not?

 3   A.    It's because we're having problems getting gigs because of

 4   the threat of being sued.

 5   Q.    Now, with respect to -- do you perform under a particular

 6   name?

 7   A.    Sometimes.

 8   Q.    In the past four years -- since 2013, have you -- can you

 9   recall any time where you've sought to get work with

10:36 10   Mr. Goudreau that you have been offered shows where you haven't

11   taken them?

12   A.    Yes.

13         MR. GREEN:  I'll wait for the next question.

14         THE COURT:  Okay.

15         That can stand.

16         Counsel.

17   BY MR. TARLOW:

18   Q.    And do you recall the reasons as to why you declined those

19   certain shows?

10:36 20   A.    Yes.

21         MR. GREEN:  Objection.

22         THE COURT:  Counsel, overruled, given the nature of

23   the counterclaims, correct?

24         MR. GREEN:  If I heard the question, it was why you

25   were declined.  It's asking for speculation as to third
```

1  parties.  It's asking for hearsay, your Honor.

2        MR. TARLOW:  I'll rephrase, your Honor, to make it

3  more clear.

4        THE COURT:  Okay.

5  BY MR. TARLOW:

6  Q.   With those particular shows you're thinking of, did you

7  and/or Mr. Goudreau decline any particular shows?

8  A.   Yes, we did.

9  Q.   Okay.

10:37 10       And what is the first show that you recall that you

11  declined to accept?  Most recent show.

12  A.   I can't remember the first one, but I can remember the

13  last ones.

14  Q.   What was the last ones, sir?

15  A.   It was Tricia Burns, who has her own agency, had called me

16  and wanted to put us in Salisbury Beach, there's a venue up

17  there called -- I think it's Ocean View.  They had several open

18  dates, and they wanted to know if we --

19        MR. GREEN:  Objection now on hearsay, your Honor.

10:37 20       THE COURT:  Well, just -- counsel, sustained as to the

21  remainder of the answer.  But, Mr. Tarlow, you can frame it as

22  to what this witness did.

23        MR. GREEN:  And again, the original question was why

24  it was declined, was also going beyond the question, your

25  Honor.  Thank you.

```
 1              THE COURT:  So, Mr. Tarlow, with that direction, just
 2    as to what the witness did.
 3    BY MR. TARLOW:
 4    Q.   Based upon your knowledge, sir, did you and Mr. Goudreau
 5    have an opportunity to play the Ocean View?
 6    A.   Yes, we did.
 7    Q.   And where is the Ocean View?
 8    A.   Salisbury Beach.
 9    Q.   And when did you have such an opportunity?
10:38 10    A.   I want to say May.
11    Q.   And how many shows did you have the opportunity to play at
12    the Ocean View?
13              MR. GREEN:  Objection.  This would either be hearsay
14    or best evidence.
15              THE COURT:  Well, no, overruled.
16    BY MR. TARLOW:
17    Q.   And how many shows did you have the opportunity to play
18    with Mr. Goudreau at the Ocean View?
19    A.   Well, she told me that there were --
10:38 20    Q.   Without telling me what someone else told you, how many
21    shows did you understand you had the opportunity to play at the
22    Ocean View?
23    A.   Two or three.
24    Q.   And at that time, were you charging a particular rate per
25    show?
```

1    A.    No.

2    Q.    At that time, did you have an understanding as to what you

3    would have been paid to play that show?

4    A.    Yes.

5    Q.    And what was that amount, sir?

6    A.    I believe it was $6,000.

7    Q.    And if you had, in fact, played that show, how much would

8    Mr. Goudreau have earned?

9    A.    Two thousand dollars.

10:39 10   Q.    And was there a reason why you declined to play that show?

11   A.    Barry was afraid of being sued by Tom.

12   Q.    And why was that, sir?

13   A.    It's because, as Tom knows, you can tell a promoter how to

14   advertise your band, but a lot of times they don't care.  They

15   want to make the most money they can, and they'll do whatever

16   they want to make money, even though they're told not to do it.

17   Q.    Are there other shows that you recall that you declined?

18   A.    Well, not specific shows, but people had approached me to

19   see if we would be available to do shows, and because they

10:40 20   wanted to do it publicly, I had to turn them down.

21   Q.    Now, you recall you gave a deposition in this matter in

22   2014?

23   A.    Somewhat.

24   Q.    Okay.  And you do recall giving testimony in that

25   deposition, correct?

1    A.    Somewhat.

2    Q.    After you took that deposition, did somebody contact you

3    on behalf -- did someone make a phone call to you or contact

4    you in any way on behalf of Mr. Scholz?

5    A.    Yes.

6    Q.    And who was that person?

7    A.    Irving Azoff.

8    Q.    And did Mr. Azoff identify himself in any way on that

9    call?

10   A.    As far as, what?   Identifying himself.

11   Q.    Did he tell you on whose behalf -- did you know who

12   Mr. Azoff was when he called you?

13   A.    Oh, yeah.   Everybody in the music business knows Irv

14   Azoff.

15   Q.    Did he say on that call on whose behalf he was calling?

16   A.    Yes, he did.

17   Q.    On whose behalf did he say he was calling?

18   A.    Tom Scholz.

19   Q.    And do you recall approximately when that phone call took

20   place?

21   A.    Positively.

22   Q.    And when was that?

23   A.    That was early February 2015.

24   Q.    Again, that was after you gave a deposition in this

25   matter, correct?

1     A.    Correct.

2     Q.    And did Mr. Azoff on behalf of Mr. Scholz tell you or ask

3     you anything during that telephone call?

4     A.    Yes, he did.

5     Q.    What did he ask you or tell you?

6     A.    He asked me if I'd be interested in going out and playing

7     the tour, the second half of the tour for BOSTON.

8     Q.    And what did you respond?

9     A.    I told him that -- I told him -- I'm not sure if it was to

10:41 10    him or Tom's pal, but I told him that I'd have to think about

11    it but I wouldn't do it without Barry.

12    Q.    And was there a response from Mr. Azoff?

13    A.    He said he'd call me in a week.

14    Q.    Did he, in fact, call you in a week?

15    A.    No.

16          MR. TARLOW:  May I just confer with my co-counsel for

17    one moment?

18          THE COURT:  You may.

19          (Discussion off the record.)

10:42 20         MR. TARLOW:  No further questions of this witness,

21    your Honor.

22          THE COURT:  Thank you, counsel.

23          Mr. Green.

24          MR. GREEN:  Thank you, your Honor.

25                          CROSS-EXAMINATION

1    BY MR. GREEN:

2    Q.    Mr. Hashian, my name is Lawrence Green.  I represent

3    Mr. Scholz.

4           Now, how long -- on how many engagements have you

5    retained Mr. Tarlow?

6    A.    I can't remember.

7    Q.    But he has been your attorney off and on for ten years; is

8    that your testimony?

9    A.    Yes.

10:42 10   Q.    On various personal and business matters?

11   A.    Yes.

12   Q.    And he was your -- he was your attorney when you were

13   deposed in this case?

14   A.    Yes.

15   Q.    Did you meet with him to prepare your testimony for today?

16   A.    No.

17   Q.    I thought -- I thought you testified that you did meet

18   with him but you just didn't talk about the previous witnesses.

19   Did I hear that incorrectly?

10:43 20   A.    I think you did.

21   Q.    You never met with him in connection with your trial

22   testimony?

23   A.    I talked to him on the phone.

24   Q.    Okay.  Thank you for clarifying that.

25           On how many occasions did you talk on the phone?

```
 1    A.    Two times.

 2    Q.    And how long was each of those calls?

 3    A.    First time was probably five minutes, and the second time

 4    was, like, one minute.

 5    Q.    Now, you and Mr. Goudreau -- you consider Mr. Goudreau

 6    your brother?

 7    A.    He's like a brother, for sure.

 8    Q.    And you've been friends, in fact, since you were 15 years

 9    old?

10:43 10    A.    No.  I think I was -- I might have been 16 or 17.  Barry

11    was younger.

12    Q.    And you are how old today?

13    A.    Sixty-seven.

14    Q.    And Mr. Goudreau?

15    A.    I think he's 63, 62.

16    Q.    You played in various bands together over the years?

17    A.    Yes, we did.

18    Q.    Including Combat Zone in the early '70s?

19    A.    No.

10:44 20    Q.    You never played in Combat Zone with him?

21    A.    In the late '60s.

22    Q.    Late '60s.  All right.  Thank you for clarifying that.

23          THE COURT:  And is Combat Zone an area of the city,

24    which is what I took it to be, as opposed to a band, or am I

25    wrong about that?
```

1          THE WITNESS:  Combat Zone is an area of the city in

2     Boston down on Washington Street.

3          THE COURT:  That's what I --

4          MR. GREEN:  Thank you for clarifying that, your Honor.

5     BY MR. GREEN:

6     Q.    You played with him in the band BOSTON, correct?

7     A.    Correct.

8     Q.    You played with him on his solo project following his

9     departure from the band BOSTON?

10:44 10     A.    Correct.

11     Q.    You played with him in a band called RTZ?

12     A.    No.

13     Q.    And you played with him in a band called Ernie and the

14     Automatics, correct?

15     A.    Correct.

16     Q.    And you're also good friends with Ernie Boch, Jr., are you

17     not?

18     A.    Yes.

19     Q.    And how long have you been friends with Ernie?

10:45 20     A.    From the time that he gave me the $30,000.

21     Q.    Every man has his price?

22     A.    I wouldn't say that, but --

23     Q.    You would have settled for 25, and you're glad you got 30?

24     A.    You know it.

25     Q.    I got it.

```
 1              You feeling well today?
 2     A.   Am I feeling what?
 3     Q.   Are you feeling well today?
 4     A.   Not bad.
 5     Q.   You have had some health issues in the past, correct?
 6     A.   I don't think that has anything to do with the trial.
 7     Q.   Well, I'm asking because you testified at your deposition
 8     about your memory, and if we -- you were asked a couple of
 9     leading questions for that.  You contracted lyme disease in
10:45 10     2011?
11     A.   Correct.
12     Q.   You contracted West Nile it he says in 2013?
13     A.   Correct.
14     Q.   And one or both of those diseases can cause inflammation
15     of the brain?
16     A.   It did.
17     Q.   They, in fact, both did?
18     A.   No, I think the West Nile did.
19     Q.   Thank you for clarifying that.
10:46 20              And you, actually, remember that you testified at a
21     deposition in 2014 in this case, correct?
22     A.   If I did say that, that's true.
23     Q.   Well, let me ask you what you also said, and I'll show it
24     to you but I'll ask you first.  You testified, quote, Really
25     cloudy on a lot of stuff in the past, close quote.  Do you
```

1    remember saying that?

2    A.    At that time, I'm sure.

3    Q.    Is that when you gave your deposition you were really

4    cloudy?

5    A.    Is that what I said at that time?

6    Q.    Right.

7    A.    Then I was cloudy.

8    Q.    Now, you do recall -- calling your attention to spring of

9    1981, the then members of the band BOSTON met at Tom Scholz's

10:46 10    house about the question of Barry leaving the band?

11    A.    Yes, I do.

12    Q.    Mr. Goudreau told you prior to the meeting that he wanted

13    to leave BOSTON, did he not?

14    A.    Yes, he did.

15    Q.    In fact, he had been telling you that for a few months

16    prior to that meeting, correct?

17    A.    Yes, he did.

18    Q.    Now, referring to Ernie and the Automatics, do you

19    consider Ernie Boch to be an honest person?

10:47 20    A.    Yes.

21    Q.    If I told you that Ernie Boch testified in this case that

22    Tom Scholz never interfered with their performances, do you

23    have any reason to disbelieve that?

24    A.    No, I don't.

25    Q.    Now, if I also told you that Ernie Boch testified that the

1    reason that the band disbanded in 2011 was he was kind of

2    getting sick of traveling around to Holiday Inn hotels at $29 a

3    night, do you have any reason to disbelieve that?

4    A.    Yes, I do.

5    Q.    So you think he was incorrect about that?

6    A.    Yes, I do.

7    Q.    Are you a mind reader, sir?

8    A.    No, I'm not.

9    Q.    Do you know what was going on -- it was Ernie's decision,

10:48 10   was it not?

11   A.    Yes, it was.

12   Q.    Were you able to read his mind then or now as to what his

13   reasons were for breaking up the band?

14   A.    Well, he may have his reasons, but I think the band had

15   their own -- you know, we could see -- see what was going on,

16   what was transpiring.

17   Q.    But it was Ernie's decision to break up the band, correct?

18   A.    It was.

19   Q.    Thank you.

10:48 20         Now, let me ask you about your feelings about Tom

21   Scholz.  Is he a musical genius?

22   A.    Oh, yeah.

23   Q.    You, in fact, have a great deal of respect for him, do you

24   not?

25   A.    Positively.

1    Q.    And why do you have great respect for Mr. Scholz as a

2    musician?

3    A.    Well, me and Tom worked together exclusively in the

4    studio, and we spent hundreds, maybe thousands of hours

5    together working out the first album, the second album, and the

6    third album.  And he's also an engineer.  So he had the whole

7    thing.  He could do it all himself.

8    Q.    Now, let me ask you about the time following your

9    departure from BOSTON, which was when, sir?

10:49 10   A.    This says March 7, 1991 legally.

11   Q.    I'm sorry?

12   A.    Legally.

13   Q.    Well, I just want to ask you, is that the right date or

14   when did you leave the band BOSTON?

15   A.    Well, actually, I left -- I mean, I wanted to leave -- I

16   quit the band somewhat in -- I think it was -- I want to say

17   early '80s, I don't know, '83, '84, around that.

18   Q.    Voluntarily?

19   A.    Yes.

10:50 20   Q.    Now, you and Barry Goudreau and Brad Delp sang backup

21   vocals on Sammy Hagar's single, "The Dock of the Bay" released

22   in 1979?

23   A.    Yes, and other songs as well.

24   Q.    Mr. Scholz didn't try to stop that, correct?

25   A.    No, he did not.

```
 1   Q.   And in 1979, you and Mr. Goudreau appeared on Sammy

 2   Hagar's solo album "Street Machine," correct?

 3   A.   Correct.

 4   Q.   And Mr. Scholz didn't interfere with that, did he?

 5   A.   Not that I know of.

 6   Q.   You have owned other businesses over the years, correct?

 7   A.   Correct.

 8   Q.   Does Mr. Scholz in any way interfere with any of those

 9   businesses?

