1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3    _____

4    DONALD THOMAS SCHOLZ,

5                    Plaintiff,        Civil Action
                                       No. 13-10951-DJC
6    V.
                                       November 1, 2016
7    BARRY GOUDREAU,                   8:32 a.m.

8                    Defendant.
     _____
9

10

11              TRANSCRIPT OF JURY TRIAL DAY 7

12         BEFORE THE HONORABLE DENISE J. CASPER

13            UNITED STATES DISTRICT COURT

14         JOHN J. MOAKLEY U.S. COURTHOUSE

15                 1 COURTHOUSE WAY

16               BOSTON, MA  02210

17

18

19

20
              DEBRA M. JOYCE, RMR, CRR, FCRR
21               Official Court Reporter
             John J. Moakley U.S. Courthouse
22            1 Courthouse Way, Room 5204
                   Boston, MA  02210
23               joycedebra@gmail.com

24

25

1     APPEARANCES:

2     FOR THE PLAINTIFF:

3     LAWRENCE G. GREEN, ESQ.
      SUSAN E. STENGER, ESQ.
4     Burns & Levinson LLP
      125 Summer Street
5     Boston, MA 02110
      617-345-3000
6
      FOR THE DEFENDANT:
7
      JEFFREY S. BAKER, ESQ.
8     Baker & Associates
      2 West Hill Place
9     Suite 100
      Boston, MA 02114
10    617-573-9505

11    DAVID M. GIVEN, ESQ.
      Phillips, Erlewine, Given & Carlin LLP
12    39 Mesa Street, Suite 201 - The Presidio
      San Francisco, CA 94129
13    415-398-0900

14    DANIEL P. TARLOW, ESQ.
      Copani Tarlow & Cranney
15    265 Broadway
      Methuen, MA 01844
16    978-686-0010

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              (The following proceedings were held in open

 3    court before the Honorable Denise J. Casper, United States

 4    District Judge, United States District Court, District of

 5    Massachusetts, at the John J. Moakley United States Courthouse,

 6    1 Courthouse Way, Boston, Massachusetts, on November 1, 2016.)

 7              THE CLERK:  Court is in session.  Please be seated.

 8              THE COURT:  Good morning, counsel.

 9              ALL:  Good morning, your Honor.

08:33 10         THE COURT:  Counsel, Ms. Hourihan is handing you

11    revised versions of the charge and the verdict form.

12              Let me just read you through the changes that I made.

13              Counsel, just taking the charge first, nothing

14    substantive changed to Part I or Part II -- Part I or Part III.

15              Focusing on Part II, counsel, which starts on page 20,

16    let me just note for the record the changes that I made.

17              On page 21, I defined EATA the way we discussed

18    yesterday.

19              Also on page 21 I changed the sequence of the

08:34 20    elements.  I did the same on the verdict list, but I'll take

21    you through that as well.

22              Because I changed the order of the elements, I also

23    changed reference to which is the first element, the second,

24    third, and fourth on the bottom of 21.

25              In regards to -- I also made clear on 21, the bottom
```

1    of 21 to 22, the third party that we're referring to is EATA,

2    as has previously been defined.

3            On page 23, as to vicarious trademark infringement,

4    again, I changed the order of the elements, and I changed the

5    reference to first, second, third, and fourth in the lower

6    paragraphs.

7            On page 24, I think I indicated yesterday I wasn't

8    going to change the reference to the logo and so forth on 24; I

9    haven't.

08:35 10            On 25, as to trademark infringement, I did consider

11    whether or not I should change the language about the source or

12    origin language.  This is the second line from the bottom in

13    the first paragraph, but I did not change that just based on my

14    reading of the standard here.

15            As to the second paragraph, I did keep the language

16    about actual confusion, but I did move it to the end of the

17    paragraph and amended it to be consistent with the state of the

18    law.

19            On page -- there's no change to 26.

08:36 20            On 27, I just left it as is as to copyright.  I think

21    it's the songs issue that came up again, I don't think the

22    videos was much of a focus here.

23            On page 28, the implied -- the breach of the implied

24    covenant, I did receive your various filings, and there's an

25    e-mail from Mr. Tarlow as well.  I did consider those.  As to

1    the plaintiff's submission, Mr. Green, on page 3, there was

2    some language -- I didn't change the elements, counsel, but I

3    did on page 29 add a sentence to the upper paragraph there.

4            MR. GREEN:  Yes.

5            THE COURT:  That conveys the rule of law that you

6    cited.  This is that the party bringing the breach of implied

7    covenant, if the party has failed to act in good faith and has

8    breached the implied covenant, that party cannot recover for

9    the subsequent breach of contract or breach of the implied

08:37 10    covenant by the other party.

11            MR. GREEN:  Yes, we see that.  Thank you, your Honor.

12            THE COURT:  Mr. Tarlow, that was consistent with what

13    you were citing to me in your e-mail.

14            MR. TARLOW:  Thank you, your Honor.

15            THE COURT:  I did make that change.  I didn't make a

16    change to the elements.

17            On page 33 -- actually, page 32.  On the introductory

18    language to damages -- one, two, three -- I did make the

19    changes to the third paragraph.  I also changed the language to

08:38 20    make clear that the concept is applying both to the claims and

21    the counterclaims.  I also in the last paragraph made the

22    reference to party as opposed to plaintiff, since there are

23    claims on either side.

24            Counsel, I did take out actual damages, so the next

25    page, 33, starts with lost profits.

1          Counsel, I did go back and read Fishman.  I also

2    reviewed -- there was a post-Fishman case, SharkNinja --

3          MR. GIVEN:  Yes, your Honor, I'm aware of that case.

4          THE COURT:  -- D. Mass. case that also talked about

5    the standard.

6          I did take a look at Tamko, Mr. Green, this is

7    referenced in your filing, 259, but I do think Fishman is on

8    point here, and SharkNinja reiterated that standard.  So I did

9    make the change that Mr. Given had asked for.  So what has

08:39 10   changed here is the intro paragraph is different, and then the

11   second paragraph is added.

12         Mr. Green, I'll note your objection in this regard.

13         The rest of the instruction, the third paragraph to

14   the end of 34, is the same.

15         Counsel, on page 36, in addition to excluding

16   interest, I also added a paragraph about excluding inclusion of

17   any attorney's fees.

18         Counsel, as I said, section 3 didn't change, and

19   substantively, paragraph section 1 didn't change.  I think

08:40 20   there were some nits here and there that I changed, but nothing

21   substantive.

22         Counsel, just to turn to the verdict form for a

23   moment, I basically made the corresponding changes to the

24   verdict form.  So as to Part I, I switched the order of the

25   elements.  As to Part II, I switched the order of the elements,

1    again to reflect how I reordered them in the charge.  And the

2    signals indicate as it goes through Part II that if they

3    answered "no" to any one question but answered "yes" to all of

4    the questions in Part II, they should proceed to question 8,

5    which is the damages question.

6            As to 8 on the infringement, it breaks it down for the

7    two preliminary questions.  If they answered "yes" to either a

8    or b or both, they go to the damages; if they answered "no" to

9    a or b, they move on to the next section.

08:41 10            And I should indicate that back at Parts I and II, if

11    they answered "no" to any of those questions as to both Parts I

12    and II, they're instructed to skip Part III.

13            Part III is largely the same, except that in 10 I

14    added the question that I think Mr. Baker asked me to add in

15    regards to the date of any breach, if that's been established.

16    The rest of Part III is the same.

17            Part IV is the same, except that it adds 14a, again,

18    as to any date having been established for the breach.

19            Part V is the same, except that there's now a 16a as

08:42 20    to the date of the breach, and then the rest remains the same.

21            Counsel, just give me one second here.

22            The only other thing that I think was raised that I

23    said I would follow up on was the apparent authority language

24    in regards to whether that was reciprocal.  I kept it as is,

25    counsel.  Mr. Green, I think it was your objection to that

1    language which will be noted for the record.

2         Counsel, just -- oh, and also, I should say,

3    Mr. Tarlow, I did receive and review your supplemental request

4    as to the verdict form.  This is Docket 258.

5         I had considered whether or not I should break out

6    fair use.  I don't think it's appropriate to do that the way

7    I've covered it in the jury instructions.  I think they've been

8    properly instructed on fair use, so I won't add that.

9         MR. TARLOW:  Just note my objection for the record,

08:44 10   your Honor.

11        THE COURT:  It's noted, counsel.

12        Counsel, this was implicit in my instructions, but my

13   practice is I read Part I before you close, and then I read the

14   remaining parts after you close.  Okay.  So I will do that.

15        Mr. Green, I wasn't sure when we spoke yesterday

16   afternoon, are you putting your client back on?  Are there

17   anymore --

18        MR. GREEN:  We will be your Honor.  He should be 10 to

19   15 minutes tops.

08:44 20        THE COURT:  Okay.

21        MR. GREEN:  And it will all be in rebuttal in points

22   that came up in Mr. Goudreau's examination yesterday.

23        THE COURT:  Okay.

24        So we'll do that -- we'll do that first.  Then I'll

25   ask you if you rest after that, and then we'll see where we are

        1    on time, counsel.  What I may do is go right into doing Part I

        2    of the instruction, and then potentially take break to let you

        3    set up for closings, and then go from there.

        4         MR. GIVEN:  Your Honor, are you entertaining any

        5    further argument on the instructions and verdict form?

        6         THE COURT:  I was not so much inviting it.  If you

        7    need to note anything for the record, counsel --

        8         MR. GIVEN:  I'm just going to make one small note on

        9    the subject of the instruction on harm.

08:45  10         All that was said in the instructions that I read last

       11    night, and I think it's repeated again, is that one of the

       12    elements of trademark infringement is that Mr. Scholz prove

       13    harm, but there was no follow-up instruction describing what

       14    sort of harm.  And my concern is that the jury could be

       15    confused by that.  Harm in the context of the Lanham Act is

       16    very particular, as your Honor, I'm certain, is aware of.  And

       17    there are really only two species of harm in the 1st Circuit

       18    that are recognized.

       19         We had a proposed instruction at 208-3 at page 22, and

08:46  20    it looks like your Honor's picked up the first part of that

       21    instruction but left out the description of what harm means in

       22    this context.  And the reason I'm concerned is because the jury

       23    could think, Well, Mr. Scholz's feelings were hurt, he felt bad

       24    about it, you know, any one of a number of things.  It just

       25    seems unmoored in the abstract to say that -- bear with me,

1    please.

2              Yes.  This is at page 25 of the current draft.  Just

3    one sentence that says, "To prove trademark infringement,

4    Mr. Scholz must also prove that he was harmed by the alleged

5    infringement of the trademark."  That seems unmoored to me, and

6    some description of what harm means in the context of a

7    trademark infringement case is warranted.

8              THE COURT:  Mr. Green, do you want to be heard?

9              MR. GREEN:  I'm not sure what is being proposed here,

08:47 10   your Honor.  I didn't hear this being raised yesterday here.

11   We're fine with where it is.  I defer to the Court as to

12   whether you're wishing to accept anything further on this, but

13   we're fine with how it is.

14              THE COURT:  Okay.

15              Counsel, let me think about it as we're moving through

16   this morning.

17              Assume for the moment I'm not going to change it, but,

18   counsel, let me think about it a little bit more.

19              Counsel, in terms of your closings, I recall from

08:47 20   yesterday 45 minutes either side.  And, Mr. Green, I think you

21   asked --

22              MR. GREEN:  I originally said 30 and 25 --

23              THE COURT:  Fifteen.

24              MR. GREEN:  I'm going to say 25 and 20, your Honor.

25              THE COURT:  Okay.

```
 1              MR. GREEN:  And I will ask instead of a five-minute
 2      warning, a two minute warning.
 3              THE COURT:  So 25 and 20, meaning you'd like a
 4      two-minute warning at 23 minutes.
 5              MR. GREEN:  Correct, your Honor.
 6              THE COURT:  Okay.
 7              MR. GIVEN:  Speaking for Mr. Baker, your Honor, I
 8      think his intention is to use up whatever time remains, which
 9      is in the neighborhood of about an hour, but he indicated
10      yesterday he was prepared to try to go to 45 on it.
11              THE COURT:  Okay.
12              MR. GIVEN:  I expect it will be 45 minutes max.
13              THE COURT:  Okay.  So I'll just give him a two-minute
14      warning to 45.
15              MR. GIVEN:  That's fine.
16              MR. GREEN:  Just so we can clarify, any time remaining
17      here, can we -- can I ask Ms. Hourihan to tell us where the
18      parties stand?  Because if they have an hour left and if
19      they're asking any questions of Mr. Scholz this morning, that's
20      presumably taken off here.
21              THE COURT:  Presumably.  I'll leave it to
22      Ms. Hourihan.
23              Counsel, anything else?
24              MR. GREEN:  Nothing for the plaintiff.
25              MR. TARLOW:  Nothing from the defendant, your Honor.
```

```
 1              THE COURT:  So why don't we -- we'll stand in recess.
 2     You can check with Ms. Hourihan -- oh, the other thing,
 3     counsel, to do today is to go through the exhibits to make sure
 4     that they're in order.  And I know there were some documents
 5     that were going to be redacted, that the parties are in
 6     agreement about that, and just verify that they're in order on
 7     the record to Ms. Hourihan.
 8              MR. GIVEN:  Yes, ma'am.
 9              MR. GREEN:  Thank you.
10              THE CLERK:  All rise.
11              (Recess taken.)
12              THE COURT:  Counsel, you can be seated for the moment.
13     I'll have Ms. Hourihan get the jury.
14              I did go back and look at, Mr. Given, your point on
15     harm.  I did look at the proposal again at 208-3.  I'm not
16     going to adopt the language that you have here.  I think it's
17     too closely tied to the facts of this case.  But I did, in
18     reviewing star financial, 89 F.3d 5, 9-10, the 1st Circuit
19     case, I did add the following language -- and I'll give you
20     just this replacement page -- this is on the bottom of the
21     trademark infringement instruction.
22              So the last paragraph, the third, would read:  "To
23     prove trademark infringement, Mr. Scholz must also prove that
24     he was harmed by the alleged infringement.  Harm caused by the
25     likelihood of confusion may be attributable to the
```

08:49 (line 10)
09:04 (line 20)

1    appropriation of the plaintiff's goodwill, for example,

2    reducing sales to plaintiff or the reduction in value of the

3    trademark by virtue of the association of the plaintiff with

4    the defendant."

5         And that is language from Star Financial.  I thought

6    there wasn't any particular language in Venture Tape, but it

7    reflects this addition.

8         Counsel, I'll just give each side replacement pages.

9         MR. GREEN:  I will note for the record that we are

09:05 10   satisfied with that particular change, your Honor.

11        THE COURT:  Thank you.

12        MR. BAKER:  Your Honor?

13        THE COURT:  Yes.

14        MR. BAKER:  Good morning.

15        THE COURT:  Good morning.

16        MR. BAKER:  Does the jury take the written

17   instructions in?

18        THE COURT:  Yes.  And I should also mention I upload

19   them to the JERS system, to the extent they want to look at

09:06 20   them together, they can.  The same with the verdict form,

21   counsel.

22        MR. BAKER:  And do you also permit the jurors -- do

23   you also permit the jurors to make written notes during

24   closing?

25        THE COURT:  I haven't taken any position on that one

1    way or the other, but short answer is I don't take away their

2    notebooks.

3              MR. BAKER:  Okay.

4              THE COURT:  Thanks.

5              Counsel, we'll have the jury come in, and I'll just

6    give them a brief overview on the schedule today, and then

7    we'll proceed.

8              MR. GREEN:  Thank you.

9              (Pause.)

09:07 10          (Jury entered the courtroom.)

11             THE CLERK:  Court is in session.  Please be seated.

12             THE COURT:  Good morning, jurors.

13             ALL:  Good morning.

14             THE COURT:  We'll get started.

15             Just to give you a sense of the schedule for the day,

16    I expect that there is one more rebuttal witness and then we'll

17    be turning to the first part of my closing charge to you,

18    closing arguments, and then final parts of the charge.  So I do

19    expect you'll get this case for your deliberations today.

09:08 20          Counsel, Mr. Green?

21             MR. GREEN:  Thank you, your Honor.

22             The plaintiff calls as a rebuttal witness, Mr. Thomas

23    Scholz.

24             THE COURT:  He may be called.

25             DONALD THOMAS SCHOLZ, having been duly sworn by the

1    Clerk, was examined and testified as follows:

2              THE CLERK:  Thank you.  Please be seated.

3              THE COURT:  Good morning, sir.  Good morning.

4              THE WITNESS:  Hi.  Good morning.

5                         DIRECT EXAMINATION

6    BY MR. GREEN:

7    Q.   Mr. Scholz, Mr. Goudreau testified as to Exhibit 26.

8              MR. GREEN:  And if I may publish that, your Honor?

9              THE COURT:  You may.

09:09 10         MR. GREEN:  Do you see that on your screen,

11   Mr. Scholz?

12             THE COURT:  Is it up now?

13   BY MR. GREEN:

14   Q.   Do you recognize Exhibit 26 as a letter that was written

15   on your behalf by the law firm of Burns & Levinson?

16   A.   I do.

17   Q.   And what were the circumstances under which this letter

18   was written, sir?

19   A.   There was a show scheduled in -- or a show proposed in

09:09 20   Chicago by World Classic Rockers two months before the BOSTON

21   show was scheduled in Chicago in 2008.  And the problem was

22   that it was being promoted with blatantly false information and

23   misleading information for two members -- two former members of

24   BOSTON to perform BOSTON songs at this show.

25             MR. TARLOW:  Objection.  Move to strike, your Honor.