10   MR. TARLOW:  Relevance, your Honor.

11   THE COURT:  Sustained as to that question.

12   MR. GREEN:  I'll move on.

13   BY MR. GREEN:

14   Q.   Now, I want to now take you to the time of Mr. Goudreau's

15   solo album.  This was in 1980.  Is that the time frame?

16   A.   Yes.

17   Q.   Did you understand that Mr. Scholz encouraged you,

18   Mr. Goudreau, Mr. Delp, Mr. Sheehan to do solo projects because

19   he, Mr. Scholz, had to deal with various issues --

20   A.   Correct.

21   Q.   -- around the next BOSTON album?

22   A.   Yes.

23   Q.   And when Barry Goudreau did his solo album, Mr. Scholz did

24   not object, did he?

25   A.   Yes, he did.
```

1    Q.    Well, he thought it was going to be a solo album, did he

2    not?

3    A.    I can't read his mind.

4    Q.    What he expressed was concern that, in fact, it was not a

5    solo album, it involved several of the members of the band

6    BOSTON, correct?

7    A.    Correct.

8    Q.    Were you familiar with Mr. Goudreau's work on the Orion

9    the Hunter album?

10:52 10    A.    I mean, I heard the record.

11    Q.    Were you involved in any way with that?

12    A.    No.

13    Q.    Do you know of Mr. Scholz's interfering with that at all?

14    A.    Not that I'm aware of.

15    Q.    Now, referring to your time with the Ernie and the

16    Automatics shows, were you familiar with the BOSTON hit "Long

17    Time"?

18    A.    Yes, I was.

19    Q.    And were there times when Ernie and the Automatics would

10:52 20    play that song and Brian Maes would abruptly stop and say,

21    That's all we can play is 18 notes of that song?

22    A.    I think he said 17 notes.

23    Q.    You actually have it right.  I misread my notes.

24    Seventeen notes, okay.

25          And Ernie and the Automatics did that from 2006 to

1    2008?

2    A.    I'm not sure the dates.

3    Q.    Do you recall Ernie and the Automatics -- the testimony in

4    this case is that Ernie and the Automatics performed

5    approximately 250 times.  My question for you is:  Do you

6    recall them being introduced from time to time as just another

7    band out of Boston?

8    A.    Never did I hear that.

9    Q.    Never happened?

10:53 10    A.    Never heard that.

11    Q.    Now, referring to your testimony about -- was it Ocean

12    View?

13    A.    I'm not exactly sure of the name, but I think that's what

14    it's called, Salisbury Beach.

15    Q.    All right.

16        So this was -- as I understand it, the decision to

17    play there was not -- the decision not to play there, the fact

18    that you didn't end up playing there with Mr. Goudreau, that

19    was not a decision of the venue or the promoter, it was Barry's

10:53 20    decision, correct?

21        MR. TARLOW:  Objection to form, your Honor.

22        THE COURT:  Sustained as to form, counsel.

23    BY MR. TARLOW:

24    Q.    You ended up not playing there, correct?

25    A.    Correct.

```
 1    Q.    And that was Barry's decision, correct?

 2    A.    Correct.

 3    Q.    And you said that Barry was afraid of being sued.  Did you

 4    or Barry make any attempt to contact Mr. Scholz on this -- as

 5    to that venue?  Just yes or no.

 6    A.    No.

 7    Q.    Did you make any attempt to contact him about playing any

 8    other venue?

 9    A.    No.

10:54 10   Q.    You made reference earlier that Mr. Scholz and Mr. Boch

11    had the same attorney?

12    A.    Yes.

13    Q.    Do you have personal knowledge of that, sir?

14    A.    No, I don't.

15    Q.    So you were speaking without personal knowledge?

16    A.    Well, no.  Actually, Ernie said he did.

17          MR. GREEN:  Move to strike as hearsay, your Honor.

18    I'm asking of his personal knowledge.

19          THE COURT:  Well, sustained as to the last part.

10:54 20        MR. GREEN:  I have nothing further.  Thank you,

21    Mr. Hashian.

22          THE COURT:  Redirect?

23          MR. TARLOW:  Very briefly, your Honor.

24          May I do it from here?

25          THE COURT:  You may.
```

REDIRECT EXAMINATION

BY MR. TARLOW:

Q.   Mr. Hashian, on cross-examination you said that you could see what was transpiring with respect to the end of Ernie and the Automatics.  What did you mean by that statement, sir?

A.   Well, like I said, when we were on the road, Ernie was having a problem keeping up and he wanted -- he wanted to take the band in another direction, and he -- actually, in the middle of the tour, he called a business meeting for me and Barry, and I was pleading with him not -- begging with him not to call the meeting, because I was -- I was on the verge of death.  And I'm like, Please don't do this now.  Don't -- he's trying to get us to agree to do some really crappy shows, you know, when we end the tour.  I'm, like, Please don't do this now.  Let's talk about it when we're off the road.  And so we could see it coming.

          MR. TARLOW:  No further questions, your Honor.

          THE COURT:  Any recross?

          MR. GREEN:  Nothing further, your Honor.

          THE COURT:  Sir, you're excused.  Thank you.

          THE WITNESS:  Thank you, your Honor.

          THE COURT:  Counsel, given that it's five to, should we just take our break now?

          MR. TARLOW:  That would be helpful to me, your Honor.

          THE COURT:  Jurors, we'll take our break now, and then

1    we'll resume.

2              Thank you.

3              THE CLERK:  All rise.

4              (Jury left the courtroom.)

5              THE COURT:  Counsel, anything before we break?

6              MR. BAKER:  Just one question, your Honor.  I think

7    it's more directed toward Ms. Hourihan, but we need to know our

8    time.

9              THE COURT:  I'll let you check in with Ms. Hourihan on

10:56 10   that.

11             MR. BAKER:  Thank you, Judge.

12             MR. GREEN:  Thank you.

13             (Recess taken.)

14             THE CLERK:  Court is in session.  Please be seated.

15             THE COURT:  Mr. Tarlow.

16             MR. TARLOW:  Yes.

17             The defense calls James Montgomery to the stand.

18             THE COURT:  He may be called.

19             JAMES MONTGOMERY, having been duly sworn by the Clerk,

11:22 20   was examined and testified as follows:

21             THE CLERK:  Thank you.  Please be seated.

22             THE COURT:  Good morning, sir.

23             THE WITNESS:  Good, how are you?

24             THE COURT:  Mr. Tarlow.

25             MR. TARLOW:  May I proceed, your Honor?

```
 1              THE COURT:  Yes.
 2                         DIRECT EXAMINATION
 3    BY MR. TARLOW:
 4    Q.   Would you please state your name for the record.
 5    A.   James Montgomery.
 6    Q.   And what do you do for a living, Mr. Montgomery?
 7    A.   I'm just slightly deaf.
 8              I'm a musician, and I've been standing in front of the
 9    symbols for quite a long time.
11:22 10          Musician.
11    Q.   For how long have you been a musician, sir?
12    A.   My current band is 47 years old.
13    Q.   And so just for the sake of brevity, if you could name --
14    have you played with some notable artists?
15    A.   Several.  All the notable blues artists: B.B. King, Buddy
16    Guy, Charlie Hooker, toured with Bruce Springsteen, toured with
17    the Allman Brothers, toured with everybody.
18              THE COURT:  Sir, I'm going to ask you to talk just a
19    little more slowly.
11:22 20          THE WITNESS:  Okay, breathe.
21              THE COURT:  I think I caught most of those.
22    BY MR. TARLOW:
23    Q.   Are you familiar with Barry Goudreau?
24    A.   Familiar with --
25    Q.   Do you know Barry Goudreau?
```

```
 1   A.   Yes.
 2   Q.   What is your relationship like with Barry Goudreau?
 3   A.   I've known him for many, many years.  I heard a cassette
 4   tape of the group BOSTON before they recorded, so I have known
 5   him since around that period.
 6   Q.   When you say -- you've known him or did you know of him?
 7   A.   I knew of him for a while.  Eventually we become friendly,
 8   and he's a great guitar player, so I've had the opportunity to
 9   work with him on several occasions.
11:23 10   Q.   Do you consider him a friend?
11   A.   Pardon me?
12   Q.   Do you consider him a friend?
13        Do you consider Barry Goudreau a friend?
14   A.   Oh, yeah.
15   Q.   Now, prior to actually meeting Barry Goudreau, did you
16   understand who Barry Goudreau was with respect to the band
17   BOSTON?  His relationship with the band BOSTON?
18   A.   I did.  I met him when the band was still playing -- I
19   actually saw them play maybe the only nightclub gig they ever
11:24 20   played.  So I knew of him before BOSTON became BOSTON.
21   Q.   Sir, in addition to being a performer, a musician, do you
22   do anything else with respect to the music business?
23   A.   Yes.  I'm executive director of a 501(c)(3) and president
24   of another one, and we raise money for healthcare for musicians
25   and also for the Woods Hole Film Festival.
```

1    Q.   And how do you do that?

2    A.   Also for veterans; we raise a lot of money for veterans.

3    Q.   You how do you do that?

4    A.   I put together what we call supergroups, where we get

5    different musicians.  Example would be Huey Lewis, the guys

6    from Aerosmith, Jim Belushi, some guys from the Dropkick

7    Murphys, the Uptown Horns, the Rolling Stones horn section.  I

8    put together these shows where, for the most part, big names

9    will play for an honorarium, and we're able to raise a

11:24 10    considerable amount of money for veterans and for healthcare.

11    Q.   Have you ever booked Barry Goudreau for any of these

12    shows?

13    A.   Yes, I have.

14    Q.   And when you book Barry Goudreau for any of these shows --

15    strike that.

16         Who's Gail Parenteau?

17    A.   Pardon me?

18    Q.   Do you know who Gail Parenteau is?

19    A.   Yes.

11:25 20    Q.   And who is Gail Parenteau?

21    A.   Well, I've known her for a long time.  I think she was

22    married to Mark Parenteau at one point.  I'm -- I think she's

23    in Tom Scholz's office.  I think she's, like, a publicist.  I

24    think she works with him in that regard.

25    Q.   Have you -- in the last seven years, have you had an

1    occasion to speak with Gail Parenteau regarding Barry Goudreau?

2    A.   Yeah, it was regarding a show that I had Barry on, and I

3    was in Denver visiting a friend.  I can't recall who initiated

4    the call.  I think probably I must have gotten a message from

5    Gail that there might have been a problem with the way Barry

6    was listed in an ad.  So I called her back, and I like Gail.

7    We talked briefly about that and maybe for 45 minutes about

8    other things.

9    Q.   And when -- with respect to -- when Barry Goudreau

11:26 10    performs at these shows, are these all the charity shows you

11    just mentioned earlier?

12    A.   Yeah.  I've done some non-charity stuff with Barry when he

13    sits in with my band.  For the most part, I would think most of

14    the things I put Barry are for charitable events.

15    Q.   Do you pay Barry Goudreau for those charitable events?

16    A.   Yeah.  Like I say, everyone takes a hit in their pay so

17    they can -- so the charity can make more money.

18    Q.   Do you pay him the same amount each time?

19    A.   No, you know, it's a ballpark.  I would say, you know,

11:26 20    within a certain framework, you know.  But, obviously, there's

21    some shows that are bigger than others and we're able to -- and

22    especially because part of the charities we do is to raise

23    money for musicians, and so when we do those, we feel it would

24    be unfair to not pay the musicians at least something for

25    helping their fellow musicians out.

1    Q.   Since 2008, were there any shows that you can recall that

2    you did not book Barry Goudreau on for any particular reason?

3    A.   I'm not -- you know, I'm not sure about the particular

4    years.  I know there's been a few years, but there have been

5    shows that I have not put Barry on because, you know, I feel

6    like -- you know, whenever I do book Barry on something, it

7    comes with -- it comes with, I don't know, "baggage" might be

8    the wrong word, but it comes with the idea that I feel I have

9    to be extremely careful in how the show is advertised.  And

11:28 10   oftentimes, you know, I can control my end of it, you know, I

11   can make sure when I advertise it I say "former member" or

12   "formerly of," but by the time you get the guys making posters

13   or the time you get someone from a paper up in Salem or, you

14   know -- you don't have any control sometimes about how they're

15   going to list Barry.

16   Q.   Do you recall any shows that you didn't put Barry on

17   because of these advertising issues?

18   A.   Yeah, I had a New Year's Eve -- you know, there's certain

19   ones that it would be hard to back away from.  In other words,

11:28 20   if I have Barry on a list and there's 20 other players on the

21   show, if it's a question of, okay, Barry, we can't use you on

22   this show because something's come up, then the show is pretty

23   much intact.  But there's been -- there was a New Year's Eve

24   show that they wanted him on; I didn't put him on.

25   Q.   The New Year's Eve show, which year New Year's Eve, sir?