```
 1              THE COURT:  Overruled.
 2    A.    Among them were that they were -- on their website they
 3    were playing my studio recording of "Peace of Mind" to promote
 4    the show.  Neither of them had played on "Peace of Mind."  They
 5    were promoting the two of them as band mates in BOSTON.  They
 6    had never been band mates in BOSTON.  Barry just played for
 7    scarcely three years.  Fran Cosmo didn't come on until 14 years
 8    later.  And the problem was when -- by advertising that they
 9    were two former band mates now doing this, it made it look like
10    two of the people in the band had split off and were presenting
11    this BOSTON material.  They also credited Barry Goudreau --
12    they said his guitar work was the trademark sound of BOSTON on
13    "More Than a Feeling," "Peace of Mind," "Rock & Roll Band,"
14    "Don't Look Back."  He didn't play on "More Than a Feeling,"
15    "Rock & Roll Band," or "Peace of Mind."  He barely played -- he
16    played a small part on "Don't Look Back," but it was roughly 3
17    percent of guitar work on that song.  Fran Cosmo hadn't played
18    on any of the songs they listed.  It was advertised honestly
19    and, as I understand it, they responded fairly --
20    Q.    I'm going to get to the response in a moment.  But just on
21    this document, sir, were you concerned about any potential
22    confusion?
23    A.    Well, of course.
24    Q.    What was your concern?
25    A.    I thought it was direct competition with our show two
```

1    months later.

2    Q.   All right.  Now, you also mentioned in this letter the

3    issue of the contract violation.  Can you turn --

4         MR. GREEN:  If we can put the screen up to page 4 at

5    the bottom.

6         (Pause.)

7    A.   Yes.

8    Q.   That was Mr. Cosmo's contract?

9    A.   That's right.

09:12 10   Q.   We're going to come back to that in a little bit.  But you

11   were anticipating my next question.

12        This letter that was sent out, Exhibit 26, was dated

13   April 25, correct?

14   A.   Right.

15   Q.   And at the end of the letter, in terms of the actual

16   demand you were making, were you demanding that Mr. Goudreau

17   not perform at all?

18        MR. TARLOW:  Leading, your Honor.

19        THE COURT:  I'm sorry?

09:12 20        Oh, sustained as to form.

21   BY MR. GREEN:

22   Q.   Let me turn your attention to page 6, number 4.

23        Can you read number 4?

24   A.   Yes.  "Immediately cease and desist from all solicitations

25   for any performance by Mr. Goudreau and Mr. Cosmo together."

1    Q.   And what did that mean, sir?

2    A.   Well, with the fraudulent advertising that was

3    accompanying it --

4         MR. TARLOW:  Objection, your Honor.

5    A.   -- having the two of them --

6         THE COURT:  Well, sustained as to relevance as to that

7    portion of the answer.

8         MR. TARLOW:  Move to strike, your Honor.

9         THE COURT:  Right.  It's struck.

09:13 10         MR. GREEN:  All right.  I'll move on.

11   BY MR. GREEN:

12   Q.   Now, following April 25, did World Classic Rockers take

13   any action in response to that letter?

14   A.   Yes.  They fixed the advertising.

15   Q.   And did you cause a letter to be written to -- from your

16   attorney, Robert Jacobs, to the William Morris Agency?

17   A.   I believe there was a letter sent.

18        MR. GREEN:  We would like to offer that, your Honor.

19   It is contested Exhibit 2 U.

09:14 20        THE COURT:  Just for the witness and for the Court and

21   counsel.

22        MR. TARLOW:  Your Honor, I would object to it being

23   offered.

24        THE COURT:  Can you make it smaller?

25        (Pause.)

 1          THE COURT:  Mr. Tarlow, what's the basis, if you can

 2   say in a word?

 3          MR. TARLOW:  Self-serving hearsay.

 4          THE COURT:  Can you just scroll down?

 5          (Pause.)

 6          THE COURT:  Sustained, counsel.

 7          MR. GREEN:  Your Honor, may I be heard?

 8          THE COURT:  I can hear you at sidebar, yes.

 9          (At sidebar on the record.)

09:15 10          THE COURT:  Counsel?

11          MR. GREEN:  This letter is certainly not hearsay.

12   This letter was written as a follow up.  It's clearly relevant.

13   There's no challenge on relevancy, on foundation.  This letter

14   was the response.

15          Mr. Goudreau made it sound like World Classic Rockers

16   was poisoned for the next number of years.

17          THE COURT:  Just keep your voice down.

18          MR. GREEN:  Yes, your Honor, I'm sorry.

19          We're saying within five days, this whole thing was

09:16 20   cleared up.  It's absolutely relevant to the case.  It's

21   absolutely not hearsay or self-serving.  This was written in

22   the ordinary course of business by the same attorney,

23   Ms. Stenger, for Mr. Scholz.

24          THE COURT:  Counsel?

25          MR. TARLOW:  It's self-serving, it is hearsay, your

1    Honor.

2        The problem with this letter is the damage is done,

3    and now they put in a letter where they think it's been cured.

4    There's no way for me -- in letter isn't addressed to

5    Mr. Goudreau, it's not addressed to Mr. Cosmo.  There's no way

6    for me to bring in now Mr. Jacobs or anyone from World Classic

7    Rockers or from the William Morris Agency to say, number one,

8    that they received the letter, it's confirming a conversation;

9    number two, that they believed it was actually over.  You know,

09:17 10    it's a 403 issue as well, your Honor.

11        MS. STENGER:  May I be heard, your Honor?

12        MR. GREEN:  They've had notice of this letter all

13    along.  It's one of our contested exhibits.

14        MS. STENGER:  It's one of their contested exhibits.

15        MR. TARLOW:  It might have been conditionally

16    relevant, but we oppose it.  Just because we agreed that the

17    World Classic Rock stuff should come in doesn't open the door

18    to this.

19        MR. GREEN:  It couldn't be more probative of what the

09:17 20    situation was.  We wanted to depose Mr. Jacobs.  He could have

21    done this a long time ago.

22        MS. STENGER:  Your Honor, if I may.  The whole

23    counterclaim is that Mr. Scholz was overzealous in protecting

24    his trademark.  This shows a reasonable response.  It's a

25    straight on defense of the claim.

```
 1              THE COURT:  And the other letter, Exhibit 26, which
 2    was the agreed to was --
 3              MS. STENGER:  The original demand letter.
 4              MR. GREEN:  Which was five days before this.
 5              MS. STENGER:  To the same --
 6              THE COURT:  To the same --
 7              MR. GREEN:  To the same people, to the same William
 8    Morris.
 9              (Discussion off the record.)
10              MR. GREEN:  This one was to the attorney.  It's to his
11    client, was the original letter.
12              MR. TARLOW:  Your Honor, the original letter was
13    written to two separate entities, one was to the attorney,
14    World Classic Rockers, one was to the William Morris Agency
15    separately, your Honor.
16              MR. GREEN:  This is the follow-up to William Morris.
17    It's the exact same party representing that they handle the
18    promos, and they were the ones who took care of this.
19              MR. TARLOW:  Which is not in evidence.
20              THE COURT:  Counsel.
21              (Pause.)
22              THE COURT:  I guess, counsel, what I was reacting to
23    was which party was offering it and the plaintiff offering it
24    as opposed to it being offered by the defendant.
25              I get your point in regards to it being business
```

1    record where it's been offered by -- well, it's a letter by

2    Mr. Scholz's counsel.

3             MR. GREEN:  Correct.

4             THE COURT:  And is it being offered for the truth,

5    counsel?

6             MR. GREEN:  It is, your Honor.  It's being offered for

7    the truth, but it certainly falls within a business record

8    exception of the hearsay rule.

9             MR. TARLOW:  Except, your Honor, we have an e-mail

09:19 10   about impending litigation that's before this.  And this is

11   clearly referencing potential litigation.

12            MR. GREEN:  If he wants to submit his e-mail, let him

13   do it on his cross.

14            THE COURT:  I don't understand the point, Mr. Tarlow.

15            MR. TARLOW:  In other words, that the document itself

16   is drafted in anticipation of litigation.

17            MS. STENGER:  You're talking about the demand letter?

18            MR. TARLOW:  No, I'm talking about this letter.

19            MS. STENGER:  No, but when you say "impending

09:20 20   litigation"?

21            MR. TARLOW:  I don't know what that was.  It was an

22   exhibit you guys referenced.

23            THE COURT:  I don't know what foundation has been laid

24   for this being a business record, counsel.

25            MR. GREEN:  He didn't even -- I'll be glad to lay the

1    foundation for that, if that's the concern.

2         THE COURT:  Counsel, if you can lay that foundation, I

3    agree with you on the relevance point.

4         MR. GREEN:  Thank you.

5         THE COURT:  I was focused on the hearsay.

6         MR. GREEN:  Thank you.

7         MR. TARLOW:  Thank you.

8         (End of discussion at sidebar.)

9         THE COURT:  Counsel, just let me say for the record,

09:21 10   I'll allow you to lay a foundation as we discussed at the

11   sidebar.

12         MR. GREEN:  Thank you, your Honor.

13   BY MR. GREEN:

14   Q.   Mr. Scholz, could you look at Exhibit 2 U?  And it's just

15   published to you and not to the jury at this point.

16         This is a letter written by Ms. Stenger?

17   A.   Right.

18   Q.   Was it written at your direction?

19   A.   Yes.

09:21 20   Q.   Was this letter written in the ordinary course of business

21   of yourself as the holder of the BOSTON trademark?

22         MR. TARLOW:  Objection, your Honor.

23         THE COURT:  Overruled.

24   A.   Yes.

25   Q.   And was it in the ordinary course of business for

```
 1    Ms. Stenger to write this type of letter on your behalf?

 2    A.   Of course.

 3              MR. GREEN:  I offer this, your Honor.

 4              MR. TARLOW:  I object, your Honor.

 5              THE COURT:  Okay.

 6              Based on the discussion and the questions that have

 7    now been proffered, I'll allow it.

 8              Ms. Hourihan, next number, 66?

 9              THE CLERK:  Yes.

10              (Exhibit 66 received into evidence.)

11              THE COURT:  It may be published.

12    BY MR. GREEN:

13    Q.   Now, this letter, sir, is dated what date?

14    A.   I'm sorry, April 25, 2008.

15    Q.   I'm talking about now to you.

16    A.   April 30, 2008.

17    Q.   This was five days after Exhibit 26th, the demand letter.

18    A.   That's correct.

19    Q.   And had World Classic Rockers taken action within that

20    five-day period that caused this letter to be written?

21    A.   Yes, quickly.

22    Q.   What action had they taken?

23    A.   They fixed their advertising and got rid of the dishonest

24    part of it.

25    Q.   And you had your attorney state here that they made
```

1    certain changes to their website?

2    A.    That's correct.

3    Q.    Now, what requests, if any, did you receive from Mr. Cosmo

4    or Mr. Goudreau for a waiver of the five-year restriction?

5              MR. GREEN:  We can take this down at this point.

6              MR. TARLOW:  Objection as to Mr. Cosmo, your Honor.

7              THE COURT:  Well, I'm assuming that's on relevance

8    grounds, counsel?

9              MR. TARLOW:  Yes, your Honor.  And also hearsay, your

09:23 10   Honor.

11             THE COURT:  Well, counsel, do you want to reframe as

12   to Mr. Goudreau?

13             MR. GREEN:  I'm going to move on, and we're going to

14   come back to that, your Honor.

15             THE COURT:  Okay.

16   BY MR. GREEN:

17   Q.    There's been reference to Mr. Cosmo's contract.

18             MR. GREEN:  Can we publish, your Honor, Trial Exhibit

19   12?

09:23 20             THE COURT:  You may.

21   BY MR. GREEN:

22   Q.    Do you recognize this document, Mr. Scholz?

23   A.    Yes.

24   Q.    And can you identify it for the jury?

25   A.    I believe that's the contract for Fran Cosmo.

1   Q.   And it is dated when, sir?

2   A.   I didn't see it, but I know it's 1993.

3   Q.   That appears on the top line of this document?

4   A.   17th of September.

5   Q.   And is that when he joined BOSTON?

6   A.   That's correct.

7   Q.   And could you --

8        MR. GREEN:   Could we now scroll down to page 4,

9   paragraph 3d?

09:24 10  Q.   This says, "Throughout the term hereof, and for a period

11  of five years after the expiration thereof, artist agrees that

12  in no event shall artist undertake to perform (excluding

13  performances rendered for Scholz hereunder) with or for any

14  musician, manager or other individual or entity that is or has

15  ever been affiliated with Scholz, the band BOSTON or any BOSTON

16  entity or; ii, in connection with any project that is

17  undertaken by or for the potential benefit of any such

18  individual or entity."

19       Did I read that properly?

09:25 20  A.   Yes.

21  Q.   Now, you were a party to this contract?

22  A.   That's right.

23  Q.   Why was this clause included in the contract?

24  A.   Because I had a very bad experience in the past where more

25  than -- two members or more had gotten together to do an album

1    and it -- it created rumors that BOSTON had broken up --

2              MR. TARLOW:  Object, your Honor.

3    A.    -- and rumors --

4              MR. TARLOW:  That it created rumors, your Honor, I

5    move to strike.

6              THE COURT:  Overruled.

7    A.     -- that actually persist to this day.

8    Q.    And were you -- when you say "created rumors," did you

9    have any concerns about confusion?

09:25 10   A.    Of course.

11   Q.    What were your concerns, sir?

12   A.    That the -- that the people --

13             MR. TARLOW:  Objection, your Honor.

14             MR. GREEN:  I'm asking for his state of mind, your

15   Honor.

16             THE COURT:  Overruled as to that.

17   A.    That the performers who were leaving to do something else

18   would be perceived as a piece of the band having left and the

19   band no longer sounding like the records that they were

09:26 20   expecting to come and hear live.

21   Q.    Now, how long did Fran Cosmo continue to be with the band

22   BOSTON?

23   A.    He worked -- he was active for 12 years.  His contract was

24   ended in 2007 when the 2007 tour had to be canceled.

25   Q.    Well, just so our arithmetic is correct, you said he

```
 1   started in 1993 --
 2   A.   '93, and his last performance with BOSTON was in 2004.
 3   Q.   And when did his contract actually end?
 4   A.   2007, after the 2007 tour never materialized.
 5   Q.   All right.
 6        So going back to clause d, he was restricted from
 7   performing for a period of five years beyond the end of his
 8   term?
 9   A.   That's correct.
10   Q.   And what year would that have taken us to?
11   A.   2012.
12   Q.   And do you know the exact date?
13   A.   It was September 17, 2012.
14   Q.   So any time after that, there was no restriction, right?
15   A.   That's correct.
16   Q.   He could perform, if he wanted to, with Mr. Goudreau?
17        MR. TARLOW:  Leading, your Honor.
18        THE COURT:  I'll allow that question.
19        He can answer.
20   A.   Well, not only -- he could perform after that date, and if
21   he got a waiver, he could perform with him before that date.
22   Q.   And on the subject of waivers, did either of them ever
23   come to you to request a waiver?
24        MR. TARLOW:  Objection, your Honor.
25        THE COURT:  Overruled.
```

 1    A.    No one in connection -- in connection with World Classic

 2    Rockers, no one did, not World Classic Rockers, not Fran Cosmo

 3    -- he had come to me three times before, and I was open to

 4    it -- not Barry Goudreau, who had all my contact information.

 5    And it was a 31-day tour on the line with his family to take

 6    care of.  I would have called everybody if it was me.  No one

 7    called; no one asked.

 8    Q.    Now, did you grant -- you said that had granted waivers to

 9    Mr. Cosmo on other occasions.  What occasions were those?

09:28 10    A.    There was a waiver without time restriction for him to

11    play with his son Anthony.  He asked for a waiver to do a

12    recording project with Barry Goudreau for a European release

13    with I think it was Orion the Hunter; I granted that.  And he

14    approached me for a waiver for something else for Barry

15    Goudreau in the United States.  But then he said Barry Goudreau

16    just wasn't interested in doing the project with him.

17    Q.    On the subject of waivers -- can we go to trial Exhibit

18    16?

19            MR. GREEN:  If I may publish that, your Honor.

09:28 20            THE COURT:  You may.

21    BY MR. GREEN:

22    Q.    Do you recognize that document, sir?

23    A.    It's an e-mail from me to Fran.

24    Q.    And what -- under what circumstances did you write this

25    e-mail?

1    A.    It was regarding his request for a waiver.

2    Q.    And what was your position -- what was the nature of the

3    request and what was your response?

4    A.    This one --

5    Q.    It had to do with performing with Barry in Europe?

6    A.    This was the European recording project, yes.

7    Q.    And what was your response?

8    A.    That basically I would -- I didn't have an objection to

9    it.  I would work with him on whatever he needed for the

09:29 10   waiver.

11   Q.    And that's set forth in writing in the fourth paragraph

12   there?

13   A.    That's correct.

14   Q.    And turning to Exhibit 17 --

15         MR. GREEN:  If I may publish that, your Honor.

16         THE COURT:  You may, 17.

17   BY MR. GREEN:

18   Q.    Can you identify that document, sir?

19   A.    Yes, that's -- I'm sorry, can you go back to the top of

09:30 20   that for just a second?

21         (Pause.)

22   A.    It was a document regarding his waiver request.

23   Q.    That was a draft waiver, correct?

24   A.    That's correct.

25         MR. GREEN:  And let me ask if we could publish 19,

```
 1    your Honor?
 2              THE COURT:  You may.
 3    BY MR. GREEN:
 4    Q.   Do you recognize that document, sir?
 5    A.   Sure.
 6    Q.   What is that?
 7    A.   Fran had expressed some concern over the exact language in
 8    a waiver that was sent to him, and that was my e-mail to him
 9    saying that I would have Maggie or my attorney working on that
10    to figure it out and get him the paperwork he needed.
11    Q.   And can you read the first sentence of the second
12    paragraph?
13    A.    It says, "I have no problem with your working with Barry,
14    and wish you both luck at it.  I wouldn't let this delay you in
15    getting started.  By the way, I think my e-mail to you last
16    year stated I didn't feel at the time that we would be able to
17    afford the additional expense of you and Anthony with regard to
18    the hypothetical future of BOSTON performances.  Best of luck."
19    Q.   Now, from and after the five-year period after Mr. Cosmo
20    left, which you identified as September 17, 2012, again, was
21    there any restriction with Mr. Goudreau performing with
22    Mr. Cosmo?
23    A.   No, of course not.
24    Q.   Now, a couple final questions, sir.
25              When did the -- when did you come back from the 40th
```

```
 1   anniversary tour?

 2   A.    We finished in middle of August.

 3   Q.    How old are you today, sir?

 4   A.    Sixty-nine; very close to 70.

 5   Q.    Are you still working?

 6             MR. TARLOW:  Objection, your Honor.  Beyond the scope.

 7             THE COURT:  Counsel, I'll sustain that as to the last

 8   question.

 9   BY MR. GREEN:

10   Q.    Is BOSTON still touring?

11   A.    Yes.

12   Q.    Do you have a next tour in mind?

13   A.    We do --

14             MR. TARLOW:  Beyond the scope, your Honor.

15             THE COURT:  Sustained, counsel.

16             MR. GREEN:  No further questions.

17             Thank you, your Honor.

18             THE COURT:  Mr. Tarlow.

19             MR. TARLOW:  Thank you, your Honor.

20             May I proceed, your Honor?

21             THE COURT:  You may.

22                        CROSS-EXAMINATION

23   BY MR. TARLOW:

24   Q.    Mr. Scholz, you just were referring to Exhibit 66 that

25   your attorney put before you.
```

```
 1              When you wrote this letter, you had no -- you had no
 2     conversations with Mr. Jacobs yourself, correct?
 3     A.   I don't know what Exhibit 66 is.
 4              MR. TARLOW:  Your Honor, may I use the projector
 5     please?
 6              THE COURT:  This has been pre -- counsel, has this
 7     been an admitted exhibit?
 8              MR. GREEN:  This is the letter that was just admitted,
 9     your Honor.
10              THE COURT:  Okay.
11              You may.
12              THE COURT:  I think this is 66.
13              THE CLERK:  Yes.
14              (Discussion off the record.)
15     BY MR. TARLOW:
16     Q.   This is the letter that you just testified --
17     A.   Yes, I recognize it.
18     Q.   You directed Ms. Stenger to send this to Robert Jacobs,
19     correct?
20     A.   That's correct.  Well, I didn't know who Robert --
21     Q.   You don't know who Robert Jacobs is, correct?
22     A.   But I knew that Ms. Stenger would send to the party.
23     Q.   You said you directed her to send a letter, correct?
24     A.   That's correct.
25     Q.   You don't know who Robert Jacobs is, do you?
```

1    A.    He was a representative for --

2    Q.    You don't know who he represented, do you?  You don't know

3    whether he represented World Classic Rockers and/or William

4    Morris Agency, correct?

5    A.    My understanding was he represented --

6    Q.    Not your understanding --

7              MR. GREEN:  Excuse me, your Honor --

8              THE COURT:  Counsel, just let him finish.

9              Mr. Tarlow, what was the question again?

09:34 10    BY MR. TARLOW:

11    Q.    Do you have personal knowledge as to whether or not Robert

12    Jacobs represented both William Morris Agency and the World

13    Classic Rockers?

14              MR. GREEN:  I object to that.  He didn't let the

15    witness answer the last question.

16              THE COURT:  Well, sustained as to compound, counsel.

17              You can ask another question.

18    BY MR. TARLOW:

19    Q.    Do you have personal knowledge that on April 30, 2008,

09:35 20    that Robert Jacobs represented World Classic Rockers?

21    A.    My understanding would have come from my attorneys, of

22    course.  And my understanding was that he represented William

23    Morris and World Classic Rockers.

24              MR. TARLOW:  Your Honor, move to strike as

25    nonresponsive.