```
 1   A.   2014 with Lydia Warren up at the Zorba club.
 2   Q.   Just very briefly, sir, why didn't you put Mr. Goudreau on
 3   that show?
 4   A.   Well, because it was a New Year's Eve and people buy a
 5   ticket for a New Year's Eve show and if you have to bump
 6   something, maybe they don't want to come to the show or they
 7   want their money back or something like that.
 8   Q.   How much would you have paid Mr. Goudreau for that show?
 9   A.   I think $500 for that.
10   Q.   Would you have put him on that show if you weren't
11   concerned about how he would have been advertised or promoted?
12   A.   Oh, yeah.
13   Q.   Can you recall any other shows?
14   A.   I did some shows with Joey Kramer from Aerosmith and Jim
15   Belushi.
16   Q.   Do you recall when that show or shows was?
17   A.   It was in Martha's Vineyard, probably six years ago, maybe
18   five years ago.  And the reason I didn't put Barry on that
19   because -- was because with Jim Belushi and the guys from
20   Aerosmith, I didn't want to be seen in an embarrassing position
21   where I told someone would be on the bill -- like I say, I'm
22   always concerned that there may be a problem arises when he's
23   on a show.
24   Q.   And in that particular show, how much would Barry Goudreau
25   have made if he had played that show?
```

A.    I'm trying to -- I think I paid everyone probably 750 for

that.

Q.    Can you recall any other shows?

A.    Well, I did a blues series at Foxwoods Casino, and they

were really terrible at advertising, and so I thought that --

and that was a series, and so I just -- I just couldn't trust

that they wouldn't goof up on the advertising and use the term

"member of BOSTON" rather than "former" --

Q.    And how many shows would have taken place during that

series?

A.    I did a series of about seven of them.  I probably would

have put Barry on two, three.

Q.    How much would you have paid him for each show?

A.    I think everyone got $1,000 on those.

Q.    Did you ever tell Mr. Goudreau that you didn't put him on

these shows?

A.    Probably not at the time.  Maybe in passing, you know,

hanging out at a later date.  But I don't think I probably did.

Q.    And why wouldn't you -- if there's an answer, sir, why

didn't you or wouldn't you have told Mr. Goudreau that you

didn't put him on those shows?

A.    Your question is why wouldn't --

Q.    If you didn't tell Mr. Goudreau that he wasn't on those

shows, would there have been any particular reason as to why

you wouldn't have told him?

1    A.   Well, no, but I mean, you know, I probably wouldn't want

2    to tell somebody, Hey, I was going to use you on a show but I

3    didn't, you know.

4    Q.   Sir, were you served with a subpoena to testify here

5    today?

6    A.   Pardon me?  Did I get served with a subpoena?  Yes, I did.

7         MR. TARLOW:  Thank you, your Honor.  No further

8    questions.

9         THE COURT:  Cross-examination, Mr. Green?

11:32 10                    CROSS-EXAMINATION

11   BY MR. GREEN:

12   Q.   Mr. Montgomery, my name is Lawrence Green.  I represent

13   Tom Scholz.

14        You told us about the times when you didn't put

15   Mr. Goudreau, but you have booked Mr. Goudreau over the years,

16   have you not?

17   A.   I have.

18   Q.   Now, let's back up.

19        You are a close friend of Mr. Goudreau's?

11:32 20   A.   At this point, yes.

21   Q.   And for how long have you been a close friend of his?

22   A.   I guess we started really hanging out on a frequent basis

23   after a show at Sculler's.  I think it might have been Danny

24   Klein's 50th birthday.  So maybe close friends for, I don't

25   know, six or seven years, something like that.

1  Q.   And you've been close friends on a continuous basis over

2  the last six or seven years?

3  A.   Yeah.

4  Q.   By the way, did you meet with Mr. Tarlow or speak to him

5  by phone prior to appearing today?

6  A.   With --

7  Q.   Attorney Tarlow who was just questioning you.

8  A.   Yeah, yeah, I did meet with him.

9  Q.   And how many occasions did you meet with him?

11:33 10  A.   Just one time.

11  Q.   When was that?

12  A.   Three weeks ago maybe.

13  Q.   For how long did you meet with him?

14  A.   Probably 45 minutes or something like that.

15  Q.   Are you also a friend of Mr. Goudreau's wife?

16  A.   Yes.

17  Q.   Mrs. Goudreau, she has booked you to perform at Kowloon's?

18  A.   Yeah.  Did I book that show or did Connie book that show?

19  I did do a show with Connie there.  I've done five or six shows

11:33 20  at the Kowloon.

21  Q.   And you performed there with Mr. Goudreau?

22  A.   Yes.

23  Q.   You traveled to Jamaica in 2007 to play a show down there?

24  A.   Yes.

25  Q.   Was that also with Mr. Goudreau?

```
 1   A.   Yes.  That wasn't my show.

 2   Q.   And did Mrs. Goudreau book that?

 3   A.   No.  John Ippolito booked that.

 4   Q.   Are you also friends with Ernie Boch, Jr.?

 5   A.   Yes.

 6   Q.   How long have you been friends with Mr. Boch?

 7   A.   I started -- I started knowing him -- he sponsored one of

 8   my charity events, and I think the year was probably 2004 I

 9   think might have been the first one that he sponsored.

10   Q.   Have you been friends with him since 2004?

11   A.   Yes, I have.

12   Q.   Has -- are you familiar with Mr. Boch's record company,

13   Open E Records?

14   A.   Yes, I am.

15   Q.   Have they released any of your recordings?

16   A.   Yes, they have.

17   Q.   On how many occasions?

18   A.   One time.

19   Q.   And have you worked with Mr. Boch in any other capacity?

20   A.   No, just as -- I booked his band.  He sponsored some of my

21   events, so when he had his band, I made sure to include him on

22   a lot of shows.

23   Q.   Now, when was the first time that you did book

24   Mr. Goudreau to appear in any of the shows you managed?

25   A.   Geez, I -- it might have been that first show with Boch
```

11:34 on line 10, 11:35 on line 20

1    when I put Ernie and the Automatics on a show.

2    Q.    And when was that?

3    A.    I think that would have been around 2006.  You know, I'm

4    not really exactly positive on some of these dates.

5    Q.    Let me give you a time frame.

6          The testimony in this case has been that Ernie and the

7    Automatics basically performed between 2007 and 2011.

8    A.    Oh, okay.

9    Q.    Using that time frame, when would you have first booked

11:36 10   Mr. Goudreau?

11   A.    Right after 2007 I would think.

12   Q.    Now, did you book Ernie and the Automatics at various

13   points?

14   A.    Yes, I did.

15   Q.    And on how many occasions?

16   A.    Probably about five.

17   Q.    Did you -- while Ernie and the Automatics was still in

18   existence, did you separately book Mr. Goudreau at any point in

19   time?

11:36 20   A.    Yeah, I did.  I booked Ernie and the Automatics, but then

21   once -- you know, once I saw that I had an opportunity to put

22   Barry on some of these charity shows, I started putting him on

23   individually as well.

24   Q.    Taking it, let's say, through 2011 when Mr. Goudreau was

25   still with Ernie and the Automatics, do you have a best

1   estimate as to how many times you booked him separately, apart

2   from Ernie and the Automatics?

3   A.   Probably five or six times.

4   Q.   Now, taking 2012 to the present -- you understand Ernie

5   and the Automatics disbanded sometime in 2011?

6   A.   You would know that more than me.

7   Q.   I just represent that for the record.

8   A.   Yeah, good, okay.

9   Q.   Using that time frame, from the time they disbanded to the

11:37  10   present, you have booked Mr. Goudreau on various occasions over

11   the years --

12   A.   Yes.

13   Q.   -- in connection with these charitable shows?

14   A.   Yes.

15   Q.   On how many occasions did you, in fact, book him?

16   A.   I would guess four or five.

17   Q.   Is that a guess?

18   A.   Pardon me?  Yeah, it's a guess.  I mean, I'm -- I book so

19   many shows a year, and I've had so many different combinations

11:37  20   of people.  You know, it would be hard for me to actually tell

21   you how many times I had James Cotton or how many times I had

22   the Uptown Horns or how many times I had any one of these

23   people because I've done it so frequently.  That's all.

24   Q.   Well, let me ask you about a show in 2016, the present

25   year.  Did he play with you on March 11th at Johnny D's in

1    Somerville?

2    A.    Yes.

3    Q.    And was that a show you booked?

4    A.    Yeah, I did.  It was kind of a show that Johnny D's put

5    together.  I mean, it was a final week that the club was open.

6    So they wanted to put together some big lineup.  So I think

7    Johnny D's came to me and said they'd like to get Barry

8    Goudreau on that last Saturday night.

9    Q.    And you so arranged to get Mr. Goudreau; is that right?

11:38 10   A.    I did.

11    Q.    Just so I understand how this works, who sets your

12    compensation for that type of show?

13    A.    I would have negotiated that deal with Johnny D's for my

14    band, and then I would have had a separate negotiation that I

15    would have conducted to get a figure together and offer it to

16    Barry and see if he wanted to do the show.

17    Q.    And is the payment that you received in any way based upon

18    how many people are in the house?

19    A.    That night it was.

11:39 20   Q.    That night it was.

21          Do you remember on that occasion -- we're talking

22    about March 11 of 2016 -- personally introducing Mr. Goudreau

23    on stage?

24    A.    Yes.

25    Q.    And do you recall introducing him as a guy who had sold 17

1   million records?

2           MR. TARLOW:  Objection, your Honor.  This was dealt

3   with.

4           THE COURT:  Sustained, counsel.

5   A.   Pardon me?

6           THE COURT:  It was sustained, so you have to wait for

7   the next question.  Thank you.

8   BY MR. GREEN:

9   Q.   Do you recall introducing him that night as having

11:39 10  something to do with "More Than a Feeling"?

11          MR. TARLOW:  Objection, your Honor.

12          THE COURT:  Sustained.

13          MR. GREEN:  I'll move on.

14  BY MR. GREEN:

15  Q.   Now, let me now take you to your conversation with Gail

16  Parenteau.  You said you talked to her -- can we put a year on

17  this, sir?

18  A.   I was staying with my ex-girlfriend in Colorado, so it

19  would have been -- I'd say probably seven years ago maybe.  But

11:40 20  here again, it's really difficult for me to pick an exact year.

21  Q.   All right.

22          Well, let me --

23  A.   She was on Hudson Street, so wait a minute.  That would

24  have been less than that.  She was out there for two years, two

25  years now -- probably about five years ago.