```
 1              THE COURT:  Overruled.
 2    BY MR. TARLOW:
 3    Q.   Did you have personal knowledge, yourself, sir, as to
 4    whether or not he represented William Morris Agency?
 5    A.   Only what my attorney would have told me.
 6    Q.   Now, sir, this letter was not sent to Barry Goudreau.  He
 7    doesn't appear to be on the face of the letter, correct?
 8    A.   That's correct.
 9    Q.   Wasn't sent to Fran Cosmo, correct?
09:35 10   A.   That's correct.
11    Q.   Okay.
12              And by the way, sir, this letter says at that time you
13    didn't intend to bring an action against William Morris Agency
14    or World Classic Rockers, correct?
15    A.   That's what it says.
16    Q.   It didn't say, Don't worry about it, we're not going to
17    sue you in the future, did it?
18    A.   I think it's implied.
19    Q.   It's implied.  You understood, sir, primarily the World
09:36 20   Classic Rockers only did corporate shows, correct, private
21    shows?
22    A.   I don't think that's actually entirely true.
23    Q.   That's what you understood primarily, sir?
24    A.   That's not what I understood.
25    Q.   Do you have any reason to believe other than the one
```

1    Amtrak show that the World Classic Rockers only did private

2    shows?

3    A.    I did believe that they did shows for general admission.

4    Q.    Right.  So you found out that they did this Amtrak show,

5    correct?  A public show and you were concerned that it might

6    somehow interfere with your BOSTON tour, correct?

7    A.    Whether it was a public show that was available for sale

8    or a corporate show, it was entirely possible that it would

9    have an effect on attendance.

09:36 10   Q.    And you were concerned that those third parties, either

11    corporate clients or public shows, might do advertising on

12    their own, correct?

13    A.    I'm sorry, I don't understand the question.

14    Q.    Well, let's talk about the Amtrak show that you knew

15    about.

16          One of your concerns, sir, must have been that they

17    would have done advertising, correct?

18    A.    Just to clarify.  Are you talking, -- is the Amtrak show

19    the show that was scheduled for Chicago?

09:37 20   Q.    Yes, sir.  The Chicago show.

21          You were concerned that the Chicago show, that that

22    client of the World Classic Rockers, might do advertising on

23    their own, correct?  Wouldn't that have been one of your

24    concerns?

25    A.    I was concerned about the fraudulent advertising that was

being done.

Q.   Sir, I'm asking you this, sir:  Wouldn't it have been one

of your concerns that a client of the World Classic Rockers

would have also publicized those performances, correct?

A.   Who is the client of World Classic Rockers?  What do you

mean by that?

Q.   Well, you knew there was going to be a show in Chicago, a

public show, correct?

A.   That's correct.

Q.   And you knew that that would have been -- and you knew,

sir, that that was going to be -- that World Classic Rockers

gets hired by a customer, by a client, correct?  World Classic

Rockers is a --

A.   You're talking -- a promoter you mean?

Q.   A promoter, sir.

A.   Thank you.

Q.   You were worried about that, right?

A.   I'm worried about it being fraudulently promoted.

Q.   Well, you're worried about that promoter, that promoter

doing their own advertising, correct?

A.   I was worried about what I saw, the incorrect advertising

that I saw and heard.

Q.   You wouldn't have been worried at that time that a

promoter might have advertised Barry Goudreau as an original

member the band BOSTON?  That wasn't your concern?

```
 1   A.   Well, it would certainly be a concern if it happened.

 2   Q.   Do you think the World Classic Rockers, after receiving

 3   that cease-and-desist letter from your attorneys, might have

 4   been worried that they couldn't control what third parties

 5   might have done for their advertising?

 6             MR. GREEN:  Objection to form, calls for speculation.

 7             THE COURT:  Sustained.

 8   BY MR. TARLOW:

 9   Q.   How many members of the band BOSTON have there been since

09:38 10   Barry Goudreau left the band in 1983?

11             MR. GREEN:  Objection, beyond the scope, your Honor.

12             THE COURT:  Sustained.

13             MR. GREEN:  Your Honor, I'm addressing the rumors

14   issue.

15             THE COURT:  Sustained, counsel.

16   BY MR. TARLOW:

17   Q.   Sir, you don't know what -- you don't know -- have you no

18   personal knowledge as to any discussions between any

19   representative of the World Classic Rockers and Barry Goudreau,

09:39 20   what they might have been after this letter of April 30, 2008,

21   do you?

22   A.   No, I don't.

23   Q.   You don't know what any of the discussions might have been

24   with anyone from William Morris Agency and Barry Goudreau since

25   April 30, 2008, do you?
```

```
 1    A.   That's correct.

 2    Q.   Sir, you testified that when Barry Goudreau did his solo

 3    record, you had a very bad experience, correct?

 4    A.   It was a bad experience.

 5    Q.   And that haunts you to this day, correct?

 6              MR. GREEN:  Objection, beyond the scope, your Honor.

 7              THE COURT:  Sustained.

 8    BY MR. TARLOW:

 9    Q.   Sir, you testified that you were concerned that there was

10    a song, a BOSTON recording, playing on the World Classic

11    Rockers website, correct?

12    A.   That's correct.

13    Q.   Who controlled the right to give authorization to use that

14    recording in 2008?

15    A.   Well, that would have either been Sony or Ahern

16    Publishing.

17    Q.   It wasn't you, sir, correct?

18    A.   That's correct.

19    Q.   And you don't know whether Sony or Mr. Ahern ever granted

20    that permission, do you?

21    A.   No, I don't.

22              MR. TARLOW:  No further questions.

23              THE COURT:  Any redirect?

24              MR. GREEN:  I have one question.

25              THE COURT:  You can ask it from there.
```

```
  1                      REDIRECT EXAMINATION
  2    BY MR. GREEN:
  3    Q.    Mr. Scholz, did you ever sue World Classic Rockers?
  4    A.    No.
  5              MR. GREEN:  Thank you.
  6              Nothing further, your Honor.
  7              THE COURT:  Recross?
  8              MR. TARLOW:  No further questions, your Honor.
  9              THE COURT:  Thank you, sir.  You're excused from the
09:40 10   stand.
 11              MR. GREEN:  The plaintiff's rebuttal case is
 12    completed, your Honor, and the plaintiff rests.
 13              THE COURT:  Thank you.
 14              Jurors, now the plaintiff has rested his rebuttal
 15    case.  We're now going to turn to the final portions of this
 16    trial.
 17              The first portion is going to be the first part of my
 18    jury instructions to you.  We're then going to take a break
 19    just to let the attorneys get organized for closing arguments,
09:41 20   then we'll hear the closing arguments, and we'll take the
 21    schedule from there.
 22              What the final part will be in open court for all of
 23    you is hearing the final two portions of my jury charge.  So
 24    we'll move to that now.
 25              (Pause.)
```

1           THE COURT:  Jurors, you can take any notes if you

2     wish, but just know that you will get a hard copy of my jury

3     charge for your use in consultation in the jury room.  So if

4     you just want to listen, that's fine as well.

5           Jurors, you've now heard the evidence and will soon

6     hear the closing arguments in this case.  It is now my duty to

7     instruct you on the law that you must follow and apply.  These

8     instructions are somewhat complicated, and I ask you to pay

9     very careful attention.  I need to read them to you because I

09:42 10    have not committed to memory all of the law about which I have

11    to instruct you.  So I ask you to do your best to listen

12    carefully and stay with me.

13          Jurors, it is your duty to find the facts from the

14    evidence admitted in this case.  You are the sole and exclusive

15    judges of the facts.  You shall determine the weight, value,

16    and effect of the evidence that has been presented to you in

17    the course of this trial.  Where there are disputes about

18    material facts about what actually happened, it is up to you,

19    the jury, to resolve those disputes in reaching your verdict.

09:43 20    You must determine the facts without fear or favor, based

21    solely on a fair consideration of the evidence.  That means

22    that you must be completely fair and impartial, swayed neither

23    by prejudice nor sympathy, nor emotion, nor any personal likes

24    or dislikes.  Your responsibility is to weigh the evidence in

25    this case fairly and impartially.

1          To those facts you must apply the law as I give it to

2     you.  The determination of the law is my duty as the judge.  It

3     is your duty to apply the law exactly as I give it to you,

4     whether you agree with it or not.  Even if you disagree with

5     one or more of the rules of law or do not understand the

6     reasons for them, you are bound to follow them.  This is a

7     fundamental part of our system of government by law rather than

8     by the individual views of the judge or jurors who have the

9     responsibility for deciding a case.

09:44 10          In following my instructions, you must follow all of

11    them and not single out some and ignore others.  They are all

12    equally important.  Consider these instructions as a whole and

13    apply them sensibly and faithfully in your deliberations.

14         All of my instructions are about the law you must

15    apply.  I do not mean any of my instructions to be understood

16    by you as a comment by me on the facts or on the evidence in

17    this case.  The lawyers were allowed to comment during their

18    arguments on some of these rules of law, but if what they have

19    said or what they're about to say about the law differs in any

09:44 20    way from my instructions, you must be guided only by the

21    instructions on the law as I state them.

22         To help you understand and remember these instructions

23    on the law, I'll divide them into three parts:  First, opening,

24    general instructions, which is what I'm giving you now; second,

25    instructions about the claims and counterclaims in this case

1    and about the law you must apply in considering them; and

2    third, some general instructions about procedures during your

3    deliberations.  I'm delivering the first part of the

4    instructions before you hear counsel's closing arguments so you

5    have some general framework for hearing those arguments.  I'll

6    deliver the second part about the elements of the claims and

7    the counterclaims and the third part about the procedures

8    during your deliberations after the closing arguments but

9    before you begin deliberations.  All of my instructions, all

09:45 10   three parts, are part of my final jury instructions and are all

11    equally important and comprise the law that you must consider

12    and apply in this case.

13         Throughout these instructions, I shall refer to the

14    plaintiff, Donald Thomas Scholz, in this case as the plaintiff

15    or Mr. Scholz.  I shall refer to the defendant, Barry Goudreau,

16    as the defendant or Mr. Goudreau.

17         Jurors, your verdict must be based solely upon the

18    evidence and according to the law.  In reaching your decision

19    as to whether the plaintiff has sustained his burden of proof

09:46 20   as to his claims against the defendant or if the defendant has

21    established his burden of proof as to his counterclaims against

22    the plaintiff, it would be improper for you to consider

23    anything that is not evidence.

24         You may not base your verdict on any personal

25    feelings, prejudices, or sympathies you may have about the

1    plaintiff or the defendant or about the nature of the claims or

2    counterclaims alleged.

3         The evidence in this case consists of the sworn

4    testimony of witnesses, both on direct and cross-examination

5    and redirect and recross-examination; the exhibits that have

6    been received in evidence; and any facts to which the parties

7    have agreed.

8         Certain things are not evidence.

9         Arguments and statements by lawyers are not evidence.

09:46 10   The lawyers are not witnesses.  What they say in their opening

11   statements or soon in their closing arguments is intended to

12   help you interpret the evidence, but it is not evidence.  If

13   the facts as you remember them from the evidence differ from

14   the way the lawyers have stated them or the way the Court has

15   referenced them, your collective memory of the facts control.

16        Questions by the lawyers standing alone are not

17   evidence.  Again, the lawyers are not witnesses.  The question

18   and the witness' answer taken together are the evidence.

19        Objections by lawyers are not evidence.  Lawyers have

09:47 20   a duty to their clients to object when they believe a question

21   is improper under the rules of evidence.  You should not be

22   influenced by any objection or by my ruling on it, and you

23   should not speculate or guess about what the answer might have

24   been or what the exhibit might have said.

25        Anything I've excluded from evidence or ordered struck

from the record and instructed you to disregard is not

evidence.

Anything you may have seen or heard when the case was

not in session is not evidence.  You are to decide the case

solely on the evidence received at trial.

Also, during the course of the trial I may have made

comments to the lawyers or spoken to a witness concerning the

manner of his testifying.  Do not assume from anything I may

have said that I have any opinion concerning any of the issues

in this case.  Except for my instructions to you on the law,

which I'm giving you now and will give to you after closings,

you should disregard anything I may have said during the trial

in arriving at your own findings as to the facts.

Jurors, there are two kinds of the evidence: direct

and circumstantial.  Direct evidence is evidence that directly

addresses the truth of a fact, such as testimony from an

eyewitness that the witness saw something.  Direct evidence

could be a simple assertion by someone, for example, it's

raining outside.  This is a statement of a fact observed.  If

you thought that the person who said that to you was truthful

and had a sufficient basis for knowing what the weather was

like outside, you could accept the statement as direct evidence

that it's raining outside.  Alternatively, if you doubted the

reliability of the statement, you could reject it.

Circumstantial evidence is indirect evidence, that is,

proof of a fact or facts from which you could draw the

inference by reason and common sense that another fact exists,

even though it has not been proved directly.  To illustrate an

example of circumstantial evidence, let's return to the prior

example regarding the weather outside.  Suppose that instead of

having someone report to you about the weather conditions,

someone came in from outside wearing a wet raincoat and shaking

water off an umbrella.  Without any words being spoken, that

is, without any direct statement or assertion being made, an

observer might conclude that it was raining outside.  The

observer would have some direct evidence to consider: the

observation of a wet raincoat and a dripping umbrella.

Thinking about those pieces of direct evidence might lead the

observer to draw a conclusion or an inference about an

unobserved fact: that it was raining.

Jurors, you're entitled to consider both kinds of

evidence.  The law permits you to give equal weight to both or

to give greater weight to one or the other.  It remains for you

to decide how much weight to give to any evidence.

Although you may consider only the evidence presented

in the case, you are not limited to the plain statements made

by witnesses or contained in the documents.  In other words,

you are not limited solely to what you saw and heard as the

witnesses testified.

You are also permitted to draw reasonable inferences

1    from the facts if you believe those inferences are justified in

2    the light of common sense and personal experience.  An

3    inference is simply a deduction or conclusion that may be drawn

4    from the facts that have been established.

5         Any inference you draw must be reasonable and based on

6    the facts as you find them.  Inferences may not be based on

7    speculation or conjecture.

8         Jurors, there are different categories of evidence

9    that you have before you.  This evidence includes exhibits,

09:51 10   witness testimony, and depositions.  Let me instruct you about

11   each of these forms of evidence.

12        First, you have a number of exhibits.  You'll have

13   paper copies of the exhibits that have been introduced in

14   evidence during the course of the trial with you in the jury

15   room.  Many of these exhibits have been shown to you in the

16   course of the presentation of evidence while others, I believe,

17   have not.  You will have all of the exhibits entered into

18   evidence, both those that have been discussed and displayed and

19   those that have not.  You may consider the exhibits and give

09:51 20   them whatever value or significance in your deliberations as

21   you think is appropriate.

22        There were some illustrations used during the

23   testimony of some of the witnesses that were marked for

24   identification but were not admitted in evidence.  These items,

25   commonly referred to as chalks by the Court and by the

1    attorneys, were merely used as items to help illustrate certain

2    testimony and were not admitted in evidence.  These chalks are

3    not evidence, and, therefore, you will not have them with you

4    in the jury room.  Only the witness' testimony, which was aided

5    by the chalk, was the evidence.

6         In addition to exhibits, jurors, you will have -- or

7    you have the testimony of the witnesses.

8         You do not have to accept the testimony of any witness

9    if you find the witness not credible.  You must decide which

09:52 10    witnesses to believe and which facts are true.  To do this, you

11    must look at all the evidence, drawing upon your common sense

12    and personal experience.  You may believe everything a witness

13    says, only part of it, or none of it.  It's entirely up to you.

14         You may want to take into consideration such factors

15    as the witness' conduct and demeanor while testifying, their

16    apparent fairness or any bias they may have displayed, relation

17    to either party, any interest they may have in the outcome of

18    the case, any prejudices they may have shown, their

19    opportunities for seeing and knowing the things about which

09:53 20    they have testified, and the reasonableness or unreasonableness

21    of the events that they have described.

22         The following are the kinds of questions you may

23    consider in evaluating a witness' credibility:  Did the person

24    seem honest?  Did he or she have some reason not to tell the

25    truth?  Did the witness have an interest in the outcome of the

1    case?  Did he or she gain any personal advantage by testifying

2    in this case?  Did the witness seem to have a good memory?  Did

3    the witness' testimony differ from his earlier testimony or

4    from the testimony of other witnesses?  Was the witness'

5    testimony different on cross and direct examination?  What was

6    the witness' manner while testifying?  These are some, but, of

7    course, not all, of the kinds of things that will help you

8    decide how much weight to give to what each witness has said.

9         The mere number of witnesses or exhibits or the length

09:54 10    of the testimony has no bearing on what weight you give

11    evidence or on whether you find the burden of proof has been

12    met.  Weight does not mean the amount of evidence.  Weight

13    means your judgment about the credibility and the importance of

14    the evidence.

15         The testimony of a witness may be discredited or

16    impeached by showing that he previously made statements that

17    are inconsistent with his present testimony.  If a witness is

18    shown to have given inconsistent statements concerning any

19    material matter, you have a right to distrust that witness'

09:54 20    testimony in other respects.  You may reject all of the

21    testimony of that witness or give it such credibility as you

22    may think it deserves.

23         Sometimes, of course, people make innocent mistakes,

24    particularly as to unimportant details.  Not every

25    contradiction or inconsistency is necessarily important.

1    Again, jurors, you alone are the judges of the witnesses'

2    credibility.

3         Some prior inconsistent statements may be used for

4    purposes other than impeachment.  If you find that a witness

5    has made inconsistent statements under oath or on an earlier

6    occasion, such as in a deposition, you may consider that

7    earlier statement for its truth or falsity the same as any

8    testimony at the trial.

9         You have also heard testimony from people or person

09:55 10  described as experts.  People who, by education and experience,

11   have become expert in some field may state their opinion on

12   matters in that field and may also state their reasons for the

13   opinion.

14        The mere fact that a witness is allowed to testify as

15   one having specialized knowledge or experience does not

16   indicate that you must accept his opinion.  Nor should you

17   substitute the expert's testimony for your own reasonable

18   judgment and common sense.  Expert opinion testimony should be

19   judged like any other testimony.  You may accept it or reject

09:56 20  it and give it as much weight as you think it deserves,

21   considering the witness' education and experience, the reasons

22   given for the opinion, and all of the other evidence in the

23   case.

24        A deposition is the sworn testimony of a witness taken

25   before trial.  The witness is placed under oath to tell the

1    truth and lawyers for each party may ask questions.  The

2    questions and the answers are recorded.  The deposition of Fran

3    Migliaccio -- and I think I mangled his name, but he was

4    referred to as Cosmo throughout this trial -- was presented to

5    you during the course of this trial.  Deposition testimony is

6    entitled to the same consideration and is to be judged insofar

7    as possible in the same way as if the witness had been present

8    when testifying.

9           A particular item of evidence is sometimes received

09:57 10    for a limited purpose only; that is, it can be used by you only

11    for one particular purpose and not for any other purpose.  I've

12    told you when that occurred and instructed you on the purposes

13    for which the item can or cannot be used.

14           As you may recall, and as I indicated at the beginning

15    of the trial, you were permitted to take notes, but some

16    cautions apply as you begin your deliberations.  You should

17    bear in mind that not everything that is written down is

18    necessarily what was said.  Thus, when you return to the jury

19    room to discuss this case, do not assume simply because

09:57 20    something appears in somebody's notes that it necessarily took

21    place in court.  Notes are an aid to recollection, nothing

22    more.  The fact that something is written down does not mean

23    that it is necessarily accurate.  Your collective memory of the

24    evidence, not any of your notes, control.

25           As I instructed at the beginning of this case, you'll

1    not be given a transcript for the trial.  Ms. Joyce has the

2    difficult job and the time-consuming job to take a raw record,

3    which is what she's been creating, and turn it into a final

4    transcript.  It's not possible to create a final transcript in

5    time for your deliberations.  Since you will not have a

6    transcript, you should rely on your collective memory of the

7    evidence.

8            The plaintiff, Mr. Scholz, has the burden of proving

9    every element of his claims against the defendant by a

09:58 10   preponderance of the evidence.  If you conclude that Mr. Scholz

11   has failed to establish his claims by a preponderance of the

12   evidence, you must decide against him on his claims against the

13   defendant.

14           The defendant, Mr. Goudreau, has the burden of proving

15   every element of his counterclaims against the plaintiff by a

16   preponderance of the evidence.  If you conclude that

17   Mr. Goudreau has failed to establish his counterclaims by a

18   preponderance of the evidence, you must decide against him on

19   his counterclaims against the plaintiff.

09:59 20          Jurors, to establish something by a preponderance of

21   the evidence means to prove that it is more likely true than

22   not true.  It means that such evidence, when considered and

23   compared with that opposed to it, has more convincing force and

24   produces in your mind the belief that what is sought to be

25   proved is more likely true than not true.  To put it

1    differently, as I said at the beginning of this trial, if you

2    were to put the evidence of Mr. Scholz and Mr. Goudreau's

3    evidence on opposite sides of the scales, Mr. Scholz's evidence

4    for his claims against Mr. Goudreau would have to make the

5    scales tip somewhat to his side. As to the counterclaims,

6    Mr. Goudreau's evidence for his counterclaims against

7    Mr. Scholz would have to make the scales tip somewhat to his

8    side. In determining whether any fact in issue has been proved

9    by a preponderance of the evidence in this case, you may

10   consider the testimony of all witnesses and all exhibits

11   received in evidence, regardless of who may have introduced

12   them. Whether a party has sustained its burden of proof does

13   not depend upon the number of witnesses it has called or upon

14   the number of exhibits it has offered, but, instead, upon the

15   nature and quality of the evidence presented.

16          Although the burden of proof is by a preponderance of

17   the evidence, this rule does not, of course, require proof to

18   an absolute certainty, nor is proof beyond a reasonable doubt

19   or by clear and convincing evidence required. As to all of the

20   issues in this case, the standard for defining the burden of

21   proof is the preponderance of the evidence standard.

22          Jurors, you'll be happy to know that that ends the

23   first part of my charge to you. We are going to take a

24   break -- and, jurors, excuse me for one moment.

25          Ms. Hourihan?