```
 1   Q.   So sometime around 2011?
 2   A.   I would think that would be about right.
 3   Q.   Had you previously had any dealings with Ms. Parenteau
 4   prior to this telephone call?
 5   A.   Not really, no business dealings.
 6   Q.   Had you ever communicated with her prior?
 7   A.   I mean, over the years -- you know, to be honest with you,
 8   I wouldn't even know if I would recognize Gail right now
 9   because it's been so long.  And my recollection is that I knew
10   her from years ago, and one of the reasons why the conversation
11   lasted a while is because we did a lot of catching up.
12   Q.   All right.
13        Because I think you said in response to Mr. Tarlow
14   that the conversation lasted about 45 minutes, correct?
15   A.   Yeah.  We ended up doing a lot of catching up, talking
16   about this guy and that guy and what happened to him and --
17   Q.   Kind of like old friends catching up?
18   A.   Yeah.
19   Q.   Now, you did understand at the time of this conversation
20   that she worked for Mr. Scholz as a publicist?
21   A.   Yes.  I believe she was a publicist, but I'm not sure.
22   Q.   And at the outset of the conversation, as I understand
23   your testimony in response to Mr. Tarlow, she was clarifying
24   what you could and could not say about Barry?
25   A.   Yes, I believe that's true.
```

1    Q.   And did she cite to a contractual provision?

2    A.   I -- yes, she may have because I -- in my mind, I'm aware

3    of some kind of contractual provision, so I probably must have

4    heard it from Gail.  That must have been where I heard it.

5    Q.   And she told you that you could only refer to Barry as

6    formerly of the band BOSTON, correct?

7    A.   Yes.

8    Q.   Did you have any reason to doubt the validity of that

9    contractual provision?

11:42 10   A.   No.  As a matter of fact, every show that I did, I went to

11   great lengths to make sure that -- that that phrase was used.

12   As I suggested, the times that I didn't use Barry was when I

13   was afraid that I wouldn't -- that I wouldn't have that much

14   control over who would use that phrase in the advertising.

15   Q.   Okay.

16        Well, that -- you're anticipating my next question

17   here.

18        So there was no doubt in your mind about the

19   contractual provision and the validity thereof.

11:43 20   A.   You know, absolutely so much so that every time that I

21   booked Barry, it would add a whole other dimension to what I

22   had to do to promote that show.

23   Q.   And you respected that contractual provision?

24   A.   Oh, absolutely.

25   Q.   Now, you said the reason why you didn't book Barry the

1    times that you mentioned was you had a concern that third

2    parties may not follow the directive?

3    A.    Yes.

4    Q.    Did you enter into -- are you talking about venues now?

5    A.    Well, the thing is, you know, if I promote a show, I'm

6    going to have to have a guy make a poster, I'm going to have to

7    get press and as many outlets as I can, and I'm going to have

8    to get radio spots, I'm going to have to do radio interviews.

9    So there's a whole panoply of ingredients that come into

11:44 10   promoting a show.  And if I feel that I'm not going to be able

11    to control all of that and that there's going to be a guy in

12    Salem who writes "member of the group BOSTON," or there's going

13    to be a radio station that plays one of the songs behind the

14    radio ad, then I feel that my show may be in trouble.  So I go

15    out of my way and -- as a matter of fact, my impression of the

16    conversation with Gail is that when she had called to mention

17    that the word "former" hadn't been used, that I had already

18    addressed that problem.  I kind of remember telling her, Don't

19    worry about it, Gail, I found out about it, too, and it's

11:44 20   already been taken care of.  And then, once that was out of the

21    way, then we had a casual conversation.

22    Q.    Okay.

23          Now, this was -- to the extent that you decided not to

24    book Barry at any of the shows, this was your personal

25    decision, correct?

1    A.    Yes.

2    Q.    Tom Scholz didn't get in the way of your booking those

3    shows, did he?

4    A.    I didn't talk to Tom, no.

5    Q.    You never -- you were never threatened with any suit by

6    Mr. Scholz or anybody on his behalf?

7    A.    Not me personally, no.

8    Q.    Did you believe there was anything unreasonable about

9    Ms. Parenteau making that request on behalf of Mr. Scholz?

11:45 10    A.    You know, I -- you know, what's reasonable about that

11    clause I've always been puzzled.  But in terms of what I

12    understand about the agreement, I would respect that Gail would

13    tell me that if she told me that was the agreement, then I

14    would believe her that that was the agreement.

15            MR. GREEN:  Thank you.

16            I have nothing further.  Thank you, Mr. Montgomery.

17            THE COURT:  Any redirect, Mr. Tarlow?

18            MR. TARLOW:  No, your Honor.

19            THE COURT:  Okay.

11:46 20            Sir, you're excused.  Thank you.

21            THE WITNESS:  Okay.  Thank you.

22            THE COURT:  Mr. Tarlow.

23            MR. TARLOW:  We call Barry Goudreau to the stand.

24            THE COURT:  You may.

25            BARRY GOUDREAU, having been duly sworn by the Clerk,

1    was examined and testified as follows:

2              THE CLERK:  Thank you.  Please be seated.

3              THE COURT:  Good morning.

4              THE WITNESS:  Good morning.

5              THE COURT:  Mr. Tarlow.

6              MR. TARLOW:  Thank you, your Honor.

7              May I proceed?

8              THE COURT:  You may.

9                         DIRECT EXAMINATION

10   BY MR. TARLOW:

11   Q.   Mr. Goudreau, directing your attention again to that 1983

12   Settlement Agreement, in that agreement did you understand

13   there to be any restrictions as to your ability to perform

14   BOSTON songs publicly or privately?

15   A.   No.

16   Q.   Just to be clear, were there restrictions --

17   A.   Were there restrictions?  Not to my knowledge, no.

18   Q.   And since the death of Brad Delp -- since -- prior to the

19   death of Brad Delp, had you, in fact, performed BOSTON songs

11:47 20   publicly?

21   A.   Oh, sure.

22   Q.   And subsequent to the death of Brad Delp, have you

23   performed those songs publicly?

24   A.   Yes.

25   Q.   And prior to Brad's death, have any of those performances

1    been advertised to the public?

2    A.    Yes.

3    Q.    And between the time when you signed the Settlement

4    Agreement in 1983 and the date of Brad Delp's death, had you

5    received any correspondence or other communications from

6    Mr. Scholz, his attorneys, or his publicist which alleged that

7    you had breached the 1983 Settlement Agreement?

8    A.    No.

9    Q.    And was the date of Brad Delp's death?

11:48 10    A.    March 9, 2007.

11    Q.    And were you, in fact, related to Mr. Delp?

12    A.    He was my brother-in-law.

13    Q.    And were you close with him at the time of his death?

14    A.    Yes.

15    Q.    Now, subsequent to Brad Delp's death, had you engaged in

16    any particular performing group which was of particular

17    interest to you?

18    A.    Yes, the World Classic Rockers.

19    Q.    Could you explain who the World Classic Rockers were?

11:48 20    A.    Well, they are, they're still around.  It's a band that

21    performs corporate events.  All the events are closed to the

22    public.  There's no advertising, no promotions.  It's all

23    members of former rock bands.  Sorry, I'm losing my voice here.

24         It's all members of former members of named rock

25    bands.

Q.   Sir, are you familiar with the term "corporate gig"?

A.   Yes.

Q.   And what's the difference between a corporate gig and a regular gig?

A.   Well, the corporate shows aren't open to the public. Normally they're large corporations that hire the band.  The shows are all in resort areas and -- pretty quishy gig, actually.

Q.   How would you describe the shows that the World Classic Rockers performed?

A.   How would I describe the shows?

Q.   Yeah.  Were they public gigs or were they corporate gigs?

A.   They're all corporate shows, all closed to the public.

Q.   And at some point in time, did you become employed by the World Classic Rockers?

A.   I did.

Q.   And how did you become employed by the World Classic Rockers?

A.   I got a call from Kevin White, who was their manager, asked for a meeting.  I met him in Florida, and he described the band to me, again, former members of big acts, all the shows were in resort areas around the world.  He told me to expect to play about 35 shows a year --

        MR. GREEN:  Objection, hearsay.

        THE COURT:  Well, counsel, what's it being offered

1  for, if you can say in a word?

2          MR. TARLOW:  It is --

3          THE COURT:  Well, offered for something other than the

4  truth, counsel?

5          MR. TARLOW:  No, that is being offered for the truth,

6  your Honor.

7          THE COURT:  Okay.  Well, sustained.

8  BY MR. TARLOW:

9  Q.  At the time when you spoke to Mr. White, were any other

11:51 10  former members or then current members of the band BOSTON

11  employed by the World Classic Rockers?

12  A.  No.

13  Q.  Now, at some point in time, did any other former members

14  of the band BOSTON become involved with the World Classic

15  Rockers?

16  A.  In the meeting, I brought up Fran Cosmo and mentioned that

17  he would be available and could be a good situation for us and

18  suggested that they take him in as well.

19  Q.  Now, at the time when you suggested Mr. Cosmo to

11:51 20  Mr. White, were you aware of any contractual restrictions that

21  Mr. Cosmo had with Mr. Scholz that would have prevented him

22  from playing with you?

23  A.  No.

24  Q.  Now, had you been aware of those contractual restrictions,

25  would you have suggested that Mr. Cosmo become a member of the

1  World Classic Rockers with you?

2  A.   No, I wouldn't have.

3  Q.   And why not, sir?

4  A.   Well, if he had a restriction that he couldn't work with

5  me, I wouldn't have brought him in if I had known that.

6  Q.   And why would you not have brought him in if you had known

7  that?

8  A.   Well, because it would have caused trouble.

9  Q.   Now, do you recall when your first performance was with

11:52 10  the World Classic Rockers?

11  A.   It was January of 2008.

12  Q.   Did they require you to sign any particular contracts?

13  A.   No, I didn't have a contract with them.

14  Q.   Now, did you give any instructions as to any

15  representative of the World Classic Rockers as to how you were

16  to be advertised or billed?

17  A.   Well, when I had the initial meeting with Kevin, I brought

18  up the fact that I needed to be promoted as "formerly of," and

19  he told me, Well, everybody in the band is promoted as

11:52 20  "formerly of."

21       MR. GREEN:  Objection to the last part, your Honor.

22       THE COURT:  Sustained as to that part.

23  BY MR. TARLOW:

24  Q.   Without telling me what Mr. White told you, sir, after

25  that conversation, did you have any concerns that Mr. White

1    would not bill you as "formerly of"?

2    A.    Well, no.  The band was promoted as former members of

3    other bands, so that was how everybody was promoted.

4    Q.    And had you seen that prior to meeting with Mr. White?

5    A.    I looked him up on the internet before I met with him,

6    sure.

7    Q.    Now, how much were you paid -- and did you ultimately

8    perform shows with the World Classic Rockers?

9    A.    I did.

11:53 10    Q.    And how much were you paid per show when you performed

11    with the World Classic Rockers?

12    A.    The first two shows I got paid $1,250, and after that it

13    was $1,500 a show.

14    Q.    And when did you -- what month and what year was your last

15    performance with the World Classic Rockers?

16    A.    I started in January of 2008, my last show was May of

17    2008.

18    Q.    And how many shows did you perform with the World Classic

19    Rockers between those dates?

11:53 20    A.    Sixteen.

21    Q.    And did you have an expectation as to how many shows a

22    year you were going to perform with the World Classic Rockers?

23    A.    I expected to do 35 shows a year.

24    Q.    And by May of 2008, were you, in fact, on track to meet or

25    exceed that number of shows?

1    A.    Yes.

2    Q.    Now, at some point in time, did your tenure with the World

3    Classic Rockers come to an end?

4    A.    It did.

5    Q.    And do you recall when that occurred?

6    A.    It was in May 2008.

7    Q.    And prior to your tenure and ending with the World Classic

8    Rockers, did a particular event occur which -- strike that.

9          Did a particular event occur prior to your tenure with

11:54 10   that band ending?

11   A.    Yes.  They got a cease-and-desist letter from Tom Scholz's

12   attorneys.

13   Q.    When you say a "cease-and-desist letter," who received the

14   cease-and-desist letter?

15   A.    My understanding was it was the management and the booking

16   agent, William Morris Booking Agency.

17   Q.    Were you familiar with -- William Morris was a booking

18   agent for whom, sir?

19   A.    World Classic Rockers.

11:55 20   Q.    Could you describe what William Morris is, their status in

21   the industry, the music industry?

22   A.    Well, they're one of the biggest booking agencies in the

23   world.

24         MR. TARLOW:  Your Honor, I'd like to publish for the

25   jury uncontested Exhibit 26.

```
 1              THE COURT:  You may.
 2    BY MR. TARLOW:
 3    Q.    Now, Mr. Goudreau, I'm going to go to the second page of
 4    Exhibit Number 26.  And could you identify this document, sir?
 5    A.    Yes, that's the notice they got.
 6    Q.    Could you just read into the record -- I'll represent to
 7    you it's a letter from Burns & Levinson.  And could you read
 8    into the record who this letter is addressed to?
 9    A.    The World Classic Rockers Incorporated.
10    Q.    And the address?  I'm sorry, sir.  The date of the letter?
11    A.    It's April 25, 2008.
12    Q.    And if you see at the top where it says, "via e-mail."
13    Could you just read into the record those two e-mail addresses,
14    please?
15    A.    Could you make it a little bigger?  I can't see that.
16              That's D. Quisenberry at QRSlaw.com.
17    Q.    And I'll just represent to you, sir, it says and "via
18    overnight mail," does it not?
19    A.    Yes.
20    Q.    And it says, "via e-mail dkekst@wma.com" and "via
21    overnight mail" as well?
22    A.    Yes.
23    Q.    And you take that to mean it's addressed to the World
24    Classic Rockers via Dan Quisenberry as well as David Kekst,
25    Esq., William Morris Agency, LLC?
```

Timestamps in left margin: 11:56 at line 10, 11:57 at line 20.

A.    Yes.

Q.    Now, at the time -- turning your attention now to this time, April 25, 2008, had you -- have you reviewed this letter, sir?

A.    No.

Q.    You've never reviewed this letter, the William Morris letter, sir?

A.    No.

Q.    Okay.

11:57        At the time -- turning your attention to April 25, 2008, were you approached by any person from either William Morris Agency or the World Classic Rockers to let you know that a complaint had been lodged relative to your performances?

A.    I heard about it sometime shortly after they got it.

Q.    And what was your understanding -- what was your understanding of the nature of the complaint?

      MR. GREEN:  Objection, hearsay.

      THE COURT:  Well, sustained as to that.  You can say as a result of.

11:58 BY MR. TARLOW:

Q.    As a result of --

      MR. TARLOW:  Let me formulate the question, your Honor.

Q.    As a result of any conversations you may have had with anyone from William Morris Agency or World Classic Rockers, did

```
 1    you have an understanding as to what the nature of the
 2    complaint that was being lodged was?
 3    A.   They were alleging trademark infringement.
 4    Q.   Was he alleging anything in addition to trademark
 5    infringement?
 6    A.   Yes.  There was a clause in Fran Cosmo's contract where he
 7    couldn't work with former BOSTON members.
 8    Q.   Same Fran Cosmo that you invited into the band?
 9    A.   Yes.
11:58 10    Q.   Now, when you say "they," who was the they that they were
 11   alleging the trademark infringement?
 12   A.   Well, me and Fran, I suppose.
 13   Q.   Who was making the complaint?  Who was lodging the
 14   complaint?
 15   A.   Oh, the complaint.  Well, it was Burns & Levinson
 16   representing Tom Scholz.
 17   Q.   Okay.
 18        Now, sir, in looking at this letter, sir, did you have
 19   any -- if you could turn to -- I'll flip down for you.
11:59 20        (Pause.)
 21   Q.   I'm turning now to the page of the same exhibit which is
 22   marked with several Bates stamps, but for reference for the
 23   record I'll reference BG-LIT-000661.  Do you see that, sir?
 24   A.   I do.
 25   Q.   Do you recognize what this document represents?
```

1    A.    It says, "tentative set list."

2    Q.    And do you see on the right here, after it says, "featured

3    artist," do you see a designation?

4    A.    Yes.  It says, "former member of," and then listed all

5    the --

6    Q.    Now, with respect to any of the marketing materials of the

7    World Classic Rockers, do you see anything on this page that

8    uses the BOSTON logo?

9    A.    No.

12:00 10    Q.    Have you ever seen anything on the World Classic

11    Rockers -- does the World Classic Rockers advertise anywhere

12    other than their website, to your knowledge?

13    A.    Not to my knowledge, no.

14    Q.    At the time when you were in the band, did you have -- did

15    you ever see the logo, the BOSTON logo, used?

16    A.    No, never.

17    Q.    Okay.

18          And do you see anywhere in here where you're being

19    referred to as anything other than former member of?

12:00 20    A.    No.

21    Q.    And again, you testified there were no restrictions on

22    your ability to play BOSTON music, correct?

23    A.    That's right.

24    Q.    Have you looked at the website for World Classic

25    Rockers -- strike that.

1                Do you know if Fran Cosmo is still in the band World

2     Classic Rockers?

3     A.   Yes, he is.

4     Q.   Have you looked at the website recently?

5     A.   I went and looked at it last night.

6     Q.   Recently have you seen the use of BOSTON logo in the

7     advertisement of the website?

8                MR. GREEN:  Objection, relevance.

9                THE COURT:  Sustained as to that.

12:01 10    BY MR. TARLOW:

11    Q.   Now, with respect -- I'm scrolling through here, sir.

12    With respect to any of these exhibits that are attached to the

13    Burns & Levinson letter, did you have -- were you consulted

14    with -- in any way with how they were actually created?

15    A.   No.

16    Q.   And had you actually seen them at any point prior to this

17    lawsuit beginning?

18    A.   I might have seen them somewhere along the line.

19    Honestly, I don't remember.

12:01 20    Q.   Did you see them while were you playing with the World

21    Classic Rockers?

22    A.   Yes.

23    Q.   And had you -- with respect to -- strike that.

24              Now, the claims that are pending to you in this

25    matter, do you have any knowledge as to whether or not any of

```
 1   these claims relate to World Classic Rockers?

 2   A.   No.

 3   Q.   You have no knowledge or --

 4   A.   None of the claims have to do with this, no.

 5   Q.   Okay.

 6          Now, do you have any knowledge as to whether

 7   Mr. Cosmo -- strike that.

 8          Did you ever receive a cease-and-desist letter like

 9   this to you at any point in time?

10   A.   Me personally, no.

11   Q.   Do you know if a cease-and-desist letter similar to this

12   was ever sent to Fran Cosmo?

13   A.   Not that I'm aware of.

14   Q.   Now, at some point in time, did you -- you left World

15   Classic Rockers, correct?

16   A.   I did.

17   Q.   And could you explain how that came to be?

18   A.   Well, they had been getting pressure because of Fran's --

19   Fran Cosmo had an agreement with Tom where he couldn't work

20   with former members.  I didn't have that agreement.  We had a

21   problem with the trademark, and it came to the point where they

22   came to Fran and I and said, One of you has to go.