```
 1              (Discussion off the record.)
 2              THE COURT:  Jurors, we'll take a 20-minute break, and
 3     when we return, we'll have closing arguments.  Even though
 4     you've heard the first part of my charge, you do not yet have
 5     this case for your deliberations, so you have to keep all of my
 6     cautionary instructions in mind.  You cannot discuss the case
 7     yet.  Just abide by all of my instructions, and we'll come back
 8     for closings and the final parts of the charge.
 9              Thank you.
10:01 10          THE CLERK:  All rise.
11              (Jury left the courtroom.)
12              THE COURT:  Counsel, anything before we break?  And
13     feel free, again, to move the podium if you'd like to use it.
14              MR. GREEN:  Not from the plaintiff, your Honor.
15              MR. GIVEN:  None from the defendant, your Honor.
16              THE COURT:  Mr. Green, just so I have this right,
17     you'd like a two-minute warning at 23 minutes.
18              MR. GREEN:  Correct, your Honor.
19              THE COURT:  And, Mr. Baker, two-minute warning?
10:02 20          MR. BAKER:  Two minutes sounds good, Judge.
21              THE COURT:  Thank you.
22              (Recess taken.)
23              (Jury entered the courtroom.)
24              THE CLERK:  Court is in session.  Please be seated.
25              THE COURT:  Jurors, as I said, we'll get started with
```

1    closing arguments.

2           Mr. Green?

3           MR. GREEN:  Thank you, your Honor.

4           Ladies and gentlemen of the jury, first and foremost,

5    on behalf of my client, Mr. Scholz, on behalf of Ms. Stenger,

6    Ms. McIlvene, and myself, I want to thank you for the time and

7    attention you've given this case.  Your job is not quite over

8    yet, so I'll thank you in advance as you'll be doing -- you

9    proceed ahead with your deliberations, but we're very, very

10   grateful to you.

11          There are two centerpieces to this case, indeed, two

12   exhibits that are foundational bedrocks that establish basic

13   clues in this case.  The first is the 1983 Settlement

14   Agreement, Exhibit 8; and the second is the BOSTON trademark,

15   Exhibit 10.  There may be many facts in dispute here, but

16   there's nothing in dispute as to the rights and obligations

17   that are created under those two documents.

18          In the 1983 agreement -- and if we can project up

19   paragraphs 7 and 8 -- this is, again, Exhibit 8.

20          You remember that in 1983, there was a Settlement

21   Agreement that was entered into involving Mr. Scholz,

22   Mr. Goudreau, the remaining members of the band BOSTON.  This

23   was the point in time when Mr. Goudreau was retiring from the

24   band.  Everybody understood what the rules are -- and if we can

25   put up paragraphs 7 and 8.

1          Excuse me, pages 7 and 8, paragraph d.  This is what

2     could be done as to the name BOSTON.  You've heard it over a

3     hundred times in this case.  Barry Goudreau could use the term

4     in the third line, "formerly of BOSTON," and he shall not use

5     any other term.  It is clear in black and white.  Everybody

6     understood what the rules were, "formerly of BOSTON," yes,

7     anything else, no.

8          The second bedrock foundational document in this case

9     is Exhibit 10, the trademark.  And if we could go to that.

10:26 10    This was a trademark where the word mark appears in the first

11    line.  I'm going to have Ms. Stenger point this out so there's

12    no confusion here.  Mr. Scholz personally owns this mark -- if

13    we could have that enlarged, please.

14          Word mark is BOSTON, all caps.  And it goes on to say,

15    "in use in phonographic and recordings," and then scrolling

16    down to the fifth point, "entertainment services in the nature

17    of a rock band."  That gave Mr. Scholz protections that

18    whenever a rock band is playing that made use of that mark, he

19    had the rights to that; no one else had the rights.

10:27 20    There is no challenge in this case to the validity of

21    this trademark.  It is a given that that is a valid trademark.

22          So we have the 1983 Settlement Agreement, this

23    trademark document, these are the bedrocks of this case.  They

24    are the bedrocks because these are unchallengeable, irrefutable

25    documents which define all rights and obligations in this case.

1          We have been here for the past week-plus, ladies and

2     gentlemen, because the promotional activities of Ernie and the

3     Automatics, with Barry Goudreau being a full participant,

4     violated both the 1983 agreement and it violated the BOSTON

5     trademark.  And the violations were rampant.  There were

6     multiple print ads -- and we can go through all the exhibits,

7     they're here, but I want to move on -- multiple print ads where

8     Mr. Goudreau was referred to as original rather than formerly

9     of BOSTON.  Mr. Boch testified there were radio ads, there were

10:28 10    television promotions, there was a web page, there was a CD, a

11    CD with a sticker that referred to formerly original, and there

12    was a video which had a version where it played with pop-ups,

13    where you saw within the first six seconds referred to former

14    original members of the band.  This took place over a four-year

15    period.  Mr. Boch admitted to the use of the term "former

16    original" in all of these media.

17          Now, Mr. Boch had every reason to make use of the

18    name.  He wanted to promote his band.  He truly was a rock star

19    wanna-be, and now he is getting to perform with Hashian, with

10:29 20    Goudreau.  He was fulfilling a dream.

21          The Migliaccio deposition that was read in yesterday

22    is important in this way:  When Fran Migliaccio, also known as

23    Fran Cosmo, when he was deposed, he was no longer a member of

24    the band BOSTON.  He was out there on his own.  And you heard

25    him say in response to attorneys' questions, Of course I wanted

1    to use the band BOSTON, Of course I would want people to know

2    that I wanted to use the band BOSTON, But I also made sure do

3    it the right way, and I would get this into contracts.

4        Well, taking it to Ernie Boch and taking it to Barry

5    Goudreau, of course, they wanted everybody to know that they

6    had two members of the band BOSTON, taking it a step further to

7    say "original members of the band BOSTON" when that was not

8    true, because, of course, they wanted to promote their band.

9    But, unlike Mr. Migliaccio, they didn't play by the rules.  And

10:30 10    indeed, when Mr. Migliaccio said, I made sure I got in

11    contracts, Mr. Boch, when he finally got around to doing

12    contracts, which was well into the four-year period -- and you

13    have it before you as Exhibits 58 A through D -- he had

14    contracts that talked about promotion and ads, but nowhere in

15    there does it say, By the way, you can only refer to

16    Mr. Goudreau and Mr. Hashian as formerly of BOSTON and no other

17    way.  It's not in those contracts.  You'll see them for

18    yourselves.

19        Now, what is Barry Goudreau's role in all of this?

10:30 20    Here we come to the first mistruth of the case that

21    Mr. Goudreau has introduced.  And when I talk about the two

22    bedrocks, those are the truths -- I'm going to be going through

23    what are, unfortunately, a series of mistruths by Mr. Goudreau.

24        His first mistruth was testimony:  I just showed up

25    and played the guitar.  That's what he said under oath.  Well,

1    really?  How is it, Mr. Goudreau, that Mr. Boch testified that

2    whenever he needed you to appear on radio and on TV, you would

3    do that?  How was it, Mr. Goudreau, that you performed on the

4    CD?  And we have in evidence the actual CD, and you'll see that

5    the wrappings inside -- the wrapping was taken off, but it's

6    inside.  Just pull it out, and you will see there the sticker

7    that says "former original members."

8            And most reprehensibly, Mr. Goudreau, how was it that

9    you appeared on that video?  And if we can just show the video

10:31 10   and we're going to just run, as you know, six seconds into that

11   video.

12           (Played recording.)

13           MR. GREEN:  Stop.

14           How is it, Mr. Goudreau, that you can permit a video

15   to be made in which you are referred to with Mr. Hashian as a

16   former original member of the band?  And worse yet, worse yet,

17   "former" is now in quotes.  What does that mean?  Does it mean

18   maybe they're not former?  Maybe they're still part of the band

19   BOSTON?

10:32 20   That video is still on YouTube today.  Indeed,

21   Mr. Goudreau said he went to see it yesterday, was trying to

22   tell you how many hits it had.  You can still see that today.

23   It's been up there over the years, never removed.  And by the

24   way, the CD with the sticker can still be obtained on Amazon,

25   as Mr. Scholz testified.

1          We now come to mistruth two by Mr. Goudreau.  First he

2    said, I just play the guitar.  In mistruth two, his case is,

3    Well, I never authorized this.  Indeed, he did.  He testified

4    that he entrusted Ernie Boch with all the decisions, including

5    decisions on promotions and ads, and Ernie Boch so confirmed.

6    And if that's not enough, take a look -- and if we could go to

7    this, Exhibit 29, sections 7 and 8.

8          In 2009, we're already two years into this, they're

9    coming out with the CD, and they sign an agreement -- and if we

10:33 10   can turn to 7 and 8 -- in which the band members, including

11   Mr. Goudreau, are saying that Mr. Boch and Ernie and the

12   Automatics -- they are the "we" -- they shall have the

13   perpetual right, without any liability to any party, to use and

14   to authorize others to use your name -- that meant

15   Mr. Goudreau -- and the other's names and biographical

16   material.

17          And worse yet, in number 8a, you warrant and represent

18   that we shall have the perpetual right without any liability to

19   any person to use and to authorize any other persons to use

10:34 20   your name and biographical material.

21          Where do we see here that Mr. Goudreau said, Well,

22   I'll let you do this, but under one condition:  You could only

23   refer to me as formerly of BOSTON?  He never says that here.

24   Why didn't he say that?  Because he was happy to go along with

25   Ernie and the rest of the band and just be promoted original of

1    BOSTON, formerly of BOSTON, however they did it.  He wanted the

2    band to be promoted here.

3           This didn't just start in 2009.  Mr. Goudreau --

4    Mr. Boch said that he already had the authority to do this.

5    There was no question he had the authority, and indeed, he

6    exercised the authority.

7           Mr. Goudreau's -- Mr. Goudreau's credibility, his

8    mistruths are further complicated when we get to counterclaim

9    paragraph 53.  If we can turn to that.

10:35 10           I'm not going to belabor this because you have already

11    seen this, but you will remember in his counterclaim, he

12    basically said -- do you have that up?  Enlarge that, please.

13           Could you highlight the language "always,"

14    Ms. Stenger, as he always did?

15           He always instructed promoters, venues, and the

16    like -- and then we go down to the last few words there -- to

17    do this formerly of BOSTON or former original of BOSTON.

18           Now, Mr. Goudreau said that's a mistake.  Indeed, he

19    said, I never even read the counterclaim.  He has brought -- he

10:36 20    has brought a significant counterclaim here, and he said he

21    didn't read his counterclaim.  But he has a further problem

22    here.  It goes to the very heart of the credibility of

23    Mr. Goudreau.

24           And if we could turn to page 90 of his deposition.

25    While they're getting that up, you'll remember here that --

1    you'll remember here that counsel tried to raise some question,

2    Well, it was kind of late in the day here, Mr. Goudreau,

3    weren't you tired?  You'll remember here that page 90 of his

4    deposition took place well before the lunch started to this

5    deposition.  Well before the lunch break.

6              At page 90, he was asked point blank:  Is that

7    accurate?  Not only did you say it, but in substance is that

8    accurate?  And he said, "Yes."  Several questions there, and he

9    confirms that paragraph 53 is accurate.  Therefore, he was

10:37 10   confirming that the instructions that he always gave promoters,

11   venues, and the like were not only formerly of BOSTON but

12   former original of BOSTON.

13             So caught in at least three major mistruths at this

14   point in time, that he only shows up and plays the guitar, that

15   he never authorized Ernie Boch to do anything, that his

16   counterclaim and deposition testimony are in error,

17   Mr. Goudreau has the audacity to come before you and engage in

18   a series of additional mistruths under oath.

19             The first is he is challenging the notion that he is

10:38 20   not an original member of the band BOSTON.  He says, Yes, I am.

21   You remember that Mr. Scholz discussed in great detail the

22   chronology of all of this, and in particular, there was a

23   significant break in time after Mother's Milk, before the

24   organization of the performing band BOSTON, during which

25   Mr. Scholz spent a couple of years pulling together all kinds

1     of studio equipment, making great investments of time and money

2     while he is trying to earn a living at Polaroid.  And with the

3     help of one person, and that was Mr. Delp, he puts together

4     some of the greatest music of all time, slaving away doing

5     that.

6          Exhibit 1 -- and if we can turn to that.  Exhibit 1 is

7     a contract that confirms who the original members are.  This

8     was the contract that Mr. Ahern, the agent, entered into with

9     CBS, because you'll remember that Mr. Scholz, as a result of

10:39 10   all of this hard work, basically delivered to -- CBS had

11    accepted demo tapes which eventually became the first album

12    here.  Mr. Ahern was retained to be their agent.  This -- if we

13    turn to the last page of Exhibit 1, the original members of the

14    band BOSTON are Donald Sholz and Bradley Delp.  Mr. Goudreau's

15    name does not appear there.

16          If we turn to Exhibit 2, you see the same names.  The

17    first two exhibits will be in the notebook you will have before

18    you.  No Barry Goudreau.  It is only later in an amendment that

19    we get to Exhibit 6, later as they're -- because they are

10:40 20   needing to tour here, that we have for the first time Barry

21    Goudreau being added as an additional member but not as an

22    original member here.

23          Mr. Goudreau was not an original member, and if

24    there's any doubt in your mind, we come back to one of the

25    basic bedrocks here.  He confirmed that in the 1983 agreement.

1    He said in black and white, I can only refer to myself as

2    former member, not an original, because that's exactly what it

3    was.

4              Yet another mistruth that he comes in to testify on,

5    somehow he was forced out of the band BOSTON in 1981.  This is

6    not only contradicted by Mr. Scholz, it's contradicted by "Sib"

7    Hashian, who was called by Mr. Goudreau's team; he was not

8    called by our team here.  And frankly, it's contradicted by

9    Mr. Goudreau himself when he said in response to my question

10:41 10    that his biggest regret in his professional career was leaving

11    the band BOSTON.  He did so voluntarily here.

12              The revisionist history continues with respect to his

13    claim for damages in this case, but I'll be talking about that

14    at a later point.

15              The way this is working, ladies and gentlemen, I'm

16    going to be speaking for approximately 25 minutes, opposing

17    counsel will be speaking for approximately 45 minutes, and then

18    I have the right to come up for 20 more minutes and present

19    rebuttal, but I'll be addressing his counterclaim at that point

10:41 20    in time.

21              Now, Judge Casper has begun her instructions, and

22    she's going to be following up with additional instructions to

23    you on the claims in this case.  And Mr. Scholz's claims are

24    trademark infringement claims and a contract claim that arises

25    out of the trademark infringement claim.

1           You are going to be asked a series of questions, and

2      the first question you're going to be asked -- because there's

3      no dispute on the trademark.  You're not going to be asked:  Is

4      there a valid trademark?  That point has been conceded.  You

5      are going to be asked:  Was the use of the trademark likely to

6      cause consumer confusion?

7           You have heard from Mr. Scholz on this.  You have

8      heard his concerns as to what would happen -- and this also

9      gets to question 2:  Did the trademark harm the plaintiff here?

10:42 10     The questions are related, and we are asking that you return

11     both questions "yes."

12          Mr. Scholz testified at length about all that it took

13     to develop this mark over the years, that the mark not only

14     referred to great music, it also referred to a way of life.  It

15     referred to much more than the music itself.

16          And his concern when he heard of Ernie and the

17     Automatics, and especially when he heard people being

18     represented as original members who are not originals, he had a

19     number of concerns, and those concerns were well-founded.  He

10:43 20     was concerned about the possibility of confusion, because here

21     we have two people holding themselves out as original members.

22     Is there some possibility here that BOSTON is reconstituting in

23     some way?  Is there some possibility that BOSTON is no longer

24     around?  You'll recall that during the years in question, 2007

25     to 2011, BOSTON only toured one time during that time period.

1    So there was a significant concern.

2         He also had a concern about the adulteration of the

3    brand, the dilution of the brand.  You heard -- you heard the

4    care he went -- there is no dispute in this case about the care

5    he went to, the quality of the music, the unique nature of the

6    music.  And he was concerned that when people hear a concert,

7    buy a CD, see an ad, this or that, and they hear something that

8    is less than the quality that he insisted on, that that was

9    diluting the BOSTON band.

10:44 10      You also heard him testify the part of the BOSTON band

11   was his story, an MIT grad who goes to work at Polaroid.  He's

12   an engineer.  He's slaving away in his basement, and all of a

13   sudden, he is coming out, after two hard years, with some of

14   the greatest music of all time.  That was an important story.

15   That was very much part of the brand.  And when Ernie and the

16   Automatics was doing what it was doing, it was very much also

17   diluting that story.  So we do ask you to respond to those

18   questions "yes," the trademark was likely to cause consumer

19   confusion.

10:45 20      Now, on this, you're going to be hearing from the

21   other side -- and they'll be saying, and it is true --

22   Mr. Scholz, we did not bring in here a person who said he or

23   she was actually confused here.  But Judge Casper will be

24   reviewing with you eight points to be considered, only one of

25   the eight of which deals with actual confusion.  One is

1    similarity of the mark.  Well, if they were using the name

2    BOSTON, it was not only similar, it was identical.

3            One is a similarity of the goods, and you heard

4    opposing counsel say in opening, Well, we were just a rock 'n'

5    roll -- we weren't a rock 'n' roll band, we were a rhythm and

6    blues band.  In fact, every witness that came up, including the

7    most important one, said, No, we were at the cutting edge of

8    rock and rhythm and blues.  They were very much competing.

9            The channels of trade.  The channels of trade were

10:46 10   very much the same: ads, print, radio, TV, CDs, video.

11           The class of prospective purchasers, another indicia

12   that the Judge will be instructing you on.  They were appealing

13   to the class of the same people, people who go to concerts, who

14   purchase CDs and the like.

15           The intent in adopting the mark.  If this is happening

16   time and again by Mr. Boch with Mr. Goudreau helping him all

17   along the way, there was certainly an intent there.

18           And the strength of the mark.  This could not have

19   been a stronger mark.  The term "BOSTON," this connection with

10:46 20   music, means a great deal, and that's exactly why Mr. Scholz

21   got his protection.

22           THE COURT:  Counsel, two minutes to 25.

23           MR. GREEN:  Now, also in our case in chief, the

24   question will be --

25           THE COURT:  Mr. Green, I just want to make sure you

1    heard me.

2         MR. GREEN:  I did.  Thank you, your Honor.  I will be

3    wrapping up in two minutes.

4         What role did Mr. Goudreau play?  Again, he played a

5    very important role by not only being a part of all the ads and

6    promotions in question, but expressly authorizing Mr. Goudreau

7    to handle the whole thing, especially as we look at the 2009

8    agreement, where he confirms this in writing.  So if he didn't

9    know of every ad, it doesn't matter because he authorized every

10:47 10   one of those ads to run.

11        And finally, on damages.  No, Mr. Scholz is not going

12   to come up here and say I lost so many record albums, but

13   you're going to be instructed by the Judge that there is

14   another measure of damages, and you heard from Mr. Scally.  He

15   gave his expert testimony.  It is entirely appropriate as a

16   measure of damages in this case to seek a return of the profit

17   that Mr. Goudreau made, and that is what that is about.

18        And I'll reserve on the rest, and I thank you for your

19   time at this point, ladies and gentlemen.

10:48 20   THE COURT:  Thank you, Mr. Green.

21        MR. TARLOW:  If we could switch the screens over,

22   please, your Honor?

23        THE COURT:  Sure.

24        (Discussion off the record.)

25        THE COURT:  Mr. Baker.