23          MR. GREEN:  Objection.  Hearsay.  Move to strike.

24          MR. TARLOW:  Your Honor, that is not being necessarily

25   offered for the truth.  It's asking for state of mind.
```

```
 1            THE COURT:  Well, counsel, I'll let you rephrase.
 2   BY MR. TARLOW:
 3   Q.   As a result of any meetings or conversations, did you have
 4   an understanding as to what -- as to what you would have to do
 5   with respect to the World Classic Rockers?
 6   A.   It came to the point where both Fran and I couldn't
 7   continue with the World Classic Rockers.  One of us had to go.
 8   Q.   And was there anything particular about Mr. Cosmo's
 9   situation -- who made the decision as to whether or not you
10   were going to stay or you were going to go?
11   A.   I did.
12   Q.   And was there anything in particular that entered into
13   your analysis as to why you withdrew from World Classic
14   Rockers?
15   A.   Well, Fran had an agreement with Tom where he couldn't
16   with work with me, but I didn't have an agreement where I
17   couldn't work with Fran.  But these trademark problems was
18   really the problem for me.  So when it came to time for one of
19   us to step down, especially since Fran had money problems at
20   the time, I decided that I would be the one to leave.
21   Q.   Had you ever informed Mr. Scholz prior to this occurrence
22   about Fran Cosmo's money problems?
23   A.   I pointed out to him in an e-mail, yes.
24   Q.   Now, did you want to remain in the World Classic Rockers?
25   A.   Oh, yes.  It was $50,000 a year.  Yes, I wanted to stay.
```

12:04  (line 10)

12:05  (line 20)

```
 1    Q.   And was that important to you at the time?
 2    A.   Sure.  I have a family to support.  I --
 3    Q.   If the allegations regarding the trademark violations
 4    weren't made against the World Classic Rockers, would your
 5    decision have been different as to whether or not you would
 6    stay or leave the World Classic Rockers?
 7    A.   I would have stayed if that were the situation, sure.
 8    Q.   And what about Mr. Cosmo?  He had financial problems, why
 9    would that not have entered into your analysis?
10    A.   Well, it was the trademark problem that was the problem
11    for me; that's why I left.
12         I mean, that's why I'm here.  That's what I was hoping
13    to avoid, but, apparently, it didn't work; I'm here.
14    Q.   Now, you testified earlier that the World Classic Rockers
15    only did corporate gigs, correct?
16    A.   Yes.
17    Q.   At some point in time, did you learn that there was going
18    to actually be a public performance?
19    A.   Yes.
20    Q.   Was that there -- at the time when you were in the band,
21    was that common?
22    A.   That's the first time that it happened while I was
23    involved.
24    Q.   And where was that -- just first the venue of that
25    performance was going to take place at?
```

A.    It was in the Midwest.  I'm not sure what the venue was,
but it was for Amtrak, the train company.

Q.    And do you recall when that show was supposed to take
place?

A.    It was in May.

Q.    And did you actually play that show?

A.    I did not.

Q.    And why not?

A.    Well, that was kind of the breaking point, when it -- when
it got to that point, I couldn't continue.

Q.    Now, at the time when you were in the World Classic
Rockers, were you also in Ernie and the Automatics?

A.    I was.

Q.    And so if you did a World Classic Rockers show, how much
would you have earned?  I think you testified earlier --

A.    Well, it was $1,500 a show for the Classic Rockers.

Q.    If instead you did an Ernie and the Automatics, how much
did you earn?

A.    A lot less.

Q.    Do you recall how much?

A.    We started around $300 a show, and I think towards the end
I was making $700 a show.

Q.    So had you not made the decision to leave the World
Classic Rockers at the time you did, do you have any reason to
believe you would not still remain performing with the World

1    Classic Rockers?

2    A.    Sure.  Fran is with them to this day.

3    Q.    Would you have stayed with that band through today?

4    A.    Sure.

5          (Pause.)

6    Q.    Now, with respect to this lawsuit here, do you recall the

7    first time you learned about -- that Mr. Scholz was suing you

8    in this -- not the prior state court cases, but this particular

9    lawsuit?

12:08 10   A.    Yes.  I remember when I found out about it.

11   Q.    And how did you learn about this lawsuit?

12   A.    I was watching television.  There's a gossip TV show, TMZ,

13   and they announced the lawsuit on that show.  The headline was,

14   "BOSTON founder says to ex-guitar player, 'Dude, you're ripping

15   me off.'"

16   Q.    And where were you when you saw that?

17   A.    I was home.

18   Q.    And what was your reaction when you saw that?

19   A.    I was -- it was really upsetting.

12:09 20   Q.    Now, at that point in 2013, and focusing your attention

21   just on the allegations from Mr. Scholz against you, had you,

22   in fact, been -- had notice that there were any prior actions

23   by Mr. Scholz against you?

24   A.    Yes.  The first one was in 2009, I believe in state court.

25   Then there was another one in 2010 in state court.  And then

1    there was one I was served the day before we left on tour with

2    Ernie and the Automatics, that was the third one, and that was

3    in federal court.

4    Q.    Now, how has this particular lawsuit affected you?

5    A.    It's been devastating.

6    Q.    Would you explain, please?

7    A.    Well, it's very stressful for myself, my wife, my

8    children.  Even though they're adults, they're out of the

9    house, they have to hear about me in the press, on TV, a

12:10 10    defendant in federal court sitting in the same seat as "Whitey"

11    Bulger sat in, explain to their friends, why.  What did your

12    dad do to end up there?

13    Q.    Has that affected your ability to go out and make a living

14    as a performing musician?

15    A.    Sure.

16    Q.    In what way, sure?

17    A.    I might as well be radioactive in the music business.

18    Nobody wants to touch me.

19    Q.    Now -- at any point in time subsequent to Brad Delp's

12:11 20    death, had you sought any informal managerial advice from Paul

21    Geary?

22    A.    Sure.  He was a friend of mine; we talked quite a bit.

23    Q.    And did you believe his advice would be important to you?

24    A.    Sure.  He's one of the top managers.

25    Q.    And did you ever ask him if he would manage you while he

```
  1   was at Front Line, Irving Azoff's company?
  2   A.   No.  I knew that they represented BOSTON and that just
  3   wouldn't work.
  4   Q.   At some point in time, did you understand that Mr. Geary
  5   had left Front Line?
  6   A.   Yes.
  7   Q.   And what do you understand Mr. Geary to do now, sir?
  8   A.   Well, he's still a manager of -- still has a bunch of big
  9   acts.
 10   Q.   At some point in time, did you desire to approach
 11   Mr. Geary about managing your career today?
 12   A.   No, I didn't want to drag him into all this.
 13   Q.   And based upon your experience in the music industry,
 14   would having professional management of the caliber of
 15   Mr. Geary have impacted your career in any way?
 16   A.   Oh, absolutely.  Beyond having the music and the talent to
 17   play it, the manager is the biggest factor.
 18   Q.   What's the most successful group, sir, you ever performed
 19   or recorded with?
 20   A.   Well, BOSTON, of course.
 21   Q.   So you heard Mr. Scholz's testimony relative to the
 22   purchase of an Ernie and the Automatics CD from amazon.com, did
 23   you not?
 24   A.   Yes.
 25   Q.   Have you had your chance to go on amazon.com recently and
```

12:11 (line 10)
12:12 (line 20)

```
 1   purchase an Ernie and the Automatics?
 2   A.   I went on Amazon last night, and they did have the CD.
 3   There was no sticker on it.  It wasn't $9.99.  And if you
 4   bought it, it came from a third party.
 5   Q.   And do you recall the testimony regarding that pop-up
 6   video being on YouTube?
 7   A.   Yes.
 8   Q.   Have you had a chance to go on YouTube and search for that
 9   pop-up video?
10   A.   I did.
11   Q.   When did you do that, sir?
12   A.   Over the weekend.
13   Q.   Sir, do you recall how many views there were of that
14   pop-up video as listed on YouTube?
15   A.   When I looked at it, there was 731.
16   Q.   And how many of those were me looking at that pop-up
17   video?
18   A.   Probably about 50 of them.
19          (Pause.)
20          MR. TARLOW:  Your Honor, just one moment.  I may be
21   done.
22          THE COURT:  Yes.
23          (Discussion off the record.)
24   BY MR. TARLOW:
25   Q.   Mr. Goudreau, has this lawsuit or the subsequent state
```

```
 1  lawsuits affected your ability to write or record music?
 2  A.   Oh, sure.
 3  Q.   In what way, sure?
 4  A.   Well, you know, I try to sit down and get in the right
 5  frame of mind of being creative and come up with something, and
 6  all I can think of is depositions and motions, and the worse
 7  part is thinking about how much it's cost.
 8            MR. TARLOW:  Your Honor, if we could take down --
 9  we're not published to the jury, I'm going to be referencing
10  contested Exhibit Z 1.
11            THE COURT:  Just for the witness and counsel.
12            If I could see it.
13            (Discussion off the record.)
14            MR. TARLOW:  Your Honor, do you have it on your
15  screen?
16            THE COURT:  I do.
17            Mr. Green, is there an objection to this?
18            MR. GREEN:  There's going to have to be a foundation,
19  your Honor, before we agree to this.
20            THE COURT:  Okay.
21            Counsel, do you want to attempt to lay the foundation?
22  BY MR. TARLOW:
23  Q.   Mr. Goudreau, looking on your screen, I'm showing you a
24  document.  Do you see that, sir?
25  A.   Yes.
```

1    Q.    Do you use any particular method of keeping track of your

2    earnings from live performances?

3    A.    Yes, I use Quicken program, and this -- I printed this

4    out.

5    Q.    And is this, in fact, a printout from that Quicken

6    program?

7    A.    It is.

8    Q.    And do you do that, sir, in the normal course of business?

9    A.    Yeah.  I handle my own accounting.

12:16  10    Q.    And I notice, sir, there's the first entry date looks like

11    in March of 2007.  In March of 2007, had you been sued by

12    Mr. Scholz?

13    A.    2007, no.

14    Q.    And had you prepared this document in anticipation of any

15    form of litigation, sir?

16    A.    Did I prepare it --

17    Q.    Had you prepared this document in anticipation of any form

18    of ligation?

19    A.    Anticipation, no.

12:16  20    Q.    And is this document a fair and accurate representation of

21    the printout that you printed out from your QuickBooks program?

22    A.    Yes.

23    Q.    If you look at the description, sir, you'll see the names

24    Boch and James MO and consumer?

25    A.    Right.

```
 1   Q.   Can you identify what Boch is?

 2   A.   Well, Boch would be from Ernie.

 3   Q.   And James MO?

 4   A.   Montgomery.

 5   Q.   Consumer?

 6   A.   That's Ernie Boch.

 7   Q.   And Subaru?

 8   A.   That was Ernie Boch.

 9   Q.   And World CLA?

12:17 10   A.   That's World Classic Rockers.

11   Q.   And Open E R?

12   A.   That would be Ernie, too.

13            MR. TARLOW:  Your Honor, I would request we move this

14   into evidence as the next exhibit.

15            THE COURT:  Counsel?

16            MR. GREEN:  No objection, your Honor.

17            THE COURT:  It may be admitted.  I believe we're up to

18   65, Ms. Hourihan.

19            THE CLERK:  65, yes.

12:17 20            THE COURT:  It can be admitted and published.

21            (Exhibit 65 received into evidence.)

22            MR. TARLOW:  Your Honor, no further questions.

23            THE COURT:  Okay.

24            Counsel, cross-examination?

25            MR. GREEN:  Yes.
```

1          If I may approach the witness, your Honor.

2          THE COURT:  You may.

3                    CROSS-EXAMINATION

4    BY MR. GREEN:

5    Q.   Sir, I want to follow up on your testimony that you went

6    on Amazon and to purchase the Ernie and the Automatics CD.

7    A.   Well, not to purchase, just to see if it was there.

8    Q.   I guess that's my point.

9          You didn't purchase it, did you?

12:18 10   A.   No, I didn't.

11   Q.   So you wouldn't know how it was packaged, would you?

12   A.   No.

13   Q.   Let me show you, sir.  We actually purchased it on behalf

14   of Mr. Scholz.  Do you see that?

15          MR. TARLOW:  Objection, your Honor.

16          THE COURT:  Well, sustained as to this, counsel.

17   BY MR. GREEN:

18   Q.   Mr. Goudreau, do you have any reason to disbelieve that

19   when you purchased the CD, it does, in fact, have a sticker

12:18 20   saying "featuring Barry Goudreau and 'Sib' Hashian former

21   original members of BOSTON"?

22   A.   I have no way of knowing how it comes.

23   Q.   Because you didn't actually purchase it, did you?

24   A.   I didn't, no.

25   Q.   Now, you were talking about legal fees --

1    A.    Yes.

2    Q.    -- just a moment ago.

3          You, in fact, have four lawyers sitting in this room,

4    do you not?

5    A.    I do.

6    Q.    You have Mr. Tarlow, who was questioning you, correct?

7    A.    Yes.

8    Q.    And from a separate office you have Mr. Baker?

9    A.    Yes.

12:19 10   Q.    And you flew in Mr. Given from the West Coast?

11   A.    Yes.

12   Q.    And you have someone sitting in the audience who has been

13   here throughout trial?

14   A.    He's an old friend, yes.

15   Q.    Who is that?

16   A.    David Herlihy.  He's a law professor.

17   Q.    At Northeastern?

18   A.    Yes.

19   Q.    And is he billing you for his time?

12:19 20   A.    No.

21   Q.    Now, you were talking about not being able to perform with

22   World Classic Rockers sometime from and after May of 2008?

23   A.    Yes.

24   Q.    Now, you didn't bring a suit against Mr. Scholz, did you,

25   at that point in time?