```
 1            MR. BAKER:  May I proceed, your Honor?

 2            THE COURT:  You may.

 3            MR. BAKER:  Ladies and gentlemen, good morning, once

 4   again, and I think perhaps good morning for the last time.

 5            When we first got together -- it seems like an eon

 6   ago -- I explained to you that the opening statement from my

 7   standpoint is the blueprint of what we hope to show to prove.

 8   The closing argument I like to refer to as the connect the

 9   dots.

10:49 10          We've heard a week or so of evidence.  And the reason

11   why we are here today, why you've been here for the past week,

12   is because the plaintiff has an unhealthy obsession with his

13   own life's work.  The plaintiff is trying to preserve his

14   version of history and in doing so write out Mr. Goudreau as if

15   he never existed.  I'm not here to comment on -- I'm not

16   allowed to -- I'm not going to comment on the merits of the

17   music that was made.  Perhaps it's to your liking.  I don't

18   know what your musical choices are; I don't know you people.

19   But that's not the point.

10:50 20          Now, as you have heard, Mr. Scholz has done everything

21   in his power to protect this mark, and in so doing, destroyed

22   anybody who comes in his way.  I submit to you, Mr. Scholz has

23   been successful.  This lawsuit -- oh, and let us not forget,

24   three other lawsuits since 2009, doing this over and over

25   again -- have caused Mr. Goudreau profound distress.  It
```

1    dominates conversation with his family.  You heard Mr. Goudreau

2    testify yesterday.  As an artist, it has become impossible for

3    Mr. Goudreau to write songs.  That's what he does.

4         Mr. Scholz has been praised as a genius.  He's been

5    compared in the same sentence as Thomas Edison, Steve Jobs.  I

6    don't know geniuses, that's lofty praise, but that does not

7    give him the right to hurt people and to ruin people.

8         We're not here -- and I submit to you it is not your

9    job -- to pass judgment on Mr. Scholz's place in history.

10:51 10   We're here to determine three finite, discrete things:

11        One, did Ernie Boch and his band Ernie and the

12   Automatics infringe on the word mark BOSTON and cause the

13   plaintiff harm?  Harm, ladies and gentlemen.  Harm.  Harm as we

14   know it.

15        Secondly, you are here to decide did Mr. Goudreau

16   somehow control Mr. Boch to such a degree -- and the Judge is

17   going to give you an instruction on the standard of law -- did

18   Mr. Goudreau control Mr. Boch to such a degree that

19   Mr. Goudreau should be held accountable based on the law for

10:52 20   Mr. Boch's actions?

21        Lastly, you're here to decide did Scholz interfere

22   with Goudreau's ability to make a living, which would

23   constitute a breach by him of the Settlement Agreement?

24        I want to talk to you about motive.  That's a word

25   that we hear, especially in the law business, frequently.

 1          I always look up the meaning of a word when I'm really

 2    trying to understand its precise meaning.  I encourage my

 3    daughter to do that, sometimes with more success than other

 4    times.

 5          Motive is something that causes a person to act in a

 6    particular way.  That's right out of Funk & Wagnalls.  It's a

 7    reason for a person's conduct.

 8          Let me tell you about Mr. Scholz's motive.  His motive

 9    is to get the royalty rights that Mr. Goudreau earned in 1976

10:53 10    by playing on that original album.  Mr. Scholz could have --

11    could have, ladies and gentlemen -- if Mr. Goudreau's

12    contribution was so minimal, as he would have you believe, he

13    could have had Mr. Goudreau sign a little letter saying, I

14    hereby release my rights to this album for $350.  Of course, he

15    testified he didn't know about that; he couldn't do that.  This

16    same man who sold 40 million records.

17          Going back to motive, ladies and gentlemen, if this

18    case were truly about trademark infringement -- remember at

19    opening I said, Trademark infringement is buying the bogus

10:54 20    Rolex on Washington Street.  If this case were really about

21    somebody passing a band off as a counterfeit Rolex, as a

22    counterfeit BOSTON, don't you think Mr. Scholz would have sued

23    the person who did that?  But he didn't.  There's an empty

24    chair here.  Where's Mr. Boch's lawyer?  Where is he?  I'll

25    tell you where he is.  He's off doing other things.  But he's

1    not here.  In fact, it was Ernie Boch who put that one little

2    sticker on the CD that has caused so much angst for Mr. Scholz.

3        Mr. Goudreau did not invite this lawsuit.  In fact,

4    you heard testimony he went out of his way to avoid conflict

5    with Mr. Scholz.  Why, if you apply the laws of logic, would

6    Mr. Goudreau, who knew his contract said don't do it, don't do

7    it, don't do it, why would Mr. Goudreau tell Boch, Go ahead,

8    put that label on, let's get another five people at the rib

9    joint.  Boy, we're going to live it up.

10:55  10       The lawsuits have destroyed this man.  They've

11    affected his family and his ability to work.  You've heard from

12    two people who really have no genuine interest in the outcome

13    of this case, except the fact that they love Barry Goudreau.

14    James Montgomery came in here, I cannot hire Barry Goudreau, he

15    is radioactive.  "Sib" Hashian, I got a couple of nice offers

16    for gigs, I didn't call Barry because I knew it was going to be

17    a problem.

18       I will tell you why Mr. Scholz did not sue Mr. Boch.

19    It's very simple.  Mr. Boch could buy and sell Mr. Scholz a

10:56  20    thousandfold over.  Mr. Boch leaves a tip at lunch which is

21    going to be more than the legal fees this man pays, and he

22    didn't want to take on that fight.  Let's be practical.  That's

23    what happened.

24       "Sib" Hashian.  We've had some colorful witnesses in

25    this case, certainly.  "Sib" Hashian got up on the witness

stand and said, I, too, have an agreement, just like

Mr. Goudreau.  I am not permitted to advertise myself as

anything other than former member.  Why wasn't Mr. Hashian

sitting right next to us there?  Same ads, same offending

language.  We'll get to the ads in a moment.  Same situation.

But "Sib" wasn't sued.  I'll tell you why.  Let's go back to

motive.  There is a reason for a person's behavior.  That's

called motive.  Mr. Scholz has maintained throughout this trial

that Mr. Goudreau's contributions were minimal and he's been

overrecognized and overcompensated in this partnership.  There

is a burning hatred that flows from that man to my client.

You heard Mr. Geary testify, the gentleman who came

from California.  A giant in this business.  He manages the

Eagles, or used to.  The Eagles.  That was the biggest band in

the world back in the '70s.  Steely Dan, another super famous

band.  Mr. Geary testified he would not manage Mr. Goudreau

because he didn't want to wind up in that seat once again.

He also testified that as the manager of a band -- and

they were managing BOSTON at the time -- the manager is the

president of the corporation.  He said that.  He gave us an

analogy, as you'll recall perhaps.  He said, I knew nothing of

any problems with Ernie and the Automatics, any infringement,

and Ernie Boch was my best friend.  Who better than Mr. Geary

as a cool, rational professional to assess whether this had any

real impact on Mr. Scholz?  Mr. Geary, I submit.

1          Think about if Mr. Geary had, in fact, managed

2     Goudreau.  The arc of Mr. Goudreau's career would have taken a

3     profoundly different trajectory.  I submit it would have had a

4     much higher, more vertical yield.

5          I want to put up on the screen, please -- we have a

6     graphic, ladies and gentlemen, that we hope you will find

7     helpful in determining the dollar value of how Mr. Goudreau has

8     suffered.

9          As you can see, in 2008, he makes approximately

10:59 10     87,000.  And 2009, ladies and gentlemen -- excuse me, in 2008,

11    in May of 2008, Mr. Goudreau was forced out of the World

12    Classic Rockers.  You'll recall all that testimony, the

13    cease-and-desist letter.  That cease-and-desist letter was

14    dated April 25, 2008.  Mr. Goudreau said, I do not want this

15    problem with Mr. Scholz.  He quit.  His earnings start to

16    decline.

17          In 2009, we heard testimony that Mr. Scholz filed his

18    first lawsuit.  Then he filed a second lawsuit in December of

19    2010.  There was a threatened lawsuit in 2011.  And April of

11:00 20     2013, that brings us all together, that's this lawsuit.  Four

21    lawsuits.  I'm going to ask you to consider this graph, the

22    decline in earnings, when you deliberate whether Mr. Goudreau

23    should be compensated for the harm he has suffered at the

24    disposal of Mr. Scholz.  We'll come back to this in a moment.

25    Keep it on the screen, please.

1          In the year 2008, he was making around $87,000.  In

2    the year 2009, it dropped, and as of two thousand -- what's the

3    last year, please?

4          MR. GIVEN:  2016.

5          MR. BAKER:  As of the year 2016, he's making around

6    $11,000 in performance.  That's a decline on an annual basis,

7    ladies and gentlemen, of about 76,000 a year.  $76,000 a year

8    from 2008 to the present is eight years.  Consider the fact

9    that Mr. Goudreau, as the other two witnesses -- Mr. Hashian

11:01 10    testified, Mr. Goudreau testified, and also Mr. Montgomery,

11   he's radioactive.  Nobody wants to hire him right now because

12   this cloud of litigation follows him everywhere he goes.

13   People don't want to get involved.  You heard Mr. Montgomery

14   say yesterday, I would have hired him with that Aerosmith gig,

15   but I just don't want to get involved, the advertising, this,

16   that, and the other.  "Sib" Hashian, the same thing.

17          So I submit to you, if you consider the damages for

18   Mr. Goudreau, I'm going to ask you to compensate him for the

19   eight years starting in 2008 to the present, and then let's

11:02 20   project into the future some reasonable amount.  I hear Mick

21   Jagger and Keith Richards are still playing in their mid-70s.

22   Other rock stars -- I don't suggest Mr. Goudreau's earnings

23   would come close to that, but maybe we can use that as a

24   barometer.  He's 64, six years, eight years, maybe it's 16

25   years, that's up to you to decide.

1          I want to talk about the trademark issue.

2          For Mr. Scholz to be successful, ladies and gentlemen,

3    he has to convince you that Ernie and the Automatics was

4    marketing itself and the consumer believed, likely believed

5    that Ernie's band was BOSTON.  That's what they have to

6    convince you of.

7          Not once, not once did you see or hear any -- did you

8    see any documents or hear any testimony -- the logo please --

9    that Ernie and the Automatics used the logo.  And let me tell

11:03 10    you why that's significant.  One of the factors that you have

11    to consider in your deliberation is -- one of the so-called

12    eight factors that Mr. Green touched upon is intent.  Did Ernie

13    Boch intend to wrongfully use Mr. Scholz's mark?  We need go no

14    further than that design to answer that question.

15          If Ernie Boch, under the direction of Barry Goudreau,

16    was so intent upon trading on the goodwill of BOSTON, why not

17    use the mark?  That's what people recognize, not the word

18    "Boston."  You go down to Faneuil Hall, everyone's got a

19    T-shirt on that says "Boston."  It's meaningless.

11:04 20          Everything that Mr. Scholz has produced in the last 40

21    years has that symbol on it.

22          1976, ladies and gentlemen, right here.  And every

23    piece of merchandise, every ticket, every concert, every show,

24    every sweatshirt, every T-shirt, every album, every CD, every

25    digital download, every key chain has that mark on it.

1          The ads.  Here's why we're here, ladies and gentlemen,

2     the ads.

3          (Pause.)

4          MR. BAKER:  Can you see it?

5          No.

6          Your Honor, may I approach to show the jury the ads?

7          THE COURT:  You may.

8          MR. BAKER:  I highlighted.  That's the offending

9     language right there.  "Former original member of the

11:05 10   multiplatinum selling band."  It's small font.  It's buried in

11    the text.  That's the advertisement that draws people.

12          The next one, July of 2007.  Another ad that Scholz

13    claims violated his trademark.  Under here it says, "Former

14    members of BOSTON, 'Sibby' Hashian and Barry Goudreau."  What's

15    wrong with that?  Dated, ladies and gentlemen, July 26, 2007.

16          Another ad.  The ever-charming Alice Cooper, ladies

17    and gentlemen.  You really have to strain to find the offending

18    language on this one, but here it is right there underneath a

19    small thumbnail-size picture of Barry Goudreau.  It says,

11:06 20   "formerly of BOSTON."  This is the ad that's getting people to

21    come to the Alice Cooper show and think they're going to see

22    BOSTON.

23          Here it is again, ladies and gentlemen, and I

24    highlighted it.  Right there.  "Both formerly of multiplatinum

25    selling band BOSTON."  Small, biographical.

1              Exhibit 22 -- you'll have all these exhibits, you can

2      look at them as long as you want in the jury deliberation room.

3      There's the language.  I mean, it's minuscule.  "Formerly of

4      the multiplatinum selling band BOSTON."

5              Chuck Berry, the father of rock 'n' roll.  Not even

6      Ernie and the Automatics.  Right there, "Barry Goudreau,

7      formerly of BOSTON."  This is dated April 13, 2008.  Look at

8      all the other names, ladies and gentlemen.  Chuck Leavell, the

9      Rolling Stones; Simon Kirke, Bad Company; Chad Smith, Chili

11:07 10  Peppers; "Skunk" Baxter, the Doobie Brothers.  Some of them

11     still play, some of them don't.  Goudreau, we know he doesn't

12     play with BOSTON anymore.  It says "formerly."  Formerly.

13             The CD, which has drawn so much attention.

14             Mr. Boch admits he made a mistake.  That's the little

15     sticker that has caused so much discussion in today's -- in

16     this past week's proceeding.  That's the advertisement right

17     there.  This is the CD.

18             Spaceships taking off for points unknown.  Butterflies

19     and rocket ships.

11:07 20        Ernie and the Automatics, advertising just what

21     they're expectation was, low.  It's a burlap cover.  It's

22     almost comedic.  Their objective was to tell the world that

23     they had no expectation that this was going anywhere.  How

24     could you possibly get these two confused to be the same band?

25     How is that possible?

1            When you look at the instructions, there's going to be

2    eight factors that you're going to have to consider to compare

3    the music of Ernie Boch to BOSTON to decide if they're

4    basically competing for the same consumer dollar.

5            You know what was missing in this trial?  I submit to

6    you a big, gaping hole in the plaintiff's proof, so big that if

7    you step near it, you fall in it.  You never heard BOSTON.

8    Perhaps some of you people know the music, maybe some of you

9    don't.  I don't know your taste; we don't know each other.

11:09 10   However, you heard Ernie and the Automatics.  Crank it up, as

11   Mr. Boch said, blasting way.  Slightly more sophisticated

12   garage music.

13           You heard lengthy description from Mr. Scholz.  My

14   music is unique, it is singular.  How do you get those two

15   songs, those two music -- those two bands confused?  How do

16   you?

17           We don't have, moreover, any videos of Ernie's band

18   performing live and BOSTON performing live.  And I submit to

19   you, ladies and gentlemen, as the Court will instruct you, the

11:09 20   burden of proof to satisfy you that it was more likely than not

21   that it occurred is on Mr. Scholz.  He didn't introduce the

22   songs.  Big mistake.  Or maybe not.  Maybe he knew they are so

23   dramatically different that you would say, I can't possibly

24   think anybody would get confused by these two musical bands.

25           A number of other factors:  BOSTON, a heavyweight, no

1    dispute, top ten songs routinely over the years on pop

2    Billboard and rock Billboard.  Ernie and the Automatics, one

3    song on blues classic Billboard -- excuse me, blues Billboard

4    for six weeks.

5         They've sold millions and millions of CDs.  Ernie Boch

6    gave away a thousand.  How does a thousand of these CDs, some

7    of which -- some of which, not all of them may have had that

8    little sticker, how is that possibly going to deceive a

9    consumer into believing this is BOSTON?  It is simply not

10   possible.

11        I want to talk to you about harm.  Now, this is a kind

12   of a tricky little part of the jury instructions, so I'll do my

13   best to explain.

14        The plaintiff has still got to demonstrate to you that

15   the plaintiff's mark suffered harm, that some kind of conduct

16   by Ernie and the Automatics caused that mark harm.  There's two

17   ways to do it.  The jury instructions will explain this to you.

18   One is lost sales.  I asked Mr. Scholz the question when he was

19   on the witness stand, that man right there.  I asked him:  What

20   did you lose?  Not one single CD.  Tickets?  Didn't lose a

21   single ticket.  Merchandise?  Didn't lose a single merchandise

22   sale.  Nothing.  Zero.  No harm.

23        There's another component to harm.  So let's just put

24   away lost sales for a moment.  Let's talk about the other type

25   of harm.  Some diminution, some devaluation, some hit to the

mark, some impairment.  You've got the nice, conclusory, glib

testimony from the person most interested in convincing you,

Mr. Scholz himself.  You didn't hear from an expert who could

come in here and say, I've reviewed organized economic data,

and I believe that the harm to the trademark is real, that

Mr. Scholz lost so many sales, or these people bought

Mr. Boch's CD thinking it was Mr. Scholz's CD and they hated

the music and they're not going to buy his music anymore.  Not

one single person.  And I'll tell you why:  They don't exist.

11:12 You didn't get a survey from an expert who said -- I asked him

the question, you all heard it -- I asked him the question:

Where's your survey, sir, of consumer confusion, all the people

who have come in here and filled out the little boxes, they get

paid $100 bucks, who knows what, and then there's a

5,000-person survey that said, I thought when I went to an

Ernie and the Automatics show, it was a BOSTON show.  Not one

person came forward with a survey.  And there's a simple reason

for it:  It wouldn't happen.  It didn't happen.  I can assure

you, if it could have happened, it would have been part of this

11:13 proceeding.

       To further underscore the fact that Mr. Scholz has

suffered no harm, we need go no further, ladies and gentlemen,

than the testimony of Mr. Scholz and his star witness, Gary

Pihl.  The last two tours were wildly successful.  Mr. Scholz

said himself, I banked $5 million last tour.  No reference to

1    any harm that Ernie and the Automatics has caused.

2         And you use your common sense.  And we rely in any way

3    on the testimony of Mr. Boch, he referred over and over and

4    over again to the fact that his band was a bar band.  This is a

5    big machine, ladies and gentlemen.

6         Furthermore, for the same period that Mr. Scholz is

7    complaining about the activities of Ernie Boch, if you look at

8    the analysis of Mr. Goudreau's royalty payments -- because his

9    royalty payments -- they both have 20 percent artist

11:14 10  royalties -- we'll talk about producer royalties and writer

11   royalties in a minute -- he shares the same amount that

12   Mr. Goudreau shared, 20 percent.  They spiked.  They actually

13   went up during the period when Mr. Scholz was complaining Ernie

14   and the Automatics was tearing his mark down.

15        The expert.  Mr. Boch -- before I talk about the

16   expert -- Mr. Boch completely scoffed at the notion that his

17   little bar band was trying to displace BOSTON in the

18   marketplace.

19        Let's talk about the expert, that nice, young man that

11:15 20  was in the witness box.  First time testifying.  No experience

21   in trademarks.  You heard him say it.  He was experienced in

22   business valuation.  That could be a million things.  But we

23   zeroed right in on what he wasn't experienced with:

24   trademarks.

25        He got paid $50,000 to add up two columns, all of

1   Mr. Goudreau's royalties and the earnings that Mr. Goudreau

2   made from Ernie and the Automatics.  $50,000.  That's a payday.

3        He couldn't tell you in any single detail -- great,

4   small, vague, ambiguous -- he could make no connection

5   whatsoever to any impairment of the mark, any infringement, any

6   devaluation and the monies that Barry made.  He didn't say at

7   this particular show, they used this advertisement and 50 more

8   people came in thinking it was BOSTON, therefore, we're

9   entitled to a discouragement of the profits.  He didn't say

11:16 10  that for a simple reason: he couldn't.  He wasn't qualified.

11        And remember he said over and over again, I am

12  assuming that there is an infringement.  I'm assuming that.  I

13  start with the premise, I'll leave it up to you guys, you go

14  figure it out.  The basis of my report is I assume that there

15  was an infringement.  So there's no causation between his

16  numbers and any real damage or harm to the mark.  It doesn't

17  exist.

18        Another point of interest.  When cross-examined by my

19  brother, Mr. Given, he admitted that his analysis of the

11:17 20  revenues lumped the two marks together, the word mark and the

21  logo mark.  Well, if we've learned anything here in this

22  proceeding, it's that the logo has the value.  The word is on

23  every T-shirt in Faneuil Hall, ladies and gentlemen.

24        I suggest you discredit his testimony 100 percent.  It

25  is baseless and it is not connected to any of the facts in this

1    case and it's a $50,000 accounting exercise.  He's a $50,000

2    Texas Instrument.

3         He wants Mr. Goudreau to return all of his royalties

4    because of these ads that don't confuse anybody.  And he wants

5    Mr. Goudreau to turn over to Mr. Scholz -- Mr. Scholz, the $40

6    million man -- CDs, all of his earnings with Ernie and the

7    Automatics, this humble man trying to earn a living.

8         I want to talk to you about original.  There has been

9    much made about the use of the word "original."

11:18 10         There is a fundamental problem in this case, and,

11   unfortunately for Mr. Goudreau, his current relationship with

12   Mr. Scholz.  The word "original" is historic, ladies and

13   gentlemen.  It applies; it's real.  You've heard the testimony.

14         All these people coming forward, I thought he was

15   original.  Mr. Scholz admitted they were buddies before the

16   album came out; they made music together.  Mr. Scholz is now

17   applying a very fine knife to carve out this moment occurred,

18   then it stopped, then that moment started, therefore, he's not

19   original.  He's on the first album.  He did the tour with 350

11:18 20   performances.  All the other guys, they're original members.

21   You heard "Sib" Hashian testify.  We're all originals: Barry;

22   me; Fran; Mr. Delp, rest in peace; Tom; "Sib."  Those are the

23   originals.  But let me tell you why this is a problem, because

24   Goudreau signed a contract that said, I will only represent

25   myself as formerly of BOSTON.  I want to put something in an

1    important context for you folks.

2            When that contract was signed, it was 1983.  And do

3    you know who signed that contract?  All the original members.

4    And that's why this word wasn't there or even important,

5    because they were all original members.  Nobody predicted this

6    band would last for 40 years.  Bands last for a few years and

7    then they go.  Except for the Rolling Stones, everyone

8    disappears.  The Beatles, they were only around for ten years,

9    ladies and gentlemen.  Popular.

11:19 10         Another thing that rankles Mr. Scholz and causes him

11   every day to want to punish Mr. Goudreau, you heard it out of

12   his mouth:  I gave Barry a stupendously good, generous deal.

13   He said it.  That bothers him.  He wants his money back.  But

14   it's not his money.  Let's analyze the facts as they existed at

15   the time.

16           Five guys hustling desperately to get a record deal.

17   Demos flying everywhere.  You heard this lovely, long testimony

18   from Mr. Scholz, how hard he worked -- I don't dispute that,

19   nobody does.  He worked hard to make these demos.  They were

11:20 20   rejected time and time again, and they played performances

21   together; they did a showcase together.  The point is this:

22   When the band came together and, ladies and gentlemen, formed a

23   partnership, it had no value.  It was just five guys in a

24   basement.  The thing took off like a rocket ship.  Everybody

25   said that.  That was after they came together.

1          Mr. Green pointed out what he considers to be some

2     deceptions by my client; that's for you to evaluate.  I'm not

3     going to comment, but I will point out something to you:  The

4     plaintiff tried to create the impression with you that he had

5     written the music, labored away, produced the music, played the

6     instruments, got the record deal, and then released the record,

7     and all he gets is 20 percent.  That is false.  And we didn't

8     learn that was false until I cross-examined him.  I had to pull

9     it out of him like a dentist pulling out teeth.  He admitted,

11:21 10    Oh, well, I got the producer fees, royalties.  Oh, yes, I guess

11    I did.  Oh, you're right, I did get the writer's royalties,

12    separate, distinct, and in addition to the artist royalties for

13    playing on the record.  Okay.  So when he says, I got my 20

14    percent just like everybody else, that's not true.  And I

15    didn't volunteer that.

16          He makes a big deal out of the concept that Barry's

17    not an original member.  Here's a sworn statement from 1977,

18    ladies and gentlemen, 1977, once again, when this band was just

19    taking off.

11:22 20          Plaintiff -- plaintiffs, Barry and Tom -- plaintiffs,

21    both of them, in the late fall of '75 or early winter of '74,

22    had formed an entirely new and different musical performing

23    group known as BOSTON.  You'll see this if you want to dig

24    around.  You'll find his sworn statement.  You'll find his

25    signature on this.