```
 1   A.   At that point, no.
 2   Q.   And you only brought suit against Mr. Scholz as a
 3   counterclaim in response to the suit that brings us here,
 4   today, correct?
 5   A.   Yes, in an attempt to end all this litigation.
 6   Q.   Now, you mentioned the previous complaints.  That fact,
 7   you knew that each of the previous complaints mentioned Ernie
 8   and the Automatics and, in particular, the issue of your being
 9   listed or publicized as an original member of the band BOSTON,
10   correct?
11              MR. BAKER:  Your Honor --
12              MR. GREEN:  We can pull out the complaint.  I'm just
13   trying to save time here.
14              MR. BAKER:  Judge, objection.  Prior rulings that your
15   Honor has made.
16              MR. GREEN:  Well --
17              THE COURT:  Well, sustained as to the form of the
18   question, counsel.
19              MR. GREEN:  Could I ask, your Honor, that Mr. Tarlow
20   be the one to make objections here?
21              THE COURT:  Oh, I didn't notice who was on his feet.
22              Yes, counsel --
23              MR. TARLOW:  I'm the taller one, your Honor.
24              THE COURT:  No double-teaming.  No disrespect to
25   Mr. Baker.  Mr. Tarlow is very competent.
```

1           Mr. Green.

2           MR. GREEN:  Thank you.

3           (Discussion off the record.)

4           MR. GREEN:  If Ms. Stenger could approach the witness,

5      your Honor.  I just want --

6           THE COURT:  She may.

7           MR. GREEN:  -- want her to identify the previous suits

8      and his particular reference.

9           MS. STENGER:  Ms. Stenger can stay there.  We're just

12:22 10    going to save time.  I'm just going to go through this very

11      quickly.  If you can just stand to the side --

12           MR. TARLOW:  Your Honor, if I may just approach to see

13      what she's pointing to.

14           THE COURT:  Yes.

15           MR. GREEN:  I just want to get dates and references

16      here.

17           Ms. Stenger, could you put the first of the complaints

18      before Mr. Goudreau?

19           MS. STENGER:  It's Exhibit 2 W.

12:22 20     MR. GREEN:  I'm sorry, say it again.

21           MS. STENGER:  Exhibit 2 W.

22           MR. GREEN:  Okay.

23           MS. STENGER:  The federal draft complaint.

24      BY MR. GREEN:

25      Q.   Do you see a date for that complaint, Mr. Goudreau?

1              (Pause.)

2    A.    May 2011.

3    Q.    That's the first.  It wasn't back in 2009, was it?

4              MS. STENGER:  No.  This is the latter one, the draft.

5              MR. GREEN:  Let's start -- my apologies, Ms. Stenger,

6    if I didn't make it clear.  I wanted the first chronologically.

7              (Pause.)

8              (Discussion off the record.)

9              MR. BAKER:  Your Honor, I hear conversations with the

12:23 10    witness, and I think the questions have got to come from --

11             THE COURT:  Yes, if there's a question.

12    A.    It does say December 2010.

13    Q.    Okay.

14             So that was the first of the complaints, would you

15    agree, sir, not 2009?

16    A.    Okay, yes.

17             MR. GREEN:  Now, Ms. Stenger, could you call the

18    witness' attention to the part of the complaint that refers to

19    Ernie and the Automatics?

12:24 20             (Pause.)

21    Q.    I'm just asking you, yes or no, sir, would you agree that

22    Ernie and the Automatics is referred to in the complaint?

23    A.    Yes.

24             MR. GREEN:  Ms. Stenger, could you next show the next

25    complaint chronologically?

```
 1              (Pause.)
 2    A.   May 2011.
 3    Q.   All right.  That's the second.
 4              MR. GREEN:  And, Ms. Stenger, could you show the
 5    reference to Ernie and the Automatics?
 6              THE WITNESS:  I see that.
 7              (Pause.)
 8              THE WITNESS:  I see that.
 9    Q.   And finally, we have the draft complaint.  And did you
10    understand that was the draft complaint that led to this
11    federal court action?
12              MS. STENGER:  To be clear, Mr. Green, the one we just
13    looked at is the draft.  There are just two in here.
14              MR. GREEN:  All right.
15    BY MR. GREEN:
16    Q.   Were there any other complaints that you were referring to
17    earlier, Mr. Goudreau?
18    A.   I'm confused as to what you're --
19              MR. GREEN:  I'm going to move on, your Honor.
20    Q.   Now, let's turn, if you would, to Exhibit 26.
21              MR. GREEN:  If we could have that published, your
22    Honor.
23              THE COURT:  You may.
24              MR. GREEN:  And if you could scroll down to the
25    first -- the next page.  Right there.
```

```
 1              And if we could --
 2    BY MR. GREEN:
 3    Q.   You're familiar with that letter written April 25, 2008,
 4    sir?
 5    A.   We were just looking at it, so, yeah.  Yes.
 6              MR. GREEN:  Could we enlarge the first paragraph,
 7    please?
 8    Q.   And in the second line it refers to soliciting and booking
 9    performances by Barry Goudreau and Fran Cosmo, correct?
10    A.   Yes.
11    Q.   You understood that the demand was written not because of
12    Barry Goudreau but because the two of you were performing
13    together in violation of Mr. Cosmo's contractual clause,
14    correct?
15    A.   Right above that it says "BOSTON trademark infringement."
16    Q.   Well, you understood --
17              MR. GREEN:  And if we could turn the letter to
18    contract violations on page 4.
19              (Pause.)
20              MR. GREEN:  Bottom of the page there, if we can
21    enlarge those two paragraphs.
22              Last paragraph.
23    Q.   Please be advised that Fran Cosmo has contractual
24    obligations to Tom Scholz.  Do you see that?
25    A.   Yes.
```

```
 1    Q.    And you were familiar with those contractual obligations,
 2    were you not?
 3    A.    Not when I joined the World Classic Rockers, no.
 4    Q.    Did you not know about Mr. Cosmo's restriction back in
 5    2006 when you were performing with him in a recording in
 6    Europe?
 7    A.    We never made that recording.
 8    Q.    But you knew, did you not, that you were seeking a waiver
 9    at that point in time from Mr. Scholz about performing with
10    Mr. Cosmo?
11              MR. TARLOW:  Objection, your Honor.
12              THE COURT:  Overruled as to this question.
13    A.    Could you repeat it again?
14    Q.    Prior to performing with World Classic Rockers, did you
15    not become aware of a restriction in Mr. Cosmo's contract with
16    Mr. Scholz in connection with you asked for a waiver?
17    A.    Fran had gone to Tom and asked for a waiver; that was him
18    dealing with his contract.
19    Q.    And that was all prior to World Classic Rockers, was it
20    not?
21    A.    It was.
22    Q.    And when was that, sir?  Was it not in 2006?
23    A.    Honestly, I don't remember when that was.  It never
24    happened, so --
25    Q.    Well, it was -- it was -- that request was made before you
```

1    became involved with World Classic Rockers, correct?

2    A.    Yes.

3    Q.    And you and Mr. Cosmo were planning what type of project,

4    sir?

5    A.    He wanted to get Orion the Hunter -- well, he -- he was

6    looking to do a record deal with a label in Italy, and he

7    wanted to get me involved and have it be Orion the Hunter.  I

8    told him if he could pull it together, that I would consider

9    doing it with him.  But I wasn't involved in any of the

12:29 10   negotiations.  That was all his deal.  As a favor, I told him

11    I'd do it if he could pull it together.

12    Q.    All right.

13    A.    What he was doing with Tom, as far as that goes, I don't

14    know.  I wasn't involved.

15    Q.    Well, let's look at Exhibit 12.

16            MR. GREEN:  If we may have that published, please.

17            THE COURT:  You may.

18    BY MR. GREEN:

19    Q.    You recognize, do you not, sir, this as the agreement that

12:30 20   Fran Cosmo had with Thomas Scholz?

21    A.    I've never seen this before.

22    Q.    Never seen it before this trial.

23    A.    No, before right now.

24    Q.    You do -- you do understand that Mr. Cosmo started with

25    BOSTON in 1993, the date reflected here?

```
 1   A.   If that's what it says, sure.
 2   Q.   And if you could look at -- if we could turn to the top of
 3   page 4, paragraph 3 d.
 4           It says, "Throughout the term hereof and for a period
 5   of five years after the expiration thereof, artist agrees that
 6   in no event shall artist undertake to perform (excluding
 7   performances rendered for Scholz hereunder) with or for, i, any
 8   musician, manager or other individual or entity that is or has
 9   been affiliated with Scholz, the band BOSTON or any BOSTON
10   entity, or, ii, in connection with any project that is
11   undertaken by or for the potential benefit of any such
12   individual or entity."  Did I read that properly?
13   A.   You did.
14   Q.   Now, you knew of that restriction prior to World Classic
15   Rockers, did you not?
16   A.   This is the first time I've ever seen this document.  I've
17   never seen this before.
18   Q.   I understand this is the first time you've seen this
19   document, sir, but under oath is it your testimony that you are
20   not aware of this contractual provision before World Classic
21   Rockers?
22           MR. TARLOW:  Asked and answered, your Honor.
23           THE COURT:  Sustained.  I think that has been asked
24   and answered, counsel.
25           MR. GREEN:  I don't believe so, with respect, your
```

1  Honor.

2       He has said he didn't see it.  I'm asking him if he

3  knew about it.

4       THE COURT:  I think it was answered.  But you can have

5  it again.

6       MR. GREEN:  Thank you.

7  BY MR. GREEN:

8  Q.   Did you know about this restriction prior to World Classic

9  Rockers?

10 A.   Fran never described to me what was in his agreement with

11 Scholz.

12 Q.   Well, did he tell you that he was under a restriction?

13      MR. TARLOW:  Asked and answered, your Honor.

14      THE COURT:  Well, I'll allow this question.

15 A.   Not that I recall.  Honestly, Fran's not a real detailed

16 guy.  He might not even have been clear on it himself.

17 Q.   Let's now turn to Trial Exhibit 16.

18      MR. GREEN:  If we could have that published, your

19 Honor.

20      THE COURT:  You may.

21 BY MR. GREEN:

22 Q.   Do you recognize that document, sir?

23      THE COURT:  Counsel -- thank you.  You made it bigger.

24      (Pause.)

25 A.   I recognize it as being Tom's e-mail, but I don't know

1    that I've read this before.

2    Q.   All right.  Well, this refers in the first paragraph -- at

3    the end of the first line it says, "As for doing a record with

4    Barry in Europe, I think I could agree to that with two

5    important conditions."  Do you see that?

6    A.   Yes.

7    Q.   Wasn't it true that as of late 2006, you and Mr. Cosmo

8    were planning to do a project in Europe?

9    A.   As I said before, this was Fran's project.  It was his

12:34  10    deal.  And he asked if I would do it with him, and I told him

11    if he could pull it all together that, yes, I would appear on

12    it.

13    Q.   And, apparently, Fran made very clear to Mr. Scholz that

14    he was going to be working with you, correct?

15          MR. TARLOW:  Objection, your Honor.

16          THE COURT:  Sustained as to this question based on

17    this document.  Sustained.

18          MR. GREEN:  Turn to Exhibit 17.

19          If we can have that published, your Honor.

12:35  20          THE COURT:  You may.

21    BY MR. GREEN:

22    Q.   Do you understand that that was -- have you seen this one

23    before?

24    A.   No.

25    Q.   Fran never talked to you about getting a waiver from

1    Mr. Scholz?

2              MR. TARLOW:  Hearsay.

3              THE COURT:  Well, sustained as to that question,

4    counsel.

5    A.   One more time?

6              THE COURT:  Well, it was sustained, so Mr. Green will

7    have another question.

8              THE WITNESS:  Sorry.

9              MR. GREEN:  Turn, if you would, to Exhibit 19.

12:35 10   BY MR. GREEN:

11   Q.   Have you seen that document before today?

12   A.   No.

13   Q.   You do recognize this as an e-mail in which Mr. Scholz is

14   saying, Fran, not to worry.  And then he says in the second

15   paragraph, I have no problem with your working with Barry and

16   wish you both luck.  Do you see that?

17             MR. TARLOW:  Objection.

18             THE COURT:  Sustained as to the question.

19   BY MR. GREEN:

12:36 20   Q.   Now, when you -- your testimony is that you didn't learn

21   about the restriction that Mr. Cosmo had until sometime in

22   2008?

23   A.   Eight, yes.

24   Q.   Once you learned of it, you respected the fact that there

25   was a contractual restriction, correct?

1    A.   Could you rephrase that?  I'm not sure what you're asking.

2    Q.   Once you learned of the restriction in Cosmo's contract,

3    you respected that there was a valid contractual restriction,

4    correct?

5    A.   Reasonably that it was true, sure.

6    Q.   Did you talk about Fran about it?

7    A.   Yes.

8    Q.   And what was that discussion?

9            MR. TARLOW:  Objection.

12:37 10         THE COURT:  Sustained.

11   BY MR. GREEN:

12   Q.   After your discussion with Mr. Cosmo, did you have any

13   doubt about the validity of the restriction?

14   A.   No.

15   Q.   Now, at any point in time -- let's now take World Classic

16   Rockers.  They said one or the other.  Is that my understanding

17   of your testimony?

18   A.   Yes.

19   Q.   And you voluntarily decided to let Fran proceed at it,

12:38 20   correct?

21   A.   I did.

22   Q.   Now, they were performing numerous concerts over the

23   course of the year as I understand it, correct?

24   A.   The year I was involved?

25   Q.   Yes.

1    A.    Yes.

2    Q.    You could have performed some and he could have performed

3    some, correct?  Did you ever raise that possibility?

4    A.    That wasn't offered to us.

5    Q.    Did you ever even ask about that?

6    A.    Like I said, it wasn't offered to us, no.

7    Q.    Now, also --

8          (Pause.)

9    Q.    At some point in time, did Fran stop performing with World

12:39 10   Classic Rockers?

11   A.    No, he's still with them.

12   Q.    Have you had any subsequent discussions with him on this

13   subject?

14   A.    Fran Cosmo?

15   Q.    Right.

16   A.    No.

17   Q.    You made a conscious decision -- and by the way, was it

18   your decision or was it a mutual decision with Fran as to who

19   would be performing?

12:39 20   A.    It was my decision.

21   Q.    Now, in connection with your claims in this case, your

22   counterclaims, were you not on hiatus between 2003 and 2007?

23         MR. TARLOW:  Objection.

24   A.    I'm not sure what you -- I'm not sure what you're asking.

25   Q.    Was there a point at time -- was there a period in time

1    prior to joining Ernie and the Automatics when you were doing

2    less performing?

3    A.    No.  I've performed all my life as -- maybe not as much

4    sometimes as others, but, sure.

5    Q.    And wasn't it true that you were performing less between

6    2003 and 2007 when you joined Ernie and the Automatics?

7    A.    I started working a lot more with the Automatics, sure.

8    Q.    But before then, before you joined them, were you not

9    working less during that time period?

12:40  10    A.    Less than what?

11    Q.    Than you had been previously working with BOSTON, for

12    example?

13    A.    I'm not sure I understand.

14    Q.    Let's establish a time frame here.

15          You came out -- I'll withdraw that.

16          Now, you were making reference to Mr. Geary.  You

17    said -- I believe you said that it was your decision not to

18    engage Mr. Geary?

19    A.    Yes.

12:41  20    Q.    That was your decision, not his, correct?

21    A.    Yes.

22          (Pause.)

23    Q.    Now, you have performed, as I understand it -- let's --

24    you have continued to perform to the present day, correct?

25    A.    I have done nine shows this year.  Most of them for very

1    little money.

2    Q.    You performed last year?

3    A.    Yes.

4    Q.    You performed the previous year?

5    A.    Every year since I was 13.

6    Q.    You've been performing all throughout this litigation,

7    correct?

8    A.    Yes.

9          MR. GREEN:  If I may have a moment, your Honor?

12:42 10          THE COURT:  You may.

11          (Discussion off the record.)

12    BY MR. GREEN:

13    Q.    Do you know when Mr. Cosmo's contractual restriction

14    ended?

15    A.    I do now.

16    Q.    If I told you it was 2012, do you have any reason to

17    disbelieve that?

18    A.    No.

19    Q.    Is there any reason why you haven't -- or let me ask you

12:43 20    this:  Have you gone back to World Classic Rockers at any time

21    since 2012 to seek employment?

22    A.    No.

23    Q.    Is there any reason why you haven't?

24    A.    I would say that well is tainted.

25    Q.    Well -- you don't know that because you haven't gone back