```
 1              Your Honor, may I approach the box?

 2              THE COURT:  You may.

 3              MR. BAKER:  It's right there, ladies and gentlemen.

 4     Not once, but twice.  And it says, "under the pains and

 5     penalties of perjury."  It's right there.

 6              So that does two things.  It tells us that Barry's got

 7     a problem with history, and Tom Scholz is a liar.  I'm not

 8     going to call this a mistruth; he's a liar.  He did this twice.

 9     You'll see this in the jury room.  Once again, he took the oath

11:23 10    and said, Barry, "Sib" and -- Barry, "Sib," and Fran are

11     original members of BOSTON.  Lie number two.

12              Judge, how am I doing on time, please?

13              THE COURT:  You still have some time.  Let's see.

14              MR. BAKER:  Twenty minutes?

15              THE COURT:  No, ten minutes.

16              MR. BAKER:  Thank you, Judge.

17              THE COURT:  I'll still give you a two-minute warning.

18              MR. BAKER:  Okay, great.

19              Let's talk about harm to Mr. Goudreau.

11:24 20         Mr. Goudreau is virtually incapable of being employed

21     now.  If you lend any credence to the witnesses that

22     testified -- Mr. Hashian -- if you credit them --

23     Mr. Montgomery, Mr. Goudreau himself -- and this graph -- can I

24     have the graph again, please?