```
 1   there, correct?
 2   A.    No.
 3              MR. GREEN:  I have nothing further.
 4              Thank you, Mr. Goudreau.
 5              THE COURT:  Mr. Tarlow, redirect?
 6              MR. TARLOW:  Yes, your Honor.
 7              May I approach the witness from here rather than go to
 8   the podium, and then I'll return to the podium?
 9              THE COURT:  You may.
10                          REDIRECT EXAMINATION
11   BY MR. TARLOW:
12   Q.    Mr. Goudreau, do you understand a moment ago Ms. Stenger
13   was up here showing you some complaints, and she represented --
14              (Discussion off the record.)
15              MR. GREEN:  Go ahead.
16   Q.    -- 2010 was the first complaint she showed you?
17   A.    That I was shown, yes.
18   Q.    I'm going to show you this document.  Could you read -- is
19   that, in fact, an actual earlier complaint that they failed to
20   show you a few moments ago?
21   A.    Yes.  It's June 26, 2009 filed.
22   Q.    And I would direct your attention to the middle of this
23   complaint here.  And is there, in fact, a reference to Ernie
24   and the Automatics?
25   A.    There is.
```

12:44

1  Q.    So when you testified earlier that 2010 instead of 2009

2  was the first complaint filed against you, was that correct or

3  incorrect?

4  A.    My understanding was it was 2009, sure.

5  Q.    Mr. Goudreau, you heard Mr. Green ask you about your four

6  lawyers in this case.

7  A.    Yes.

8  Q.    And he had asked you if you were paying Mr. Herlihy,

9  who --

12:45 10  A.    He went back to school.

11  Q.    The other three lawyers that are remaining in the case,

12  are you paying them?

13  A.    I'm paying you.

14  Q.    To date, sir, how much have you incurred in legal fees and

15  costs relative to this matter, if you know?

16  A.    It's in the hundreds of thousands.

17  Q.    And, sir, when you say "in the hundreds of thousands,"

18  would that be before or after we actually began trial in this

19  matter?

12:45 20  A.    It was hundreds of thousands before it even came to trial.

21  It's -- it's insane.

22  Q.    Mr. Given been sending you periodic statements of his

23  time, sir?

24  A.    He has.

25  Q.    Do you know what the total is the last time he sent you a

```
 1   statement?

 2   A.    It was approaching a quarter of a million dollars.

 3   Q.    How have you been paying for this, sir?

 4   A.    From my retirement.

 5   Q.    How old are you, sir?

 6   A.    Sixty-five.  I'm sorry, I'll be 65 next month.

 7   Q.    Sir, I'm going to show you what has been marked as Exhibit

 8   16.

 9           MR. TARLOW:  Your Honor, if I can publish to the jury?

10           THE COURT:  You may.

11           (Pause.)

12   BY MR. TARLOW:

13   Q.    Sir, you recall Mr. Green asking you some questions

14   regarding this e-mail?

15   A.    Yes.

16   Q.    Who do you know the e-mail N362a@aol.com to be from?

17   A.    I know it was Tom Scholz's e-mail at one time.

18   Q.    And does that particular reference "N362a" mean anything?

19   A.    I recognize it as his e-mail.

20   Q.    I'm sorry, sir?

21   A.    I recognize that as Tom Scholz's e-mail.

22   Q.    Sir, could you just read the subject matter of this e-mail

23   into the record, please?

24   A.    It says, "Re Impending Lawsuit."

25   Q.    And the date of this e-mail?
```

```
 1    A.    December 19, 2006.

 2    Q.    Sir, what is the status of your retirement account to

 3    date?

 4              MR. GREEN:  Objection.

 5              THE COURT:  I'm sorry, counsel, there was an

 6    objection?

 7              MR. GREEN:  Objection on relevance, your Honor.  And

 8    403.

 9              THE COURT:  Okay.  Well, I'll allow this question,

12:47  10   Mr. Tarlow.

11              Overruled.

12    BY MR. TARLOW:

13    Q.    What is the status of your retirement account to date,

14    sir?

15    A.    Seriously depleted.

16              MR. TARLOW:  No further questions, your Honor.

17              THE COURT:  Any recross?

18              MR. GREEN:  Can we just turn on the last exhibit for a

19    moment?

12:47  20             MR. TARLOW:  I'll pull it up, your Honor.

21              THE COURT:  Sure.

22              I think it was 16.

23              (Pause.)