25              I'm going to ask you to compensate him.  Now, I don't
```

1    expect you to be able to come up with an amount, ladies and

2    gentlemen, for the lost opportunities because Mr. Geary in

3    Front Line management wouldn't touch him.  It's just too hard

4    to figure out a number.  But consider that when deliberating as

5    to whether Mr. Scholz harmed Mr. Goudreau for these little

6    words in an ad that do nothing.  That's point one.

7          Point two.  I'm not asking you to give Mr. Goudreau

8    any money for the two or three gigs that he couldn't perform

9    with Mr. Montgomery and the three gigs that he couldn't perform

11:25 10   with Mr. Hashian.  I'm asking you to go right there.  Right

11   there, ladies and gentlemen.  If you really want to try to

12   quantify the amount of damage that Mr. Scholz has done to my

13   client, to his career, that's where you start.

14         Mr. Goudreau testified he can't write songs.  I have

15   no way of arguing to you what those royalty rights would be

16   because there's so many factors that go into that.  He did

17   testify he has labored under an enormous financial burden with

18   this case, and also with his family.  He has been distraught.

19   It has affected every part of his life.

11:26 20        So when you evaluate how much, should you do so, to

21   award Mr. Goudreau, I want you to go right there.  And I think

22   16 years is not unreasonable.  It's up to you to decide.  Eight

23   years in the past times 76,000 and maybe another eight years

24   forward.  If you don't think Mr. Goudreau's as sprite and he's

25   going to play that well for the last few years, you consider

1    that.  If you think he's physically fit enough -- and he would

2    have had the interest, consider that, too.  Eight times 76,000

3    is $1.1 million, ladies and gentlemen.  One-point-one.  If you

4    think that's reasonable, I ask you to award that.  If you think

5    it's excessive, then you consider that and you come up with

6    your own evaluation.  You have the tools; you have the

7    parameters.

8            I want to talk to you about a couple other concepts.

9            Fair use.  The Judge is going to give you an

11:27 10    instruction on what is fair use.  And fair use says -- I've got

11    the jury instructions here -- the product or service that's

12    identified -- this is permissible under the law -- the product

13    or service that is identified must not be one readily

14    identifiable without the use of the trademark.

15            What do you say?  Hi, I'm Barry Goudreau, formerly

16    from a band named after an East Coast city where the Red Sox

17    play.  That doesn't work.  You say, I'm Barry Goudreau,

18    formerly of BOSTON.  We didn't use the logo -- I strike that.

19    Mr. Boch did not use the logo in no one single instance.  So he

11:27 20    didn't use more than he had to.

21            The second factor is only so much of the trademark may

22    be used as is reasonably necessary to identify the product or

23    service.  Mr. Boch used the word.  He didn't use the trademark.

24    And it's in very small font, tiny font.

25            Lastly, the user must do nothing that would, in

1    conjunction with the trademark -- and that's Ernie Boch --

2    suggest sponsorship or endorsement by the trademark holder.

3    Nowhere does it say, This band approved by Tom Scholz; This

4    band approved by BOSTON; This band sponsored by BOSTON, the

5    official local band of Boston.  No.  In every instance, ladies

6    and gentlemen, it talks about the past.  Former, not current,

7    former.

8        So as the Judge will instruct you at the appropriate

9    time, we have the right under this principle called fair use --

11:28 10   you'll see it in the jury instructions -- to do just what I

11   said, refer to the mark.  We referred to the word -- Ernie Boch

12   referred to the word.  Only so much as is necessary.  The word,

13   not the logo, and in small letters.

14       And lastly, no suggestion of affiliation.

15       Another thing I want to point out to you, in order for

16   you to find Mr. Goudreau liable -- because they're seeking a

17   disgorgement of profits of my client's hard-earned money

18   because they can't prove actual damage -- they're going to have

19   to demonstrate either one-for-one direct competition, that if

11:29 20   it weren't for the fact that my client worked for Ernie Boch

21   and Ernie Boch was selling CDs, some person would have bought a

22   CD from Mr. Scholz.  I submit that's simply unsustained by the

23   evidence.

24       Second thing he has to show, Mr. Scholz, if you don't

25   buy in for this one-for-one identical product theory -- and

1    it's music, ladies and gentlemen.  Your taste in Dave Matthews

2    may be different than your taste in the Grateful Dead.  They

3    might as well be worlds apart.

4         The other thing that Mr. Scholz has to demonstrate is

5    willfulness, that Barry Goudreau was willfully, knowingly,

6    intentionally, and with a bad state of mind, a bad purpose,

7    misusing the mark.  All you've heard for a week and change is

8    Barry and "Sib" saying, Please don't use it, and Ernie Boch

9    mostly doing what he was supposed to do, not using it, and

11:30 10   sometimes using the mark.  But I don't know how you could

11   conclude from these facts that Mr. Goudreau acted with a bad

12   purpose, ladies and gentlemen.

13        (Pause.)

14        MR. BAKER:  The verdict form.  If you support our

15   theory of the case, if you believe the facts as we suggest that

16   you should, "No."

17        First question:  Contributory trademark infringement.

18   Was the use of the mark likely to cause consumer confusion?

19   Vote no on question 1.  It's that time of the year.

11:31 20        2.  Did this use of the mark harm the plaintiff?  Vote

21   no on two 2.

22        3.  Did Goudreau control Mr. Boch and the

23   instrumentality, the advertisements?  Vote no.

24        Next, Mr. Scholz's vicarious trademark claim.  Vote no

25   on consumer confusion.  It's the exact same standard with a

 1    different claim.

 2         Secondly, did the use of the mark harm the plaintiff?

 3    Five million last tour.  Wildly successful.  One thousand CDs,

 4    a couple punky little ads.

 5         You don't need to get deep into the verdict

 6    questionnaire if you say on the first of these two claims "no."

 7         Was there confusion?  Did somebody who went to see

 8    Ernie and the Automatics think, What a disappointment.  I got

 9    in for free, and I got a free CD, but I was expecting to see

11:32 10    the band BOSTON.

11         THE COURT:  Two minutes, counsel.

12         MR. BAKER:  Thank you, Judge.

13         There's no confusion in this case.  Use your own --

14    deploy your own logic and reason and think, Is this really what

15    happened?

16         Another point of importance to our case, very

17    important, very, very important, we have a contract claim,

18    ladies and gentlemen.  We suggest to you that Mr. Scholz, in

19    fact, breached the Settlement Agreement by creating this

11:32 20    atmosphere of litigation that caused people to flee from my

21    client.  The reason why I'm bringing it up is there's a special

22    question on the verdict form that says, What was the date that

23    Mr. Scholz breached the contract?  And that date, ladies and

24    gentlemen, is April 25, 2008.  April 25, 2008.  That's the date

25    that that cease-and-desist letter went out from Mr. Scholz's

1    attorneys prohibiting Barry Goudreau from playing with the

2    World Classic Rockers.  It is that date, April 25, 2008, that

3    Mr. Goudreau -- his career was directly interfered with by

4    Mr. Scholz, and it just started then.  Factor that in with the

5    three other lawsuits and then this lawsuit.

6          So I submit to you, in closing, I ask you just to

7    consider the harm that Mr. Goudreau suffered.  I've given you

8    what we consider to be the parameters.  It's up to you to

9    decide.

11:33 10          I ask that your decision be grounded in fairness, what

11    you consider to be fair, and based on the evidence.  We've

12    given you the evidence.  You sift through it.  You evaluate it.

13    If you agree that Mr. Goudreau has been harmed by Mr. Scholz,

14    that he's breached the contract, I ask you to award some money

15    to try to restore this man.  I've given you the amounts, you

16    figure out what the right amount is.

17          One last comment.

18          Like everybody sitting in the jury box, my job is

19    hard.  I know your job is hard.  I know your job is hard.  I

11:34 20    know your job is hard.  I want to be very clear.  The only time

21    that I feel like being a lawyer is special is when I get to

22    address a jury, because it is unique to the job.

23          Thank you, all.

24          THE COURT:  Thank you, Mr. Baker.

25          Mr. Green.

1          MR. GREEN:  Thank you, your Honor.

2          As Judge Casper has instructed you, lawyers' closings

3    are not evidence.  Counsel's recollection of the case is not

4    what controls.  My recollection of the case is not what

5    controls.  It is your recollection of the case that controls.

6    Similarly, counsel's instructions on the law is not what

7    controls.  It's Judge Casper's instructions on the law that

8    controls.

9          Let me now respond to what this case has become from

11:35 10   their perspective.

11          This case started as a trademark infringement case.

12   I'm going to come back to that in rebuttal.  But I first want

13   to get to what the case has become for counsel and for

14   Mr. Goudreau.  All of a sudden, it's a plaintiff's case; it's a

15   personal injury case.  They're not only looking for damages

16   from the past, they want to go eight years into the future and

17   award -- get an award of multi, multi damages here.

18          I'm going to start with a date that he just gave you:

19   April 25.  He says there's going to be a special question, it

11:35 20   all started then.

21          One hour ago, we heard evidence from Mr. Scholz -- and

22   you will see Exhibit 66 -- on April 30, it all ended then.  We

23   have a letter from Mr. Scholz to the people at World Classic

24   Rockers saying, Thank you for cleaning up your web page; thank

25   you for taking down the fraudulent information; you're good to

1    go.  And the demand letter didn't say Barry Goudreau couldn't

2    perform.  It said Barry Goudreau in conjunction with Fran

3    Cosmo.  And here we get to the next mistruth, and I was saving

4    this one because it relates to the counterclaim.

5        And by the way, I was almost aghast to hear counsel

6    stand up here and say, Well, you've heard about various

7    mistruths that Mr. Green talked about with Mr. Goudreau.  I'm

8    going to put that aside.  Seriously, he never responded to the

9    mistruths that I mentioned before, that Mr. Goudreau said he

11:36 10   just showed up and played the guitar; that he never authorized

11   Ernie Boch, paragraph 53 of his counterclaim -- of his

12   deposition testimony; Mr. Goudreau's mistruth that he left

13   voluntarily.  Counsel in 45 minutes didn't address any of that,

14   and the reason is he's incapable of providing a refutation on

15   that, because when all is said and done, as I said to you

16   originally, the two bedrocks of this case, the two truths of

17   this case are the 1983 Settlement Agreement, which says "only

18   formerly of BOSTON," and the trademark, Exhibit 10.

19       Now, let me get to the next mistruth, because, again,

11:37 20   it just happened this morning, and somehow counsel didn't

21   mention it.

22       You heard Mr. Goudreau get on the stand yesterday and

23   say, I was radioactive.  By the way, when counsel says that

24   Geary and Montgomery and Hashian all said it, they didn't use

25   the word "radioactive."  I'm going to come back to them in a

1    minute.  The only person who used the word "radioactive" is

2    Mr. Goudreau.  Again, it's your view of the case that controls,

3    not counsel.

4         But let me get to the next mistruth here.  It is an

5    undisputed fact in this case, established this morning, that

6    Mr. Fran Cosmo was released of any restriction in his agreement

7    with Mr. Scholz as of September 2012.  From and after that

8    point, they can do whatever they wanted to do.

9         You'll recall yesterday that I asked Mr. Goudreau, who

11:38 10   was saying how important World Classic Rockers was to him, have

11    you even asked to play there in recent years?  He said, No, I

12    haven't asked to play.  And yet, he's coming in and saying, I

13    want millions of dollars from the past, millions of dollars

14    going forward.

15        Judge Casper is going to be instructing you on a

16    principle of law called "mitigation of damages."  Mr. Goudreau

17    had an obligation to mitigate damages.  He's not entitled to

18    any damages unless he exercises reasonable efforts to mitigate.

19    He's been a free man since September 2012 when Mr. Cosmo was

11:39 20   released from any restriction.  We're here in November of 2016.

21    He's had more than four years to play with Mr. Cosmo, to appear

22    at World Classic Rockers, which, as he said, is still playing

23    as of today.  How is it that he hasn't even applied to get a

24    position there and he comes before you and says, I've lost

25    millions of dollars?  It is not only a failure to mitigate

1    damages, it is a flat-out lie that he has suggested to you.

2        It goes beyond that.  When we have counsel saying that

3    everybody says he's radioactive and what the real evidence is,

4    is Mr. Montgomery saying, Well, maybe there were two shows,

5    Mr. Hashian not testifying to more than one show, and then

6    Mr. Geary testifying that he wouldn't represent Mr. Goudreau

7    because his firm has represented BOSTON, he doesn't want to

8    travel to the Northeast from L.A. -- but, most importantly,

9    Mr. Goudreau said he never sought to have Mr. Geary represent

11:40 10  him.  So how can counsel stand before you and say, I want

11   millions of dollars here because you should project what

12   Mr. Goudreau would have made had Mr. Geary represented him.

13   Mr. Goudreau said I didn't even ask Mr. Geary to represent him.

14       The Court is also going to instruct you that you can't

15   speculate.  And all that you're being asked to do by

16   Mr. Goudreau's counsel is to speculate.

17       There's been reference to attorney's fees in this

18   case.  This Court is also going to instruct you here that

19   attorney's fees are not a measure of damages.  The Court

11:41 20  figures out what the damages -- that's done separate and apart

21   from the jury.  You're not asked to do damages.  It is for the

22   Judge to do that.

23       You're going to be asked a special question:  Did he

24   mitigate?  He did not based upon what I just told you.  But

25   further here, you're going to be asked another question.  A

1    party cannot recover for contract for implied covenant unless

2    they are in conformance with the contract.  It is an undisputed

3    fact that Mr. Goudreau has breached the 1983 Settlement

4    Agreement.  And this is now the segue back into the trademark

5    case here.

6         And let me just address motive here.  Any suggestion

7    that Mr. Scholz has anything other than the best of motives

8    here is belied by the following:  Royalties have been paid to

9    Mr. Goudreau for the past 40 years.  If Mr. Scholz -- and, yes,

11:42 10   he believes he did a lot more than Mr. Goudreau -- but if he

11    wanted to start depriving Mr. Goudreau of some royalty, I would

12    suggest he wouldn't be waiting 40 years to do that.

13         You heard what Mr. Scholz said.  He said, My motive is

14    simply to address a trademark violation.

15         And let's now get to that.

16         No, counsel, this is not the case about BOSTON

17    T-shirts.  You'll have the trademark before you, Exhibit 10.

18    It doesn't say "BOSTON" in any regard.  It says, "BOSTON in

19    connection with rock music."  My client has that trademark.

11:42 20   This is not someone walking down at Faneuil Hall.  This is

21    going into a performance, buying a CD, and seeing the word

22    "BOSTON," which is the next thing that, frankly, counsel has

23    tried to mislead you on and I want to try to set you straight.

24    There are two trademarks here, but what really is at issue is

25    the word "BOSTON" used in conjunction with music.  We

1    understand here that Ernie and the Automatics didn't use the

2    logo, but we certainly saw time and time again, not only in

3    these ads that he's holding back here -- people don't read ads

4    from 10 feet away, they look at ads, they read the newspaper

5    and the like -- ads, radio, TV, web page, CD with the sticker,

6    video -- Ernie testified to all of those, that the word

7    "original" appeared in all of this.  That's what we're talking

8    about here.  That when the word "BOSTON" appears there, it

9    means something, and it shouldn't have been used in that

11:43 10   context.

11          As I said to you earlier, it was done that way by

12    Mr. Boch with Mr. Goudreau fully participating as part of this

13    because they want to sell more albums and they were riding on

14    the BOSTON wave.  That's exactly what they were doing.

15          And one of the instructions you'll be hearing from

16    Judge Casper here is was there an attempt to, in essence, make

17    use of, exploit the BOSTON name, words to that effect.  And,

18    yes, there was.  That's exactly what was being done here.

19          When you have a video that opens in the first six

11:44 20   seconds and says we have two former members, in quotes, of the

21    band BOSTON, of course, of course you're trading on the

22    goodwill of BOSTON here.

23          Mr. Scholz testified about what the trademark means:

24    the music, the story, the lifestyle.  That was harmed when you

25    have -- when you have what happened here.  People holding

1    themselves out either as some incarnation of BOSTON, trying to

2    play on the goodwill of BOSTON.  That's an adulteration.

3    That's a dilution.  That hurts the mark.  That potentially

4    causes confusion here.

5         Again, go through the eight factors.  As the Court

6    will tell you, actual confusion does not have to be shown.  You

7    can look at all of the factors.  Weigh them.  There's no doubt

8    that there was harm here.

9         Final thing I want to say to you is about our damages

11:45 10   here.

11         Now, Mr. Scally was put on as a damages expert.  So

12    when he was asked questions *ad nauseam*:  Did you do a consumer

13    survey?  Did you study the market?  He was not -- he was not a

14    market confusion expert.  He did one job.  He was a damages

15    expert, and his purpose was to explain to you why it's

16    appropriate to use a lost profit analysis here.  And you'll be

17    hearing the Judge's instruction, that is an appropriate measure

18    of damages.

19         He came up with two figures.  Now, the figures were

11:46 20   done by addition, but only done when he, as an expert, said

21    this is the most appropriate way to do this in this type of

22    case.  And when we're told here, Well, he's just an evaluation

23    guy -- he had close to 15 years of experience at one of the

24    major accounting firms in the world in doing valuations,

25    including valuations of intellectual property assets, and among

1    those assets are trademarks.  So he knows what he's talking

2    about here.

3           The amounts are very simple here.  We see from the

4    exhibit as to Mr. Goudreau's -- as to Mr. Goudreau's income

5    that he made $184,000 while with Mr. Boch.  We didn't hear of

6    any expenses that were attributed to that.  I suppose he could

7    have said, Gee, Mr. Scally, why didn't you deduct my mileage,

8    that type of thing.  We didn't hear anything on that.  And you

9    also heard that over the past years since the Ernie Boch thing

11:47 10  started, he received $544,000 in royalties.  That adds up to

11   $728,000.  Unlike counsel, who said I want you to go higher,

12   I'm going to suggest you have every right to go lower if you

13   choose.  We're not here to ask for 728 or nothing, we leave it

14   to you.

15          Mr. Scholz brought this case not to recover 728,000.

16   Mr. Scholz brought this case because he cares so deeply about

17   his trademark.  Whether you give him 728, a half of that, a

18   quarter of that or whatever, he will feel vindicated in

19   whatever amount you see fit so that we can say to Mr. Scholz,

11:47 20  and we can say, frankly, to the greater musical world, you know

21   what, trademarks mean something, and we shouldn't have car

22   dealers, wanna-be musicians going out and trading upon

23   someone's goodwill.  There are repercussions for those actions.

24   There are repercussions when Mr. Goudreau joins in this.  And

25   we simply ask, ladies and gentlemen, that you set an amount

1  that you think is right.  And I'm telling you we are fine in

2  going down rather than what opposing counsel did, to tell you

3  to go up.  We will accept whatever amount you come to because

4  I -- as my brother said -- I do believe in the importance of

5  the jury system.  You have an important job to do.

6  Once again, on behalf of my team and on behalf of my

7  client, we thank you for your time and consideration.

8  THE COURT:  Thank you, Mr. Green.

9  Jurors, I will now summarize the claims and

11:49 10  counterclaims and explain the explicable -- the applicable law,

11  excuse me.

12  Plaintiff, Mr. Scholz, brings claims for contributory

13  trademark infringement and vicarious trademark infringement for

14  the use of the band name BOSTON and, as related to the 1983

15  Settlement Agreement between the parties, breach of the implied

16  covenant of good faith and fair dealing.  As to these claims,

17  the plaintiff, Mr. Scholz, must show by a preponderance of the

18  evidence each of the elements of these claims.  Defendant,

19  Mr. Goudreau, brings counterclaims for breach of contract and

11:50 20  breach of the implied covenant of good faith and fair dealing

21  against Mr. Scholz, all arising out of the same 1983 Settlement

22  Agreement.  As to each of these counterclaims respectively,

23  Mr. Goudreau must show by a preponderance of the evidence each

24  of the elements of these counterclaims.  I'll now turn to each

25  of these claims and counterclaims.

1      Here, jurors, there is no claim for direct trademark

2  infringement against Mr. Goudreau before you.  Instead, the

3  plaintiff asserts claims against Mr. Goudreau for contributory

4  trademark infringement and vicarious trademark infringement

5  related to his involvement with trademark infringement by a

6  third party, namely, Ernie Boch, Jr. and/or Ernie and the

7  Automatics, which I'll refer to collectively as EATA throughout

8  these instructions.

9      As to the contributory trademark infringement claim,

11:51 10  Mr. Scholz must show by a preponderance of the evidence each of

11  the elements of these claims:

12      1.  Existence of a valid, enforceable trademark;

13      2.  That the use of the trademark was likely to cause

14  consumer confusion;

15      3.  This use of the trademark harmed the plaintiff,

16  and;

17      4.  The defendant continued to supply his product or

18  services to a third party whom he knew or should have known was

19  engaging in trademark infringement or the defendant had direct

11:51 20  control in monitoring of the instrumentality used by a third

21  party to infringe a trademark and knew or should have known

22  that the third party would so use the instrumentality.

23      The first element of this claim is addressed in the

24  instruction I'll give you in a moment about trademark.

25      The second and the third elements of this claim

1    concerning likelihood of confusion from the use of the mark and

2    the resulting harm to the plaintiff are addressed in the

3    instruction I'll give you in a moment about trademark

4    infringement.

5        As to the fourth element plaintiff has to show relates

6    to the defendant's role as to the infringement of the third

7    party, alleged here to be EATA.  Plaintiff must show that

8    defendant continued to supply his product or services to a

9    third party, alleged to be EATA, whom he knew or should have

11:52 10  known was engaging in trademark infringement or the defendant

11   had direct control in monitoring of the instrumentality used by

12   third party, again, alleged to be EATA, to infringe a trademark

13   and knew or should have known that the third party, again,

14   alleged to be EATA, would so use the instrumentality.

15       Jurors, as to the vicarious trademark infringement

16   claim against Mr. Goudreau, Mr. Scholz must show by a

17   preponderance of the evidence:

18       1.  That the use of the trademark was likely to cause

19   consumer confusion;

11:53 20     2.  This use of the trademark harmed the plaintiff;

21       3.  The defendant, Mr. Goudreau, and a third party,

22   here alleged to be EATA, had an actual or apparent partnership,

23   and;

24       4.  Mr. Goudreau and EATA had authority to bind the

25   other in transactions with third parties or exercise joint

1    ownership or control over the infringing product or services.

2         The first and second elements of this claim concerning

3    likelihood of confusion and harm to the plaintiff are addressed

4    in the instruction I'll give you in a moment on trademark

5    infringement.

6         As to the third and fourth elements of this claim,

7    Mr. Scholz must show whether Mr. Goudreau and the third party,

8    alleged to be EATA, had authority to bind the other in

9    transactions with third parties or exercise joint ownership or

11:53 10    control over the infringing product or services.  Here,

11    Mr. Scholz alleges that EATA acted with Mr. Goudreau's apparent

12    authority.  Apparent authority results from conduct by the

13    principal which causes a third party reasonably to believe that

14    a particular person has authority to enter into negotiations or

15    make representations as his agent.

16         Trademark.  Jurors, both trademark claims that I've

17    just instructed you about require the existence of a trademark.

18    A trademark is a word, a name, a symbol, a device, or a

19    combination of them that indicates the source or origin of

11:54 20    goods or services.  The owner of a trademark has the right to

21    exclude others from using that trademark.  The parties do not

22    dispute that the plaintiff, Mr. Scholz, has a valid trademark

23    registration and owns the trademark for the word "BOSTON," all

24    caps, for use of that word in connection with sound recordings

25    and live musical performances and the BOSTON logo.  Mr. Scholz,

1    therefore, has the right to exclude others from using the

2    BOSTON trademark for these goods and services, subject to

3    certain limitations of fair use that I'll discuss in a moment.

4         Trademark infringement.  As to both trademark claims

5    that I've just instructed you about, plaintiff must show that

6    the trademark was infringed.  As to both the contributory

7    trademark infringement and vicarious trademark infringement

8    claims, the alleged infringement was by EATA.  To prove that

9    trademark infringement, Mr. Scholz must demonstrate by a

11:55 10    preponderance of the evidence that EATA's use of that mark was

11    likely to cause confusion as to the source or origin of EATA's

12    sound recordings or live performances, and that use actually

13    harmed plaintiff, Mr. Scholz.

14         Plaintiff must show that the use of the trademark was

15    likely to create confusion in the mind of a reasonably prudent

16    purchaser or user as to Mr. Scholz's role as the source or

17    origin of either EATA's sound recordings or its live

18    performances.  To determine whether there was such likelihood

19    of confusion, you may consider a number of factors, including

11:56 20    the similarity of the marks, the similarity of the goods, the

21    relationship between the parties' channels of trade, the

22    relationship between the parties' advertising, the classes of

23    prospective purchasers, evidence of actual confusion, the

24    intent in using the trademark, and the strength of the

25    trademark.  These factors are non-exclusive.  Not every factor

1    will necessarily be relevant.  No single factor is

2    determinative, and not all of the factors need to be found.

3    Your inquiry should be based upon the totality of the

4    circumstances.  It is not necessary to show that members of the

5    public were actually confused by the use of the trademark.

6    Evidence of actual confusion, if any, may be considered in

7    determining whether there was any likelihood of confusion.

8            To prove trademark infringement, Mr. Scholz must also

9    prove that he was harmed by the alleged infringement.  Harm

11:57 10    caused by the likelihood of confusion may be attributable to

11    the appropriation of the plaintiff's goodwill, for example,

12    reducing sales to the plaintiff, or the reduction in value of

13    the trademark by virtue of the association of the plaintiff

14    with the defendant.

15            In deciding whether Mr. Scholz has shown that there

16    was a likelihood of confusion, you may consider whether any use

17    of the trademark by EATA constituted fair use.  Fair use of a

18    trademark is shown if:

19            1.  The product or service must be one not readily

11:58 20    identifiable without use of the trademark;

21            2.  Only so much of the trademark may be used as is

22    reasonably necessary to identify the product or service, and;

23            3.  The user must do nothing that would, in

24    conjunction with the trademark, suggest sponsorship or

25    endorsement by the trademark holder.

1          If you find that the alleged use of the trademark was

2     fair use, then there has been no trademark infringement.

3          Jurors, this is not a copyright infringement case.

4     Mr. Scholz is not claiming that EATA infringed Mr. Scholz's

5     copyrights in his songs by playing those songs in concert.

6          Jurors, each of the parties brings a breach of the

7     implied covenant of good faith and fair dealing claim against

8     the other.  For his claim against Mr. Goudreau, Mr. Scholz must

9     show the elements of this claim by a preponderance of the

11:59 10   evidence.  For his counterclaim against Mr. Scholz,

11    Mr. Goudreau must show the elements of this claim by a

12    preponderance of the evidence.  The elements of this breach of

13    implied covenant of good faith and fair dealing claim and the

14    counterclaim are as follows:

15          1.  Existence of a contract between the parties;

16          2.  Breach of the implied covenant of good faith and

17    fair dealing inherent in that contract, and;

18          3.  Damage to the party bringing the claim or

19    counterclaim as a result of that breach.

11:59 20        Every contract, jurors, contains what is called an

21    implied covenant of good faith and fair dealing between the

22    parties to that contract.  That means that the law treats the

23    covenant of good faith and fair dealing to be in every contract

24    automatically, even if there are no words in the agreement that

25    expressly include the covenant.  The implied covenant of good

1    faith and fair dealing means that neither party may do anything

2    that will have the effect of destroying or injuring the right

3    of the other party to receive the benefits of the contract.

4    The implied covenant of good faith and fair dealing only

5    governs conduct of parties after they've entered into a

6    contract.  Without a contract, there is no covenant to be

7    breached.  There is no requirement that bad faith be shown;

8    instead, the plaintiff has to prove or the party bringing the

9    claim has the burden of proving a lack of good faith.  The lack

12:00 10    of good faith can be inferred from the totality of the

11    circumstances.  The scope of the covenant is only as broad as

12    the agreement.  The covenant does not supply terms that the

13    parties to the agreement are free to negotiate, nor does it

14    create rights or duties not otherwise provided for in the

15    contract.  If the party bringing the breach of the implied

16    covenant of good faith and fair dealing claim has failed to act

17    in good faith and has breached the implied covenant of good

18    faith and fair dealing, that party cannot recover for the

19    subsequent breach of contract or breach of the implied covenant

12:01 20    of good faith and fair dealing by the other party.

21        Because Mr. Scholz's breach of the implied covenant of

22    good faith and fair dealing claim is premised upon his

23    vicarious and contributory trademark infringement claims, if

24    you find against Mr. Scholz on these trademark claims, then his

25    breach of the implied covenant of good faith and fair dealing

1     fails as well.

2          The defendant, Mr. Goudreau, asserts two counterclaims

3     against the plaintiff, Mr. Scholz.  The first counterclaim is

4     for breach of the contract; namely, the 1983 Settlement

5     Agreement between the parties.  The second of Mr. Goudreau's

6     counterclaims is for Mr. Scholz's alleged breached of the

7     implied covenant of good faith and fair dealing in that 1983

8     Settlement Agreement.  As I've said before, just as Mr. Scholz

9     bears the burden of proving every element of his claim by a

12:02 10   preponderance of the evidence, Mr. Goudreau bears that same

11    burden as to every element of each of his two counterclaims.

12          As to the second counterclaim for breach of the

13    covenant of good faith and fair dealing, the same elements as I

14    just described in the prior instruction apply to Mr. Goudreau's

15    counterclaim against Mr. Scholz as they did for Mr. Scholz's

16    claim against Mr. Goudreau for the same, except that

17    Mr. Goudreau bears the burden of proving these claims by a

18    preponderance of the evidence.

19          As to the first counterclaim for breach of contract,

12:02 20   the defendant, Mr. Goudreau, must prove by a preponderance of

21    the evidence that:

22          1.  There is a valid and binding contract between the

23    parties;

24          2.  That the defendant performed his obligations under

25    the contract, or because the plaintiff's conduct is excused

1    from performance;

2            3.   That the plaintiff breached the contract, and;

3            4.   That the defendant suffered damages as a result of

4    that breach.

5            As to the first element, the parties do not dispute

6    that the 1983 Settlement Agreement was a valid and binding

7    contract.  As to the second element, the defendant must show

8    that he performed his own obligations under that agreement or,

9    alternatively, that because of the plaintiff's conduct,

12:03 10   defendant was excused from performing his obligation the under

11   the contract.  As to the third element, defendant must show

12   that the conduct of the plaintiff's breached or violated the

13   agreement and, as must be shown as to the fourth element, as a

14   result, defendant suffered damages.

15           I'm now going to turn to the issue of damages.

16           The plaintiff, Mr. Scholz, must also prove damages by

17   a preponderance of the evidence.  You will only reach the issue

18   of damages, jurors, if you find that the plaintiff has proven

19   his claims by a preponderance of the evidence.  As with all of

12:04 20   the other elements of those claims, the plaintiff bears the

21   burden of proving his damages by a preponderance of the

22   evidence.  In addition, the defendant, Mr. Goudreau, must also

23   prove damages by a preponderance of the evidence for his

24   counterclaims.  You will only reach the issue of damages if you

25   find that the defendant has proven his counterclaims by a

1    preponderance of the evidence.  As with all of the other

2    elements of those counterclaims, the defendant bears the burden

3    of proving his damages by a preponderance of the evidence.

4         The object of damages, jurors, is to try to restore

5    the person to the position that they would have been in had the

6    wrong not occurred.  The purpose is not to reward the plaintiff

7    on his claims or the defendant on his counterclaims, and not to

8    punish the defendant for plaintiff's claims or plaintiff on

9    defendant's counterclaims.  Damages are to be awarded to a

12:05 10  party as a fair and reasonable compensation for the legal wrong

11   done to him by the opposing party.

12        There is no special formula under the law to assess

13   the party's damage.  It is your obligation to assess what is

14   fair, adequate, and just.  You must use your wisdom and

15   judgment and your sense of basic justice to translate into

16   dollars the amount which you will fairly and reasonably

17   compensate the party for his injuries.  You must be guided by

18   your common sense and your conscience.  You are not permitted

19   to award speculative damages.  I'll now turn to the categories

12:05 20  of damages that you may consider in this case.

21        Jurors, if you find that the plaintiff, Mr. Scholz,

22   has proven his contributory trademark infringement claim or his

23   vicarious trademark infringement claim by a preponderance of

24   the evidence against the defendant, plaintiff is entitled to

25   lost profits if he further proves by a preponderance of the

1    evidence that such infringement was wilful or the parties were

2    in direct competition.

3          A showing that the infringement by the defendant was

4    willful requires a showing of conscious awareness of wrongdoing

5    by the defendant or, at least, objectively reckless conduct by

6    the defendant.  If, however, the plaintiff's and the

7    defendant's goods or services are in direct competition, no

8    showing of willfulness of the defendant's infringement is

9    required.  Direct competition in this context means that the

12:06  10  parties' goods or services are complete substitutes for the

11   other such that a sale by the defendant under the plaintiff's

12   trademark is almost automatically a lost sale by plaintiff.

13   Otherwise, plaintiff must make a showing that the defendant's

14   infringement was willful, as that term has been defined in this

15   instruction, to recover any lost profits on the trademark

16   infringement claims.

17          The plaintiff is entitled to any profits earned by the

18   defendant that are attributable to the infringement which the

19   plaintiff, Mr. Scholz, must prove by a preponderance of the

12:07  20  evidence.  You may not, however, include in any award of

21   profits any amount -- well, you may not include -- I'm going to

22   skip that, counsel.

23          Profit is determined by deducting all expenses from

24   gross revenue.  Gross revenue is all of the defendant's

25   receipts from using the trademark in the sale of his services.

 1    The plaintiff has the burden of proving a defendant's gross

 2    revenue by a preponderance of the evidence.  Expenses are all

 3    operating and production costs are all operating and production

 4    costs occurred in producing the gross revenue.  The defendant,

 5    Mr. Goudreau, has the burden of proving the expenses and the

 6    portions of the profit attributable to factors other than use

 7    of the infringed trademark by a preponderance of the evidence.

 8    If Mr. Goudreau proves that any portion of the profit from

 9    Mr. Goudreau's services is attributable to factors other than

12:08 10   the use of Mr. Scholz's trademark, you must deduct that amount

11    from the total profits to reach the profit attributable to that

12    infringement, if any.

13          If you award lost profits, you are only to award

14    Mr. Goudreau's profits.  Mr. Scholz is not entitled to recover

15    the profits of a non-party from Mr. Goudreau.

16          Jurors, this instruction applies to the breach of the

17    implied covenant of good faith and fair dealing claim asserted

18    by the plaintiff against the defendant and the defendant's two

19    counterclaims against the plaintiff for breach of contract and

12:09 20   breach of the implied covenant of good faith and fair dealing.

21    As to each, the party bringing the claim or counterclaim bears

22    the burden of proving his damages, if any, as to those claims.

23    The basic principle of contract damages, jurors, which applies

24    to the breach of the implied covenant of good faith and fair

25    dealing claims as well, is that the injured party should be put

1    in as good a position as if the other party had fully performed

2    its obligations under the contract.

3         Before the party may recover damages for a breach of

4    contract claim, he must prove that the breaching party's breach

5    caused him damages.  The party asserting the claim must

6    demonstrate that the damages complained of were caused by the

7    breaching party's conduct.  If the damages were caused by

8    someone other than the breaching party, the party asserting the

9    claim is not entitled to damages from the breaching party.

12:09 10        Jurors, if you determine that the injured party is

11   entitled to damages, in deciding the amount of damages, you may

12   not include any sum for interest.  The law automatically

13   provides for interest, and the clerk would later calculate that

14   if you made any damages determination.

15        In determining if any party is entitled to damages,

16   you should not consider any payment of attorney's fees.

17   Accordingly, computation of damages, if any, should not include

18   attorney's fees.

19        Any injured party has a duty of reasonable care and

12:10 20   diligence to avoid loss and to minimize damages.  The injured

21   party may not recover for losses that could have been prevented

22   by reasonable efforts on his part.

23        I'm happy to announce Part III, the final part, of my

24   jury charge.

25        You will soon begin deliberations.  Please listen to

1    these special instructions about those deliberations and

2    communications with me during your deliberations.

3            Jurors, when you retire, you will discuss the case

4    with the other jurors to reach agreement, if you can do so.  As

5    your first order of business, you should select a foreperson.

6    You should permit your foreperson to preside over your

7    deliberations, and your foreperson will speak for you here in

8    court.  Your verdict as to each count and claim must be

9    unanimous; that is, all of you must agree on the verdict.

12:11 10           Jurors, each of you must decide this case for

11   yourself, but you should do so only after considering all the

12   evidence, discussing it fully with the other jurors, and

13   listening to the views of the other jurors.

14           Do not be afraid to change your opinion if you think

15   you are wrong, but do not come to a decision simply because

16   other jurors think it is right.

17           It is important that you reach a verdict, if you can

18   do so conscientiously.  You should not hesitate to reconsider

19   your views from time to time and change them if you are

12:12 20   persuaded that this is appropriate.

21           It is important that you attempt to return a verdict,

22   but, of course, only if each of you can do so after having made

23   your own conscientious determination.  Do not surrender an

24   honest conviction as to the weight and the effect of the

25   evidence simply to reach a verdict.

1    I want to explain to you what I think counsel on both

2    sides referred to in their respective closings, this is what's

3    called the verdict form.  The verdict form is simply a written

4    notice of the decision you'll reach in this case.  In addition

5    to the hard copy of the charge I've read to you, you'll also

6    have a copy of this.

7        Let me just walk you through what it asks you to do.

8        It just has the case name and number on it.  It's

9    called a verdict form.  It's broken down into sections that

10   correspond to the three claims that are brought by the

11   plaintiff against the defendant and the two counterclaims that

12   the defendant brings back against the plaintiff.

13       Part I concerns the plaintiff's contributory trademark

14   infringement claims, and it asks you a series of questions.

15       First question:  Was the use of the trademark likely

16   to cause consumer confusion?

17       You'll see that this relates to the elements that were

18   listed for this claim in the jury charge.  It asks you to list

19   an answer, "yes" or "no."  Depending on what your answer is,

20   you'll see in italics after each question directions on what

21   you should do next.  So in regards to this question, and,

22   actually, each of questions 1 through 3 under Part I, if you

23   answer "yes," you proceed to the next question in the section.

24   If you answered "no," you're just going to skip the rest of the

25   questions in Part I and skip to Part II.  So that's true for

1    each of the three questions in Part I as to the contributory

2    trademark claim.

3         In Part II, this relates to Mr. Scholz's vicarious

4    trademark infringement claim against Mr. Goudreau, and again,

5    it asks you a series of questions.  And after each question,

6    again, it begins with:  Was the use of the trademark likely to

7    cause consumer confusion?  These will look familiar because

8    they relate to the elements, the disputed elements that are

9    listed in the jury charge that I read to you and that you'll

12:14 10    have.

11         After each question, again, it gives you directions

12    about what to do.  If you answer "yes" to 4, for example, you

13    go on to 5.  If you answered "no" to question 4 but you had

14    answered "yes" to all of the questions in Part I, meaning you

15    made a finding as to contributory trademark infringement but

16    had answered "no" here, you would proceed to the damages

17    question about infringement.  And if you answered "no" to this

18    question and "no" to any of the questions as to Part I, you

19    would skip ahead to Part IV.

12:15 20         You'll see similar instructions after 4, 5, 6, and 7

21    in Part II.

22         Question number 8 here, damages as to infringement

23    claim, as I explained in the jury charge, you'll only reach

24    this issue if you had answered "yes" to all of the questions in

25    Part I and/or all of the questions in Part II.  That is, you

1    only reach the damages issue if, obviously, you had found

2    infringement as to vicarious infringement or contributory

3    infringement, but not otherwise.

4         Part III is in regards to Mr. Scholz's implied

5    covenant of good faith and fair dealing claim.  As I instructed

6    you in the jury instructions, you'd only reach this claim if

7    you had found for Mr. Scholz on either the vicarious or the

8    contributory infringement claims or both.  Again, it asks you a

9    series of questions as to this breach claim, and, again, in

12:16 10   italics it gives you directions about which question to go to

11   next.

12        And then it asks if you were to find on that claim

13   what damages you would award, and that is question 11.

14        Part IV switches to Mr. Goudreau's counterclaims back

15   against Mr. Scholz.  It asks, again, a series of questions, and

16   it gives you directions in italics after each question about

17   where to go next.  It includes not just the questions about

18   each of the elements of those claims, but it also indicates, as

19   I think counsel may have alluded to, if you were to find a

12:17 20   breach, it also asks you if a date was established for that

21   breach.  That's true for the plaintiff's breach of the implied

22   covenant, too.

23        Part V relates to the last of the counterclaims,

24   Mr. Goudreau's implied covenant of good faith and fair dealing

25   claim.  It also asks a series of questions.

1       And question 17 relates to damages -- if you reach

2   this issue, again, you will only reach this issue if you found

3   for Mr. Goudreau on one or both of the counterclaims, and it

4   asks you a question about damages.

5       Final page is for your foreperson, after you've

6   completed this and agreed on a verdict, for your foreperson to

7   sign it and date it.

8       Jurors, after you've reached a unanimous agreement on

9   a verdict, your foreperson, as I indicated, will fill out this

12:17 10  form and sign it and will advise either Ms. Hourihan or the

11  court security officer outside of your door that you're ready

12  to return to the courtroom to deliver the verdict.

13      After you return to the courtroom, we'll direct you or

14  we'll direct the foreperson to deliver that verdict form to the

15  clerk for announcement in open court.

16      Jurors, if it becomes necessary during your

17  deliberations to communicate with me, you may send through the

18  court security officer a note signed by your foreperson or by

19  one or more members of the jury.  No member of the jury should

12:18 20  ever attempt to communicate with me on anything concerning the

21  case except by a signed writing, and I will communicate with

22  any member of the jury on anything concerning this case only in

23  writing or orally here in open court.  If you send out a

24  question, I'll consult with the parties as promptly as possible

25  before answering it, which may take some time.  You may

1    continue with your deliberations while waiting for the answer

2    to any question.

3           When you're communicating with me -- and this is

4    important -- please do not tell me or anyone else how the jury

5    stands numerically or toward which decision the jury is

6    leaning.

7           Jurors, one last time I need to consult with counsel

8    before we have you go up to begin your deliberations.

9           Counsel?

12:19 10    (At sidebar on the record.)

11           THE COURT:  Counsel, I just want to make one note for

12    the record that I think I indicated --

13           (Interruption.)

14           THE COURT:  On page 33, I didn't read the one line

15    that made reference to actual damages.  I think on the hard

16    copy, just so not as to change -- well, actually, we may be

17    able to take that out and not affect the pagination.  So I'm

18    going to take that out of the hard copy.  We can revise that on

19    the electronic version on the JERS as well.

12:20 20           There were a few -- I noticed one other thing, it was

21    just a typo that I read the right way --

22           (Pause.)

23           THE COURT:  On page 25, I read perspective as

24    prospective.  Counsel, I can't remember what it was on page 28

25    it was.  It's just something I read the correct way.

1           Oh, I know what it was.

2           Counsel, on page 28, I said there's no requirement

3    that bad faith be shown, instead the party -- I meant -- I read

4    party bringing the claim as opposed to plaintiff.

5           Okay.

6           Counsel, anything you need to say on the record?

7           MR. GREEN:  From the plaintiff's perspective, your

8    Honor, I think that you properly summarized all of our

9    exceptions when we had our conversation at 8:30, so I don't

12:22 10   have anything to add.

11          The only thing I think you didn't mention was the

12   agent of Mr. Boch.  But you do understand we take exception on

13   that.

14          THE COURT:  Yes, noted for the record.  Counsel, I did

15   consider that.

16          MS. STENGER:  Just one thing, your Honor, and I

17   haven't consulted Mr. Green on this.  I noticed you took out

18   the tort language that had been in there, the interest

19   instruction.  You said if you determine the injured party --

12:22 20        THE COURT:  I left it there purposefully because I was

21   trying to suggest it shouldn't apply to either side.

22   Meaning --

23          MR. GREEN:  That's fine, your Honor.

24          MR. GIVEN:  Your Honor, on that same point, when you

25   were describing Ernie and the Automatics, you left out LLC.