24                          RECROSS-EXAMINATION

25    BY MR. GREEN:
```

1    Q.    There was no impending lawsuit against you at that time,

2    correct?

3    A.    No.

4    Q.    2006.

5    A.    No.

6              MR. GREEN:  I have nothing further.

7              Thank you.

8              THE COURT:  Thank you, sir.

9              You can step off the witness stand.

12:48 10              Thank you.

11              THE COURT:  Mr. Tarlow.

12              MR. BAKER:  Judge, I believe that our evidence is

13    complete, but I just want to talk to my co-counsel.

14              THE COURT:  Yes.

15              MR. BAKER:  There may be some exhibits that we want to

16    ID for the record.

17              THE COURT:  That we don't need the jury for.

18              Why don't you confer, and then I'll ask you your

19    position as to further witnesses.

12:48 20              MR. BAKER:  Just one moment, please.

21              THE COURT:  Yes.

22              (Discussion off the record.)

23              MR. TARLOW:  Your Honor, defense rests, subject to our

24    marking for ID, as just stated a moment ago.

25              THE COURT:  Okay.

1          Mr. Green, do you need to be heard?

2          MR. GREEN:  Yes, I do want to be heard, and we do have

3    one, possibly two short rebuttal witnesses, your Honor.

4          THE COURT:  Well, counsel, I'll talk to you about that

5    in a moment.

6          Jurors, bear with us.

7          Now you've heard the defense has rested, so this is

8    another critical juncture I need to speak with counsel briefly.

9          (At sidebar on the record.)

12:50 10        THE COURT:  Counsel?

11          Counsel, just in terms of the defense case, the

12    exhibits to mark for ID are just for the purposes of preserving

13    the record?

14          MR. BAKER:  That's correct, Judge.

15          THE COURT:  Mr. Green.

16          MR. GREEN:  Thank you, your Honor.

17          We do move for a directed verdict on all three of the

18    defendant's counts.  There is no credible evidence before the

19    jury that --

12:50 20        THE COURT:  Just keep your voice down.

21          MR. GREEN:  -- that Mr. Scholz deprived Mr. Goudreau

22    of any opportunity.  There is no breach of contract here.

23    There's no breach of the implied covenant.  There's been none

24    pointed to.  There is no Chapter 93A violation here.

25          There were decisions that Mr. Goudreau himself has

1  made over the years about his career.  He can point to nothing

2  in the contract that was violated by Mr. Scholz and can point

3  to what happened here, especially given that this Court has

4  dismissed the abuse of process counter --

5          THE COURT:  Counsel, let me say this.  I'll reserve on

6  this matter until I hear you later this afternoon if there's

7  anything you want to add.  Your motion is preserved --

8          MR. GREEN:  Thank you, your Honor.

9          THE COURT:  -- for the record.

12:51  10          Counsel, what is this about rebuttal?

11          MR. GREEN:  We basically have Mr. Pihl, your Honor,

12  who was a former band member.  And he's simply going to testify

13  very briefly as to his treatment by Mr. Scholz over the years

14  here and what he perceived, also what he perceives as to the

15  trademark and importance of the trademark here, your Honor.

16          We just heard Mr. Goudreau trying to make reference to

17  the trademark as part of what his reasoning was, and we intend

18  to put Mr. Pihl on to talk about how he -- how Mr. Scholz

19  treated the band, particularly with reference to the trademark.

12:52  20          I think it would be very short, your Honor.

21          THE COURT:  And who's the other witness?

22          MR. GREEN:  And I want to consult with Mr. Scholz, but

23  we may need to call him on a couple of points related to

24  Mr. Goudreau, in particular the references as related to

25  Mr. Cosmo.  I think it would be only on that, your Honor.  I

1    think on both rebuttal witnesses we could be very brief.

2            THE COURT:  Counsel?

3            MR. BAKER:  With respect to Mr. Pihl, your Honor, how

4    Mr. Scholz treated Mr. Pihl, irrelevant.

5            With respect to the other comment about the trademark,

6    that sounds like that should have been part of Mr. Green's case

7    in chief.  We've raised nothing to challenge the enforceability

8    or validity of the trademark.

9            As to Mr. Scholz's testimony, I don't really know that

12:53 10    I can object to that.  I'm not exactly sure what he's going to

11    say.

12            THE COURT:  Counsel, I guess -- I think he can be

13    recalled in rebuttal.  Committed largely to my discretion are

14    things that couldn't reasonably be anticipated in the case in

15    chief.  I guess Mr. Scholz may fall in a different category,

16    but Mr. Pihl, how is it relevant and how is it not anticipated

17    in the case in chief?

18            MR. GREEN:  I think, your Honor, that we have heard

19    Mr. Goudreau and his testimony right now trying to place the

12:53 20    blame on the trademark here, and we simply want to respond to

21    this.  In other words, this is not simply rebuttal, your Honor;

22    they're making a counterclaim, and it's a defense to the

23    counterclaim.

24            THE COURT:  I mean, I think the lines have been

25    blurred on both sides about what's come in on the case in chief

 1    and what's come in on rebuttal.

 2         How long do you anticipate Mr. Pihl would be?

 3         MR. GREEN:  I think we can get him off the stand

 4    within ten minutes, your Honor.

 5         MR. BAKER:  Your Honor, if I could just address that

 6    point.

 7         I don't know that he can testify about how nice

 8    Mr. Scholz has been to him.  I consider that irrelevant.  I'm

 9    not sure what your position is on that.  That's point one.

12:54 10        Point two, I'm still not clear on what Mr. Pihl is

11    going to say that would be probative and relevant with respect

12    to the trademark.  I mean, that's not clear from Mr. Green's

13    offer of proof, so maybe you can be just a little more precise

14    about that.

15         THE COURT:  Well, I guess, counsel -- and what is it

16    responsive to in the counterclaims?

17         MR. GREEN:  I think what it's responsive to in the

18    counterclaim, your Honor, is there's some suggestion -- we've

19    heard from Mr. Goudreau now that Mr. Scholz was overzealous in

12:55 20   connection with his care of the trademark enforcement.  And

21    this is to simply respond to that and say there's a reason for

22    this.  The trademark does mean something.

23         MR. BAKER:  Nobody disputes that --

24         THE COURT:  Counsel, counsel, address the Court.

25         MR. BAKER:  I'm sorry, Judge.

1          MR. TARLOW:  Your Honor, Mr. Pihl is in the courtroom.

2          MR. GREEN:  He only came in after the last witness was

3     done.

4          MR. BAKER:  I agree with that.  I saw him walk in.

5          MR. TARLOW:  I'm sorry, Mr. Green.

6          THE COURT:  Counsel -- well, I think, counsel,

7     Mr. Baker's point about relevance, I think generally how

8     Mr. Scholz may have treated Mr. Pihl I don't think is relevant.

9     If you're offering it in regards to the efforts to protect the

12:56 10    trademark and so forth -- well, I think it has to be brief,

11    counsel --

12         MR. GREEN:  Okay.

13         THE COURT:  -- based on what I've heard so far.

14         Mr. Scholz himself, how long do you anticipate that to

15    be?

16         MR. GREEN:  I think it can be 10 minutes or so, your

17    Honor.

18         THE COURT:  Okay.

19         Given the time, I'm not inclined to keep the jury

12:56 20    over.  Mr. Pihl, can he be on and off?

21         MR. GREEN:  I don't know if there are any questions.

22    We'll do our best to be quick.

23         MR. BAKER:  I don't know what they're going to ask.

24    Perhaps to reconsider, the standard you just articulated --

25         THE COURT:  It's reserved.

1          MR. BAKER:  Got it.  Enough.

2          THE COURT:  So I think what I'm going to tell them is

3    there's rebuttal -- a rebuttal case, it's brief witnesses,

4    we're going to do one now, and I have assurances it will be

5    brief, and then we'll go from there.

6          (End of discussion at sidebar.)

7          THE COURT:  Jurors, the plaintiff now has the

8    opportunity for rebuttal witnesses.  There's one brief rebuttal

9    witness that they're going to call now.

12:57 10          I recognize what time it is, but there's been

11    representations on all sides that it will be brief.  So if you

12    could bear with us.

13          Mr. Green.

14          MR. GREEN:  Thank you, your Honor.

15          GARY PIHL, having been duly sworn by the Clerk, was

16    examined and testified as follows:

17          THE CLERK:  Thank you.  Please be seated.

18          THE COURT:  Good afternoon.  Good afternoon, sir.

19                        DIRECT EXAMINATION

20    BY MR. GREEN:

21    Q.   Can you state your name for the record, please.

22    A.   Gary Pihl.

23    Q.   Where do you live?

24    A.   Acton, Mass.

25    Q.   What is your profession?

| | | |
|---|---|---|
| 1 | A. | Musician. |
| 2 | Q. | At some point in time, did you become involved with the |
| 3 | | band BOSTON? |
| 4 | A. | Yes. |
| 5 | Q. | And when was that, sir? |
| 6 | A. | 1985. |
| 7 | Q. | And did you play -- do you play a particular instrument? |
| 8 | A. | Guitar mostly, but keyboards as well. |
| 9 | Q. | And was that true back in 1985? |
| 12:58 10 | A. | Yes. |
| 11 | Q. | And did you join the band BOSTON at that point in time? |
| 12 | A. | Yes. |
| 13 | Q. | And how long did you stay with the band BOSTON? |
| 14 | A. | To this day, so 30-something years. |
| 15 | Q. | Did you play on BOSTON recordings? |
| 16 | A. | Yes, I have. |
| 17 | Q. | Did you perform on BOSTON tours? |
| 18 | A. | Yes, I have. |
| 19 | Q. | And has that been every tour since you joined? |
| 12:58 20 | A. | Yes. |
| 21 | Q. | How many tours would that have been? |
| 22 | A. | Ten and a half.  We did a short Canadian tour, so 11 |
| 23 | | total. |
| 24 | Q. | Including the most recent one in 2016? |
| 25 | A. | That's right. |

1    Q.   When was your first tour?

2    A.   '87.

3    Q.   And how successful was that tour, sir?

4    A.   Very successful.

5    Q.   When -- when was the most recent tour?

6    A.   Just this last summer.  It was the --

7    Q.   Was that the 40th Anniversary Tour?

8    A.   Exactly.

9    Q.   How successful was that?

12:59 10   A.   Again, it was very successful.  We had some sold-out

11   shows.

12   Q.   Now, in your work with Mr. Scholz over the years, what

13   observations have you made as to his concern about the BOSTON

14   trademark?

15   A.   It always struck me that he was very proud of it and

16   protective of it, that it be represented in a very positive

17   light.

18   Q.   And what was your observation as to what he did in that

19   regard?

01:00 20   A.   Certainly from -- I can speak to technically.  He and I

21   both had a passion for electronics, and as early as 1977, when

22   I was playing with Sammy Hagar's band, we were the opening act,

23   and when we would -- for concerts, and when we would go to a

24   concert, Tom would be at the sound board listening to make sure

25   that the audience could hear things correctly -- this is at

1    sound check -- actually, this is in the afternoon when the

2    bands would arrive -- and making sure all the equipment was

3    working correctly.  And he'd also go around to the back seats

4    all around the arena to make sure that the audience could hear

5    things well.  And if it wasn't correct, he would have -- he and

6    the crew move things around.

7             MR. TARLOW:  Objection.

8             THE COURT:  Overruled as to this answer.

9    BY MR. GREEN:

01:01 10  Q.   Why was the quality of the sound so important to

11    Mr. Scholz in your observations, sir?

12    A.   We're all about the sound, music.  We want to make sure

13    that people hear what we're doing.

14    Q.   How did that relate to the trademark, sir?

15    A.   People would walk out of the arena, you know, glowing

16    about how good it sounded, and it certainly helped the brand

17    and the name.

18    Q.   Was Mr. Scholz passionate about that issue?

19    A.   Absolutely.

01:01 20  Q.   And did he ask you to do anything to assist him in that

21    regard?

22    A.   Yes.  Again, he knew I had some electronics and recording

23    background, and so I helped as best I could.  I also worked at

24    his electronics company where we actually made the amplifiers

25    that we started using on stage and still use them to this day.

 1    Q.    Did Mr. Scholz have very high standards?

 2    A.    Yes.

 3    Q.    Could he be demanding?

 4    A.    As much as the rest of us.  We all wanted to make it as

 5    good as possible.

 6    Q.    As demanding as he was, did you ever feel that he was

 7    unfair to you?

 8    A.    Never.

 9              MR. GREEN:  Nothing further.  Thank you.

01:02 10              THE COURT:  Cross-examination?

11              MR. TARLOW:  Yes, your Honor.

12                         CROSS-EXAMINATION

13    BY MR. TARLOW:

14    Q.    Mr. Pihl --

15    A.    Yes, sir.

16    Q.    -- fair to say Mr. Scholz is your boss?

17    A.    He's the other band member and leader of the band, yes.

18    Q.    Do you own any interest in the band BOSTON, sir?

19    A.    Own any, no.

01:02 20    Q.    So he's your boss.  You work for Tom Scholz.

21    A.    I work for the band, yes.

22    Q.    For 30 years, the sole source of your income has come from

23    the band BOSTON or Scholz Resource and --

24    A.    No.

25    Q.    What's the primary source of your income for the last 30

1    years?

2    A.    Depended on the year.

3    Q.    Has BOSTON been a primary source of your income for many

4    years?

5    A.    Yes.

6    Q.    How much did you make last year, sir, working for the band

7    BOSTON?

8    A.    About $200,000.

9    Q.    Scholz Research and Development, you work for that entity,

01:03 10   too, do you not?

11   A.    I did there.

12   Q.    And how much did you make with -- what was the last year

13   you worked for Scholz Research and Development?

14   A.    Would have been '96.

15   Q.    That's an entity that Mr. Scholz owned, correct?

16   A.    Yup.

17   Q.    How much did you make from that?

18   A.    Seventy thousand.

19   Q.    Last tour you did -- what was the last tour you did for

01:03 20   BOSTON?

21   A.    This summer.

22   Q.    How much did you make on this tour for this summer, sir?

23   A.    About 200,000.

24   Q.    "Corporate America," you were on that tour?

25   A.    Yes.

1    Q.    That tour wasn't quite as successful, was it?

2    A.    No.

3    Q.    In fact, that was long before Ernie and the Automatics was

4    involved.  What year was "Corporate America"?

5    A.    I think it was 2002 that it came out.

6    Q.    You can't blame Mr. Goudreau for the failure of that tour,

7    can you?

8    A.    I wouldn't say the tour was a failure.

9    Q.    Didn't make as much money as the recent tours, did it?

01:03 10    A.    I don't know.

11    Q.    Well, because you're not an owner of the band?

12    A.    Pardon?

13    Q.    You agree that "Corporate America" tour wasn't as

14    successful as the most recent tours, correct?

15    A.    Not as far as my salary would go, no.

16    Q.    Because you're paid the same no matter what, right?

17    You're paid the same no matter how the tour does, correct?

18    A.    No.

19    Q.    You get paid a piece of the tour?

01:04 20    A.    We sometimes get a bonus if the tour has gone well.

21    Q.    You're guaranteed a base, correct?

22    A.    Yes.

23    Q.    Did you bonus out in "Corporate America"?

24    A.    I believe so.  I can't recall.

25    Q.    Was it more or -- was it a smaller bonus or bigger bonus

1   than the more recent tour?

2   A.   I'd say it was smaller.

3   Q.   Now, sir, you have a website, do you not?

4   A.   Me personally?

5          MR. GREEN:  Objection, beyond the scope.

6          THE COURT:  Sustained as to that.

7          MR. TARLOW:  Your Honor, it goes to bias.

8          THE COURT:  Counsel, what's the --

9          MR. TARLOW:  It also goes to the testimony about the

01:04 10  mark.

11         THE COURT:  Well, what's the next question, counsel?

12  BY MR. TARLOW:

13  Q.   On your website, sir, you use the BOSTON logo mark, do you

14  not?

15  A.   On my personal website?  No, I don't.

16  Q.   You don't.

17  A.   No.

18         MR. TARLOW:  May I approach, your Honor?

19         THE COURT:  You may.

01:05 20  A.   If I could say, other than there may be pictures --

21  Q.   That's what I'm getting at.

22         There were pictures of you and the band using the

23  BOSTON mark, correct?

24  A.   Sure, because of scenery behind us, whatever, yeah.

25  Q.   Well, there are also professionally staged photographs,

         1    are there not?

         2    A.   "Staged" meaning?

         3         MR. TARLOW:  May I approach, your Honor?

         4         THE COURT:  You may.

         5         MR. GREEN:  I do believe this is beyond the scope and

         6    has nothing to do with bias, your Honor.

         7         THE COURT:  Well, counsel, if you can just ask him the

         8    question directly.

         9         MR. TARLOW:  Yes, your Honor.

01:05   10         THE COURT:  Go ahead.

        11    BY MR. TARLOW:

        12    Q.   Mr. Pihl, is that a picture from your website?

        13    A.   I don't believe it is.

        14    Q.   Is that a picture with you with the band BOSTON?

        15    A.   Yes.

        16    Q.   In fact, there's a road case in that picture, is there

        17    not?

        18    A.   Yes.

        19    Q.   And is that road case has what on it, sir?

01:06   20    A.   It has the name and logo of BOSTON on it.

        21    Q.   In fact, when you perform with the band BOSTON, you

        22    perform with very large-scale logos in each and every

        23    performance; is that correct?

        24    A.   That's right, it's in several places.

        25    Q.   You don't perform, sir, with just the word mark "BOSTON"

1    on the stage, do you?

2    A.    It may be there, as well.

3    Q.    Certainly not prominent -- what's the average size of the

4    audience you performed to on last tour, sir?

5    A.    Average, five to ten thousand.

6              MR. TARLOW:  May I approach one more time, your Honor?

7              THE COURT:  You may.

8    BY MR. TARLOW:

9    Q.    Sir, is that a photograph of you performing with the band

01:06 10    BOSTON?

11    A.    Yes.

12    Q.    Which tour is that from, sir?

13    A.    I couldn't tell you just by looking at it.  It could be --

14    the last -- either one of the last two tours because -- no, no,

15    I'm sorry, it's -- it was not the last two tours.  It was at

16    least one tour before that because of the personnel on stage.

17    Q.    You would agree there's a very prominent "BOSTON" logo on

18    stage, correct?

19    A.    There's a video image behind the band, yes.

01:07 20    Q.    And in fact, on almost all -- every tour you've been on,

21    that video image of that BOSTON logo is featured prominently

22    during the concerts; is it not?

23    A.    We didn't have video on all tours.

24    Q.    On other tours that logo was featured on the kick drums?

25    A.    Absolutely.

```
 1    Q.   Featured on some of the amplifiers?

 2    A.   No on the amplifiers.

 3    Q.   Featured on some of the stage props?

 4    A.   I don't recall that -- I don't recall that.

 5    Q.   Sir, you would agree with me you play with a big gong

 6    sometimes behind you, correct?

 7    A.   Yes.

 8    Q.   It's featured on that big gong?

 9    A.   In recent tours, yes.

10    Q.   Not just the word mark in capital letters, that's not

11    featured on the big gong, is it?

12    A.   No.

13    Q.   You're also familiar with BOSTON merchandising, are you

14    not?

15    A.   To a point.

16    Q.   In all the merchandising you've seen, primarily for the

17    most part, sir, it's got that BOSTON logo on it, does it not?

18    A.   Yes.

19    Q.   By the way, sir --

20             MR. TARLOW:  No further questions.

21             THE COURT:  Redirect?

22             MR. GREEN:  Nothing further.

23             Thank you, Mr. Pihl.

24             Thank you, your Honor.

25             THE COURT:  Thank you, sir.
```

1          Counsel, jurors, we're going to stop here.

2          As I told you on Friday, you should prepare for

3   tomorrow to stay all day.  I expect you'll still have this case

4   tomorrow for your deliberations.  I'll give you in the morning

5   a schedule of when things will occur, but, at a minimum, you'll

6   have the closing arguments, my final charge to you, and then

7   you'll have this case for your deliberation.  So you should be

8   prepared to be here until 4:30 or so.

9          But as you leave today, keep all of my cautionary

01:08  10  instructions in mind.  Don't discuss the case with anyone,

11  don't do any outside research, keep an open mind.  Thank you.

12          We'll see you tomorrow.

13          THE CLERK:  All rise.

14          (Jury left the courtroom.)

15          THE COURT:  Counsel, anything briefly, bearing in mind

16  that I need to be back on the bench shortly.

17          MR. GREEN:  From our end, your Honor, you'll let us

18  know what our schedule is this afternoon?

19          THE COURT:  Let me just confer with Ms. Hourihan.

01:09  20          (Discussion off the record.)

21          THE COURT:  So, counsel, I'm on the bench in other

22  matters until 4:00.  Counsel, I will give you a charge before

23  then, slightly before then, but we'll be on at 4:00.  I'll hear

24  you on charge matters, on the arguments you preserved,

25  including the motion to amend, counsel.  Although, Mr. Green,

1    just tipping my hand somewhat, I've reviewed the case law, and

2    I thought about your arguments.  I'm not optimistic you will

3    prevail on that motion, but I'll hear you further.

4           Counsel, I'll hear you on all of the arguments you've

5    preserved about the various claims and counterclaims.  We may,

6    frankly, do that in the context of the jury charge, but you

7    should otherwise, to the extent that you're spending more time

8    this afternoon preparing for this case, you should otherwise be

9    preparing for tomorrow as if everything is going to go forward.

01:10 10    I know experienced counsel would know to do that, but I just

11    say that for your benefit now.

12           MR. GIVEN:  Back in the courtroom at 4:00?

13           THE COURT:  Yes.

14           MR. GREEN:  Thank you, your Honor.

15           (Court adjourned at 1:10 p.m.)

16           - - - - - - - - - - - -

17                    CERTIFICATION

18           I certify that the foregoing is a correct transcript

19    of the record of proceedings in the above-entitled matter to

20    the best of my skill and ability.

21

22

23

24    /s/Debra M. Joyce_____          June 8, 2017_____
      Debra M. Joyce, RMR, CRR, FCRR     Date
25    Official Court Reporter

1                                    INDEX

2

3    WITNESS                                                    PAGE

4

WILLIAM SCALLY
5
       Continued Direct Examination                            10
6      By Mr. Green
       Cross-Examination                                       16
7      By Mr. Given
       Redirect Examination                                    28
8      By Mr. Green
       Recross-Examination                                     31
9      By Mr. Given

10   FRANCIS MIGLIACCIO (via deposition designations)          37

11

JOHN "SIB" HASHIAN
12
       Direct Examination                                      71
13     By Mr. Tarlow
       Cross-Examination                                       88
14     By Mr. Green
       Redirect Examination                                    100
15     By Mr. Tarlow

16   JAMES MONTGOMERY

17     Direct Examination                                      102
       By Mr. Tarlow
18     Cross-Examination                                       109
       By Mr. Green
19
     BARRY GOUDREAU
20
       Direct Examination                                      120
21     By Mr. Tarlow
       Cross-Examination                                       143
22     By Mr. Green
       Redirect Examination                                    160
23     By Mr. Tarlow
       Recross-Examination                                     163
24     By Mr. Green:

25

1                         INDEX (Cont'd)

2    GARY PIHL

3        Direct Examination                              170
         By Mr. Green
4        Cross-Examination                               174
         By Mr. Tarlow
5

6

7                         E X H I B I T S

8
         Exhibit No.          Description            Received
9

10       65            Mr. Goudreau accounting record      142

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25