```
 1              THE COURT:  Oh, I thought I said it.
 2              MR. GIVEN:  I'm quite sure you did not.  That may be
 3    material to this.
 4              THE COURT:  Well, I think it's in the instruction.  I
 5    could have sworn I said it, but -- it's definitely in the
 6    instructions itself.
 7              MR. GIVEN:  I'll just say, again for the record, that
 8    at page 25, on the subject of actual confusion, I do think that
 9    the instruction at the end of the second full paragraph is
12:23 10    incomplete on the subject citing your own opinion, your Honor
11    in the Petco case.
12              And again --
13              THE COURT:  Noted.
14              MR. GIVEN:  And again, at page 30, again, renew the
15    objection that defendant must show that he performed his own
16    obligations under the 1983 agreement.  As I've said before,
17    your Honor has already determined that the defendant has
18    performed his obligations under that agreement, and we believe
19    an instruction reflecting that fact should be given to the
12:23 20    jury.
21              THE COURT:  Okay.
22              MR. GIVEN:  The only other thing --
23              THE COURT:  Noted for the record.
24              MR. GIVEN:  The only other thing I'll mention now, I
25    assume I'm preserving all the other objections as stated, is I
```

1    do think that a query on the subject of fair use is warranted

2    in this case.  There is case law directly on point on that, the

3    Building 19 case has fulsome discussion that it is an

4    affirmative defense.  We do bear the burden.  There should have

5    been an instruction on this and on fair use.

6              THE COURT:  My memory is, from looking at the case

7    law, it hasn't been necessarily decided by the 1st Circuit that

8    fair use is an affirmative defense.  I think it's appropriately

9    mentioned in the jury instruction.

12:24 10              MR. GREEN:  Thank you.

11              MR. GIVEN:  Thank you.

12              (End of discussion at sidebar.)

13              THE COURT:  Jurors, it's now time for the case to be

14    submitted to you.  As I said, I will give you a written copy of

15    the charge, and you'll also have a verdict form as well.  In

16    regards to the written charge, I want to caution you, however,

17    not to dwell on any one particular portion of the charge, if

18    you decide to review it at all, because you must consider these

19    instructions as a whole and not just one individual particular

12:25 20    instruction.

21              In a moment, you'll be able to begin your

22    deliberations.  All of you who make up the jury -- and that's

23    all eight of you -- should be together at all times when you

24    are deliberating.  Whenever you need a recess for any purpose,

25    your foreperson may declare a recess.  Do not discuss the case

1    during a recess in your deliberations.  All of your discussion

2    of the case should occur only when all of you are together and

3    the foreperson has indicated that deliberations may proceed.

4    This should be your procedure just so that everyone on the jury

5    will have an equal opportunity to participate in the

6    deliberations and hear all of what the other members of the

7    jury have to say.

8         You will also get -- in a moment, we'll get up to you

9    the hard copies of the exhibits.  You may have noticed the flat

12:25 10    screen television or what looks like a television on the jury

11    room wall.  That's essentially one large iPad.  It's an exhibit

12    display system.  If you -- I think it's on the lower right-hand

13    corner, if you press the button, it will run you through a very

14    quick tutorial.  But the exhibits have also been loaded onto

15    that system electronically.  It will allow all of you on the

16    jury to look at those exhibits together if you'd like to.  I

17    have also uploaded a copy of the jury charge along with the

18    jury form.  So, again, if you'd all like to look at any of

19    those items together, you may do so.

12:26 20         Jurors, the case is now yours for your deliberation,

21    and Ms. Hourihan will see you up to the jury room.

22         Thank you.

23         THE CLERK:  All rise.

24         (Jury left the courtroom.)

25         THE COURT:  Counsel, anything before we break?

1          MR. GREEN:  Nothing from the plaintiff, your Honor.

2          THE COURT:  I can't recall, have you certified the

3     exhibits yet?

4          MR. TARLOW:  That will be my task with, I believe --

5          MR. BAKER:  Judge, what's the Court's position on

6     leaving the building?

7          THE COURT:  Counsel, my thought is it's always hard to

8     know whether or not they're going to have questions and how

9     soon they'll have questions.  If you could stay close to the

12:27 10     courthouse and make sure that Ms. Hourihan has your cell phone

11     number --

12          MR. BAKER:  Okay.

13          THE COURT:  -- then, if any question comes up, she'll

14     promptly reach out to both sides, and we'll try to get

15     assembled as quickly as we can.

16          MR. BAKER:  We're five minutes away in a local office.

17          THE COURT:  That's fine.

18          Counsel, anything else either side?

19          MR. GREEN:  Nothing, your Honor.

12:27 20          THE COURT:  Counsel, there's a lot of passion on

21     either side of this case.  I appreciated your advocacy on both

22     sides, and it was a pleasure to preside.

23          MR. GIVEN:  Thank you, your Honor.

24          MR. TARLOW:  It was my first federal trial, your

25     Honor.  Thank you very much for a great experience.

         1              MR. GREEN:  Thank you for your service.

         2              THE COURT:  Welcome to our courtroom 11.

         3              (Judge left the bench.)

         4              (Discussion off the record.)

         5              MR. TARLOW:  Defendant, Barry Goudreau, certifies on

         6     the record that the exhibits are in order.

         7              MS. STENGER:  And I, on behalf of Donald Thomas

         8     Scholz, also so certify.

         9              (Discussion off the record.)

12:43  10              MS. STENGER:  Yes, all the exhibits have been loaded

        11     into the JERS system.

        12              MR. TARLOW:  Defendant Barry Goudreau also certifies

        13     that the JERS system is in order as well.

        14              (Recess taken from 12:43 p.m. to 4:29 p.m.)

        15              THE COURT:  Counsel, Ms. Hourihan is getting a jury.

        16     I'm sure she's informed you we have a verdict.

        17              MR. GREEN:  Yes, your Honor.

        18              (Jury entered the courtroom.)

        19              THE CLERK:  Members of the jury, please remain

04:29  20     standing.  All others may be seated.

        21              Mr. Foreman, members of the jury, have you reached a

        22     unanimous verdict?

        23              FOREPERSON:  Yes.

        24              THE CLERK:  You may be seated for a minute.

        25              (Pause.)

1          THE COURT:  It's in order and may be recorded.

2          Ms. Hourihan.

3          THE CLERK:  Members of the jury, please stand.

4          Mr. Foreman, members of the jury, harken to your

5     verdict as it is now recorded for the record.

6          In the case of Donald Thomas Scholz v. Barry Goudreau,

7     the verdict is as follows:

8          1.  Was the use of the trademark likely to cause

9     consumer confusion?

04:30 10          Answer:  No.

11          Part II:  Mr. Scholz's vicarious trademark

12     infringement claim against Mr. Goudreau.

13          4.  Was the use of the trademark likely to cause

14     consumer confusion?

15          Answer:  No.

16          That brings us to Part IV.

17          12.  Did defendant perform his obligations under the

18     contract or was excused from performance because of plaintiff's

19     conduct?

04:30 20          Answer:  No.

21          Part V.

22          Question 15.  Did plaintiff breach the implied

23     covenant of good faith and fair dealing inherent in the 1983

24     Settlement Agreement?

25          Answer:  No.

1          So say you, Mr. Foreman, so say you all members of the

2    jury, that you agree with the verdict as it was just recorded

3    for the record?

4          JURY:  Yes.

5          THE CLERK:  Thank you.  Please be seated.

6          THE COURT:  Thank you.

7          Mr. Green, any further inquiry?

8          MR. GREEN:  No, your Honor.

9          THE COURT:  Mr. Tarlow, Mr. Given, Mr. Baker?

04:31 10          MR. TARLOW:  No further inquiry.

11          THE COURT:  Jurors, thank you very much on behalf of

12    not just me and my behalf, but on behalf of the parties and

13    counsel in this case.  You were attentive throughout the case

14    and prompt each day.  We greatly appreciate it.  You are now

15    discharged from your duties.  You no longer have to follow my

16    instructions, but I want to thank you for your service in this

17    case.

18          I know it's late in the day, but if you have a moment

19    or two, I'd like to come up and thank you personally if you'd

04:31 20    like to stick around.  If you need to go, that's fine, too, but

21    I'll be up in a moment.

22          THE CLERK:  All rise for the jury.

23          (Jury left the courtroom.)

24          THE COURT:  Counsel, I want to thank you again.

25          Thank you, counsel.

1          MR. GREEN:  Thank you, your Honor, for all your time

2     and patience with us.  We appreciate it.

3          MR. TARLOW:  Thank you.

4          THE COURT:  Thank you.

5          (Court adjourned at 4:32 p.m.)

6               - - - - - - - - - - - -

7                    CERTIFICATION

8          I certify that the foregoing is a correct transcript

9     of the record of proceedings in the above-entitled matter to

10    the best of my skill and ability.

11

12

13

14    /s/Debra M. Joyce                June 8, 2017
      Debra M. Joyce, RMR, CRR, FCRR        Date
15    Official Court Reporter

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2

3   WITNESS                                                    PAGE

4

DONALD THOMAS SCHOLZ

5

    Direct Examination                                         15
6   By Mr. Green
    Cross-Examination                                          32
7   By Mr. Tarlow
    Redirect Examination                                       40
8   By Mr. Green

9   Jury Instruction Part I p. 41

10  Closing Argument by Mr. Green p. 55

11  Closing Argument by Mr. Baker p. 69

12  Rebuttal Argument by Mr. Green  p. 94

13  Jury Instructions Part II and III p. 102

14                             E X H I B I T S

15

16  Exhibit No.            Description                      Received

17

    66              Letter from Ms. Stenger to William         24
18                  Morris Agency

19

20

21

22

23

24

25